UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDITH SCHLAIN WINDSOR, in her capacity as Executor of the estate of THEA CLARA SPYER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | 10 Civ. 8435 (BSJ) (JCF)<br>ECF Case<br><br>AMENDED COMPLAINT |



## PRELIMINARY STATEMENT

1.      This is an action seeking a refund of the estate tax levied on a married same-sex couple, which would not have applied to a married straight couple, and which consequently violates the United States Constitution.

2.      Edith Schlain Windsor ("Edie") met her late spouse, Thea Clara Spyer ("Thea"), nearly a half-century ago at a restaurant in New York City. Edie and Thea went on to spend the rest of Thea's life living together in a loving and committed relationship in New York.

3.      After a wedding engagement that lasted more than forty years, and a life together that would be the envy of any couple, Thea and Edie were finally legally married in Toronto, Canada in 2007. Having spent virtually their entire lives caring for each other in sickness—including Thea's long, brave battle with multiple sclerosis—and in health, Thea and Edie were able to spend the last two years of Thea's life together as married.

4.      New York State legally recognizes Edie and Thea's marriage and provided them with the same status, responsibilities, and protections as other married people.  However, Edie and Thea were not considered "married" under federal law because of the operation of the statute known (ironically) as the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7.

5.      This clearly unequal treatment of Edie and Thea's marriage both demeans their remarkable commitment to one another and has great practical significance for the sole beneficiary of Thea's estate, Edie.  Under the Internal Revenue Code, the transfer of money or property from one spouse to another upon death generally does not trigger any estate tax at all.  Because of the operation of DOMA, however, the federal government does not consider Edie and Thea to have been married, and, as a result, more than $350,000 in federal estate tax was imposed on Thea's estate that would not otherwise have been imposed if Edie and Thea's marriage were recognized under federal law.

6.      In other words, the inheritance of the sole beneficiary of Thea's estate—Edie, Thea's surviving spouse—has been significantly reduced by the estate tax, unlike the inheritance of a widow who had been left everything by her deceased husband.  Edie, now 81 years old, faces the rest of her life without Thea, with shrunken retirement savings, and with the added insult of the federal government refusing to recognize the validity of her marriage, not to mention her forty-four-year committed relationship.

7.      Throughout the history of this country, whenever the federal government has attached protections or responsibilities to marriage, it has always

deferred to the states' determination of whether a couple is validly married. Since 1996, the federal government has deviated from that practice, but only for same-sex couples who marry.

8.      Accordingly, Edie Windsor, in her capacity as executor of Thea Spyer's estate, now brings this action to recover the federal estate tax that she, as executor, was forced to pay in violation of the Constitutional guarantee of equal protection of the law.

## JURISDICTION

9.      This action arises under the Constitution of the United States and the laws of the United States, including 26 U.S.C. § 7422. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(1).

## VENUE

10.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(e)(2), (3) and 1402(a)(1) because plaintiff Edith Schlain Windsor, the executor of Thea Clara Spyer's estate, resides in this judicial district, because Thea Spyer resided in this judicial district, because the estate of Thea Spyer was probated in this judicial district, and because the defendant is the United States of America.

## PARTIES

11.      Plaintiff Edith Schlain Windsor is a citizen of the United States. She resides in New York County, New York. Plaintiff is the executor of the estate of her late spouse, Thea Clara Spyer.

12.      Defendant United States of America is the proper defendant in an action seeking refund of any internal revenue tax pursuant to 26 U.S.C. § 7422(f)(1).

# FACTS

13.     Edie and Thea's life stories are in one sense remarkable for the extraordinary times through which they lived, and at the same time quite typical of the lives of gay men and lesbians of their generation, given the pervasive discrimination and homophobia that Edie and Thea encountered on a routine basis.  Yet despite obstacles nearly unimaginable today to the generations of gay men and lesbians who followed in their wake, Edie and Thea went on to live lives of great joy, full of dancing, love, and celebration.

