UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDITH SCHLAIN WINDSOR, in her capacity as Executor of the estate of THEA CLARA SPYER,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES OF AMERICA,<br><br>    Defendant. | 10 Civ. 8435 (BSJ) (JCF)<br>ECF Case |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
Roberta A. Kaplan, Esq.
Andrew J. Ehrlich, Esq.
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
rkaplan@paulweiss.com
aehrlich@paulweiss.com

AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
James D. Esseks, Esq.
Rose A. Saxe, Esq.
125 Broad Street
New York, NY 10004
(212) 549-2500
jesseks@aclu.org
rsaxe@aclu.org

NEW YORK CIVIL LIBERTIES UNION
 FOUNDATION
Melissa Goodman, Esq.
Alexis Karteron, Esq.
Arthur Eisenberg, Esq.
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
mgoodman@nyclu.org
akarteron@nyclu.org
aeisenberg@nyclu.org

*Attorneys for Plaintiff Edith Schlain Windsor*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................... 3

ARGUMENT ........................................................................................................ 9

I.      THE APPLICABLE STANDARD ............................................................... 9

II.     DOMA IS SUBJECT TO AND CANNOT SURVIVE  STRICT OR
INTERMEDIATE SCRUTINY ...................................................................10

      A.     Sexual Orientation Discrimination Requires Strict or Intermediate
Scrutiny .........................................................................................11

           1.    Lesbians and Gay Men Have Suffered a History of
Discrimination ...............................................................13

           2.    Sexual Orientation Has No Bearing on Ability to
Participate in or Contribute to Society ...........................16

           3.    Sexual Orientation Is a Core Part of Individual Identity and
Is Immutable .................................................................17

           4.    Lesbians and Gay Men Lack Political Power .................20

      B.     DOMA Is neither Narrowly Tailored to Serve Any Compelling
Government Interest nor Substantially Related to an Important
Government Interest .......................................................................23

           1.    DOMA Does Not Satisfy Either the Strict or Intermediate
Scrutiny Standard ..........................................................23

           2.    All of Congress's Justifications for DOMA Fail ...........24

                 a)    Preserving "Traditional" Marriage Is Not a
Compelling or Important Government Interest ...............25

                 b)    DOMA Does Not Promote Heterosexuality ...................26

                 c)    DOMA Does Not Promote Responsible Procreation
or Child-Rearing .............................................................26

                 d)    DOMA Undermines Democratic Self-Governance .........28

e) DOMA Does Not Conserve Resources .......................... 29

f) "Moral Disapproval" Is Not a Compelling or
Important Government Interest ....................................... 30

III. EVEN UNDER RATIONAL BASIS REVIEW, DOMA IS
UNCONSTITUTIONAL .................................................................. 31

A. The Applicable Standard ..................................................... 32

B. Congress's 1996 Justifications for DOMA Fail Rational Basis
Review ................................................................................. 33

C. No Other Rational Basis for DOMA Can Be Asserted ........... 37

IV. BAKER v. NELSON IS NEITHER CONTROLLING NOR PERSUASIVE
AUTHORITY ................................................................................. 40

CONCLUSION ....................................................................................... 43

## TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Able* v. *United States*,
    968 F. Supp. 850 (E.D.N.Y. 1997) .................................................................12, 19

*Able* v. *United States*,
    155 F.3d 628 (2d Cir. 1998) ..................................................................... 12, 13, 19

*Adarand Constructors, Inc.* v. *Peña*,
    515 U.S. 200 (1995).......................................................................... 10, 20, 23

*Ake* v. *Wilson*,
    354 F. Supp. 2d 1298 (M.D. Fla. 2005) ...................................................33

*Alexander* v. *Cahill*,
    598 F.3d 79 (2d Cir. 2010)...................................................................41

*Alma Society, Inc.* v. *Mellon*,
    601 F.2d 1225 (2d Cir. 1979) ...............................................................23

*Baker* v. *Nelson*,
    191 N.W.2d 185 (Minn. 1971) ..............................................................41

*Baker* v. *Nelson*,
    409 U.S. 810 (1972).......................................................................40, 41

*In re Balas*,
    No. 2:11-BK-17831 (TD), 2011 WL 2312169 (Bankr. C.D. Cal. June 13, 2011) .......3, 33

*Board of Trustees of the University of Alabama* v. *Garrett*,
    531 U.S. 356 (2001)............................................................................32

*Beard* v. *Banks*,
    548 U.S. 521 (2006)............................................................................ 9

*Bowen* v. *Gilliard*,
    483 U.S. 587 (1987)........................................................................12, 20

*Bush* v. *Vera*,
    517 U.S. 952 (1996)...........................................................................41

*Christian Legal Society Chapter of the University of California, Hastings College
    of the Law* v. *Martinez*,
    130 S. Ct. 2971 (2010)....................................................................11, 18

*City of Cleburne* v. *Cleburne Living Center*,
    473 U.S. 432 (1985)....................................................................passim

*Clark* v. *Jeter*,
   486 U.S. 456 (1988)...................................................................................23

*Dean* v. *District of Columbia*,
   653 A.2d 307 (D.C. 1995).........................................................................14

*Dragovich* v. *United States Department of the Treasury*,
   No. 10-01564 (CW), 2011 WL 175502 (N.D. Cal. Jan. 18, 2011) ............... 30, 33, 35

*Estate of Goldwater* v. *Commissioner of Internal Revenue*,
   539 F.2d 878 (2d Cir. 1976) ..................................................................... 7

*In re Estate of Ranftle*,
   81 A.D.3d 566 (1st Dep't 2011) ................................................................ 6

*Frontiero* v. *Richardson*,
   411 U.S. 677 (1973).................................................................. 12, 15, 16, 21

*Gill* v. *Office of Personnel Management*,
   699 F. Supp. 2d 374 (D. Mass. 2010) ..............................................passim

*In re Golinski*,
   587 F.3d 901 (9th Cir. 2009).................................................................... 3

*Goodridge* v. *Department of Public Health*,
   798 N.E.2d 941 (Mass. 2003)...................................................................25

*Graham* v. *Richardson*,
   403 U.S. 365 (1971)............................................................................18, 30

*Green Party of Connecticut* v. *Garfield*,
   616 F.3d 213 (2d Cir. 2010) .....................................................................41

*Hernandez-Montiel* v. *Immigration and Naturalization Service*
   225 F.3d 1084 (9th Cir. 2000)...................................................................19

*High Tech Gays* v. *Defense Industrial Security Clearance Office*,
   909 F.2d 375 (9th Cir. 1990).....................................................................21

*Illinois Board of Elections* v. *Socialist Workers Party*,
   440 U.S. 173 (1979)..................................................................................41

*Johnson* v. *Robison*,
   415 U.S. 361 (1974)..................................................................................12

*In re Kandu*,
   315 B.R. 123 (W.D. Wa. 2004)..............................................................33, 42

*Kerrigan* v. *Commissioner of Public Health*,
    957 A.2d 407 (Conn. 2008)........................................................................passim

*Kimel* v. *Florida Board of Regents*,
    528 U.S. 62 (2000)..................................................................................17

*Lamprecht* v. *Federal Communications Commission*,
    958 F.2d 382 (D.C. Cir. 1992) ...............................................................14

*Lawrence* v. *Texas*,
    539 U.S. 558 (2003) ...............................................................................passim

*In re Levenson*,
    587 F.3d 925 (9th Cir. 2009)...................................................................passim

*Lofton* v. *Secretary of the Department of Children and Family Services*,
    358 F.3d 804 (11th Cir. 2004)................................................................13

*Log Cabin Republicans* v. *United States*,
    716 F. Supp. 2d 884 (C.D. Cal. 2010) ...................................................22

*Loper* v. *New York City Police Department*,
    999 F.2d 699 (2d Cir. 1993) .................................................................. 9

*Lyng* v. *Castillo*,
    477 U.S. 635 (1986)................................................................................12

*Mandel* v. *Bradley*,
    432 U.S. 173 (1977).............................................................................. 41

*In re Marriage Cases*,
    183 P.3d 384 (Cal. 2008) ...............................................................12, 14, 19

*In the Matter of the Marriage of J.B. and H.B.*,
    326 S.W.3d 654 (Tex. App. 2010) .........................................................41

*Martinez* v. *County of Monroe*,
    850 N.Y.S.2d 740 (4th Dep't 2008) ....................................................... 7

*Massachusetts Board of Retirement* v. *Murgia*,
    427 U.S. 307 (1976)........................................................................ 12, 13, 18

*Matthews* v. *Lucas*,
    427 U.S. 495 (1976) ...............................................................................12

*Morse* v. *Republican Party of Virginia*,
    517 U.S. 186 (1996)................................................................................41

*Myers* v. *County of Orange*,
   157 F.3d 66 (2d Cir. 1998)..............................................................32

*Neill* v. *Gibson*,
   278 F.3d 1044 (10th Cir. 2001) ....................................................13

*Parham* v. *Hughes*,
   441 U.S. 347 (1979)........................................................................17

*Pedersen* v. *Office of Personnel Management*,
   No. 3:10-cv-1750 (VLB) (D. Conn.) ...................................... 9

*Perry* v. *Schwarzenegger*,
   704 F. Supp. 2d 921 (N.D. Cal. 2010) ......................................11, 13, 14

*Plyler* v. *Doe*,
   457 U.S. 202 (1982)................................................................passim

*Rinaldi* v. *Yeager*,
   384 U.S. 305 (1966)........................................................................32

*Romer* v. *Evans*,
   517 U.S. 620 (1996)................................................................passim

*Rowland* v. *Mad River Local School District*,
   470 U.S. 1009 (1985)......................................................................13

*San Antonio Independent School District* v. *Rodriguez*,
   411 U.S. 1 (1973) .................................................................12, 18, 21

*Shapiro* v. *Thompson*,
   394 U.S. 618 (1969).........................................................................30

*Sharif* v. *New York State Education Department*,
   709 F. Supp. 345 (S.D.N.Y. 1989) .............................................32

*Shaw* v. *Hunt*,
   517 U.S. 899 (1996).........................................................................23

*Smelt* v. *County of Orange*,
   374 F. Supp. 2d 861 (C.D. Cal. 2005) ...............................33, 42

*Tester* v. *City of New York*,
   No. 95 Civ. 7972 (LMM), 1997 WL 81662 (S.D.N.Y. Feb. 25, 1997)....................13

