UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDITH SCHLAIN WINDSOR, in her capacity as Executor of the estate of THEA CLARA SPYER,<br><br>     Plaintiff,<br><br>     v.<br><br>THE UNITED STATES OF AMERICA,<br><br>     Defendant. | 10 Civ. 8435 (BSJ) (JCF)<br>ECF Case<br><br>**PLAINTIFF'S STATEMENT PURSUANT TO <u>LOCAL RULE 56.1</u>** |

Pursuant to Local Rule 56.1, Plaintiff Edith Schlain Windsor submits this statement of material facts as to which there can be no dispute:

I. **Facts Relevant to Plaintiff's Claim**

 A. **The Parties**

  1. Plaintiff, Edith Schlain Windsor ("Edie"), is a citizen of the United States. She resides in New York County, New York.

  2. Plaintiff is the sole executor of the estate of her late spouse, Thea Clara Spyer ("Thea"). Affidavit of Edith Schlain Windsor ("Windsor Aff.") ¶ 1.

  3. Defendant United States of America is a proper defendant in this action. Order and Mem. of June 2, 2011 at 9.

  4. Defendant-Intervenor Bipartisan Legal Advisory Group of the United States House of Representatives ("BLAG") has intervened in this action for the limited purpose of defending the constitutionality of the challenged legislation, Section 3 of the Defense of Marriage Act. Order and Mem. of June 2, 2011 at 10; Def.-Intervenor Mot. to Intervene at 1.

### B. Edie and Thea Were Legally Married

5. Edie met her late spouse Thea in 1963 at a restaurant in New York City, and the two began a committed relationship that spanned five decades. Windsor Aff. ¶ 5.

6. After an engagement that lasted more than forty years, Edie and Thea were legally married in a ceremony performed in Toronto, Canada, on May 22, 2007. *Id.* ¶ 26; *id.* Ex. A (Marriage License No. E485225 (registered June 25, 2007, Ontario, Canada)); *id.* Ex. B (Marriage Certificate No. 2007-05-013109 (issued March 10, 2008, Ontario, Canada)).

7. Edie and Thea's marriage was valid in New York State and provided them with the same status, responsibilities, and protections as other married people. Affidavit of Andrew J. Ehrlich ¶ 10.

8. Edie and Thea spent two years as a married couple before Thea succumbed to complications from a heart condition on February 5, 2009, and died. Windsor Aff. ¶ 28; *id.* Ex. D (Death Certificate of Thea Clara Spyer).

9. After Thea's passing, Edie was hospitalized with stress cardiomyopathy, an ailment commonly known as "broken heart syndrome," which required the insertion of an implantable cardioverter-defibrillator (ICD), and has resulted in serious, irreversible damage to her heart. *Id.* ¶ 29.

10. After Thea died, her Last Will and Testament, dated September 7, 2004, was admitted to probate by the Surrogate's Court of New York County (Index No. 2009-1162), and Edie was appointed as executor of Thea's estate on April 24, 2009. *Id.* ¶ 30; *id.* Ex. E (Last Will and Testament of Thea Clara Spyer); *id.* Ex. F. (Letters Testamentary).

11. In accordance with Article Third of Thea's Last Will and Testament, her executor is directed to distribute her entire estate to the TCS Revocable Trust created by Thea. *Id.* ¶ 31; *id.* Ex. G (TCS Revocable Trust).

12. In accordance with Article III of the trust agreement creating the TCS Revocable Trust, because Edie survived Thea, the trustees were directed to distribute the remaining trust property, after the payment of taxes and administration expenses, to the trustees of the ESW Revocable Trust created by Edie. Edie is a trustee and the sole beneficiary of the ESW Revocable Trust during her life, and she has the power, exercisable by her alone, to invade the trust property and to revoke the trust agreement in its entirety at any time. *Id.* ¶ 32; *id.* Ex. H. (ESW Revocable Trust).

