## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                        :
EDITH SCHLAIN WINDSOR, in her           :
capacity as Executor of the Estate of THEA :
CLARA SPYER,                            :
                                        :
                          Plaintiff,    :
                                        :      No.1:10-cv-8435-BSJ-JCF
               v.                       :      ECF Case
                                        :
THE UNITED STATES OF AMERICA            :
                                        :
                          Defendant.    :
-------------------------------------------------------x
```

## BRIEF FOR THE STATE OF NEW YORK AS AMICUS CURIAE
## IN SUPPORT OF THE PLAINTIFF

ERIC T. SCHNEIDERMAN
  *Attorney General of the*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
BENJAMIN N. GUTMAN
  *Deputy Solicitor General*
SIMON HELLER
  *Assistant Solicitor General*
120 Broadway, 25th floor
New York, NY 10271
P: 212-416-8020
F: 212-416-8962
simon.heller@ag.ny.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... i

INTEREST OF THE STATE OF NEW YORK ........................................................... 1

ISSUE PRESENTED ............................................................................................. 5

SUMMARY OF ARGUMENT .................................................................................. 6

ARGUMENT ....................................................................................................... 7

      SECTION 3 OF DOMA DENIES  EQUAL PROTECTION OF THE
      LAW TO PERSONS IN SAME-SEX MARRIAGES VALID UNDER
      STATE LAW .............................................................................................. 7

         A.    DOMA is an Unprecedented Intrusion into the Power of the
              States to Define Marriage. ................................................................... 8

         B.    DOMA Discriminates Based on Sex and Sexual Orientation and
              is Therefore Subject to Heightened Scrutiny. ...................................... 11

              1.    Sexual orientation discrimination. .............................................. 11

              2.    Sex discrimination. .................................................................... 16

         C.    DOMA fails whatever level of scrutiny applies because it does
              not advance any legitimate federal interest ......................................... 17

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                            **Page**

*Baehr v. Lewin,*
   74 Haw. 530 (1993) ........................................................................................ 12

*Baker v. Nelson,*
   409 U.S. 810 (1972) ...................................................................................... 24

*Boggs v. Boggs,*
   520 U.S. 833 (1997) ........................................................................................ 9

*Bond v. United States,*
   131 S. Ct. 2355 (2011) ................................................................................. 10

*Braschi v. Stahl Assocs. Co.,*
   74 N.Y.2d 201 (1989) ..................................................................................... 2

*City of Cleburne v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985) ...................................................................................... 15

*Clark v. Jeter,*
   486 U.S. 456 (1988) ........................................................................... 6, 15, 17

*Coyne v. Smith,*
   221 U.S. 559 (1911) ........................................................................................ 9

*Craig v. Boren,*
   429 U.S. 190 (1976) ................................................................................. 17, 24

*Cruz v. McAneney,*
   31 A.D.3d 54 (2d Dep't 2006) ....................................................................... 3

*Dickerson v. Thompson,*
   73 A.D.3d 52 (3d Dep't 2010) ..................................................................... 1-2

*Dragovich v. U.S. Dep't of Treasury,*
   764 F. Supp. 2d 1178 (N.D. Cal. 2011) .................................................. 10, 23

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) ...................................................................................... 13

*Gill v. Office of Personnel Mgmt.,*
   699 F. Supp. 2d 374 (D. Mass. 2010), *appeal pending*, Nos. 10-2207 & 10-
   2214 (1st Cir.) ...................................................................................... 19-20, 23

ii

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                **Page**

*Godfrey v. Spano,*
   13 N.Y.3d 358 (2009) ............................................................................. 1-3

*Goodridge v. Dep't of Pub. Health,*
   440 Mass. 309 (2003) ............................................................................. 9

*Haddock v. Haddock,*
   201 U.S. 562 (1906), *overruled on other grounds, Williams v. North Carolina,* 317 U.S. 287 (1942) ........................................................ 8-9

*Hayden v. County of Nassau,*
   180 F.3d 42 (2d Cir. 1999) ..................................................................... 16

*Heller v. Doe,*
   509 U.S. 312 (1993) ............................................................................... 15

*In re Balas,*
   449 B.R. 567 (Bankr. C.D. Cal. 2011) ............................................ 17, 19

*In re Estate of Ranftle,*
   81 A.D.3d 566 (1st Dep't 2011) ............................................................. 1

*In re Levenson,*
   560 F.3d 1145 (9th Cir. Jud. Council 2009) ......................................... 17

*In re Levenson,*
   587 F.3d 925 (9th Cir. Jud. Council 2009) ............................... 7, 19, 23

*J.E.B. v. Alabama ex rel. T.B.,*
   511 U.S. 127 (1994) ............................................................................... 11

*Kerrigan v. Comm'r of Pub. Health,*
   289 Conn. 135 (2008) ............................................................................. 9

*Kirchberg v. Feenstra,*
   450 U.S. 455 (1981) ............................................................................... 18

*Larson v. Valente,*
   456 U.S. 228 (1982) ............................................................................... 6

*Lawrence v. Texas,*
   539 U.S. 558 (2003) ............................................................................... 13

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                         **Page**

*Lewis v. N.Y. State Dep't of Civil Serv.*,
60 A.D.3d 216, *aff'd on other grounds sub nom. Godfrey v. Spano*, 13
N.Y.3d 358 (2009) ............................................................................................ 2

*Loving v. Virginia*,
388 U.S. 1 (1967) ........................................................................................... 17

*Mandel v. Bradley*,
432 U.S. 173 (1977) ....................................................................................... 24

*Martinez v. County of Monroe*,
50 A.D.3d 189 (4th Dep't 2008) ....................................................................... 2

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) ....................................................................................... 13

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
698 F. Supp. 2d 234 (D. Mass. 2010), *appeal pending*, No. 10-2204 (1st
Cir.) ........................................................................................................... 5, 10

