# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                          )

EDITH SCHLAIN WINDSOR, in her    )
capacity as executor of the estate of    )
THEA CLARA SPYER,          )
                          )

      Plaintiff,              )
                          )

      v.                   )     Civil Action No. 10-CV-8435 (BSJ)(JCF)
                          )

THE UNITED STATES OF AMERICA,   )
                          )

      Defendant.          )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR-DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Paul D. Clement
H. Christopher Bartolomucci
Conor B. Dugan
Nicholas J. Nelson
BANCROFT PLLC
1919 M Street, Northwest, Suite 470
Washington, District of Columbia  20036

*Counsel for the Bipartisan Legal Advisory Group of the U.S. House of Representatives*

OF COUNSEL:

Kerry W. Kircher, General Counsel
Christine Davenport, Senior Assistant Counsel
Katherine E. McCarron, Assistant Counsel
William Pittard, Assistant Counsel
Kirsten W. Konar, Assistant Counsel
OFFICE OF GENERAL COUNSEL
U.S. House of Representatives
219 Cannon House Office Building
Washington, District of Columbia  20515

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii

INTRODUCTION ..........................................................................................1

BACKGROUND ............................................................................................2

STANDARD OF REVIEW ...............................................................................2

ARGUMENT ................................................................................................5

    I.    THE CLASSIFICATION AT ISSUE IN DOMA IS NOT SUBJECT TO
        ANY FORM OF HEIGHTENED SCRUTINY. .............................................5

        A.    Persuasive Authority Unequivocally Supports the Conclusion
              That Homosexuals Are Not a Suspect Class. ......................................5

        B.    Based on the Traditional Criteria Used to Determine Suspect
              or Quasi-Suspect Classes, Homosexuals Clearly Are Not
              a Suspect or Quasi-Suspect Class. .......................................................7

              1.    History of Discrimination. ...................................................8

              2.    Ability to Participate in or Contribute to Society. ...............9

              3.    Immutability. ......................................................................10

              4.    Political Powerlessness. ......................................................12

    II.    PLAINTIFF'S ADDITIONAL ARGUMENTS ALSO FAIL. ........................21

        A.    The Federal Government Has Involved Itself in Marriage Law in
              Circumstances of Deviation from the Traditional Definition. ............21

         B.    Plaintiff Misstates the Science on Same-Sex Parenting. ....................23

    III.    PLAINTIFF HAS FAILED TO ESTABLISH THAT HER SAME-SEX
        MARRIAGE WAS VALID FOR THE TAX YEAR IN QUESTION. ............24

CONCLUSION.............................................................................................25

# TABLE OF AUTHORITIES

## **Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)....................................................3

*Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989)..............................................6, 19

*Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006) ..........................5, 6

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...............................*passim*

*Clark v. Jeter*, 486 U.S. 456 (2008)....................................................................3 n.1

*Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008), *cert. denied sub. nom.*,
*Pietrangelo v. Gates*, 129 S. Ct. 2763 (2009) ............................................................5-6

*F.C.C. v. Beach Commnc'ns, Inc.*, 508 U.S. 307 (1993).........................................4, 21

*Frontiero v. Richardson*, 411 U.S. 677 (1973)........................................................7, 9, 11

*Dandridge v. Williams*, 397 U.S. 471 (1970) ...........................................................4

*Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs*, 962 F.2d 136
(2d Cir. 1992)......................................................................................................10, 20

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) ....................................3

*Heller v. Doe*, 509 U.S. 312 (1993) .......................................................................4, 21 n.35

*Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006).....................................................25

*High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563
(9th Cir. 1990)....................................................................................................6, 12, 19

*In re Kandu*, 315 B.R. 123 (Bankr. W.D. Wash. 2004)............................................6

*Johnson v. Robison*, 415 U.S. 361 (1974)..............................................................20

*Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d Cir. 1999) ...................................2

*Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450 (1988) ..........................................3

*Lawrence v. Texas*, 539 U.S. 558 (2003)...............................................................5, 7, 8

*Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973)..............................4

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301
(11th Cir. 2009)..................................................................................................21 n.35

*Lofton v. Sec. of Dep't of Children & Fam. Servs.*, 358 F.3d 804 (11th Cir. 2004)..6, 24

*Lyng v. Castillo*, 477 U.S. 635 (1986) ......................................................................7, 10, 20

*Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307 (1976)....................................................3

*Mills v. Habluetzel*, 456 U.S. 91 (1982) .................................................................4 n.1

*Plyler v. Doe*, 457 U.S. 202 (1982)...........................................................................9

*Ramsey v. Coughlin*, 94 F.3d 71 (2d Cir. 1996) ....................................................3

*Reynolds v. United States*, 98 U.S. 145 (1878)........................................................22

*Romer v. Evans*, 517 U.S. 620 (1996).......................................................................5, 7

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..............................19-20

*Smelt v. Cnty. of Orange*, 447 F.3d 673 (9th Cir. 2006) ...........................................1, 6

*Smelt v. Cnty. of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005), *vacated in part for lack of standing on the DOMA Section 3 issue by* 477 F.3d 673 (9th Cir. 2006)..................................................................................................6

*Steffan v. Cheney*, 780 F. Supp. 1 (D.D.C. 1991), *rev'd on other grounds sub nom. Steffan v. Aspin*, 8 F.3d 57 (D.C. Cir. 1993) ...........................................................19

*U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166 (1980)........................................................4

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ...........................................................2

*Wilson v. Ake*, 354 F. Supp. 2d 1298 (M.D. Fla. 2005)............................................6

*Woodward v. United States*, 871 F.2d 1068 (Fed. Cir. 1989)....................................12


**Statutes and Legislative Authorities**

2011 R.I.H.B. 6103 (July 2, 2011)...........................................................................18 n.31

26 U.S.C. § 2056.....................................................................................................2

26 U.S.C. § 2010.....................................................................................................2

750 Ill. Comp. Stat. 75 / 20 (2011) .........................................................................18 n.31

Cal. Fam. Code § 297.5 (West 2011)........................................................................18 n.31

Colo. Rev. Stat. § 15-22-105 (2011) ..................................................................18 n.31

Conn. Gen. Stat. Ann. § 46b-20 (West 2011) .........................................................18 n.30

D.C. Code § 46-401, *et seq.* (2011) ...................................................................18 n.30

Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996),
1 U.S.C. § 7 ............................................................................................... 1

Del. Code Ann. tit. 13 § 212 (2011) ...................................................................18 n.31

Fed. R. Civ. P. 56(a) ..................................................................................2

Haw. Rev. Stat. § 572C-1 (2011) .......................................................................18 n.31

Morrill Anti-Bigamy Act, ch. 126, § 1, 12 Stat. 501, 501 (1862)
(codified as amended at U.S. Rev. Stat. § 5352) ...................................................22

N.H. Rev. Stat. Ann. § 457:1-a, *et seq.* (2011) .......................................................18 n.30

N.Y. Dom. Rel. § 10-a (McKinney 2011) .................................................................18 n.30

Nev. Rev. Stat. Ann. § 122A.010, *et seq.* (2011) ......................................................18 n.31

Or. Rev. Stat. § 106.305 (West 2011) ..................................................................18 n.31

Vt. Stat. Ann. tit. 15, §8, *et seq.* (West 2011) ......................................................18 n.30

Wash. Rev. Ann. Code § 26.60.010 (West 2011) ..........................................................18 n.31

## **Other Authorities**

6 James Wm. Moore, et al., *Moore's Federal Practice* (2d ed. 1995) ......................3

Abby Goodnough, *Rhode Island Lawmakers Approve Civil Unions*, N.Y.
Times, June 29, 2011, http://www.nytimes.com/2011/06/30/us/30unions.html. ......14 n.11

Abby Phillip, *Obama to Nominate Fourth Openly Gay Judicial Candidate*,
Politico, July 20, 2011, http://www.politico.com/news/stories/0711/59489.html.....14 n.8

