UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| EDITH SCHLAIN WINDSOR, in her capacity as executor of the estate of THEA CLARA SPYER,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 10-CV-8435 (BSJ)(JCF)<br>)<br>)<br>)<br>)<br>)<br>) |

**INTERVENOR-DEFENDANT'S LOCAL RULE 56.1 RESPONSE TO
PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1, Intervenor-Defendant the Bipartisan Legal Advisory Group of the United States House of Representatives (the "House") submits this Response to Plaintiff's Statement Pursuant To Local Rule 56.1:

1. Undisputed.

2. Undisputed.

3. Whether the United States of America is a proper defendant in this action is not a question of fact, but is for the Court to determine as a matter of law. This is illustrated by the fact that Plaintiff cites no admissible evidence in support of this proposition.

4. Undisputed.

5. The House does not dispute that Plaintiff had a long-standing relationship with Thea Spyer. Aff. of Edith Schlain Windsor (June 24, 2011) (ECF No. 31) ("Windsor Aff.") ¶¶ 5, 7-9.

1

6. The House does not dispute the length of Plaintiff's and Spyer's engagement or that Plaintiff and Spyer participated in a ceremony in Toronto, Canada on May 22, 2007. Windsor Aff. ¶¶ 26-27 & Exs. A & B. The legal validity of that ceremony is not a question of fact, but is for the Court to determine as a matter of law.

7. Disputed. The legal validity of Plaintiff's marriage, and the status, responsibilities, and protections it entailed, are not questions of fact, but are for the Court to decide as a matter of law. This is illustrated by the fact that the only evidence cited by Plaintiff in support of her assertions in this regard is the affidavit of her attorney.

8. The House does not dispute that Plaintiff and Spyer continued their relationship until Spyer's death, or that her death occurred two years after their Canadian ceremony. Windsor Aff. ¶ 28 & Ex. D. Whether they were legally "a married couple" during that period is not a question of fact, but is for the Court to determine as a matter of law.

9. Any health problems suffered by Plaintiff are not relevant to the issues presented in this case, and thus would not be admissible in evidence. The House disputes Plaintiff's apparent implication that her health problems somehow resulted from Spyer's death. Plaintiff offers no support for this proposition whatsoever. *See* Windsor Aff. ¶ 29.

10. Undisputed.

11. The House does not dispute that Plaintiff's Exhibit G is a copy of a genuine trust document. *See* Windsor Aff. ¶ 31. The legal significance of that document is not a question of fact, but is for the Court to determine as a matter of law.

12. The House does not dispute that Plaintiff's Exhibit H is a copy of a genuine trust document. *See* Windsor Aff. ¶ 32. The legal significance of that document is not a question of fact, but is for the Court to determine as a matter of law.

13. While the House agrees that, for federal purposes, DOMA states that marriage includes only opposite-sex relationships, the meaning of DOMA and whether it or any other statute precludes recognition of same-sex relationships as "marriages" for purposes of federal law is not a question of fact, but is for the Court to decide as a matter of law. This is illustrated by the fact that Plaintiff cites no admissible evidence in support of this proposition.

14. The House does not dispute that the IRS determined that Spyer's estate was not entitled to the marital deduction. *See* Windsor Aff., Ex. L. The House disputes that this determination was "[s]olely" due to DOMA. Plaintiff's evidence supports only that the IRS regarded DOMA as a *sufficient* reason for denying the deduction, not the *only* reason, and Plaintiff cites no additional evidence that would support a finding that there was no other reason for the IRS's action. *See id.* Whether any other federal statute actually would bar the deduction is not a question of fact, but is for the Court to decide as a matter of law.

15. Undisputed, except to the extent that the word "[c]onsequently" implies that the tax levied on Spyer's estate was "[s]olely" due to DOMA. In that respect the House incorporates by reference Paragraph 14, *supra*.

