# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| EDITH SCHLAIN WINDSOR, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 10-CV-8435 (BSJ)(JCF) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | ECF CASE |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT UNITED STATES' MEMORANDUM OF LAW
## IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND INTERVENOR'S MOTION TO DISMISS

**INTRODUCTION**

Plaintiff challenges the constitutionality of Section 3 of the Defense of Marriage Act ("DOMA"), 1 U.S.C. § 7.  Plaintiff brings this action as the executor of her late same-sex spouse's estate, seeking a refund of $363,053.00 of federal estate taxes that – but for DOMA – the estate would not have paid due to the marital deduction.

Section 3 of DOMA unconstitutionally discriminates.  Section 3 treats same-sex couples who are legally married under their states' laws differently than similarly situated opposite-sex couples, denying them the status, recognition, and significant federal benefits otherwise available to married persons.  Under well-established factors set forth by the Supreme Court to guide the determination whether heightened scrutiny applies to a classification that singles out a particular group, discrimination based on sexual orientation merits heightened scrutiny.  Under this standard of review, Section 3 of DOMA is unconstitutional.

**BACKGROUND**

## I.     THE DEFENSE OF MARRIAGE ACT

The Defense of Marriage Act ("DOMA") was enacted by Congress in 1996.  DOMA has two main provisions.  Section 2 of DOMA provides that no state is required to give effect to any public act, record, or judicial proceeding of another state that treats a relationship between two persons of the same sex as a marriage under its laws.  28 U.S.C. § 1738C.  Section 3 of DOMA defines the terms "marriage" and "spouse" for purposes of federal law:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7.  Section 3 thereby excludes same-sex relationships from the definition of marriage or spouse for purposes of federal law, even if that relationship is recognized under state law.  Only Section 3 is at issue here.

## II.     PLAINTIFF'S SAME-SEX MARRIAGE

Plaintiff Edith Schlain Windsor and her late spouse Thea Clara Spyer were married in Toronto, Canada in May 2007.  Am. Compl. ¶ 3.  At that time, the couple had been living together in New York for approximately 40 years.  *See id.* ¶¶ 26, 28.  New York law then restricted marriage to opposite-sex couples, s*ee Hernandez v. Robles*, 7 N.Y.3d 338, 357 (2006), but "accord[ed] marriages between same-sex couples the same legal validity as marriages between opposite-sex couples.  New York has long recognized as valid same-sex marriages that were solemnized under the laws of other States or nations, such as plaintiff Edith Windsor's Canadian marriage to Thea Spyer."  Brief for the State of New York as Amicus Curiae in

Support of the Plaintiff at 1, ECF No. 40-1; *see In re Estate of Ranftle*, 81 A.D.3d 566 (1st Dep't 2011); *Lewis v. New York State Dep't of Civ. Serv.*, 60 A.D.3d 216 (3rd Dep't 2009), *affirmed on other grounds*, *Godfrey v. Spano*, 13 N.Y.3d 358 (2009); *Martinez v. County of Monroe*, 50 A.D.3d 189 (4th Dep't 2008).

### III.   THE FEDERAL ESTATE TAX REFUND CLAIM

Plaintiff Windsor's late spouse Spyer died in 2009.  Am. Compl. ¶ 51.  Spyer's last will and testament effectively passed the entire estate to Plaintiff.  *See id.* ¶¶ 53-55.  Section 2001 of the Internal Revenue Code imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  26 U.S.C. § 2001(a).  Section 2056 further provides that the value of the taxable estate shall be determined "by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse," if such interest is included in determining the value of the gross estate.  26 U.S.C. § 2056.  Because of DOMA, Spyer's estate was ineligible to exclude from the gross taxable estate property passed to Plaintiff.  As a result, Spyer's estate paid $363,053.00 in estate taxes that it otherwise would not have had to pay had it been entitled to the marital deduction.  *See* Am. Comp. ¶ 73.

In her capacity as executor of Spyer's estate, Plaintiff filed a refund claim with the Internal Revenue Service ("IRS") on April 7, 2010, on the basis that the decedent's entire estate passed to Plaintiff as decedent's spouse and thus no estate tax should be imposed.  *Id.* ¶ 76.  The IRS disallowed the claim for refund on May 26, 2010.  *Id.* ¶ 77.  Having satisfied the requirement of 26 U.S.C. § 7422(a) that a taxpayer first timely file an administrative refund claim before

filing suit, Plaintiff, as the executor of Spyer's estate, filed the instant action on November 9, 2010, seeking a refund of the estate tax.

## ARGUMENT

## DOMA VIOLATES EQUAL PROTECTION

The Constitution's guarantee of equal protection of the laws, applicable to the federal government through the Due Process Clause of the Fifth Amendment, *see Bolling v. Sharpe*, 347 U.S. 497, 500 (1954), embodies a fundamental requirement that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). DOMA Section 3 is inconsistent with that principle of equality, as it denies legally married same-sex couples federal benefits that are available to similarly situated opposite-sex couples. For the reasons set forth below, DOMA is subject to heightened scrutiny. Under that standard, Section 3 of DOMA cannot pass constitutional muster.

**I.     Plaintiffs' Equal Protection Challenge to DOMA Is Subject to Heightened Scrutiny under Supreme Court Precedent.**

As a general rule, legislation challenged under equal protection principles is presumed valid and sustained as long as the "classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. "[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the [government] has authority to implement," courts will not "closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *Id.* at 441. Where, however, legislation classifies on the basis of a factor that "generally provides no sensible ground for differential treatment,"

such as race or gender, the law demands more searching review and imposes a greater burden on the government to justify the classification.  *Id.* at 440–41.

Such suspect or quasi-suspect classifications are reviewed under a standard of heightened scrutiny, under which the government must show, at a minimum, that a law is "substantially related to an important government objective."  *Clark v. Jeter*, 586 U.S. 456, 461 (1988).  This more searching review enables courts to ascertain whether the government has employed the classification for a significant and proper purpose, and serves to prevent implementation of classifications that are the product of impermissible prejudice or stereotypes.  *See, e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion); *United States v. Virginia* ("*VMI*"), 518 U.S. 515, 533 (1996).

