# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
)
EDITH SCHLAIN WINDSOR, in her )
capacity as executor of the estate of )
THEA CLARA SPYER, )
)
      Plaintiff, )
)
        v. )      Civil Action No. 10-CV-8435 (BSJ)(JCF)
)
THE UNITED STATES OF AMERICA, )
)
      Defendant. )
_____)

## REPLY MEMORANDUM OF LAW OF INTERVENOR-DEFENDANT
## THE BIPARTISAN LEGAL ADVISORY GROUP
## OF THE UNITED STATES HOUSE OF REPRESENTATIVES
## IN SUPPORT OF ITS MOTION TO DISMISS

Paul D. Clement
H. Christopher Bartolomucci
Conor B. Dugan
Nicholas J. Nelson
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036

*Counsel for the Bipartisan Legal Advisory
Group of the U.S. House of Representatives*

OF COUNSEL:

Kerry W. Kircher, General Counsel
Christine Davenport, Senior Assistant Counsel
Katherine E. McCarron, Assistant Counsel
William Pittard, Assistant Counsel
Kirsten W. Konar, Assistant Counsel
OFFICE OF GENERAL COUNSEL
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C. 20515

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................1

I.     *BAKER v. NELSON* MANDATES DISMISSAL ......................................1

II.    DEFERENTIAL RATIONAL-BASIS REVIEW APPLIES TO DOMA ................3

      A.     Plaintiff Badly Misstates the House's Position on Rational-Basis Review ........................................................................ 3

      B.     DOMA Is a Classic Line-Drawing Statute ..................................5

III.   DOMA EASILY SURVIVES RATIONAL-BASIS REVIEW ..............................7

      A.     Protecting the Societal Benefits of Marriage from the Unknown Consequences of Its Redefinition Is an Eminently Rational Basis for Legislation.......................................7

      B.     Preserving a Fundamental Assumption on Which Previously-Enacted Marriage Statutes Were Created Is a Rational Basis ..................... 8

      C.     DOMA Is Rationally Related to the Legitimate Government Interest in a Consistent Nationwide Federal Definition of Marriage..................... 10

      D.     DOMA Is Rationally Related to the Government Interest in Maintaining the Link Between Marriage and Children ......................... 11

      E.     DOMA Advances the Government Interest in Fostering Marriages That Provide Children with a Mother and Father..................... 14

      F.     Because DOMA Rationally Serves All the Above Legitimate Government Interests, *Romer v. Evans* and Related Cases Are Not Applicable Here ................................................................ 16

CONCLUSION...................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena,*
 515 U.S. 200 (1995)........................................................................................... 2

*Bacon v. Toia,*
 648 F.2d 801 (2d Cir. 1981) ............................................................................. 4

*Baker v. Nelson,*
 409 U.S. 810 (1972)........................................................................................... 1

*Dandridge v. Williams,*
 397 U.S. 471 (1970)..................................................................................... 11, 15

*Fed. Commc'ns Comm'n v. Beach Commc'ns,*
 508 U.S. 307 (1993).................................................................................. 5, 9, 16

*Gill v. Office of Pers. Mgmt.,*
 699 F. Supp. 2d 374 (D. Mass. 2010)....................................................... 8, 10, 11

*Hassan v. Wright,*
 45 F.3d 1063, 1069 (7th Cir. 1995) .................................................................. 6

*Heller v. Doe,*
 509 U.S. 312 (1993).................................................................................. 9, 11, 16

*Lawrence v. Texas,*
 539 U.S. 558 (2003)........................................................................................... 2

*Mandel v. Bradley,*
 432 U.S. 173 (1977)........................................................................................... 2

*Mathews v. Diaz,*
 426 U.S. 67 (1976)............................................................................................. 5

*Romer v. Evans,*
 517 U.S. 620 (1996)..................................................................................... 2, 16

*Schweiker v. Wilson,*
 450 U.S. 221 (1981)........................................................................................... 5

*U.S. Dep't of Agric. v. Moreno,*
 413 U.S. 528 (1973)......................................................................................... 16

*Vacco v. Quill,*
 521 U.S. 793 (1997)........................................................................................... 4

*Watson v. City of Memphis*,
   373 U.S. 526 (1963) ........................................................................................................... 8

## Statutes & Legislative Authorities

1 U.S.C. § 7 ............................................................................................................................ 7

26 U.S.C. § 7703(b) ............................................................................................................... 3

28 U.S.C. § 1738C ................................................................................................................. 7

42 U.S.C. § 416 ...................................................................................................................... 3

142 Cong. Rec. 17094 (1996) ............................................................................................. 17

142 Cong. Rec. 22467 (1996) ............................................................................................. 17

## Other Sources

Adam P. Romero et al., *Census Snapshot* at 3 (The Williams Institute, Dec. 2007) .................... 12

*Estimated Median Age at First Marriage by Sex: 1890 to Present*, U.S. Census Bureau ........... 13

