UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/6/12
```

------------------------------------x
EDITH SCHLAIN WINDSOR,                 :
                                       :
                 Plaintiff,            :        10 Civ. 8435 (BSJ)
                                       :          **Order**
         v.                            :
                                       :
                                       :
THE UNITED STATES OF AMERICA,          :
                 Defendant.            :
------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

This case arises from Plaintiff's constitutional challenge
to section 3 of the Defense of Marriage Act ("DOMA"), the
operation of which required Plaintiff to pay federal estate tax
on her same-sex spouse's estate, a tax from which similarly
situated heterosexual couples are exempt. Plaintiff claims that
section 3 deprives her of the equal protection of the laws, as
guaranteed by the Fifth Amendment to the United States
Constitution. For the following reasons, Defendant-Intervenor's
motion to dismiss is DENIED and Plaintiff's motion for summary
judgment is GRANTED.

## I.     BACKGROUND

### A.     DOMA

DOMA was enacted and signed into law in 1996. The
challenged provision, section 3, defines the terms "marriage"
and "spouse" under federal law. It provides:

> In determining the meaning of any Act of Congress, or
> of any ruling, regulation, or interpretation of the
> various administrative bureaus and agencies of the
> United States, the word 'marriage' means only a legal
> union between one man and one woman as husband and
> wife, the word 'spouse' refers only to a person of the
> opposite sex who is a husband or a wife.

1 U.S.C. § 7.

In large part, DOMA was a reaction to the possibility that
states would begin to recognize legally same-sex marriages.
Specifically, Congress was spurred to action by a 1993 decision
by the Hawaii Supreme Court, which suggested that same-sex
couples might be entitled to marry. Baehr v. Lewin, 852 P.2d 44
(Haw. 1993). The House Judiciary Committee's Report on DOMA
("House Report") discussed Baehr at length, describing it as a
"legal assault . . . against traditional heterosexual marriage."
H.R. Rep. No. 104-664, at 3 (1996). The Report noted that, if
homosexuals were permitted to marry, "that development could
have profound practical implications for federal law," including
making homosexual couples "eligible for a whole range of federal
rights and benefits." Id. at 10. A federal definition of
marriage was seen as necessary because, the Committee reasoned,
never before had the words "marriage" (which, at the time,
appeared in 800 sections of federal statutes and regulations) or
"spouse" (appearing more than 3,100 times) meant anything other
than a union between a man and a woman—an implicit assumption

2

upon which Congress had relied in enacting these statutes and regulations.  Id. at 10.

In addition to this notion of "mak[ing] explicit what has always been implicit," id. at 10, the House Report justified DOMA as advancing government interests in: "(1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality; (3) protecting state sovereignty and democratic self-governance;[1] and (4) preserving scarce government resources."  Id. at 12.

**B.    The Parties**

In 1963, Plaintiff in this action, Edie Windsor, met her late-spouse, Thea Spyer, in New York City.  Shortly thereafter, Windsor and Spyer entered into a committed relationship and lived together in New York.  In 1993, Windsor and Spyer registered as domestic partners in New York City, as soon as that option became available.  In 2007, as Spyer's health began to deteriorate due to her multiple sclerosis and heart condition, Windsor and Spyer decided to get married in another jurisdiction that permitted gays and lesbians to marry.  They were married in Canada that year.

Spyer died in February 2009.  According to her last will and testament, Spyer's estate passed for Windsor's benefit.

---

[1] This interest was not addressed to section 3, therefore the Court does not consider it.  See Massachusetts v. U.S. Dep't of Health & Human Servs., et al., Nos. 10-2207 & 10-2214, slip op. at 25 (1st Cir. May 31, 2012).

Because of the operation of DOMA, Windsor did not qualify for the unlimited marital deduction, 26 U.S.C. § 2056(a), and was required to pay $363,053 in federal estate tax on Spyer's estate, which Windsor paid in her capacity as executor of the estate.