## Thea Spyer's Background

14.     Thea Spyer was born in Amsterdam, The Netherlands on October 8, 1931.  Having lost her mother as an infant, Thea not only knew great sadness, but as a Jew witnessed first-hand the devastation wrought by Nazi Germany.  Thea was fortunate enough to be able to flee Amsterdam with her stepmother at the outbreak of the Second World War, thereby escaping the Holocaust.  They first went to England, where her father, a Dutch soldier, later joined them just as the Nazi troops were about to invade, and then to the United States, where they built a new life.

15.     Thea enrolled at Sarah Lawrence College, but was expelled when a campus security guard saw Thea and another woman kissing.  She subsequently enrolled in and received a bachelor's degree from The New School for Social Research.  Later, she obtained a master's degree in clinical psychology from the City University of New York and a Ph.D. in clinical psychology from Adelphi University.

16.     Upon receiving her doctorate, Thea interned at St. Vincent's Hospital and the Veterans Administration Hospital in New York City.  Afterwards, she

became Director of the Psychiatric Clinic at the International Center for the Disabled and then a Clinical Consultant in Rehabilitation at St. Vincent's Hospital, Westchester. For most of her career, she focused on her private practice as a clinical psychologist.

### Edie Windsor's Background

17.     Edie was born on June 20, 1929, in Philadelphia, Pennsylvania. Edie's parents struggled for financial security during the Great Depression, and her family lost its home when she was a child.

18.     Edie received a bachelor's degree from Temple University in 1950.

19.     In the early 1950s, Edie moved to New York City from Philadelphia. Shortly after arriving in New York, she decided to pursue graduate studies in mathematics. She obtained a master's degree in mathematics from New York University in 1957. Edie then joined International Business Machines Corp. ("IBM"), where she worked for sixteen years in senior technical and management positions related to systems architecture and implementation of operating systems and language processors. During her time at IBM, Edie spent two semesters studying applied mathematics at Harvard University on an IBM fellowship. In May 1968, she attained the title of Senior Systems Programmer, the highest technical position at IBM.

### Edie and Thea's Introduction

20.     Edie and Thea met in New York City in 1963, at a time when few gays or lesbians publicly identified as such. Lesbians and gay men then faced extensive prejudice, and their relationships were not afforded rights anywhere in the world. Police officers would often shut down bars and restaurants catering to gay men and lesbians, at

times physically beating and arresting the patrons.  The constant threat of disclosure and harassment forced gay people into an underground network, where they could socialize with other gay men and lesbians.

21.     Edie and Thea first met at Portofino, a restaurant in Greenwich Village, where it was comfortable for a lesbian clientele to go on Friday evenings.  Edie, who was working long hours at her job, decided to call an old friend and ask her to take her "to where the lesbians go."  At the restaurant, Edie was introduced to Thea. Although Edie and Thea were each there with other people, they danced together all night.  In fact, by the end of the evening, Edie had danced a hole through the bottom of one of her stockings.

22.     After that first night dancing together, Edie and Thea occasionally saw each other at parties over the next two years.  At these parties, they would start dancing, and their respective dates would stand frustrated on the side of the dance floor with their coats on, waiting for Edie and Thea to separate.

### Edie and Thea's Courtship and Engagement

23.     Edie and Thea did not forget about each other—that first night made a deep impression on them both.  Some two years later, in the late spring of 1965, Edie learned through mutual acquaintances that Thea would be spending Memorial Day weekend on the East End of Long Island.  Desperate to see Thea again, Edie asked some friends with a nearby house to let her stay with them for the weekend.  After she arrived at the house, Edie declined to go out with her friends that Friday night so she could wait for Thea to arrive.

24.     When her friends returned home later that evening, they told Edie that Thea was delayed at work in New York City and was not expected until the next day. Nervous but excited, Edie reconnected with Thea when she arrived that Saturday afternoon. As it turned out, there was nothing to be nervous about: from that moment on, Edie and Thea were inseparable.

25.     When Thea asked Edie that weekend what she wanted from her, Edie's response was simple: "Not much. I'd like to date for a year. And if that goes the way it is now, I think I'd like to be engaged, say for a year. And if it still feels this goofy joyous, I'd like us to spend the rest of our lives together." And they did. That weekend marked the start of a committed relationship of mutual love and support that would last for the next forty-four years.