*United States Department of Agriculture* v. *Moreno*,
   413 U.S. 528 (1973)........................................................................31

*United States* v. *Brennan*,
   No. 08-5171-cv (L), 2011 WL 1679850 (2d Cir. May 5, 2011) ...............................23

*United States* v. *Carolene Products Company*,
   304 U.S. 144 (1938)........................................................................................11, 21

*United States* v. *Virginia*,
   518 U.S. 515 (1996).........................................................................................passim

*Varnum* v. *Brien*,
   763 N.W.2d 862 (Iowa 2009)................................................................. 14, 19, 25

*Watkins* v. *United States Army*,
   875 F.2d 699 (9th Cir. 1989)..................................................................... 13, 19

*Williams* v. *Illinois*,
   399 U.S. 235 (1970)..................................................................................................25

*Witt* v. *United States Department of the Air Force*,
   739 F. Supp. 2d 1308 (W.D. Wash. 2010)..............................................................22

**STATUTES**

Defense of Marriage Act ("DOMA"), Section 3, 1 U.S.C. § 7 (2006) ....................passim

26 U.S.C. § 2010(c) (Supp. 2010)........................................................................ 7

26 U.S.C. § 2056(a) (2006)................................................................................... 7

**OTHER AUTHORITIES**

Cong. Budget Off., U.S. Cong., *The Potential Budgetary Impact of Recognizing
   Same-Sex Marriages* 1 (June 21, 2004) ...........................................................29, 35

*Defense of Marriage Act: Hearing on H.R. 3396 Before the Subcomm. on the
   Const. of the H. Comm. on the Judiciary*, 104th Cong. 1 (1996)..............................27

Fed. R. Civ. P. 56(a) ...................................................................................... 9

Fifth Amendment to the United States Constitution ...............................................1, 8, 29

H.R. Rep. No. 104-664 (1996)...................................................................................24, 30

H.R. Rep. No. 97-201 (1981)....................................................................................... 7

Rev. Rul. 58-66, 1958-1 C.B. 60................................................................................ 7

S. Rep. No. 97-144 (1981).......................................................................................... 7

Plaintiff Edith Schlain Windsor respectfully submits this memorandum of law in support of her motion for summary judgment.

## PRELIMINARY STATEMENT

Edith Schlain Windsor, or Edie, is the sole executor of the estate of her late spouse, Thea Clara Spyer.  Prior to Thea's death in February 2009, Edie and Thea spent over four decades together in a loving, committed union.  At the beginning of their relationship, in 1965, neither Thea nor Edie imagined that they would have the opportunity to legally marry.  But Edie and Thea had the courage and self-respect to get engaged and, after an engagement that lasted more than forty years, Edie and Thea were finally wed in May 2007.

Sadly, Edie and Thea were able to spend less than two years as a married couple before Thea passed away at the age of 77.  Then, while grieving the loss of the love of her life, Edie also had to face the injustice of the federal government's refusal to recognize her marriage.  Under Section 3 of the Defense of Marriage Act, or DOMA, which requires the federal government to disregard marriages that are valid under state law if they are not between one man and one woman, the federal government treated Edie and Thea as if they were legal strangers.

Because of DOMA, the federal government imposed more than $363,000 in federal estate tax on Thea's estate, significantly reducing Edie's inheritance.  Yet, if "Thea" were instead "Theo," her estate would have passed to Edie tax-free.  For Edie and Thea, the "tax" for being gay exceeded $363,000.

This disparate treatment violates Edie's right to the equal protection of the laws that is guaranteed by the Fifth Amendment to the United States Constitution.

Indeed, because of the patent nature of this constitutional violation, the President of the United States and his Department of Justice have declined to defend this lawsuit.

DOMA is a sweeping statute that rewrites over one thousand federal laws and overturns the federal government's long-standing practice of deferring to state determinations of marital status. Throughout the history of this country, the federal government has never married people, leaving that to the states. The federal government nevertheless has attached 1,138 different protections or responsibilities to marriage, and has always deferred to the states' determinations of whether a couple is validly married, despite significant variation in marriage laws from state to state. That practice changed in 1996, when, following a decision from the Hawaii Supreme Court which Congress feared would lead to same sex-couples actually having the opportunity to marry, the federal government explicitly differentiated among valid state marriages, and pre-emptively refused recognition of the otherwise valid marriages of gay and lesbian couples for all federal purposes. Since DOMA's passage fifteen years ago, five states and the District of Columbia now allow same-sex couples to marry, and several other states, including New York, recognize marriages of same-sex couples performed elsewhere. Yet, the federal government continues to denigrate these state-approved marriages through DOMA's exclusion of these marriages from all federal protections and obligations.

At its core, this case presents a straightforward question of constitutional law: Should the government be permitted to levy a substantial estate tax upon Edie Windsor simply because, as a lesbian, she was married to a woman, instead of a man? That it has taken until the second decade of the twenty-first century for the Attorney

General of the United States and several other federal courts[1] to see the obvious impermissibility of such blatant discrimination under the United State Constitution speaks, we respectfully contend, more to the lingering legacy of stereotypes and prejudice than it does to the difficulty of the constitutional principles at issue.  As Justice Kennedy so presciently observed in the landmark case of *Lawrence* v. *Texas*:  "[T]hose who drew and ratified the [Constitution] . . . knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress.  As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."  539 U.S. 558, 578 (2003).

## FACTUAL AND PROCEDURAL BACKGROUND

Before the modern gay rights movement began, at a time when lesbians and gay men faced dangerous prejudice if they disclosed their sexual orientation, Edie Windsor and Thea Spyer met, fell in love, and began a committed relationship that would last until Thea's death, forty-four years later.

Edie and Thea's Engagement & Marriage

Edie and Thea first met in 1963 at a restaurant in Greenwich Village which was one of the few places in New York City accepting of lesbian and gay clientele. Affidavit of Edith Schlain Windsor ("Windsor Aff.") ¶ 5.  Edie, who was working long hours at her job at IBM as one of the first software programmers, called an old friend and asked her to take her "where the lesbians go."  *Id.*  The night they met, Edie and Thea

---

[1]   *See* Letter of Att'y Gen. Holder to Speaker Boehner of the U.S. House of Rep. (Feb. 23, 2011) [hereinafter Holder Letter]; *Gill* v. *Office of Pers. Mgmt.*, 699 F. Supp. 2d 374 (D. Mass. 2010); *In re Levenson*, 587 F.3d 925 (9th Cir. 2009) (Reinhardt, J.); *In re Golinski*, 587 F.3d 901 (9th Cir. 2009) (Kozinski, J.); *In re Balas*, No. 2:11-BK-17831 (TD), 2011 WL 2312169 (Bankr. C.D. Cal. June 13, 2011).

spent the whole time dancing together; by the end of the evening, Edie had danced a hole through the bottom of her stockings.  *Id.*

After a few chance encounters over the next two years, Edie begged friends for a place to stay on the East End of Long Island for Memorial Day weekend to ensure that she would see Thea, who was renting a place there for the summer.  *Id.* ¶¶ 6–7.  When they met again that weekend and Thea asked Edie what she wanted from her, Edie's response was simple:  "Not much.  I'd like to date for a year.  And if that goes the way it is now, I think I'd like to be engaged, say for a year.  And if it still feels this goofy joyous, I'd like us to spend the rest of our lives together."  *Id.* ¶ 9.  And so began a committed relationship that lasted for the next forty-four years.

Thea and Edie's life together was full of joy and passion.  *Id.* ¶ 14.  They traveled in the United States and abroad, and entertained frequently.  *Id.*  Thea, a clinical psychologist and an accomplished cook, would prepare elaborate meals for their friends on holidays and at other times, including annual celebrations of their anniversary every Memorial Day weekend.  *Id.*  They grew closer together as a couple, and they independently thrived professionally and personally.  *Id.*  And, of course, they continued to dance.  *Id.* ¶¶ 16, 19.

In 1967, there was no legal recognition for same-sex couples in the United States and little hope for immediate change.  *Id.* ¶ 10.  Even so, after having been together for two years, Thea asked Edie to marry her.  *Id.*  Of course, they knew that they could not legally marry.  *Id.*  They also faced tremendous pressure—as did all lesbians and gay men at that time—to conceal their relationship from their co-workers, society, and their family and friends, for fear of insult and discrimination.  *Id.* ¶ 11.  For example,

instead of an engagement ring, Thea gave Edie a circular diamond pin to signify their commitment to one another, because a ring would have been hard to explain to others. *Id.* ¶ 10.  Six months later, they moved together into a Greenwich Village apartment.  *Id.* ¶ 12.  In 1968, they bought a small summer cottage on Long Island, which was where they spent many of their happiest moments, and where Edie cared for Thea in her final years.  *Id.* ¶¶ 13, 16.

In 1993, when New York City began registering domestic partnerships, Edie and Thea were one of the first couples to register—they were the eightieth couple to receive such recognition.  *Id.* ¶¶ 21–22.  Although Thea had appointments with patients scheduled all day long, Edie had little patience, prompting, "I have waited more than twenty-eight years for this day, and I am not waiting a single day more!"  *Id.* ¶ 22.  That was all it took.  Thea cleared her schedule and bought flowers.  *Id.*  While they were elated to have some recognition after such a long time together, the limited protections and obligations of a New York City domestic partnership were no substitute for marriage.  *Id.* ¶ 23.

Over the years, health problems began to plague Thea and, indirectly, Edie.  *Id.* ¶¶ 15–20.  In 1977, twelve years after their relationship began, Thea was diagnosed with Progressive Multiple Sclerosis, or MS, a chronic disease of the central nervous system that causes gradually worsening and irreversible neurological damage and paralysis.  *Id.* ¶ 15.  But Edie and Thea refused to give up on the life they had built together.  *Id.* ¶ 16.  Thea reinvented herself with each year of her increasing physical disability, working to maintain a life that was full and active.  *Id.*  Edie committed herself to ensuring that their lives remained full of joy and passionate commitment.  *Id.*  Edie

5

nursed, encouraged, and supported Thea as her disability caused ever-increasing paralysis—first requiring a cane, then crutches, then a manual wheelchair, then a motorized wheelchair that Thea could operate with her remaining usable hand. *Id.* ¶ 17.