**C.     Edie and Thea's Marriage Was Not Recognized Under Federal Law Solely by Operation of Section 3 of the Defense of Marriage Act**

13. Edie and Thea were not considered "married" under federal law because, pursuant to Section 3 of the Defense of Marriage Act ("DOMA"), the federal government refuses to recognize valid marriages of same-sex couples. 1 U.S.C. § 7 (2006).

14. Solely because of the operation of Section 3 of DOMA, the Internal Revenue Service ("IRS") determined that the estate of Thea, a decedent whose surviving spouse, Edie, is a person of the same sex as the decedent, was not entitled to the marital deduction under 26 U.S.C. § 2056(a). Windsor Aff. Ex. L (Ltr. from R.A. Mitchell, Internal Revenue Service, to Edith Schlain Windsor (May 26, 2010)).

15. Consequently, because Thea's taxable estate and adjusted taxable gifts exceeded the applicable exclusion amount, a federal estate tax was imposed on Thea's estate that would not otherwise have been imposed if Edie and Thea's marriage were recognized under federal law. *Id.*

16. As a direct result of the federal government's exclusion of same-sex surviving spouses like Edie from the protections of the estate tax marital deduction, $363,053 (three hundred sixty-three thousand fifty-three dollars) in federal estate tax was imposed on Thea's estate. *Id.*

17. As a direct result of Section 3 of DOMA, Edie has also been prevented from being eligible for a Social Security lump-sum death benefit and Social Security widow's insurance benefits that would otherwise be available to her as a surviving spouse. 42 U.S.C. § 402 (2006).

## II. Constitutional Facts Supporting Heightened or Strict Scrutiny

### A. Gay men and lesbians have suffered a long history of purposeful discrimination

18. Gay men and lesbians have suffered a long history of discrimination at the hands of both governmental and private actors. Expert Affidavit of George Chauncey, Ph.D., ¶¶ 5, 6, 10–55, 65–86, 90–103.

19. In early colonial America, the strong influence of Puritanical clergy and the adoption of anti-sodomy legislation verbatim from the book of Leviticus led to the execution of several men for the crime of sodomy. *Id.* ¶ 19.

20. In the early twentieth century, the medical community condemned homosexuality as a "mental defect" or "disease," with this ostensibly scientific view (now rejected) helping to legitimize much anti-gay bias. *Id.* ¶¶ 26–27.

21. The early twentieth century also saw the promulgation and selective enforcement of state and local ordinances against disorderly conduct, vagrancy, lewdness, and loitering directed at lesbians and gay men who attempted to gather together. *Id.* ¶ 29.

22. In addition to subjecting lesbians and gay men to police harassment, states and localities embarked upon widespread censorship campaigns designed to suppress gay people's freedom of speech and ability to discuss gay issues. *Id.* ¶¶ 31–34.

23. During and after World War II, the military systematically attempted to screen out lesbians and gay men from the armed forces, and discharge and deny benefits to those that served and were "discovered" later. *Id.* ¶¶ 39–41.

24. By the middle of the twentieth century, all federal agencies were prohibited from hiring lesbians and gay men, and the federal government engaged in far-reaching surveillance and investigation to identify and purge supposed "homosexuals" from the federal civil service. *Id.* ¶¶ 42–50.

25. Lesbians and gay men were also demonized by the media between the late 1930s and late 1950s. *Id.* ¶¶ 51–53.

26. The modern anti-gay rights movements commenced as a response to the slightest advancements in the direction of equality for lesbians and gay men in the 1970s. *Id.* ¶¶ 66–68.

27. Campaigners against gay rights have spread false stereotypes of lesbians and gay men as child molesters, unfit parents, and threats to heterosexuals—stereotypes that linger to this day. *Id.* ¶¶ 68–74.

28. The anti-gay rights movement has endeavored to repeal and block even basic nondiscrimination protections for lesbians and gay men, and has contributed to the promulgation of overtly discriminatory legislation at the state and federal level, including restrictions on adoption by same-sex couples and marriage rights. *Id.* ¶¶ 75–86.