*New York v. United States*,
505 U.S. 144 (1992) ..................................................................................... 8, 11

*Nixon v. Administrator of Gen Servs.*,
433 U.S. 425 (1977) ....................................................................................... 24

*Plyler v. Doe*,
457 U.S. 202 (1982) ....................................................................................... 21

*Printz v. United States*,
521 U.S. 898 (1997) ......................................................................................... 9

*Reed v. Reed*,
404 U.S. 71 (1971) ..................................................................................... 19, 24

*Romer v. Evans*,
517 U.S. 620 (1996) ............................................................................... 15, 22-23

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995) ....................................................................................... 22

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                           **Page**

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973) ................................................................................ 12, 14

*Sosna v. Iowa,*
    419 U.S. 393 (1975) .................................................................................. 8

*Trimble v. Gordon,*
    430 U.S. 762 (1977) ................................................................................ 15

*United States v. Brennan,*
    No. 08-5171(L), 2011 WL 1679850 (2d Cir. May 5, 2011) ................................ 22-23

*United States v. Carolene Prods. Co.,*
    304 U.S. 144 (1938) ................................................................................ 12

*United States v. Lopez,*
    514 U.S. 549 (1995) ................................................................................ 10

*United States v. Moreno,*
    413 U.S. 528 (1973) .................................................................................. 7

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................................ 18

*Varnum v. Brien,*
    763 N.W.2d 862 (Iowa 2009) ...................................................................... 9

*Williamson v. Lee Optical, Inc.,*
    348 U.S. 483 (1955) ................................................................................ 15

*Zablocki v. Redhail,*
    434 U.S. 374 (1978) .................................................................................. 8

### Federal Statutes

1 U.S.C. § 7 ............................................................................................ 4, 16

7 U.S.C. § 2009aa-1(i) .............................................................................. 21

11 U.S.C. § 302(a) ...................................................................................... 4

## TABLE OF AUTHORITIES (cont'd)

**Federal Statutes**                                                 **Page**

26 U.S.C.
   § 1 ......................................................................................................... 5
   § 2056(a) ............................................................................................... 4
   § 2523 .................................................................................................... 4

38 U.S.C. § 1311 .................................................................................... 4

42 U.S.C. § 402 ..................................................................................... 4

Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2149 .................................... 1

**State Statutes**

*New York*

Marriage Equality Act, ch. 95, 2011 N.Y. Laws __ ............................................. 3-4, 10

Ch. 2, 2002 N.Y. Laws 46 ......................................................................... 3, 14

Civil Rights Law § 40-c(2) ....................................................................... 13

Education Law § 313 .............................................................................. 13

Executive Law
   § 296 ..................................................................................................... 3, 13
   § 354-b .................................................................................................. 3

Insurance Law § 2701(a) .......................................................................... 14

Penal Law
   § 485.05 ................................................................................................ 14
   § 240.30 ................................................................................................ 14

Public Health Law
   § 2805-q ............................................................................................... 3
   § 4201 .................................................................................................. 3

*Other States*

15 Vt. Stat. Ann. § 8 ............................................................................ 9

N.H. Rev. Stat. § 457:1-a ........................................................................ 9

## TABLE OF AUTHORITIES

**Miscellaneous Authorities** **Page**

142 Cong. Rec. H7444 (daily ed. July 11, 1996) ........................................................ 23

142 Cong. Rec. H7487 (daily ed. July 12, 1996) ........................................................ 23

142 Cong. Rec. H7494 (daily ed. July 12, 1996) ........................................................ 23

142 Cong. Rec. H7501 (daily ed. July 12, 1996) ........................................................ 23

Congressional Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* (June 21, 2004) ................................................... 21

H.R. Rep. 104-664 (1996) .........................................................................................passim

Human Rights Campaign, *Employment Non-Discrimination Laws on Sexual Orientation and Gender Identity, available at* http://www.hrc.org/issues/4844.htm ...................................................... 14

Letter from Barry R. Bedrick, Assoc. Gen. Counsel, General Accounting Office, to Hon. Henry J. Hyde, Chairman, House Judiciary Comm. (No. GAO/OGC-97-16 Jan. 31, 1997), *available at* www.gao.gov/archive/ 1997/og97016.pdf .......................................................................................... 4-5

Letter from Dayna K. Shah, Assoc. Gen. Counsel, General Accounting Office, to Hon. Bill Frist, Senate Majority Leader, at 2 (No. GAO-04-353R Jan. 23, 2004)................................................................................................... 18

Williams Institute, *New York Census Snapshot 2010, available at* http://www3.law.ucla.edu/williamsinstitute/pdf/ Census2010Snapshot_NewYork.pdf........................................................ 4

New York Attorney General Eric T. Schneiderman submits this brief amicus curiae on behalf of the State of New York, in support of plaintiff's motion for summary judgment.

## INTEREST OF THE STATE OF NEW YORK

Until Congress enacted the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2149 (DOMA), in 1996, marital status in the United States was determined exclusively by state law. Although some federal laws turn on marital status, the federal government generally has relied on the law of a person's domicile or the place where a marriage was solemnized to determine if the person was validly married. States thus have always had the sole sovereign prerogative to define and regulate marriage.