*Abortion Policy/Pro-Life: Long-Term Contribution Trends*, OpenSecrets.org,
http://www.opensecrets.org/industries/totals.php?cycle=2010&ind=Q14 ...............17 n.27

Ann Hulbert*, The Gay Science: What Do We Know About the Effects of Same-
Sex Parenting?*, Slate (Mar. 12, 2004), http://www.slate.com/id/2097048/ ............24

Corporate Equality Index 2011,
http://www.hrc.org/documents/HRC-CEI-2011-Final.pdf. ......................................15 n.13

Corporate Equality Index 2011, http://www.hrc.org/cei2011/index.html. ................15 n.14

Dana Milbank, *In A 'Quiet Moment' Gay Judge Makes History*, Wash. Post,
July 18, 2011, http://www.washingtonpost.com/opinions/in-a-quiet-moment-gay-judge-makes-history/2011/07/18/gIQAo7PhMI_story.html  ........................................13 n.6

*Dorsey Receives Top Score on HRC's Corporate Equality Index, Dorsey &
Whitney LLP*, http://www.dorsey.com/hrc_corp_equity_2010/. ...............................15 n.15

Dudley Clendinen & Adam Nagourney, Out for Good:  The Struggle to Build a
Gay Rights Movement in America (1999)...............................................................16

Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*, N.Y. Times,
July 22, 2011, http://www.nytimes.com/2011/07/23/us/23military.html .................14 n.12

*Esurance Earns Perfect Score in 2011 Human Rights Campaign Corporate
Equality Index*, esurance, http://www.esurance.com/news/2010-esurance-esurance-earns-perfect-score-2011-hrc-index-press-release  ....................................................15 n.15

Frank Newport, *For First Time, Majority of Americans Favor Legal Gay
Marriage*, Gallup.com (May 20, 2011), http://www.gallup.com/poll/147662/First-Time-Majority-Americans-Favor-Legal-Gay- Marriage.aspx. ...........................................18 n.28

*Gay & Lesbian Rights & Issues: Long-Term Contribution Trends*, OpenSecrets.org,
http://www.opensecrets.org/industries/totals.php?cycle=2010&ind=j7300 .............17 n.26

The Gay & Lesbian Victory Fund and Leadership Institute, *2008 Annual
Report*, http://www.victoryfund.org/files/victory_annual_08.pdf. ...........................16 n.20

The Gay & Lesbian Victory Fund and Leadership Institute, *2010 Annual
Report*, http://www.victoryfund.org/files/victory_annual_10.pdf. ...........................17 n.24

Gay Histories and Cultures:  An Encyclopedia (George E.
Haggerty ed., 2000)..............................................................................................11

George Chauncey, Why Marriage?:  The History Shaping Today's Debate
Over Gay Equality (2004).......................................................................................8

George W. Dent, Jr., *No Difference?:  An Analysis of Same-Sex Parenting*,
___ Ave Marie L. Rev. ___ (forthcoming 2011),
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1848184 .................................24

*gleam:  Gay, Lesbian, Bisexual, and Transgender Employees at Microsoft*,
Microsoft Corp.,
http://www.microsoft.com/about/diversity/en/us/programs/ergen/gleam.aspx .........15 n.19

Human Rights Campaign Lauds 2008 Election Results (Nov. 4, 2008),
http://www.hrc.org/11517.htm ...............................................................................17 n.22

Joe Biden:  'National Consensus' on Gay Marriage Inevitable, LGBTQ,
Nation (Dec. 25, 2010),  http://www.lgbtqnation.com/2010/12/joe-biden-national-consensus-on-
gay-marriage-inevitable-video/ .............................................................................19 n.33

Kenji Yoshino, *The Gay Tipping Point*, 57 UCLA L. Rev. 1537 (June 2010)..........16

Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the
Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc.
Issues 301 (2000) .....................................................................................................11

Lisa Diamond, *New Paradigms for Research on Heterosexual & Sexual-Minority
Development*, 32 J. of Clinical Child & Adolescent Psychol. 492 (2003)................10-11

Marc Gunther, *Queer Inc.:  How Corporate America Fell in Love with Gays
and Lesbians*, Fortune, Nov. 30, 2006,
http://money.cnn.com/magazines/fortune/fortune_archive/2006/12/11/8395465/....15 n.16

Michael Barbaro, *Behind N.Y. Gay Marriage, an Unlikely Mix of Forces*,
N.Y. Times, June 25, 2011, http://www.nytimes.com/2011/06/26/nyregion/the-road-to-gay-
marriage-in-new-york.html?pagewanted=all..........................................................14 n.9

Michelle Minkoff et al., *Proposition 8:  Who Gave in the Gay Marriage Battle?*,
L.A. Times, July 13, 2011, http://projects.latimes.com/prop8/ .................................18 n.29

MJ Lee, *Obama Backs Bill To End DOMA*, Politico, July 19, 2011,
http://www.politico.com/politico44/perm/0711/all_due_respect_52655160-80d9-4749-a26a-
3525888f615a.html. ..................................................................................................14 n.7

Nigel Dickson, et al., *Same Sex Attraction in a Birth Cohort:  Prevalence and
Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607 (2003) ..........................12

Owen Keehnen, *The Case for Gay Marriage: Talking with* Why Marriage?
*Author George Chauncey* (2004), GLBTQ.com,
http://www.glbtq.com/sfeatures/interviewgchauncey.html .......................................8

*Perfect Score on HRC Corporate Equality Index - 2008, 2009, 2010, 2011*,
Bryan Cave,
http://www.bryancave.com/2011-national-lgbt-equality-survey-10-04-2010/ .........15 n.15

Phil Reese, *O'Malley Backs 2012 Push for Marriage Equality*, Wash. Blade,
July 22, 2011, http://www.washingtonblade.com/2011/07/22/omalley-backs-2012-push-for-
marriage-equality/ ....................................................................................................14 n.12

Press Release, Victory! Administration Drops DOMA Defense, Human Rights
Campaign, https://secure3.convio.net/hrc/site/Advocacy?cmd=display&page=
UserAction&id=1045 .......................................................................................13

*Raytheon Featured in New Book by Bestselling Author*, Raytheon,
http://www.raytheon.com/newsroom/feature/rtn08_tsandersbk/ ............................15-16 n.19

Reid J. Epstein, *John Kerry Backs Gay Marriage*, Politico, July 22, 2011,
http://www.politico.com/news/stories/0711/59643.html...........................................14 n.12

Susan Page, *Gay Candidates Gain Acceptance*, U.S.A. Today (last updated
July 20, 2011), http://www.usatoday.com/news/politics/2011-07-19-gay-candidates-
politics_n.htm.............................................................................................13 n.5, 17 n.25

Wyatt Buchanan, *New State Law Requires LGBT History in Textbooks*, S.F.
Chron., July 15, 2011, http://www.sfgate.com/cgi-
bin/article.cgi?f=/c/a/2011/07/14/BAL61KAHVQ.DTL...........................................14 n.10

## INTRODUCTION

Plaintiff is not entitled to judgment as a matter of law.  Her claim to summary judgment fails at the threshold:  Contrary to her arguments, no form of heightened scrutiny applies to Section 3 of the Defense of Marriage Act ("DOMA").  Pub. L. No. 104-199, § 3, 110 Stat. 2419 (1996), codified at 1 U.S.C. § 7.  Rather, DOMA is subject only to rational basis review.  And (as made clear in the memorandum of law simultaneously filed by the United States House of Representatives' Bipartisan Legal Advisory Group (the "House") in support of its motion to dismiss), DOMA easily passes the rational basis test and does not violate the Equal Protection component of the Fifth Amendment.