16. Undisputed.

17. The House does not dispute that Plaintiff is not eligible for a Social Security lump-sum death benefit or widow's insurance benefits, although it notes that she has cited no admissible evidence in support of this proposition. Whether this is "a direct result of Section 3 of DOMA," or whether the same result would have occurred under federal law prior to DOMA, is not a question of fact but for the Court to decide as a matter of law. This is illustrated by the fact that Plaintiff also cites no admissible evidence in support of this proposition.

3

18. Disputed. In equal protection jurisprudence the question of whether a class of persons has suffered a "history of discrimination" is not a question of fact but is for the Court to decide as a matter of law. As a factual matter the House does not dispute that at various times some homosexual persons have been treated differently because of their sexual orientation, but Plaintiff's evidence is not sufficient to establish a "history of discrimination" for purposes of equal protection. *See generally* Aff. of George Chauncey (June 24, 2011) (ECF No. 35) ("Chauncey Aff.").

19. Undisputed. However, colonial sodomy prosecutions were aimed not at homosexual persons or conduct *per se* but rather at non-procreative sexual conduct in general, including such conduct between persons of opposite sexes. Dep. of George Chauncey, Ph.D. (July 12, 2011) ("Chauncey Dep.") at 34:9-34:24, attached as Ex. A to Dugan Decl.

20. Undisputed. However, Plaintiff submits no evidence that medical views of homosexuality have themselves been based on bias, as opposed to past understandings of scientific knowledge. *See* Chauncey Aff. ¶¶ 26-27.

21. Undisputed.

22. Undisputed, on the understanding that the assertion refers to occurrences in the early 20th Century.

23. Undisputed.

24. Undisputed.

25. Undisputed.

26. Undisputed.

27. Undisputed.

28. Disputed. Whether federal legislation is "overtly discriminatory" is a question of law for the Court to decide not a question of fact.

29. Undisputed, on the understanding that the phrase "ever-present threat of anti-gay violence" does not mean that all or most homosexual persons fear violence every minute of every day.

30. The House does not dispute that many persons still oppose homosexual conduct and the homosexual lifestyle, and that gay and lesbian interest groups continue to regard some laws as against their interests. However, Plaintiff substantially understates the "social and legal progress" that gay men and lesbians have experienced. *See, e.g.*, evidence cited in ¶ 61, *infra*.

31. The mere facts that homosexual persons' rights are not unlimited, vary from place to place, and are subject to changing public opinion, are not relevant to any issue in this case and thus not admissible in evidence. Few if any classes of persons enjoy civil rights that are not "limited" in some way, or that are absolutely identical in every place in the county. And, all political gains, no matter the class at issue, are subject to the vicissitudes of public opinion. As a result, these characteristics cannot be relevant to whether a given class of people is a suspect class for equal protection purposes.

32. Undisputed. However, gay-rights groups have made great advances through the political process. *See* evidence cited in ¶ 61, *infra*.

33. Disputed. "Enduring" is not an accurate description of everyone's experience of sexual orientation. As evidence shows, a not insignificant number of people who described themselves at one time as homosexual, later describe themselves as heterosexual. *See, e.g.*, Lisa M. Diamond, *New Paradigms for Research on Heterosexual and Sexual Minority Development*, 32 J. of Clinical Child and Adolescent Psychol. 492 (2003); Lisa M. Diamond & Ritch C. Savin-

Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc. Issues 297, 301 (2000) ("50% [of study's] respondents had changed their identity label more than once since first relinquishing their heterosexual identity."); Nigel Dickson, *et al.*, *Same Sex Attracting in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1612-13 (2003) (at age 21 "[t]en percent of men and nearly a quarter of the women [in the study group] reported same-sex attraction at any time, but this nearly halved for current attraction at age 26").

34. Disputed. In the equal protection context, the ability of a class of persons "to contribute to society" is not a question of fact, but is for the Court to decide as a matter of law.

35. The House does not dispute that many thousands of persons in modern society identify themselves as gay and lesbian, and that many people regard this as "normal." What is a "normal expression of human sexuality," however, is not a question of fact but a matter of unreviewable opinion.