The Supreme Court has yet to rule on the appropriate level of scrutiny for classifications based on sexual orientation.[1]  It has, however, established and repeatedly confirmed a set of

---

[1]  In neither *Romer v. Evans*, 517 U.S. 620 (1996), nor *Lawrence v. Texas*, 539 U.S. 558 (2003), did the Supreme Court opine on the applicability of heightened scrutiny to sexual orientation.  In both cases, the Court invalidated sexual orientation classifications under a more permissive standard of review without having to decide whether heightened scrutiny applied (*Romer* found that the legislation failed rational basis review, 517 U.S. at 634–35; *Lawrence* found the law invalid under the Due Process Clause, 539 U.S. at 574–75).

Nor did the Court decide the question in its one-line per curiam order in *Baker v. Nelson*, 409 U.S. 810 (1972), in which it dismissed an appeal as of right from a state supreme court decision denying marriage status to a same-sex couple, *id.* at 810.  *Baker* did not concern the constitutionality of a federal law, like DOMA Section 3, that distinguishes among couples who are already legally married in their own states, and was motivated by animus toward gay and lesbian people, as discussed later.  Moreover, neither the Minnesota Supreme Court decision, *Baker v. Nelson*, 191 N.W.2d 185, 187 (Minn. 1971), nor the questions presented in the plaintiffs' jurisdictional statement raised whether classifications based on sexual orientation are subject to heightened scrutiny, *see Baker v. Nelson*, Jurisdictional Statement, No. 71-1027 (Sup. Ct.), at 2; *see also id.* at 13 (repeatedly describing equal protection challenge as based on the "arbitrary" nature of the state law).  There is no indication in the Court's order that the Court nevertheless considered, much less resolved, that question.

factors that guide the determination whether heightened scrutiny applies to a classification that singles out a particular group.  These include: (1) whether the group in question has suffered a history of discrimination; (2) whether members of the group "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"; (3) whether the group is a minority or is politically powerless; and (4) whether the characteristics distinguishing the group have little relation to legitimate policy objectives or to an individual's "ability to perform or contribute to society."  *Bowen v. Gilliard*, 483 U.S. 587, 602–03 (1987); *see also Cleburne*, 473 U.S. at 441–42.

The Second Circuit has not ruled on the appropriate level of scrutiny for sexual orientation classifications.  Although there is substantial authority in other circuits holding that rational basis review generally applies to sexual orientation classifications,[2] most of those decisions fail to give adequate consideration to these enumerated factors.[3]  Indeed, the reasoning

---

[2]  A number of these cases involved challenges to military policy on homosexual conduct. *See Cook v. Gates*, 528 F.3d 42, 45 (1st Cir. 2008)*; Richenberg v. Perry*, 97 F.3d 256, 258 (8th Cir. 1996); *Thomasson v. Perry*, 80 F.3d 915, 919 (4th Cir. 1996); *Steffan v. Perry*, 41 F.3d 677, 682 (D.C. Cir. 1994) (en banc); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 565 (9th Cir. 1990); *Woodard v. United States*, 871 F.2d 1068, 1069 (Fed. Cir. 1989); *Ben-Shalom v. Marsh*, 881 F.2d 454, 456 (7th Cir. 1989).  Classifications in the military context, however, present different questions from classifications in the civilian context, *see, e.g.*, *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981), and the military is not involved here.

[3]  Many other courts relied in whole or in part on *Bowers v. Hardwick*, 478 U.S. 186 (1986), which has since been overruled by *Lawrence*.  *See Equality Found. v. City of Cincinnati*, 54 F.3d 261, 266–67 & n.2 (6th Cir. 1995); *Steffan*, 41 F.3d at 685; *High Tech Gays*, 895 F.2d at 571; *Woodward*, 871 F.2d at 1076; *Ben-Shalom*, 881 F.2d at 464; *see also Richenberg*, 97 F.3d at 260 (citing the reasoning of prior appellate decisions that were based on *Bowers*); *Thomasson*, 80 F.3d at 928 (same).  Other courts relied on the fact that the Supreme Court has not recognized that gays and lesbians constitute a suspect or quasi-suspect class.  *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Cook*, 528 F.3d at 61.  Though it is true that the Supreme Court has not yet recognized that gays and lesbians constitute a suspect class, *see* note 1, *supra*, the Court has thus far not been required to decide that issue and therefore cannot be said to have resolved it.

of this line of case law traces back to circuit court decisions from the late 1980s and early 1990s,

a time when *Bowers v. Hardwick*, 478 U.S. 186 (1986), was still the law.  The Supreme Court

subsequently overruled *Bowers* in *Lawrence v. Texas*, 539 U.S. 558 (2003), and the reasoning of

these circuit decisions no longer withstands scrutiny.  As discussed below, careful consideration

of the factors the Supreme Court has identified as relevant to the inquiry demonstrates that

classifications based on sexual orientation should be subject to heightened scrutiny.

A.     **Gays and Lesbians Are a Suspect or Quasi-Suspect Class under the Relevant
       Factors Identified by the Supreme Court.**

       1.     **Gays and Lesbians Have Been Subject to a History of
              Discrimination.**

       First, courts have recognized that gay and lesbian individuals have suffered a long and

significant history of purposeful discrimination.  *See High Tech Gays  v. Defense Indus. Sec.*

*Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990) ("[W]e do agree that homosexuals have

suffered a history of discrimination . . . ."); *see also Ben-Shalom v. Marsh*, 881 F.2d 454, 465–66

(7th Cir. 1989) (noting that "[h]omosexuals have suffered a history of discrimination and still do,

though possibly now in less degree").  So far as we are aware, no court to consider this question

has ever ruled otherwise.

       Discrimination against gay and lesbian individuals has a long history in this country,

*Bowers*, 478 U.S. at 192, from colonial laws ordering the death of "any man [that] shall lie with

mankind, as he lieth with womankind" to state laws that, until very recently, have "demean[ed]

the[] existence" of gay and lesbian people "by making their private sexual conduct a crime,"

_____

Finally, the remaining courts to address the issue offered no pertinent reasoning in so doing.
*Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004);
*Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1273 (10th Cir. 1984).