*Living Arrangements of Children Under 18 Years Old: 1960 to Present*, Current Population
Survey, March and Annual Social and Economic Supplements, 2010 and Earlier (U.S.
Census Bureau, U.S. Dep't of Commerce, Nov. 2010) .............................................................. 12

Stephanie J. Ventura, *Changing Patterns of Nonmarital Childbearing in the United States*,
Ctrs. for Disease Control & Prevention (May 2009) ................................................................. 13

## INTRODUCTION

When people disagree in the legislative process, they often are required to listen to each other so as to be able to rebut arguments actually made by opponents and change enough minds to bring about legislative change.  Proponents of same-sex marriage have proven adept at this and, as a result, have won numerous important legislative victories.  The plaintiff here, however, has taken a different tack—she seeks to brand those who disagree with her as irrational and motivated by animus.  The result is disheartening:  Plaintiff has failed to engage fairly many of the House's contentions in support of DOMA, instead attacking "irrational" arguments that she apparently *wishes* the House had put forward.  Thus, not only does Plaintiff's Memorandum of Law in Opposition to Defendant-Intervenor's Motion to Dismiss (Aug. 19, 2011) (ECF No. 70) ("Pl.'s Opp'n") leave the House's actual contentions unscathed, it demonstrates why the definition of marriage is far better suited to resolution in a legislative process that requires supporters of same-sex marriage to convince others that their positions are right, rather than arguing to a court that the bipartisan majority that enacted DOMA acted utterly irrationally.

## ARGUMENT

## I.    *BAKER v. NELSON* MANDATES DISMISSAL.

In its opening memorandum, the House identified *Baker v. Nelson*, 409 U.S. 810 (1972), as controlling precedent on the issue of whether equal protection requires governmental recognition of same-sex marriages.  Plaintiff's response to this controlling Supreme Court precedent comes at the very end of her opposition, *see* Pl.'s Opp'n at 32-35, and is entirely unpersuasive.  Plaintiff first notes that a summary dismissal by the Supreme Court no longer will be binding on the lower courts if it is inconsistent with later doctrinal developments, and she maintains that *Baker* is inconsistent with the Supreme Court's later application of heightened

scrutiny to sex-based classifications, as well as the decisions in *Romer v. Evans*, 517 U.S. 620 (1996), and *Lawrence v. Texas*, 539 U.S. 558 (2003).  Pl.'s Opp'n at 32-33.  However, Plaintiff twice disavows any intent to bring a sex-discrimination challenge against DOMA, *see id.* at 5 n.2 & 34 n.17, so any developments in equal protection jurisprudence governing sex discrimination are wholly irrelevant to *Baker*'s vitality with respect to Plaintiff's claims.[1]  Moreover, in *Lawrence* (which was decided after *Romer*), the Supreme Court expressly disavowed that it was applying heightened scrutiny and just as expressly stated that it was not reaching the question "whether the government must give formal recognition to any relationship that homosexual persons seek to enter."  539 U.S. at 578.  Short of mentioning *Baker* by name, there is nothing more that the *Lawrence* Court could have done to leave *Baker*'s holding unimpaired.

Plaintiff also argues that *Baker* does not control this case because she, unlike Baker, claims already to have been married under state law to a same-sex partner and is seeking *federal* recognition of her relationship as a marriage.  Pl.'s Opp'n at 33-35.  Plaintiff offers no explanation of how this distinction is material.  Both *Baker* and this case deal with the question of whether the Constitution requires that same-sex relationships be recognized as marriages under the law of the applicable sovereign.  Because the equal protection inquiry under the Fifth Amendment is "precisely the same" as that applicable to state action under the Fourteenth Amendment, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995), *Baker* controls.

---

[1]  Plaintiff's reliance on the Minnesota Supreme Court's doctrinal framing of *Baker* further is incorrect as a matter of law because a summary affirmance by the Supreme Court "affirm[s] the judgment but not necessarily the reasoning by which it was reached."  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (citation omitted).  In any event, no matter the legal theory on which *Baker* was decided, its holding is clear:  Equal protection does not require the government to recognize same-sex marriages.

There is no support for an independent rule that would compel the federal government to recognize a same-sex relationship as a marriage once the relevant state has done so.  Such a rule would turn the Supremacy Clause upside down and would be utterly unworkable.[2]  If interpreted leniently, Congress would remain free to define whatever categories of family relationships it wished so long as it simply avoided labeling those categories with traditional family-law terms such as "marriage."  On the other hand, if interpreted strictly, such a rule would require an impossibly slippery judicial inquiry into whether the substance of any given federally-defined relationship crossed the line into the area of family law marked "states only" so that, regardless of what Congress denominated or intended in this regard, it would be supplanted by a patchwork of definitions from fifty plus jurisdictions.  Because states do not have the constitutional power to dictate to Congress the meaning of terms that appear in federal statutes—including the terms "marriage" and "spouse"—*Baker* must control whether the federal government is required to recognize same-sex marriages.