On November 9, 2010, Windsor commenced this suit, seeking a refund of the federal estate tax levied on Spyer's estate and a declaration that section 3 of DOMA violates the Equal Protection Clause of the Fifth Amendment.

In February 2011, Attorney General Holder announced that the Department of Justice would no longer defend DOMA's constitutionality because the Attorney General and the President believed that a heightened standard of scrutiny should apply to classifications based on sexual orientation, and that section 3 is unconstitutional under that standard. Letter from Eric H. Holder, Jr., Attorney Gen., to John A. Boehner, Speaker, U.S. House of Rep., at 5 (Feb. 23, 2011). Given the Executive Branch's decision not to enforce DOMA, the Bipartisan Legal Advisory Group of the U.S. House of Representatives ("BLAG") moved to intervene to defend the constitutionality of the statute. BLAG's motion was granted on June 2, 2011.

On June 24, 2011, Windsor moved for summary judgment, arguing that DOMA is subject to strict constitutional scrutiny because homosexuals are a suspect class. She contends that DOMA

4

fails under that standard of constitutional review because the government cannot establish that DOMA is narrowly tailored to serve a compelling or legitimate government interest.  In the alternative, she argues that DOMA has no rational basis.

On August 1, 2011, BLAG moved to dismiss Plaintiff's complaint.  It argues that the weight of the precedent compels the Court to review DOMA only for a rational basis and, under that standard, there are ample reasons that justify the legislation.  Because the motion to dismiss turns on the same legal question as the motion for summary judgment, the Court will address the two motions simultaneously.

## II.  DISCUSSION

### A.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 86 (2d Cir. 2010) (quoting Fed. R. Civ. P. 56(c)).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of

5

law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "the operative standard requires the plaintiff [to] provide the grounds upon which [her] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (citation and internal quotation marks omitted). That is, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

## B.  Windsor's Standing to Pursue this Suit

As a threshold matter, the Court addresses whether Windsor has standing to pursue this action.  "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted).  Second, the plaintiff must present a "causal connection between the injury and the conduct complained of—the injury has to be fairly . . .  traceable to the

6

challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." Id. (internal quotation marks and alterations omitted). Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561.

There is no question that Windsor meets the first and third requirements. BLAG seeks to undermine the second factor by arguing that Windsor has not proved that her marriage was recognized under New York law in 2009, the relevant tax year. In support of this argument, it points to a 2006 case where the New York Court of Appeals held that the "New York Constitution does not compel recognition of marriages between members of the same sex." Hernandez v. Robles, 855 N.E.2d 1, 5 (N.Y. 2006).

While the Court acknowledges the Court of Appeals' decision in Hernandez, in light of subsequent state executive action and case law, the Court ultimately finds BLAG's argument unpersuasive. In 2009, all three statewide elected executive officials—the Governor, the Attorney General, and the Comptroller—had endorsed the recognition of Windsor's marriage. See Godfrey v. Spano, 13 N.Y.3d 358, 368 n.3 (N.Y. 2009) (describing 2004 informal opinion letters of the Attorney General and the State Comptroller which respectively concluded that "New York law presumptively requires that parties to such

7

[same-sex] unions must be treated as spouses for purposes of New York law" and "[t]he Retirement System will recognize a same-sex Canadian marriage in the same manner as an opposite-sex New York marriage, under the principle of comity"); Dickerson v. Thompson, 73 A.D.3d 52, 54-55 (N.Y. App. Div. 2010) (citing a 2008 directive by the Governor to recognize same-sex marriages from other jurisdictions).

In addition, every New York State appellate court to have addressed the issue in the years following Hernandez has upheld the recognition of same-sex marriages from other jurisdictions. See In re Estate of Ranftle, 917 N.Y.S.2d 195 (N.Y. App. Div. 2011) (holding that a Canadian same-sex marriage is valid in New York); Lewis v. N.Y. State Dep't of Civil Serv., 60 A.D.3d 216 (N.Y. App. Div. 2009), aff'd on other grounds sub nom. Godfrey, 13 N.Y.3d 358 (affirming the lower court's holding that New York's marriage recognition rule requires the recognition of out-of-state same-sex marriages); Martinez v. Cnty. of Monroe, 850 N.Y.S.2d 740 (N.Y. App. Div. 2008) (holding that plaintiff's same-sex Canadian marriage is entitled to recognition in New York).