26.     Two years later, Thea asked Edie to marry her, even though no state in the United States afforded legal recognition to same-sex couples, much less marriage rights, at that time. Thea feared that if Edie wore an engagement ring to work, her sexual orientation might be disclosed to her colleagues at her job at IBM, so Thea proposed to Edie with a circular diamond pin instead. With this brooch symbolizing their commitment, Edie and Thea began their very long engagement in 1967.

27.     Edie and Thea's choice not to wear traditional engagement rings was just one of many ways in which Edie and Thea had to mold their lives to make their relationship invisible. Both women faced pressures not only in the workplace and in society at large, but also from family and friends. It is worth noting that Edie and Thea were engaged *two years before* the Stonewall riots in June 1969 that led to the birth of the modern gay rights movement in the United States and around the world. Like

countless other same-sex couples. Edie and Thea engaged in a constant struggle to balance their love for one another and their desire to live openly and with dignity, on the one hand, with their fear of disapproval and discrimination from others, on the other.

### Edie and Thea's Life Together

28.     Edie and Thea's relationship blossomed rapidly.  They moved in to an apartment in Greenwich Village together six months after getting engaged.

29.     In 1968, Edie and Thea bought a small house together on Long Island.  It was just big enough for them to shower off the sand from the beach and change into clothes for dancing.  In that home, they spent the next forty summers, and it was the site of some of their happiest memories together.

30.     During their decades together, Thea and Edie lived a full life. They enjoyed travel and often took trips both in the United States and abroad.  Thea and Edie also loved to entertain frequently, and Thea, an accomplished cook, would prepare elaborate meals for their friends on holidays and at other times, including annual celebrations of their anniversary every Memorial Day weekend.

### Thea's Illness

31.     Twelve years into their relationship, Edie and Thea were confronted with what became the most serious challenge of their lives.  In 1977, at the age of forty-five, Thea was first diagnosed with Progressive Multiple Sclerosis, or MS, a chronic disease of the central nervous system that causes gradually worsening and irreversible neurological damage and paralysis.

32.     Despite the difficulties they faced following the diagnosis, Edie and Thea refused to give up on the life they had built together.  Thea reinvented herself

with each year of her increasing physical disability, working to maintain a life that was active and joyous. Edie committed herself to ensuring that their lives remained full of the passion they had felt when they first met. They even modified their dancing style, with Thea balancing herself on two canes to get to the dance floor and then dropping them to dance to the latest disco hit.

33.    Thea's MS caused a gradual, but ever-increasing paralysis. Edie nursed, encouraged and supported Thea as her disability grew ever more severe—first requiring a cane, then crutches, then a manual wheelchair, then a motorized wheelchair that Thea could operate with her remaining usable hand.

34.    When Thea could no longer swim, the couple installed special equipment to help Thea enter, exit and float in the pool at their Long Island house so that Thea could exercise and enjoy herself in the water, with Edie's assistance.

35.    When Thea started using a wheelchair, they adopted a new style of dancing. Edie would sit on Thea's lap as Thea maneuvered her electric wheelchair across the dance floor.

**The Journey Toward Marriage**

36.    As the years passed, Thea and Edie never gave up on their dream of getting married. In 1993, twenty-eight years into their relationship and sixteen years after Thea's diagnosis, New York City first began recognizing domestic partnerships between same-sex couples.

37.    Edie told Thea she wanted them to be one of the first couples to register as domestic partners in New York City. Thea, ever-dedicated to her private practice as a psychologist, told Edie that they would have to wait to register as domestic

partners because she had appointments with patients all day long.  Edie responded, "I have waited more than twenty-eight years for this day, and I am not waiting a single day more!"  Fortunately, Thea agreed, cleared her schedule for the day, and bought flowers for Edie before they proudly became one of the first couples registered as domestic partners in New York City.

38.     Notwithstanding their excitement, both women saw the limited rights and benefits afforded by domestic partnership, although a significant step forward, as no substitute for the institution of marriage.

39.     Although they had always hoped to marry in their home state of New York, Thea's worsening condition was a constant and grave reminder that they were running out of time.  After celebrating their fortieth anniversary together as a committed couple, they decided they could not wait for the law in New York to finally recognize the reality of their relationship.  They decided to seek civil marriage rights where they could get them.