In 2002, Thea suffered a heart attack and was diagnosed with another serious medical condition, aortic stenosis, the narrowing of the aortic valve of the heart. *Id.* ¶ 24. Because of the near complete paralysis that had resulted from her MS, Thea was not willing to undergo the lengthy hospitalization that would have resulted from surgery to fix the valve. *Id.* The doctors told Edie and Thea that Thea did not have long to live. *Id.*

In 2007, as Thea's condition worsened, it was clear that Thea would not live long enough for them to have the opportunity to marry in New York. *Id.* ¶ 25. Thus, with a physician and other friends, Thea, then 75, and Edie, then 77, traveled to Toronto, Canada, and were married on May 22, 2007. *Id.* ¶ 26. They spent two difficult, but loving years together as a married couple before Thea died on February 5, 2009. *Id.* ¶ 28. After Thea's passing, Edie was hospitalized with stress cardiomyopathy, an ailment commonly known as "broken heart syndrome," which has caused serious, irreversible damages to her heart. *Id.* ¶¶ 29.

<u>Thea's Estate and the Burdens of DOMA</u>

After Thea died, her Last Will and Testament, dated September 7, 2004, was admitted to probate by the Surrogate's Court of New York County (Index No. 2009-1162), and Edie was appointed as executor of Thea's estate on April 24, 2009. *Id.* ¶ 30. Thea's estate passed for Edie's benefit. *Id.* ¶¶ 31–32.

Under New York's marriage recognition rule, Edie and Thea's legal Canadian marriage is recognized as valid in New York. *See In re Estate of Ranfile*, 81

A.D.3d 566 (1st Dep't 2011) (recognizing validity under New York law, for purposes of probating will, of Canadian marriage of same-sex couple); *Martinez* v. *Cnty. of Monroe*, 850 N.Y.S.2d 740 (4th Dep't 2008).   Solely because of the operation of DOMA, however, the federal government does not recognize their marriage, as New York State does.   Consequently, because Thea's taxable estate and adjusted taxable gifts exceeded the applicable exclusion amount set forth in 26 U.S.C. § 2010(c) (Supp. 2010), a federal estate tax was imposed on Thea's estate that would not otherwise have been imposed if Edie and Thea's marriage were recognized under federal law.

More specifically, under 26 U.S.C. § 2056(a), property that passes from a decedent to a surviving spouse generally passes free of any federal estate tax.   Congress enacted this unlimited marital deduction three decades ago to eliminate what the House Ways and Means Committee called the "widow's tax," which fell "most heavily on widows" who were "subject to estate taxes even though the property remains within the marital unit."   H.R. Rep. No. 97-201, at 159 (1981).   In justifying the unlimited deduction, the Committee explained that "an individual should be free to pass his entire estate to a surviving spouse without the imposition of any additional tax."   *Id.*; *see also* S. Rep. No. 97-144, at 127 (1981).

Ordinarily, whether a couple is married for purposes of applying the estate tax marital deduction depends on whether the couple is considered validly married under the law of the state of decedent's domicile at the time of death.   *See, e.g.*, *Estate of Goldwater* v. *Comm'r*, 539 F.2d 878 (2d Cir. 1976) (relying on New York law to determine status of "surviving spouse" for purposes of estate tax marital deduction), *cert. denied sub nom.*, *Lipkowitz* v. *Comm'r*, 429 U.S. 1023 (1976); *cf.* Rev. Rul. 58-66, 1958-

1 C.B. 60, 60 ("The marital status of individuals as determined under state law is recognized in the administration of the Federal income tax laws.").  Although the estate tax marital deduction applies on its face to all lawfully married couples, married same-sex couples alone are denied its protections because, pursuant to DOMA, the federal government refuses to recognize their marriages.  More specifically, Section 3 of DOMA provides, in relevant part, that "[i]n determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."  1 U.S.C. § 7.

As a direct result of the federal government's unconstitutional exclusion of same-sex surviving spouses from the protections of the estate tax marital deduction, $363,053.00 in federal estate tax was imposed on Thea's estate, which Edie paid in her capacity as executor of Thea's estate.

The Instant Lawsuit

On November 9, 2010, Edie filed this lawsuit, seeking a refund of the federal estate tax levied on and paid by Thea's estate and a declaration that Section 3 of DOMA violates the equal protection guarantee secured by the Fifth Amendment to the United States Constitution.

On February 23, 2011, after having carefully considered the constitutionality of Section 3 of DOMA, the President and the Attorney General announced that they had determined that heightened scrutiny is the appropriate standard of review for government classifications based on sexual orientation and that, under that

standard, Section 3 of DOMA is unconstitutional.  As the Attorney General explained in his letter to Congress:

> [T]he legislative record underlying DOMA's passage contains discussion and debate that undermines any defense under heightened scrutiny.  The record contains numerous expressions reflecting moral disapproval of gays and lesbians and their intimate and family relationships— precisely the kind of stereotype-based thinking and animus the Equal Protection Clause is designed to guard against.

Holder Letter, at 4.  Accordingly, the Executive Branch decided to stop defending DOMA in this case, as well as in a companion case filed in the District of Connecticut, *Pedersen* v. *Off. Pers. Mgmt.*, No. 3:10-cv-1750 (D. Conn.).

Following that announcement, on April 18, 2011, the Bipartisan Legal Advisory Group of the U.S. House of Representatives, or BLAG, moved to intervene for the limited purpose of defending the constitutionality of Section 3 of DOMA.  On May 11, 2011, the Court established a discovery and briefing schedule.  BLAG's motion to intervene was granted on June 2, 2011.

## ARGUMENT

## I.

## THE APPLICABLE STANDARD

Summary judgment is appropriate where the pleadings, the discovery materials, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Beard* v. *Banks*, 548 U.S. 521, 529, 534 (2006) (granting summary judgment in constitutional challenge);  *Loper* v. *New York City Police Dep't*, 999 F.2d 699 (2d Cir. 1993) (affirming summary judgment entered by district court declaring state statute unconstitutional).

Since it is undisputed that Edie has been injured by virtue of having to pay a $363,000 estate tax, the only issue in this case is whether her injury violates the Constitution's equal protection guarantee.  To overcome summary judgment under strict scrutiny, BLAG must persuade this Court that there is a genuine issue of material fact as to whether Section 3 of DOMA is narrowly tailored to further a compelling government interest.  *See Adarand Constructors, Inc.* v. *Peña*, 515 U.S. 200, 227 (1995).  Alternatively, under the more lenient rational basis test, BLAG must, at the very least, demonstrate that there is a dispute of fact as to whether Section 3 rationally advances a legitimate government purpose.  *See City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

Because, as demonstrated below, BLAG cannot come close to satisfying either of these standards to justify the overt discrimination that occurred here, the Court should grant summary judgment for Plaintiff.

## II.

## DOMA IS SUBJECT TO AND CANNOT SURVIVE STRICT OR INTERMEDIATE SCRUTINY

DOMA classifies legally married couples into two distinct groups—married straight couples, and married gay couples—and subjects the latter to disparate treatment by, among other things, denying them over 1,000 federal protections and obligations.  Never before, or since, has the federal government categorically disregarded state determinations of who is validly married and substituted its own definition.  Accordingly, to defend DOMA, BLAG must justify DOMA's discriminatory treatment of

10

married same-sex couples, which is a departure from the government's long-standing practice of deferring to state definitions of marriage.[2]

As the Supreme Court clearly has recognized, treating lesbians and gay men differently than straight people is sexual orientation discrimination. *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law* v. *Martinez* ("*CLS*"), 130 S. Ct. 2971, 2990 (2010). Because DOMA is discriminatory federal legislation directed at an historically and politically marginalized class of people based on an immutable characteristic irrelevant to their ability to contribute to society, the Constitution requires DOMA be subjected to strict, or at the very least, intermediate scrutiny. As the President and Attorney General have already concluded, DOMA cannot survive such searching review. (Nor can DOMA survive even rational basis review, as Part III, *infra*, demonstrates.)

**A.     Sexual Orientation Discrimination Requires Strict or Intermediate Scrutiny**

Most legislative classifications come with a presumption of constitutionality, and the courts generally "will not presume that any given legislative action . . . is rooted in considerations that the Constitution will not tolerate." *City of Cleburne*, 473 U.S. at 446. Certain kinds of classifications, however, carry a particularly high risk of improper use in the legislative process, and are therefore treated as "suspect" or "quasi-suspect." *Cf. United States* v. *Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938).

---

[2]     The issue here is thus different from *Perry* v. *Schwarzenegger*, 704 F. Supp. 2d 921 (N.D. Cal. 2010), and other cases seeking the freedom to marry for same-sex couples. The only question at issue in this case is what possible justification the government might have for singling out and disregarding one group of valid marriages for all federal purposes.

In a long line of cases, the Supreme Court has developed a test for determining whether a legislative classification should be treated with this kind of suspicion and subjected to heightened scrutiny.[3]   Under this test, the essential criteria are that:  "(1) the group has suffered a history of invidious discrimination; and (2) the characteristics that distinguish the group's members bear no relation to their ability to perform or contribute to society."  *Kerrigan* v. *Comm'r of Pub. Health*, 957 A.2d 407, 426 (Conn. 2008) (explaining U.S. Supreme Court's jurisprudence) (internal citations and quotation marks omitted); *see also*, *e.g.*, *Mass. Bd. of Ret.* v. *Murgia*, 427 U.S. 307, 313 (1976) (per curiam); *United States* v. *Virginia*, 518 U.S. 515, 532–33 (1996).   In assessing whether a group is subject to strict or intermediate scrutiny, courts sometimes also consider whether the characteristic that defines the group is immutable or "so integral an aspect of one's identity [that] it is not appropriate to require a person to repudiate or change [it] . . . in order to avoid discriminatory treatment," *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008); *see also Able* v. *United States*, 968 F. Supp. 850, 863–64 (E.D.N.Y. 1997), *rev'd on other grounds*, 155 F.3d 628, 632 (2d Cir. 1998), and whether the group is a minority or comparatively politically powerless, *Bowen* v. *Gilliard*, 483 U.S. 587, 602–03 (1987); *City of Cleburne*, 473 U.S. at 442–46.