29. To this day, lesbians and gay men are subjected to continued public opprobrium from leading political and religious figures and the ever-present threat of anti-gay violence. *Id.* ¶¶ 91–102.

30. Despite social and legal progress in the past thirty years towards greater acceptance of homosexuality, gay men and lesbians continue to live with the legacy of historical antigay measures and the attitudes that motivated those measures; this legacy is evident both in laws that remain on the books and in the many legal protections that have not been enacted. *Id.* ¶¶ 7, 8.

31. Today, the limited civil rights enjoyed by gay and lesbian Americans vary substantially from region to region and are still subject to the vicissitudes of public opinion. *Id.* ¶ 9.

32. Like other minority groups, gay men and lesbians often must rely on judicial decisions to secure equal rights. *Id.*

**B.     Sexual orientation has no bearing on one's ability to contribute to or perform in society.**

33. Sexual orientation refers to an enduring pattern of emotional, romantic, and/or sexual attractions to men, women or both sexes. Sexual orientation is most often discussed in terms of three categories: heterosexual (having attractions to members of the opposite sex), gay or lesbian (having attractions to members of one's own sex), and bisexual (having attractions to both men and women). Expert Affidavit of Letitia Anne Peplau, Ph.D. ("Peplau Aff."), ¶¶ 14, 15.

34. Being gay or lesbian has no inherent association with a person's ability to lead a happy, healthy, and productive life or to contribute to society. *Id.* ¶¶ 11, 29–33.

6

35. Being gay or lesbian is a normal expression of human sexuality. *Id.* ¶¶ 11, 29.

36. Being gay or lesbian is not a mental illness. *Id.*

37. Empirical evidence and scientifically rigorous studies have consistently found that gay men and lesbians are as able as heterosexuals to form loving, committed relationships. *Id.* ¶¶ 22, 31.

38. Like their heterosexual counterparts, many lesbian, gay, and bisexual individuals form loving, long-lasting relationships, including marriage, with a partner of the same sex. *Id.* ¶ 12.

39. Sexual orientation is centrally linked to the most important human relationships that adults form with other adults in order to meet their basic human needs for love, attachment and intimacy, and is an essential part of an individual's personal identity. *Id.* ¶ 18.

40. Numerous studies of youths raised by same-sex parents conducted over the past 25 years by respected researchers and published in peer-reviewed academic journals demonstrate that the children raised by same-sex parents are just as well-adjusted as those of heterosexual parents, including "biological" parents. Expert Affidavit of Michael Lamb, Ph.D., ¶¶ 12, 28–37.

41. Parental sexual orientation has no effect on children's and adolescents' adjustment. Expert Affidavit of Michael Lamb, Ph.D. ("Lamb Aff."), ¶¶ 12, 28–31.

42. The factors that best account for the adjustment of children and adolescents are the quality of the youths' relationships with their parents, the quality of the relationship between the parents or significant adults in the youths' lives, and the availability of economic and socio-economic resources. *Id.* ¶¶ 13, 18–20.

43. There is a scientific consensus that the same factors affect the adjustment of children, whatever the sexual orientation of their parents. *Id.* ¶¶ 28–37.

44. The parents' sex or sexual orientation does not affect the capacity to be good parents or their children's healthy development. *Id.* ¶¶ 13, 18–20.

45. There is consensus in the scientific community that parental sexual orientation has no effect on children's and adolescents' adjustment. *Id.* ¶ 31.

46. Numerous organizations representing mental health and child welfare professionals have issued statements confirming that same-sex parents are as effective as heterosexual parents in raising well-adjusted children and adolescents and should not face discrimination. *Id.*

47. There is no empirical support for the notion that the presence of both male and female role models in the home promotes children's adjustment or well being. *Id.* ¶¶ 13, 21–27.

48. The absence of a male or female parent in the home does not impair a child's development because men and women both have the capacity to be good parents, it is not harmful to children when parents (male or female) do not assume traditional gender roles with respect to parenting styles, and society is replete with male and female role models. *Id.* ¶¶ 23–27.