Exercising this sovereign prerogative, New York accords marriages between same-sex couples the same legal validity as marriages between opposite-sex couples. New York has long recognized as valid same-sex marriages that were solemnized under the laws of other States or nations, such as plaintiff Edith Windsor's Canadian marriage to Thea Spyer. All three statewide elected executive officials— the Governor, the Attorney General, and the Comptroller—have endorsed that conclusion, finding it to have deep roots in New York's general principle of marriage recognition. *See Godfrey v. Spano*, 13 N.Y.3d 358, 368 n.3 (2009) (describing opinions of the Attorney General and Comptroller); *Dickerson v. Thompson*, 73 A.D.3d 52, 54-55 (3d Dep't 2010) (citing directive of the Governor). Every New York State appellate court that addressed the issue has agreed, rejecting the argument that same-sex marriages were contrary to New York's public policy. *See In re Estate*

*of Ranftle*, 81 A.D.3d 566 (1st Dep't 2011) (Canadian same-sex marriage is valid in New York); *Lewis v. N.Y. State Dep't of Civil Serv.*, 60 A.D.3d 216 (3d Dep't), *aff'd on other grounds sub nom. Godfrey v. Spano*, 13 N.Y.3d 358 (2009); *Martinez v. County of Monroe*, 50 A.D.3d 189 (4th Dep't 2008). And while the New York Court of Appeals has not yet found it necessary to address the question, finding a narrower ground for affirmance in *Godfrey,* the four-judge majority said nothing to cast doubt on the uniform lower-court authority recognizing the validity of same-sex marriages, *see Godfrey*, 13 N.Y.3d at 377 (declining to reach question of validity of same-sex marriages), and a three-judge concurrence expressly endorsed that line of cases, *id.* (Ciparick, J., concurring). *See generally Dickerson*, 73 A.D.3d at 54-56 (summarizing New York's "clear commitment to respect, uphold and protect parties to same-sex relationships" both through decisional law and executive action).

Moreover, New York's recognition of out-of-state same-sex marriages is consistent with a long list of other actions taken by New York State and its officials to afford equal rights to same-sex couples. For more than twenty years, New York has recognized that same-sex partners can qualify as "family members" for purposes of state law. *See Braschi v. Stahl Assocs. Co.*, 74 N.Y.2d 201, 211-14 (1989) (interpreting the State's rent-regulation laws to treat certain same-sex partners as family members protected from eviction). In 2002 the Legislature enacted the Sexual Orientation Non-Discrimination Act prohibiting discrimination on the basis of sexual orientation—including discrimination against same-sex couples—in a wide variety of public and private settings, including employment, education, and

housing.  Ch. 2, 2002 N.Y. Laws 46 (codified in Executive Law § 296).  In recent years, the State has recognized same-sex domestic partnerships for a variety of specific purposes.  Among other things, domestic partners are permitted to make claims against the September 11 victim compensation fund, *see Cruz v. McAneney*, 31 A.D.3d 54, 58 (2d Dep't 2006); they are eligible for a supplemental burial allowance for partners killed in military combat, *see* Executive Law § 354-b (enacted 2003); they may visit their partners in hospitals just as spouses may, *see* Public Health Law § 2805-q (enacted 2004); and they may dispose of their partners' remains, *see id.* § 4201(1)(c) (enacted 2006).  And since the mid-1990s, the State has permitted domestic partners of state employees to enroll in the New York State Health Insurance Program for public employees.  *See Godfrey*, 13 N.Y.3d at 369.

More recently, New York enacted the Marriage Equality Act, ch. 95, 2011 N.Y. Laws __, which allows same-sex couples to marry in New York.  This statute represents the next step along a path on which New York long ago embarked, the path of extending equal treatment under law to same-sex couples.  Consistent with these earlier actions, the Marriage Equality Act effectuated the Legislature's express intent to treat same-sex couples and other couples equally with respect to the basic right to enter into marriage, with the following declaration:

> Marriage is a fundamental human right.  Same sex  couples should  have the same access as others to the protections, responsibilities, rights, obligations, and benefits of  civil marriage. Stable family relationships help build a stronger society.  For the welfare of the community and in fairness to all New Yorkers,  this  act formally  recognizes otherwise-valid marriages without regard to whether the parties are of the same or different sex.

Ch. 95, § 2, 2011 N.Y. Laws at __.  The impact of this statute is significant.  The Act expresses an important New York State policy, affecting a substantial number of New York State residents.[1]

Despite the long-standing tradition of state control over the definition of marriage, Section 3 of DOMA redefines marriage for federal purposes to exclude same-sex marriages that are valid under state law.  1 U.S.C. § 7.  Because New York has consistently expressed and implemented its commitment to equal treatment for same-sex couples, New York has a strong interest in ensuring that the "protections, responsibilities, rights, obligations, and benefits," ch. 95, § 2, 2011 N.Y. Laws at __, accorded to them under federal law by virtue of marriage are equal to those accorded to different-sex married couples.  Without such equal treatment by the federal government, New York's statutory commitment to marriage equality for all married couples will be substantially unrealized.  Federal law extends numerous important benefits on the basis of marriage, including the federal estate-tax exemption at issue in this case, 26 U.S.C. § 2056(a); the related gift-tax exemption, *id.* at § 2523(a); social security benefits, 42 U.S.C. § 402; veteran's benefits, 38 U.S.C. § 1311; and the option to file joint bankruptcy petitions, which is often advantageous to married debtors, 11 U.S.C. § 302(a).  *See generally* Letter from Barry R. Bedrick, Assoc. Gen. Counsel, General Accounting Office, to Hon.