Any effort to redefine the institution of marriage as something other than the union of one man and one woman is a matter best left in the hands of the elected, politically accountable branches of the federal government and the citizenry through the democratic process.  As the Ninth Circuit has noted, "it is difficult to imagine an area more fraught with sensitive social policy considerations in which federal courts should not involve themselves if there is an alternative."  *Smelt v. Cnty. of Orange*, 447 F.3d 673, 681 (9th Cir. 2006).  And there is an alternative:  Determining the federal rights of same-sex couples "remains a fit topic for [Congress] rather than the courts."  *Id*. at 684 n.34 (citing several bills pending in the 109th Congress).  In short, the question at issue in this case is not the sort of question that is "unlikely to be soon rectified by legislative means."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see infra* at 12-21 (discussing significant political power of gays and lesbians). This is a quintessential legislative and democratic question that should be decided by the people, not by the courts.  Accordingly, this Court should deny Plaintiff's Motion for Summary Judgment and instead grant Defendant-Intervenor's Motion to Dismiss.

## BACKGROUND

Plaintiff Edith Schlain Windsor, a resident of New York State, and Thea Clara Spyer obtained a marriage certificate in Toronto, Canada, in May 2007.  Am. Compl. (Feb. 2, 2011) (ECF No. 9) ¶¶ 11, 40.  In February 2009, Ms. Spyer died, leaving her substantial estate to Plaintiff.  Am. Compl. ¶ 51.  While New York law allegedly recognizes an out-of-country same-sex marriage, *see id.* ¶ 4, the federal government does not.  For couples who are married consistent with the federal law definition, the property of a deceased spouse ordinarily passes to the surviving spouse without the surviving spouse incurring any federal estate tax.  *See* 26 U.S.C. § 2056(a).  Because Spyer's estate exceeded $5,000,000—the exclusion amount in 26 U.S.C. § 2010(c)—and because Spyer and Plaintiff were not married according to federal law, federal law treated Plaintiff like any other recipient of a substantial bequest.  Plaintiff had to pay applicable estate taxes, in the amount of approximately $360,000.  Am. Compl. ¶ 76.  Plaintiff brought this action alleging that DOMA violates the equal protection component of the Fifth Amendment's due process clause and asking this Court to declare DOMA unconstitutional.  Am. Compl. ¶ 85; "Prayers for Relief."

## STANDARD OF REVIEW

Summary judgment should be granted where the pleadings, discovery, and any affidavits show there to be "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In ruling on a motion for summary judgment, a court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'"  *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 133 (2d Cir. 1999) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)).

"[I]t is generally established that 'the trial court is not precluded from entering summary judgment for the non-movant if, in reality, no factual dispute exists and the non-movant is entitled to summary judgment as a matter of law.'"  *Ramsey v. Coughlin*, 94 F.3d 71, 73 (2d Cir. 1996) (quoting 6 James Wm. Moore, et al., *Moore's Federal Practice* ¶ 56.12, at 56-165 (2d ed. 1995)).  "It is the movant's burden to show that no genuine factual dispute exists and all reasonable inferences must be drawn in the non-movant's favor."  *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (internal citations omitted).  "[W]here the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing."  *Id*. at 140-41 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

A legal classification such as DOMA is subject to review under the equal protection component of the Fifth Amendment.  In *Massachusetts Board of Retirement v. Murgia*, the Supreme Court summarized well-settled doctrine in stating that "equal protection analysis requires strict scrutiny of a legislative classification *only when* the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."  427 U.S. 307, 312 (1976) (emphasis added).  Where laws do not implicate a suspect class or fundamental right, such laws "will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose."  *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457-58 (1988).[1]

---

[1]  Between strict scrutiny and rational basis review lies intermediate scrutiny.  The Supreme Court has recognized two classifications that fall within this category:  Classifications based on sex and those based on illegitimacy.  A law classifying on the basis of sex will only survive if "it is substantially related to a sufficiently important governmental interest."  *City of Cleburne*, 473 U.S. at 441 (internal citation omitted); *see also Clark v. Jeter*, 486 U.S. 456, 461

*(Continued)*

The Supreme Court has made clear that rational review involves a low bar over which legislation must pass. "This standard of review is a paradigm of judicial restraint." *F.C.C. v. Beach Commnc'ns, Inc.*, 508 U.S. 307, 314 (1993). A law reviewed under rational basis "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id*. at 313. "On rational-basis review, a classification in a statute . . . comes to us bearing a strong presumption of validity." *Id*. at 314; *City of Cleburne*, 473 U.S. at 440 ("legislation is presumed to be valid" under rational review standard). Those who attack a classification that does not implicate a suspect class or a fundamental right "have the burden 'to *negative* every conceivable basis which might support it.'" *Beach Commnc'ns*, 508 U.S. at 315 (emphasis added) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). "Moreover, . . . it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315 (citing *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980)). This means that, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* at 315. Courts are also "compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe*, 509 U.S. 312, 321 (1993); *see also id*. ("A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.") (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)).

---

(2008). A classification based on illegitimacy will only survive where it is "substantially related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 441 (quoting *Mills v. Habluetzel*, 456 U.S. 91, 99 (1982)) (quotation marks omitted). Such heightened or intermediate review "inevitably involves substantive judgments about legislative decisions . . . ." *Id.* at 443.

**ARGUMENT**

I.   **THE CLASSIFICATION AT ISSUE IN DOMA IS NOT SUBJECT TO ANY FORM OF HEIGHTENED SCRUTINY.**

A.   **Persuasive Authority Unequivocally Supports the Conclusion That Homosexuals Are Not a Suspect Class.**

Plaintiff argues that DOMA is subject to either strict or intermediate scrutiny.  Pl.'s Mem. Summ. J. at 10 (June 24, 2011) (ECF No. 29).[2]  Pointing to no supporting cases—and assiduously avoiding the citation of the legion of cases holding that rational basis applies—Plaintiff asks this Court to create a new suspect classification.  This Court should decline that invitation and instead follow every circuit to have addressed the issue and hold that homosexuality does not constitute a suspect or quasi-suspect class.

Sexual orientation *never* has been viewed as a suspect or quasi-suspect classification by the federal courts.  First, "the Supreme Court has never ruled that sexual orientation is a suspect classification for equal protection purposes."  *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006).  On the contrary, it applied the rational basis test to equal protection challenges of classifications based on sexual orientation.  *See Romer v. Evans*, 517 U.S. 620 (1996); *Lawrence v. Texas*, 539 U.S. 558 (2003).  Second, every federal Court of Appeals that has addressed the question—and nearly every Circuit has—has concluded that homosexuals are not a suspect or quasi-suspect class.  No fewer than *eleven* federal circuits have held that homosexuals are not a suspect class.  *See Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008) ("Absent additional guidance from the Supreme Court, we join our sister circuits in declining to

---

[2]  Plaintiff offers no guidance as to whether strict or intermediate scrutiny applies. Rather, Plaintiff simply argues that DOMA "should be subject to strict or, at the very least, intermediate scrutiny."  Pl.'s Mem. Summ. J. at 22.  Plaintiff also generally argues that DOMA satisfies neither standard, but again fails to tell this Court which of the two standards governs. *Id.* at 23.

read *Romer* as recognizing homosexuals as a suspect for equal protection purposes."), *cert.*

*denied sub. nom.*, *Pietrangelo v. Gates*, 129 S. Ct. 2763 (2009); *Citizens for Equal Prot.*, 455

F.3d at 866-67; *Lofton v. Sec. of Dep't of Children & Fam. Servs.*, 358 F.3d 804, 818 & n.16

(11th Cir. 2004) (citing cases from the Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, District of

Columbia, and Federal Circuits) ("[A]ll of our sister circuits that have considered the question

have declined to treat homosexuals as a suspect class.")[3]; *High Tech Gays v. Def. Indus. Sec.*

*Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990) ("Our review compels us to agree with the

other circuits that have ruled on this issue and to hold that homosexuals do not constitute a

suspect or quasi-suspect class."); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989)

("[W]e must depart from [the district court's] analysis in which [it] found that homosexuals

constitute a suspect class, justifying heightened scrutiny of the regulation.").  Indeed, a number

of courts have applied rational basis review not only to classifications based on homosexuality in

general, but have done so in the specific context of laws defining marriage as between a man and

a woman.  *See Citizens for Equal Prot.*, 455 F.3d at 866-67; *Wilson v. Ake*, 354 F. Supp. 2d

1298, 1307-08 (M.D. Fla. 2005); *Smelt v. Cnty. of Orange*, 374 F. Supp. 2d 861, 874-75 (C.D.