36. Undisputed.

37. Undisputed.

38. Undisputed, except that whether any given relationship or type of relationship is or can be a "marriage" is a question of law rather than fact.

39. Undisputed. However, many persons experience fluidity or change in their sexual orientation in a manner that suggests that maintaining any particular sexual orientation may not be "essential" to their identities. *See* evidence cited in ¶ 33, *supra*.

40. Disputed. Numerous studies, including those relied upon by Plaintiff's expert, show that homosexual parenting studies are flawed because of sampling errors, a major focus on lesbian mothers rather than homosexual fathers, and other design flaws. Dep. of Michael Lamb,

Ph.D. (June 24, 2011) ("Lamb Dep."), Ex. 6 at 327, attached as Ex. E to Dugan Decl. ("Studies of children raised by same-sex parents have almost *exclusively focused* on families headed by lesbian mothers rather than gay fathers.") (emphasis added); *Id.*, Ex. 8 at 526 ("We still have *relatively few studies* of adolescent offspring of lesbian or gay parents, however, and some have advised caution when generalizing the results of research conducted with young children to adolescents") (emphasis added); *Id.*, Ex. 9 at 254 ("Future research on gay and lesbian couples needs to address several key issues.  One is sampling: Because most studies have used convenience samples of mostly white and well-educated partners, the extent to which findings generalized to the larger population of gay and lesbian couples is *unknown*. . . . Most studies on gay and lesbian couples have used self-report surveys.  Future work could address some of the *biases* associated with self-report data.") (emphasis added); *see also* studies cited in *Lofton v. Sec. of Dept. of Children & Fam. Servs.*, 358 F.3d 804, 825 nn.24-25 (11th Cir. 2004) (demonstrating serious methodological problems in gay parenting studies); Ann Hulbert*, The Gay Science: What Do We Know About the Effects of Same-Sex Parenting?*, Slate, March 12, 2004, http://www.slate.com/id/2097048/ (stating that both camps in the gay marriage debate "have converged lately on a very basic point: The existing science is methodologically flawed and ideologically skewed").

      41.    Disputed, as one would expect with regard to such a contentious issue.  *See* evidence cited in ¶ 40, *supra*.  Furthermore, Plaintiff does not define the term "adjustment."

      42.    The House does not dispute that these factors affect the "adjustment" of children and adolescents.  The House disputes the assertion to the extent it is rooted in the assertions of the prior paragraphs.  *See* evidence cited in ¶ 40, *supra*.

      43.    Disputed.  *See* evidence cited in ¶ 40, *supra*.

44. Disputed. Homosexuals of course can be good parents, but the House disputes whether parents' sexual orientation has no effect on children. *See* evidence cited in ¶ 40, *supra*.

45. Disputed. *See* evidence cited in ¶ 40, *supra*.

46. The House does not dispute that certain organizations have stated that the evidence suggests that same-sex parents are as effective as heterosexual parents in raising well-adjusted children and adolescents. *See also* evidence cited in ¶ 40, *supra*.

47. Disputed. *See, e.g.*, sources cited in *Irizarry v. Bd. of Educ. of Chi.*, 251 F.3d 604, 607 (7th Cir. 2001) ("[S]o far as heterosexuals are concerned, the evidence that" marriage "provides a stable and nourishing framework for child-rearing . . . refutes any claim that policies designed to promote marriage are irrational.") (namely, Linda J. Waite & Maggie Gallagher, *The Case for Marriage: Why Married People Are Happier, Healthier, and Better Off Financially* (2000); David Popenoe, *Life without Father: Compelling New Evidence That Fatherhood and Marriage Are Indispensable for the Good of Children and Society* (1996); George W. Dent, Jr., *The Defense of Traditional Marriage*, 15 J.L. & Pol. 581 (1999)); *see also* source cited in *Bowen v. Gilliard*, 483 U.S. 587, 614 (1987) (Brennan, J., dissenting) (noting that "considerable scholarly research . . . indicates that '[t]he optimal situation for the child is to have both an involved mother and an involved father'") (quoting H. Biller, *Paternal Deprivation* 10 (1974)); *Lofton*, 358 F.3d at 820 ("Although social theorists from Plato to Simone de Beauvoir have proposed alternative child-rearing arrangements, none has proven as enduring as the marital family structure, nor has the accumulated wisdom of several millennia of human experience discovered a superior model.").