7

*Lawrence*, 539 U.S. at 578.  In addition to the discrimination reflected in DOMA itself, as explained below, the federal government, state and local governments, and private parties all have contributed to this long history of discrimination.[4]

### i.      Discrimination by the Federal Government

The federal government has played a significant and regrettable role in the history of discrimination against gay and lesbian individuals.  For years, the federal government deemed gays and lesbians unfit for employment, barring them from federal jobs on the basis of their sexual orientation.  *See Employment of Homosexuals and Other Sex Perverts in Government*, Interim Report submitted to the Committee by its Subcommittee on Investigations pursuant to S. Res. 280 (81st Congress), December 15, 1950, ("Interim  Report"), at 9.  In 1950, Senate Resolution 280 directed a Senate subcommittee "to make an investigation in the employment by the Government of homosexuals and other sexual perverts."  Patricia Cain, *Litigating for Lesbian and Gay Rights:  A Legal History*, 79 Va. L. Rev. 1551 , 1565–66 (1993).  The Committee found that from 1947 to 1950, "approximately 1,700 applicants for federal positions were denied employment because they had a record of homosexuality or other sex perversion." Interim Report at 9.

---

[4]  We do not understand the Supreme Court to have called into question this well-documented history when it said in *Lawrence* that "it was not until the 1970's that any State singled out same-sex relations for criminal prosecution," 539 U.S. at 570, and that only nine States had done so by the time of *Lawrence*.  The question before the Court in *Lawrence* was whether, as *Bowers* had asserted, same-sex sodomy prohibitions were so deeply rooted in history that they could not be understood to contravene the Due Process Clause.  That the Court rejected that argument and invalidated Texas's sodomy law on due process grounds casts no doubt on the duration and scope of discrimination against gay and lesbian people writ large.

In April 1953, in the wake of the Senate investigation, President Eisenhower issued

Executive Order 10450, which officially added "sexual perversion" as a ground for investigation

and possible dismissal from federal service.  Exec. Order No. 10450, 3 C.F.R. 936, 938 (1953);

*see also* 81 Fed. Reg. 2489.  The Order expanded the investigations of civilian employees for

"sexual perversion" to include every agency and department of the federal government, and thus

had the effect of requiring the termination of all gay people from federal employment.  *See*

General Accounting Office, *Security Clearances: Consideration of Sexual Orientation in the*

*Clearance Process*, at 2 (Mar. 1995).

The federal government enforced Executive Order 10450 zealously, engaging various

agencies in intrusive investigatory techniques to purge gays and lesbians from the federal civilian

workforce.  The State Department, for example, charged "'skilled' investigators" with

"interrogating every potential male applicant to discover if they had any effeminate tendencies or

mannerisms," used polygraphs on individuals accused of homosexuality who denied it, and sent

inspectors "to every embassy, consulate, and mission" to uncover homosexuality.  Edward L.

Tulin, Note, *Where Everything Old Is New Again—Enduring Episodic Discrimination Against*

*Homosexual Persons*, 84 Tex. L. Rev. 1587, 1602 (2006).  In order to identify gays and lesbians

in the civil service, the FBI "sought out state and local police officers to supply arrest records on

morals charges, regardless of whether there were convictions; data on gay bars; lists of other

places frequented by homosexuals; and press articles on the largely subterranean gay world."

Williams Institute, "Documenting Discrimination on the Basis of Sexual Orientation and Gender

Identity in State Employment," ch. 5 at 7, *available at* http://www.law.ucla.edu/williamsinstitute

/programs/EmploymentReports_ENDA.html ("Williams Report").  The United States Postal

9

Service ("USPS"), for its part, aided the FBI by establishing "a watch list on the recipients of physique magazines, subscrib[ing] to pen pal clubs, and initiat[ing] correspondence with men whom [it] believed might be homosexual." *Id.* The mail of individuals concluded to be homosexual would then be traced "in order to locate other homosexuals." *Id.* The end result was thousands of men and women forced from their federal jobs based on the suspicion that they were gay or lesbian. It was not until 1975 that the Civil Service Commission prohibited discrimination on the basis of sexual orientation in federal civilian hiring. *See* General Accounting Office, *Security Clearances: Consideration of Sexual Orientation in the Clearance Process* (1995) (describing the federal government's restrictions on the employment of gay and lesbian individuals).[5]

The history of the federal government's discrimination against gays and lesbians extends beyond the employment context. For decades, gay and lesbian noncitizens were categorically barred from entering the United States, on grounds that they were "persons of constitutional psychopathic inferiority," "mentally defective," or sexually deviant. *Lesbian/Gay Freedom Day Comm., Inc. v. INS*, 541 F. Supp. 569, 571–72 (N.D. Cal. 1982) (quoting Ch. 29, § 3, 39 Stat. 874 (1917)), *aff'd*, *Hill v. INS*, 714 F.2d 1470 (9th Cir. 1983). As the Supreme Court held in *Boutilier v. INS*, 387 U.S. 118 (1967), "[t]he legislative history of [the Immigration and Nationality Act of 1952] indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals." *Id.* at 120. This exclusion remained

---

[5] Open military service by gays and lesbians was prohibited, first by regulation and then by statute, 10 U.S.C. § 654 (2007), until the "Don't Ask, Don't Tell" Repeal Act, enacted last year, 111 P.L. 321, 124 Stat. 3515 (2010). The President, Secretary of Defense, and Chairman of the Joint Chiefs of Staff certified the repeal on July 22, 2011, and repeal will become effective 60 days from that date, on September 20, 2011.

in effect until Congress repealed it in 1990.  *See* Immigration Act of 1990, Pub. L. No. 101-649,

104 Stat. 4978.

ii.      **Discrimination by State and Local Governments**

Like the federal government, state and local governments have long discriminated against

gays and lesbians in public employment.  By the 1950s, many state and local governments had

banned gay and lesbian employees, as well as gay and lesbian "employees of state funded schools

and colleges, and private individuals in professions requiring state licenses."  Williams Report,

ch. 5 at 18.  Many states and localities began aggressive campaigns to purge gay and lesbian

employees from government services as early as the 1940s.  *Id.* at 18–34.