## II.     DEFERENTIAL RATIONAL-BASIS REVIEW APPLIES TO DOMA.

### A.     Plaintiff Badly Misstates the House's Position on Rational-Basis Review.

Plaintiff derisively accuses the House of contending that DOMA is exempt from rational-basis review because it "does not actually exclude [state-law] married same-sex couples from

---

[2]  It also would be inconsistent with Congress' long history of enacting laws creating unique federal definitions of the terms "marriage" and "spouse."  The federal tax code, for instance, excludes some couples "living apart" from its definition of married persons even if those couples are married under state law.  26 U.S.C. § 7703(b).  The Social Security Act includes detailed definitions of the words "spouse," "wife," "widow," "divorce," "child," "husband," and "widower," giving these terms meanings that inevitably will vary from state definitions.  42 U.S.C. § 416.

federal protections."  Pl.'s Opp'n at 8.[3]  Plaintiff cites to nothing in the House's memorandum

that even hints at such an argument.  To the contrary, the House agrees that DOMA has the effect

of offering marital benefits to traditional marriages and to no other relationships, and that this

classification is subject to rational-basis review.  *See, e.g.*, House Mem. at 16-26 ("In judging an

equal protection claim, the deferential rational basis test applies where, *as here*, 'a legislative

classification or distinction neither burdens a fundamental right nor targets a suspect class.'"

(quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)) (emphasis added)).

     Nor does the House contend that rational-basis review does not apply because defining

the term "marriage" as it appears in federal statutes is necessarily an exercise in line-drawing, as

Plaintiff suggests.  *See* Pl.'s Opp'n at 11-13.  Rather, the line-drawing nature of DOMA merely

informs the *character* of rational-basis review.  The correct standard is stated by the Second

Circuit's decision in *Bacon v. Toia*, quoted by Plaintiff:  "[L]egislation . . . always involves

drawing lines among categories of people, lines that necessarily are sometimes arbitrary"; as a

result, equal protection simply requires that "the line-drawing process must itself rest on a

rational foundation."  648 F.2d 801, 809 (2d Cir. 1981) (quotation marks and citation omitted),

*aff'd sub nom.*, *Blum v. Bacon*, 457 U.S. 132 (1982).

---

    [3]  Although Plaintiff acknowledges the House's contention that it has pointed to
government interests that would justify DOMA not only under rational-basis review but under
whatever level of scrutiny applies, she maintains that the Court need not consider this contention
because it was raised in a footnote.  Pl.'s Opp'n at 6 n.4 (citing House Mem. in Supp. of Mot. to
Dismiss (Aug. 1, 2011) (ECF No. 53) ("House Mem.") at 26 n.6).  Although the House firmly
believes that rational-basis review is the appropriate level of scrutiny here, even if some other
level of scrutiny applied, it would serve the interests of no one for the Court to make a far-
reaching decision of constitutional law on the default basis urged by Plaintiff.  This is especially
true as most of the government interests at stake here, articulated at length in the House's
briefing, are the same regardless of the applicable level of scrutiny.

### B.    DOMA Is a Classic Line-Drawing Statute.

As the House noted in its opening memorandum, unless any two people who seek to be deemed "married" are treated as such, some line-drawing is inevitable:  The very process of defining any term including "marriage" involves line-drawing.  House Mem. at 27-28. Plaintiff's only real response to this point is to protest that "[a]ny comparison of DOMA to some kind of administrative law regime is obviously inapplicable on its face."  Pl.'s Opp'n at 12 (referring to House's citation of *Fed. Commc'ns Comm'n v. Beach Commc'ns*, 508 U.S. 307 (1993), in which the Supreme Court applied a line-drawing equal protection analysis to legislation involving cable television systems).  Plaintiff makes no note, however, of the fact that the Supreme Court in fact has applied an identical rule in cases involving the allocation of federal benefits to individuals, such as *Mathews v. Diaz*, 426 U.S. 67, 84 (1976) (declining to "substitute our judgment for that of Congress" regarding eligibility rules for certain Medicare benefits:  "When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment."), and *Schweiker v. Wilson*, 450 U.S. 221, 238 (1981) (applying "strong presumption of constitutionality" as to congressional allocation of certain social security benefits) (citation omitted), both quoted in the House's memorandum.  *See* House Mem. at 27.  No matter what entities or persons a statute regulates or benefits, it must define who those entities or persons are, and thus very often will become an exercise in line-drawing.