Finally, although the Court of Appeals has yet to readdress the question of same-sex marriage recognition directly, its 2009 opinion in Godfrey v. Spano said nothing to cast doubt on the

8

uniform lower-court authority recognizing the validity of same-sex marriages.  13 N.Y.3d at 377.

For all of these reasons, since the State, through its executive agencies and appellate courts, uniformly recognized Windsor's same-sex marriage in the year that she paid the federal estate taxes, the Court finds that she has standing.

## C.    The Effect of **Baker v. Nelson**

The Court next considers BLAG's argument that the Supreme Court's holding in Baker v. Nelson, 409 U.S. 810 (1972), requires it to dismiss Windsor's case.  There, the Supreme Court summarily affirmed a challenge to a Minnesota state law that denied a marriage license to a same-sex couple.  The plaintiffs challenged the law in state court on equal protection grounds, arguing that "the right to marry without regard to the sex of the parties is a fundamental right," and that "restricting marriage to only couples of the opposite sex is irrational and invidiously discriminatory."  Baker v. Nelson, 191 N.W.2d 185, 186 (Minn. 1971).  The Supreme Court dismissed the challenge for "want of a substantial federal question."  Baker, 409 U.S. 810. BLAG now argues that Baker is dispositive of the issue before this Court and, as binding precedent, compels the Court to find that "defining marriage as between one man and one woman comports with equal protection."  (BLAG Mot. to Dismiss at 12.)

9

Summary judgments from the Supreme Court are binding on the lower courts only with regard to the precise legal questions and facts presented in the jurisdictional statement. Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182 (1979). The case before the Court does not present the same issue as that presented in Baker. DOMA defines marriage for federal purposes, with the effect of allocating federal rights and benefits. It does not preclude or otherwise inhibit a state from authorizing same-sex marriage (or issuing marriage licenses), as did the Minnesota statute in Baker. Indeed, BLAG agrees that DOMA does not preclude or inhibit same-sex marriage and Windsor does not argue that DOMA affects the fundamental right to marry.

Accordingly, after comparing the issues in Baker and those in the instant case, the Court does not believe that Baker "necessarily decided" the question of whether DOMA violates the Fifth Amendment's Equal Protection Clause. Accord, e.g., Smelt v. Cnty. of Orange, 374 F. Supp. 2d 861, 872-73 (C.D. Cal. 2005), aff'd in part, rev'd in part on other grounds, 447 F.3d 673 (2006) (declining to find that Baker controlled in an equal protection challenge to DOMA); see also In re Kandu, 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (same). The Court will not rest its decision on such a "slender reed" of support. Morse v. Republican Party of Va., 517 U.S. 186, 203 n.21 (1996).

Having decided that Baker does not require a decision in
BLAG's favor as a matter of law, the Court turns to the parties'
equal protection arguments.

**D.   Equal Protection**

Equal protection requires the government to treat all
similarly situated persons alike.  City of Cleburne v. Cleburne
Living Ctr., 473 U.S. 432, 439 (1985).  It prohibits the
government from drawing "distinctions between individuals based
solely on differences that are irrelevant to a legitimate
governmental objective."  Lehr v. Robertson, 463 U.S. 248, 265
(1983).

Of course, not all legislative classifications violate
equal protection.  See Nordlinger v. Hahn, 505 U.S. 1, 10
(1992).  The "promise [of] equal protection of the laws must
coexist with the practical necessity that most legislation
classifies for one purpose or another, with resulting
disadvantage to various groups or persons."  Romer v. Evans, 517
U.S. 620, 631 (1996).  With that reality in view, "[t]he general
rule is that legislation is presumed to be valid and will be
sustained if the classification drawn by the statute is
rationally related to a legitimate state interest."  City of
Cleburne, 473 U.S. at 440.  That general rule, embodied in the
"rational basis" test, applies in the mine-run of cases
involving "commercial, tax and like regulation."  Massachusetts

11

v. U.S. Dep't of Health & Human Servs., et al., Nos. 10-2207 &
10-2214, slip op. at 13 (1st Cir. May 31, 2012).