**The Marriage**

40.     With six friends, including one who was a physician, Edie, then seventy-seven, and Thea, then seventy-five, traveled to Toronto, Canada, where they were legally married on May 22, 2007.  A copy of their wedding announcement, which was published in the *New York Times*, is attached as Exhibit A.

41.     Wanting to share their journey toward marriage and their love with the world, Edie and Thea agreed to be featured in the documentary film entitled "Edie & Thea:  A Very Long Engagement," which chronicled the couple's courtship, engagement and marriage.

42.     Edie and Thea's marriage is recognized as a valid marriage in
New York State. *See Martinez* v. *County of Monroe*, 850 N.Y.S.2d 740 (4th Dep't
2008); *see also In re May's Estate*, 114 N.E.2d 4, 7 (N.Y. 1953); Memorandum from
David Nocenti to Agency Counsel (May 14, 2008),
http://www.ny.gov/governor/reports/pdf/Nocenti_memo.pdf (the "Nocenti Memo");
*Golden* v. *Paterson*, 877 N.Y.S.2d 822 (N.Y. Sup. Ct. 2008) (rejecting challenge to
legality of Nocenti Memo).

43.     New York State recognizes marriages of same-sex couples as
valid in a multitude of ways.  The New York State Department of Civil Service, for
example, provides same-sex spouses access to all the benefits available under the New
York State Health Insurance Program.  *See Godfrey* v. *Spano*, 920 N.E.2d 328, 335–37
(N.Y. 2009) (upholding Civil Service Department's non-exclusive policy).  The New
York State Comptroller recognizes, for retirement benefit purposes, out-of-state
marriages between same-sex couples.  *See Godfrey* v. *DiNapoli*, 866 N.Y.S.2d 844
(N.Y. Sup. Ct. 2008) (upholding State Comptroller's non-exclusive policy).  The New
York State Insurance Department, in turn, has directed that all insurance companies
doing business in New York must extend insurance offered under state policies to same-
sex spouses on the same terms as to other married couples.  Circular Letter No. 27 (Nov.
21, 2008), http://www.ins.state.ny.us/circltr/2008/cl08_27.pdf.

44.     And New York courts recognize marriages between same-sex
couples performed outside New York, including for purposes of determining entitlement
to spousal health care benefits, *Martinez* v. *County of Monroe*, 850 N.Y.S.2d at 743
(holding that New York affords legal recognition to civil marriages that are lawful in

jurisdiction in which they are entered into, even if such marriage could not be entered into in New York); probating a will, *Matter of the Estate of Ranftle*, No. 4585-2008 (N.Y. Sur. Ct. Jan. 26, 2009) (holding that Canadian marriage to another person of same sex "is entitled to recognition in New York"); adoption and protecting parent-child relationships, *In re Adoption of Sebastian*, 879 N.Y.S.2d 677 (N.Y. Sur. Ct. 2009) (recognizing Dutch marriage between two women and declaring that legal parent-child relationship already exists by operation of law between both women and their child, but nonetheless entering redundant adoption order to ensure portability of parent-child rights in other jurisdictions).

45.     Thus, New York considered Thea and Edie as validly married.

### Thea's Final Years

46.     In 2002, Thea was diagnosed with another serious medical condition: aortic stenosis, or a narrowing of the aortic valve of the heart. This condition caused her to suffer a heart attack in 2002. Because of increasing paralysis resulting from her MS, Thea was not willing to undergo the lengthy hospitalization that would have resulted from surgery to fix the valve. The doctors told Edie and Thea that Thea did not have long to live.

47.     Thea long outlived her doctors' expectations. She spent the next five years receiving hospice care at home, moving from her apartment in Manhattan to their home on Long Island during the summer, all the time with Edie at her side providing love and support.

48.     Prior to her passing, Thea agonized over the financial burden that her death would impose on Edie.  Thea and Edie engaged in thorough financial planning to ensure that they would have enough money to live out their days comfortably.

49.     During the dramatic collapse of the financial markets in the fall of 2008, however, Thea was understandably panicked over how she and Edie would afford the high cost of her medical care, which they had to pay out-of-pocket since a significant portion of the costs were not covered.  They also were well aware of the huge lump-sum payment that Edie would have to make following Thea's death because of the federal estate tax and the fact that Edie would not benefit from the marital deduction as a result of DOMA.