---

[3]   *See, e.g.*, *San Antonio Indep. Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 28 (1973) (wealth); *Frontiero* v. *Richardson*, 411 U.S. 677, 684–88 (1973) (plurality opinion) (sex); *Johnson* v. *Robison*, 415 U.S. 361, 375 n.14 (1974) (conscientious objectors); *Mass. Bd. of Ret.* v. *Murgia*, 427 U.S. 307, 313 (1976) (per curium) (age);  *Matthews* v. *Lucas*, 427 U.S. 495, 505–06 (illegitimacy) (1976); *City of Cleburne*, 473 U.S. at 440–41 (mental disability); *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986) (close relatives).

No single factor is dispositive. *Murgia*, 427 U.S. at 321 (internal quotation marks omitted). Instead, the existence of any one of these factors can serve as a warning sign that a particular classification "provides no sensible ground for differential treatment," *City of Cleburne*, 473 U.S. at 440, or is "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective," *Plyler* v. *Doe*, 457 U.S. 202, 216 n.14 (1982).

Neither the Supreme Court nor the Second Circuit has yet articulated the level of scrutiny that should apply to laws like DOMA that discriminate based on sexual orientation.[4] However, it is plain that "gays and lesbians are the type of minority strict scrutiny was designed to protect." *Perry* v. *Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D. Cal. 2010) (citing *Murgia*, 427 U.S. at 313). At the very least, intermediate scrutiny should apply to such laws. *See Virginia*, 518 U.S. at 573–74; *Kerrigan*, 957 A.2d at 426 (listing factors for quasi-suspect status).

### 1.   Lesbians and Gay Men Have Suffered a History of Discrimination

The long history of purposeful discrimination that lesbians and gay men have suffered at the hands of both governmental and private actors is both painfully clear and undisputed in this case. To our knowledge, no court has ever found to the contrary. *See Rowland* v. *Mad River Local Sch. Dist.*, 470 U.S. 1009, 1014–15 (1985) (Brennan &

---

[4]   *See Able* v. *United States*, 155 F.3d 628, 632 (2d Cir. 1998); *Tester* v. *City of New York*, No. 95 Civ. 7972 (LMM), 1997 WL 81662, at *5 (S.D.N.Y. Feb. 25, 1997); Holder Letter at 1. Although several courts of appeal have declined to find that sexual orientation classifications are suspect or quasi-suspect, many of these decisions rest on previous circuit precedent or on pre-*Lawrence* cases. *See, e.g.*, *Lofton* v. *Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 n.16 (11th Cir. 2004) (citing ten cases, all decided before *Lawrence*, that denied heightened scrutiny to laws that classify based on sexual orientation).

Marshall, JJ., dissenting from denial of writ of certiorari).[5]   This extensive history of discrimination suggests that any legislative burdens placed on lesbians and gay men "are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective." *Plyler*, 457 U.S. at 216 n.14.

As set forth in the expert affidavit of Professor George Chauncey, in early colonial America, being identified as an individual who had same-sex sexual relations could endanger one's life:  the strong influence of Puritanism led to the execution of several men for the crime of sodomy.   Expert Affidavit of George Chauncey, Ph.D. ("Chauncey Aff.") ¶ 19.[6]   Well into the twentieth century, the medical community condemned homosexuality as a "mental defect" or "disease."   *Id.* ¶¶ 26–27.   This ostensibly scientific view (now rejected) helped legitimize much anti-gay bias.   *Id.*   The early twentieth century also saw the passage of state and local laws directed at preventing lesbians and gay men from gathering together.   *Id.* ¶¶ 29, 36–38.

---

[5]   *See also Neill* v. *Gibson*, 278 F.3d 1044, 1065–67 (10th Cir. 2001) (Lucero, J., dissenting); *Watkins* v. *U.S. Army*, 875 F2d 699, 724 (9th Cir. 1989) (Norris, J., concurring); *Perry*, 704 F. Supp. 2d at 996; *Varnum* v. *Brien*, 763 N.W.2d 862, 889–90 (Iowa 2009); *In re Marriage Cases*, 183 P.3d at 442; *Kerrigan*, 957 A.2d at 434; *Dean* v. *Dist. of Columbia*, 653 A.2d 307, 344–45 (D.C. 1995) (Ferren, J., dissenting in part); Expert Affidavit of George Chauncey, Ph.D. ¶¶ 10–55, 65–86, 90–103; Holder Letter at 2.

[6]   It is appropriate for the Court to consider the parties' expert affidavits and the factual record in this case because district courts are empowered to make findings of fact as to constitutional questions.   *Lamprecht* v. *FCC*, 958 F.2d 382, 392 (D.C. Cir. 1992) (Thomas, J.) ("We know of no support . . . for the proposition that if the constitutionality of a statute depends in part on the existence of certain facts, a court may not review a legislature's judgment that the facts exist.   If a legislature could make a statute constitutional simply by 'finding' that black is white or freedom, slavery, judicial review would be an elaborate farce. At least since *Marbury v. Madison* . . . that has not been the law.").

In the domain of federal service, despite the pressing need for soldiers, the military systematically attempted to screen out lesbians and gay men from the armed forces during World War II, and to discharge and deny benefits to those soldiers who were "discovered" later. *See id.* ¶¶ 39–41. Such discrimination was not limited to the military. All federal agencies were prohibited from hiring lesbians and gay men after the war (a ban that lasted until 1975), and the federal government engaged in far-reaching surveillance and investigation to identify and purge supposed "homosexuals" from the federal civil service. *See id.* ¶¶ 42–50. With such blatant official discrimination, it is no surprise that lesbians and gay men were demonized by the media through the 1950s and 1960s. *See id.* ¶¶ 51–55.

The slightest advancement for civil rights for lesbians and gay men has been met with vicious anti-gay backlash. *See id.* ¶¶ 66–68; Expert Affidavit of Gary Segura, Ph.D. ("Segura Aff.") ¶¶ 35–44. Campaigns have spread false stereotypes of lesbians and gay men as child molesters, unfit parents, and threats to heterosexuals— stereotypes that linger to this day. *See* Chauncey Aff. ¶¶ 68–86. Unfortunately, discrimination against lesbians and gay men is not a historical relic. Indeed, until judicial intervention in 2003, states were able to "demean [lesbians' and gay men's] existence or control their destiny by making their private sexual conduct a crime." *Lawrence*, 539 U.S. at 578. To this day, lesbians and gay men are subjected to continued opprobrium from leading political and religious figures and the ever-present threat of anti-gay violence. Chauncey Aff. ¶¶ 91–102. The Supreme Court has long recognized that such an extensive history of discrimination supports the application of heightened scrutiny.

*See, e.g.*, *Virginia*, 518 U.S. at 531–32 (noting the "long and unfortunate history of sex discrimination") (quoting *Frontiero* v. *Richardson*, 411 U.S. 677, 684 (1973)).

In short, it is difficult to imagine how BLAG, or indeed anyone else, could seriously dispute the history of discrimination suffered by gay men and lesbians.

### 2.     Sexual Orientation Has No Bearing on Ability to Participate in or Contribute to Society

Classifications based on a "characteristic" that "frequently bears no relation to ability to perform or contribute to society" further reinforce the need for heightened scrutiny because such classifications are rarely a legitimate basis for government decisionmaking. *Frontiero*, 411 U.S. at 686; *accord Plyler*, 457 U.S. at 216 n.14 ("Classifications treated as suspect tend to be irrelevant to any proper legislative goal."); *City of Cleburne*, 473 U.S. at 440–41 (noting that classifications that do not "rest[] on meaningful considerations" require heightened scrutiny).

As Plaintiff's uncontradicted expert observes, a person's sexual orientation is not correlated with any "'impairment in judgment, stability, reliability, or general social and vocational capabilities.'"  Expert Affidavit of Letitia Anne Peplau, Ph.D ("Peplau Aff.") ¶ 30 (quoting Am. Psychiatric Ass'n, *Position Statement on Homosexuality and Civil Rights*, 60 Am. J. Psychiatry 436, 497 (1974)).  Indeed, "[b]eing gay or lesbian has no inherent association with a person's ability to participate in or contribute to society."  Peplau Aff. ¶ 29.  Obviously, few if any people today would seriously contend that an individual's ability to be a judge, a lawyer, a doctor, a scientist, or even a software programmer is in any way affected by the fact that he or she is heterosexual, gay, or lesbian.  The only people who might take that position are those who still view homosexuality as a mental disorder, but the medical profession rejected

that conclusion almost forty years ago.  Peplau Aff. ¶ 30 (citing Gregory M. Herek & Linda D. Garnets, *Sexual Orientation and Mental Health*, 3 Ann. Rev. Clinical Psycol. 353, 354 (2007)); *cf. City of Cleburne*, 473 U.S. at 442–43  (holding that classifications based on disabilities are not suspect because mental and physical disabilities are relevant to a person's ability to participate in society).

In light of the overwhelming and undisputed record, it is clear that sexual orientation bears no relation to an individual's ability to perform or contribute to society. Sexual orientation thus plainly satisfies the two essential heightened scrutiny factors.

### 3. Sexual Orientation Is a Core Part of Individual Identity and Is Immutable

In addition to the two essential heightened scrutiny factors discussed above, sexual orientation classifications also satisfy the alternative factor of immutability. It is well-settled that legislation should not burden individuals on the basis of a core trait that they cannot or should not have to change, which provides another reason for courts to look more closely at laws that do impose such burdens.  *Cf. Parham* v. *Hughes*, 441 U.S. 347, 353 (1979) ("Unlike the illegitimate child for whom the status of illegitimacy is involuntary and immutable . . . .").  By contrast, where the characteristic is something that changes over time for most people, there is less reason for courts to be concerned, because legislation drawing lines based on that characteristic could potentially burden all individuals equally.  *See, e.g.*, *Kimel* v. *Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000) (reaffirming that age is not suspect classification under Equal Protection Clause because all people will experience old age if they live out their normal life spans).[7]

---

[7]  Moreover, it is now clear for constitutional purposes that laws that discriminate based on sexual orientation, such as Section 3 of DOMA, cannot be excused or justified

To the extent immutability is relevant, the Supreme Court also has recognized that a defining characteristic need not be absolutely unchangeable for it to form the basis of a suspect classification.   *See, e.g.*, *Graham* v. *Richardson*, 403 U.S. 365, 375–76 (1971) (classifications based on alienage subject to strict scrutiny); *see also City of Cleburne*, 473 U.S. at 442–43 & n.10 (relevance of immutability).[8]  After all, few if any of the suspect classifications identified by the Supreme Court are truly "immutable" in the strictest sense of the word—people can convert religions, aliens can become naturalized, individuals can change their sex, and some people can "pass" or even modify outward signs of their race or national origin.   Nonetheless, all of these classifications have been deemed "immutable" in the heightened scrutiny analysis.