49. Gay men and lesbians experience and respond to life experiences and events as any member of society would; this is despite the pervasive social stigma and unique social stresses lesbians and gay men must endure. Peplau Aff. ¶¶ 29–33; Lamb Aff. ¶¶ 12, 13, 20, 28–40

### C. Sexual orientation is a defining or immutable characteristic for constitutional purposes

50. There is a scientific consensus that accepts that sexual orientation is a characteristic that is immutable. Peplau Aff. ¶¶ 19–28; Letter of Att'y Gen. Holder to Speaker Boehner of the U.S. House of Rep., at 3 (Feb. 23, 2011) (Docket Entry No. 10-2).

51. Sexual orientation is a characteristic of an individual, like their biological sex or race. It also is about relationships because sexual orientation is not merely about sexual behavior but also about building enduring intimate relationships. These relationships are an essential part of an individual's personal identity. Peplau Aff. ¶¶ 14, 18.

52. The factors that cause an individual to become heterosexual, gay or lesbian, or bisexual are not currently well understood. Most social and behavioral scientists view sexual orientation as resulting from the interplay of biological, psychological, and social factors. *Id.* ¶ 19.

53. Most adults are attracted to and form relationships with members of only one sex. *Id.* ¶¶ 10, 20.

54. The significant majority of adults exhibit a consistent and enduring sexual orientation. *Id.* ¶ 23.

55. Efforts to change a person's sexual orientation through religious or psychotherapy interventions have not been shown to be effective. *Id.* ¶¶ 10, 26, 27.

56. No major mental health professional organization has approved interventions to change sexual orientation, and virtually all of them have adopted policy statements cautioning professionals and the public about these treatments. *Id.* ¶ 27.

9

57. The fact that a small minority of people may experience some change in their sexual orientation over their lifetime does not suggest that such change is within their power to effect. *Id.* ¶ 23.

58. It is psychologically harmful to ask lesbians and gay men to deny a core part of their identity by ignoring their attraction to same-sex partners and instead marry a different-sex partner. *Id.* ¶ 24.

### D. Gay men and lesbians are a relatively powerless political minority

59. Gay men and lesbians are a minority in the United States. *Id.* ¶ 40.

60. At any level above a local precinct or neighborhood, there is no geographic place in the United States with a gay majority. Expert Affidavit of Gary M. Segura, Ph.D., ¶ 49.

61. Gay men and lesbians do not possess a meaningful degree of political power and are politically vulnerable. *Id.* ¶¶ 9–85.

62. Political power means a person's or group's demonstrated ability to extract favorable or prevent unfavorable policy outcomes from the political system. *Id.* ¶ 13.

63. Traditional markers of political powerlessness include systematic disadvantages in the political process; the existence of significant prejudice, stigmatization, or *de facto* or *de jure* second-class status; or an inability, alone or in concert with reliable coalition partners, to secure basic rights or equal treatment from and within the political process. *Id.* ¶ 27.

64. Gay men and lesbians frequently lack the political power to secure basic rights within the normal political processes or to defend themselves and their civil rights against a hostile majority. *Id.* ¶¶ 9, 26.

65. Gay men and lesbians are the subject of political exclusion and suffer political disabilities greater than other groups that have received suspect class protection from the courts. *Id.* ¶¶ 9, 81–85.

66. In the political arena, gay men and lesbians must rely almost exclusively on allies who are regularly shown to be insufficiently strong or reliable to achieve their goals or protect their interests. *Id.* ¶¶ 9, 75–77.

67. Positive policy outcomes that remediate or repeal express, *de jure* discrimination and bias against the group do not demonstrate a group's affirmative political power but should rather be viewed as a sign of political powerlessness. *Id.* ¶ 25.