---

[1] Recent analysis of 2010 census data shows that there are more than 65,000 same-sex couples living in New York.  Williams Institute, *New York Census Snapshot 2010*, *available at* http://www3.law.ucla.edu/williamsinstitute/pdf/Census2010Snapshot_NewYork.pdf.

Henry J. Hyde, Chairman, House Judiciary Comm., at 3 (No. GAO/OGC-97-16 Jan. 31, 1997) ("GAO, DOMA Letter") (identifying thirteen categories of federal laws in which marital status is a factor), *available at* www.gao.gov/archive/ 1997/og97016.pdf.   In some unusual cases—such as eligibility for Medicaid, *see Massachusetts v. U.S. Dep't of Health & Human Servs.*, 698 F. Supp. 2d 234, 242 (D. Mass. 2010), *appeal pending*, No. 10-2204 (1st Cir.), or avoidance of the federal income tax's so-called marriage penalty, GAO, DOMA Letter, *supra* at 2; 26 U.S.C. § 1—same-sex married couples may fare better under federal law because they will be treated as unmarried by operation of DOMA.   But in many situations, they will fare worse, as Windsor did with respect to the estate tax.   By discriminating among married couples based on sexual orientation and sex, DOMA deprives New York of the ability to extend true equality to all marriages valid in the State.

## ISSUE PRESENTED

Does section 3 of DOMA violate the right of married same-sex couples to equal protection of the law?

5

## SUMMARY OF ARGUMENT

By refusing to recognize for federal purposes marriages that are valid under state law, DOMA intrudes on matters historically within the control of the States, and undermines and denigrates New York's law designed to ensure equality of same-sex and different-sex married couples.  Thus DOMA threatens basic principles of federalism.  Moreover, it classifies and determines access to rights, benefits, and protections based on sexual orientation, and also based on sex.

For each of these reasons, considered separately or together, DOMA should be subjected to heightened scrutiny under the equal protection component of the Fifth Amendment, and it cannot withstand such scrutiny.  Considered as discrimination based on sexual orientation, the statute should be subjected to at least the intermediate scrutiny that applies to classifications based on sex or illegitimacy, *Clark v. Jeter*, 486 U.S. 456, 461 (1988), if not to the strict scrutiny that applies to classifications based on race, national origin, or fundamental rights, *id.*, as well as to discrimination among religious denominations, *Larson v. Valente*, 456 U.S. 228, 246 (1982).  Considered as discrimination based on sex, the statute must be subjected to intermediate scrutiny under well-established precedent.  And judicial scrutiny of this statute should be especially demanding because it intrudes on matters that are, in our federal system of government, quintessentially within the authority of the States.  DOMA fails such heightened constitutional scrutiny because it discriminates between same-sex married couples and different-sex married couples without serving any important federal interest, and therefore violates the equal protection component of the Fifth Amendment.

Moreover, even if the Court were to conclude that intermediate scrutiny does not apply here, the Court should apply more than the most deferential judicial review used in cases involving purely economic government regulation. Instead, the Court should apply a form of rational-basis review that demands an evidence-based connection between legitimate governmental interests and the statute, as well as some demonstration that those interests are advanced. Moreover, a statute is unconstitutional even under rational-basis review if it reflects "a bare congressional desire to harm a politically unpopular group." *United States v. Moreno*, 413 U.S. 528, 534 (1973). DOMA falls squarely within this category because Congress sought to harm married same-sex couples, and therefore the Court should invalidate DOMA under any applicable standard of review.[2]

### ARGUMENT

### SECTION 3 OF DOMA DENIES  EQUAL PROTECTION OF THE LAW TO PERSONS IN SAME-SEX MARRIAGES VALID UNDER STATE LAW

Section 3 of DOMA does not merely determine eligibility for a particular federal program. It literally redefines the term marriage, and it does so in a blunt, across-the-board manner that has no connection to the particular contexts in which federal laws rely on marital status. This interferes with New York's exercise of its

---

[2] Whether the principles leading to the conclusion that DOMA is unconstitutional would also require invalidation of a state law limiting marriage to different-sex couples, such as New York's prior law, is not directly presented by a challenge to DOMA, *see, e.g.*, *In re Levenson*, 587 F.3d 925, 931 n.5 (9th Cir. 2009) (Reinhardt, J., for the Ninth Circuit's Standing Comm. on Federal Public Defenders), and need not be addressed by the Court here.

sovereign authority to define marriage and to eliminate discrimination based on sexual orientation.  Because DOMA treads so closely to—if not beyond—the limits of federal power with respect to the States, the Court should examine carefully both the interests it purportedly advances and the extent to which it actually serves those interests.

**A.    DOMA is an Unprecedented Intrusion into the Power of the States to Define Marriage.**

Under the federal system of government established by the United States Constitution, there are areas of governmental authority reserved to the States alone that are beyond the federal government's power to regulate.  *See New York v. United States*, 505 U.S. 144, 156 (1992).   Domestic relations, including determinations of marital status, is one such area.  It "has long been regarded as a virtually exclusive province of the States," subject only to the constitutional limitations of due process, equal protection, and full faith and credit.  *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *see also Zablocki v. Redhail*, 434 U.S. 374, 392 (1978) (Stewart, J., concurring in the judgment) (recognizing that the right to marry "is under our federal system peculiarly one to be defined and limited by state law"); *Haddock v. Haddock*, 201 U.S. 562, 575 (1906) ("No one denies that the States, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and that] the Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce."),

8

*overruled on other grounds, Williams v. North Carolina*, 317 U.S. 287 (1942) (holding that divorce decrees are entitled to full faith and credit).