Cal. 2005) (stating that DOMA "does not make a suspect or quasi-suspect classification"),

*vacated in part for lack of standing on the DOMA Section 3 issue by* 477 F.3d at 686; *In re*

*Kandu*, 315 B.R. 123, 143 (Bankr. W.D. Wash. 2004) (holding that *Lawrence* did "not

eviscerate" the Ninth Circuit's holding in *High Tech Gays* that homosexuals do not constitute a

suspect or quasi-suspect class).

      Plaintiff would have this Court disregard this consistent, substantial, and persuasive

authority.  She invites this Court to take a radical step while failing to mention any of this

---

[3]  The only two Courts of Appeals not to have addressed the question are the Second and
Third Circuits.

substantial precedent in her memorandum of law in support of her motion for summary judgment.  This Court should decline this invitation to depart from this substantial body of persuasive authority.

> **B.     Based on the Traditional Criteria Used to Determine Suspect or Quasi-Suspect Classes, Homosexuals Clearly Are Not a Suspect or Quasi-Suspect Class.**

Even putting this on-point precedent to one side, Plaintiff's arguments for applying some form of heightened scrutiny fail under the standards articulated by the Supreme Court for determining whether heightened scrutiny is appropriate.

Plaintiff argues that "[n]either the Supreme Court nor the Second Circuit has yet articulated the level of scrutiny that should apply to laws like DOMA that discriminate based on sexual orientation."  Pl.'s Mem. Summ. J. at 13.  As demonstrated above, as to the Supreme Court, this is simply wrong:  The Supreme Court has considered such classifications in two cases and applied rational basis scrutiny in each instance.  *See supra* at 5 (citing *Romer* and *Lawrence*).

The traditional criteria for determining whether a class is suspect or quasi-suspect are: (1) whether the class has suffered a history of discrimination; (2) whether the classification at issue relates to one's "ability to perform or contribute to society," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973); (3) whether the class demonstrates immutable characteristics; and (4) whether the class at issue is politically powerless.  *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (holding that "[c]lose relatives are not a 'suspect' or 'quasi-suspect' class" because "[a]s a historical matter, they have not been subjected to discrimination; they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; *and* they are not a minority or *politically powerless*") (emphasis added).

1.      **History of Discrimination.**

Plaintiff first argues that DOMA is subject to strict scrutiny because of the "long history of purposeful discrimination that lesbians and gay men have suffered at the hands of both governmental and private actors."  Pl.'s Mem. Summ. J. at 13.  But as Plaintiff's own expert has admitted, "[a]lthough . . . antigay discrimination is popularly thought to have ancient roots, in fact it is a unique and relatively short-lived product of the twentieth century."  George Chauncey, Why Marriage?: The History Shaping Today's Debate Over Gay Equality 14 (2004).  According to Dr. Chauncey, "all of the [discrimination] was put in place between the 1920s and 1950s, and most were dismantled between the 1960s and the 1990s."  Owen Keehnen, *The Case for Gay Marriage: Talking with* Why Marriage? *Author George Chauncey* (2004), GLBTQ.com, http://www.glbtq.com/sfeatures/interviewgchauncey.html; *see also id.* ("It's really dangerous – and it hurts us – that we are so unfamiliar with this history because the opponents of gay rights and certainly same-sex marriage like to claim that history is on their side and that discrimination and hostility against gay people is age old.").  Plaintiff's expert agrees with the Supreme Court's observation in *Lawrence v. Texas* that the relatively short history of anti-gay discrimination is a consequence of the fact that homosexuality – as a distinct category or class – was not even recognized in the United States until the late nineteenth century.  539 U.S. at 568-69 (relying on the scholarly position that "the concept of the homosexual as a distinct category of person did not emerge until the late 19th century"); Chauncey Aff. ¶¶ 10, 20-21 (June 24, 2011) (ECF No. 35); Dep. of George Chauncey, Ph.D. (July 12, 2011) ("Chauncey Dep.") at 48:24-51:24, attached as Ex. A to Decl. of Conor B. Dugan ("Dugan Decl.").

Moreover, whatever the historical record of discrimination, the most striking factor is how quickly things are changing through the normal democratic processes on issues ranging

from same-sex marriage to "Don't Ask Don't Tell" and beyond. *See infra* at 12-21. Historical discrimination alone never has been a basis for heightened scrutiny. Courts apply a multi-factor test that focuses on current reality and cautions courts against unnecessarily taking issues away from the normal democratic process. *See, e.g.*, *City of Cleburne*, 473 U.S. at 440 (stating that strict scrutiny applies where a group faces "discrimination [that] is unlikely to be soon rectified by legislative means").

### 2.  Ability to Participate in or Contribute to Society.

Plaintiff next argues that "[c]lassifications based on a 'characteristic' that 'frequently bears no relation to ability to perform or contribute to society' further reinforce the need for heightened scrutiny because such classifications are rarely a legitimate basis for government decisionmaking." Pl.'s Mem. Summ. J. at 16 (quoting *Frontiero*, 411 U.S. at 686). Yet, according to case law that Plaintiff herself cites, the "[c]lassifications treated as suspect tend to be *irrelevant* to any *proper legislative goal*." *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 218 n.14 (1982)) (emphasis added).

That is not the case when it comes to the definition of marriage to cover only the traditional definition. The Congress that enacted DOMA and the President who signed it obviously thought that the classifications drawn by DOMA were relevant and rationally related to several legitimate legislative goals. *See also* House Mem. in Supp. of Mot. to Dismiss (Aug. 1, 2011) at 26-43. If that is the case, then DOMA survives rational basis review. If that were not the case, then DOMA would fail rational basis, and the application of heightened scrutiny would be superfluous.

Moreover, as with historical considerations, Plaintiff's question-begging contention that homosexuality is never a relevant or rational basis for classification is hardly the sum total of the

heightened scrutiny analysis.  The questions whether a classification involves an immutable characteristic and whether the class is politically powerless are also essential to the heightened scrutiny analysis.  *See Lyng*, 477 U.S. at 638; *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs*, 962 F.2d 136, 141 (2d Cir. 1992).

### 3.    Immutability.

Plaintiff next argues that sexual orientation is immutable.  Pl.'s Mem. Summ. J. at 17-18. She states that "the Attorney General has recognized[] 'a growing scientific consensus [that] accepts that sexual orientation is a characteristic that is immutable.'"  *Id.* at 18 (second alteration in original) (quoting Feb. 23, 2011 Letter from Eric A. Holder Jr., Att'y Gen., to John A. Boehner, Speaker of the U.S. House of Reps. (Feb. 25, 2011) (ECF No. 10-2)) ("Holder Letter"). Whether a classification is "immutable" is of course a legal conclusion – not a scientific one – and the Attorney General's selective reading of scientific evidence warrants no deference from this Court.  His conclusion and the Plaintiff's argument are also both wrong.

Plaintiff's claim runs headlong into the differing definitions of the terms "sexual orientation," "homosexual," "gay," and "lesbian" supplied by Plaintiff's own experts.  *See* Dep. of Letitia Anne Peplau, Ph.D. (July 8, 2011) ("Peplau Dep.") at 11:19-13:3, attached as Ex. B to Dugan Decl. (declining to use term homosexuality and defining sexual orientation, gay, and lesbian); Dep. of Gary Segura, Ph.D. (July 8, 2011) ("Segura Dep.") at 14:17-16:15, attached as Ex. C to Dugan Decl. (defining gay, lesbian, and homosexual); Chauncey Dep. at 12:15-15:15, attached as Ex. A to Dugan Decl. (acknowledging that some people distinguish "gay" and "homosexual," but stating that he uses them synonymously; defining the terms gay, lesbian, homosexuality, and homosociality); *see also* Lisa Diamond, *New Paradigms for Research on Heterosexual & Sexual-Minority Development*, 32 J. of Clinical Child & Adolescent Psychol.