48. Disputed. *See* evidence cited in ¶¶ 40 & 47, *supra*.

49. Disputed. The classes of "gay men" and "lesbians" are *defined* by a different experience of sexuality. Aff. of Letitia Anne Peplau, Ph.D. (June 24, 2011) (ECF No. 32) ("Peplau Aff.") ¶¶ 14, 15, 18. The issue of how "any member of society" would "experience and respond to life experiences" is not a question of fact but of unreviewable opinion.

50. In the equal protection context, whether a characteristic is immutable is not a question of fact but is for the Court to decide as a matter of law. In a non-legal sense, while the House does not dispute that sexual orientation is stable in many people, it disputes that "immutable" is an accurate descriptor for sexual orientation as a whole. Dep. of Letitia Anne Peplau, Ph.D. (June 17, 2011) ("Peplau Dep.") at 25:20-25:23, attached as Ex. B to Dugan Decl. ("[L]ooking at a newborn, I would not be able to tell you what that child's sexual orientation is going to be."); *id.* at 36:24-37:24; *id.*, Ex. 4 at 186 (over 12% of self-identified gay men and nearly one out of three lesbians reported that they experienced some or much choice about their sexual orientation); Lisa Diamond, New Paradigms for Research on Heterosexual and Sexual Minority Development, 32 J. of Clinical Child and Adolescent Psychol. 492 (2003); Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. of Soc. Issues 301 (2000) ("50% [of study's] respondents had changed their identity label more than once since first relinquishing their heterosexual identity."); Nigel Dickson, *et al.*, *Same Sex Attracting in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1612-13 (2003) (at age 21 "[t]en percent of men and nearly a quarter of the women [in the study group] reported same-sex attraction at any time, but this nearly halved for current attraction at age 26").

51. The House does not dispute that sexual orientation is an individual characteristic. The House disputes whether it is as immutable or "essential" as sex or race. *See* evidence cited in ¶¶ 33 & 50, *supra*.

52. Undisputed.

53. Undisputed.

54. Undisputed. However, evidence indicates that a great many people who experience homosexual attraction at one period in their adult lives do not in another. *See* evidence cited in ¶ 33, *supra*.

55. The House does not dispute the absence of evidence for the effectiveness of such interventions. However, evidence does indicate that, even absent such interventions, changes in sexual orientation occur with some frequency. *See* evidence cited in ¶¶ 33 & 54, *supra.*

56. Undisputed, with the understanding that Plaintiff is not here asserting that the policies referenced in the Peplau Affidavit are correct on the current evidence or that future evidence might not emerge that would cause these policies to be changed.

57. Disputed. The fact that some people experience change in their sexual orientation is not fully understood. *See, e.g.*, Peplau Dep., Ex. 3 at 2, attached as Ex. B to Dugan Decl. ("There is no consensus amongst scientists about the exact reasons that an individual develops a heterosexual, bisexual, gay, or lesbian orientation. . . . [N]o findings have emerged that permit scientists to conclude that sexual orientation is determined by any particular factor or factors."); Diamond & Savin-Williams, *supra* ¶ 50, at 301.

58. The House does not dispute that it likely would be psychologically harmful to force lesbians or gay men to take these steps or attempt to persuade them to do so against their will. The House disputes that every noncoercive, non-aggressive request will inherently be

"psychologically harmful" to its recipient. To the extent Plaintiff's evidence suggests otherwise, it is wholly implausible and not entitled to be credited by the finder of fact. *See, e.g.*, Peplau Aff. ¶ 24.