This employment discrimination was interrelated with longstanding state law prohibitions

on sodomy; the discrimination was frequently justified by the assumption that gays and lesbians

had engaged in criminalized and immoral sexual conduct.  *See, e.g.*, *Childers v. Dallas Police*

*Dep't*, 513 F. Supp. 134, 138 (N.D. Tex. 1981) (holding that police could refuse to hire gays),

*aff'd without opinion*, 669 F.2d 732 (5th Cir. 1982); *Gaylord v. Tacoma Sch. Dist. No. 10*, 559

P.2d 1340, 1342 (Wash. 1977) (upholding the dismissal of an openly gay school teacher who was

fired based on a local school board policy that allowed removal for "immorality"); *Burton v.*

*Cascade Sch. Dist. Union High Sch., No.5*, 512 F.2d 850, 851 (9th Cir. 1975) (upholding the

dismissal of a lesbian teacher in Oregon upon the adoption of a resolution stating that she was

being terminated "because of her immorality of being a practicing homosexual"); *Bd. of Educ. v.*

*Calderon*, 110 Cal. Rptr. 916, 919 (1973) (holding that state sodomy statute was a valid ground

for discrimination against gays as teachers); *see also Baker v. Wade*, 553 F. Supp. 1121, 1128 n.9

(N.D. Tex. 1982) ("A school board member testified that [the defendant] would have been fired

11

[from his teaching position] if there had even been a suspicion that he had violated [the Texas sodomy statute].”), *rev'd,* 769 F.2d 289 (5th Cir. 1985) (holding that challenged Texas homosexual sodomy law was constitutional).  Some of these discriminatory employment policies continued into the 1990s.  *See Shahar v. Bowers*, 114 F.3d 1097, 1105 & n.17, 1107–10 (11th Cir. 1997) (en banc) (upholding Georgia Attorney General's Office's rescission of a job offer to plaintiff after she mentioned to co-workers her upcoming wedding to her same-sex partner); *City of Dallas v. England*, 846 S.W.2d 957 (Tex. App. 1993) (holding unconstitutional Dallas Police Department policy denying gays and lesbians employment).

Based on similar assumptions regarding the criminal sexual conduct of gays and lesbians, states and localities also denied child custody and visitation rights to gay and lesbian parents. *See, e.g.*, *Ex parte H.H.*, 830 So. 2d 21, 26 (Ala. 2002) (Moore, C.J., concurring) (concurring in denial of custody to lesbian mother on ground that "homosexual conduct is . . . abhorrent, immoral, detestable, a crime against nature, and a violation of the laws of nature and of nature's God [and] an inherent evil against which children must be protected"); *Pulliam v. Smith*, 501 S.E.2d 898, 903–04 (N.C. 1998) (upholding denial of custody to a gay man who had a same-sex partner; emphasizing that father engaged in sexual acts while unmarried and refused to "counsel the children against such conduct"); *Bowen v. Bowen*, 688 So. 2d 1374, 1381 (Miss. 1997) (holding that the trial court did not err in granting a father custody of his son on the basis that people in town had rumored that the son's mother was involved in a lesbian relationship); *Bottoms v. Bottoms*, 457 S.E.2d 102, 108 (Va. 1995) (noting that, although the Court had previously held "that a lesbian mother is not per se an unfit parent," the "[c]onduct inherent in lesbianism is punishable as a Class 6 felony in the Commonwealth" and therefore "that conduct

12

is another important consideration in determining custody"); *Roe v. Roe*, 324 S.E.2d 691, 692,

694 (Va. 1985) (holding that father, who was in a gay relationship, was "an unfit and improper

custodian as a matter of law" because of his "continuous exposure of the child to his immoral

and illicit relationship").

State and local law also has been used to prevent gay and lesbian people from associating

freely.  Liquor licensing laws, both on their face and through discriminatory enforcement, were

long used to harass and shut down establishments patronized by gays and lesbians.  *See* William

N. Eskridge, Jr., *Privacy Jurisprudence and the Apartheid of the Closet, 1946–1961*, 24 Fla. St.

U. L. Rev. 703, 762–66 (1997) (describing such efforts in New York, New Jersey, Michigan,

California, and Florida); *see also Irvis v. Scott*, 318 F. Supp. 1246, 1249 (M.D. Pa. 1970)

(describing such efforts in Pennsylvania).  State and local police also relied on laws prohibiting

lewdness, vagrancy, and disorderly conduct to harass gays and lesbians, often when gay and

lesbian people congregated in public.  *See, e.g.*, *Pryor v. Mun. Court*, 599 P.2d 636, 644 (Cal.

1979) ("Three studies of law enforcement in Los Angeles County indicate[d] that the

overwhelming majority of arrests for violation of [the 'lewd or dissolute' conduct statute]

involved male homosexuals."); Steven A. Rosen, *Police Harassment of Homosexual Women and*

*Men in New York City, 1960–1980*, 12 Colum. Hum. Rts. L. Rev. 159, 162–63 (1982); Florida

State Legislative Investigation Committee (Johns Committee), *Report: Homosexuality and*

*Citizenship in Florida*, at 14 (1964) ("Many homosexuals are picked up and prosecuted on

vagrancy or similar non-specific charges, fined a moderate amount, and then released.").  Similar

practices persist to this day.  *See, e.g.*, *Calhoun v. Pennington*, No. 09-3286 (N.D. Ga.)

(involving September 2009 raid on Atlanta gay bar and police harassment of patrons); *Settlement*

13

*in Gay Bar Raid*, N.Y. Times (Mar. 23, 2011) (involving injuries sustained by gay bar patron

during raid by Fort Worth police officers and the Texas Alcoholic Beverage Commission).

      Efforts to combat discrimination against gays and lesbians also have led to significant

political backlash, as evidenced by the long history of successful state and local initiatives

repealing laws that protected gays and lesbians from discrimination.  A rash of such initiatives

succeeded in the late 1970s.  *See, e.g.*, *St. Paul Citizens for Human Rights v. City Council of the*

*City of St. Paul*, 289 N.W.2d 402, 404 (Minn. 1979) (St. Paul, Minnesota in 1978); Christopher

R. Leslie, *The Evolution of Academic Discourse on Sexual Orientation and the Law*, 84 Chi.

Kent L. Rev. 345, 359 (2009) (Boulder, Colorado in 1974); Rebecca Mae Salokar, Note, *Gay and*

*Lesbian Parenting in Florida: Family Creation Around the Law*, 4 Fla. Int'l. U. L. Rev. 473, 477

(2009) (Dade County, Florida in 1977); *Gay rights referendum in Oregon*, Washington Post,

May 11, 1978, at A14 (Wichita, Kansas in 1978); *Why tide is turning against homosexuals*, U.S.