Plaintiff further maintains that DOMA "[i]s neither a regulatory nor a government benefits statute" because it is instead a "*definitional* statute."  Pl.'s Opp'n at 12.  That is neither true nor relevant.  DOMA, inter alia, defines marriage for purposes of federal benefits. Countless other statutes do the same, and it is in the nature of regulating who is eligible for federal benefits that definitions must be used to draw lines.  That line-drawing is subject to

rational-basis review and the effect on the public fisc alone generally provides the rational basis. *See, e.g.*, *Hassan v. Wright*, 45 F.3d 1063, 1069 (7th Cir. 1995) ("At bottom, protecting the fisc provides a rational basis for Congress' line drawing in this instance.").

Finally, Plaintiff repeatedly argues that DOMA does not benefit any married couples but functions solely to exclude same-sex couples. *See*, *e.g.*, Pl.'s Opp'n at 2, 8, 10, 26, 27.  But every definitional statute necessarily has the dual tendencies to benefit (or regulate) those who come within the definition, as well as to not benefit (or not regulate) those who are outside of it. The same undoubtedly is true of DOMA:  The Congress that enacted it surely intended to *provide* benefits to persons included in its definition of "marriage," just as it intended *not* to provide them to those outside its scope.[4]  The exclusion may benefit those not excluded (for example, by giving them a larger slice of a static pool of benefits), or it may rationally further another government interest.  Either way, Plaintiff cannot escape application of rational-basis review.

---

[4]  DOMA, of course, was not enacted as part of a larger regulatory or benefits bill to which DOMA's definitions would apply.  Instead, it was a clarification of the definition of the word "marriage" in preexisting statutes.  This may be the source of Plaintiff's repeated contention that DOMA operates solely to deny rights to same-sex couples.  *See, e.g.*, Pl.'s Opp'n at 2, 8, 10, 26, 27.  But Plaintiff offers no authority or logic in support of the proposition that line-drawing deference is a one-time-only occurrence—that after an initial congressional attempt at line-drawing, any later clarifications or amendments of that line no longer will be subject to deferential rational-basis review.  Moreover, DOMA's global nature actually points to another rational basis:  Namely, that DOMA preserves the legislative judgments implicit in countless earlier congressional enactments.

III.    **DOMA EASILY SURVIVES RATIONAL-BASIS REVIEW.**[5]

    A.    **Protecting the Societal Benefits of Marriage from the Unknown Consequences of Its Redefinition Is an Eminently Rational Basis for Legislation.**

In response to the House's observation (i) that marriage is one of our most fundamental social institutions and that, in light of its importance, (ii) Congress was well justified in demanding more evidence that any redefinition of marriage would not undermine the institution's vitality or impair the benefits derived from it, House Mem. at 29-30, Plaintiff maintains that the House "does not offer any rationale as to why Congress would want to proceed with caution, and does nothing more than describe what DOMA does." Pl.'s Opp'n at 18. The rationale for proceeding with caution is plain: When dealing with an institution as important as marriage and a definition as long-established as the traditional definition of marriage, it is eminently rational to move slowly and allow states to experiment with new definitions before those definitions are either transferred by force of law to other states, *see* DOMA Section 2, 28 U.S.C. § 1738C, or adopted as the federal definition, *see* DOMA Section 3, 1 U.S.C. § 7.

---

[5]   The Department of Justice ("DOJ") attempts to use marriage referenda as evidence of homosexuals' political powerlessness. DOJ Mem. of Law in Response to Pl.'s Mot. Summ. J. and Intervenor's Mot. Dismiss at 18-19 (Aug. 19, 2011) (ECF Nos. 71 & 72) ("DOJ Mem."). *First*, the Court should disregard DOJ's submission because it is, in essence, an unauthorized brief of *amicus curiae*. *See* Mem. and Order (June 2, 2011) (ECF No. 26) ("Intervention Order") (granting House motion to intervene as defendant where DOJ refused to defend constitutionality of United States statute at issue). DOJ's submission also is inconsistent with DOJ's filing of a motion to dismiss Plaintiff's amended complaint, *see* Mot. to Dismiss (Aug. 1, 2011) (ECF No. 49), which motion in turn disregards the Court's order granting the House's motion to intervene, *see* Intervention Order. *More substantively*, DOJ's formulation is problematic because it begs the very question at issue here, i.e., whether it is invidious discrimination to limit marriage to opposite-sex couples. *Furthermore*, stating that in 1996 "only three states had statutes restricting marriage to opposite-sex couples" does not have the import DOJ suggests. DOJ Mem. at 18. Every state's marriage law was enacted against the backdrop assumption that marriage was between one man and one woman.

This is crucially different from the argument rejected in *Gill v. Office of Personnel Management*, 699 F. Supp. 2d 374 (D. Mass. 2010), cited by Plaintiff.  *See* Pl.'s Opp'n at 18.  In *Gill*, decided before the House became a party to DOMA challenges, DOJ had argued that Congress could enact DOMA simply "to preserve the 'status quo,'" *id.* at 390, but pointedly refrained from suggesting that the status quo had benefits or that change could be negative.  As a result, the court noted that "[s]taying the course is not an end in and of itself."  *Id.* at 394.  But here, the House is making a distinct argument:  DOMA does not stay the course merely for the sake of staying the course—rather, it stays the course on marriage because of the benefits that have resulted from the traditional definition, the foundational importance of marriage, and concerns that potentially deleterious changes from the traditional definition should not be undertaken without substantially more empirical study and deliberation.[6]

### B.   Preserving a Fundamental Assumption on Which Previously-Enacted Marriage Statutes Were Created Is a Rational Basis.