     Rational basis review is the "paradigm of judicial
restraint."  FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314
(1993).  The burden of proving a statute unconstitutional falls
on the party attacking the legislation.  Heller v. Doe, 509 U.S.
312, 321 (1993); Baker v. Carr, 369 U.S. 186, 266 (1962)
(Stewart, J., concurring).  "A statutory discrimination will not
be set aside if any state of facts reasonably may be conceived
to justify it."  McGowan v. Maryland, 366 U.S. 420, 426 (1961).
Accordingly, courts must accept as constitutional those
legislative classifications that bear a rational relationship to
a legitimate government interest.

     Courts review with greater scrutiny classifications that
disadvantage a suspect class or impinge upon the exercise of a
fundamental right.  Plyler v. Doe, 457 U.S. 202, 216-17 (1982).
Pursuant to a court's "strict scrutiny," a classification
violates equal protection unless it is "precisely tailored to
serve a compelling governmental interest."  Id. at 217; see
Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995).
Classifications that disadvantage a quasi-suspect class are also
subject to a heightened standard of constitutional review.
Courts review those classifications with an intermediate level
of scrutiny.  Under "heightened" or "intermediate scrutiny," the

classification must be "substantially related to a legitimate
state interest" to survive constitutional attack.  Mills v.
Habluetzel, 456 U.S. 91, 99 (1982).

There are few classifications that trigger strict or
heightened scrutiny.  See, e.g., Clark v. Jeter, 486 U.S. 456,
461 (1988) (illegitimacy subject to intermediate scrutiny);
Miss. Univ. for Women v. Hogan, 458 U.S. 718, 723-24 (1982)
(gender subject to intermediate scrutiny); Loving v. Virginia,
388 U.S. 1, 11 (1967) (race subject to strict scrutiny);
Korematsu v. United States, 323 U.S. 214, 216 (1944) (national
ancestry and ethnic origin subject to strict scrutiny).  "And
because heightened scrutiny requires an exacting investigation
of legislative choices, the Supreme Court has made clear that
'respect for the separation of powers' should make courts
reluctant to establish new suspect classes."  Thomasson v.
Perry, 80 F.3d 915, 928 (1996) (quoting City of Cleburne, 473
U.S. at 441); see also Lyng v. Castillo, 477 U.S. 635, 638
(1986) (declining to extend strict scrutiny to "[c]lose
relatives"); Mass. Bd. of Retirement v. Murgia, 427 U.S. 307,
313 (1976) (per curiam) (declining to extend strict scrutiny to
the elderly).

Windsor now argues that DOMA should be subject to strict
(or at least intermediate) scrutiny because homosexuals as a
class present the traditional indicia that characterize a

13

suspect class: a history of discrimination, an immutable characteristic upon which the classification is drawn, political powerlessness, and a lack of any relationship between the characteristic in question and the class's ability to perform in or contribute to society.

In making this claim, Windsor asks the Court to distinguish the precedent in eleven Courts of Appeals that have applied the rational basis test to legislation that classifies on the basis of sexual orientation. See Massachusetts v. HHS, Nos. 10-2207 & 10-2214; Citizens for Equal Protection v. Bruning, 455 F.3d 859 (8th Cir. 2006); Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804 (11th Cir. 2004); Johnson v. Johnson, 385 F.3d 503 (5th Cir. 2004); Equality Found. v. City of Cincinnati, 128 F.3d 289 (6th Cir. 1997); Thomasson, 80 F.3d 915; Steffan v. Perry, 41 F.3d 677 (D.C. Cir. 1994); High Tech Gays v. Def. Indus. Sec. Clearance Office, 895 F.2d 563 (9th Cir. 1990); Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir. 1989); Woodard v. United States, 871 F.2d 1068 (Fed. Cir. 1989); Nat'l Gay Task Force v. Bd. of Educ., 729 F.2d 1270 (10th Cir. 1984). She invites this Court to decide, as a matter of first impression in the Second Circuit, whether homosexuals are a suspect class.