50.     Although the film documenting Edie and Thea's lives was meant to focus only on their relationship and marriage, as Thea's illness became increasingly debilitating, Thea decided that she wanted posterity to see the realities of her MS and disability.  Thea therefore changed her mind and allowed the filmmakers to film Edie moving her in and out of her bed and the pool using a mechanical lift, as well as Edie arranging Thea's breathing apparatus as she did each night before Thea went to sleep.  Why was Thea comfortable showing strangers such intimate and potentially embarrassing details of her illness?  Because, as Thea explained, they were making a *documentary* and she wanted everyone to know that "s _ _ _ happens," and that marriage is about sharing the good times and the bad times with the person you love.  And Edie and Thea did exactly that.

51.    Edie and Thea were able to spend two years as a married couple before Thea succumbed to complications from her heart condition on February 5, 2009 and died.

52.    After Thea's passing, in the midst of her mourning, Edie was forced to attend to the financial burdens, including the federal estate tax, that accompanied Thea's death.

### Thea's Estate and the Estate Tax

53.    Thea's Last Will and Testament, dated September 7, 2004, was admitted to probate by the Surrogate's Court of New York County (Index No. 2009-1162), and Edie was appointed as executor of Thea's estate on April 24, 2009.

54.    In accordance with Article Third of Thea's Last Will and Testament, her executor is directed to distribute her entire estate to the TCS Revocable Trust created by Thea.

55.    In accordance with Article III of the trust agreement creating the TCS Revocable Trust, because Edie survived Thea, the trustees were directed to distribute the remaining trust property, after the payment of taxes and administration expenses, to the trustees of the ESW Revocable Trust created by Edie.  Edie is a trustee and sole beneficiary of the ESW Revocable Trust during her life, and she has the power, exercisable by her alone, to invade the trust property and to revoke the trust agreement in its entirety at any time.

56.    Because Thea's estate slightly exceeded the applicable exclusion amount set forth in 26 U.S.C. § 2010(c), Thea's estate was subject to federal estate tax.

57.     Under 26 U.S.C. § 2056(a), a decedent's estate is generally entitled to deduct the value of any interest in property which passes from the decedent to his or her surviving spouse.  Accordingly, property that passes from a decedent to a surviving spouse generally passes free of the federal estate tax.

58.     Congress passed this unlimited marital deduction in order to eliminate what the House Ways and Means Committee called the "widow's tax," which fell "most heavily on widows" who were "subject to estate taxes even though the property remains within the marital unit." H.R. Rep. No. 97-201, at 159 (1981).  The Committee explained that "an individual should be free to pass his entire estate to a surviving spouse without the imposition of any additional tax." *Id.*; *see also* S. Rep. No. 97-144, at 127 (1981).

59.     Ordinarily, whether a couple is married for purposes of applying the estate tax marital deduction depends on whether the couple is considered validly married under the law of their state. *Cf., e.g., Eccles* v. *Comm'r*, 19 T.C. 1049, 1051, 1053–54 (1953) (holding that "[m]arriage, its existence and dissolution, is particularly within the province of the states" and discussing in dicta that were the opposite rule to prevail, "problems of inconsistency with the language of the estate tax 'marital deduction' . . . immediately arise"), *aff'd mem.*, 208 F.2d 796 (4th Cir.); Rev. Rul. 58-66, 1958-1 C.B. 60, 60 ("The marital status of individuals as determined under state law is recognized in the administration of the Federal income tax laws."); Rev. Rul 29, 1953-1 C.B. 67, 67 (deferring to New York State's recognition of validity of marriage).

### The Defense of Marriage Act

60.     Although the estate tax marital deduction applies on its face to all lawfully married couples, same-sex couples alone are denied its benefits by operation of DOMA.  DOMA provides, in relevant part, that "[i]n determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." 1 U.S.C. § 7.

61.     Solely because of the operation of DOMA, the Internal Revenue Service ("IRS") has determined that the estate of a decedent whose surviving spouse is a person of the same sex as the decedent is not entitled to the marital deduction under 26 U.S.C. § 2056(a).