Applying these principles here, there is, as the Attorney General has recognized, "a growing scientific consensus [that] accepts that sexual orientation is a characteristic that is immutable."  Holder Letter at 3; *see also* Peplau Aff. ¶¶ 19–28.  Like the history of discrimination or the ability to contribute to society, few people today

---

merely as discrimination against certain conduct.  *See Lawrence*, 539 U.S. at 575 ("When homosexual *conduct* is made criminal by law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination . . . ." (emphasis added)); *accord id.* at 583 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual.  Under such circumstances, Texas' sodomy law is targeted at more than conduct.  It is instead directed toward gay persons as a class.").  The Supreme Court has reaffirmed since *Lawrence* that, with regard to sexual orientation and same-sex intimacy, "[o]ur decisions have declined to distinguish between status and conduct in this context."  *CLS*, 130 S. Ct. at 2990.  Thus, under the law, lesbians and gay men cannot be denied fair treatment on the grounds that there is some meaningful distinction that can be drawn between "being gay" and "engaging in homosexual conduct."

[8]   *See also Murgia*, 427 U.S. at 313 (not listing "immutability" as requirement for strict scrutiny); *San Antonio Indep. Sch. Dist.*, 411 U.S. at 28 (1973).

would argue that a gay man can willfully change his orientation or that the so-called "therapies" that have been promoted to enable him to do so are anything other than a sham. *See* Am. Psychological Ass'n, *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, at v (2009), http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf ("[E]fforts to change sexual orientation are unlikely to be successful and involve some risk of harm.").

Indeed, sexual orientation is central to individual liberty and identity, as recognized in *Lawrence* v. *Texas*. *See* 539 U.S. at 574. Accordingly, courts that have considered the issue since *Lawrence* have recognized that sexual orientation (whether straight or gay) constitutes a central element of an individual's identity, which one should not be compelled to change in order to avoid discriminatory treatment under the law. *See, e.g.*, *Varnum* v. *Brien*, 763 N.W.2d 862, 893 (Iowa 2009); *Kerrigan*, 957 A.2d at 438; *In re Marriage Cases*, 183 P.3d at 442; *see also Watkins* v. *U.S. Army*, 875 F.2d 699, 725 (9th Cir. 1989) (Norris, J., concurring) (immutability describes "traits that are so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change them"); *Able* v. *United States*, 968 F. Supp. 850, 863–64 (E.D.N.Y. 1997) ("Whether or not sexual orientation is immutable, it forms a significant part of a person's identity."), *rev'd on other grounds*, 155 F.3d 628 (2d Cir. 1998); *cf. Hernandez-Montiel* v. *INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (concluding that "sexual orientation and sexual identity are immutable" for gay men and lesbians for purposes of determining whether they were "social group" eligible for asylum), *overruled on other grounds*, *Thomas* v. *Gonzalez*, 409 F.3d 1177 (9th Cir. 2005).

### 4.    Lesbians and Gay Men Lack Political Power

Finally, although political disadvantage is not necessarily required for a government classification to be treated as suspect,[9] to the extent the inability to redress a group's grievances politically is relevant, lesbians and gay men are clearly a minority and frequently lack the political power to defend themselves and their civil rights against a hostile majority.  Segura Aff. ¶¶ 9–85.  "Political power refers to a person's or group's demonstrated ability to extract favorable (or prevent unfavorable) policy outcomes from the political system."  *Id.* ¶ 13.  There can be no serious dispute that ongoing political events evince "a continuing antipathy or prejudice" towards lesbians and gay men "and a corresponding need for more intrusive oversight by the judiciary."  *City of Cleburne*, 473 U.S. at 443; *see also Plyler*, 457 U.S. at 216 n.14.

Thus, for example, gay rights opponents have aggressively used state ballot initiatives and referenda to pass discriminatory laws or repeal protective ones and even to amend state constitutions to deny lesbians and gay men important protections.  *See, e.g.*, *Romer* v. *Evans*, 517 U.S. 620 (1996); *see also* Segura Aff. ¶ 36 (citing repeals of legislatively enacted anti-gay discrimination ordinances through popular vote mechanisms); *id.* ¶¶ 37–38 (surveying anti-marriage initiatives).  This kind of "direct democracy" has been used against lesbians and gay men more than any other group.  Segura Aff. ¶ 43.  This extraordinary use of majoritarian democratic processes to affirmatively disadvantage a lesbian and gay minority vividly illustrates the inability of

---

[9]    Though some Supreme Court precedents have considered political powerlessness as a factor in determining whether heightened scrutiny applies, *see, e.g.*, *Bowen* v. *Gilliard*, 483 U.S. 587, 602 (1987), it is not a necessary factor, *see, e.g.*, *Adarand Constructors*, 515 U.S. at 235 (holding that all racial classifications are subject to strict scrutiny, although many racial groups hold substantial political power).

gay men and lesbians to protect themselves politically. *Cf. San Antonio Indep. Sch. Dist.*, 411 U.S. at 28 (identifying suspect classifications as those that burden groups that are "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"); *Carolene Prods.*, 304 U.S. at 153 n.4 (noting that "more searching judicial inquiry" is warranted when majority prejudice "curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities").

That there have been some modest and even important political initiatives in recent years that have helped mitigate the discrimination against lesbians and gay men does not alter this analysis. Segura Aff. ¶¶ 15–17. Indeed, the Supreme Court has applied heightened scrutiny to statutes that rely on racial classifications after racial minorities had achieved far greater political victories against discrimination than lesbians and gay men have today. *Id.* ¶¶ 81–85. By the early 1970s, African-Americans were "protected by three federal constitutional amendments, major federal Civil Rights Acts of 1866, 1870, 1871, 1875 (ill-fated though it was), 1957, 1960, 1964, 1965, and 1968, as well as by antidiscrimination laws in 48 of the states." *High Tech Gays* v. *Def. Indus. Sec. Clearance Office*, 909 F.2d 375, 378 (9th Cir. 1990) (Canby, J., dissenting). By the same token, by the time the *Frontiero* plurality recognized that sex-based classifications required intermediate judicial scrutiny, Congress had already passed Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, and the Equal Rights Amendment. *Frontiero*, 411 U.S. at 687–88; *Kerrigan*, 957 A.2d at 452–53. The existence of these protections did not stop the Supreme Court from holding that laws that discriminate on the basis of race and sex must be subject to heightened scrutiny.

By contrast, lesbians and gay men have virtually no political power when measured by the same yardstick.   There is no federal legislation prohibiting discrimination on the basis of sexual orientation in employment, education, access to public accommodations, or housing.   Segura Aff. ¶ 29.   Until 2009, when sexual orientation was added to federal anti-hate crime legislation (over significant opposition), no federal legislation had ever existed to protect individuals on the basis of sexual orientation.   *Id.* ¶ 31.   Additional progress recently—including repeal of the military's ban on lesbian and gay service members by a lame-duck congress following two judicial findings of unconstitutionality, *see Log Cabin Republicans* v. *United States*, 716 F. Supp. 2d 884 (C.D. Cal. 2010); *Witt* v. *U.S. Dep't of Air Force*, 739 F. Supp. 2d 1308 (W.D. Wash. 2010)—while important, hardly demonstrates meaningful political capital, particularly as there was overwhelming popular support for repeal long before any legislative progress was made.   Segura Aff. ¶ 32.   Moreover, eliminating express, *de jure* discrimination, such as "Don't Ask, Don't Tell," hardly constitutes evidence of affirmative political power.   *Id.* ¶ 25.

*        *        *

Because sexual orientation satisfies both of the two essential factors relevant to determining if a given classification is suspect, as well as the two additional critieria that courts sometimes rely upon, DOMA's exclusion of married same-sex couples from all federal marital protections and obligations should be subject to strict or, at the very least, intermediate scrutiny.

**B.     DOMA Is neither Narrowly Tailored to Serve Any Compelling Government Interest nor Substantially Related to an Important Government Interest**

**1.     DOMA Does Not Satisfy Either the Strict or Intermediate Scrutiny Standard**

The standard for justifying a discriminatory statute like DOMA under heightened scrutiny is justifiably formidable.  To survive strict scrutiny, the government must prove that the classification at issue is "*narrowly tailored*" and furthers "*compelling* governmental interests." *Adarand Constructors*, 515 U.S. at 227 (emphasis added). Under intermediate scrutiny, the government must still establish that the classification at issue is "*substantially related*" to an "*important governmental objective*."  *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (emphasis added).

Under both tests, after-the-fact justifications are not permissible.  Under heightened scrutiny, "a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded." *Virginia*, 518 U.S. at 535–36. In other words, where, as here, heightened scrutiny applies, "the State must show that the alleged objective was the legislature's actual purpose for the discriminatory classification," *Shaw* v. *Hunt*, 517 U.S. 899, 908 n.4 (1996) (internal quotation marks omitted), and "not hypothesized or invented *post hoc* in response to litigation," *Virginia*, 518 U.S. at 533 (internal quotation marks omitted).  *See also, e.g.*, *United States* v. *Brennan*, No. 08-5171-cv (L), 2011 WL 1679850, at *30 (2d Cir. May 5, 2011); *Alma Soc'y, Inc.* v. *Mellon*, 601 F.2d 1225, 1234–35 (2d Cir. 1979); Holder Letter at 4.  Given these demanding standards, BLAG cannot possibly meet its burden to demonstrate that DOMA's disparate treatment of married same-sex couples serves any compelling or

23

important state interest, much less one that is narrowly tailored or substantially related to an important governmental objective.[10]

### 2. All of Congress's Justifications for DOMA Fail

According to the legislative history, DOMA's exclusion in 1996 of all same-sex couples who might one day get married from all federal marital protections and obligations was intended to: (a) "defend[] and nurtur[e] the institution of traditional, heterosexual marriage," H.R. Rep. No. 104-664, at 12 (1996); (b) "promot[e] heterosexuality," *id.* at 15 n.53; (c) "encourag[e] responsible procreation and child-rearing," *id.* at 13; (d) "protect[] . . . democratic self-governance," *id.* at 16; (e) "preserve scarce government resources" by preventing marital benefits from "hav[ing] to be made available to homosexual couples and surviving spouses of homosexual marriages," *id.* at 18; and (f) promote a "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality," *id.* at 16.