68. The political powerlessness of gay men and lesbians is evidenced by their inability to bring an end to pervasive prejudice and discrimination, and to secure desired policy outcomes and prevent undesirable outcomes on fundamental matters that closely and directly impact their lives. *Id.* ¶ 28.

69. The demonstrated vulnerability of occasional and geographically confined policy gains to reversal or repeal is indicative of a role played by "affinity" or sympathy, rather than the exercise of meaningful political power by gay men and lesbians. *Id.* ¶ 28.

70. Even when gay men and lesbians have successfully secured minimal protections in state courts and legislatures, opponents have aggressively used state ballot initiatives and referenda to repeal favorable laws and even amend state constitutions to preclude favorable court decisions. *Id.* ¶¶ 22–23, 34–44.

71. These direct democracy processes have been used against gay men and lesbians more than any other social group. *Id.* ¶ 43.

72. At the time the Supreme Court first began articulating the factors that call for heightened judicial scrutiny, women and racial minorities already had far more protection from discrimination than gay men and lesbians have today. *Id.* 81–85.

73. There is no federal legislation prohibiting discrimination on the basis of sexual orientation in employment, education, access to public accommodations, or housing. *Id.* ¶ 29.

74. Until sexual orientation was added to the federal hate crimes laws in 2009 (over significant opposition), no federal legislation had ever been passed to protect people on the basis of the sexual orientation. *Id.* ¶ 31.

75. Congress only recently authorized the repeal of the military's ban on gay and lesbian service members, and it did so only in a lame-duck session and after two courts had declared the policy unconstitutional. *Id.* ¶ 32.

76. On the state level, there is no statutory protection against discrimination in employment or public accommodations for gay men and lesbians in twenty-nine states. *Id.* ¶ 33.

77. FBI statistics demonstrate that in 2009, almost one-fifth of all hate crime incidents for the previous year were committed because of sexual orientation, and that gay men, along with Jewish Americans, are most likely to be victimized by a bias crime. *Id.* ¶¶ 52, 54.

78. In 2008, seventy-three percent of all hate crimes committed against gay men and lesbians included an act of violence; seventy-one percent of all hate motivated murders in the United States were of gay men and lesbians; and fifty-five percent of all hate-motivated rapes were against gay men and lesbians. *Id.* ¶ 53.

79. The fact that sexual orientation is not a visible trait has undermined gay men and lesbians' ability to mobilize and exercise meaningful political power. *Id.* ¶¶ 56–64.

80.     Gay men and lesbians face severe hostility from non-gay citizens in many parts of the country and opinion data shows that they are held in considerably lower regard than many groups currently receiving the protection of heightened scrutiny from the courts. *Id.* ¶¶ 66–71, 78.

81.     Gay men and lesbians face outspoken denunciation by elected officials in a manner that would be unthinkable if directed toward almost any other social group. *Id.* ¶¶ 72–74.

### V.     History of Marriage and the Defense of Marriage Act

82.     The institution of marriage in the United States is a particular, not a universal, form of the institution. Expert Affidavit of Nancy F. Cott, Ph.D., ¶ 8.

83.     Marriage in the United States has been defined and controlled historically at the state level. *Id.* ¶¶ 24–28.

84.     Since the founding of the United States, there has been a patchwork quilt of marriage rules across the country. *Id.* ¶¶ 24–28.

85.     Marriage has been shaped by legislators and judges in the various states to adjust to changing needs from the founding of the nation until today. *Id.* ¶¶ 13–23.

86.     State marriage laws have varied in accordance with political and economic environments, religious forces, changes in the ethnic composition of a state's residents, and many other local conditions. *Id.* ¶¶ 25–28.

87.     The ability to procreate has never been an eligibility criterion to enter into marriage. *Id.* ¶¶ 19–23.

88. States' variances regarding the validity of marriages of same-sex couples resembles and is parallel to the history of states' divergences with respect to many other dimensions of marriage validity. *Id.* ¶¶ 32–64.