Thus, the Supreme Court recognized that since the creation of the Constitution—more than 200 years before the passage of DOMA—the definition of marriage was within the province of the States, *see Haddock, supra*, and until DOMA, federal law generally treated the definition of marriage as a subject within the control of the States. *See Boggs v. Boggs*, 520 U.S. 833, 848 (1997) ("As a general matter, '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.'"). But DOMA departs from the tradition of federal respect for the States' definition of marriage, flatly rejecting the definition of marriage in New York and five other States[3] and thereby elevating the choices of some States above those made by other States. In doing so, DOMA threatens "the constitutional equality of the states [that] is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyne v. Smith*, 221 U.S. 559, 580 (1911).

Were Congress to require New York to repeal the Marriage Equality Act and replace New York's definition of marriage with DOMA's, there would be little doubt that this would constitute an unconstitutional "commandeering" of the sovereignty of New York State. *See Printz v. United States*, 521 U.S. 898, 925 (1997). What

---

[3] These states are: Connecticut, *Kerrigan v. Comm'r of Pub. Health,* 289 Conn. 135 (2008); Iowa, *Varnum v. Brien,* 763 N.W.2d 862 (Iowa 2009); Massachusetts, *Goodridge v. Dep't of Pub. Health,* 440 Mass. 309 (2003); New Hampshire, N.H. Rev. Stat. § 457:1-a; and Vermont, 15 Vt. Stat. Ann. § 8.

DOMA does, however, is but one step short of that: it seeks to limit the effectiveness of New York's new law as much as possible without directly repealing it.  Because so many of "the protections, responsibilities, rights, obligations, and benefits of civil marriage," ch. 95, § 2, 2011 N.Y. Laws at __, are determined by federal law governing taxation, social security benefits, veterans benefits, and health care, DOMA goes a long way towards blocking the desired effect of laws such as New York's Marriage Equality Act.

Although plaintiff has not raised a Tenth Amendment claim in her complaint, principles of federalism should inform this Court's review of her equal-protection claim as well.  Federalism protects not merely the interests of state governments, but also individual liberty: "By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power." *Bond v. United States*, 131 S. Ct. 2355, 2364 (2011).  The power of Congress is at its lowest when it seeks to discourage States from enacting statutes, like the Marriage Equality Act, that are at the core of the States' sovereignty.  In analyzing the validity of the Gun-Free School Zones Act under the Commerce Clause, Justice Kennedy instructed that "[A]t the least we must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern." *United States v. Lopez*, 514 U.S. 549, 580 (1995) (Kennedy, J., concurring).  So too here, the analysis of the statute must take into account that it intrudes on an area of traditional state concern.  *See also Massachusetts*, 698 F. Supp. 2d at 249 (DOMA "intrudes on a core area of state sovereignty"); *Dragovich v.*

10

*U.S. Dep't of Treasury*, 764 F. Supp. 2d 1178, 1189 (N.D. Cal. 2011) (DOMA "impairs the states' authority to define marriage").  DOMA's unprecedented supplanting of state definitions of marriage with a federal definition should therefore be reviewed with significant skepticism, and in recognition of the principle that "the Constitution divides authority between federal and state governments for the protection of individuals." *New York*, 505 U.S. at 181.[4]

### B.    DOMA Discriminates Based on Sex and Sexual Orientation and is Therefore Subject to Heightened Scrutiny.

A statute is subjected to heightened scrutiny if it employs a suspect or quasi-suspect classification, such as race or sex, or is intended to discriminate against a group defined by such a classification.  *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994).  DOMA discriminates among married couples based on two classifications that warrant heightened judicial scrutiny: sexual orientation and sex.

### 1.    Sexual orientation discrimination.

Although DOMA does not expressly employ classifications based on sexual orientation, it has both the purpose and effect of discriminating against gay and

---

[4] These federalism principles come into play only when state choices are impeded by federal *legislation*.  Federalism concerns cannot, of course, protect state choices from the requirements of the federal *Constitution*; indeed, the Fourteenth Amendment was enacted for the specific purpose of overruling contrary state choices.  Thus the federalism concerns invoked here would have no bearing on a claim that the Equal Protection Clause of the Fourteenth Amendment requires invalidating a  state statute regulating same-sex marriage.

lesbian couples.  DOMA's enactment was in direct response to the decision of the Hawaii Supreme Court in *Baehr v. Lewin*, 74 Haw. 530 (1993), in which two lesbian couples and one gay couple sought the right to marry under state law.  The House Judiciary Committee Report expressly stated that "[DOMA] was motivated by the Hawaiian lawsuit" and the prospect of States "permitting homosexual couples to marry" in response to an "orchestrated legal campaign by homosexual groups." H.R. Rep. 104-664, at 2, 4, 9 (1996).  The report stated that DOMA's purpose in part was to express "moral disapproval of homosexuality."  *Id.* at 16.  And because heterosexual individuals are quite unlikely to marry a spouse of the same sex even where they have the right to do so, DOMA's practical effect is felt only by gay and lesbian couples.

Legislative classification based on sexual orientation should trigger heightened scrutiny.  Heightened scrutiny is appropriate where "the class is saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  This may include "discrete and insular minorities," *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938), but also classes (such as women) that do not strictly speaking satisfy that formulation, *see Frontiero v. Richardson*, 411 U.S. 677, 686 n.17 (1973).  The most important factor in determining whether to give a classification heightened scrutiny is that it has historically been used to discriminate in ways that are seldom if ever

relevant to the achievement of legitimate interests.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976).

Gay men and lesbians have long been subjected to purposeful unequal treatment, including criminalization of their sexual conduct.  As the Supreme Court recognized in *Lawrence v. Texas*, "[w]hen homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres."  539 U.S. 558, 575 (2003).  Moreover, the Supreme Court held that such discrimination served no proper governmental interest.  *See id.* at 578 ("The State cannot demean [the] existence [of gay men and lesbians] or control their destiny by making their private sexual conduct a crime.").