492 (2003) ("There is currently no scientific or popular consensus on the exact constellation of experiences that definitively 'qualify' an individual as lesbian, gay, or bisexual."); Gay Histories and Cultures:  An Encyclopedia 452 (George E. Haggerty ed., 2000) ("[T]he single word *homosexuality* has come to condense a variety of mutually conflicting ideas about same-sex sexual attraction and an assortment of conceptual models for understanding it . . . .  [I]t is less useful to insist on any one definition of *homosexuality* than it is to describe and to account for the conceptual incoherence that now has become inseparable from both the term and the category."). These differing definitions show that these terms are amorphous and do not adequately describe a particular class.

Moreover, Plaintiff's argument also conflicts with the admissions by one of her experts that homosexuality cannot be determined at birth, *see* Peplau Dep. at 25:20-23, attached as Ex. B to Dugan Decl. ("[L]ooking at a newborn, I would not be able to tell you what that child's sexual orientation is going to be."), and that a significant percentage of gays and lesbians believe they exercised some or a great deal of choice in determining their sexuality, *id.* at 36:24-37:24. Plaintiff's own evidence indicates more than 12% of self-identified gay men and nearly one out of three lesbians reported that they experienced some or much choice about their sexual orientation.  *Id.*, Ex. 4 at 186.  This contrasts with actual suspect classes, which involve "immutable characteristic[s]" determinable at birth and "determined *solely* by the *accident* of birth."  *Frontiero*, 411 U.S. at 686 (emphasis added) (plurality op.).  Moreover, according to multiple studies, a high number of persons who experience sexual attraction to members of the same sex early in their adult lives later cease to experience such attraction.  Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc. Issues 301 (2000) ("50% [of respondents] had changed their identity

11

label more than once since first relinquishing their heterosexual identity"); Nigel Dickson, et al., *Same Sex Attraction in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1611-12 (2003).[4]  Even Plaintiff's own expert discusses and recognizes the concept of sexual plasticity and fluidity – that "individuals have reported changes in their sexual orientation in midlife."  Peplau Aff. ¶ 23.

Plaintiff's claim concerning immutability also fails to account for the courts that have rejected this argument in the past.  For instance, the Federal Circuit has held that

> [h]omosexuality, as a definitive trait, differs fundamentally from those defining any of the recognized suspect or quasi-suspect classes.  Members of recognized suspect or quasi-suspect classes, e.g., blacks or women, exhibit immutable characteristics, whereas homosexuality is primarily behavioral in nature. . . .  The conduct or behavior of the members of a recognized suspect or quasi-suspect class has no relevance to the identification of those groups.

*Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) (internal citations omitted); *see also High Tech Gays*, 895 F.2d at 573 ("Homosexuality is not an immutable characteristic.").

### 4.    Political Powerlessness.

Plaintiff also argues that lesbians and gay men lack political power.  Plaintiff argues that "[t]here can be no serious dispute that ongoing political events evince 'a continuing antipathy or prejudice' towards lesbians and gay men."  Pl.'s Mem. Summ. J. at 20.  That is a difficult claim to maintain in light of recent events in this state and in this litigation.  Plaintiff cannot maintain that she is part of a class that faces "discrimination [that] is unlikely to be soon rectified by legislative means."  *City of Cleburne*, 473 U.S. at 440.

Plaintiff appears oblivious to the irony of maintaining that homosexuals have limited political power in a case in which her position is supported by both the State of New York and

---

[4]  Indeed, the plaintiff in this case, at one time, was married to a man.  *See* Divorce Decree, attached as Ex. F to Dugan Decl.

the United States Department of Justice.  In light of the latter's longstanding duty to defend the constitutionality of federal statutes, its decision to decline to defend the constitutionality of DOMA, and instead adopt the very position advocated by Plaintiff, is particularly telling.  *See* Holder Letter 3 (stating that he and the President "concluded that classifications based on sexual orientation warrant heightened scrutiny").  In fact, President Obama's decision came after he received a letter from the Human Rights Campaign criticizing his Administration's defense of DOMA.  Segura Dep., Ex. 5, attached as Ex. C to Dugan Decl.  And the Human Rights Campaign seemed to believe that it had helped persuade the President to change his mind.  *See* Press Release, Victory! Administration Drops DOMA Defense, Human Rights Campaign, https://secure3.convio.net/hrc/site/Advocacy?cmd=display&page=UserAction&id=1045 (stating that "HRC supporters have written tens of thousands of letters to President Obama" and that it was now "time to thank the president for what he's done").

A spate of recent news stories only confirms the conclusion that homosexuals are far from politically powerless.  A recent poll showed that more than two-thirds of Americans would vote for a "well-qualified gay candidate for president if he or she were nominated by their [sic] party."[5]  In the last weeks and months, the first openly gay male federal judge was confirmed by the Senate by an overwhelming majority.[6]  President Obama announced his support of a Senate

---

[5] Susan Page, *Gay Candidates Gain Acceptance*, USA Today, July 19, 2011, http://www.usatoday.com/news/politics/2011-07-19-gay-candidates-politics_n.htm.

[6] Dana Milbank, *In A 'Quiet Moment' Gay Judge Makes History*, Wash. Post, July 18, 2011, http://www.washingtonpost.com/opinions/in-a-quiet-moment-gay-judge-makes-history/2011/07/18/gIQAo7PhMI_story.html (stating that final vote was 80-13 and that "remarkable thing about what happened" vis-à-vis the nomination "was that it was utterly unremarkable").

bill to repeal DOMA.[7]  The President also nominated his fourth openly-gay candidate for a United States District Court judgeship.[8]  The State of New York passed a law legalizing gay marriage over the opposition of the New York Catholic Conference and other groups.[9]  The Governor of California signed legislation requiring California's public school textbooks to include the historical contributions of lesbian, gay, bisexual, and transgendered  ("LGBT") Americans.[10]  Rhode Island passed a bill instituting civil unions for same-sex couples.[11]  And, finally, President Obama took the final step in repealing the so-called "Don't Ask, Don't Tell" policy.[12]  This remarkable collection of political victories covers just the past month.  Thus, gays and lesbians cannot be labeled "politically powerless" without draining that phrase of all meaning.

Gays and lesbians have wielded considerable power in corporate America as well.  The Human Rights Campaign publishes a yearly Corporate Equality Index in which it rates American

---

[7]  MJ Lee, *Obama Backs Bill To End DOMA*, Politico, July 19, 2011, http://www.politico.com/politico44/perm/0711/all_due_respect_52655160-80d9-4749-a26a-3525888f615a.html.

[8]  Abby Phillip, *Obama to Nominate Fourth Openly Gay Judicial Candidate*, Politico, July 20, 2011, http://www.politico.com/news/stories/0711/59489.html.

[9]  Michael Barbaro, *Behind N.Y. Gay Marriage, an Unlikely Mix of Forces*, N.Y. Times, June 25, 2011, http://www.nytimes.com/2011/06/26/nyregion/the-road-to-gay-marriage-in-new-york.html?pagewanted=all.

[10]  Wyatt Buchanan, *New State Law Requires LGBT History in Textbooks*, S.F. Chron., July 15, 2011, http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2011/07/14/BAL61KAHVQ.DTL.

[11]  Abby Goodnough, *Rhode Island Lawmakers Approve Civil Unions*, N.Y. Times, June 29, 2011, http://www.nytimes.com/2011/06/30/us/30unions.html.