59. Undisputed.

60. Undisputed.

61. Disputed. In the context of equal protection jurisprudence, whether a given class of persons has "political power" or is "politically vulnerable" is not a question of fact, but is for the Court to decide as a matter of law. Moreover, in this very case Plaintiff has demonstrated the *significant* political power that gays and lesbians hold. *See, e.g.*, Letter of Att'y Gen. Holder to Speaker Boehner of the U.S. House of Rep. (Feb. 23, 2011); *see also* Susan Page, *Gay Candidates Gain Acceptance*, USA Today, July 19, 2011, http://www.usatoday.com/news/politics/2011-07-19-gay-candidates-politics_n.htm; MJ Lee; *Obama Backs Bill To End DOMA*, Politico, July 19, 2011, http://www.politico.com/politico44/perm/0711/all_due_respect_52655160-80d9-4749-a26a-3525888f615a.html; Michael Barbaro, *Behind N.Y. Gay Marriage, an Unlikely Mix of Forces*, N.Y. Times, June 25, 2011, http://www.nytimes.com/2011/06/26/nyregion/the-road-to-gay-marriage-in-new-york.html?pagewanted=all; Wyatt Buchanan, *New State Law Requires LGBT History in Textbooks*, S.F. Chron., July 15, 2011, http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2011/07/14/BAL61KAHVQ.DTL; Abby Goodnough, *Rhode Island Lawmakers Approve Civil Unions*, N.Y. Times, June 29, 2011, http://www.nytimes.com/2011/06/30/us/30unions.html; Elisabeth Bumiller, *Obama Ends 'Don't Ask, Don't Tell' Policy*, N.Y. Times, July 22, 2011, http://www.nytimes.com/2011/07/23/us/23military.html.

62. In the equal protection context, the definition of "political power" is not a question of fact, but is to be decided by the Court as a matter of law. *See, e.g.*, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (deciding question of political powerlessness without reference to formally adduced evidence).

63. In the equal protection context, the definition of "political power" and the factors that evidence it are not questions of fact, but are to be decided by the Court as a matter of law.

64. Disputed. In the equal protection context, the quantum of political power possessed by a given class of people is not a question of fact, but is to be decided by the Court as a matter of law. Moreover, gay and lesbian persons wield a very significant degree of political power. *See* evidence cited in ¶ 61, *supra*.

65. Disputed. In the equal protection context, the quantum of political powerlessness suffered by a given class of people is not a question of fact, but is to be decided by the Court as a matter of law. *See Lyng*, 477 U.S. at 638. Additionally, the Court may take judicial notice of the fact that gay and lesbian persons form a vastly smaller portion of the population than other groups that have received suspect class protection. Nevertheless, they have come to wield a degree of political power that is proportionately greater than those groups. *See* evidence cited in ¶ 61, *supra*.

66. Disputed. Gay men and lesbians are very frequently able to achieve their political goals. *See* evidence cited in ¶ 61, *supra*.

67. Disputed. In the equal protection context, the definitions of "political powerlessness" and "political power" are not questions of fact, but are to be decided by the Court as a matter of law.

68. Disputed. In the equal protection context, the definition of "political powerlessness" is not a question of fact, but is to be decided by the Court as a matter of law. Moreover, gay men and lesbians are very frequently able to achieve their political goals. *See* evidence cited in ¶ 61, *supra*.

69. Disputed. In the equal protection context, the definition and indicators of "political power" are not questions of fact, but are to be decided by the Court as a matter of law.

70. Undisputed, on the understanding that Plaintiff is not here asserting that gay men or lesbians have never secured more than "minimal protections," or that every "minimal protection" they have won has been "aggressively" repealed or even opposed. Moreover, the indicia of the political power of gays and lesbians are numerous and very strong. *See* evidence cited in ¶ 61, *supra*.

71. Disputed. Plaintiff has no reliable metric for determining how frequently direct democracy processes have been used against any "social group." *See* Aff. of Gary Segura (June 24, 2011) (ECF No. 36) ¶ 43.

72. Disputed. This is a question of law, not a question of fact.

73. The import of federal law is not a question of fact but is to be answered by the Court as a matter of law. However, the House does not dispute that there is no federal legislation prohibiting discrimination on the basis of sexual orientation.