News & World Report, June 5, 1978, at 29 (Eugene, Oregon in 1978).  The laws at issue in

*Romer* and in *Equality Foundation v. City of Cincinnati*, 54 F.3d 261 (6th Cir. 1995), are just two

of a number of more recent examples from the 1990s.  In fact, in May 2011, the Tennessee

legislature enacted a law stripping counties and municipalities of their ability to pass local

non-discrimination ordinances that would prohibit discrimination on the basis of sexual

orientation, and repealing the ordinances that had recently been passed by Nashville and other

localities.[6]  Similar responses have followed states' decisions to recognize same-sex marriages.

*See infra* at 18-19.

---

    [6] *See* State of Tennessee, Public Chapter No. 278, *available at* http://state.tn.us/sos/acts
/107/pub/pc0278.pdf.

###### iii.      Discrimination by Private Parties

Finally, private discrimination against gays and lesbians in employment and other areas has been pervasive and continues to this day.[7]  *See, e.g.*, Williams Report, ch. 5 at 8–9 (explaining that private companies and organizations independently adopted discriminatory employment policies modeled after the federal government's, and as "federal employers shared police and military records on gay and lesbian individuals with private employers, these same persons who were barred from federal employment on the basis of their sexual orientation were simultaneously blacklisted from employment by many private companies").  The pervasiveness of private animus against gays and lesbians is underscored by statistics showing that gays and lesbians continue to be among the most frequent victims of all reported hate crimes.  *See* H.R. Rep. 111-86, at 10 (2009) ("According to 2007 FBI statistics, hate crimes based on the victim's sexual orientation—gay, lesbian, or bisexual—constituted the third highest category reported—1,265 incidents, or one-sixth of all reported hate crimes."); Kendall Thomas, *Beyond the Privacy Principle*, 92 Colum. L. Rev. 1431, 1464 (1992).

In sum, gays and lesbians have suffered a long history of discrimination based on prejudice and stereotypes.  That history counsels strongly in favor of heightened scrutiny, giving courts ample reason to question whether sexual orientation classifications are the product of hostility rather than a legitimate government purpose.

-------------------------------------------------

[7]  Private discrimination, as well as official discrimination, is relevant to whether a group has suffered a history of discrimination for purposes of the heightened scrutiny inquiry. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality) ("[W]omen still face pervasive, although at times more subtle, discrimination in our educational institutions, in the job market and, perhaps most conspicuously, in the political arena.").

2.      **Gays and Lesbians Exhibit Immutable Characteristics that
          Distinguish Them as a Group.**

Over ten years ago, in considering whether gays and lesbians constituted a "particular

social group" for asylum purposes, the Ninth Circuit recognized that "[s]exual orientation and

sexual identity are immutable," and that "[h]omosexuality is as deeply ingrained as

heterosexuality." *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (quotation

omitted). *But see High Tech Gays*, 895 F.2d at 573 (stating that sexual orientation is not

immutable because "it is behavioral"). Sexual orientation, the Ninth Circuit explained, is

"fundamental to one's identity," and gay and lesbian individuals "should not be required to

abandon" it to gain access to fundamental rights guaranteed to all people. *Hernandez-Montiel*,

225 F.3d at 1093.

This conclusion is consistent with the overwhelming consensus in the scientific

community that sexual orientation is an immutable characteristic. *See e.g.*, G.M. Herek, et al.

*Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and

Bisexual Adults* 7, 176–200 (2010), *available at* http://www.springerlink.com/content/

k186244647272924/fulltext.pdf (noting that in a national survey conducted with a representative

sample of more than 650 self-identified lesbian, gay, and bisexual adults, 95 percent of the gay

men and 83 percent of lesbian women reported that they experienced "no choice at all" or "very

little choice" about their sexual orientation). There is also a consensus among the established

medical community that efforts to change an individual's sexual orientation are generally futile

and potentially dangerous to an individual's well-being.[8] *See* Am. Psychological Ass'n, *Report*

---

[8] In fact, every major mental health organization has adopted a policy statement
cautioning against the use of so-called "conversion" or "reparative" therapies to change the

16

*of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, at v (2009), *available at* http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf ("[E]fforts to change sexual orientation are unlikely to be successful and involve some risk of harm."); *see also* Richard A. Posner, *Sex and Reason* 101 n.35 (1992) (describing "failure of treatment strategies . . . to alter homosexual orientation"); Douglas Haldeman, *The Practice and Ethics of Sexual Orientation Conversion Therapy*, 62 J. Consulting & Clinical Psychol. 221, 226 (1994) (describing "lack of empirical support for conversion therapy").

Furthermore, sexual orientation need not be a "visible badge" that distinguishes gays and lesbians as a discrete group for the classification to warrant heightened scrutiny.  As the Supreme Court has made clear, a classification may be "constitutionally suspect" even if it rests on a characteristic that is not readily visible, such as illegitimacy.  *Mathews v. Lucas*, 427 U.S. 495, 504 (1976); *see id.* at 506 (noting that "illegitimacy does not carry an obvious badge, as race or sex do," but nonetheless applying heightened scrutiny).  Whether or not gays and lesbians could hide their identities in order to avoid discrimination, they are not required to do so.  As the Court has recognized, sexual orientation is a core aspect of identity, and its expression is an "integral part of human freedom," *Lawrence*, 539 U.S. at 562, 576–77.

---

sexual orientation of gays and lesbians.  These policy statements are reproduced in a 2009 publication of the American Psychological Association, available at http://www.apa.org/pi/lgbt/resources/just-the-facts.pdf.