In enacting DOMA, Congress reasonably could have been concerned with preserving the legislative judgments embodied in previously-enacted statutes using the words "marriage" and "spouse," all of which inevitably would have been enacted under the assumption that only opposite-sex couples would qualify.  In opposition to this, Plaintiff maintains only that, "[s]ince there were no states that recognized legal marriage of same-sex couples in the United States before 2004, the Congresses that passed earlier statutes were not thinking about whether to exclude or include married same-sex couples from the specific protections of the law."  Pl.'s

---

[6]  This case is strikingly different from *Watson v. City of Memphis*, 373 U.S. 526 (1963), in which the city conceded the occurrence of an ongoing equal protection violation but sought to delay remedying that violation in order to prevent civil unrest.  In stark contrast to *Watson*, the equal protection question is precisely what is being litigated in this case, and the House strenuously denies that any violation is taking place.

Opp'n at 9-10.  Not only is this argument wrong on its own terms, it entirely misses the point.

Whether or not the enacting legislators affirmatively thought about how these statutes would

apply to same-sex couples, they certainly did contemplate that only opposite-sex couples would

qualify as "married" under them.  This is plain from the text of many of the statutes themselves

as well as from judicial and agency interpretations thereof.  *See* House Mem. at 3-4.  It also is

plain from the mere fact that no state ever had permitted same-sex marriages, and until relatively

recently there was no discernible prospect that any of them ever would.  In this light, virtually

every pre-DOMA statute using the term "marriage" would have been enacted by a Congress that,

in considering whether and on what terms to legislate, assumed that the rights and duties created

by the statute would apply only to traditional marriages.  There can be no reasonable

disagreement that DOMA preserved previous legislative judgments in this way.

And, as the House observed in its opening brief, one of these federal concerns was

protecting the public fisc by imposing reasonable limits on the availability of federal benefits.

*See* House Mem. at 32-33.  Plaintiff asserts that there is no evidence "that DOMA saves the

federal government money."  Pl.'s Opp'n at 19.  The House, of course, need not provide any

such evidence; that is the fundamental nature of rational-basis review.  *See, e.g.*, *Heller v. Doe*,

509 U.S. 312, 320 (1993) (government "has no obligation to produce evidence to sustain the

rationality of a statutory classification"); *Beach Commc'ns*, 508 U.S. at 315 ("[A] legislative

choice is not subject to courtroom fact-finding and may be based on rational speculation

unsupported by evidence or empirical data.").  Moreover, in light of the fact that Plaintiff in this

very case claims that DOMA's unconstitutionality means that the government owes her more

than $300,000, Plaintiff's assertion rings hollow.  As to Plaintiff's citation to the 2004 CBO

analysis, the House already has explained that that report is at best a scantily-supported, ill-

explained estimate, and the exact fiscal impact of a repeal or invalidation of DOMA could not be

known for certain until it occurred.  House Mem. at 32 n.8.  It certainly was rational for members

of Congress at the time of the enactment of DOMA to determine (as they did) that the entire

corpus of federal statutes on balance benefits, rather than penalizes, marriage and thus that

DOMA preserves the public fisc.  *See, e.g.*, House Mem. at 28, 32-33.

> C. **DOMA Is Rationally Related to the Legitimate Government Interest in a Consistent Nationwide Federal Definition of Marriage.**

Plaintiff does not disagree with the House that DOMA prevents a situation where

similarly situated same-sex couples will be granted or denied federal benefits based solely on the

state in which they live.  Nor does she dispute that avoiding such disuniformity is a legitimate

government interest.  Instead, Plaintiff finds this "simply impossible to credit" as a rationale in

support of DOMA "because both prior to and since the enactment of DOMA there has always

been significant inconsistency in federal marital benefits as a function of the federal

government's deference to the states' determinations of who can marry."  Pl.'s Opp'n at 20.

This argument is badly flawed.  First, despite the stress Plaintiff places on the supposedly

major differences in modern state laws regarding marriage qualifications, she does not identify a

single actual difference.  *Gill*, on which Plaintiff relies almost exclusively on this point, does

little better:  The only currently existing difference in state marriage qualifications identified by

the *Gill* court was the fact that New Hampshire sets the age of consent lower than other states—

thirteen years for women and fourteen for men.  699 F. Supp. 2d at 394.  The notion that

Congress could not rationally have regarded the issue of same-sex marriage as calling for

legislation to ensure uniformity while not thinking the same of marriages between minors should

not be taken seriously by this Court.[7]  *See Heller*, 509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" (quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970))).