Though there is no case law in the Second Circuit binding the Court to the rational basis standard in this context, the Court is not without guidance on the matter. For one, as the

14

Supreme Court has observed, "courts have been very reluctant, as they should be in our federal system," to create new suspect classes. City of Cleburne, 473 U.S. at 442. Moreover, the Supreme Court "conspicuously" has not designated homosexuals as a suspect class, even though it has had the opportunity to do so. See Massachusetts v. HHS, Nos. 10-2207 & 10-2214, slip op. at 15 (noting that "[n]othing indicates that the Supreme Court is about to adopt this new suspect classification when it conspicuously failed to do so in Romer"). Against this backdrop, this district court is not inclined to do so now. In any event, because the Court believes that the constitutional question presented here may be disposed of under a rational basis review, it need not decide today whether homosexuals are a suspect class.

The Court will, however, elaborate on an aspect of the equal protection case law that it believes affects the nature of the rational basis analysis required here. The Supreme Court's equal protection decisions have increasingly distinguished between "[l]aws such as economic or tax legislation that are scrutinized under rational basis review[, which] normally pass constitutional muster," and "law[s that] exhibit[] . . . a desire to harm a politically unpopular group," which receive "a more searching form of rational basis review . . . under the Equal Protection Clause . . . ." Lawrence v. Texas, 539 U.S.

15

558, 579-80 (2003) (O'Connor, J., concurring); see Romer, 517
U.S. 620; City of Cleburne, 473 U.S. 432; U.S. Dep't of Agric.
v. Moreno, 413 U.S. 528 (1973). It is difficult to ignore this
pattern, which suggests that the rational basis analysis can
vary by context.

   At least one Court of Appeals has considered this pattern
as well. As the First Circuit explains, "Without relying on
suspect classifications, Supreme Court equal protection
decisions have both intensified scrutiny of purported
justifications where minorities are subject to discrepant
treatment and have limited the permissible justifications." See
Massachusetts v. HHS, Nos. 10-2207 & 10-2214, slip op. at 15.
And, "in areas where state regulation has traditionally
governed, the Court may require that the federal government
interest in intervention be shown with special clarity." Id.

   Regardless whether a more "searching" form of rational
basis scrutiny is required where a classification burdens
homosexuals as a class and the states' prerogatives are
concerned, at a minimum, this Court must "insist on knowing the
relation between the classification adopted and the object to be
attained." Romer, 517 U.S. at 632. "The search for the link
between classification and objective gives substance to the
[equal protection analysis]." Id. Additionally, as has always
been required under the rational basis test, irrespective of the

16

context, the Court must consider whether the government's asserted interests are legitimate. Pursuant to these established principles, and mindful of the Supreme Court's jurisprudential cues, the Court finds that DOMA's section 3 does not pass constitutional muster.[2]

## E.    Congress's Justifications

Contemporaneous with its enactment, Congress justified DOMA as: defending and nurturing the traditional institution of marriage; promoting heterosexuality; encouraging responsible procreation and childrearing; preserving scarce government resources; and defending traditional notions of morality. In its motion to dismiss and memorandum in opposition to summary judgment, BLAG advances some, but not all of these interests as rational bases for DOMA. It additionally asserts that Congress passed DOMA in the interests of caution, maintaining consistency in citizens' eligibility for federal benefits, promoting a social understanding that marriage is related to childrearing, and providing children with two parents of the opposite sex. The Court considers all of these interests to determine whether

---

[2] Any additional discussion of heightened or intermediate scrutiny would be "wholly superfluous to the decision" and contrary to settled principles of constitutional avoidance. City of Cleburne, 473 U.S. at 456 (Marshall, J., concurring in part, dissenting in part); Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 (1944); see also Miss. Univ. for Women, 458 U.S. at 724 n.9 (declining to address strict scrutiny when heightened scrutiny was sufficient to invalidate the challenged action); Hooper v. Bernalillo Cnty. Assessor, 472 U.S. 612, 618 (1985) (declining to reach heightened scrutiny in reviewing classifications that failed the rational basis test).