62.     As a direct result of DOMA's unconstitutional exclusion of same-sex spouses from the benefits of the estate tax marital deduction, $363,053.00 in federal estate tax was imposed on Thea's estate.

63.     There can be no dispute that if "Thea" were instead "Theo," her estate would have passed for the benefit of Edie tax-free.  Solely because Edie and Thea were both women, Thea's estate was denied the marital deduction.

64.     In addition to the estate tax burden described above, DOMA has placed other burdens on Edie, including preventing her from being eligible for a Social Security lump-sum death benefit that would be payable to her as a surviving spouse, *see* 42 U.S.C. § 402(i), and Social Security widow's insurance benefits, *see id.* § 402(e).

Edie has applied for these benefits from the Social Security Administration, and if she is denied those benefits based on DOMA, she will move to amend her complaint to add claims that DOMA violates the United States Constitution by preventing recognition of her marriage for purposes of these programs.

65.     Despite the sweeping impact of DOMA, the federal government does not have a rational basis for, much less a compelling interest in, enforcing this statute.  According to the House of Representatives Report on DOMA, H.R. Rep. No. 104-664 (1996), Congress put forward four rationales for treating an individual married to a person of the same sex differently from an individual married to a person of a different sex.  All of them are irrational.

66.     First, Congress claimed that DOMA advances the government's interest in defending and nurturing the institution of traditional heterosexual marriage. *Id.* at 12.  This so-called rationale simply restates the government's intent to discriminate against same-sex couples and provides no independent justification for the government's discriminatory action.  By failing to recognize Thea and Edie's marriage, the federal government does nothing to "nurture" the institution of marriage; rather, it minimizes and denigrates a loving, committed relationship that should serve as a model for all couples, whether homosexual or heterosexual.

67.     Like the first rationale, Congress's second justification for DOMA, advancing the government's interest in defending traditional notions of morality, *id.* at 15, is yet another form of discrimination cloaked in the rhetoric of government interest.  Discrimination for its own sake is not a legitimate government interest.

17

68.     Congress claimed, as its third rationale, that DOMA advances the government's interest in protecting state sovereignty and democratic self-governance. *Id.* at 16.  Yet DOMA hinders rather than protects state sovereignty, because it refuses to respect state sovereign decisions regarding what marriages to recognize.  Before the passage of DOMA, states such as New York determined the marital status of their citizens, and the federal government deferred to a state's determination of marriage in the application of federal law.  DOMA, rather than enhancing state sovereignty, actually diminishes states' autonomy.

69.     The federal government's final rationale for enacting DOMA is that the law advances the government's interest in preserving scarce government resources.  *Id.* at 18.  However, according to the Congressional Budget Office, the recognition of the marriages of same-sex couples will increase annual net federal revenue rather than deplete "scarce government resources."  Cong. Budget Office, U.S. Cong., *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* 1 (June 21, 2004), http://www.cbo.gov/ftpdocs/55xx/doc5559/06-21-SameSexMarriage.pdf.

## PROCEDURAL HISTORY AND STANDING

70.     Thea Spyer died on February 5, 2009.

71.     Edie, in her capacity as executor of Thea's estate, filed an Application for Extension of Time to File a Return and/or Pay U.S. Estate (and Generation-Skipping Transfer) Taxes (Form 4768) with the IRS on October 28, 2009.

72.     On November 5, 2009, Edie, in her capacity as executor of Thea's estate, made an advance payment of the estate's federal estate tax to the U.S. Treasury in the amount of $520,000.00.

73.     On January 28, 2010, Edie, in her capacity as executor of Thea's estate, filed a United States Estate (and Generation-Skipping Transfer) Tax Return (Form 706) with the IRS, which showed that $363,053.00 was due in federal estate tax, $156,947.00 less than the advance payment made in November 2009.

74.     Schedule M (Bequests, etc., to Surviving Spouse) of the estate's United States Estate (and Generation-Skipping Transfer) Tax Return explained that, although the decedent was married at the time of her death and the decedent's entire estate passed for the benefit of her surviving spouse, the estate was not claiming the marital deduction authorized by 26 U.S.C. § 2056(a) because of the operation of DOMA.