As shown below, excluding married same-sex couples from all federal benefits and protections is not narrowly tailored to advance any important, much less a compelling governmental interest.[11]

---

[10]   Because being gay or lesbian, like other classifications that trigger strict scrutiny, has nothing whatsoever to do with an individual's ability to perform in any job or profession, strict scrutiny is the appropriate level of judicial scrutiny to apply to sexual orientation classifications, but Plaintiff believes that this Court need not determine whether strict or intermediate scrutiny applies, because DOMA cannot withstand either.

[11]   Indeed, as discussed below, none of these justifications can withstand even rational basis review.

### a)     Preserving "Traditional" Marriage Is Not a Compelling or Important Government Interest

It is well settled that "tradition" alone cannot justify the government's discrimination against a class of individuals.  *Williams* v. *Illinois*, 399 U.S. 235, 239 (1970) (noting in equal protection challenge that "neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack"); *cf. Varnum*, 763 N.W.2d at 898 ("A specific tradition sought to be maintained cannot be an important governmental objective for equal protection purposes, however, when the tradition is nothing more than the historical classification currently expressed in the statute being challenged."); *Kerrigan*, 957 A.2d at 478 (same); *Goodridge* v. *Dept. of Pub. Health*, 798 N.E.2d 941, 972–73 (Mass. 2003) (Greaney, J., concurring) ("To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question . . . .").  In other words, under the Constitution, discriminatory classifications cannot merely perpetuate past stereotypes or enforce prior discrimination.  Thus, the fact that lesbians and gay men have historically been denied access to marriage cannot provide the necessary independent basis for the federal government's disregard of existing state-approved marriages of same-sex couples today.

Put another way, limiting federal benefits and protections to heterosexual couples is not an independent justification for DOMA.  Instead, it simply restates the classification itself.  Accepting this kind of circular reasoning would render the entire concept of heightened judicial scrutiny a farce.  Indeed, were sustaining the tradition of excluding same-sex couples from the federal benefits of marriage a compelling interest,

then so too would have been banning interracial marriage in order to preserve a history of miscegenation laws or avoiding racially integrated education in order to preserve a history of segregated schools.   In each such case, a government purpose aimed at perpetuating unequal (albeit traditional) treatment of a group of people cannot justify the history of discrimination.  *Cf. Romer*, 517 U.S. at 635 ("[The amendment at issue] is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit.").

### b)       DOMA Does Not Promote Heterosexuality

Similarly, any suggestion that DOMA promotes and encourages heterosexuality deserves very short shrift.  It is entirely unclear how, for example, denying an 82-year-old widow an estate tax deduction promotes heterosexuality, either with respect to Edie Windsor or anyone else for that matter.  To the contrary, as discussed above, the undisputed scientific consensus is that a person's sexual orientation is enduring and stable, and not the result of personal choice.  Peplau Aff. ¶ 28 ("[T]here is converging scientific evidence documenting that sexual orientation reflects an enduring set of attractions and experiences for most people.  Efforts to change a person's sexual orientation through religious or psychotherapy interventions have not been shown to be effective.").  There is surely no "substantial relationship" between Section 3 of DOMA and promoting heterosexuality, or any sense in which DOMA is narrowly tailored to achieve that end.

### c)       DOMA Does Not Promote Responsible Procreation or Child-Rearing

Excluding married same-sex couples from all federal marital protections and obligations is also thoroughly unrelated to any interest the federal government may

have in promoting "responsible procreation" or child-rearing.  DOMA instead works directly contrary to such interests because it "prevent[s] children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure when afforded equal recognition under federal law."  *Gill* v. *Office of Pers. Mgmt.*, 699 F. Supp. 2d 374, 389 (D. Mass. 2010) (internal quotation marks omitted); Expert Affidavit of Michael Lamb ("Lamb Aff.") ¶¶ 41–42.

DOMA's congressional supporters claimed it was necessary to override state determinations of what constitutes a valid marriage "because our society recognizes that heterosexual marriage provides the ideal structure within which to beget and raise children."  *Defense of Marriage Act:  Hearing on H.R. 3396 Before the Subcomm. on the Const. of the H. Comm. on the Judiciary*, 104th Cong. 1 (1996) (statement of Rep. Canaday, Chairman, H. Subcomm. on the Const.).   Because that statement is demonstrably false, and relies on stereotypes and other impermissible considerations, it cannot provide a sufficient justification for DOMA's disregard for valid state-approved marriages.

There is clear expert consensus, based on decades of social science research concerning same-sex couples as parents, that the children raised by lesbian or gay parents are just as well-adjusted as those of heterosexual parents.  *See* Lamb Aff. ¶¶ 28–37.  The factors predicting the healthy adjustment of children are the same for lesbian and gay parents as for heterosexual parents, and include the quality of the parent-child relationship and the availability of sufficient economic and social resources.  *See id.* ¶¶ 18–20; *Gill*, 699 F. Supp. 2d at 388 & n.106 (since enactment of DOMA in 1996, "a consensus has developed among the medical, psychological, and social welfare

27

communities that children raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents").[12]

Moreover, DOMA does nothing to advance this purported interest. It does not alter the fact that same-sex married couples, like many different-sex married couples, conceive children through assisted reproduction, or form families through adoption. Excluding validly married same-sex couples from federal marital benefits and protections cannot possibly be said to be "narrowly tailored" to achieving a goal of having children be raised by heterosexual married parents. (Nor, as discussed below, is it even rationally related to that so-called interest. *See infra* Part III.B.)

### d)   DOMA Undermines Democratic Self-Governance

Despite Congress's lip-service to the contrary in 1996, DOMA undermines democratic self-governance because it undermines the ability of citizens of a state (through their democratically elected leaders) to exercise their authority to regulate marriage—or to "vote with their feet" by relocating to a state that recognizes marriage between same sex couples. DOMA instead foists on all states, including those like New

---

[12]   Citing Comm. on Psychosocial Aspects of Child and Family Health, Am. Acad. of Pediatrics, *Coparent or Second-Parent Adoption by Same-Sex Parents*, 109 Pediatrics 339 (2002), *available at* http://pediatrics.aappublications.org/cgi/reprint/109/2/339.pdf; Am. Psychological Ass'n, *Resolution on Sexual Orientation, Parents, and Children*, *in Proceedings of the American Psychological Association for the Legislative Year 2004*, 60 Am. Psychol. 436, 496–97 (2005), *available at* http://www.apa.org/ about/governance/council/policy/parenting.aspx; Am. Acad. of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or Transgender Parents Policy Statement*, http://www.aacap.org/cs/root/policy_statements/gay_lesbian_transgender_and_bi sexual_parents_policy_statement; Am. Med. Ass'n, *AMA Policy Regarding Sexual Orientation*, http://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisory committee/ama-policy-regarding-sexual-orientation.shtml; Child Welfare League of Am., *Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults*, http://www.cwla.org/programs/ culture/glbtqposition.htm.

York that recognize valid marriages of same-sex couples from other jurisdictions, and on United States citizens from across the country, a mandatory, second-class category of marriage.

In any event, Congress's "interest" in "protecting" democratic self-governance can never constitute a compelling or important interest that justifies a discriminatory law. Like the "preserving tradition" argument discussed above, this circular reasoning would permit the federal government to discriminate simply because the majority wants to discriminate.   That, of course, is precisely what the Fifth Amendment was designed to prevent.

### e)    DOMA Does Not Conserve Resources

Congress's justification that federal non-recognition of legal same-sex marriages conserves resources can be easily disposed of because it is demonstrably false. According to the nonpartisan Congressional Budget Office, the recognition of the marriages of same-sex couples would actually *increase* annual net federal revenue. Cong. Budget Off., U.S. Cong., *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* 1 (June 21, 2004), http://www.cbo.gov/ftpdocs/55xx/doc5559/06-21-SameSexMarriage.pdf.[13]

Even if refusing to recognize the legal marriages of same-sex couples did save the federal government money (which it does not), such cost-cutting, standing alone, cannot constitute a compelling or important governmental interest.  *Plyler*, 457 U.S. at

---

[13]    In any event, saving public resources, although mentioned in the House Report, did not actually motivate the enactment of DOMA.  *Gill*, 699 F. Supp. 2d at 390 n.116 ("[T]he House rejected a proposed amendment to DOMA that would have required a budgetary analysis of DOMA's impact prior to passage.") (citing 142 Cong. Rec. H7503–05 (daily ed. July 12, 1996)).

227 ("[A] concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources.") (citing *Graham*, 403 U.S. at 374–75); *Shapiro* v. *Thompson*, 394 U.S. 618, 633 (1969) ("[A State] must do more than show that denying welfare benefits to new residents saves money."), *overruled on other grounds by Edelman* v. *Jordan*, 415 U.S. 651 (1974); *In re Levenson*, 587 F.3d 925, 933 (9th Cir. 2009) (Reinhardt, J.) ("[T]hat a government policy incidentally saves the government an insignificant amount of money does not provide a rational basis for that policy if the policy is, as a cost-saving measure, drastically underinclusive, let alone founded upon a prohibited or arbitrary ground.").

    *f)*  ***"Moral Disapproval" Is Not a Compelling or Important Government Interest***

    If there is one objective that DOMA was in fact intended to achieve it is moral condemnation of gay men and lesbians.  The legislative history explicitly states that DOMA was intended to express the "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality."  H.R. Rep. No. 104-664, at 15–16; *see Dragovich* v. *U.S. Dep't of Treas.*, No. 10-01564 (CW), 2011 WL 175502, at *12 (N.D. Cal. Jan. 18, 2011) ("[A]nimus toward, and moral rejection of, homosexuality and same-sex relationships are apparent on the congressional record."); *see also* Exs. 1–7 to Affidavit of Andrew J. Ehrlich (collecting examples of anti-gay animus in congressional record).

    But "the denial of federal benefits to same-sex spouses cannot be justified as an expression of the government's disapproval of homosexuality, preference for heterosexuality, or desire to discourage gay marriage."  *Levenson*, 587 F.3d at 932.