89. States have varied from one another in defining the basic elements of marriage, including whether or not ceremonies are required for validation, age at marriage, what other "race" may marry a "white" person, how marriage may be dissolved, and other issues, and how spousal roles shall be defined and enforced. *Id.* ¶¶ 32–73.

90. There remains substantial variation in state rules on marriage to this day—including whether common law marriages will be recognized, minimum age required for marriage, "hygienic requirements" (such as degree of relatedness that will be permitted between spouses), and marriage dissolution rules—yet the federal government has never stepped in to create uniform requirements for purposes of federal law. *Id.* ¶¶ 32–44, 58–64.

91. Heated controversy often surrounded changes to the features of marriage on which state laws diverged in the past; the controversies today focusing on marriage between couples of the same sex, and state variance on the matter, resemble these past disagreements. *Id.* ¶¶ 36, 50–57, 60–61.

92. Since the Revolutionary War era, the federal government has used marriage as a vehicle to convey benefits to adult citizens and their dependents. *Id.* ¶ 81.

93. The extent of federal laws and policies using marriage in this way has grown to cover vast and important areas, including income tax, Social Security, and citizenship and naturalization privileges and limits. *Id.* ¶ 82.

94. DOMA represents a dramatic departure from the federal government's longstanding tradition of deferring to states' determinations of marital status, as prior to 1996 the

14

federal government never stipulated a uniform definition of marriage for purposes of federal law, and instead relied upon states' determinations. *Id.* ¶¶ 38, 44, 57, 64, 83, 88.

95. By denying federal recognition to legally married same-sex couples, DOMA both reflects and perpetuates stigma against lesbians, gay men, and same-sex couples. Peplau Aff. ¶¶ 39–41.

96. The stigma and discrimination perpetuated by DOMA harm not only individuals in legal same-sex marriages, but gay men, lesbians, and bisexuals as a group. *Id.* ¶ 13.

97. According to the legislative history, DOMA's exclusion in 1996 of all same-sex couples who might one day get married from all federal marital protections and obligations was intended to: (a) "defend[] and nurtur[e] the institution of traditional, heterosexual marriage," (b) "promot[e] heterosexuality," (c) "encourag[e] responsible procreation and child-rearing," (d) "protect[] . . . democratic self-governance," (e) "preserve scarce government resources" by preventing marital benefits from "hav[ing] to be made available to homosexual couples and surviving spouses of homosexual marriages," and (f) promote a "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." H.R. Rep. No. 104-664, at 12, 13, 15, 17, 18 (1996).

98. The recognition of the marriages of same-sex couples would actually increase annual net federal revenue. Cong. Budget Office, U.S. Cong., *The Potential Budgetary Impact of Recognizing Same-Sex Marriages*, at 1 (June 21, 2004), http://www.cbo.gov/ftpdocs/ 55xx/doc5559/06-21-SameSexMarriage.pdf.

Dated: New York, New York
       June 24, 2011

                              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                              /s/ Andrew J. Ehrlich /s/
                              _____
                              Roberta A. Kaplan, Esq.
                              Andrew J. Ehrlich, Esq.
                              1285 Avenue of the Americas
                              New York, New York 10019-6064
                              (212) 373-3000
                              rkaplan@paulweiss.com
                              aehrlich@paulweiss.com

                              – and –
                              James D. Esseks, Esq.
                              Rose A. Saxe, Esq.
                              AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                              125 Broad Street
                              New York, New York 10004-2400
                              (212) 549-2500
                              jesseks@aclu.org
                              rsaxe@aclu.org

                              – and –
                              Alexis Karteron, Esq.
                              Melissa Goodman, Esq.
                              Arthur Eisenberg, Esq.
                              NEW YORK CIVIL LIBERTIES UNION FOUNDATION
                              125 Broad Street, 19th Floor
                              New York, New York 10004
                              (212) 607-3300
                              akarteron@nyclu.org
                              mgoodman@nyclu.org
                              aeisenberg@nyclu.org

                              *Attorneys for Plaintiff Edith Schlain Windsor*