Recognizing this long history of invidious discrimination against gay men and lesbians, New York statutes generally treat discrimination on the basis of sexual orientation like discrimination based on other suspect or quasi-suspect classifications such as race, sex, and religion.  For example, New York law includes sexual orientation as one of the protected characteristics for which discrimination is prohibited in the workplace, organized labor, housing, education, public accommodations, credit, and trade.  *See* Civil Rights Law § 40-c(2); Executive Law § 296; Education Law § 313.  New York law extends the special protections to persons seeking insurance benefits for harm occurring in "areas under Nazi influence" to those who suffered discriminated on the basis of sexual orientation.  Insurance Law § 2701(a).  And New York criminalizes hate crimes motivated by sexual orientation

along with crimes motivated by "race, color, national origin, ancestry, gender, religion, religious practice, age, [and] disability." Penal Law §§ 240.30(3), 485.05(1). Many other States have similar laws. *See, e.g.*, Human Rights Campaign, *Employment Non-Discrimination Laws on Sexual Orientation and Gender Identity*, *available at* http://www.hrc.org/issues/4844.htm (last visited July 21, 2011) (noting that twenty States have laws barring employment discrimination on the basis of sexual orientation).

These laws are predicated on legislative findings that gay men and lesbians have suffered a long history of and continue to face unjustifiable discrimination because of their sexual orientation. The New York Legislature has expressly found "that many residents of this state have encountered prejudice on account of their sexual orientation, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering," and that "this prejudice has fostered a general climate of hostility and distrust, leading in some instances to violence against those perceived to be homosexual or bisexual." Ch. 2, 2002 N.Y. Laws at 46.

This "history of purposeful unequal treatment," *San Antonio Indep. Sch. Dist.*, 411 U.S. at 28, justifies heightened scrutiny under the Equal Protection Clause for classifications based on sexual orientation. The Court need not decide precisely what level of heightened scrutiny—intermediate or strict—to apply to sexual-orientation classifications in order to invalidate DOMA on constitutional grounds. And even were the Court to determine that sexual-orientation

14

discrimination should be given something less that intermediate scrutiny, at the very least it deserves something more searching than the minimal scrutiny that applies to ordinary legislative classifications, typified by the Court's review of a statute regulating opticians in *Williamson v. Lee Optical, Inc.,* 348 U.S. 483 (1955). The Court should instead apply a form of rational-basis review that asks whether federal recognition of lawful same-sex marriages "would threaten legitimate interests," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985), insists upon some evidence that such legitimate interests are *actually* threatened, *see id.* at 448-50, and requires that the connection between legitimate interests and government regulation not be "so attenuated as to render the distinction arbitrary or irrational," *id.* at 446.[5]  *See also Heller v. Doe*, 509 U.S. 312, 321 (1993) ("[E]ven the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation").  DOMA does not satisfy this form of rational-basis review.  *See supra* at 7; *cf. Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (striking down a state law that denied gay men and lesbians legal protection across the board under a demanding form of rational-basis review)  The Court need not resolve this particular question regarding the appropriate level of

---

[5] The intermediate scrutiny applied to discrimination based on sex and illegitimacy developed from this more exacting form of rational-basis review as the Court developed its equal protection jurisprudence.  *Compare Trimble v. Gordon*, 430 U.S. 762, 767 (1977) (scrutiny of classification based on illegitimacy is not "toothless," in part because it "approach[es] sensitive and fundamental personal rights"), *with Clark*, 486 U.S. 456  (applying intermediate scrutiny to classification based on illegitimacy).

scrutiny,  both because DOMA also discriminates on the basis of sex, which indisputably requires intermediate scrutiny, and because it fails any level of scrutiny that could be applied here.

### 2.    Sex discrimination.

DOMA discriminates not only on the basis of sexual orientation, but also, and even more explicitly, on the basis of sex or gender.  On its face the statute employs express sex-based classifications.  Section 3 uses sex-based language to classify by marital status: "In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one *man* and one *woman* as husband and wife, and the word 'spouse' refers only to a person of the opposite *sex* who is a husband or a wife."  1 U.S.C. § 7 (emphasis added).  DOMA thus makes federal marital status dependent upon the sex of the partners in the marriage: A man who marries a woman is recognized as married under federal law, but if the same man were to marry a man his marriage would not be recognized.

For this reason, too, DOMA should be subjected to heightened  scrutiny.  A law that "expressly classifies persons on the basis of . . . gender," as does section 3 of DOMA, is discriminatory on its face.  *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).  And it is settled law that discrimination on the basis of sex or gender is subject to "intermediate" scrutiny, under which it will be upheld only if

sex is "substantially related to an important governmental objective." *Clark*, 486 U.S. at 461; *see also Craig v. Boren,* 429 U.S. 190, 197 (1976).

Indeed, DOMA discriminates based on sex in much the same way that the antimiscegenation statute at issue in *Loving v. Virginia*, 388 U.S. 1 (1967), discriminated based on race. *Loving* rejected Virginia's contention "that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications do not constitute an invidious discrimination based upon race." *Id.* at 8. Here too, DOMA discriminates on the basis of sex even though it applies to both men and women who marry persons of the same sex. *See In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. Jud. Council 2009) (Reinhardt, J., for the Ninth Circuit's Standing Comm. on Federal Public Defenders) ("the denial of benefits at issue here [required by DOMA] was sex-based and can be understood as" sex discrimination); *In re Balas*, 449 B.R. 567, 577 (Bankr. C.D. Cal. 2011) (op. of twenty bankruptcy judges) ("DOMA is gender-biased because it is explicitly designed to deprive the Debtors of the benefits of other important federal law solely on the basis that these debtors are two people married to each other who happen to be men.").