[12]  Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*, N.Y. Times, July 22, 2011, http://www.nytimes.com/2011/07/23/us/23military.html; *see also* Reid J. Epstein, *John Kerry Backs Gay Marriage*, Politico, July 22, 2011, http://www.politico.com/news/stories/0711/59643.html; Phil Reese, *O'Malley Backs 2012 Push for Marriage Equality*, Wash. Blade, July 22, 2011, http://www.washingtonblade.com/2011/07/22/omalley-backs-2012-push-for-marriage-equality/.

businesses on lesbian, gay, bisexual, and transgender equality.[13]  The most recent index showed that "an unprecedented 337 major U.S. businesses earned [the] top rating of 100 percent, up from 305" in 2010.[14]  Far from being ashamed or abashed about such ratings, companies tout them on their websites.[15]  Even nearly five years ago this trend was recognized.  In a November 2006 *Fortune* article, Marc Gunther wrote:  "Last June the gay rights movement quietly achieved a milestone:  For the first time, more than half of *Fortune* 500 companies—263, to be precise—offered health benefits for domestic partners, according to the Human Rights Campaign.  Ten years ago only 28 did."[16]  There is even a gay chamber of commerce dedicated to certifying businesses as gay owned.[17]  As one author describes:

> Today the Washington-based gay chamber, which has 24,000 members, certifies small businesses as gay-owned so that they can qualify for supplier-diversity programs at big companies.  Think about that:  Homosexuality, once a career-killing secret, has become enough of a competitive advantage in some circles that certification is needed to deter straight people from passing as gay.[18]

Companies also proudly feature such programs on their websites.[19]

---

[13]  *See* Corporate Equality Index 2011, http://www.hrc.org/documents/HRC-CEI-2011-Final.pdf.

[14]  Corporate Equality Index 2011, http://www.hrc.org/cei2011/index.html.

[15]  *See, e.g.*, *Perfect Score on HRC Corporate Equality Index - 2008, 2009, 2010, 2011*, Bryan Cave, http://www.bryancave.com/2011-national-lgbt-equality-survey-10-04-2010/; *Esurance Earns Perfect Score in 2011 Human Rights Campaign Corporate Equality Index*, esurance, http://www.esurance.com/news/2010-esurance-esurance-earns-perfect-score-2011-hrc-index-press-release; *Dorsey Receives Top Score on HRC's Corporate Equality Index, Dorsey & Whitney LLP*, http://www.dorsey.com/hrc_corp_equity_2010/.

[16]  Marc Gunther, *Queer Inc.:  How Corporate America Fell in Love with Gays and Lesbians*, Fortune, Nov. 30, 2006, http://money.cnn.com/magazines/fortune/fortune_archive/2006/12/11/8395465/.

[17]  *Id.*

[18]  *Id.*

[19]  *See, e.g.*, *gleam:  Gay, Lesbian, Bisexual, and Transgender Employees at Microsoft*, Microsoft Corp., http://www.microsoft.com/about/diversity/en/us/programs/ergen/gleam.aspx;

*(Continued)*

15

Indeed these victories signal a trend that has been occurring for some time.  *See* Kenji Yoshino, *The Gay Tipping Point*, 57 UCLA L. Rev. 1537, 1537 (June 2010) (stating that "evidence supports" 1999 statement that "it seems likely that the movement for gay identity and gay rights has come further and faster, in terms of change, than any other that has gone before it in this nation") (internal quotation marks omitted) (quoting Dudley Clendinen & Adam Nagourney, Out for Good:  The Struggle to Build a Gay Rights Movement in America 13 (1999)).  As Professor Yoshino states:  "A 'gay tipping point' occurred in the United States in the latter decades of the twentieth century."  Yoshino at 1537.  This has led to a situation in which gays and lesbians "are increasingly powerful."  *Id*. at 1542.

The Gay and Lesbian Victory Fund, a group devoted to electing gays and lesbians to office, stated in its 2008 annual report that "[i]t's hard to dispute the statement that 2008 was a watershed year in American politics."[20]  The report details evidence of how this year constitutes a watershed:  The Victory Fund endorsed "80 successful candidates" and "more than 70% of Victory-endorsed candidates won their elections in 2008."[21]  The Human Rights Campaign also touted the 2008 election results and the money it spent on the campaign:

> During this historic election cycle, the Human Rights Campaign launched its nationwide $7 million "Year to Win" electoral initiative to mobilize 5 million LGBT and allied voters to help elect fair-minded candidates and defeat discriminatory ballot measures.  HRC deployed staff to key election campaigns in 22 states and helped train hundreds of activists in 17 cities in crucial battleground states throughout the nation.  In 2008, the LGBT community and the entire social justice movement are poised to make

---

*Raytheon Featured in New Book by Bestselling Author*, Raytheon, http://www.raytheon.com/newsroom/feature/rtn08_tsandersbk/ (detailing author's "story of how Raytheon came to offer a liberal domestic-partner benefits policy").

[20]  The Gay & Lesbian Victory Fund and Leadership Institute, *2008 Annual Report* at 2, http://www.victoryfund.org/files/victory_annual_08.pdf.

[21]  *Id*.

significant gains in the representation of fair-minded candidates throughout all levels of government.[22]

The Human Rights Campaign noted that it had been "ranked the second most successful" political organization in the entire country by National Journal.[23]  In the 2010 election, more than two-thirds of the Victory Fund endorsed candidates won election, accounting for 107 electoral positions.[24]  The Victory Fund reports that only four states "have no openly gay elected officials at any level."[25]  Significant sums of money also have been spent by gay and lesbian advocacy groups.  Between 1990 and the beginning of the 2012 election cycle, nearly $20 million was spent to lobby for gay and lesbian rights.[26]  By way of contrast, from the 1990 election cycle through the beginning of the 2012 election cycle, pro-life groups have donated more than $10 million to anti-abortion advocacy.[27]  Thus, for an allegedly politically powerless group, gays and lesbians have achieved and continue to achieve substantial political success.

Plaintiff and her experts also attempt to use marriage referenda as evidence of political powerlessness.  This approach would transform the inquiry from a search for "political powerlessness" into a search for a "lack of political omnipotence."  Even—perhaps especially— in the debate over marriage, gay-rights groups have proven to be a major political force well-

---

[22]  Human Rights Campaign Lauds 2008 Election Results (Nov. 4, 2008), http://www.hrc.org/11517.htm.

[23]  *Id*. (citing *Reversal of Fortune*, Nat'l J., Nov. 11, 2006).

[24]  The Gay & Lesbian Victory Fund and Leadership Institute, *2010 Annual Report* at 5-6, http://www.victoryfund.org/files/victory_annual_10.pdf.

[25]  Page, *supra* note 5.

[26]  *Gay & Lesbian Rights & Issues: Long-Term Contribution Trends*, OpenSecrets.org, http://www.opensecrets.org/industries/totals.php?cycle=2010&ind=j7300 (crediting the Center for Responsive Politics).

[27]  *Abortion Policy/Pro-Life: Long-Term Contribution Trends*, OpenSecrets.org, http://www.opensecrets.org/industries/totals.php?cycle=2010&ind=Q14 (crediting the Center for Responsive Politics).

equipped to wage and, very often, to win major policy battles—and who have gained more political ground in less time than just about any other interest group in American political history.  According to Gallup polling, between 1996 and 2011 the portion of the United States population who believed that same-sex marriage should be recognized increased from 27% to 53%.[28]  In the campaign over Proposition 8, California's traditional-marriage constitutional amendment, pro-homosexual forces were able to outspend proponents of traditional marriage.[29]  In the space of only half a decade, this popular and financial support has translated into legislation recognizing same-sex marriage in Vermont, New York, New Hampshire, Connecticut, and the District of Columbia,[30] and offering legal rights for same-sex couples substantially equal to those of marriage in Delaware, Hawaii, Illinois, Rhode Island, Colorado, Oregon, California, Washington, and Nevada.[31]  When jurisdictions where such rights have been imposed judicially are added, a full 37% of the United States population lives in states that substantively treat same-sex relationships identically to traditional marriages.[32]  As a result, no less a political personage than Vice President Biden believes that, far from gays being locked out

---

[28]  Frank Newport, *For First Time, Majority of Americans Favor Legal Gay Marriage*, Gallup.com (May 20, 2011), http://www.gallup.com/poll/147662/First-Time-Majority-Americans-Favor-Legal-Gay- Marriage.aspx.