74. The import of federal law is not a question of fact but is to be answered by the Court as a matter of law. However, the House does not dispute that no federal *legislation* had been passed prior to 2009 to protect people on the basis of sexual orientation.

75. Undisputed.

76. The import of state law is not a question of fact but is to be answered by the Court as a matter of law.

77. Undisputed.

78. Undisputed.

79. Undisputed. However, gay men and lesbians wield great political power, especially considering the relatively small share of the population they make up. *See* evidence cited in ¶ 61, *supra*.

80. Disputed, to the extent that whether a given set of conditions amounts to "severe hostility" is not a question of fact but of unreviewable opinion. It is also a vague and opaque assertion.

81. Disputed. The House does not dispute that many elected officials do not support expanded benefits for homosexual persons, but whether denunciation is "unthinkable" is not a question of fact but of unreviewable opinion. In any event, politicians not infrequently make offensive remarks about various social groups. *See, e.g.*, Tim Reid, *Barack Obama's "Guns and Religion" Blunder Gives Hillary Clinton a Chance*, The Times of London, April 14, 2008, http://www.timesonline.co.uk/tol/news/world/us_and_americas/us_elections/article3740080.ece (describing then-Senator Obama's comments concerning blue-collar voters in Pennsylvania and the Midwest); Xuan Thai & Ted Barrett, *Biden's Description of Obama Draws Scrutiny*, CNN, July 31, 2007, http://articles.cnn.com/2007-01-31/politics/biden.obama_1_braun-and-al-sharpton-african-american-presidential-candidates-delaware-democrat?_s=PM:POLITICS (describing then-Senator Biden's comment concerning then-Senator Obama and how he differed from former black presidential candidates).

82.  The meaning of this assertion is so vague that is does not qualify as a proper assertion of fact.

83.  Disputed.  The meaning of federal and state law governing marriage through the years is not a question of fact, but is a matter of law for the Court to decide.  In any event, marriage has largely been a creature of state law, but the federal government has been involved with and injected itself into marriage law when states have deviated from the traditional definition.  *See, e.g.*, Morrill Anti-Bigamy Act, ch. 126, § 1, 12 Stat. 501, 501 (1862) (codified as amended at U.S. Rev. Stat. § 5352) (repealed prior to codification in the U.S.C.) (punishing and preventing the practice of polygamy in the territories of the United States)[1]; *see also Reynolds v. United States*, 98 U.S. 145, 165-67 (1878) (holding that law banning polygamy did not violate the Constitution's guarantee of free exercise of religion); Aff. of Nancy F. Cott (June 24, 2011) (ECF No. 33) ("Cott Aff.") ¶ 77 (discussing the Freedmen's Bureau's work in supporting marriage); Dep. of Nancy F. Cott (July 6, 2011) ("Cott Dep.") at 17:20-18:1, attached as Ex. D to Dugan Decl. (stating that "in dealing with Indians . . . in federal territories and in certain states where the federal government was dealing . . . with native Americans through the Bureau of Indian Affairs, the form of marriage observed by these populations was of concern to that federal agency").

84.  The House does not dispute that there have always been some variations in State marriage rules.  Whether these variations are great enough to be described as a "patchwork quilt" is not a question of fact.  Additionally, the Court may take judicial notice that for 228 years after the founding, no state law permitted same-sex marriage.

85.  Undisputed.

---

[1] The House cited statutes and caselaw as evidence of the historical fact of the enactment of provisions of federal law.

86. Undisputed.

87. The House does not dispute that no state has ever placed upon an individual would-be spouse the burden of affirmatively proving that he or she individually is able to procreate. The Court, however, may take judicial notice of the fact that human procreation normally involves one man and one woman only, and that for more than two centuries after the Founding these parties and only these were permitted to enter marriage in every State. In addition, impotence has often been regarded as a ground for the dissolution of marriages. Cott Dep. at 20:13-21:18.