###### 3.      Gays and Lesbians Are Minorities with Limited Political Power.

Third, gays and lesbians are a minority group,[9] *Able v. United States*, 968 F. Supp. 850, 863 (E.D.N.Y. 1997), *rev'd*, 155 F.3d 628 (2d Cir. 1998), that has historically lacked political power.  To be sure, many of the forms of historical discrimination described above have subsided or been repealed.  But efforts to combat discrimination have frequently led to successful initiatives to scale back protections afforded to gay and lesbian individuals.  As described above, the adoption of ballot initiatives specifically repealing laws protecting gays and lesbians from discrimination (including the laws at issue in *Romer* and *Equality Foundation v. City of Cincinnati*) are examples of such responses.  In fact, "[f]rom 1974 to 1993, at least 21 referendums were held on the sole question of whether an existing law or executive order prohibiting sexual orientation discrimination should be repealed or retained.  In 15 of these 21 cases, a majority voted to repeal the law or executive order."  Robert Wintemute, *Sexual Orientation and Human Rights* 56 (1995).

The strong backlash in the 1970s, 1980s, and 1990s to these civil rights ordinances has been followed in the 2000s with similar political backlashes against same-sex marriage.  In 1996, at the time DOMA was enacted, only three states had statutes restricting marriage to opposite-sex couples.  National Conference of State Legislatures, *Same-Sex Marriage, Civil Unions and*

------

[9]  It is difficult to offer a definitive estimate for the size of the gay and lesbian community in the United States.  According to an analysis of various data sources published in April 2011 by the Williams Institute, there appear to be 8 million adults in the United States who are lesbian, gay or bisexual, comprising 3.5 percent of the adult population.  *See* Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender? available at* http://www3.law.ucla.edu/williamsinstitute/pdf/How-many-people-are-LGBT-Final.pdf (last reviewed June 30, 2011).  Ascertaining the precise percentage of gays and lesbians in the population, however, is not relevant to the analysis, as it is clear that whatever the data reveal, there is no dispute that gays and lesbians constitute a minority in the country.

*Domestic Partnerships*, *available at* http://www.ncsl.org/default.aspx?tabid=16430 (last updated May 2011). Today, thirty-seven states have such statutes, and thirty states have constitutional amendments explicitly restricting marriage to opposite-sex couples. *Id.*

California and Iowa are recent examples of such backlash. In May 2008, the California Supreme Court held that the state was constitutionally required to recognize same-sex marriage. *In re Marriage Cases*, 183 P.3d 384, 419 (Cal. 2008). In November 2008, California's voters passed Proposition 8, which amended the state constitution to restrict marriage to opposite-sex couples. *See Strauss v. Horton*, 207 P.3d 48, 120 (Cal. 2009). In November 2010, when three Iowa state supreme court justices who had been part of a unanimous decision legalizing same-sex marriage were up for reelection, Iowa voters recalled all of them. *See* A.G. Sulzberger, *Ouster of Iowa Judges Sends Signal to Bench*, N.Y. Times, Nov. 4, 2010, at A1.

Beyond these state ballot initiatives, the relatively recent passage of anti-sodomy laws singling out same-sex conduct, such as the Texas law the Supreme Court ultimately invalidated in *Lawrence*, indicates that gays and lesbians lack the consistent "ability to attract the [favorable] attention of the lawmakers." *Cleburne*, 473 U.S. at 445.

This is not to say that the political process is closed entirely to gay and lesbian people. But complete foreclosure from meaningful political participation is not the standard by which the Supreme Court has judged "political powerlessness." When the Court ruled in 1973 that gender-based classifications were subject to heightened scrutiny, *Frontiero v. Richardson*, 411 U.S. 677 (1973), women already had won major political victories, including a constitutional amendment granting the right to vote and protection against employment discrimination under Title VII. As

*Frontiero* makes clear, the "political power" factor does not require a complete absence of political protection, and its application is not intended to change with every political success.[10]

4.      **Sexual Orientation Bears No Relation to Legitimate Policy Objectives or Ability to Perform or Contribute to Society.**

Even where other factors might point toward heightened scrutiny, the Court has declined to treat as suspect those classifications that generally bear on "ability to perform or contribute to society."  *See Cleburne*, 473 U.S. at 441 (holding that mental disability is not a suspect classification) (quotation omitted); *see also Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 315 (1976) (holding that age is not a suspect classification).

Sexual orientation is not such a classification.  As the history described above makes clear, prior discrimination against gay and lesbian people has rested not on their ability to contribute to society, but on the basis of invidious and long-discredited views that gays and lesbians are, for example, sexual deviants or mentally ill.  As the American Psychiatric Association stated more than 35 years ago, "homosexuality per se implies no impairment in judgment, stability, reliability or general social or vocational capabilities."  Resolution of the Am. Psychiatric Ass'n (Dec. 15, 1973); *see also Minutes of the Annual Meeting of the Council of Representatives*, 30 Am. Psychologist 620, 633 (1975) (reflecting a similar American Psychological Association statement).

_____

[10]   In determining that gender classifications warranted heightened scrutiny, the plurality in *Frontiero* noted that "in part because of past discrimination, women are vastly underrepresented in this Nation's decision-making councils.  There has never been a female President, nor a female member of this court.  Not a single woman presently sits in the United States Senate, and only 14 women hold seats in the House of Representatives."  411 U.S. at 686 n. 17 (plurality opinion).

Just as a person's gender, race, or religion does not bear an inherent relation to a person's ability or capacity to contribute to society, a person's sexual orientation bears no inherent relation to his or her ability to perform or contribute.  President Obama elaborated on this principle in the context of the military when he signed the Don't Ask, Don't Tell Repeal Act of 2010:

> [S]acrifice, valor and integrity are no more defined by sexual orientation than they are by race or gender, religion or creed. . . . There will never be a full accounting of the heroism demonstrated by gay Americans in service to this country; their service has been obscured in history.  It's been lost to prejudices that have waned in our own lifetimes.  But at every turn, every crossroads in our past, we know gay Americans fought just as hard, gave just as much to protect this nation and the ideals for which it stands.

White House, Remarks by the President and Vice President at Signing of the Don't Ask, Don't Tell Repeal Act of 2010 (Dec. 22, 2010), *available at* http://www.whitehouse.gov/the-press -office/2010/12/22/remarks-president-and-vice-president-signing-don't-ask-don't-tell-repeal-a.