Plaintiff states in a conclusory fashion that "it simply defies logic to claim that it is more 'consistent' to treat Edie Windsor and Thea Spyer like unmarried same-sex couples from Alabama or Wisconsin, than it would be to treat them like a married couple from New York, where they actually lived."  Pl.'s Opp'n at 21.  Plaintiff does not even attempt to explain why it would be irrational—not just a slightly inferior approach, but downright irrational—for Congress to prefer national uniformity in the *substantive* definition of federal marriage rather than a mere choice-of-law provision incorporating the rules of fifty-plus different jurisdictions.

### D.     DOMA Is Rationally Related to the Government Interest in Maintaining the Link Between Marriage and Children.

In response to the House's observation that DOMA furthers the government interest in maintaining the link between marriage and children, Plaintiff offers a glaring *non sequitur*:  She notes that "[h]aving children is not and never has been a prerequisite for marriage," and she maintains that therefore there "is simply no connection" between recognizing same-sex marriage and undermining the message that marriage draws much of its importance from its tendency

---

[7]  To be sure, greater differences between state-law marriage qualifications may have existed in the past, as the *Gill* court noted.  699 F. Supp. 2d at 392.  And Congress often has failed to act in the interest of national uniformity in the face of those differences.  But the fact that Congress chose not to act then does not make it irrational for the Congress that enacted DOMA to have exercised its judgment differently and to have decided that it *was* appropriate to address the greatest threat of disuniformity in state marriage laws that was posed then (or that exists now).

toward procreation.  Pl.'s Opp'n at 23.  This argument relies on the invalid assumption that it is

impossible for the government to foster the link between marriage and childbearing except by

prohibiting marriage to anyone who cannot or will not have children.  Plaintiff gives no reason

why government cannot also reinforce the importance of children to marriage by recognizing

that marriage must be defined with reference to the *likelihood* that marital relationships will

involve children.

Census data reveal that, as of 2005, opposite-sex married couples were more than twice

as likely as same-sex couples to include children in their household—48.3% of opposite-sex

couples had children as opposed to 19.6% of same-sex couples.  Adam P. Romero et al., *Census

Snapshot* at 3 (The Williams Institute, Dec. 2007).  The data also demonstrate that, in 2005, less

than one-half of one percent of American children (an estimated .37% of American children)

were living in households headed by same-sex couples.  *Id.* at 2 (stating total number of children

living in households headed by same-sex couples); *Living Arrangements of Children Under 18

Years Old: 1960 to Present*, Current Population Survey, March and Annual Social and Economic

Supplements, 2010 and Earlier (U.S. Census Bureau, U.S. Dep't of Commerce, Nov. 2010),

www.census.gov/population/www/socdemo/hh-fam.html (stating total number of children living

in United States).  Moreover, Plaintiff cannot change the simple and obvious fact that a marriage

between a man and a woman is biologically oriented toward children in a way that same-sex

relationships are not.

Plaintiff also (i) scoffs at the idea "that any straight man or woman anywhere in this

nation would decide not to get married" if the government redefined marriage to include same-

sex marriages, dismissing the notion as "def[ying] everything we know about human nature (not

to mention common sense)," Pl.'s Opp'n at 23, and (ii) similarly summarily dismisses any

connection between the redefinition of marriage and out-of-wedlock births as "completely ridiculous," *id.* at 25.  Once again, Plaintiff substitutes derision for argument.  She offers no reason why a fundamental and entirely novel change in the definition of the institution of marriage should not be expected to have an effect on how people regard that institution, or whether they decide to enter it for themselves.  There can be no reasonable dispute that people's views on marriage and childbearing outside marriage, and on their willingness to marry or to have children outside marriage, have varied considerably throughout history.  *See* Stephanie J. Ventura, *Changing Patterns of Nonmarital Childbearing in the United States*, Ctrs. for Disease Control & Prevention (May 2009), http://www.cdc.gov/nchs/data/databriefs/db18.htm (stating that number of babies born to unmarried women in 2007 was "2.5 times the number reported in 1980 and 19 times the estimate for 1940"); *Estimated Median Age at First Marriage by Sex: 1890 to Present*, U.S. Census Bureau, http://www.census.gov/population/socdemo/hh-fam/ms2.xls (showing that median age for first marriages in 2010 for men and women was 28.2 and 26.1 years, respectively, and, in 1980, 24.7 and 22.0 years, respectively).  The causes of these changes are no doubt complex, but it would be eminently reasonable for Congress to conclude that changing the definition of what marriage *is* also would have an impact on these attitudes, and to take that likely impact into account in enacting DOMA.[8]

Plaintiff observes that "DOMA does nothing to change the fact that same-sex couples can and are likely to marry" under the laws of some states.  Pl.'s Opp'n at 24.  But again, this would refute the conclusion that DOMA rationally preserves the link between marriage and childbearing only if one makes the wholly implausible assumption that the federal-law definition

---

[8]  Thus, DOJ's claim that DOMA "does nothing to affect the stability of heterosexual marriages," DOJ Mem. at 26, fails.

of marriage plays no role whatsoever in shaping societal understandings of the nature and purpose of marriage.[9]  Plaintiff offers no argument in support of that assumption, and none persuasively can be made.