Windsor has "negative[d] every conceivable basis which might support [the statute]." Heller, 509 U.S. at 320-21 (citation and internal quotation marks omitted).

### 1. Caution and The Traditional Institution of Marriage

BLAG submits that "caution" was a rational basis for DOMA insofar as Congress wanted time to consider whether it should embrace (some of) the states' "novel redefinition" of marriage. As BLAG describes it, caution justified DOMA because altering the social concept of marriage would undermine Congress's goal of nurturing the foundational institution of marriage. (BLAG Mot. to Dismiss at 29-31.) By that account, Congress's putative interest in "caution" seems, in substance, no different than an interest in nurturing the traditional institution of marriage. See H.R. Rep. No. 104-664, at 12. The Court therefore considers both of these interests together.

With respect to traditional marriage, BLAG argues that Congress believed DOMA would promote it by "maintain[ing] the definition of marriage that was universally accepted in American law." (BLAG Mot. to Dismiss at 28). That interest may be legitimate.[3] However, it is unclear how DOMA advances it.

---

[3] While tradition as an end in itself may not be a legitimate state interest in this case, see Heller, 509 U.S. at 326 (noting that the "[a]ncient lineage" of a tradition does not necessarily make its preservation a legitimate government goal), the Court acknowledges that an interest in maintaining the traditional institution of marriage, when coupled with other legitimate interests, could be a sound reason for a legislative classification, see Lawrence, 539 U.S. at 585 (O'Connor, J., concurring)

DOMA does not affect the state laws that govern marriage.
(BLAG Mot. to Dismiss at 20 (noting that DOMA does not "directly
and substantially interfere with the ability of same-sex couples
to marry").)  Precisely because the decision of whether same-sex
couples can marry is left to the states, DOMA does not, strictly
speaking, "preserve" the institution of marriage as one between
a man and a woman.  The statute creates a federal definition of
marriage.  But that definition does not give content to the
fundamental right to marry—and it is the substance of that
right, not its facial definition, that actually shapes the
institution of marriage.  Cf. De Sylva v. Ballentine, 351 U.S.
570, 580 (1956) (noting that "[t]he scope of a federal right is,
of course, a federal question, but that does not mean that its
content is not to be determined by state, rather than federal
law, [which] is especially true where a statute deals with a
familial relationship [because] there is no federal law of
domestic relations").

To the extent Congress had any other independent interest
in approaching same-sex marriage with caution, for much the same
reason, DOMA does not further it.  A number of states now permit

---

(stating that "preserving the traditional institution of marriage" would be a
legitimate state interest in an equal protection analysis).  To the extent
Congress had an interest in defending traditional notions of morality in
furtherance of an interest in traditional marriage, H.R. Rep. No. 104-664, at
16, the Court agrees that "[p]reserving th[e] institution [of traditional
marriage] is not the same as mere moral disapproval of an excluded group, and
that is singularly so in this case given the range of bipartisan support for
[DOMA]."  Massachusetts v. HHS, Nos. 10-2207 & 10-2214, slip op. at 29, 30
(citation and internal quotation marks omitted).

same-sex marriages.  DOMA did not compel those states to "wait[]

for evidence spanning a longer term before engaging in . . . a

major redefinition of a foundational social institution."  (BLAG

Mot. to Dismiss at 29.)  Thus, whatever the "social

consequences" of this legal development ultimately may be, DOMA

has not, and cannot, forestall them.[4]

### 2.   Childrearing and Procreation

Promoting the ideal family structure for raising children

is another reason Congress might have enacted DOMA.  Again, the

Court does not disagree that promoting family values and

responsible parenting are legitimate governmental goals.  The

Court cannot, however, discern a logical relationship between

DOMA and those goals.