75.     In March, 2010, the U.S. Treasury issued a refund to the estate in the amount of $156,947.00, representing the overpayment of federal estate tax by the estate in November 2009.

76.     For federal tax purposes, an individual is married if she or he is married under local law. *See* Rev. Rul. 58-66, 1958-1 C.B. 60 (recognizing common law marriages for tax purposes). Consistent with this authority, Edie, in her capacity as executor of Thea's estate, filed a Claim for Refund and Request for Abatement (Form 843) and a Disclosure Statement (Form 8275) with the IRS on April 7, 2010, stating that Edie and Thea were lawfully married in Toronto, that New York State recognizes that marriage under local law, that DOMA unconstitutionally discriminates on the basis of sexual orientation, and, as a result, that Thea's estate is entitled to the marital deduction and to a refund in the amount of $363,053.00. In the Disclosure Statement, Edie, in her capacity as executor of Thea's estate, explained that DOMA is unconstitutional.

77.     On May 26, 2010, the IRS notified Edie, in her capacity as executor of Thea's estate, that it disallowed the estate's claim for a refund on the grounds that "[s]ince both spouses were women and since under DOMA '. . . the words [sic] "spouse" refers only to a person of the opposite sex who is a husband or a wife', Section 2056 is inapplicable because the surviving spouse is not a spouse as defined by DOMA."

78.     As a result of this disallowance, and solely because of the existence and operation of DOMA, the estate has suffered specific and concrete financial harms.  Specifically, the disallowance has forced the executor of Thea's estate to pay $363,053.00 more in federal estate tax than would be paid by the executor of a similarly situated estate of a decedent with a spouse of the opposite sex, thereby reducing the inheritance of the beneficiary of Thea's estate by $363,053.00.

79.     Under 26 U.S.C. § 7422(a), "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected . . . until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof."  26 U.S.C. § 7422(a).

80.     Under 26 U.S.C. § 6532(a)(1), "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time, nor after the expiration of 2 years from the date of mailing by certified mail or registered

mail by the Secretary to the taxpayer of a notice of the disallowance of the part of the claim to which the suit or proceeding relates." 26 U.S.C. § 6532(a)(1).

81.     As set forth above, the plaintiff has satisfied all of the prerequisites to bring this action required by 26 U.S.C. §§ 7422(a) and 6532(a).

## CAUSE OF ACTION

82.     The plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

83.     This is an action for the recovery of federal estate tax erroneously or illegally assessed and collected.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(1).  This action also arises under 26 U.S.C. § 7422.  The defendant is the United States of America.

84.     As a direct result of DOMA, the federal government treats legally married same-sex couples in New York differently than heterosexual married couples in New York, and because of this disparity in treatment, the estate of Thea Spyer owed, and the executor of the estate paid, $363,053.00 more in federal estate tax than that of a similarly situated heterosexual decedent.  Because the federal government defers to New York's determination of who is married for all married couples in New York except married same-sex couples, DOMA discriminates on the basis of sexual orientation.

85.     Because DOMA, as applied by the IRS, requires this disparity of treatment with regard to Thea Spyer's estate, it creates a classification that singles out one class of valid marriages—those of same-sex couples—and subjects persons in those marriages to differential treatment compared to other similarly situated couples without

justification in violation of the right of equal protection secured by the Fifth Amendment to the Constitution of the United States.

### PRAYERS FOR RELIEF

WHEREFORE, the plaintiff prays that this Court:

1.   Declare DOMA, 1 U.S.C. § 7, unconstitutional as applied to the plaintiff, Edith Schlain Windsor, in her capacity as executor of the estate of Thea Clara Spyer.

2.   Enjoin the defendant from continuing to discriminate against the plaintiff by treating the estate of Thea Clara Spyer differently from similarly situated estates of decedents married to persons of the opposite sex.

3.   Award the plaintiff judgment in the amount of $363,053.00, plus interest and costs as allowed by law, and such other relief as the Court may deem just, including an award of reasonable litigation costs incurred in this proceeding pursuant to 26 U.S.C. § 7430 and an award of reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412.

4.      Grant such other and further relief as the Court may deem

equitable and proper.