Animus against gay men and lesbians, as a matter of law, is not a legitimate, much less an important or compelling, government interest. *Romer*, 517 U.S. at 632.

"[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Dep't of Agric.* v. *Moreno*, 413 U.S. 528, 534 (1973). Indeed, the Supreme Court has soundly rejected moral disapproval as a justification for discrimination against lesbians and gay men, holding that "'the fact that the governing majority in a State has traditionally viewed [homosexuality] as immoral is not a sufficient reason for upholding a law prohibiting the practice.'" *Lawrence*, 539 U.S. at 577 (quoting *Bowers* v. *Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)); *id.* at 583 (O'Connor, J., concurring) ("Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be 'drawn for the purpose of disadvantaging the group burdened by the law.'" (quoting *Romer*, 517 U.S. at 633)). Here too, "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . , are not permissible bases" for governmental discrimination. *City of Cleburne*, 473 U.S. at 488.

### III.

### EVEN UNDER RATIONAL BASIS REVIEW, DOMA IS UNCONSTITUTIONAL

While, as discussed above, the question of DOMA's constitutionality should properly be analyzed under the heightened scrutiny standard, even if it were to be analyzed under the more lenient rational basis standard, it would still fail.

**A.      The Applicable Standard**

Under rational basis review, a statute will be upheld as constitutional "if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440.  Still, there must be a "link between classification and objective," *Romer*, 517 U.S. at 632, *i.e.*, "some relation between the classification and the purpose it serve[s]."  *Id.* at 633.  Importantly, it is the classification—the challenged discrimination—and not the law as a whole that must rationally advance a legitimate governmental interest.  *Bd. of Trustees of the Univ. of Ala.* v. *Garrett*, 531 U.S. 356, 366–67 (2001); *Rinaldi* v. *Yeager*, 384 U.S. 305, 308–09 (1966).

"Despite the wide latitude afforded [the government under this level of review] . . . distinctions that do not have a rational basis will not be sustained." *Myers* v. *Cnty. of Orange*, 157 F.3d 66, 75 (2d Cir. 1998).  "In a long line of cases, the Supreme Court has applied rational basis scrutiny to strike down legislation where the permissible bounds of rationality were exceeded."  *Sharif* v. *N.Y. State Educ. Dep't*, 709 F. Supp. 345, 364 (S.D.N.Y. 1989) (citing cases).

A classification fails rational basis review if its connection to the asserted purpose, while not totally lacking, is "so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.  For example, in *Romer*, Colorado defended its ban on antidiscrimination protection for gay people by asserting that the ban rationally furthered two state interests:  (1) respecting the religious liberties of landlords and employers, and (2) conserving state resources to fight discrimination against other groups.  517 U.S. at 635.  Yet the Supreme Court held that those interests, even if legitimate on their own, were "so far removed" from the ban's classification, which singled out gay people for its burden, that it was "impossible to credit" that they were the

reason for the law.  *Id.*  Here too, DOMA is so far removed from any legitimate purpose that it is simply impossible to credit any "relation between the classification and the purpose it serves."  *Id.* at 633.

**B.      Congress's 1996 Justifications for DOMA Fail Rational Basis Review**

In circuits that, unlike the Second Circuit, had already decided what level of scrutiny applies to sexual orientation classifications, and prior to the U.S. Attorney General's determination that such classifications should be subject to heightened scrutiny, numerous courts have applied rational basis review to DOMA's purported justifications.  Even under that lower level of scrutiny, these courts held that the government's justifications were either illegitimate or insufficient.  *See, e.g.*, *Dragovich*, 2011 WL 175502; *Gill*, 699 F. Supp. 2d 374; *Levenson*, 587 F.3d 925; *In re Balas*, No. 2:11-BK-17831 (TD), 2011 WL 2312169 (Bankr. C.D. Cal. June 13, 2011).[14]

As discussed above, the House Report for DOMA identified the congressional interests purportedly served by denying federal marital protections and

---

[14]   While a few district courts previously held that DOMA's discrimination against married same-sex couples was not unconstitutional, those decisions either did not involve Section 3 of DOMA and *federal* benefits at all, *see e.g.*, *Ake* v. *Wilson*, 354 F. Supp. 2d 1298 (M.D. Fla. 2005) (challenge to Florida's refusal to recognize marriage of same-sex couple married in Massachusetts); or ignored the complete lack of any rational connection between DOMA's sexual orientation classification and a legitimate government interest, *see e.g.*, *In re Kandu*, 315 B.R. 123, 145–47 (W.D. Wa. 2004) (accepting assertion that DOMA advanced interest in "encouraging the development of relationships optimal for procreation" and finding that DOMA "simply codified that definition of marriage historically understood by society"); *Smelt* v. *Cnty. of Orange*, 374 F. Supp. 2d 861, 880 (C.D. Cal. 2005) (accepting assertion that "Congress could plausibly have believed sending [the] message [that heterosexual marriages have special significance] makes it more likely people will enter into opposite-sex unions, and encourages those relationships"), *aff'd in part and vacated in part on other grounds*, 477 F.3d 673 (9th Cir. 2006).

obligations to married same-sex couples.  *See* 142 Cong. Rec. H7503–05 (daily ed. July 12, 1996).  As also explained above, those justifications are unsound either because they are plainly illegitimate interests or because the relationship between the purported justifications and DOMA's discriminatory classification is "so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.

> *Preserving "traditional" marriage is not a legitimate interest.*  As set forth above, a history and tradition of limiting marriage to straight couples alone cannot justify DOMA's discrimination.  That purported justification does not explain the classification as equal protection requires, but merely restates the classification and fails to provide any independent purpose for DOMA's exclusion of one class of state-recognized marriages from federal marital protections and obligations.  *See Romer*, 517 U.S. at 633 (classification "must bear a rational relationship to an independent and legitimate legislative end").  Accordingly, it cannot provide a rational basis for DOMA's denigration of married same-sex couples.  *Gill*, 699 F. Supp. 2d at 389–90; *Levenson*, 587 F.3d at 932.

> *DOMA does not "promote" heterosexuality.*  No one could rationally credit that denying the validity of state-approved marriages of same sex couples would have any impact on whether different-sex couples marry or divorce, or cohabit.  Nor does Section 3 of DOMA "encourage[ gay men and lesbians] to enter into marriages with members of the opposite sex."  *Levenson*, 587 F.3d at 932 (applying rational basis review).  Indeed, applying rational basis scrutiny to this purported governmental interest, Judge Tauro in *Gill* simply could not "discern a means by which the federal government's denial of benefits to same-sex spouses might encourage homosexual people

to marry people of the opposite sex." *Gill*, 699 F. Supp. 2d at 389. *Accord Dragovich*, 2011 WL 175502, at *11 ("The exclusion of same-sex couples from the federal definition of marriage does not encourage heterosexual marriages.").

> *DOMA does not advance any legitimate interest in child-rearing.* Section 3 of DOMA's connection with child-rearing is also too attenuated to meet even rational basis review. Procreation and child-rearing are not the sole or even the primary focus of marriage, certainly under federal law. For example, "the ability to procreate is not now, nor has it ever been, a precondition to marriage in any state in the country." *Gill*, 699 F. Supp. 2d at 389 (citing *Lawrence*, 539 U.S. at 605 (2003) (Scalia, J., dissenting)); *see also* Expert Affidavit of Nancy Cott ("Cott Aff.") ¶ 19. The federal government, for its part, has never treated married heterosexual couples differently if they were infertile or otherwise unable or unwilling to procreate. And the great majority of the federal protections and obligations that come with marriage relate not to child-rearing or procreation but to practical protections aimed at the adults.[15] On the other hand, DOMA excludes married same-sex couples not just from federal recognition of their relationship in contexts relating to children or procreation, but in every one of the 1,138 federal statutes and programs that relate to marriage in any way. DOMA's sweeping breadth, and the striking disconnect between the classification and the purported purpose, make it "impossible to credit" that this law was crafted to promote child-rearing by heterosexuals. *Romer*, 517 U.S. at 635.

---

[15] DOMA affects over a thousand rights and obligations, many of which do not relate to children. *See* Cong. Budget Off., U.S. Cong., *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* 1 (June 21, 2004), http://www.cbo.gov/ftpdocs/ 55xx/doc5559/06-21-SameSexMarriage.pdf.

Because it is "beyond scientific dispute" that a child's adjustment is not determined by his parents' sexual orientation, *see* Lamb Aff. ¶ 13, any suggestion by DOMA's defenders that it advances a legitimate interest in ensuring that children will be better adjusted by being raised in households with heterosexual parents to whom they are biologically-related cannot provide a rational basis for DOMA's discrimination. *Gill*, 699 F. Supp. 2d at 388–89. The scientific evidence, in fact, demonstrates that male and female parents can be equally competent, and that the absence of a male or female parent does not affect child development. Lamb Aff. ¶¶ 23–27. And even more fundamentally, as discussed above, DOMA does nothing to alter the fact that same-sex couples may marry and raise children together, and may reside in states like New York that recognize their marriages. *In re Levenson*, 587 F.3d at 934 (DOMA "does not serve any governmental interest in promoting a child-rearing environment," and thus fails rational basis review "because [. . . ] the denial of benefits to same-sex spouses will not affect the decisions made by same-sex couples regarding marriage or parenting."). As a result, it is simply impossible to credit this so-called "interest" as a rational justification for DOMA's exclusion of same-sex couples from federal benefits and programs.

*DOMA does not promote self-governance.* Nor can Section 3 of DOMA be said to rationally advance a legitimate interest in promoting self-governance; instead, as discussed above, it denies states their traditional role in regulating marriage, and arbitrarily disregards the state-approved marriages of same-sex couples. *Gill*, 699 F. Supp. 2d. at 391 ("There can be no dispute that the subject of domestic relations is the exclusive province of the states. And the powers to establish eligibility requirements for

marriage, as well as to issue determinations of martial status, lie at the very core of such domestic relations law."); Cott Aff. ¶ 88.