### C.   DOMA fails whatever level of scrutiny applies because it does not advance any legitimate federal interest.

Because section 3 of DOMA is subject to heightened scrutiny, it can be upheld only if, at a minimum, it satisfies intermediate scrutiny—that is, its discriminatory classification must be "substantially related to the achievement of an important

governmental objective." *Kirchberg v. Feenstra*, 450 U.S. 455, 459 (1981). "Focusing on the differential treatment for denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.' The burden of justification is demanding and it rests entirely on" those defending the statute. *United States v. Virginia*, 518 U.S. 515, 532-33 (1996). And "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 533.

DOMA's defenders cannot meet this burden. DOMA effectively amended a large and unknown number of federal statutes in one fell swoop. The General Accounting Office identified by means of an electronic search over 1,000 federal statutes affected by DOMA, but it cautioned that because of "the many ways in which the laws of the United States Code may deal with marital status," it may not have captured every relevant law. Letter from Dayna K. Shah, Assoc. Gen. Counsel, General Accounting Office, to Hon. Bill Frist, Senate Majority Leader, at 2 (No. GAO-04-353R Jan. 23, 2004). The legislative history of DOMA purports to identify a number of specific interests that the statute advances, but its blunt approach makes it hard to identify any coherent policy it serves.

Nor can DOMA survive the more exacting form of rational-basis review that courts have sometimes applied to classifications that have not yet been recognized as suspect or quasi-suspect, but nevertheless merit more searching review. *See Reed v. Reed*, 404 U.S. 71 (1971) (finding, under rational-basis review, that sex-

based classification was "the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment").

Section 3 of DOMA does not advance any of the legitimate interests Congress cited in support of the statute:

● Congress asserted an interest in "defending and nurturing the institution of traditional, heterosexual marriage." H.R. DOMA Rep., *supra*, at 12, 15 n.53. It is doubtful that the interest in nurturing the institution of marriage can be limited to heterosexual marriage, but even if it could, that interest would not be served by denying federal benefits to married same-sex couples. It is not plausible that the denial of benefits will induce same-sex couples who are already married to divorce and marry members of the opposite sex. *See Gill v. Office of Personnel Mgmt.*, 699 F. Supp. 2d 374, 389 (D. Mass. 2010), *appeal pending*, Nos. 10-2207 & 10-2214 (1st Cir.). It is equally implausible that the prospect of being denied federal benefits will induce unmarried same-sex couples to separate and marry members of the opposite sex. *See In re Levenson*, 587 F.3d at 932. And allowing same-sex married couples to invoke federal rights associated with marriage, such as the right to file a joint bankruptcy petition, will not "in any way harm any marriage of heterosexual persons." *In re Balas*, 449 B.R. at 578.

● The asserted interest in "encouraging responsible procreation and child-rearing," H.R. DOMA Rep., *supra* at 13, is likewise not served by discriminating among validly married couples, all of whom may be or become parents, whether by adoption or otherwise. Depriving same-sex married couples of

the federal benefits of their marital status will not make them better parents.  On the contrary, this interest would be better served by extending the federal benefits associated with marriage to same-sex couples who have children, because the children would then enjoy "the immeasurable advantages that flow from the assurance of a stable family structure, when afforded equal recognition under federal law." *See Gill*, 699 F. Supp. 2d at 389 (quotation marks and footnote omitted) (quoting *Goodridge v. Dep't of Public Health,* 440 Mass. 309, 335 (2003)).

●    The interest in "protecting . . . democratic self-governance," H.R. DOMA Rep., *supra* at 16, is undermined, not advanced, by DOMA, because it interferes with the democratic decisions of States like New York to guarantee marriage equality regardless of sexual orientation and sex.  This is true whether the States adopted marriage equality through express legislation, as in New York, New Hampshire, and Vermont, or through judicial rulings that themselves are the product of democratic choices about the structure of the state court system and the contents of state constitutions.  Nor does depriving same-sex married couples of the federal benefits of their marital status promote "democratic self-governance" in any other way.

●    The asserted interest in preserving scarce government resources, H.R. DOMA Rep., *supra* at 18, is not enough standing alone to satisfy intermediate scrutiny.  *See Plyler v. Doe*, 457 U.S. 202, 227 (1982) (rejecting interest in preservation of state resources as sufficient to justify discrimination against undocumented aliens).  And in any event, it is served only in the most sporadic and

haphazard way—if at all—by DOMA.  To be sure, exempting any couples from certain types of federal benefits—such as tax exemptions or federal aid programs—saves the cost of *those* benefits.  But many statutes affected by DOMA—such as spousal conflict-of-interest statutes, *e.g.*, 7 U.S.C. § 2009aa-1(i)—do not involve *any* expenditure of funds.  Others, such as exempting married same-sex couples from the so-called marriage penalty imposed on many married couples by the federal income tax laws, impose *greater* costs on the federal government than if DOMA did not exist.  Without a careful analysis of the financial impact of DOMA arising from each of the over 1,000 statutes it affects, it is impossible to determine with any precision whether it actually preserves government resources.  And the Congressional Budget Office—although recognizing that there is "significant uncertainty" about the issue—ultimately concluded that "[o]n balance, legalization of same-sex marriages would have only a small impact on federal tax revenues" and that the net effect would be to *save* the federal government money.  Cong. Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages* 2, 3 (June 21, 2004).  As confirmed by this report, at a minimum DOMA has "little chance" of "directly and materially advanc[ing]" the asserted interest in saving governmental resources.  *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995); *see also Romer*, 517 U.S. at 632 (enactment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects").