[29]  Michelle Minkoff et al., *Proposition 8:  Who Gave in the Gay Marriage Battle?*, L.A. Times, July 13, 2011, http://projects.latimes.com/prop8/.

[30]  Vt. Stat. Ann. tit. 15, §8, *et seq.* (West 2011); N.Y. Dom. Rel. § 10-a (McKinney 2011); N.H. Rev. Stat. Ann. § 457:1-a, *et seq.* (2011); Conn. Gen. Stat. Ann. § 46b-20 (West 2011); D.C. Code § 46-401, *et seq.* (2011).

[31]  Del. Code Ann. tit. 13 § 212 (2011); Haw. Rev. Stat. § 572C-1 (2011); 750 Ill. Comp. Stat. 75 / 20 (2011); 2011 R.I.H.B. 6103 (July 2, 2011); Colo. Rev. Stat. § 15-22-105 (2011); Or. Rev. Stat. § 106.305 (West 2011); Cal. Fam. Code § 297.5 (West 2011); Wash. Rev. Ann. Code § 26.60.010 (West 2011); Nev. Rev. Stat. Ann. § 122A.010, *et seq.* (2011).

[32]  Calculated from census data available at http://2010.census.gov/2010census/data/.

of marriage as a result of political powerlessness, "a national consensus in support of gay marriage" is "an inevitability."[33]

Moreover, case law supports the conclusion that homosexuals are not politically powerless. Courts—long before the most recent and dramatic gains—have rejected the contention that gays and lesbians are politically powerless. For instance, the Ninth Circuit in *High Tech Gays* declared that "homosexuals are not without political power; they have the ability to and do 'attract the attention of lawmakers.'" 895 F.2d at 574 (quoting *City of Cleburne*, 473 U.S. at 445). The Seventh Circuit more than 20 years ago stated that "[i]n these times homosexuals are proving that they are not without growing political power." *Ben-Shalom*, 881 F.2d at 466. The court held that "[i]t cannot be said 'they have no ability to attract the attention of the lawmakers'" and that the "political approach is open to them." *Id.* (quoting *City of Cleburne*, 473 U.S. at 445); *see also Steffan v. Cheney*, 780 F. Supp. 1, 7-8 (D.D.C. 1991) ("[I]t is still very clear that homosexuals as a class enjoy a good deal of political power in our society, not only with respect to themselves, but also with respect to issues of the day that affect them."), *rev'd on other grounds sub nom. Steffan v. Aspin*, 8 F.3d 57 (D.C. Cir. 1993). As made clear above, the political power of homosexuals only has increased—exponentially—in the past 20 years. Thus, Plaintiff's argument that gays and lesbians are politically powerless must fail.

As Plaintiff notes, both racial minorities and women already had obtained legal protections through the political process when they were recognized as protected classes. Pl.'s Mem. Summ. J. at 21. But, by contrast, the mentally handicapped and the poor have been held not to be politically powerless. *City of Cleburne*, 473 U.S. at 445; *San Antonio Indep. Sch. Dist.*

---

[33] Joe Biden: 'National Consensus' on Gay Marriage Inevitable, LGBTQ, Nation (Dec. 25, 2010), http://www.lgbtqnation.com/2010/12/joe-biden-national-consensus-on-gay-marriage-inevitable-video/.

*v. Rodriguez*, 411 U.S. 1 (1973).  And the very significant gains made by homosexual-rights groups both in legislative terms and in popular opinion—and the phenomenal speed at which these victories have come—demonstrate that they have ample ability to attract the favorable attention of lawmakers.  In addition, Plaintiff's attempts to equate the situation of homosexuals in this regard with that of racial minorities or women elides the fact that homosexuals make up a much smaller portion of the population than do women or racial minorities.  *See* Peplau Dep. at 19:2-4, attached as Ex. B to Dugan Decl. (stating that "between 1 and 2 percent of [American] women identified as lesbian, and somewhere between 2 and 3 percent of [American] men identified as gay").  The ability to make real political gains despite relatively small numbers bespeaks a proportionate political power significantly greater than that of other protected classes.

Where a group is not lacking in political power, it hardly can claim the "extraordinary protection from the majoritarian political process" provided by heightened scrutiny.  *Rodriguez*, 411 U.S. at 28.  Political powerlessness and immutability are "traditional indicia of suspectedness."  *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974); *see also Lyng*, 477 U.S. at 638 (holding that "[c]lose relatives are not a 'suspect' or 'quasi-suspect' class" because "[a]s a historical matter, they have not been subjected to discrimination; they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; *and* they are not a minority or *politically powerless*") (emphasis added).  Homosexuals are not "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian process."  *Disabled Am. Veterans*, 962 F.2d at 141.  Accordingly, DOMA is not subject to strict scrutiny or intermediate scrutiny.[34]

---

[34]   While we do not concede in the least that a form of heightened scrutiny is applicable to DOMA, even under that searching standard DOMA's classification is constitutional because it reflects and reinforces the Supreme Court's own definition of a fundamental right.

The facts thus confirm the entirely unsurprising conclusion that the eleven circuits that have applied rational basis to classifications based on homosexuality have gotten the issue correct.  Indeed, the one relevant factor in the analysis that is most subject to change over time—political powerlessness—has only underscored the validity of the precedent.  Rational basis review applies here.[35]  *See* House Mem. in Supp. of Mot. to Dismiss at 26-43.  That rational basis applies shows the extent to which the factual record developed by Plaintiff is beside the point.  *See Beach Commc'ns*, 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

## II.     PLAINTIFF'S ADDITIONAL ARGUMENTS ALSO FAIL.

In addition to the above arguments, Plaintiff also makes several other attacks upon DOMA throughout the course of her memorandum of law in support of summary judgment.  None of those arguments supports summary judgment in her favor.

### A.     The Federal Government Has Involved Itself in Marriage Law in Circumstances of Deviation from the Traditional Definition.

Plaintiff argues that "[n]ever before, or since, has the federal government categorically disregarded state determinations of who is validly married and substituted its own definition."  Pl.'s Mem. Summ. J. at 10.  This observation, even if true, would be irrelevant.  Novelty does not

---

[35]  As made clear in the House's simultaneously filed memorandum in support of its motion to dismiss, DOMA clearly passes the rational basis test.  As explained therein, under that test the government "has no obligation to produce evidence to sustain the rationality of a statutory classification," *Heller*, 509 U.S. at 320, and "a statute is presumed constitutional, and the *burden* is on the *one attacking* the legislative arrangement to *negative every conceivable basis* that might support it, whether or not the basis has a foundation in the record."  *Id.* at 320-21 (quotation marks, brackets, and citations omitted) (emphasis added).  Under rational basis review, a court must accept a legislature's generalizations even when there is an imperfect fit between means and ends.  *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (citing *Heller*, 509 U.S. at 320).

amount to irrationality.  But in all events, this contention is wrong.  While it is true that regulating the details of traditional marriage historically has been left to the states, it also is true that the federal government has been involved with and injected itself into marriage law when states have deviated from the traditional definition.  Thus, for instance, the United States Congress banned polygamy in United States territories when faced with widespread plural marriage in the Utah Territory.  Morrill Anti-Bigamy Act, ch. 126, § 1, 12 Stat. 501, 501 (1862) (codified as amended at U.S. Rev. Stat. § 5352) (repealed prior to codification in the U.S.C.); *see also Reynolds v. United States*, 98 U.S. 145, 165-67 (1878).  After the Civil War, during Reconstruction, the Freedmen's Bureau promoted and supported the marriages of former slaves.  Cott Aff. ¶ 77 (June 24, 2011) (ECF No. 33).  The federal government also worked to support the marriages of American Indians.  Dep. of Nancy Cott, Ph.D. (July 6, 2011) ("Cott Dep.") at 17:20-18:1, attached as Ex. D to Dugan Decl. (stating that "in dealing . . . with native Americans through the Bureau of Indian Affairs, the form of marriage observed by these populations was of concern to that federal agency").