88. Whether one "variance" between the legal rules adopted by different States "resembles" or "is parallel to" another variance is not a question of fact but a matter of unreviewable legal opinion. In any event, the Court may take judicial notice of the fact that while other "divergences" noted in the Cott Affidavit have been repeated throughout history in numerous other places in the world, same-sex marriage is virtually unprecedented in all of human history. *See generally* Cott Aff.

89. Undisputed.

90. Undisputed. However, the federal government has certainly concerned itself with the definition of marriage in other contexts. *See* evidence cited in ¶ 83, *supra*.

91. Undisputed, so long as it is recognized that the Plaintiff's assertion does not answer the specific legal question in this case.

92. Undisputed.

93. Undisputed.

94. The House does not dispute that despite other federal efforts to ensure that the traditional definition of marriage would govern, *see supra* ¶ 83, prior to 1996 the federal

16

government had never created a uniform definition of marriage for purposes of federal law. Whether DOMA amounted to a "dramatic" departure from this history is not a question of fact but of unreviewable opinion.

95.   The House does not deny that DOMA prevents same-sex couples from being recognized as married for purposes of federal law.  Whether this "reflects and perpetuates stigma" is not a question of fact.  Instead, it is either a question of law in the equal-protection context for decision by the Court, or else is a matter of unreviewable opinion.

96.   Whether a given statute causes a "stigma," let alone whether any such "stigma" causes "harm" to anyone, is not a question of fact but of unreviewable opinion, or else of law for the Court to decide.

97.   Undisputed.

98.   Disputed.  The Congressional Budget Office Report is an estimate as stated in the report itself and this estimate assumes "that same-sex marriages are legalized in all 50 states and recognized by the federal government."  Cong. Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex Marriages*, at 1 (June 21, 2004), http://cbo.gov/ftpdocs/55xx/doc5559/06-21-SameSexMarriage.pdf.

        Respectfully submitted,

        */s/ Paul D. Clement*
        Paul D. Clement
        H. Christopher Bartolomucci
        Conor B. Dugan
        Nicholas J. Nelson
        BANCROFT PLLC
        1919 M Street, Northwest, Suite 470
        Washington, District of Columbia  20036
        Telephone:     (202) 234-0090
        Facsimile:      (202) 234-2806

        *Counsel for the Bipartisan Legal Advisory*
        *Group of the U.S. House of Representatives*

OF COUNSEL:

Kerry W. Kircher, General Counsel
Christine Davenport, Senior Assistant Counsel
Katherine E. McCarron, Assistant Counsel
William Pittard, Assistant Counsel
Kirsten W. Konar, Assistant Counsel
OFFICE OF GENERAL COUNSEL
U.S. House of Representatives
219 Cannon House Office Building
Washington, District of Columbia  20515
Telephone:     (202) 225-9700
Facsimile:      (202) 226-1360

August 1, 2011

## CERTIFICATE OF SERVICE

       I certify that on August 1, 2011, I served one copy of Intervenor-Defendant's Local Rule 56.1 Response to Plaintiff's Statement of Material Facts by CM/ECF and by electronic mail (.pdf format) on the following:

Roberta A. Kaplan, Esquire, & Andrew J. Ehrlich, Esquire
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York City, New York  10019-6064
rkaplan@paulweiss.com
aehrlich@paulweiss.com

Alexis Karteron, Esquire, & Arthur Eisenberg, Esquire
NEW YORK CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 19th Floor
New York City, New York  10004
akarteron@nyclu.org
arteisenberg@nyclu.org

James D. Esseks, Esquire, Melissa Goodman, Esquire, & Rose A. Saxe, Esquire
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York City, New York  10004
jesseks@aclu.org
mgoodman@nyclu.org
rsaxe@aclu.org

Jean Lin, Esquire
UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION
20 Massachusetts Avenue, Northwest, Seventh Floor
Washington, District of Columbia  20530
jean.lin@usdoj.gov

Simon Heller, Esquire
STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL
120 Broadway
New York, NY 10271
simon.heller@ag.ny.gov

                                          */s/ Kerry W. Kircher*
                                          Kerry W. Kircher