The Supreme Court has also recognized that opposition to homosexuality, though it may reflect deeply held personal religious and moral views, is not a legitimate policy objective. *Lawrence*, 539 U.S. at 577 ("[T]he fact that a governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice."); *Romer*, 517 U.S. at 633 (noting that a law cannot broadly disfavor gays and lesbians because of "personal or religious objections to homosexuality" (quotation omitted)). Whether premised on pernicious stereotypes or simple moral disapproval, laws classifying on the basis of sexual orientation rest on a "factor [that] generally provides no sensible ground for differential treatment," *see Cleburne*, 473 U.S. at 441; thus, such laws merit heightened scrutiny.

21

## II.     DOMA Fails Heightened Scrutiny.

For the reasons described above, heightened scrutiny is the appropriate standard by which

to review classifications based on sexual orientation, including DOMA Section 3.[11]  In reviewing

a legislative classification under heightened scrutiny, the government must establish, at a

minimum, that the classification is "substantially related to an important government objective."

*Clark*, 586 U.S. at 461.  Moreover, under any form of heightened scrutiny, a statute must be

defended by reference to the "actual [governmental] purpose" behind it, not a different

"rationalization."  *VMI*, 518 U.S. at 535–36.

Section 3 fails this analysis.  The legislative history demonstrates that the statute was

motivated in significant part by animus towards gays and lesbians and their intimate and family

relationships.[12]  Among the interests expressly identified by Congress in enacting DOMA was

"the government's interest in defending traditional notions of morality."  H.R. Rep. No. 104-664,

at 15 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905 ("H.R. Rep.").  The House Report repeatedly

claims that DOMA upholds "traditional notions of morality" by condemning homosexuality, and

by expressing disapproval of gays and lesbians and their committed relationships.  *See, e.g.*, H.R.

Rep. at 15–16 ("[J]udgment [opposing same-sex marriage] entails both moral disapproval of

---

[11]   The government takes no position on whether sexual orientation classifications should
be considered suspect, as opposed to quasi-suspect, and therefore whether DOMA should be
subject to intermediate or strict scrutiny.

[12]   We note that some members of the majority in Congress that enacted DOMA have
changed their views on the law, and the legitimacy of its rationales, since 1996.  *See, e.g.*, Bob
Barr, *No Defending the Defense of Marriage Act*, L.A. Times, Jan. 5, 2009,  *available at*
http://www.latimes.com/news/politics/newsletter/la-oe-barr5-2009jan05,0,2810156.
story?track=newslettertext.  In reviewing the statute under heightened scrutiny, however, what is
relevant are the views of Congress at the time of enactment, as evidenced by the legislative
record.

homosexuality and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality."); *id.* at 16 (stating that same-sex marriage "legitimates a public union, a legal status that most people . . . feel ought to be illegitimate" and "put[s] a stamp of approval . . . on a union that many people . . . think is immoral"); *id.* at 15 ("Civil laws that permit only heterosexual marriage reflect and honor a collective moral judgment about human sexuality."); *id.* at 31 (favorably citing the holding in *Bowers* that an "anti-sodomy law served the rational purpose of expressing the presumed belief . . . that homosexual sodomy is immoral and unacceptable").

The House Report also explicitly stated an interest in extending legal preferences to heterosexual couples in various ways to "promote heterosexuality" and discourage homosexuality.  H.R. Rep. at 15 n.53 ("Closely related to this interest in protecting traditional marriage is a corresponding interest in promoting heterosexuality. . . .  Maintaining a preferred societal status of heterosexual marriage thus will also serve to encourage heterosexuality . . . ."). Thus, one of the goals of DOMA was to provide gays and lesbians with an incentive to abandon or at least to hide from view a core aspect of their identities, which legislators regarded as immoral and inferior.

This record evidences the kind of animus and stereotype-based thinking that the Equal Protection Clause is designed to guard against.  *Cf. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) ("If the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."); *see also Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring) ("[The Supreme Court] ha[s] consistently held . . . that some

23

objectives, such as a bare desire to harm a politically unpopular group, are not legitimate state interests."). And even if Congress's opposition to gay and lesbian relationships could be understood as reflecting moral or religious objections, that would remain an impermissible basis for sexual-orientation discrimination. *See Romer*, 517 U.S. at 633 (holding that law cannot broadly disfavor gays and lesbians because of "personal or religious objections to homosexuality"). Discouraging homosexuality, in other words, is not a governmental interest that justifies sexual orientation discrimination.

Nor is there some other important governmental interest identified by Congress and substantially advanced by Section 3 of DOMA, as required under heightened scrutiny. In addition to expressing bare hostility to gay and lesbian people and their relationships, the House Report articulated an interest in "defending and nurturing the institution of traditional, heterosexual marriage." H.R. Rep. at 12. That interest does not support Section 3. As an initial matter, reference to tradition, no matter how long established, cannot by itself justify a discriminatory law under equal protection principles. *VMI*, 518 U.S. at 535 (invalidating longstanding tradition of single-sex education at Virginia Military Institute). But even if it were possible to identify a substantive and animus-free interest in protecting "traditional" marriage on this record, there would remain a gap between means and end that would invalidate Section 3 under heightened scrutiny. Section 3 of DOMA has no effect on recognition of the same-sex marriages Congress viewed as threatening to "traditional" marriage; it does not purport to defend "traditional, heterosexual marriage" by preventing same-sex marriage or by denying legal recognition to such marriages. Instead, Section 3 denies benefits to couples who are already legally married in their own states, on the basis of their sexual orientation and not their marital

status.  Thus, there is not the "substantial relationship" required under heightened scrutiny between an end of defending "traditional" marriage and the means employed by Section 3.

The same is true of Congress's interest in "promoting responsible procreation and child-rearing," which the House Report identified not as a separate rationale for DOMA Section 3, but as the basis for its larger interest in defending "the institution of traditional, heterosexual marriage."  *See, e.g.*, H.R. Rep. at 12–13 ("At bottom, civil society has an interest in maintaining and protecting the institution of heterosexual marriage because it has a deep and abiding interest in encouraging responsible procreation and child-rearing."); *id.* at 14 ("Were it not for the possibility of begetting children inherent in heterosexual unions, *society would have no particular interest* in encouraging citizens to come together in a committed relationship.") (emphasis added).  Again, even assuming that Congress legislated on the basis of an independent and animus-free interest in promoting responsible procreation and child-rearing, that interest is not materially advanced by Section 3 of DOMA and so cannot justify that provision under heightened scrutiny.