> **E.**    **DOMA Advances the Government Interest in Fostering Marriages That Provide Children with a Mother and Father.**

Perhaps the clearest example of Plaintiff's misunderstanding of the nature of the constitutional review of line-drawing statutes is her contention that the Court must inquire "whether encouraging heterosexual parenting is a legitimate interest rationally advanced by denying federal recognition to same-sex couples."  Pl.'s Opp'n at 28.  Plaintiff claims that the authorities cited by the House "fail[] to articulate any rational link between the exclusion of same-sex couples from marriage and encouraging heterosexual couples to do anything at all" and that "[i]t is simply irrational to believe that excluding same-sex couples from federal protections will result in any children being raised by heterosexual parents."  *Id.*

Plaintiff thus seems to believe that in order to have a rational basis for extending benefits to one group of people and not another, Congress must be able to demonstrate not just that benefiting the first group will further its purposes somewhat more effectively than benefiting the second, but also that excluding the second group from benefits will *in itself* benefit the first group.  This is not an argument in favor of extending marriage rights to same-sex couples; instead it is an argument against having a governmentally-sanctioned institution of marriage at

---

[9]  Plaintiff claims that the House "concedes [that DOMA] does not deter anyone from marrying," citing the House's explanation of why DOMA does not impact the fundamental right to marry because it does not penalize individuals for contracting marriages under state law.  Pl.'s Opp'n at 27 (citing House Mem. at 20).  This is a misreading of the House's position.  While DOMA certainly does not threaten anyone with punishment or any detrimental change in the benefits to which they are entitled should they enter a state-law same-sex marriage, and thus does not "deter" such marriages in that sense, the House does not concede that it has no impact on whether a couple will choose to marry.

all.  If the test for whether Congress must recognize someone as married is whether *not* recognizing the marriage affirmatively would benefit other marriages—and if, as Plaintiff maintains, preserving the integrity of the definition of marriage itself is not a cognizable benefit—then it is difficult to see how Congress could offer marital benefits to anyone without offering them to everyone, since there are vanishingly few people or relationships to whom the denial of benefits would be an intrinsic benefit to other marriages.  Under Plaintiff's version of rational-basis review, platonic friendships would be entitled to "marital" benefits if the parties desired them, because excluding them from recognition would not in and of itself benefit other marriages.

This is thus a classic situation where judicial deference to Congress' line-drawing judgment must be exercised.  The question is not, as Plaintiff would have it, whether excluding same-sex couples (or anyone else) from the definition of marriage by itself encourages parenting in families including mothers and fathers.  Instead, the question is whether a desire to encourage parenting in mother-father families rationally could have led Congress to define "marriage" so as to extend benefits to opposite-sex couples and not same-sex couples.  The answer to this question is certainly "yes."

Plaintiff also maintains that she should be entitled to put on evidence to demonstrate that same-sex couples are just as good of parents as opposite-sex ones and therefore that encouraging families that can provide both a mother and a father to their children is not a legitimate government interest.  Pl.'s Opp'n at 29-30.  This would not be appropriate, given the applicable standard of review.  Heightened scrutiny is the avenue for such empirical second-guessing of Congress' judgments.  When it comes to rational-basis review, Congress' rational judgment that favoring the child-rearing arrangement that has long been the dominant one, and not changing it

in favor of a newly-recognized alternative, is not to be second-guessed in the courts.  *See, e.g.*, *Heller*, 509 U.S. at 320; *Beach Commc'ns*, 508 U.S. at 315.

Indeed, even if Plaintiff could put on an empirical showing, the necessarily recent vintage of her empirical data would be reason enough for Congress to reject it under rational-basis review.  Due to the comparatively recent emergence of same-sex couples raising children, whatever evidence Plaintiff might submit inevitably would be substantially limited in terms of the timeframe in which same-sex couples' parenting was studied as well as the sample size (and representative nature) of the same-sex couples involved.  *See* House Summ. J. Opp'n (Aug. 1, 2011) (ECF No. 50) at 23-24.  It is in this regard that Congress' rationality in demanding a larger body of evidence before considering changing the definition of marriage is most clearly illustrated.  *See* House Mem. at 28-31.

### F.    Because DOMA Rationally Serves All the Above Legitimate Government Interests, *Romer v. Evans* and Related Cases Are Not Applicable Here.