BLAG argues that Congress enacted DOMA to avoid a social

perception that marriage is not linked to childrearing.  In

furtherance of that interest, it argues, Congress might have

---

[4] Congress also expressed "a corresponding interest in promoting
heterosexuality" as "closely related to the interest in protecting
traditional marriage."  H.R. Rep. No. 104-664, at 15 n.53.  BLAG does not
contend that this is a rational basis for DOMA's classification; nonetheless,
the Court briefly considers it, as a "conceivable" basis that "might" support
it.  Heller, 509 U.S. at 320.

A permissible classification must at least "find some footing in the
realities of the subject addressed by the legislation."  Id. at 321.  Here,
such footing is lacking.  DOMA affects only those individuals who are already
married.  The Court finds it implausible that section 3 does anything to
persuade those married persons (who are homosexuals) to abandon their current
marriages in favor of heterosexual relationships.  Thus, the stated goal of
promoting heterosexuality is so attenuated from DOMA's classification that it
"render[s] the distinction arbitrary or irrational."  City of Cleburne, 473
U.S. at 446.

passed DOMA to deter heterosexual couples from having children
out of wedlock, or to incentivize couples who are pregnant to
get married. (BLAG Mot. to Dismiss at 36.)  BLAG also claims
that Congress had an interest in promoting the optimal social
(family) structure for raising children—that is, households with
one mother and one father. (BLAG Mot. to Dismiss at 38.)  These
concerns appear related to Congress's contemporaneously stated
interest in "responsible procreation." H.R. Rep. No. 104-664,
at 12-13.

These are interests in the choices that heterosexual
couples make:  whether to get married, and whether and when to
have children. Yet DOMA has no direct impact on heterosexual
couples at all; therefore, its ability to deter those couples
from having children outside of marriage, or to incentivize
couples that are pregnant to get married, is remote, at best.
It does not follow from the exclusion of one group from federal
benefits (same-sex married persons) that another group of people
(opposite-sex married couples) will be incentivized to take any
action, whether that is marriage or procreation. See In re
Levenson, 587 F.3d 925, 934 (9th Cir. 2009).

Conceivably, Congress could have been interested more
generally in maintaining the societal perception that a primary
purpose of marriage is procreation.  However, even formulated as
such, the Court cannot see a link between DOMA and childrearing.

21

DOMA does not determine who may adopt and raise children.  Nor
could it, as these matters of family structure and relations
"belong[] to the laws of the States and not to the laws of the
United States."  Elk Grove Unified Sch. Dist. v. Newdow, 542
U.S. 1, 12 (2004).

At most, then, DOMA has an indirect effect on popular
perceptions of what a family "is" and should be, and no effect
at all on the types of family structures in which children in
this country are raised.  And so, although this Court must
"accept a legislature's generalizations even when there is an
imperfect fit between means and ends," Heller, 509 U.S. at 320,
here, Congress's goal is "so far removed" from the
classification, it is impossible to credit its justification.
Romer, 517 U.S. at 635; see Lewis v. Thompson, 252 F.3d 567, 584
n.27 (2d Cir. 2001) (noting that the justification for the law
cannot rely on factual assumptions that are beyond the "limits
of 'rational speculation'" (quoting Heller, 509 U.S. at 320)).

### 3.    Consistency and Uniformity of Federal Benefits

Additionally, BLAG explains that Congress was motivated to
define marriage at the federal level to ensure that federal
benefits are distributed consistently.  In other words, Congress
might have enacted DOMA to avoid a scenario in which "people in
different States . . . have different eligibility to receive
Federal benefits," depending on the state's marriage laws.

22

(BLAG Mot. to Dismiss at 34 (quoting 142 Cong. Rec. S10121 (daily ed. Sept. 10, 1996) (statement of Sen. Ashcroft)).)

Here, the Court does discern a link between the means and the end. It is problematic, though, that the means used in this instance intrude upon the states' business of regulating domestic relations. That incursion skirts important principles of federalism and therefore cannot be legitimate, in this Court's view.