Dated: New York, New York
            February 2, 2011

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Roberta A. Kaplan, Esq.
Andrew J. Ehrlich, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
rkaplan@paulweiss.com
aehrlich@paulweiss.com

- and -

James D. Esseks, Esq.
Rose A. Saxe, Esq.
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street
New York, New York 10004-2400
(212) 549-2500
jesseks@aclu.org
rsaxe@aclu.org

- and -

Alexis Karteron, Esq.
Arthur Eisenberg, Esq.
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
aeisenberg@nyclu.org
akarteron@nyclu.org

*Attorneys for Plaintiff Edith Schlain Windsor, in her
capacity as Executor of the Estate of Thea Clara
Spyer*

23

# EXHIBIT A

The New York Times

# Weddings/Celebrations

## Thea Spyer and Edith Windsor

Published May 27 2007

Thea Clara Spyer and Edith Schlain Windsor were married in Toronto on Tuesday. Justice Harvey Brownstone of the North Toronto Family Court officiated at the Sheraton Gateway Hotel.



V. Moraweck

Dr. Spyer (above, left) is 75. She is a clinical psychologist with a private practice in Manhattan. She graduated from the New School for Social Research and received a master's degree in clinical psychology from City University of New York and a Ph.D. in that subject from Adelphi. Dr. Spyer is the daughter of the late Elisabeth Ketellapper and the late Willem Spyer, who lived in Amsterdam.

Ms. Windsor, 77, who is retired, worked in New York as a computer systems consultant for I.B.M. She was a board member of Social Services and Advocacy for Gay, Lesbian, Bisexual and Transgender Elders, also known as SAGE, from 1985 to 1987 and from 2004 to 2006. She graduated from Temple University and received a master's degree in mathematics from New York University. Ms. Windsor, whose previous marriage ended in divorce, is a daughter of the late Celia and James D. Schlain, who lived in Philadelphia.

Dr. Spyer and Ms. Windsor met in 1965 in New York at Portofino, a restaurant in the West Village.

"Everyone lived in the closet," Ms. Windsor said of lesbian life in New York in the 1960s. "The only place to go was bars, and they were rough."

Adjourning to a friend's apartment that night, Dr. Spyer and Ms. Windsor danced until the impromptu party ended, finally "dancing with our coats on, and other people

standing at the door, annoyed, waiting for us," Ms. Windsor recalled, adding, "She was smarter than hell, beautiful — and sexy."

Dr. Spyer recalled of Ms. Windsor that night, "We danced so much and so intensely that she danced a hole through her stockings."

It was not until two years later, during a Memorial Day weekend in the Hamptons, that the two women again encountered each other, and both happened to be uninvolved.

"I heard she would be there, and called friends who had a house, and begged them, 'Please can I come out,' " Ms. Windsor said. "Then I waited at a house where I knew she would drop by."

Dr. Spyer, who has become a quadriplegic as a result of advanced multiple sclerosis, said of the weekend, and her time spent with Ms. Windsor: "It was a feeling of complete delight in being with her. I had a real sense of 'I've *landed* in my life.' "

That was 40 years ago.

Dr. Spyer had the help of three aides who traveled with her to Canada to officially marry Ms. Windsor, ending an engagement that began in 1967.

AFFIDAVIT OF SERVICE BY FIRST CLASS MAIL

STATE OF NEW YORK   )
                           ) ss.:
COUNTY OF NEW YORK )

AUSTIN K. WILKINSON, being duly sworn, deposes and says:

     1. I am not a party to this action, am over 18 years of age and am employed by

Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New

York, New York 10019.

     2. On February 2, 2011, I served a true copy of the AMENDED COMPLAINT on the

following:

Jean Lin<br>
U.S. Department of Justice<br>
Civil Division<br>
20 Massachusetts Ave., N.W., 7th Fl.<br>
Washington, DC 20530

     3. I made such service by personally enclosing a true copy of the aforementioned

document in properly addressed prepaid wrapper and depositing it into an official

depository under the exclusive custody and care of the United States Postal Service,

within the State of New York.

_____
Austin K. Wilkinson

Sworn to before me this
2ND day of February, 2011

_____
Notary Public

ALEX SOUZA
Notary Public, State of New York
No. 01SO6199477
Qualified in New York County
Commission Expires January 12, 2013