*DOMA does not conserve resources.*   Finally, DOMA does not rationally advance any legitimate interest in conserving government resources.   As the court observed in *Gill*, "the Congressional Budget Office concluded in 2004 that recognition of same-sex marriages by all fifty states would actually result in a net *increase* in federal revenue."   699 F. Supp. 2d at 390 n.116.   Moreover, this justification fails because "[t]here is no rational relationship" whatsoever between the sex of a person's spouse and the federal government's desire to limit its outlays.   *Levenson*, 587 F.3d at 933; *accord Gill*, 699 F. Supp. 2d at 390.   *See also Romer*, 517 U.S. at 635 ("Colorado also cites its interest in conserving resources to fight discrimination against other groups.   The breadth of the amendment is so far removed from [this] justification[] that we find it impossible to credit . . . .").

The only congressional justification DOMA does rationally advance is one the Supreme Court has held is constitutionally invalid no matter what the standard—the expression of animus and moral disapproval toward lesbians and gay men.   *See Romer*, 517 U.S. at 632; Part II.B.2.f, *supra*.

## C.    No Other Rational Basis for DOMA Can Be Asserted

Moreover, none of the additional purported justifications asserted in previous litigation regarding Section 3 of DOMA can overcome the patent lack of a rational basis for the statute's discrimination.

*DOMA does not avoid inconsistency.*   As Judge Reinhardt of the Ninth Circuit recognized, the claim that DOMA's definition of marriage avoids inconsistency across states, because same-sex couples cannot marry in every jurisdiction, must fail

"[e]ven under the more deferential rational basis review [. . . ]."  *Levenson*, 587 F.3d at

933.  Varying state eligibility requirements for marriage throughout our country's history

have meant that heterosexual couples who could validly marry in one state might not be

able to in another.  *Gill*, 699 F. Supp. 2d at 391; Cott Aff. ¶¶ 24–64.  "And yet the federal

government has fully embraced these variations and inconsistencies in state marriage

laws by recognizing as valid for federal purposes any heterosexual marriage which has

been declared valid pursuant to state law."  *Gill*, 699 F. Supp. 2d at 391 (internal citations

omitted).

> In other words, Congress has never before cared about uniformity across

state definitions of marriage, even though, for example, only a minority of states

recognize common law marriages, Cott Aff. ¶¶  36–38, so any assertion of such an

interest here simply cannot be credited.  *See City of Cleburne*, 473 U.S. at 448–50 (under

rational basis review, government may not single out a group for disfavored treatment

where the group does not present any "special threat to the [state's] legitimate interests").

While the rational basis inquiry may not require a perfect fit between a classification and

its justification, "this deferential constitutional test nonetheless demands some reasonable

relation between the classification in question and the purpose it purportedly serves."

*Gill*, 699 F. Supp. 2d at 396.  The government "may not rely on a classification whose

relationship to an asserted goal is so attenuated as to render the distinction arbitrary or

irrational."  *Id.* at 388 (quoting *City of Cleburne*, 473 U.S. at 446).

> *DOMA does not preserve the status quo.*  The argument, asserted in other

cases, that DOMA "preserves the status quo," in that no state allowed same-sex couples

to marry when DOMA was enacted in 1996, is similarly unavailing.  As courts applying

rational basis review have pointed out, the "assertion that pursuit of this interest provides a justification for DOMA rests on a conspicuous misconception of what the status quo was *at the federal level* in 1996." *Gill*, 699 F. Supp. 2d at 393 (emphasis in original). At the time, the federal status quo "was to recognize, for federal purposes, any marriage declared valid according to state law." *Id.* In other words, "DOMA did not preserve the status quo vis-à-vis the relationship between federal and state definitions of marriage; to the contrary, it disrupted the long-standing practice of the federal government deferring to each state's decisions as to the requirements for a valid marriage." *Levenson*, 587 F.3d at 933.

*     *     *

As the Supreme Court has explained, "laws singling out a certain class of citizens for disfavored legal status or general hardships are rare." *Romer*, 517 U.S. at 633. They are rare in part because such classifications generally lack any rational connection to a legitimate government interest.[16] The Supreme Court in *Romer* held that the purported justifications for the Colorado amendment at issue failed to provide a rational basis because "[the amendment's] sheer breadth is so discontinuous with the reasons offered for it that the amendment seem[ed] inexplicable by anything but animus toward the class it affect[ed]." *Id.* at 632. DOMA paints with a similarly broad brush by denying married same-sex couples all federal marital benefits and protections, regardless of the nature of those protections.

---

[16] As Justice O'Connor explained in her concurring opinion in *Lawrence*: "Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be drawn for the purpose of disadvantaging the group burdened by the law." 539 U.S. at 583.

In other words, like the Colorado amendment in *Romer*, Section 3 of DOMA has no "identifiable legitimate purpose or discrete objective." *Id.* at 635. Its sweeping breadth—covering the entire range of federal statutes and benefits that pertain to marriage or spouses, including denying couples married under state law recognition of their marriage for purposes of the marital exemption to the federal estate tax; denying married lesbian and gay federal employees the ability to provide health insurance to their spouses; and preventing married bi-national same-sex couples from remaining together in the United States in the ways available to straight couples—makes it impossible to explain the exclusion of married same-sex couples from those benefits and protections by anything other than sheer animus. *Cf. id.* ("We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit."). Because, under our constitutional framework, the government needs more than animus or moral disapproval to justify the harms and denigration DOMA imposes on married same-sex couples, DOMA fails even rational basis review.

## IV.

### *BAKER* v. *NELSON* IS NEITHER CONTROLLING NOR PERSUASIVE AUTHORITY

Finally, although we anticipate that BLAG will rely heavily on it in their opposition, the Supreme Court's summary dismissal in *Baker* v. *Nelson*, 409 U.S. 810 (1972), almost four decades ago is not persuasive authority that should inform, let alone bind, this Court's resolution of Plaintiff's equal protection challenge to DOMA.

In *Baker*, a same-sex couple seeking the right to marry challenged on due process and equal protection grounds a Minnesota marriage licensing law that limited marriage to heterosexual couples.  *Baker* v. *Nelson*, 191 N.W.2d 185 (Minn. 1971).  The Minnesota Supreme Court, applying rational basis review, upheld the statute.  *See id.* at 186–87.  The U.S. Supreme Court, which was required to accept the appeal under its since-repealed mandatory appellate jurisdiction, summarily dismissed the appeal "for want of a substantial federal question."  *Baker*, 409 U.S. at 810.

The precedential effect of such a dismissal is exceptionally narrow.  Summary dispositions are treated as binding only with regard to the precise legal questions and facts presented in the jurisdictional statement.  *Ill. Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173, 182 (1979); *Mandel* v. *Bradley*, 432 U.S. 173, 176 (1977) (per curiam); *Alexander* v. *Cahill*, 598 F.3d 79, 89 n.7 (2d Cir. 2010).  Summary dispositions, moreover, do not signal the Supreme Court's adoption of a lower court's reasoning.  *Mandel*, 432 U.S. at 176; *Bush* v. *Vera*, 517 U.S. 952, 996 (1996) (Kennedy, J. concurring) ("We do not endorse the reasoning of the [lower court] when we order summary affirmance.").  As such, summary dispositions are "a rather slender reed on which to rest future decisions." *Morse* v. *Republican Party of Va.*, 517 U.S. 186, 203 n.21 (1996) (quoting *Anderson* v. *Celebrezze*, 460 U.S. 780, 784–85 n.5 (1983)); *see also Green Party of Conn.* v. *Garfield*, 616 F.3d 213, 225 (2d Cir. 2010) (summary dispositions "provide little guidance" in subsequent disputes).

Plaintiff's claims here present very different legal questions and facts than those at issue in *Baker*.  *See Mandel*, 432 U.S. at 80, 177 (Brennan, J., concurring).  *Baker* concerned whether the state's marriage licensing statute (1) deprived appellants of

"their liberty to marry" without due process; (2) violated their equal protection rights; and (3) violated their privacy rights.  *In re Kandu*, 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (quoting jurisdictional statement).   Here, by contrast, Plaintiff challenges the federal government's refusal to recognize her valid, state-sanctioned marriage for purposes of federal rights and benefits by virtue of DOMA—an entirely different statute that has different legal effects, legislative history, and justifications through entirely different legal arguments than those at issue in *Baker*.  For this reason, *Baker* has no binding effect in this case.  *See Smelt* v. *Cnty. of Orange,* 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) (stating that the court "[could not] conclude *Baker* necessarily decided the questions raised by the constitutional challenge to DOMA"), *aff'd in part and vacated in part on other grounds*, 447 F.3d 673 (9th Cir. 2006);  *In re Kandu* 315 B.R. at 137–38 (rejecting *Baker*'s application to DOMA challenge in part because case concerned "subsequently-enacted federal legislation with its own Congressional history that concerns exclusively federal benefits"); *see also In the Matter of the Marriage of J.B. & H.B.*, 326 S.W.3d 654, 671–72 (Tex. App. 2010) (finding *Baker* did "not control the disposition" of equal protection challenge to state law that precluded adjudication of married same-sex couple's divorce petition because it was "distinguishable" and presented different legal issues).[17]

---

[17]   Indeed, two courts already have held that *Baker* does not control or inform the outcome of equal protection challenges to DOMA because the issues presented are different.  *Smelt*, 374 F. Supp. 2d at 874 (holding that *Baker* "is not binding precedent on Plaintiffs' constitutional challenge to Section 3 of DOMA"), *aff'd in part and vacated in part on other grounds*, 477 F.3d 673 (9th Cir. 2006); *In re Kandu* 315 B.R. at 137–38 (same).  While, as discussed above, Plaintiff disagrees with these courts' reasoning on the constitutionality of DOMA, there is no dispute that these cases accurately state *Baker*'s precedential weight.

## CONCLUSION

For all the foregoing reasons, the Court should grant Plaintiff's motion for summary judgment.

Dated: New York, New York
        June 24, 2011

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP

/s/ Andrew J. Ehrlich
_____
Roberta A. Kaplan, Esq.
Andrew J. Ehrlich, Esq.
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
rkaplan@paulweiss.com
aehrlich@paulweiss.com

– and –

James D. Esseks, Esq.
Rose A. Saxe, Esq.
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street
New York, New York 10004-2400
(212) 549-2500
jesseks@aclu.org
rsaxe@aclu.org

– and –

Melissa Goodman, Esq.
Alexis Karteron, Esq.
Arthur Eisenberg, Esq.
NEW YORK CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
mgoodman@nyclu.org
akarteron@nyclu.org
aeisenberg@nyclu.org

*Attorneys for Plaintiff Edith Schlain Windsor*