●       To the extent Defendants seek to assert that DOMA is necessary to promote a uniform federal definition of marriage, this argument should be rejected at the outset because it was never identified by Congress as a basis for DOMA.  *See United States v. Brennan*, No. 08-5171(L), 2011 WL 1679850, at *30 (2d Cir. May 5, 2011) (under heightened scrutiny courts do not consider *post hoc* rationalizations). Moreover, even if it warranted consideration, the lack of uniformity in the definition of marriage is a direct consequence of the primacy of state regulation of marriage, *see supra* at 8-11, and is therefore integrally related to a significant principle of the federalism established by our Constitution, not a problem whose solution can justify discrimination.  In the context of defining marriage, which has always been a core function of the States, a bare interest in uniformity is  illegitimate.

●       The *only* asserted interest actually advanced by DOMA's unprecedented expansion of federal power is expressing moral disapproval of homosexuality and same-sex relationships.   Congress specifically acknowledged that other interests it asserted in support of DOMA were animated by this overarching interest: "These reasons—procreation and child-rearing—are in accord with nature and hence have a moral component."  H.R. DOMA Rep., *supra* at 15. Moreover, Congress forthrightly expressed its moral condemnation of same-sex marriage: "Civil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality.   This judgment entails both moral disapproval of homosexuality, and a moral conviction that heterosexuality

better comports with traditional (especially Judeo-Christian) morality." [6]  *Id.* at 15-16 (footnote omitted).

But as the Supreme Court explained in striking down a state law prohibiting government action designed to protect gay men and lesbians from discrimination, "a bare desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest."  *Romer*, 517 U.S. at 634 (ellipsis omitted).  Thus, while "[t]he animus toward, and moral rejection of, homosexuality and same-sex relationships are apparent in" DOMA's legislative history, *Dragovich*,  764 F. Supp. 2d at 1190, Congress's desire to express moral condemnation cannot justify denying federal benefits to married same-sex couples.  *See In re Levenson*, 587 F.3d at 932; *see also Gill*, 699 F. Supp. 2d at 396 ("Congress undertook this classification for the

---

[6] Individual congressional proponents of DOMA expressed their disapproval of homosexuality and the gay-rights movement in starker terms.  For example, then-Representative (now Senator) Tom Coburn asserted that his constituents believe "homosexuality is immoral, that it is based on perversion, that it is based on lust."  142 Cong. Rec. H7444 (daily ed. July 11, 1996).  Representative David Funderburk asserted: "Homosexuality has been discouraged in all cultures because it is inherently wrong and harmful to individuals, families, and societies.  The only reason it has been able to gain such prominence in America today is the near blackout on information about homosexual behavior itself."  142 Cong. Rec. H7487 (daily ed. July 12, 1996).  Representative Lamar Smith opined that "[s]ame-sex 'marriages' . . . legitimize unnatural and immoral behavior."  *Id.* at H7494. Representative Henry Hyde, while disclaiming mean-spiritedness or bigotry, asserted that "[t]he homosexual movement has been very successful in intimidating the psychiatric profession."  *Id.* at H7501.

one purpose that lies entirely outside of legislative bounds, to disadvantage a group of which it disapproves.").[7]

Defenders of DOMA occasionally have argued that the lower courts are bound by the Supreme Court's summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972), but that ruling does not foreclose the argument that DOMA violates equal protection of the law. The precedential effect of a summary dismissal for want of a substantial federal question extends no further than "the precise issues presented and necessarily decided by" the dismissal. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). The "precise issues" presented in *Baker* differ from those presented here in at least two significant ways. First, *Baker* addressed whether a State was obliged to permit same-sex couples to marry, not whether the federal government could discriminate among lawful marriages on the basis of sex or sexual orientation. Second, it is not clear that *Baker* presented a claim of discrimination on the basis of sex as well as sexual orientation, but even if it did, at the time sex discrimination was subject only to rational-basis review. *See Reed*, 404 U.S. 71. Later cases, however, definitively held that heightened scrutiny applies to classifications based on sex. *See, e.g., Craig*, 429 U.S. at 197. Thus *Baker* is not dispositive because it

---

[7] The absence of any non-punitive interest supporting DOMA also suggests that it constitutes legislative punishment of same-sex married couples and therefore violates the Bill of Attainder Clause of Article I, section 9. *See Nixon v. Administrator of Gen Servs.*, 433 U.S. 425, 475-76 (1977) ("Where . . . legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers.").

presumptively applied rational-basis review, which is not the standard that applies here.

In sum, DOMA does not advance any legitimate governmental interest. It cannot survive the scrutiny that is warranted because of the groups that it disadvantages and because of the intrusion on an area that is at the heart of state sovereign power. Accordingly, it must be invalidated as a violation of the equal protection component of the Fifth Amendment's Due Process Clause.

## CONCLUSION

This Court should grant plaintiff's motion for summary judgment and declare section 3 of DOMA unconstitutional.

Dated: July 26, 2011.　　　　Respectfully submitted,

ERIC T. SCHNEIDERMAN
　*Attorney General of the*
　*State of New York*
BARBARA D. UNDERWOOD
　*Solicitor General*
BENJAMIN N. GUTMAN
　*Deputy Solicitor General*

By:　/s/　Simon Heller
　SIMON HELLER
　　*Assistant Solicitor General*
　120 Broadway, 25th floor
　New York, NY 10271
　P: 212-416-8020
　F: 212-416-8962
　simon.heller@ag.ny.gov

25