Furthermore, as Plaintiff's own experts admit, the implicit understanding of marriage through the nineteenth century until at least the 1970s was that marriage was between a man and a woman.  Chauncey Dep. at 84:20-23, attached as Ex. A to Dugan Decl.; Cott Dep. at 28:20-29:8, attached as Ex. D to Dugan Decl.  Thus, faced with the possibility of state courts changing the traditional definition of marriage, Congress' effort to maintain the traditional definition was consistent with its historical role and hardly lacked precedent.  Moreover, with respect to Section 3 in particular, Congress' decision to preserve the same definition of marriage—namely, the traditional one—that prevailed at the time Congress passed innumerable statutes granting

benefits and imposing burdens on marriages and spouses is a classic use of federal power to ration federal burdens and benefits.

### B.  Plaintiff Misstates the Science on Same-Sex Parenting.

Plaintiff spends much of her strict scrutiny argument attacking Congress' stated justifications for DOMA.  Pl.'s Mem. Summ. J. at 24-31.  In particular, Plaintiff argues that "[e]xcluding married same-sex couples from all federal marital protections and obligations is also thoroughly unrelated to any interest the federal government may have in promoting 'responsible procreation' or child-rearing."  *Id.* at 26-27.  In support of this contention, Plaintiff asserts that "[t]here is clear expert consensus, based on decades of social science research concerning same-sex couples as parents, that the children raised by lesbian or gay parents are just as well-adjusted as those of heterosexual parents."  *Id.* at 27 (citing Lamb. Aff. ¶¶ 28-37 (June 24, 2011) (ECF No. 34)).

There are two fundamental problems with this argument.  First, the universe of rational bases that support DOMA is hardly limited to concerns about child rearing.  Second, as one would expect on such a divisive issue, Plaintiff's claim of a clear expert consensus is overstated. Indeed, the evidence relied upon by Plaintiff's own expert demonstrates that studies comparing gay or lesbian parents to heterosexual parents have serious flaws.  Dep. of Michael Lamb, Ph.D. (June 24, 2011 ) ("Lamb Dep."), Ex. 6 at 327, attached as Ex. E to Dugan Decl. ("Studies of children raised by same-sex parents have almost *exclusively focused* on families headed by lesbian mothers rather than gay fathers.") (emphasis added); *id.*, Ex. 8 at 526 ("We still have *relatively few studies* of adolescent offspring of lesbian or gay parents however, and some have advised caution when generalizing the results of research conducted with young children to adolescents.") (emphasis added); *id.*, Ex. 9 at 254 ("Future research on gay and lesbian couples

needs to address several key issues.  One is sampling.  Because most studies have used

convenience samples of mostly white and well-educated partners, the extent to which findings

generalize to the larger population of gay and lesbian couples is *unknown*. . . .  Most studies on

gay and lesbian couples have used self-report surveys.  Future work could address some of the

*biases* associated with self-report data . . . .") (emphasis added).  Numerous studies have pointed

to methodological flaws in those studies comparing heterosexual and homosexual parents.  *See*

*Lofton*, 358 F.3d at 825 nn.24-25 (listing studies demonstrating serious methodological problems

in gay parenting studies); *see also* Ann Hulbert, *The Gay Science: What Do We Know About the*

*Effects of Same-Sex Parenting?*, Slate (Mar. 12, 2004), http://www.slate.com/id/2097048/

(stating that both camps in gay marriage debate "have converged lately on a very basic point:

The existing science is methodologically flawed and ideologically skewed").  The Eleventh

Circuit explicitly recognized the limitations of gay parenting research in *Lofton*, stating that

> [o]penly homosexual households represent a very recent phenomenon, and
> sufficient time has not yet passed to permit any scientific study of how
> children raised in those households fare as adults.  Scientific attempts to
> study homosexual parenting in general are still in their nascent stages and
> so far have yielded inconclusive and conflicting results.  Thus, it is hardly
> surprising that the question of the effects of homosexual parenting on
> childhood development is one on which even experts of good faith
> reasonably disagree.

358 F.3d at 826; *see generally* George W. Dent, Jr., *No Difference?:  An Analysis of Same-Sex*

*Parenting*, ___ Ave Marie L. Rev. ___ (forthcoming 2011),

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1848184.

## III.    PLAINTIFF HAS FAILED TO ESTABLISH THAT HER SAME-SEX MARRIAGE WAS VALID FOR THE TAX YEAR IN QUESTION.

Plaintiff has not established that her marriage was valid for the relevant tax year.  In her

Amended Complaint she avers that New York recognized her 2007 Canadian same-sex marriage

as valid.  *See* Am. Comp. ¶ 4.  In her memorandum in support of her motion for summary

judgment, she states in passing that Plaintiff and Spyer's Canadian marriage was "recognized as

valid in New York."  Pl.'s Mem. Summ. J. at 6-7.  That legal claim about New York law appears

to be the premise of her entire constitutional claim and claim to a refund.  While it is true that

various Appellate Divisions of New York's Supreme Court have weighed in on the matter, New

York's Court of Appeals has held that the "New York Constitution does not compel recognition

of marriages between members of the same sex."  *Hernandez v. Robles*, 855 N.E.2d 1, 5 (N.Y.

2006).  *Hernandez* remained good law until the New York state legislature passed the recent gay

marriage law.  Thus, the premise of Plaintiff's entire constitutional attack—that DOMA fails to

recognize a marriage recognized by the relevant state law because it involves a same-sex

couple—appears to be mistaken.

## CONCLUSION

For all of the foregoing reasons, the House respectfully requests that Plaintiff's Motion

for Summary Judgment be denied.

Respectfully submitted,

*/s/ Paul D. Clement*
Paul D. Clement
H. Christopher Bartolomucci
Conor B. Dugan
Nicholas J. Nelson
BANCROFT PLLC
1919 M Street, Northwest, Suite 470
Washington, District of Columbia  20036
Telephone:     (202) 234-0090
Facsimile:      (202) 234-2806

*Counsel for the Bipartisan Legal Advisory*
*Group of the U.S. House of Representatives*

OF COUNSEL:

Kerry W. Kircher, General Counsel
Christine Davenport, Senior Assistant Counsel
Katherine E. McCarron, Assistant Counsel
William Pittard, Assistant Counsel
Kirsten W. Konar, Assistant Counsel
OFFICE OF GENERAL COUNSEL
U.S. House of Representatives
219 Cannon House Office Building
Washington, District of Columbia  20515
Telephone:     (202) 225-9700
Facsimile:      (202) 226-1360

August 1, 2011

## CERTIFICATE OF SERVICE

I certify that on August 1, 2011, I served one copy of the Memorandum of Law in

Support of Intervenor Defendant's Opposition to Plaintiff's Motion for Summary Judgment by

CM/ECF and by electronic mail (.pdf format) on the following:

Roberta A. Kaplan, Esquire, & Andrew J. Ehrlich, Esquire
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York City, New York  10019-6064
rkaplan@paulweiss.com
aehrlich@paulweiss.com

Alexis Karteron, Esquire, & Arthur Eisenberg, Esquire
NEW YORK CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 19th Floor
New York City, New York  10004
akarteron@nyclu.org
arteisenberg@nyclu.org

James D. Esseks, Esquire, Melissa Goodman, Esquire, & Rose A. Saxe, Esquire
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York City, New York  10004
jesseks@aclu.org
mgoodman@nyclu.org
rsaxe@aclu.org

Jean Lin, Esquire
UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION
20 Massachusetts Avenue, Northwest, Seventh Floor
Washington, District of Columbia  20530
jean.lin@usdoj.gov

Simon Heller, Esquire
STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL
120 Broadway
New York, NY 10271
simon.heller@ag.ny.gov

*/s/ Kerry W. Kircher*
Kerry W. Kircher