First, there is no sound basis for concluding that same-sex couples who have committed to marriages recognized by state law are anything other than fully capable of responsible parenting and child-rearing.  To the contrary, many leading medical, psychological, and social welfare organizations have issued policies opposing restrictions on lesbian and gay parenting based on their conclusions, supported by numerous studies, that children raised by gay and lesbian parents are as likely to be well-adjusted as children raised by heterosexual parents.  *See, e.g.*, American Academy of Pediatrics, Coparent or Second-Parent Adoption by 16 Same-Sex Parents (Feb. 2002), *available at* http://aappolicy.aappublications.org/cgi/content/full

/pediatrics;109/2/339; American Psychological Association, Sexual Orientation, Parents, & Children (July 2004), *available at* http://www.apa.org/about/governance/council/policy /parenting.aspx; American Academy of Child and Adolescent Psychiatry, Gay, Lesbian, Bisexual, or Transgender Parents Policy Statement (Oct. 2008), *available at* http://www.aacap.org/cs/root/policy_statements/gay_lesbian_transgender_and_bisexual_parents_ policy_statement; American Medical Association, AMA Policy Regarding Sexual Orientation, *available at* http://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisorycommittee/ama-policy-regarding-sexual-orientation.shtml; Child Welfare League of America, Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults, *available at* http://www.cwla.org/ programs/culture/glbtqposition.htm.  For this reason alone, no penalty or prohibition on same-sex marriage can be "substantially" related to an interest in promoting responsible child-rearing.

Second, there is no evidence in the legislative record that denying federal benefits to same-sex couples legally married under state law operates in any way to encourage responsible child-rearing, whether by opposite-sex or same-sex couples, and it is hard to imagine what such evidence would look like.  In enacting DOMA, Congress expressed the view that marriage plays an "irreplaceable role" in child-rearing.  H.R. Rep. at 14.  But Section 3 does nothing to affect the stability of heterosexual marriages or the child-rearing practices of heterosexual married couples. Instead, it denies the children of same-sex couples what Congress sees as the benefits of the stable home life produced by legally recognized marriage, and therefore, on Congress's own account, undermines rather than advances an interest in promoting child welfare.

Finally, as to "responsible procreation," even assuming an important governmental interest in providing benefits only to couples who procreate, Section 3 is not sufficiently tailored to that interest to survive heightened scrutiny.  Many state-recognized same-sex marriages involve families with children; many opposite-sex marriages do not.  And the ability to procreate has never been a requirement of marriage or of eligibility for federal marriage benefits; opposite-sex couples who cannot procreate for reasons related to age or other physical characteristics are permitted to marry and to receive federal marriage benefits.  *Cf.* H.R. Rep. at 14 (noting "that society permits heterosexual couples to marry regardless of whether they intend or are even able to have children" but describing this objection to DOMA as "not a serious argument").[13]

In sum, the official legislative record makes plain that DOMA Section 3 was motivated in substantial part by animus toward gay and lesbian individuals and their intimate relationships, and Congress identified no other interest that is materially advanced by Section 3.  Section 3 of DOMA is therefore unconstitutional.[14]

---

[13]  The House Report also identifies preservation of scarce government resources as an interest underlying Section 3's denial of government benefits to same-sex couples married under state law.  *See* H.R. Rep. at 18.  In fact, many of the rights and obligations affected by Section 3, such as spousal evidentiary privileges and nepotism rules, involve no expenditure of federal funds, and in other cases, exclusion of state-recognized same-sex marriages costs the government money by preserving eligibility for certain federal benefits.  But regardless of whether an interest in preserving resources could justify Section 3 under rational basis review, it is clear that it will not suffice under heightened scrutiny; the government may not single out a suspect class for exclusion from a benefits program solely in the interest of saving money.  *See Graham v. Richardson*, 403 U.S. 365, 374–75 (1971) (holding that state may not advance its "valid interest in preserving the fiscal integrity of its programs" through alienage-based exclusions).

[14]  In the amicus brief filed by the State of New York (ECF No. 40-1), New York argues, among other things, that DOMA improperly intrudes into the power of the states to define marriage.  Brief for the State of New York at 8-10.  No party has raised a Tenth Amendment claim, so this Court need not and should not address it.  Section 3 of DOMA is unconstitutional because it violates the Constitution's guarantee of equal protection of the laws, but the Tenth

**CONCLUSION**

For the foregoing reasons, Section 3 of DOMA fails heightened scrutiny, and this Court should deny the motions to dismiss Plaintiff's constitutional claim and grant Plaintiff's motion for summary judgment.

Dated:   August 19, 2011                          Respectfully submitted,

                                                  TONY WEST
                                                  Assistant Attorney General

                                                  ARTHUR R. GOLDBERG
                                                  Assistant Branch Director

                                                  ___/s/___*Jean Lin*_____
                                                  JEAN LIN (NY Bar No. 4074530)
                                                  Senior Trial Counsel
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  20 Massachusetts Ave., N.W.
                                                  Washington, DC 20530

---

Amendment does not independently preclude the federal government from defining those relationships that qualify for federal benefits.

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2011, I electronically transmitted the foregoing

document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of

Electronic Filing to the following ECF registrants:


Roberta A. Kaplan
Andrew J. Ehrlich
Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019

Alexis B. Karteron
Arthur N. Eisenberg
New York Civil Liberties Union
125 Broad Street
New York, NY 10004

James D. Esseks
Melissa Goodman
Rose A. Saxe
American Civil Liberties Union
Lesbian and Gay Rights Project
125 Broad Street
New York, NY 10004-2400

Paul D. Clement
H. Christopher Bartolomucci
Conor B. Dugan
Bancroft PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20006

Kerry Kircher
U.S. House of Representatives
219 Cannon House Office Building
Washington, DC 20515