Plaintiff cites Supreme Court precedent for the propositions "'that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest'" and that a law that "'seems inexplicable by anything but animus toward the class it affects . . . lacks a rational relationship to legitimate state interests.'"  Pl.'s Opp'n at 31 (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), and *Romer*, 517 U.S. at 633).  As DOMA rationally furthers all the legitimate government interests identified in the House's briefing, it cannot be said to be motivated by a bare desire to harm same-sex couples, and it easily can be explained without reference to animus against them.  Plaintiff has mined DOMA's legislative history to find remarks by some supporters of DOMA that she regards as expressing "animus" towards homosexual persons.  Pl.'s Opp'n at 30-31.  The Court need only review the House's briefing in this case, or DOMA's legislative history in its entirety, to see that numerous non-animus based

16

rationales also were articulated in support of the bill.  On Plaintiff's account of things, such prominent figures as Vice President Biden, House Speaker John Boehner, Representative James Clyburn, Representative Steny Hoyer, Senator Tom Daschle, Senator Olympia Snowe, and Senator Paul Wellstone all were willing to support a bill motivated by nothing more than animus toward a disfavored minority group.  *See* 142 Cong. Rec. 17094 (1996) (House vote); 142 Cong. Rec. 22467 (1996) (Senate vote).  This is implausible, and a finding to the contrary would not amount to proper treatment by the judiciary of a co-equal branch of government.  Of course, it may be possible that some of these figures have changed their views.  That is ample reason why this dispute should be settled in the legislative process, rather than by judicially-branding such prominent figures as irrational and/or bigoted.[10]

## CONCLUSION

Every branch of our government, not to mention the people of the United States, will be better off if the debate over the definition of marriage is settled by the parties' efforts to persuade each other in the halls of Congress and the various statehouses of our nation, rather than by one side branding both its opponents and the proponents of DOMA as irrational (not to mention contemptible), as Plaintiff seeks to do here.  Accordingly, for the reasons stated herein and in the House's memorandum in support of its motion to dismiss, the Court should dismiss Plaintiff's amended complaint with prejudice.

---

[10]  Indeed, even DOJ is unwilling to state that DOMA's passage was solely the result of animus-based reasons.  DOJ Mem. at 27 (stating that "DOMA Section 3 was motivated in substantial part by animus").

Respectfully submitted,

*/s/ Paul D. Clement*
Paul D. Clement
H. Christopher Bartolomucci
Conor B. Dugan
Nicholas J. Nelson
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C.  20036
Telephone:     (202) 234-0090
Facsimile:     (202) 234-2806

*Counsel for the Bipartisan Legal Advisory
Group of the U.S. House of Representatives*[11]

OF COUNSEL:

Kerry W. Kircher, General Counsel
Christine Davenport, Senior Assistant Counsel
Katherine E. McCarron, Assistant Counsel
William Pittard, Assistant Counsel
Kirsten W. Konar, Assistant Counsel
OFFICE OF GENERAL COUNSEL
U.S. House of Representatives
219 Cannon House Office Building
Washington, D.C.  20515
Telephone:     (202) 225-9700
Facsimile:     (202) 226-1360

September 9, 2011

---

[11]   The Bipartisan Legal Advisory Group currently is comprised of the Honorable John A. Boehner, Speaker of the House; the Honorable Eric Cantor, Majority Leader; the Honorable Kevin McCarthy, Majority Whip; the Honorable Nancy Pelosi, Democratic Leader; and the Honorable Steny H. Hoyer, Democratic Whip.  The Democratic Leader and the Democratic Whip decline to support the filing of the House's motion to dismiss in this matter.

## CERTIFICATE OF SERVICE

I certify that on September 9, 2011, I served one copy of the Reply Memorandum of Law of Intervenor-Defendant the Bipartisan Legal Advisory Group of the United States House of Representatives in Support of Its Motion to Dismiss by CM/ECF and by electronic mail (.pdf format) on the following:

Roberta A. Kaplan, Esquire, & Andrew J. Ehrlich, Esquire
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York City, New York  10019-6064
rkaplan@paulweiss.com
aehrlich@paulweiss.com

Alexis Karteron, Esquire, & Arthur Eisenberg, Esquire
NEW YORK CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 19th Floor
New York City, New York  10004
akarteron@nyclu.org
arteisenberg@nyclu.org

James D. Esseks, Esquire, Melissa Goodman, Esquire, & Rose A. Saxe, Esquire
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York City, New York  10004
jesseks@aclu.org
mgoodman@nyclu.org
rsaxe@aclu.org

Jean Lin, Esquire
UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION
20 Massachusetts Avenue, Northwest, Seventh Floor
Washington, District of Columbia  20530
jean.lin@usdoj.gov

Simon Heller, Esquire
STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL
120 Broadway
New York City, New York  10271
simon.heller@ag.ny.gov

_/s/ Kerry W. Kircher_
Kerry W. Kircher