In the first instance, it bears mention that this notion of "consistency," as BLAG presents it, is misleading. Historically the states—not the federal government—have defined "marriage." Cf. United States v. Lopez, 514 U.S. 549, 583 (1995) (Kennedy, J., concurring) (noting that the states have enjoyed the latitude to "experiment[] and exercis[e] their own judgment in an area to which [they] lay claim by right of history and expertise"). For that reason, before DOMA, any uniformity at the federal level with respect to citizens' eligibility for marital benefits was merely a byproduct of the states' shared definition of marriage. The federal government neither sponsored nor promoted that uniformity. See In re Levenson, 587 F.3d at 933 (noting that the relevant status quo prior to DOMA was the federal government's recognition of any marriage declared valid according to state law); Gill v. Office of Pers. Mgmt., 699 F. Supp. 2d 374, 393 (D. Mass. 2010) (same).

23

Yet even if Congress had developed a newfound interest in promoting or maintaining consistency in the marital benefits that the federal government provides, DOMA is not a legitimate method for doing so.  To accomplish that consistency, DOMA operates to reexamine the states' decisions concerning same-sex marriage.  It sanctions some of those decisions and rejects others.  But such a sweeping federal review in this arena does not square with our federalist system of government, which places matters at the "core" of the domestic relations law exclusively within the province of the states.  See Ankenbrandt v. Richards, 504 U.S. 689, 716 (1992) (Blackmun, J., concurring); Sosna v. Iowa, 419 U.S. 393, 404 (1975); see also Massachusetts v. U.S. Dep't of Health & Human Servs., 698 F. Supp. 2d 234, 249-50 (D. Mass. 2010) (discussing the history of marital status determinations as an attribute of state sovereignty).

The states may choose, through their legislative or constitutional processes, to preserve traditional marriage or to redefine it.  See Golinski v. Office of Pers. Mgmt., 824 F. Supp. 2d 968, 988 (N.D. Cal. 2012) (noting that thirty states have passed constitutional amendments banning same-sex marriage).  But generally speaking, barring a state's inability to assume its role in regulating domestic relations, the federal government has not attempted to manage those processes and

affairs. See id. at 1000 n.10 (observing that, historically, the federal government has only legislated in this area where there has been a failure or absence of state government). BLAG has conceded this historical fact. See Transcript of Oral Argument at 10:15-20, 18:2-5, Golinski, 824 F. Supp. 2d 968 (No.10-257) (conceding that BLAG's "research hasn't shown that there are historical examples which [sic] Congress has legislated on behalf of the federal government in the area of domestic relations"). This is the "virtue of federalism." Massachusetts v. HHS, Nos. 10-2207 & 10-2214, slip op. at 30.

### 4.    Conserving the Public Fisc

Lastly, Congress also justified DOMA as a means of conserving government resources. (BLAG Mot. to Dismiss at 32.) An interest in conserving the public fisc alone, however, "can hardly justify the classification used in allocating those resources." Plyler, 457 U.S. at 227. After all, excluding any "arbitrarily chosen group of individuals from a government program" conserves government resources. Dragovich v. U.S. Dep't of the Treasury, 764 F. Supp. 2d 1178, 1190 (N.D. Cal. 2011). With no other rational basis to support it, Congress's interest in economy does not suffice. Accord, e.g., Dragovich v. U.S. Dep't of the Treasury, No. C 10-01564, slip op. at 26 (N.D. Cal. May 24, 2012); Golinski, 824 F. Supp. 2d at 994-95.

25

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendant-Intervenor's motion to dismiss is DENIED. The Court declares that section 3 of the Defense of Marriage Act, 1 U.S.C. § 7, is unconstitutional as applied to Plaintiff. Plaintiff is awarded judgment in the amount of $353,053.00, plus interest and costs allowed by law. Each party shall bear their own costs and fees.

This case is CLOSED. The clerk of the court is directed to terminate the motions at docket numbers 28, 49, and 52.

SO ORDERED:

_____
BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:      New York, New York
            June 6, 2012