**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

WRITER'S DIRECT FACSIMILE
(212) 373-3086

WRITER'S DIRECT E-MAIL ADDRESS
(212) 373-2818

rkaplan@paulweiss.com

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO. 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON*
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
HENK BRANDS
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JEANETTE K. CHAN
YVONNE Y. F. CHAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
JAMES M. DUBIN
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ANDREW C. FINCH
BRAD J. FINKELSTEIN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
PAUL D. GINSBERG
ADAM M. GIVERTZ
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
JOYCE S. HUANG
DAVID S. HUNTINGTON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
JOHN C. KENNEDY

ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
JOHN J. O'NEIL
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
ROBERT P. PARKER*
MARC E. PERLMUTTER
MARK F. POMERANTZ
VALERIE E. RADWANER
CARL L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
PETER J. ROTHENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
AUDRA J. SOLOWAY
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
MARK A. UNDERBERG
LIZA M. VELAZQUEZ
MARIA T. VULLO
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
BETH A. WILKINSON
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA T.M. WOOD
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

August 17, 2011



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/8/12

**BY HAND**

Judge Barbara S. Jones
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

*Windsor* v. *United States*, 10 Civ. 8435 (BSJ) (JCF)

Dear Judge Jones:

      We write on behalf of the plaintiff, Edith Schlain Windsor, in the above-captioned matter with respect to the Court's Order dated August 15, 2011 (the "August 15 Order").

      In connection with Your Honor's consideration of Plaintiff's motion to strike, filed on August 10, 2011, enclosed please find what we believe to be true and correct copies of the 12 documents referenced by Defendant-Intervenor, the Bipartisan Legal Advisory Group of the House of Representatives ("BLAG"), in opposition to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Hon. Barbara S. Jones                                                          2

Plaintiff's motion for summary judgment that are also the subject of Plaintiff's motion to strike.

As we previously mentioned, we did not receive these materials in discovery and they were not attached to BLAG's papers in opposition to Plaintiff's motion for summary judgment.[1] Thus, we obtained most of these materials either by searching the internet for them or by obtaining them from sources like amazon.com. As a result, we apologize in advance if we have made any errors. Nevertheless, we believe that the Court should have copies in order to facilitate its resolution of the pending motion to strike.

Finally, while as the Court can imagine, we are loathe to raise this issue, we note that in our letter to the Court dated August 11, 2011, we requested permission to file a reply brief in connection with our motion for summary judgment of up to thirty (30) pages. In the August 15 Order, however, Your Honor indicated that "Plaintiff's request to file a reply in support of her motion for summary judgment of up to 25 pages will be decided along with the Court's resolution of the motion to strike." Although we were not sure whether this numerical disparity was intentional or not, we of course will comply with whatever page limitation is ultimately ordered by the Court.

Respectfully submitted,

*Roberta Kaplan*

Roberta A. Kaplan

Encl.

cc:     James D. Esseks, Esq.
        H. Christopher Bartolomucci, Esq.
        Jean Lin, Esq.

---

[1]     As discussed in Plaintiff's motion to strike and related correspondence with the Court, four of the documents Plaintiff seeks to strike were used by BLAG at the depositions of Plaintiff's expert witnesses.  (App. Entries 4, 5, 6, & 11.)

Appendix

References to Documents in BLAG's 56.1 Statement and Opposition to Plaintiff's Motion for Summary Judgment
That Plaintiff Seeks to Strike

| Entry | Location of Citation | Material Cited | Proposition BLAG Attempts to Support | References in Plaintiff's Expert Reports | References at Depositions |
|---|---|---|---|---|---|
| 1 | BLAG 56.1 ¶¶ 33, 39, 50, 51, 54, 55, 57; SJ Br. at 10 | Lisa M. Diamond, *New Paradigms for Research on Heterosexual and Sexual Minority Development*, 32 J. Clinical Child and Adolescent Psychol. 492 (2003). | Sexual orientation is not immutable; change in sexual orientation occurs "with some frequency" | None | None |
| 2 | BLAG 56.1 ¶¶ 33, 39, 50, 51, 54, 55, 57; SJ Br. at 11–12 | Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. Soc. Issues 297, 301 (2000). | Sexual orientation is not immutable; change in sexual orientation occurs "with some frequency" | None | None |
| 3 | BLAG 56.1 ¶¶ 33, 39, 50, 51, 54, 55, 57; SJ Br. at 12 | Nigel Dickson, et al., *Same Sex Attracting in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607, 1612–13 (2003). | Sexual orientation is not immutable; change in sexual orientation occurs "with some frequency" | None | None |
| 4 | BLAG 56.1 ¶¶ 40, 41, 42, 43, 44, 45, 46, 48; SJ Br. at 23 | Susan Golombok and Fiona Tasker, "Gay Fathers," *The Role of The Father in Child Development* (2010). | "Homosexual" parenting studies are "flawed"; cited to dispute Plaintiff's assertions that same-sex parents are not as effective as straight | Lamb Aff. at Ex. B. | Lamb Dep. 75:9–78:24. |

| | | | parents | | |
|---|---|---|---|---|---|
| 5 | BLAG 56.1 ¶¶ 40, 41, 42, 43, 44, 45, 46, 48; SJ Br. at 23 | Jennifer L. Wainright and Charlotte J. Patterson, *Delinquency, Victimization, And Substance Use Among Adolescents With Female Same-Sex Parents*, 20 J. Family Psych. 526 (2006). | "Homosexual" parenting studies are "flawed"; cited to dispute Plaintiff's assertions that same-sex parents are not as effective as straight parents | Lamb Aff. at Ex. B. | Lamb Dep. 81:12–83:21. |
| 6 | BLAG 56.1 ¶¶ 40, 41, 42, 43, 44, 45, 46, 48; SJ Br. at 23–24 | Lawrence A. Kurdek, "What Do We Know About Gay And Lesbian Couples?" *Current Directions in Psychological Science* (2005). | "Homosexual" parenting studies are "flawed"; cited to dispute Plaintiff's assertions that same-sex parents are not as effective as straight parents | Lamb Aff. at Ex. B. | Lamb Dep. 83:22–86:7. |
| 7 | BLAG 56.1 ¶¶ 40, 41, 42, 43, 44, 45, 46, 48; SJ Br. at 24 | Ann Hulbert, *The Gay Science: What Do We Know About the Effects of Same-Sex Parenting?*, Slate.com, March 12, 2004, http://www.slate.com/id/2097048/. | "Homosexual" parenting studies are "flawed"; cited to dispute Plaintiff's assertions that same-sex parents are not as effective as straight parents | None | None |
| 8 | BLAG 56.1 ¶¶ 47, 48 | Linda J. Waite & Maggie Gallagher, *The Case for Marriage: Why Married People Are Happier, Healthier, and Better Off Financially* (2000). | It is better for children to have both male and female parents in the home who assume traditional gender roles | None | None |
| 9 | BLAG 56.1 ¶¶ 47, 48 | David Popenoe, *Life without Father: Compelling New Evidence That Fatherhood and Marriage Are Indispensable for the Good of Children* | It is better for children to have both male and female parents in the home who assume traditional gender | None | None |

| | | and Society (1996). | roles | | |
|---|---|---|---|---|---|
| 10 | BLAG 56.1 ¶¶ 47, 48 | George W. Dent, Jr., *The Defense of Traditional Marriage*, 15 J.L. & Pol. 581 (1999). | It is better for children to have both male and female parents in the home who assume traditional gender roles | None | None |
| 11 | BLAG 56.1 ¶¶ 50, 51; SJ Br. at 11 | Gregory M. Herek, et al., *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults in a US Probability Sample*, 7 Sex. Res. Soc. Pol'y 176 (2010). | "Immutable" is not an accurate descriptor for sexual orientation | Peplau Aff. at Ex. B. | Peplau Dep. 35:13–38:20, 100:4–101:18. |
| 12 | SJ Br. at 24 | George W. Dent, Jr., *No Difference?: An Analysis of Same-Sex Parenting*, ___ Ave Maria L. Rev. ___ (forthcoming 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1848184. | Research into gay and lesbian parents has limitations | None | None |

# Tab 1

Journal of Clinical Child and Adolescent Psychology
2003, Vol. 32, No. 4, 490–498

Copyright © 2003 by
Lawrence Erlbaum Associates, Inc.

# SPECIAL SECTION: INTEGRATING RESEARCH ON SEXUAL-MINORITY AND HETEROSEXUAL DEVELOPMENT: THEORETICAL AND CLINICAL IMPLICATIONS

## New Paradigms for Research on Heterosexual and Sexual-Minority Development

### Lisa M. Diamond
*Department of Psychology, University of Utah*

*As psychological research on sexual-minority (i.e., nonheterosexual) adolescents has increased over the past 20 years, it has become increasingly segregated from research on mainstream heterosexual youths, as if the knowledge gleaned from each population had nothing to offer our understanding of the other. To the contrary, understanding of both populations would be greatly improved by integrating investigations of sexual-minority issues into mainstream psychological research on adolescents. I outline 4 weaknesses in contemporary research on sexual-minority youth that stem from—and perpetuate—its historical isolation from mainstream developmental research: misspecification of the populations under study, lack of attention to within-group diversity, failure to test alternative explanations for—and moderators of—"sexual-minority effects," and insufficient attention to the underlying processes and mechanisms through which sexual-minority effects operate. Correcting these weaknesses has important implications for future research on how same-sex and other-sex sexuality shape adolescent psychosocial development and clinical child and adolescent problems.*

Psychological research on sexual-minority (i.e., nonheterosexual) adolescents has increased dramatically over the past 20 years, providing psychologists with valuable information on the unique experiences of this population. Whereas it was once presumed that sexual-minority adolescents did not even exist, one can now find comprehensive social scientific data on the special challenges that come with growing up gay in a heterosexual (and heterosexist) world.

As the amount and sophistication of research on sexual-minority youth has steadily grown, it has become increasingly specialized. For example, it is common to find entire conference symposia devoted to sexual-minority adolescents or special sections of journals devoted to the topic: "sexual orientation" or "lesbian/gay/bisexual" frequently appear as special-interest keywords that developmental psychologists may select when indicating their research interests. These examples signal the extent to which psychological research on sexual-minority youth has gained acceptance as an independent research area.

This has proven to be a mixed blessing. Although the growth and specialization of this research area has provided clinicians and service providers with the detailed information they need to serve sexual-minority youths, it has been accompanied by a progressive segregation from mainstream research on adolescent development (as critiqued by Goldfried, 2001). Quite simply, both the research literature on sexual-minority adolescents and the research literature on typical (presumably) heterosexual adolescents seem to suggest that knowledge gleaned from each population has nothing to offer our knowledge of the other.

Nothing could be further from the truth. Rather, understanding of both populations would be greatly improved by integrating investigations of sexual-minority issues into mainstream psychological research on adolescent development. In this article I outline four weaknesses in contemporary research on sexual-minority youth that stem from—and perpetuate—its historical isolation from mainstream developmental research:

Requests for reprints should be sent to Lisa M. Diamond, Department of Psychology, University of Utah, 380 South 1530 East, Room 502, Salt Lake City, UT 84112-0251. E-mail: diamond@psych.utah.edu

NEW PARADIGMS FOR RESEARCH

misspecification of the populations under study, lack of attention to within-group diversity, failure to test alternative explanations for—and moderators of—"sexual-minority effects," and insufficient attention to the underlying processes and mechanisms through which sexual-minority effects operate. I make recommendations to correct these weaknesses and highlight their importance for future research on the role of same-sex and other-sex sexuality in shaping all adolescents' psychosocial development.

### Problem #1: Who Belongs in Each Population?

### Links and Distinctions Among Sexual Orientation, Sexual Identity, and Same-Sex Sexuality

The gap between heterosexual and sexual-minority research reflects the widespread belief that sexual-minority and heterosexual populations are themselves fundamentally distinct and dissimilar. Because this belief reflects a number of implicit precepts about sexual orientation, sexual identity, and same-sex sexuality, a brief review of these constructs is in order.

*Sexual orientation* is typically defined as a consistent, enduring pattern of sexual desire for individuals of the same sex, the other sex, or both sexes. In contrast, *sexual identity* represents a culturally organized conception of the self, usually lesbian/gay, bisexual, or heterosexual. Notably, however, contemporary youths are increasingly adopting alternative labels such as *queer* or *questioning*, or rejecting sexual identity labels altogether, in an explicit acknowledgment of these labels' arbitrary nature and in an attempt to embrace all sexual possibilities (see Diamond, 2003, in press; Hollander, 2000). *Same-sex sexuality* is the broadest among these constructs and includes all aspects of same-sex desire, romantic affection, fantasy, and behavior, regardless of whether the individual(s) experiencing them have a nonheterosexual orientation or identity.

Of course, there has been extensive research, speculation, and debate over the nature and causes of sexual orientation, but there is increasing consensus on the fact that although sexual orientation—to some extent, within some individuals—appears genetically influenced (reviewed in Bailey & Pillard, 1995), sexual orientation appears to have multiple causes, and different combinations of causes may operate for different individuals (Garnets & Kimmel, 1991; Richardson, 1987). For some, genetic factors outweigh environmental influences; for others, psychosocial and interpersonal factors are most important. Accordingly, same-sex sexuality develops at different rates and in different contexts across different individuals. For these reasons, it

is important to remember that sexual orientation and same-sex sexuality are fundamentally distinct phenomena. One need not possess a same-sex orientation to seek, experience, and enjoy same-sex sexuality, and correspondingly one need not possess a heterosexual orientation to seek, experience, and enjoy other-sex sexuality. Rather, individuals typically experience a diverse array of attractions and behaviors during their adolescent years, some of which reflect curiosity and experimentation, some of which reflect social pressure, and some of which reflect an underlying sexual orientation (Bancroft, 1990; Cass, 1990; Laumann, Gagnon, Michael, & Michaels, 1994).

This makes it difficult to specify a distinct set of behaviors and affects that reliably distinguishes adolescents with stable nonheterosexual orientations from youths with heterosexual orientations who are temporarily experimenting with same-sex sexuality. There appears no reliable way to predict whether a particular adolescent's same-sex sexuality will persist into adulthood or give way to stable and exclusive other-sex sexuality over time (Diamond, 2003). Yet this element of complexity is rarely acknowledged in research on sexual-minority youth. Rather, most empirical articles on this topic assume that it is possible—and from a methodological standpoint, desirable—to reliably identify and categorize "gay" and "straight" youth simply by asking the right questions (i.e., "Do you consider yourself heterosexual or gay/lesbian/bisexual?") or choosing the right recruitment strategies (e.g., sampling nonheterosexual youths at gay/lesbian/bisexual community centers).

### Implications for Research

Yet such clear-cut categorization may not be possible. Different individuals have remarkably different interpretations of the categories "heterosexual," "lesbian/gay," and "bisexual" (e.g., Diamond, 2003; Golden, 1996; Rust, 1992), and participation in lesbian/gay/bisexual community activities is not a reliable marker of one's sexual orientation or identity. Thus, research projects that presume clear and consistent boundaries between heterosexual and sexual-minority youths engender a number of problems: Perhaps most obviously, they systematically undersample individuals with lesbian/gay/bisexual orientations that fail to identify as such during their adolescent years. Given that far more individuals (at all stages of life) appear to possess nonheterosexual orientations than to openly claim them (Laumann et al., 1994), this leads to a substantial selection bias.

Perhaps an even more important problem is that this approach overemphasizes and oversimplifies sexual orientation while undertheorizing and misrepresenting same-sex and other-sex sexuality. As noted previously, these are not the same phenomena, although they are

491

frequently presumed to be. Consider the following cases: a teenage girl who falls in love with her female best friend but does not experience same-sex attractions for anyone else; an adolescent boy who fools around sexually with his neighbor but only falls in love with women; a young woman who experiences her first same-sex attractions at age 21. None of these individuals seems as prototypically "gay" as an individual who first begins experiencing same-sex attractions at an early age, fails to experience other-sex attractions, and finds him or herself consistently and exclusively drawn to the same sex throughout adolescence and adulthood. In other words, all of these individuals have direct experience with same-sex sexuality, but not all of them may have a same-sex orientation. Should studies of sexual-minority youth include only those that can be reliably classified in the latter group?

One problem is that making such differentiations may prove more complicated than it first appears (Diamond, 2003). There is currently no scientific or popular consensus on the exact constellation of experiences that definitively "qualify" an individual as lesbian, gay, or bisexual rather than curious, confused, or maladjusted. The more carefully researchers, clinicians, and social workers map these constellations—differentiating, for example, between gender identity and sexual identity, desire and behavior, sexual versus affectional feelings, early appearing versus late-appearing attractions, attractions and fantasies, or social identifications and sexual profiles (reviewed in McWhirter, Sanders, & Reinisch, 1990)—the more complicated the picture becomes. This is especially true because lesbian/gay/bisexual individuals do not report uniform intercorrelations among the aforementioned domains (Golden, 1987; Weinberg, Williams, & Pryor, 1994). One adolescent may fantasize about same-sex contact but never experience a clear-cut same-sex attraction; another may pursue same-sex sexual contact but never develop a same-sex emotional relationship.

An even more important problem with focusing on sexual orientation rather than same-sex sexuality is the presumption that only the former phenomenon has important psychological implications. Even if an adolescent having a same-sex affair decides down the line that he or she is heterosexual, that affair may have powerful psychosocial implications that deserve systematic study and potentially clinical attention. This is why researchers increasingly speak of *sexual minorities* rather than lesbian/gay/bisexual individuals. Regardless of whether one considers a particular adolescent to be heterosexual or nonheterosexual, any experience with same-sex sexuality—from fantasy to unrequited love to sexual behavior—violates standards for normative heterosexuality. Thus, it is not simply a youth's sexual orientation and identity that has important developmental and mental health implications, but his or her sexual-minority status.

But because of the split between heterosexual and lesbian/gay/bisexual research, questions about same-sex sexuality are rarely asked of youths who identify as (or are presumed to be) heterosexual. Similarly, the other-sex experiences of openly identified gay and lesbian adolescents are frequently dismissed as false or forced and often presumed to have been uniformly dissatisfying. Yet this is not the case. Studies using random, representative samples of adults and adolescents indicate that more individuals possess attractions to both sexes than exclusive same-sex attractions (French, Story, Remafedi, Resnick, & Blum, 1996; Garofalo, Wolf, Wissow, Woods, & Goodman, 1999; Laumann et al., 1994). Clearly, researchers have gotten into a dangerous habit of assessing identity and making subsequent assumptions about behavior and experience, rather than assessing behavior and experience and treating their link to identity as an open empirical question.

The solution is for researchers to pose the same questions about same-sex and other-sex attractions, fantasies, and behaviors to all youths, regardless of how they identify themselves or how they were sampled. The National Longitudinal Study of Adolescent Health (www.cpc.unc.edu/projects/addhealth) provides an excellent example of this approach. This random, representative survey of American adolescents contains no questions about sexual identity or orientation, but it asks all youths to report on attractions to girls and attractions to boys. When stratified by respondent's sex, this makes it possible to test hypotheses about youths with same-sex attractions rather than lesbian/gay/bisexual-identified youth (for examples, see French et al., 1996; Russell & Consolacion, this issue; Russell & Joyner, 2001; Russell, Seif, & Truong, 2001). This research strategy is invaluable for facilitating integration between sexual-minority and heterosexual adolescent research and for investigating how same-sex and other-sex sexuality influence the sexual and social development of all adolescents.

### Problem #2: How Do We Know Whether It's Really a Youth's Sexuality That Matters?

#### Untested Assumptions Regarding the Primacy of Sexual-Minority Status

The previous section critiqued the assumption of a fixed and fundamental distinction between lesbian/gay/bisexual and heterosexual youths. A corresponding—and similarly problematic—assumption is that this distinction matters. Specifically, when researchers describe distinctive or salient characteristics of sexual-minority youths, it is often implicitly conveyed that such characteristics are attributable to the youths' sexual-minority status. In other words, despite

the voluminous psychological literature detailing hundreds of individual difference dimensions that moderate youths' social, sexual, emotional, cognitive, and moral development, researchers frequently frame investigations of sexual-minority youth as studies of "the impact of sexual orientation" or "the consequence of nonnormative sexual identity" without testing or even questioning whether something other than the youths' same-sex sexuality may be responsible for the phenomenon of interest.

It is perfectly appropriate to postulate that a youth's sexual-minority status does matter, that it influences his or her trajectory of psychological development and moderates the effects of other known influences, such as socioeconomic status, family structure, social skills, and so on. Yet it is inappropriate to presume that sexual-minority status is the most important influence simply because it is one of the most salient to the researcher or the culture at large. Rather, researchers should take special care, particularly when comparing sexual-minority and heterosexual youths, to assess multiple factors that differentiate between these groups and to thoughtfully formulate and test hypotheses about main effects, mediating effects, moderating effects, and potential confounds. When valid main effects for sexual-minority status are found, researchers should compare the effect sizes to those of other significant main effects to provide a realistic portrait of the relative influence of a youth's sexual-minority status on his or her development. Tests for potential confounds are particularly critical. Given that heterosexual and sexual-minority research participants are typically recruited by very different methods, it is important to determine whether group differences on the outcome of interest are attributable to sexual-minority status or to a third variable that happens to be correlated with sexual-minority status (e.g., participation in extracurricular community activities or youth support groups). This is particularly important for translating research findings on the unique experiences of sexual-minority youth into useful and appropriate clinical interventions designed to foster their well-being.

**Examples From Extant Research**

To provide an example of the importance of these factors, consider research on adolescents' romantic relationships. In recent years, there has been an explosion of theory and research on this topic, ranging from investigations of the developmental antecedents of adolescent romance to its long-term psychosocial consequences (Collins & Sroufe, 1999; Conger, Cui, Bryant, & Elder, 2000; Florsheim, 2003; Furman, Feiring, & Brown, 1999; Furman & Wehner, 1994, 1997). For example, as Brown (1999) noted, romantic relationships provide youths the opportunity to master critical skills related to patience, mutuality, commitment, trust, and

emotion regulation. Skills regarding emotion regulation are particularly salient. Some of the most powerful emotions adolescents experience are those that emerge in the context of romantic relationships (reviewed in Larson, Clore, & Wood, 1999), and thus these relationships provide youths with repeated opportunities to wrestle with a wider and more complex range of powerful feeling states than are typically experienced in other contexts.

Consequently, individuals that pursue no romantic relationships whatsoever during the adolescent years may move into young adulthood with a notably different constellation of interpersonal and self-regulatory skills than those with extensive romantic experience. As one might expect, sexual-minority youths are disproportionately likely to report low (or no) romantic experience (Diamond & Dubé, 1998): in some cases they forego romantic relationships to avoid suspicion of their sexual orientation, whereas in other cases they simply have difficulty finding potential partners. Given the aforementioned social-developmental benefits of adolescent romantic participation, this may have a host of psychosocial consequences that might appear to be "sexual-minority effects" but that in reality are just as likely to be observed among heterosexual youths with similar patterns of low romantic experience. Thus, to appropriately model the impact of a youth's sexual-minority status on his or her social development, and to effectively integrate this information into child–adolescent clinical practice, researchers must anticipate and investigate confounding factors such as differential experience with romantic relationships.

This approach requires greater attention to theory and model building than often characterizes sexual-minority research. Researchers must attend scrupulously to "hidden characteristics" of their sexual-minority samples that may influence research findings and must take care to include appropriate measures of such characteristics. Rather than simplistically testing for heterosexual and sexual-minority differences "because they are there," it will be incumbent on researchers to specify exactly why they expect such differences, in which subgroups of each population they anticipate finding them, and, most important, what such differences have to teach us about normative developmental processes in all youths. Only by systematically formulating and testing such hypotheses can we hone in on those developmental phenomena that are most significantly and specifically influenced by a youth's experiences with same-sex sexuality.

**Problem #3: Whatever Happened to Within-Group Variation?**

One of the advantages of the approach outlined previously is that it is particularly amenable to investigat-

493

ing the degree and range of variation within both sexual-minority and heterosexual populations on various outcomes of interest. If the sexual-minority effect on a particular outcome variable is actually mediated by, for example, familial problems or perceived stress, then it stands to reason that (a) sexual-minority youths with particularly well-functioning families or particularly strong coping abilities will end up "looking like" the average heterosexual adolescent, and (b) heterosexual youths with dysfunctional families or particularly high stress levels will end up looking like the average sexual-minority youth. Understanding such within-group variation is critical for building models of adolescent psychological development that capably represent the relative impact of sexual identity and orientation. However, such within-group variation has been historically understudied in research on sexual-minority youths.

To some extent, this is understandable. An important priority of early research on sexual-minority youth was simply to document that this population existed and that they had unique developmental and mental health challenges deserving of systematic empirical study and clinical attention. However, this has all too often led to a universalization of the "adolescent lesbian/gay/bisexual experience," as if the commonalities across such youths flowing from their shared sexual-minority status invariably outweighed the multiple social and individual factors differentiating them. Yet as research on sexual-minority youths has become increasingly sophisticated, the notion of a typical trajectory of sexual-minority development or a typical pattern of adolescent sexual-minority experience has become suspect. For example, although it was once thought that all sexual minorities experienced the emergence of their same-sex attractions prior to adolescence, it is now known that this is not always the case. As noted earlier, sexual minorities report widely divergent ages and contexts for first awareness of same-sex attractions, first sexual questioning, and first self-identification (Diamond, 1998, 2000, in press; Diamond & Savin-Williams, 2000; Golden, 1987; Savin-Williams, 1998a, in press; Savin-Williams & Diamond, 2000). They also have remarkably divergent patterns of sexual and romantic relationships (Diamond, Savin-Williams, & Dubé, 1999; Savin-Williams, 1996a), divergent patterns of friendship with sexual-minority and heterosexual age-mates and adults (Diamond & Dubé, 2002), and divergent degrees of openness about their sexuality to friends and family members (Cohen & Savin-Williams, 1996; Savin-Williams, 1998c).

Some of this diversity is attributable to the moderating influences of sex (Baumeister, 2000; Diamond & Savin-Williams, 2000), ethnicity (Chan, 1992; Collins, 1990; Dubé & Savin-Williams, 1999; Espin, 1997; Hidalgo, 1984; Icard, 1986), social class

(Carballo-Dieguez & Dolezal, 1994; Hunter, Dolezal, Baer, & Yu, 2000; Serovich, Skeen, Walters, & Robinson, 1993; Stokes, Miller, & Mundhenk, 1998), local political climate (Espin, 1987; Golden, 1994; Mays, Cochran, & Rhue, 1993), and accessibility of support resources (Grossman & Kerner, 1998; Lee, 2002; Nesmith, Burton, & Cosgrove, 1999; Wright, Gonzalez, Werner, Laughner, & Wallace, 1998). Less often studied but potentially just as important are individual difference dimensions such as personality, coping ability, perceived social support, social skills, locus of control, and even attractiveness. The degree to which such factors explain the remarkably diverse developmental trajectories and outcomes of heterosexual youths has long been a mainstay of adolescent research (e.g., Broderick, 1998; Bronstein, Fitzgerald, Briones, & Pieniadz, 1993; Cooper, Shaver, & Collins, 1998; Hoffman & Levy-Shiff, 1994; Larson, Csikszentmihalyi, & Graef, 1980; Losel, 1994; Underwood, Kupersmidt, & Coie, 1996; Wilson, Stelzer, Bergman, & Kral, 1995). Surely such factors are no less important for sexual-minority youths, yet they are all too rarely taken into account. For example, much research has demonstrated that early- and late-maturing girls and boys show divergent patterns of social participation and self-concept and hence unique constellations of social-developmental benefits and deficits (e.g., Brooks-Gunn & Reiter, 1990; Caspi, 1995; Duncan, Ritter, Dornbusch, Gross, & Carlsmith, 1985). How might such differences account for variation in the social-developmental experiences of sexual-minority youth, among whom the experience of early or late sexual maturation is accompanied by an inevitable realization of one's nonnormative sexual status?

One advantage of attending to such sources of diversity within sexual-minority youth is that it will provide developmental and clinical psychologists with novel and important information on whether specific contextual and individual difference dimensions operate similarly or differently across different subgroups of adolescents to shape their development and mental health. Thus, just as research on ethnic-minority populations can provide critical correctives to psychological and sociological theory by highlighting where mainstream models succeed or fail tests of generalizability, the same is true for research on sexual-minority populations.

## Problem #4: How Do We Know Why Sexual-Minority Status Matters?

### Assuming the Worst and the Most Obvious

Just as researchers have historically paid too little attention to factors other than sexual-minority status

that might account for differences between heterosexual and lesbian/gay/bisexual youths, they have also paid too little attention to testing for the specific processes and mechanisms through which sexual-minority status creates such differences. In many cases, these processes and mechanisms are simply assumed to be the most salient, and usually dire, aspects of sexual-minority experience: self-hatred and stress stemming from social isolation (Martin & Hetrick, 1988; Remafedi, 1987; Savin-Williams, 1994), family conflict or rejection (Anderson, 1987; Anhalt & Morris, 1998; Savin-Williams, 1998b), peer harassment (D'Augelli, 1989; Halderman, 2000; Herek, Gillis, Cogan, & Glunt, 1997; Rivers, 2000), and physical violence (D'Augelli, 1992; Herek et al., 1997).

The studies cited here all provide evidence that these experiences do, in fact, produce considerable stress for sexual-minority adolescents and that such "gay-related" stress can impair adjustment (DiPlacido, 1998; Rotheram-Borus, Hunter, & Rosario, 1994). However, although gay-related stress might be the most salient mechanism through which sexual-minority status influences adolescent development, it is not necessarily the most predominant or important. Evidence suggests that the average sexual-minority youth spends as much time ruminating about normative adolescent concerns such as love and romance as about gay-specific stressors such as hate crimes or familial rejection (see, e.g., D'Augelli, 1991). Yet the prevalence and clinical-developmental consequences of normative adolescent experiences such as romantic break-ups, routine conflicts with friends, and career worries have received practically no systematic attention (Diamond et al., 1999). In contrast, there has been extensive research on more dire but less prevalent problems such as suicidality (see Savin-Williams & Ream, this issue). This is not to say that suicidality and other serious psychosocial problems among sexual-minority youth are not critically important. However, to the extent that investigation of such issues crowds out investigation of more mundane adolescent experiences, it not only creates overly negative characterizations of the "typical" sexual-minority adolescent, but also risks misspecifying the full range of processes and mechanisms through which a youth's sexual-minority status influences his or her development and mental health.

## Examples From Extant Research

To illustrate these points, consider one recent study that found that sexual-minority youths report having smaller social networks than heterosexual youths (Diamond & Dubé, 2002). One might plausibly hypothesize that such differences reflect the greater social rejection of sexual-minority youths; alternatively, one might consider that sexual-minority youths have smaller social networks because they are more selective about choosing and maintaining peer relationships, as a safeguard against potential rejection. These different mechanisms obviously have notably different implications for interpreting small versus large social networks as "risk factors" for low social support and hence compromised well-being among sexual-minority youth.

To provide another example, the study cited previously also found that young sexual-minority male—but not female—youths had disproportionately high numbers of other-sex peers in their friendship networks. As with the question of social network size, there are a number of different mechanisms through which such differences might have come about. For example, one possibility is that sexual-minority male youths' preferences for female friends reflect broad-based gender atypicality in interests. If this is the case, then one should find a significant association between a youth's gender atypicality and the gender distribution of his or her friendship network, regardless of his or her sexual-minority status. Alternatively, a sexual-minority male youth's high proportions of other-sex friends may stem from the fact that female friends are typically judged as having more advanced empathic and support-provision skills than male friends during the adolescent years (Buhrke & Fuqua, 1987; George, Carroll, Kersnick, & Calderon, 1998). Additionally, women tend to be less homophobic than men and less likely to harass sexual minorities (D'Augelli & Rose, 1990; Herek, 1988). Thus, young sexual-minority male youths may view young women as more willing and able to offer them the social support that they need. Alternatively, they may be disproportionately selected as friends by female versus male youths. Youths that are openly identified, or identifiable, as sexual minorities may find that male peers shy away from them to avoid suspicion of their own sexual orientation—one would expect this to be more of a problem for the friendships of male rather than female sexual-minority youths given that contemporary American society more strongly associates male–male friendship intimacy with same-sex sexuality than female–female friendship intimacy.

Testing process-oriented hypotheses such as these not only provides for a more sophisticated understanding of sexual-minority youths, but also yields important information about basic developmental processes that can directly enrich understanding of—and clinical practice with—heterosexual youths. In many ways, sexual-minority youths represent extreme cases of the types of developmental challenges that confront all youths: self-doubt and identity questioning, popularity versus rejection, strained family relationships, ambivalence and uncertainty regarding romantic relationships, and so on. By examining the specific reasons for which some of these issues are amplified, dampened, or otherwise transformed for sexual-minority youths, clinical and developmental psychologists can gain im-

495

DIAMOND

portant insights into how normative adolescent developmental trajectories are shaped by each youth's unique intrapsychic and environmental profile.

## Conclusion

Whether one views the historical split between mainstream and sexual-minority adolescent research as innocuous or detrimental depends on how one conceptualizes the goal of sexual-minority research. If the goal is simply to understand and document the unique experiences and concerns of this historically invisible population, then there seems little harm in conducting such investigations entirely independently of mainstream adolescent research. In fact, one might argue that such a specialized approach may actually be preferable, as it would guard against inappropriate extrapolation of heterosexual models to sexual minorities and would encourage instead the formulation, testing, and clinical application of developmental models based on the specific experiences of sexual minorities. Of course, as noted earlier, this strategy makes a fundamental assumption that sexual-minority and heterosexual youths are more different than they are alike, an assumption that can neither be confirmed nor disproved with the data currently available.

If one recasts the goal of sexual-minority research to include the broader aim of revealing and explaining the multiple ways in which same-sex and other-sex sexuality interact to shape youths' trajectories of psychological, social, cognitive, and emotional development, then the bifurcated approach is obviously insufficient. Rather, we should seek to constantly compare insights gained in each population to fit and refit models of adolescent experience. This approach can yield important new insights and can enhance clinical interventions on a range of topics, such as stigma and labeling; peer support and peer victimization; continuity and discontinuity in developmental processes; boundaries between friendship and romance; influences of, and interactions between, each partner's sex on adolescent relationships; the relative importance of friends and family in providing social support; and the role of religious faith in psychosocial development. These are just a few of the many potential examples.

The past 20 years of research on lesbian/gay/bisexual-identified youth have undoubtedly made critical contributions to the field of developmental and clinical child-adolescent psychology by bringing this historically invisible population widespread attention and highlighting their unique developmental challenges. With this foundation of knowledge, the field is now prepared for deeper and more systematic investigations into the role of same-sex and other-sex feelings and experiences in shaping the development of all adolescents, regardless of their underlying sexual orientation

or their self-described sexual identity. These aims can be made possible only when mainstream adolescent researchers and those who specialize in sexual-minority development appreciate the value of one another's findings, theories, literatures, and methods and seek an integrated approach to studying heterosexual and sexual-minority youth that can dramatically advance our understanding of both.

## References

Anderson, D. (1987). Family and peer relations of gay adolescents. *Adolescent Psychiatry, 14,* 162–178.

Anhalt, K., & Morris, T. L. (1998). Developmental and adjustment issues of gay, lesbian, and bisexual adolescents: A review of the empirical literature. *Clinical Child and Family Psychology Review, 1,* 215–230.

Bailey, J. M., & Pillard, R. C. (1995). Genetics of human sexual orientation. *Annual Review of Sex Research, 6,* 126–150.

Bancroft, J. (1990). Commentary: Biological contributions to sexual orientation. In D. P. McWhirter, S. A. Sanders, & J. M. Reinisch (Eds.), *Homosexuality/heterosexuality: Concepts of sexual orientation* (pp. 101–111). New York: Oxford University Press.

Baumeister, R. F. (2000). Gender differences in erotic plasticity: The female sex drive as socially flexible and responsive. *Psychological Bulletin, 126,* 247–374.

Broderick, P. C. (1998). Early adolescent gender differences in the use of ruminative and distracting coping strategies. *Journal of Early Adolescence, 18,* 173–191.

Bronstein, P., Fitzgerald, M., Briones, M., & Pieniadz, J. (1993). Family emotional expressiveness as a predictor of early adolescent social and psychological adjustment. *Journal of Early Adolescence, 13,* 448–471.

Brooks-Gunn, J., & Reiter, E. (1990). The role of pubertal processes. In S. S. Feldman & G. E. Elliott (Eds.), *At the threshold: The developing adolescent* (pp. 16–23). Cambridge, MA: Harvard University Press.

Brown, B. B. (1999). "You're going out with *who*?" Peer group influences on adolescent romantic relationships. In W. Furman, C. Feiring, & B. B. Brown (Eds.), *Contemporary perspectives on adolescent romantic relationships* (pp. 291–329). New York: Cambridge University Press.

Buhrke, R. A., & Fuqua, D. R. (1987). Sex differences in same- and cross-sex supportive relationships. *Sex Roles, 17,* 339–352.

Carballo-Diéguez, A., & Dolezal, C. (1994). Contrasting types of Puerto Rican men who have sex with men (MSM). *Journal of Psychology and Human Sexuality, 6,* 41–67

Caspi, A. (1995). Puberty and the gender organization of schools: How biology and social context shape the adolescent experience. In L. J. Crockett & A. C. Crouter (Eds.), *Pathways through adolescence: Individual development in relation to social context* (pp. 57–74). Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Cass, V. (1990). The implications of homosexual identity formation for the Kinsey model and scale of sexual preference. In D. P. McWhirter, S. A. Sanders, & J. M. Reinisch (Eds.), *Homosexuality/heterosexuality: Concepts of sexual orientation* (pp. 239–266). New York: Oxford University Press.

Chan, C. S. (1992). Cultural considerations in counseling Asian American lesbians and gay men. In S. H. Dworkin & F. J. Gutierrez (Eds.), *Counseling gay men and lesbians: Journey to the end of the rainbow* (pp. 115–124). Alexandria, VA: American Association for Counseling and Development.

Cohen, K. M., & Savin-Williams, R. C. (1996). Developmental perspectives on coming out to self and others. In R. C. Savin-Wil-

NEW PARADIGMS FOR RESEARCH

liams & K. M. Cohen (Eds.), *The lives of lesbians, gays, and bisexuals: Children to adults* (pp. 113–151). Fort Worth, TX: Harcourt Brace.

Collins, P. H. (1990). Homophobia and Black lesbians. In P. H. Collins (Ed.), *Black feminist thought: Knowledge, consciousness, and the politics of empowerment* (pp. 192–196). New York: Routledge, Chapman, & Hall.

Collins, W. A., & Sroufe, L. A. (1999). Capacity for intimate relationships: A developmental construction. In W. Furman, C. Feiring, & B. B. Brown (Eds.), *Contemporary perspectives on adolescent romantic relationships* (pp. 125–147). New York: Cambridge University Press.

Conger, R. D., Cui, M., Bryant, C. M., & Elder, G. H., Jr. (2000). Competence in early adult romantic relationships: A developmental perspective on family influences. *Journal of Personality and Social Psychology, 79,* 224–237.

Cooper, M. L., Shaver, P. R., & Collins, N. L. (1998). Attachment styles, emotion regulation, and adjustment in adolescence. *Journal of Personality and Social Psychology, 74,* 1380–1397.

D'Augelli, A. R. (1989). Lesbian's and gay men's experiences of discrimination and harassment in a university community. *American Journal of Community Psychology, 17,* 317–321.

D'Augelli, A. R. (1991). Gay men in college: Identity processes and adaptations. *Journal of College Student Development, 32,* 140–146.

D'Augelli, A. R. (1992). Lesbian and gay male undergraduates' experiences of harassment and fear on campus. *Journal of Interpersonal Violence, 7,* 383–395.

D'Augelli, A. R., & Rose, M. L. (1990). Homophobia in a university community: Attitudes and experiences of heterosexual freshmen. *Journal of College Student Development, 31,* 484–491.

Diamond, L. M. (1998). Development of sexual orientation among adolescent and young adult women. *Developmental Psychology, 34,* 1085–1095.

Diamond, L. M. (2000). Sexual identity, attractions, and behavior among young sexual-minority women over a two-year period. *Developmental Psychology, 36,* 241–250.

Diamond, L. M. (2003). Was it a phase? Young women's relinquishment of lesbian/bisexual identities over a 5-year period. *Journal of Personality and Social Psychology, 84,* 352–364.

Diamond, L. M. (in press). What we got wrong about sexual identity development: Unexpected findings from a longitudinal study of young women. In A. Omoto & H. Kurtzman (Eds.), *Recent research on sexual orientation.* Washington, DC: American Psychological Association Press.

Diamond, L. M., & Dubé, E. M. (1998, June). *What's sexual orientation got to do with it? Intimacy and attachment in the romantic relationships of sexual-minority and heterosexual youth.* Paper presented at the International Network on Personal Relationships, Norman, OK.

Diamond, L. M., & Dubé, E. M. (2002). Friendship and attachment among heterosexual and sexual-minority youths: Does the gender of your friend matter? *Journal of Youth and Adolescence, 31,* 155–166.

Diamond, L. M., & Savin-Williams, R. C. (2000). Explaining diversity in the development of same-sex sexuality among young women. *Journal of Social Issues, 56,* 297–313.

Diamond, L. M., Savin-Williams, R. C., & Dubé, E. M. (1999). Sex, dating, passionate friendships, and romance: Intimate peer relations among lesbian, gay, and bisexual adolescents. In W. Furman, C. Feiring, & B. B. Brown (Eds.), *Contemporary perspectives on adolescent romantic relationships* (pp. 175–210). New York: Cambridge University Press.

DiPlacido, J. (1998). Minority stress among lesbians, gay men, and bisexuals: A consequence of heterosexism, homophobia, and stigmatization. In G. M. Herek (Ed.), *Stigma and sexual orientation: Understanding prejudice against lesbians, gay men, and bisexuals* (pp. 138–159). Thousand Oaks, CA: Sage.

Dubé, E. M., & Savin-Williams, R. C. (1999). Sexual identity development among ethnic sexual-minority male youths. *Developmental Psychology, 35,* 1389–1398.

Duncan, P., Ritter, P., Dornbusch, S., Gross, R., & Carlsmith, J. (1985). The effects of pubertal timing on body image, school behavior, and deviance. *Journal of Youth and Adolescence, 14,* 227–236.

Espín, O. M. (1987). Issues of identity in the psychology of Latina lesbians. In Boston Lesbian Psychologies Collective (Ed.), *Lesbian psychologies: Explorations and challenges* (pp. 35–51). Urbana: University of Illinois Press.

Espín, O. M. (1997). Crossing borders and boundaries: The life narratives of immigrant lesbians. In B. Greene (Ed.), *Ethnic and cultural diversity among lesbians and gay men* (pp. 191–215). Thousand Oaks, CA: Sage.

Florsheim, P. (Ed.). (2003). *Adolescent romantic relations and sexual behavior: Theory, research, and practical implications.* Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

French, S. A., Story, M., Remafedi, G., Resnick, M. D., & Blum, R. W. (1996). Sexual orientation and prevalence of body dissatisfaction and eating disordered behaviors: A population-based study of adolescents. *International Journal of Eating Disorders, 19,* 119–126.

Furman, W., Feiring, C., & Brown, B. B. (Eds.). (1999). *Contemporary perspectives on adolescent romantic relationships.* New York: Cambridge University Press.

Furman, W., & Wehner, E. A. (1994). Romantic views: Toward a theory of adolescent romantic relationships. In R. Montemayor, G. R. Adams, & T. P. Gullotta (Eds.), *Personal relationships during adolescence* (pp. 168–195). Thousand Oaks, CA: Sage.

Furman, W., & Wehner, E. A. (1997). Adolescent romantic relationships: A developmental perspective. In S. Shulman & W. A. Collins (Eds.), *Romantic relationships in adolescence: Developmental perspectives* (pp. 21–36). San Francisco: Jossey-Bass.

Garnets, L. D., & Kimmel, D. C. (1991). Lesbian and gay male dimensions in the psychological study of human diversity. In J. Goodchild (Ed.), *Psychological perspectives on human diversity in America* (pp. 137–192). Washington, DC: American Psychological Association.

Garofalo, R., Wolf, R. C., Wissow, L. S., Woods, E. R., & Goodman, E. (1999). Sexual orientation and risk of suicide attempts among a representative sample of youth. *Archives of Pediatrics and Adolescent Medicine, 153,* 487–493.

George, D., Carroll, P., Kersnick, R., & Calderon, K. (1998). Gender-related patterns of helping among friends. *Psychology of Women Quarterly, 22,* 685–704.

Golden, C. (1987). Diversity and variability in women's sexual identities. In Boston Lesbian Psychologies Collective (Ed.), *Lesbian psychologies: Explorations and challenges* (pp. 19–34). Urbana: University of Illinois Press.

Golden, C. (1994). Our politics and choices: The feminist movement and sexual orientation. In B. Greene & G. M. Herek (Eds.), *Lesbian and gay psychology: Theory, research, and clinical applications* (pp. 54–70). Thousand Oaks, CA: Sage.

Golden, C. (1996). What's in a name? Sexual self-identification among women. In R. C. Savin-Williams & K. M. Cohen (Eds.), *The lives of lesbians, gays, and bisexuals: Children to adults* (pp. 229–249). Fort Worth, TX: Harcourt Brace.

Goldfried, M. R. (2001). Integrating gay, lesbian, and bisexual issues into mainstream psychology. *American Psychologist, 56,* 977–988.

Grossman, A. H., & Kerner, M. S. (1998). Support networks of gay male and lesbian youth. *Journal of Gay, Lesbian, and Bisexual Identity, 3,* 27–46.

Haldeman, D. C. (2000). Gender atypical youth: Clinical and social issues. *School Psychology Review, 29,* 192–200.

497

Herek, G. M. (1988). Heterosexuals' attitudes toward lesbians and gay men: Correlates and gender differences. *Journal of Sex Research, 25,* 451–477.

Herek, G. M., Gillis, J. R., Cogan, J. C., & Glunt, E. K. (1997). Hate crime victimization among lesbian, gay, and bisexual adults. *Journal of Interpersonal Violence, 12,* 195–215.

Hidalgo, H. (1984). The Puerto Rican lesbian in the United States. In T. Darty & S. Potter (Eds.), *Women identified women* (pp. 105–150). Palo Alto, CA: Mayfield.

Hoffman, M. A., & Levy-Shiff, R. (1994). Coping and locus of control: Cross-generational transmission between mothers and adolescents. *Journal of Early Adolescence, 14,* 391–405.

Hollander, G. (2000). Questioning youths: Challenges to working with youths forming identities. *School Psychology Review, 29,* 173–179.

Hunter, J., Dolezal, C., Baer, J., & Yu, C. (2000, October). *Interactions addressing high-risk sexual and drug behaviors among GLBT Youth.* Paper presented at the American Academy of Child and Adolescent Psychiatry, New York.

Icard, L. (1986). Black gay men and conflicting social identities: Sexual orientation versus racial identity. *Journal of Social Work and Human Sexuality, 4,* 83–93.

Larson, R., Csikszentmihalyi, M., & Graef, R. (1980). Mood variability and the psychosocial adjustment of adolescents. *Journal of Youth and Adolescence, 9,* 469–490.

Larson, R. W., Clore, G. L., & Wood, G. A. (1999). The emotions of romantic relationships: Do they wreak havoc on adolescents? In W. Furman, C. Feiring, & B. B. Brown (Eds.), *Contemporary perspectives on adolescent romantic relationships* (pp. 19–49). New York: Cambridge University Press.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, J. (1994). *The social organization of sexuality: Sexual practices in the United States.* Chicago: University of Chicago Press.

Lee, C. (2002). The impact of belonging to a high school gay/straight alliance. *High School Journal, 85,* 13–26.

Losel, F. (1994). Some high-risk adolescents do not develop conduct problems: A study of protective factors. *International Journal of Behavioral Development, 17,* 753–777.

Martin, A. D., & Hetrick, E. S. (1988). The stigmatization of the gay and lesbian adolescent. *Journal of Homosexuality, 15,* 163–183.

Mays, V. M., Cochran, S. D., & Rhue, S. (1993). The impact of perceived discrimination on the intimate relationships of black lesbians. *Journal of Homosexuality, 25,* 1–14.

McWhirter, D. P., Sanders, S. A., & Reinisch, J. M. (Eds.). (1990). *Homosexuality/heterosexuality: Concepts of sexual orientation.* New York: Oxford University Press.

Nesmith, A. A., Burton, D. L., & Cosgrove, T. J. (1999). Gay, lesbian, and bisexual youth and young adults: Social support in their own words. *Journal of Homosexuality, 37,* 95–108.

Remafedi, G. (1987). Adolescent homosexuality: Psychosocial and medical implications. *Pediatrics, 79,* 331–337.

Richardson, D. (1987). Recent challenges to traditional assumptions about homosexuality: Some implications for practice. *Journal of Homosexuality, 13,* 1–12.

Rivers, I. (2000). Social exclusion, absenteeism and sexual minority youth. *Support for Learning, 15,* 13–18.

Rotheram-Borus, M. J., Hunter, J., & Rosario, M. (1994). Suicidal behavior and gay-related stress among gay and bisexual male adolescents. *Journal of Adolescent Research, 9,* 498–508.

Russell, S. T., & Consolacion, T. B. (2003). This issue: Adolescent romance and emotional health in the United States: Beyond binaries. *Journal of Clinical Child and Adolescent Psychology, 32,* 499–508.

Russell, S., & Joyner, K. (2001). Adolescent sexual orientation and suicide risk: Evidence from a national study. *American Journal of Public Health, 91,* 1276–1281.

Russell, S. T., Seif, H., & Truong, N. L. (2001). School outcomes of sexual minority youth in the United States: Evidence from a national study. *Journal of Adolescence, 24,* 111–127.

Rust, P. (1992). The politics of sexual identity: Sexual attraction and behavior among lesbian and bisexual women. *Social Problems, 39,* 366–386.

Savin-Williams, R. C. (1994). Verbal and physical abuse as stressors in the lives of lesbian, gay male, and bisexual youths: Associations with school problems, running away, substance abuse, prostitution, and suicide. *Journal of Consulting and Clinical Psychology, 62,* 261–269.

Savin-Williams, R. C. (1996a). Dating and romantic relationships among gay, lesbian, and bisexual youths. In R. C. Savin-Williams & K. M. Cohen (Eds.), *The lives of lesbians, gays, and bisexuals: Children to adults* (pp. 166–180). Fort Worth, TX: Harcourt Brace.

Savin-Williams, R. C. (1996b). Memories of childhood and early adolescent sexual feelings among gay and bisexual boys: A narrative approach. In R. C. Savin-Williams & K. M. Cohen (Eds.), *The lives of lesbians, gays, and bisexuals: Children to adults* (pp. 94–109). Fort Worth, TX: Harcourt Brace.

Savin-Williams, R. C. (1998a). *"... And then I became gay": Young men's stories.* New York: Routledge.

Savin-Williams, R. C. (1998b). Lesbian, gay and bisexual youths' relationships with their parents. In C. Patterson & A. R. D'Augelli (Eds.), *Lesbian, gay, and bisexual identities in families: Psychological perspectives* (pp. 75–98). New York: Oxford University Press.

Savin-Williams, R. C. (1998c). The disclosure to families of same-sex attractions by lesbian, gay, and bisexual youths. *Journal of Research on Adolescence, 8,* 49–68.

Savin-Williams, R. C. (in press). *"... And then I kissed her": Young women's stories.* New York: Routledge.

Savin-Williams, R. C., & Diamond, L. M. (2000). Sexual identity trajectories among sexual-minority youths: Gender comparisons. *Archives of Sexual Behavior, 29,* 419–440.

Savin-Williams, R. C., & Ream, G. L. (2003). This issue: Suicide attempts among sexual-minority male youth. *Journal of Clinical Child and Adolescent Psychology, 32,* 509–522.

Serovich, J. M., Skeen, P., Walters, L. H., & Robinson, B. E. (1993). In-law relationships when a child is homosexual. *Journal of Homosexuality, 26,* 57–76.

Stokes, J. P., Miller, R. L., & Mundhenk, R. (1998). Toward an understanding of behaviourally bisexual men: The influence of context and culture. *Canadian Journal of Human Sexuality, 7,* 101–113.

Underwood, M. K., Kupersmidt, J. B., & Coie, J. D. (1996). Childhood peer sociometric status and aggression as predictors of adolescent childbearing. *Journal of Research On Adolescence, 6,* 201–223.

Weinberg, M. S., Williams, C. J., & Pryor, D. W. (1994). *Dual attraction: Understanding bisexuality.* New York: Oxford University Press.

Wilson, K. G., Stelzer, J., Bergman, J. N., & Kral, M. J. (1995). Problem solving, stress, and coping in adolescent suicide attempts. *Suicide and Life Threatening Behavior, 25,* 241–252.

Wright, L. R., Gonzalez, C., Werner, J. N., Laughner, S. T., & Wallace, M. (1998). Indiana Youth Access Project—A model for responding to the HIV risk behaviors of gay, lesbian, and bisexual youth in the heartland. *Journal of Adolescent Health, 23,* 83–95.

*Received October 1, 2002*
*Accepted May 1, 2003*

Copyright of Journal of Clinical Child & Adolescent Psychology is the property of
Lawrence Erlbaum Associates and its content may not be copied or emailed to
multiple sites or posted to a listserv without the copyright holder's express written
permission. However, users may print, download, or email articles for individual use.

# Tab 2

*Journal of Social Issues, Vol. 56, No. 2, 2000, pp. 297–313*

# Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women

**Lisa M. Diamond***
*University of Utah*

**Ritch C. Savin-Williams**
*Cornell University*

*This article summarizes findings from two ongoing studies charting the development of 167 adolescent and young adult sexual-minority women. Results document considerable variation in the quality, relative distribution, and context of women's same-sex and other-sex attractions. Furthermore, contrary to conventional wisdom, the timing of a woman's first same-sex attractions is not systematically related to subsequent features of sexual identity development. Rather, the quality and context of a woman's early attractions and behavior is more important. We argue that variability in sexual-minority and heterosexual women's development is best explained by interactions between personal characteristics and environmental contexts, and we urge future studies of the sexual-minority life course to include women with same-sex attractions that do not identify as lesbian or bisexual.*

Models of sexual identity development typically posit a sequence of feelings, experiences, and events through which individuals progressively realize, understand, and accept a nonheterosexual (or *sexual-minority*) identity. Because most of these "coming-out" models are based on men, they portray as normative a sequence of feelings and experiences that may be entirely foreign to a sexual-minority woman: early "precursors" such as gender atypicality or feelings of differentness, late childhood and early adolescent same-sex attractions, lack of

*Correspondence concerning this article should be addressed to Lisa M. Diamond, Department of Psychology, University of Utah, 390 South 1530 East, Room 502, Salt Lake City, UT, 84112-0251 [e-mail: diamond@psych.utah.edu].

© 2000 The Society for the Psychological Study of Social Issues

sexual interest in the other sex, subsequent same-sex experimentation, and finally adolescent self-labeling as lesbian, gay, or bisexual.

In fact, the developmental trajectories of most sexual-minority women violate this "master narrative" in at least one way. Some sexual-minority women have no childhood or adolescent recollections of same-sex attractions (Kitzinger & Wilkinson, 1995), but assert that their same-sex attractions were triggered in adulthood by exposure to lesbian, gay, or bisexual ideas or individuals (Golden, 1996) or the formation of an unusually intense emotional attachment to one particular woman (Cassingham & O'Neil, 1999; Kitzinger & Wilkinson, 1995; Shuster, 1987). Others report abrupt changes in their sexual attractions over time (Weinberg, Williams, & Pryor, 1994).

Such cases run counter to the conventional view of sexual orientation as a stable, early-appearing trait. Yet these cases have typically been considered few in number and exceptional in nature—unwanted noise in the "data" of normative sexual identity development. The results of our intensive investigations of adolescent and young adult sexual-minority women directly challenge this view (Diamond, 1998, 2000a, 2000b; Diamond & Dubé, 2000; Savin-Williams, in press; Savin-Williams & Diamond, in press). Our findings lead us to propose that variability in the emergence and expression of female same-sex desire during the life course is normative rather than exceptional. In other words, the cases noted above are *not* noise in the data; rather, they are the data with potentially the most to tell us about female sexual development.

In this article we review major findings from our ongoing program of research, integrate them with existing knowledge on female sexuality, and articulate a conceptual approach to the study of female same-sex sexuality that aims to explain, and not simply describe, the diverse developmental trajectories we have observed. Our goal is not to replace a single model of development with an ever-increasing number of ideosyncratic models but to highlight the conditions and processes that *produce* multiple developmental trajectories. Toward this end, our main points are as follows:

1. Because of the prevalence of nonexclusivity and fluidity in women's attractions, there is considerable variation in the quality and relative distribution of women's same-sex and other-sex attractions as well as the context in which these attractions are experienced.

2. The timing of a woman's first same-sex attractions does not systematically predict their quality or exclusivity, nor does it predict the stability of her sexual identity.

3. Variability in both sexual-minority and heterosexual women's sexual development is best explained by interactions between personal characteristics and environmental contexts.

Although we here emphasize women's development, the approach we advocate would also enhance research on men's sexual development (Savin-Williams, 1998). Yet we believe it holds particular promise for research on women given the prevalence of nonexclusivity and fluidity in women's attractions (Baumeister, 2000), as well as the documented tendency for social and environmental factors to exert stronger influences on female than male sexual behavior (Udry, Talbert, & Morris, 1986).

## Sample and Methods

We here review findings from two independent, ongoing studies (for clarity, Study A and Study B). Study A is a longitudinal study of the sexual attractions, behaviors, and identities of 89 sexual-minority and 11 heterosexual women who were first interviewed in 1995 when they were between the ages of 16 and 23 (Diamond, 1998). These women were reinterviewed 2 years later in 1997 (Diamond, 2000a, 2000b) and are currently undergoing a third round of interviews. This is the first prospective study of female sexual-minority youth ever undertaken and therefore offers a unique opportunity to observe the long-term course of sexual identity development. Study B is an interview study of the childhood and adolescent experiences of 78 female and 86 male sexual minorities between the ages of 17 and 25 (Savin-Williams, 1998, in press; Savin-Willaims & Diamond, in press). Because this study uses a standardized, qualitative interview protocol, it permits systematic examination of the quality and context of sexual identity milestones and not just their timing.

Participants for both projects were recruited from similar sites: lesbian/gay/bisexual community events and youth support groups in central New York, college classes on gender and sexuality, campus social and political organizations, and Internet list-serves (for more detail, see publications cited above). This wide-ranging recruitment strategy was undertaken to ensure diversity in women's histories of same-sex attractions and behaviors and to recruit women who decline to identify as lesbian or bisexual but acknowledge same-sex attractions. Of the participants in Study A, 34% identified as lesbian, 26% as bisexual, 20% as "unlabeled" or "questioning" (collectively denoted *unlabeled*), and 10% as heterosexual (heterosexual participants were recruited on the basis of having consciously reflected on their sexual identity at some point in time and thus cannot be considered representative of most heterosexual women). Of the female participants in Study B, 38% identified as lesbian, 42% as bisexual, and 20% as unlabeled. Both samples overrepresent highly educated, middle-class White women; about 25% of the women were working-class and 20% were women of color. A primary goal for the ongoing expansion of both studies involves recruitment of greater numbers of ethnic-minority and working-class women.

The interview questions for both studies were modeled on those represented in existing survey and interview data on sexual identity development (Golden, 1996; Rust, 1992, 1993; Savin-Williams, 1998; Weinberg et al., 1994). Topics included childhood experiences such as gender atypicality and feelings of differentness, early sexual and emotional attractions, sexual and romantic relationship history, and antecedents and processes of sexual questioning (for more details, see publications cited above).

### Will the Real Sexual Minorities Please Stand Up?

*Studying Bisexual and Unlabeled Women*

Both studies include notable proportions of bisexual and unlabeled women, who have been traditionally underrepresented in research on sexual minorities. In fact, many researchers intentionally exclude such individuals from their samples because they are difficult to categorize. As a journal reviewer for one of our recent manuscripts queried, "How can you be sure of their true sexual orientation? It would make for a cleaner study if you took them out."

The implicit assumption is that openly identified lesbians are the most prototypical group of sexual-minority women and therefore the most valid basis for generalizations about the development of same-sex sexuality. Yet this assumption is questionable. Data from a random, representative sample of American men and women (Laumann, Gagnon, Michael & Michaels, 1994) showed that 84% of women with same-sex attractions or behavior identify as heterosexual. Given that research on female sexual minorities has focused exclusively on openly identified lesbian/bisexual women, it appears that our current understanding of the female sexual-minority life course is based on the smallest, least representative subset of this population. In our view, any explanation of female sexual development that does not account for the full range of sexual-minority women is no explanation at all. For this reason, we begin with a discussion of two phenomena that critically influence variability in women's developmental trajectories: nonexclusivity and fluidity in women's attractions.

*Nonexclusivity*

Contrary to conventional wisdom, exclusive same-sex attractions are the exception rather than the norm among sexual-minority women. Laumann et al. (1994) found that 4.4% of American women reported experiencing same-sex attractions, and 94% of these women were also attracted to men. In fact, nearly two thirds were *predominantly* attracted to men. Similarly, two thirds of the lesbian women in Study A reported experiencing periodic attractions to men. The prevalence of nonexclusivity in sexual-minority women's attractions suggests that

other-sex attractions and relationships remain an ever-present possibility for most sexual-minority women, a fact that creates multiple opportunities for discontinuity and inconsistency in the female sexual-minority life course. For example, nearly one fourth of lesbians in Study A listed a high school boyfriend as one of the strongest attractions they had ever experienced, yet many of these women reported that they no longer experienced other-sex attractions (Diamond, 1998). An altogether different subset of lesbians (again, approximately one fourth) pursued other-sex sexual contact between the first and second interviews (Diamond, 1998, 2000b).

Such experiences may explain why so many women in Study A changed identity labels over time. Contrary to the notion that most sexual minorities undergo a one-time discovery of their true identities, 50% of the respondents had changed their identity label more than once since first relinquishing their heterosexual identity (Diamond, 2000b). Rust (1993) ably identified nonexclusive attractions as a key factor in such transitions. She argued that women with nonexclusive attractions may comfortably adopt a lesbian *or* bisexual identity, depending on such factors as the relative intensity of their attractions, perceived prospects for same-sex and other-sex relationships, and their social network. When one of these factors or its importance changes, identity may change as well. It is possible that by the time women in Study A reach late adulthood, a majority will have reconsidered or changed their sexual-minority identity in the process of navigating the multiple possibilities engendered by nonexclusive attractions.

What about heterosexual women? If most sexual-minority women retain a capacity for other-sex attractions, do most heterosexual women retain a capacity for same-sex attractions? A reliable answer to this question is elusive, given the stigma that prevents heterosexual women from readily acknowledging same-sex attractions, yet Laumann et al. (1994) found that 7.3% of heterosexually identified women admitted experiencing same-sex attractions or behavior. As they noted, sporadic same-sex attractions and fantasies among heterosexuals may never culminate in same-sex behavior or identity change. Yet in order to interpret their developmental significance, *both* same-sex and other-sex attractions, fantasies, and behaviors should be routinely assessed in studies of female sexual development.

### Sexual Fluidity

One of the most significant challenges to traditional notions of sexual orientation is posed by heterosexual women who report experiencing sexual desire (sometimes culminating in sexual contact) for one and only one woman, typically an extremely close friend. Such stories are often greeted with a wink and a knowing smile, implying a tacit understanding that there is, of course, no such thing as *one* same-sex attraction. However, the experiences of several heterosexual women interviewed for Study A suggest that unusually intense emotional bonds sometimes spill over into authentic, albeit temporary, same-sex sexual desire.

We attribute this phenomenon to *sexual fluidity*, defined as a capacity for situation dependence in some women's erotic responses. The notion that female sexuality is more situation dependent than male sexuality has been noted by many researchers (Dixon, 1985; Kitzinger & Wilkinson, 1995; Pillard, 1990; Shuster, 1987; Weinberg et al., 1994) and has recently been the subject of an extensive review and theoretical treatment by Baumeister (2000). However, notions of fluidity have not been systematically integrated into models of female sexual identity development, perhaps because sexual fluidity is thought to pose a de facto challenge to any systematic developmental model of same-sex sexuality. However, this is not the case: Fluid sexual responsiveness is not the same as random sexual responsiveness. Across a wide variety of cultures and historical periods, the situations that trigger unexpected same-sex eroticism among ostensibly heterosexual women are remarkably similar, allowing for some speculation regarding the underlying mechanisms, limiting parameters, and even evolutionary bases of sexual fluidity (Baumeister, 2000; Diamond, 2000c).

One of the most common triggers for sexual fluidity is an intense, emotionally intimate relationship. For example, an unlabeled participant in Study A was interviewed shortly after becoming sexually involved with her best friend: "We've known each other since we were twelve and we've always been really affectionate, but last Tuesday it just sort of kept going.... Right now I only have these feelings for her, and I don't know if that'll change. I don't know if I'm a lesbian. I just know I want to be with her, forever." One might be tempted to characterize this woman as a budding lesbian who was not quite ready to embrace her true identity. Two years later, however, she reported that she and her best friend had gone back to being platonic friends. Neither one ever experienced attractions for other women, nor could they recall prior "repressed" same-sex attractions (to their disappointment, actually). Both continue to identify as heterosexual. Similarly, a lesbian in Study A unexpectedly fell in love with a close *male* friend between the first and second interviews, and felt this relationship was "an exception."

In our view, neither one of these women's experiences is fully interpretable without an appreciation for nonexclusivity and fluidity in women's attractions, and we maintain that these phenomena should be integrated into models of *all* women's sexual development. Yet by blurring distinctions among lesbian, bisexual, and heterosexual women, they make it difficult to discern exactly who we have been (and should be) sampling in research on sexuality. How should we distinguish a latent bisexual from a curious heterosexual? At what point in a woman's development can we reliably sort her into one of these categories?

In truth, the answer may be "never." One of the unavoidable implications of nonexclusivity and sexual fluidity is that no heterosexual woman can be unequivocally assured that she will never desire same-sex contact, just as no lesbian woman can be unequivocally assured that she will never desire other-sex contact. Of course, not all women appear equally fluid, and the question of

individual differences in fluidity deserves substantive attention. For now, we argue that it is both logistically impossible and theoretically misguided to study female same-sex sexuality by seeking out "true" sexual minorities and assessing the process by which they came out. The notion of "true" sexual minorities presumes categories where there may be continua, and "coming out" presumes a single out-come where there may be several.

We advocate replacing traditional assessments of identity labels with descriptive data on women's actual feelings and behaviors in different circumstances and replacing the traditional focus on coming out with a focus on *sexual questioning*. The advantage of focusing on sexual questioning is that it shifts attention to the process, rather than the outcome, of sexual development. Unlike coming out, sexual questioning can be initiated by any woman, can be repeated multiple times, and might never culminate with the adoption of a lesbian or bisexual identity. The advantage of focusing on specific experiences of same-sex attractions and behavior rather than identity labels is that it broadens the scope of our investigations to include women who do not subscribe to the set of sexual identity categories defined by (historically male) researchers. This allows us to begin modeling not "lesbian identity development," but *female sexual development*, a process that possibly involves varying degrees of same-sex and other-sex eroticism at different points in the life course.

Although we define the population of sexual minorities fairly broadly, we consider their defining characteristic to be same-sex attractions. Sexual attractions have generally been considered the most reliable indicator of an individual's sexual orientation (Cohen, 1999; Marmor, 1980). Yet our research suggests that accurate models of female sexual development may have to jettison traditional assumptions about when and how same-sex attractions emerge. Specifically, the notion that the timing of a woman's first same-sex attractions predicts the future course of her sexuality requires substantial revision. It is this topic to which we turn next.

### First Same-Sex Attractions: What's Age Got to Do With It?

*I should probably tell you that I'm not one of those people who knew they were gay from when they were very little. I didn't know at all until I was 20! Listen, I'm probably not a very good example of a gay person, and I don't want to mess up your study or anything, so it's okay if you don't want to interview me after all.*

—(21-year-old bisexual)

Perhaps the most common question posed to sexual minorities by friends, family members, and social scientists is, "When were you first attracted to the same sex?" The most common answer, especially among women, is, "When I was

young, although I didn't interpret it that way at the time." Most studies (including our own) find that individuals' earliest recollections of same-sex attractions take place around age 10 (see McClintock & Herdt, 1996, for a review); importantly, this is also the age at which heterosexual children first recall experiencing sexual feelings (Knoth, Boyd, & Singer, 1988) and has been linked to adrenal maturation (McClintock & Herdt, 1996).

Yet rarely are these early feelings interpreted at the time as same-sex attractions, especially among women. The respondents in Study A reported that their first *conscious* same-sex attraction occurred at a mean age of 15, and they did not consider the relevance of these feelings for sexual identity until a mean age of 16. Once the full range of variability is taken into account, some women show disjunctures of 10 to 20 years between their first recollected *experience* and their first recollected *awareness* of same-sex attractions. These gaps are typically attributed to the fact that women receive more ambiguous cues of sexual arousal from their bodies than do men and are not socialized to monitor such cues as rigorously as are men (Baldwin & Baldwin, 1997). Nonetheless, the attractions are presumed to be "in there" all along, and sexual minorities often search their memories for such prescient childhood desires in the process of sexual questioning.

### "Early Onset" and "Late Onset" Subtypes

What if they can't find any? Is it possible that such individuals develop authentic same-sex attractions in adulthood, with no prior warning? This notion runs directly counter to the popular conceptualization of sexual orientation as an early-appearing trait. Perhaps for this reason, women with late-appearing same-sex attractions are often characterized as less essentially or exclusively attracted to the same sex than those with early-appearing same-sex attractions and more likely to question their sexual identities for ideological rather than sexual reasons. This conceptual framework contrasts *born, primary,* or *exclusive* lesbians with *elective, political,* or *bisexual* lesbians (Burch, 1993; Ettore, 1980; Golden, 1996; Ponse, 1978). The underlying presumption is that a woman who recalls being sexually attracted to women from the age of 10 is more essentially, consistently, and exclusively attracted to the same sex than a woman whose first attractions emerged in a Women's Studies class at age 20.

Despite its intuitive appeal, our research finds no support for this view. Study A subdivided sexual-minority women into *primary* and *elective* subgroups to determine whether this distinction fell along lesbian/bisexual lines. The *primary* group contained women who reported a childhood feeling or event that presaged their eventual sexual orientation (prepubertal same-sex attractions, childhood gender atypicality, or "feelings of differentness"), experienced clear-cut same-sex attractions *before* questioning their sexuality, and reported stability in their attractions over time. The *elective* group contained any woman who did not meet these

criteria. As it turned out, there were equal proportions of lesbian, bisexual, and unlabeled women in each group, and there was no link between group membership and a woman's degree of same-sex attractions (Diamond, 1998). Since then, follow-up assessments have established that women in the *primary* group are just as likely to report changes in their sexual attractions or sexual identities over time as women in the *elective* group. One important implication of these findings, which we teased out with follow-up analyses, is that prior inconsistencies do not necessarily foreshadow later inconsistencies, and prior stability does not necessarily foreshadow later stability. Women who reported at the first interview that their attractions had previously changed were not more likely to undergo *subsequent* changes in either their attractions or their sexual identity.

These findings cast doubt not only on the notion of primary/elective subtypes but also on the view that the timing of a woman's same-sex attractions gives us critical information about the nature of her sexual orientation. Study B provides further evidence to this effect: Neither the age of first same-sex attractions nor the recollection of childhood experiences such as gender atypicality was associated with subsequent features of sexual identity development, including the timing of first same-sex sexual contact, the timing of first sexual-minority identification, the sequencing of first sex and first identification, the total length of time of the questioning process, or the selection of a lesbian versus bisexual versus unlabeled identity.

In our minds, these counterintuitive findings spotlight two critical questions. First, what did we think "age of first attractions" had to do with the rest of sexual identity development to begin with? Were we assuming that earlier attractions represented stronger attractions? More exclusive attractions? A more authentic same-sex orientation? A more self-aware individual? These are all plausible and testable hypotheses, but the simple truth is that few studies assessing age of first attractions articulate a theoretical rationale for doing so, relying instead on a collective, implicit intuition that it has *some* developmental relevance.

In our view, this vague notion of developmental relevance needs to be clarified and reconsidered. We think the timing of same-sex attractions *is* relevant but not for the reasons some have thought. Specifically, we believe that it taps general features of sexual development (such as whether the sexual system is "on line" and the availability of various eliciting stimuli) rather than predicting or explaining variation in developmental trajectories. This does not mean that the childhood feelings of heterosexual and sexual-minority women are necessarily identical, only that the comparative *timing* of their same-sex and other-sex attractions may be less informative than their comparative *quality*. Thus, rather than simply assessing the age at which heterosexuals and sexual minorities first experienced same-sex and other-sex attractions, we should assess the experiential context of these attractions, their strength, their physiological and affective correlates, their frequency, and their capacity to motivate behavior.

*Will the Real Same-Sex Attractions Please Stand Up?*

This brings us to a second question: When respondents report "age of first attractions," what are they counting as an attraction? It is implicitly assumed that researchers, study participants, and readers have comparable conceptualizations of sexual attractions and that we all "know them when we feel them." Yet for many of the women in Study A, a significant component of their questioning process involved trying to determine just what qualified as a sexual attraction. As one 16-year-old noted, "When I look at a beautiful woman I'm not sure if I want her or if I want to *be* her." Another young woman was unsure whether she had ever experienced an authentic sexual attraction to *either* sex. Such reports challenge the notion that same-sex and other-sex attractions are unambiguous, easily recognizable experiences.

This becomes particularly clear when one attempts to interpret a sexual-minority woman's most intense same-sex friendships. Nearly half of the young women in Study A (Diamond, 2000a) reported having participated in a platonic same-sex friendship characterized by high levels of emotional passion, devotion, exclusivity, and physical affection. Such relationships typically occurred in early adolescence, often long before sexual questioning, and appeared remarkably similar to the unusually affectionate bonds that have been documented between young women in a variety of cultures and historical periods (Faderman, 1981; Gay, 1985; Sahli, 1979; Smith-Rosenberg, 1975). In most cases, the intense feelings that developed were not considered sexual (Diamond, 2000a; Faderman, 1981).

Should we consider such relationships early manifestations of same-sex attractions? After all, even if women did not experience their feelings as explicitly sexual, it seems plausible that sexual-minority women might unconsciously desire more intense and affectionate same-sex friendships than do heterosexual women and might find such relationships particularly rewarding even when they do not involve explicit sexual interest or activity. At the same time, Faderman (1981) convincingly argued that we are too eager to apply our contemporary cultural notions of same-sex sexuality to such passionate friendships—in many cases, they may be authentically nonsexual attachments.

In truth, the affectional component of sexuality has been drastically undertheorized in studies of both sexual minorities and heterosexuals, creating a notable stumbling block for efforts to understand the uniqueness of women's experiences. How common are passionate, platonic friendships among sexual-minority *and* heterosexual women? To what extent does a young woman's sexual orientation prefigure experiences of emotional bonding? In our view, research on the development of sexual orientation must begin to explore systematically processes of emotional bonding and attachment formation to better understand how these processes shape sexual desires and behaviors. Toward this end, we have begun to

explore associations between the specific quality and context of sexual minorities' first same-sex attractions and their subsequent development.

*Do Quality and Context Matter?*

When asked to describe their first same-sex attraction, interviewees listed a wide range of divergent experiences. Examples included "wanted all the girls to take their clothes off," "fixation on the popular girls in school," "loved to look at pretty women," "moved my cot next to this one girl and wanted to be napping with her," "platonic crushes on girls—wanted to get to know them," "wanted to touch Wonder Woman's breasts," "terribly upset when best friend moved away, couldn't stop crying." The men in Study B, too, listed a wide range of experiences, but their descriptions were more consistently linked to the concrete experience of sexual arousal.

We coded interviewees' descriptions into three basic groups: The *sexual* group included individuals who described this experience as involving explicit sexual thoughts or sexual activity (for example, "wanted to touch Wonder Woman's breasts"). The *emotional* group included individuals who described their attractions as involving only emotional feelings (for example, "terribly upset when best friend moved away"). The *ambiguous* group included individuals who described this experience in terms that were neither explicitly sexual nor emotional (such as "fixation on the popular girls in school"). The following discussion will focus on the sexual and emotional categories, as these were the primary sites for gender differences. The ambiguous category is clearly a fascinating one, but we suspect it houses several meaningful subcategories, and we are holding off on interpreting "ambiguous" attractions until we can tease them apart. Interrater reliability for the existing coding scheme was assessed by calculating Cohen's kappa on a subset of cases ($n = 86$), and this value was .86.

Although nearly two thirds of young men recalled an explicitly sexual context for their first same-sex attraction, just over one third of the young women did so. In contrast, women were five times as likely as young men to recall an exclusively emotional basis for their first same-sex attraction (Savin-Williams & Diamond, in press). Quite frequently these were emotional "crushes" on peers, teachers, or coaches. The quality of a young man's or woman's same-sex attractions was not associated with the age at which those attractions were experienced, or with the age at which he/she first had same-sex sexual contact. Among women, however, the quality of first attractions was associated with the *context* of first same-sex contact. Women who described their first same-sex attractions as exclusively emotional were more likely to have their first same-sex contact within an established same-sex romantic relationship (a pattern characteristic of nearly 70% of the women and only 5% of the men). Furthermore, women who had their first same-sex sexual contact within a relationship were more likely to self-identify as

sexual minorities before or soon after this experience, and they reported shorter absolute latencies between first sex and first self-labeling. To the contrary, the majority of sexual-minority men had their first same-sex sexual contact several years before self-labeling.

We observed that some young women whose first sexual contact took place within a relationship appeared to undergo a compressed version of sexual identity development, moving quickly through self-labeling, first sex, first relationship, and first disclosure during the course of a single, transformative romance. One possibility is that such women are only comfortable acknowledging and acting on sexual feelings when these feelings have an intimate emotional context. Alternatively, they may be disproportionately sensitive to emotional cues, such that sexual attractions achieve greater strength, intensity, and motivational force when they occur in an intimate emotional context. At the present time, we are simply unable to discriminate between such possibilities. We now offer a number of suggestions on how future research might address these questions.

### Individual Differences and Person-Context Interactions

In our review of research on processes of sexual identity development, we are struck by what the extant data do *not* address: individual differences in women's personal characteristics and environmental/situational contexts. By personal characteristics, we mean factors such as personality, attachment style, sexual attitudes and expectations, self-efficacy, self-control, social skills, and even physical attractiveness. By environmental/situational context, we mean factors such as a woman's family relationships (including her degree of involvement in and supervision by the family), friendship and local community ties, ethnic background, social class, access to educational and work opportunities, access to information about sexuality, and opportunities for both same-sex and other-sex friendships and romantic relationships.

Such factors have been exhaustively investigated in studies of *heterosexual* feelings and behaviors during adolescence (see, for example, Feldman, Rosenthal, Brown, & Canning, 1995; Goodson, Evans, & Edmundson, 1997; Udry, 1988), yet have been almost entirely ignored by researchers investigating same-sex sexuality, with the exception of ethnicity and social class. Even when ethnicity and social class are addressed, the unfortunate tendency has been to emphasize group differences at the expense of individual differences.

Our suggestion that researchers pay greater attention to person-context interactions is far from revolutionary: Such interactions have long been a chief concern in developmental psychology. Yet investigations of sexual identity development have been strangely myopic on this front. This may have been justifiable in the earliest phases of research on sexual orientation but is no longer tenable. To understand why women with similar feelings and experiences follow radically different

sexual identity trajectories, we must begin to assess factors *other* than sexual orientation that impinge on their participation in (and subjective experience of) sexually and emotionally intimate relationships.

For example, research on heterosexual adolescents has identified a wide range of environmental factors that reliably influence the age at which an adolescent becomes sexually active, ranging from peers' sexual attitudes and behavior (Udry, 1990) to mothers' coerciveness and love withdrawal (Miller et al., 1997). An adolescent's personal characteristics also play a role, such as independence, restlessness, achievement motivation, aggressiveness, tolerance for deviance, risk taking, and religiosity (R. Jessor, Costa, S. L. Jessor, & Donovan, 1983; S. L. Jessor & R. Jessor, 1974; Udry, Kovenock, Morris, & Vandenberg, 1995). Then there is basic sexual motivation. It is well-known that some individuals are more arousable than others (Bancroft, 1989), have more difficulty recognizing feelings of sexual arousal (Heiman, 1975; Knoth et al., 1988), and are more likely to initiate sexual behavior than others (Cyranowski & Andersen, 1998). These differences are obviously related to social factors (Udry et al., 1986), but they also show associations with individual differences in hormonal status and personality (Andersen & Cyranowski, 1995) and are reliably associated with sexual behavior (Udry, 1990).

How might our interpretation of a "late onset" lesbian change if we discovered that she has a generally low sex drive, is fairly inhibited, and has had the same boyfriend throughout high school? Such a woman might only become aware of same-sex attractions if and when she encounters a situation that makes it extraordinarily easy to do so, such as a Women's Studies class or having a lesbian roommate. She might only *act* on those attractions if the opportunity practically falls in her lap, and this is probably more likely to occur if she is socially and physically attractive, has plenty of female friends, is comfortable with intimacy, and enjoys some degree of privacy. Conversely, a woman with unusually high arousability, low self-restraint, a tendency to approach novel situations, and a history of early heterosexual behavior might begin experimenting with same-sex sexual contact at a fairly early age, even in environments that are less conducive to this behavior. Importantly, the difference between these two women's trajectories might have nothing to do with the quality or exclusivity of their same-sex attractions.

As if this is not complicated enough, we must also consider the fact that sexual arousal and desire are not the only motivations for sexual behavior. Youths also engage in sexual behavior to discharge negative affect, to achieve status, to attain intimacy, to procure companionship, or to experience excitement (Cooper, Shapiro, & Powers, 1998). The long-term implications of same-sex sexual behavior for sexual identity development likely depends on these initial motivations. For example, one interviewee in Study A indicated that although her "gut level" attractions for men were stronger than her attractions for women, she consistently achieved greater levels of emotional intimacy with women than men. Because this

was more important to her, she eventually identified as lesbian. To characterize this woman as "in denial" of her bisexual orientation would be not only dismissive but wrong. Yet in order to make sense of her identity development, we must move beyond models of sexual orientation that assume clean, stable matches between attractions, behavior, and identity toward models that acknowledge the multiple factors shaping *all* women's experiences and interpretations of same-sex and other-sex desires and relationships.

### Conclusion

The incredible variability in the developmental trajectories of sexual minorities, especially sexual-minority women, has received little systematic attention. Instead, researchers have focused disproportionately on discerning whether milestones such as "age of first same-sex attractions" predict the adult course of sexual orientation. The findings from our research suggest that this approach may be of limited usefulness. The quality, timing, and interpretation of same-sex *and* other-sex erotic responses (and their manifestation in sexual behavior) are multiply determined phenomena. This is anything but a new argument (Kinsey, Pomeroy, & Martin, 1948), but it seems to have been forgotten in the rush to describe and explain the unique experiences of gay, lesbian, and bisexual men and women. As a result, researchers commonly treat sexual minorities as a homogeneous class of people whose differences from heterosexuals (owing to their sexual orientation) outweigh differences among themselves.

This reification of sexual identity categories has long been the subject of criticism, particularly by feminist theorists who argue that the very notion of essential, traitlike sexual predispositions is a historically specific social construction (Kitzinger, 1987; Rust, 1993). An early blow against sexual categorization was struck by Rich (1980), who argued in a now-classic article that *all* women occupy a "lesbian continuum" ranging from passionate, platonic same-sex friendships to explicit same-sex sexual affairs. Rich's notion of a lesbian continuum has been most influential as an ideological vision, yet our research demonstrates that it is also an empirical reality with substantive implications for understanding the course of female sexual development.

For this reason, we argue that future research on sexual minorities should undertake a large-scale shift from classifying individuals into sexual identity categories to describing the full range of men's and women's same-sex and other-sex desires, affections, and behaviors. This requires more complex and labor-intensive research strategies, yet there is no alternative. Our failure to systematically study the development of individuals who challenge our traditional notions of same-sex and other-sex sexuality is, at a basic level, unscientific. Asking *all* adolescents about the quality and context of their same-sex and other-sex sexuality, and questioning our own assumptions about what experiences do and do

not "count" as developmentally relevant, is a necessary first step toward building models that both describe *and* explain diversity in human sexuality.

## References

Andersen, B L., & Cyranowski, J M (1995) Women's sexuality Behaviors, responses and individual differences *Journal of Consulting and Clinical Psychology, 63,* 891–906

Baldwin, J D., & Baldwin, J I (1997) Gender differences in sexual interest *Archives of Sexual Behavior, 26,* 181–210

Bancroft, J H (1989) Sexual desire and the brain *Sexual and Marital Therapy, 3,* 11–27

Baumeister, R F (2000) Gender differences in erotic plasticity The female sex drive as socially flexible and responsive *Psychological Review, 126,* 347–374

Brown, L (1995) Lesbian identities Concepts and issues In A R D'Augelli & C Patterson (Eds ), *Lesbian, gay, and bisexual identities over the lifespan* (pp 3–23) New York Oxford University Press

Burch, B (1993) *On intimate terms The psychology of difference in lesbian relationships* Chicago University of Illinois Press

Cassingham, B J , & O'Neil, S M (1999) *And then I met this woman* WA Freeland, Soaring Eagle Publishing

Cohen, K M (1999) *The biology of male sexual orientation Relationship among homoeroticism, childhood sex-atypical behavior, handedness, and spatial ability* Unpublished manuscript, University of Detroit-Mercy, Detroit, MI

Cooper, M L , Shapiro, C M , & Powers, A M (1998) Motivations for sex and risky sexual behavior among adolescents and young adults A functional perspective *Journal of Personality & Social Psychology, 75,* 1528–1558

Cyranowski, J M , & Andersen, B L (1998) Schemas, sexuality, and romantic attachment *Journal of Personality and Social Psychology. 74,* 1364–1379

Diamond, L M (1998) Development of sexual orientation among adolescent and young women *Developmental Psychology, 34,* 1085–1095

Diamond, L M (2000a) Passionate friendships among adolescent sexual-minority women *Journal of Research on Adolescence. 10,* 191–209

Diamond, L M (2000b) Sexual identity, attractions, and behavior among young sexual-minority women over a two-year period *Developmental Psychology, 36,* 241–250

Diamond, L M (2000c, March) *Variability in same-gender sexuality A model emphasizing evolved processes underlying human mating* Paper presented at the annual meeting of the Society for Research on Adolescence, Chicago, IL.

Diamond, L M , & Dubé, E M (2000) *Friendship and attachment among heterosexual and sexual-minority youths Does the gender of your friend matter?* Manuscript under review

Dixon, J K (1985) Sexuality and relationship changes in married females following the commencement of bisexual activity *Journal of Homosexuality, 11,* 115–133

Ettore, E M (1980) *Lesbians, women, and society,* London Routledge

Faderman, L (1981) *Surpassing the love of men* New York William Morrow

Feldman, S S , Rosenthal, D R , Brown, N L , & Canning, R D (1995) Predicting sexual experience in adolescent boys from peer rejection and acceptance during childhood *Journal of Research on Adolescence, 5,* 387–411

Gay, J (1985) "Mummies and babies" and friends and lovers in Lesotho *Journal of Homosexuality, 11,* 97–116

Golden, C (1996) What's in a name? Sexual self-identification among women In R C Savin-Williams & K M Cohen (Eds ), *The lives of lesbians, gays, and bisexuals Children to adults* (pp 229–249) Fort Worth, TX Harcourt Brace

Goodson, P , Evans, A , & Edmundson, E (1997) Female adolescents and onset of sexual intercourse A theory-based review of research from 1984 to 1994 *Journal of Adolescent Health, 21,* 147–156

Herman, J R (1975) The physiology of erotica Women's sexual arousal *Psychology Today, 8,* 90–94

312                                                                                                    Diamond and Savin-Williams

Jessor, R , Costa, F , Jessor, L , & Donovan, J E (1983) Time of first intercourse A prospective study
    Journal of Personality and Social Psychology, 44, 608–626
Jessor, S L , & Jessor, R (1974) Transition from virginity to nonvirginity among youth A social-
    psychological study over time Developmental Psychology, 11, 473–484
Kinsey, A C , Pomeroy, W B , & Martin, C E (1948) Sexual behavior in the human male Philadel-
    phia W B Saunders
Kitzinger, C (1987) The social construction of lesbianism London Sage
Kitzinger, C , & Wilkinson, S (1995) Transitions from heterosexuality to lesbianism The discursive
    production of lesbian identities Developmental Psychology, 31, 95–104
Knoth, R , Boyd, K , & Singer, B (1988) Empirical tests of sexual selection theory Predictions of sex
    differences in onset, intensity, and time course of sexual arousal Journal of Sex Research, 24,
    73–89
Laumann, E O , Gagnon, J H , Michael, R T , & Michaels, F (1994) The social organization of
    sexuality Sexual practices in the United States Chicago University of Chicago Press
Marmor, J (1980) Homosexual behavior A modern reappraisal New York Basic Books
McClintock, M K , & Herdt, G (1996) Rethinking puberty The development of sexual attraction
    Current Directions in Psychological Science, 5, 178–183
Miller, B C , Norton, M C , Curtis, T , Hill, E J , Schvaneveldt, P , & Young, M H (1997) The timing
    of sexual intercourse among adolescents—Family, peer and other antecedents Youth & Society,
    29, 54–83
Pillard, R C (1990) The Kinsey Scale Is it familial? In D P McWhirter, S A Sanders, & J M
    Reinisch (Eds ), Homosexuality/heterosexuality Concepts of sexual orientation (pp 88–100)
    New York Oxford University Press
Ponse, B (1978) Identities in the lesbian world The social construction of self Westport, CT
    Greenwood Press
Rich, A (1980) Compulsory heterosexuality and lesbian existence Signs, 5, 631–660
Rust, P (1992) The politics of sexual identity Sexual attraction and behavior among lesbian and
    bisexual women Social Problems, 39, 366–386
Rust, P (1993) Coming out in the age of social constructionism Sexual identity formation among
    lesbians and bisexual women Gender and Society, 7, 50–77
Sahli, N (1979) Smashing Women's relationships before the fall Chrysalis, 8, 17–27
Savin-Williams, R C (1998) "      And then I became gay" Young men's stories New York
    Routledge
Savin-Williams, R C (in press) "      And then I kissed her" Young women's stories New York
    Routledge
Savin-Williams, R C , & Diamond, L M (in press) Sexual identity trajectories among sexual-minority
    youths Gender comparisons Archives of Sexual Behavior
Shuster, R (1987) Sexuality as a continuum The bisexual identity In Boston Lesbian Psychologies
    Collective (Ed ), Lesbian psychologies (pp 56–71) Urbana, IL University of Illinois Press
Smith-Rosenberg, C (1975) The female world of love and ritual Relations between women in
    nineteenth century America Signs, 1, 1–29
Udry, J R (1988) Biological predispositions and social control in adolescent sexual behavior Ameri-
    can Sociological Review, 53, 709–722
Udry, J R (1990) Hormonal and social determinants of adolescent sexual initiation In J Bancroft &
    J M Reinisch (Eds ), Adolescence and puberty (pp 70–87) New York Oxford University
    Press
Udry, J R , Kovenock, J , Morris, N M , & Vandenberg, B J (1995) Childhood precursors of age at
    first intercourse for females Archives of Sexual Behavior, 24, 329–337
Udry, J R , Talbert, L M , & Morris, N M (1986) Biosocial foundations for adolescent female sexual-
    ity Demography, 23, 217–230
Weinberg, M S , Williams, C J , & Pryor, D W (1994) Dual attraction Understanding bisexuality
    New York Oxford University Press

LISA M  DIAMOND is Assistant Professor of Psychology and Women's Studies
at the University of Utah. She received her doctorate in Human Development from

Cornell University. Diamond's research focuses on adolescent and young adult social and sexual development. She has written extensively on female sexual identity development and is conducting the first long-term, prospective study of sexual identity transitions among sexual-minority women. She also investigates how peer attachment relationships (particularly best friendships and romantic relationships) help adolescents and adults regulate negative emotions and physiological stress and whether romantic relationships are uniquely beneficial. She has been particularly interested in the phenomenon of "passionate friendships" among young women.

RITCH C. SAVIN-WILLIAMS is Professor of Clinical and Developmental Psychology and Director of Graduate Studies in the Department of Human Development at Cornell University. Savin-Williams has written six books on adolescent development. His latest, published by APA Press, *"Mom, Dad, I'm Gay": Stories, Research, Advice*, details the coming-out process of sexual-minority youths. It follows *"...And Then I Became Gay": Young Men's Stories* (Routledge,1998) and (coedited with Kenneth M. Cohen) *The Lives of Lesbians, Gays, and Bisexuals: Children to Adults* (Harcourt Brace, 1996). Savin-Williams is currently writing about the experiences of growing up female with same-sex attractions, suicide attempts among sexual-minority youths, and other aspects of gay youths. He is also a licensed clinical psychologist with a private practice specializing in identity, relationship, and family issues among young adults and has served as an expert witness on same-sex marriage, adoption, and Boy Scout court cases.

# Tab 3



**PERGAMON**

Social Science & Medicine 56 (2003) 1607–1615



SOCIAL
SCIENCE
&
MEDICINE
www.elsevier.com/locate/socscimed

# Same-sex attraction in a birth cohort: prevalence and persistence in early adulthood

Nigel Dickson*, Charlotte Paul, Peter Herbison

*Department of Preventive and Social Medicine, University of Otago Medical School, P.O. Box 913, Dunedin, New Zealand*

## Abstract

There is a continuing debate about the importance of social versus biological factors in the expression of same-sex attraction. Investigation of prevalence, continuities, and changes over time among young adults growing up in a country with a relatively accepting climate to homosexuality is likely to illuminate this debate. Analyses were therefore undertaken of self-reported same-sex attraction at age 21 and 26, in a cohort of about 1000 people born in 1972/3 in one New Zealand city. Participants were also asked about same-sex behaviour and attitudes to same-sex relationships. By age 26, 10.7% of men and 24.5% of women reported being attracted to their own sex at some time. This dropped to 5.6% of men and 16.4% of women who reported some current same-sex attraction. Current attraction predominantly to their own sex or equally to both sexes (major attraction) was reported by 1.6% of men and 2.1% of women. Occasional same-sex attraction, but not major attraction, was more common among the most educated. Between age 21 and 26, slightly more men moved away from an exclusive heterosexual attraction (1.9% of all men) than moved towards it (1.0%), while for women, many more moved away (9.5%) than towards (1.3%) exclusive heterosexual attraction. These findings show that much same-sex attraction is not exclusive and is unstable in early adulthood, especially among women. The proportion of women reporting some same-sex attraction in New Zealand is high compared both to men, and to women in the UK and US. These observations, along with the variation with education, are consistent with a large role for the social environment in the acknowledgement of same-sex attraction. The smaller group with major same-sex attraction, which changed less over time, and did not differ by education, is consistent with a basic biological dimension to sexual attraction. Overall these findings argue against any single explanation for homosexual attraction.
© 2002 Elsevier Science Ltd. All rights reserved.

*Keywords:* Same-sex attraction; Homosexuality; Longitudinal study; New Zealand

## Introduction

The wave of studies over the last 15 years of the prevalence of sexual behaviour and attitudes in populations began in response to the HIV epidemic. In New Zealand such studies have been used to predict and monitor the course of the HIV epidemic among population samples and gay men, and to evaluate preventive methods (Paul et al., 1995; Worth, Saxton, Hughes, Reid, & Segedin, 1997). The focus of such

studies has not been on the causes of sexual preferences or behaviours, but on their health implications. Other threats to health among gay men and lesbians have been the subject of increasing attention (Northridge, 2001). There is growing evidence that homosexual young people are more vulnerable to suicidal behaviour, which may relate to social pressures against homosexuality and lack of self-acceptance (Fergusson, Horwood, & Beautrais, 1999). Victimization has also been related to social hostility to homosexuality (Russell, Franz, & Driscoll, 2001). The Institute of Medicine (IOM) report on lesbian health (IOM, 1999) has highlighted the importance of characterizing the health needs of this population. This called for prospective, longitudinal studies to increase understanding of lesbian development and its

*Corresponding author. Tel.: +64-3-479-7211; fax: +64-3-479-7298.

*E-mail address:* ndickson@gandalf.otago.ac.nz (N. Dickson).

0277-9536/03/$ - see front matter © 2002 Elsevier Science Ltd. All rights reserved.
PII: S 0 2 7 7 - 9 5 3 6 ( 0 2 ) 0 0 1 6 1 - 2

1608                    *N. Dickson et al. / Social Science & Medicine 56 (2003) 1607–1615*

implications for defining and measuring lesbian sexual orientation. We hope to contribute to this understanding, for both lesbians and gay men.

Investigations of the development of homosexuality have tended to focus on adults with an established homosexual identity reporting their earlier experiences. This tells us little about those who have transient same-sex attraction and experience at young ages. National surveys of sexual behaviour such as that in the United Kingdom reported by Johnson, Wadsworth, Wellings, and Field (1994) have shown that there are major differences in prevalence between reports of current and lifetime homosexual experiences, suggesting that such experiences are episodic or passing events for many people, especially during adolescence. The very few longitudinal studies have mainly followed groups identified by some same-sex behaviour or attraction, so have not been able to assess acquisition of same-sex attraction over time (Diamond, 2000). In addition, recruitment into those studies has been predominantly through gay, bisexual, lesbian and women's studies networks rather than from the general population (Pattatucci & Hamer, 1995).

Information about continuities and changes over time also casts light on theoretical claims about the nature of sexual attraction and orientation. There has been a major debate between essentialists and social constructionists. But, as demonstrated by Stein (1990), in his anthology of essays on both sides of this debate, the two sides have a questionable understanding of each other's views. Instead of taking a position within this controversy, we have set out the theories that influenced the choice of research methods and which we have used in the interpretation of our results. Kinsey, Pomeroy, and Martin (1948), in the first major empirical study of the sexual behaviour of the American male, assumed that sexual orientation was a matter of degree rather than of kind, and framed their questions accordingly. Kinsey believed that "the capacity of an individual to respond erotically to any sort of stimulus... is basic to the species" (Kinsey et al., 1948). We have used his scale, with the modifications made by Johnston et al. (1994). Subsequent empirical research has suggested that this continuum of sexual attraction and behaviour is clearer for lesbians, while for gay men there is more evidence for a bimodal distribution (LeVay, 1996).

In contrast to Kinsey's view, that there is an innate capacity to respond sexually to men or women, those who argue for a genetic basis for sexual orientation generally assume there are distinct categories of orientation and that the prevalence of homosexuality is stable over time. LeVay (1996) states "the only kind of prevalence data that could undermine a purely genetic theory would be the demonstration that homosexuality has rapidly become more common or less common within a single culture".

The main aim of this study was to investigate the prevalence and persistence of sexual attraction and same-sex sexual contact, and attitudes to same-sex relationships, among young adults enrolled in a multi-disciplinary longitudinal study. The association of these with education, as a key measure of the social environment of young people, has also been examined. We have also used this empirical evidence to test theoretical claims about a continuum versus categories of sexual attraction and about the roles of the environment versus biology.

## Methods

The sample was enrolled in the Dunedin Multi-disciplinary Health and Development Study. This longitudinal study of about 1000 children born in Dunedin, New Zealand in 1972–1973, and still living in the region at age 3, has been described by Silva and Stanton (1996). The sample was first followed up at age 3, then seen every two years until age 15, and again at ages 18, 21 and 26, for an extensive medical, psychological and behavioural assessment. Participants generally returned to Dunedin for the assessments at ages 21 and 26, even if overseas.

The questions on sexual behaviour were presented by computer. Most responses were given by indicating the desired response from a list of options. The opportunity was given to skip every question. The participants were informed of the strict safeguards for confidentiality. At ages 21 and 26, questions on past and current sexual attraction based on the 1990 British National Survey of Sexual Attitudes and Lifestyles were asked ("What best describes who you have ever felt [these days feel] sexually attracted to?"), with six Kinsey-style options being offered (Johnson et al., 1994). At age 26, men were asked "Have you ever had sexual contact with another man (or men)? By sexual contact we mean oral, anal or any other form of sex", and women "Have you ever had sexual contact with another woman (or women)? By sexual contact we mean oral, vaginal or any other form of sex". Sexual intercourse between men and women was defined as penile–vaginal sex. Both men and women at age 26 were asked their opinion about sex between men and women using the same question as in the British study ("What is your general opinion about sex between two men/women?"). The highest educational qualification was recorded at age 26. Those who had obtained a non-university qualification after leaving school were classified as having a "vocational" qualification.

To assess the representativeness of the sample, information on the highest school qualification of people normally resident in New Zealand aged 25 and 26 years at the national census in 1996 was obtained. Chi-squared tests for heterogeneity were used for comparison of

N. Dickson et al. / Social Science & Medicine 56 (2003) 1607–1615

1609

proportions. The relationship between same-sex attraction and education was examined using a log-linear model.

## Results

### Sample

Of the 1037 members of the cohort formed at age 3, 1019 were believed to be alive at age 26 in 1998/9. Of these, 39 (3.8%) were either not traceable or refused involvement in the whole study. In addition, 22 (2.2%) who were seen either refused the sexual health section of the assessment or did not compete this for other reasons. The responses of one man have not been included because of gross inconsistencies. In all, 485 men and 473 women, respectively, 92.4% and 95.8% of men and women in the surviving cohort, answered questions on sexual health. At formation the cohort was slightly socio-economically advantaged compared to New Zealand families as a whole at that time (Silva & Stanton, 1996). This difference persisted, and at the 26-year-old assessment 15.1% of those seen had no school qualification, compared to 25.7% of a comparable age group nationally at the census. Nonetheless, the full range of socioeconomic strata is represented in the cohort.

### Sexual attraction and same-sex contact

Most men and women had only ever been sexually attracted to the opposite sex (Table 1). Fewer men than women had ever been (10.7% versus 24.5%, $p < 0.001$), or were at age 26 (5.6% and 16.4%, $p < 0.001$), attracted at all to their own sex. However, similar proportions of men and women had ever been (1.9% for each), or were currently (1.6% and 2.1%, respectively), attracted either equally to both sexes, or mainly or only to their own. (This combination is subsequently referred to as "major same-sex attraction". Those who were more often attracted to the opposite sex and at least once to their own are referred to as having "occasional same-sex attraction".).

The proportions of men (8.9%) and women (9.7%) who reported ever having had sexual contact with a person of their own sex were similar ($p = 0.74$) (Table 2). Of the 43 men reporting this, 17 (3.5% of all men) had contact within the previous 12 months, of whom four (0.8%) reported currently being in a sexual relationship with another man. The lifetime numbers of male partners reported by the 43 men ranged from 1 to 120.

Table 1
Sexual attraction currently and ever at age 26

| | Currently | | | | Ever | | | |
| | Men ($N = 485$) | | Women ($N = 473$) | | Men ($N = 485$) | | Women ($N = 473$) | |
| | No. | % | No. | % | No. | % | No. | % |
|---|---|---|---|---|---|---|---|---|
| Only to opposite sex, never to same sex | 452 | 93.2 | 387 | 81.9 | 427 | 88.0 | 350 | 74.1 |
| More often to opposite sex at least once to same sex | 19 | 3.9 | 68 | 14.3 | 43 | 8.8 | 107 | 22.6 |
| About equally to both sexes | 1 | 0.2 | 4 | 0.8 | 2 | 0.4 | 4 | 0.8 |
| More often to same sex, at least once to opposite sex | 1 | 0.2 | 2 | 0.4 | 4 | 0.8 | 5 | 1.1 |
| Only to same sex, never to opposite sex | 6 | 1.2 | 4 | 0.8 | 3 | 0.6 | 0 | 0.0 |
| Not attracted to anyone at all | 0 | 0.0 | 1 | 0.2 | 0 | 0.0 | 3 | 0.6 |
| Not answered | 6 | 1.2 | 7 | 1.5[a] | 6 | 1.2 | 4 | 0.8 |

[a] Includes those who were not asked as they had reported no sexual attraction ever.

Table 2
Same-sex sexual contact in previous year and ever at age 26

| | In previous 12 months | | | | Ever | | | |
| | Men ($N = 485$) | | Women ($N = 473$) | | Men ($N = 485$) | | Women ($N = 473$) | |
| | No. | % | No. | % | No. | % | No. | % |
|---|---|---|---|---|---|---|---|---|
| Yes | 17 | 3.5 | 15 | 3.2 | 43 | 8.9 | 46 | 9.7 |
| No | 465 | 95.9 | 456 | 96.4 | 439 | 90.5 | 425 | 89.9 |
| Not answered | 3 | 0.6 | 2 | 0.4 | 3 | 0.6 | 2 | 0.4 |

1610                        *N. Dickson et al. / Social Science & Medicine 56 (2003) 1607–1615*

One partner was reported by 23, between two and four by 15, between five and nine by 2, and 10 or more by 3 men. Anal intercourse ever with another man was reported by 13 (2.7%) of all the men, less than a third of those who reported any same-sex sexual contact, and by eight in the previous 12 months. Of the 46 women who had ever had sexual contact with another woman, 15 (3.2% of all women) had done so within the previous 12 months, of whom four (0.8%) were currently in a sexual relationship with another woman. The lifetime number of female partners reported by these 46 women ranged from 1 to 28. Twenty-seven had had one, 14 between two and four, 2 between five and nine, and 2 had had 10 or more female partners.

Of the eight men who at age 26 reported current major attraction to men, five had had sexual contact, and four had anal intercourse, with a man during the previous year. These behaviours were reported, respectively, by four and two of the 19 men currently reporting occasional attraction to men. Of the 10 women who reported major current attraction to women, eight had sexual contact with a woman in the previous year, whereas this was reported by only four of the 68 women who had occasional attraction to women.

### Opinions of same-sex relationships

Opinions about same-sex relationships were polarized (Table 3). While men and women had similar attitudes about sexual relationships between women, men were much more likely than women to consider sex between men always or mostly wrong (36.3% vs. 22.2% $p = <0.001$). The views of women about homosexual behaviour were similar whether the behaviour involved women or men.

Not surprisingly opinions were more favourable among those who reported same-sex contact or attraction. Of the 17 men who had sexual contact with a man in the past year, none thought sex between men was wrong at all. Of the 15 comparable women, one thought

sex between women was rarely, and one mostly, wrong. Of the 27 men who currently had any attraction to men, again none thought sex between men at all wrong. Of the corresponding 78 women, six thought sex between women was wrong in some circumstances. All of these six women were only occasionally attracted to women, and only one had had sexual contact with another woman in the previous year.

### Attraction and current relationships

Overall 328 (67.6%) of the men were in a sexual relationship with a woman at age 26, among whom 12 (3.7%) had an occasional, but none a major attraction to other men. Of the 157 who were not in a heterosexual relationship, 142 (90.4%) had had sexual intercourse with a woman. Among these 142, seven (4.9%) had occasional, and five (3.5%) a major attraction to other men. Of the 15 men who had not had intercourse with a woman, none reported occasional, and three (20.0%) major attraction to men. Therefore, same-sex attraction was more common among men not in a heterosexual relationship, with one in ten (9.6%) of these having some current same-sex attraction. Of the women, 374 (78.9%) were in a sexual relationship with a man, among whom 55 (11.6%) reported occasional and 4 (0.8%) major attraction to women. Of the 100 who were not in a heterosexual relationship, 90 had had intercourse with a man and of these, 12 (13.3%) reported occasional, and five (5.5%) major attraction to women. Among the 10 women who had never had sexual intercourse with a man, one reported occasional attraction, and one major attraction to women. Overall of the 100 women not in a relationship with a man, one in five (19.0%) had any current attraction to other women.

At age 26, all four men and four women who were currently in a same-sex relationship reported major same-sex attraction. In fact, all of these except one woman reported currently being attracted only to their own sex.

Table 3
Opinions about same-sex sexual relationships reported at age 26

|  | Sex between two men | | Sex between two women | |
|---|---|---|---|---|
|  | Men ($N = 485$) | Women ($N = 473$) | Men ($N = 485$) | Women ($N = 473$) |
| Always wrong | 27.6 | 15.4 | 10.3 | 14.2 |
| Mostly wrong | 8.7 | 6.8 | 6.4 | 6.1 |
| Sometimes wrong | 3.5 | 4.4 | 5.6 | 4.3 |
| Rarely wrong | 3.1 | 3.8 | 6.2 | 4.4 |
| Not wrong at all | 34.6 | 48.8 | 47.4 | 51.2 |
| Depends | 11.8 | 12.3 | 16.3 | 12.5 |
| Do not know | 8.0 | 6.6 | 4.9 | 5.3 |
| Not answered | 2.7 | 1.9 | 2.9 | 2.1 |

*N. Dickson et al. / Social Science & Medicine 56 (2003) 1607–1615*                    1611

*Association of education with sexual attraction, same-sex sexual contact, and attitudes to same-sex relationships*

Those men and women with the highest education were more likely to report currently having any attraction to their own sex (Table 4). For men there was a trend across the range of educational levels, but for women the difference was only apparent at the highest level. However, for both men and women the variation was solely due to variations in the proportion with only occasional same-sex attraction. Whereas for men this trend was statistically significant ($p = 0.002$), it was not for women ($p = 0.14$). There was no difference by education level among those who reported major attraction to their own sex. For same-sex sexual contact there were no significant differences according to education. Opinions about same-sex relationships differed by educational level among both men and women, in a way corresponding to the variation in sexual attraction.

*Sexual attraction at ages 21 and 26*

Overall 451 men and 436 women reported their current sexual attraction at both ages 21 and 26. Among the 448 men reporting any sexual attraction at both ages, similar proportions were in the three categories at

the two assessments (Fig. 1). Between age 21 and 26, slightly more men moved away from an exclusive heterosexual attraction (1.9% of all men) than moved towards it (1.0%). Among the women, more reported attraction only to the opposite sex at age 21 (90.7%) than at age 26 (84.0%), as many more moved away (9.5%) than towards (1.3%) exclusive heterosexual attraction. There had been little change in the proportion of women reporting major attraction to women (1.9% at 21 and 2.1% at 26). Not shown in the figure is that no sexual attraction at age 21 was reported by three men, of whom at age 26, two were attracted only to women, and one occasionally to women. Among women, 13 reported no attraction at age 21, of whom at age 26, 8 were attracted only to men, one occasionally to women, one had a major attraction to women, and three still reported no attraction to either sex.

**Discussion**

The findings show the diversity of sexual attraction. We were able to distinguish two groups having any same-sex attraction. There was a large group with occasional same-sex attraction, which was larger for females than males and largest for those with the most education. There was a smaller group with major

Table 4
Sexual attractions ever, same-sex contact ever and opinions of same-sex relationships between members of own sex by highest qualification

|  | Men[a] | | | | Women[a] | | | |
|---|---|---|---|---|---|---|---|---|
|  | Degree $N = 92$ | Vocational $N = 214$ | School $N = 177$ | Total $N = 485$ | Degree $N = 121$ | Vocational $N = 183$ | School $N = 168$ | Total $N = 473$ |
| *Current sexual attraction* | | | | | | | | |
| Only opposite sex | 89.1 | 92.5 | 96.0 | 93.2 | 78.5 | 83.1 | 82.7 | 81.8 |
| Occasional same sex | 8.7 | 5.2 | 0 | 3.9 | 19.8 | 12.6 | 12.5 | 14.4 |
| Major same sex | 2.2 | 1.4 | 1.7 | 1.6 | 1.7 | 2.7 | 1.8 | 2.1 |
| No one | 0 | 0 | 0 | 0 | 0 | 0 | 0.6 | 0.2 |
| Not answered | 0 | 0.9 | 2.3 | 1.2 | 0 | 1.6 | 2.4 | 1.5 |
| *Same-sex contact in previous 12 months* | | | | | | | | |
| Yes | 3.3 | 4.7 | 2.3 | 3.5 | 1.7 | 4.9 | 2.4 | 3.2 |
| No | 96.7 | 94.4 | 97.1 | 95.9 | 97.5 | 95.1 | 97.0 | 96.4 |
| Not answered | 0 | 0.9 | 0.6 | 0.6 | 0.8 | 0 | 0.6 | 0.4 |
| *Attitude to sexual relationships between members of own sex* | | | | | | | | |
| Always/mostly wrong | 20.7 | 36.0 | 45.2 | 36.3 | 8.2 | 23.0 | 26.2 | 20.3 |
| Sometimes wrong | 4.3 | 3.7 | 2.8 | 3.5 | 4.1 | 4.4 | 4.8 | 4.2 |
| Rarely/not wrong | 54.3 | 36.0 | 31.6 | 37.7 | 74.6 | 48.6 | 48.8 | 55.6 |
| Depends | 14.1 | 12.1 | 9.0 | 11.8 | 9.8 | 18.0 | 8.3 | 12.5 |
| Do not know | 6.5 | 8.9 | 7.9 | 8.0 | 2.5 | 4.4 | 8.3 | 5.3 |
| Not answered | 0.0 | 3.3 | 3.4 | 2.7 | 0.8 | 1.6 | 3.6 | 2.1 |

[a] Two men and one woman who did not provide information on highest qualification.

*N. Dickson et al. / Social Science & Medicine 56 (2003) 1607–1615*



Fig. 1. Persistence and change in current sexual attraction reported at ages 21 and 26.

same-sex attraction, which was of similar size for males and females and did not differ according to education.

The findings also revealed a surprising degree of change over time. Ten percent of men, and nearly a quarter of women, reported same-sex attraction at any time, but this nearly halved for current attraction at age 26. The changes were not just in one direction. The instability was most marked for women, with a greater movement away from exclusively heterosexual attraction from age 21 to 26 than among men.

The strengths of this study are that it is based on a relatively large birth cohort with a very high response rate, and used well-validated instruments (Johnson et al., 1994). Moreover, the use of a computer, with safeguards to protect confidentiality, is likely to improve disclosure as has been shown by Turner et al. (1998). Disclosure may also have been more complete because of the trust in the study built up over many years. Care was taken to distinguish sexual attraction from behaviour, to consider sexual attraction on a continuum, and to avoid the use

of terms such as homosexual or bisexual which require self-identification, which are potentially stigmatizing, and may, as suggested by Johnson et al. (1994) affect response. Because the responses were collected by computer there was a possibility of entry mistakes by the subjects. We investigated this possibility by examining consistency, and one person was excluded for grossly inconsistent responses.

The prevalence of some same-sex attraction for men (5.6%) was not markedly different from that found for similar age groups in the US (18–29 years, 7.4%) (Laumann, Gagnon, Michael, & Michaels, 1994) and the UK (25–34 years, 5.3%) (Johnson et al., 1994). In contrast the prevalence of same-sex attraction among women (16.7%) was much higher than reported for US women (4.4%) and UK women (5.7%). Our survey used identical questions to the UK survey. Ever having same-sex contact was similar in this sample of New Zealand men (8.9%) as for men aged 25–34 years in the US (6.8%) (only contact at age 18 and over) and higher than

in the UK (3.7%). (Michael, Wadsworth, Feinleib, Johnson, Laumann, & Wellings, 1998). But again the differences were more marked for women—9.7% in New Zealand compared to 3.7% and 2.0% of women aged 25 to 34 years in the US and UK, respectively. The US survey by Laumann et al. was conducted in 1992. More recent data from the US General Social Surveys show a significant increase in same-sex contact in the last five years among women aged 18–59 years, from 1.0% on 1991 to 3.3% in 1998 (Butler, 2000). A New Zealand national survey in 1991 also showed a lower prevalence of same-sex contact (Paul et al., 1995) in women aged 18–24 years than we found in this current study.

Three aspects of the results are particularly striking and require explanation. First, the high prevalence among women compared to men of same-sex attraction; second, the greater proportion of women who report same-sex attraction but not contact, compared to men; and third, the higher rates of both same-sex attraction and behaviour among women compared to other comparable countries. These results cannot be explained by the greater disclosure from the computer questionnaire, because they applied to women only. Disclosure may be easier for women than men in New Zealand because of more accepting attitudes to female homosexuality than male (as our results have shown). Conversely, admitting same-sex attraction may be harder for men, so that those who do admit it have stronger attraction, which they are more likely to act on.

The overall higher rate of same-sex attraction and contact for women in New Zealand in relation to other comparable countries, almost certainly represents a recent increase in prevalence. As such it argues strongly against a purely genetic explanation and suggests the environment can have a significant influence. It might be related to social changes which have happened with particular intensity and rapidity in this country. Though New Zealand has a strong feminist tradition: women got the vote early, in 1893, the dominance of women in public life is new and has been remarked on (Guardian Weekly, 2000). In 2001, the Prime Minister, Leader of the Opposition, Attorney General, Governor General-elect and the Chief Justice were all women. It is also a small country, having a population of less than 4 million, which tends to adopt new social trends easily as indicated by the rapid uptake of the oral contraceptive in the 1960s and vasectomy in the 1970s (Pool et al., 1999). Also relevant is that there has been a recent change in the age of sexual initiation of young women compared to men: women now report earlier median age of first intercourse than men (Dickson, Paul, Herbison, & Silva, 1998). Changes that empower women socially and sexually may be important in relaxing the taboos around to whom women will allow themselves to feel attracted. The increases in same-sex sexual partnerships among women in the US (Butler, 2000) in the 1990s have

been attributed more specifically to the equalizing of earning potential of men and women which enable women to consider family structures and sexual partnerships which do not include men. Average hourly earnings of women in New Zealand (Statistics New Zealand, 1997) are now 81% of those of men.

The association of same-sex attraction with education has also been found in the US, although there the association between increasing education and increasing prevalence of same-sex attraction was strongest among women (Laumann et al., 1994). In New Zealand relatively high rates of attraction were seen among women of all educational levels, although this was most common among those with a university education. What is surprising and unexplained in these findings is that the high rates of same-sex attraction in the highly educated were not accompanied by higher rates of sexual contact for the most educated, for either men or women, though the numbers were small. Nevertheless, this lack of association with education and sexual contact was also seen in the US General Social Survey data (Butler, 2000).

Attitudes to homosexual sex were much more tolerant than in either the US or the UK. We found that sex between two men was regarded as "always" or "mostly wrong" by 36.3% of men and 22.2% of women, compared to 62.1% of men and 48.9% of women aged 25–34 years in the UK (Johnson et al., 1994). In the US, 70.7% of men and 66.8% of women in this age group regarded any homosexual sex as always or almost always wrong (Laumann et al., 1994). Tolerance has increased during the 1990s in the US, though the proportion regarding homosexual relations as "always wrong" remained above 50% in 1998 (Butler, 2000).

The differences observed in behaviour, attraction and attitudes compared to the US and UK, raise the possibility that methodological differences may be responsible. Our study had an unusually high response rate and the computer-based questionnaire may have facilitated disclosure. We have already shown higher rates of reported numbers of heterosexual partners in our study at age 18 compared to a national New Zealand survey (Dickson, Paul, & Herbison, 1993). Hence our higher rates may be partly because of greater openness and accuracy. The higher educational attainment of the sample compared to the population of this age as a whole, means that we might also have slightly overestimated the extent of same-sex attraction. Applying our rates for the three educational groups to the distribution in the whole population of a similar age we would expect rates of any current same-sex attraction of 4.3% for men and 15.3% for women (instead of 5.6% and 16.7%).

An accepting climate towards homosexuality has been found to be associated with higher rates of reported homosexual behaviour among European countries

(Sandfort 1998). Nevertheless, as discussed by Catania, Gibson, Chitwood, and Coates (1990), more acceptance may increase reporting as well as occurrence, and it is difficult to disentangle these. New Zealand does have a relatively accepting climate towards homosexuality, demonstrated not only by attitudes reported here but also by openly gay Members of Parliament, and by the annual Gay and Lesbian Hero Parade in Auckland being attended by leading politicians.

Despite the present results suggesting relatively high levels of homosexual behaviour among men (consistent with a relaxed social climate towards homosexuality) we have shown that the epidemic of HIV in New Zealand was one of the first in developed countries to plateau (Sharples, Dickson, Paul, & Skegg, 1996). HIV prevention programmes involving gay men were developed early in the epidemic. One explanation is that a society with more tolerance and less stigma enables the development of effective HIV prevention programmes.

## Conclusions

Much same-sex attraction is non-exclusive and unstable. The large size of this unstable group in New Zealand, compared to other countries, and for women compared to men, and its variation by education, is consistent with a large role for the social environment. Nevertheless, we also noted a smaller group of men and women who reported more major same-sex attraction. Most people in this group reported some same-sex attraction at both age 21 and age 26, and prevalence did not differ by education. This minority may be less influenced in the expression of their sexuality by their social environment—consistent with a basic biological dimension to sexual orientation. Overall these findings argue against any single explanation for homosexual attraction.

## Acknowledgements

This study was part of the Dunedin Multidisciplinary Health and Development Study (DMHDS). We thank Paula Sowerby and Dianne Morrison for monitoring the interviews, and the other staff of the DMHDS who were involved in the collection of the data and other aspects of the study. We also thank the sample members and their families for their long-term involvement in the study. Helpful comments on an early draft of this paper were received from Julie Fitzjohn, Tony Hughes, Rob McGee, Shyamala Nada-Raja, Lianne Parkin, Sarah Romans, Peter Saxton, David Skegg and Keren Skegg. The Health Research Council of New Zealand funded this study and provided salary support for Peter Herbison.

## References

Butler, A. C. (2000). Trends in same-gender sexual partnering, 1988–1998. *The Journal of Sex Research, 37*, 333–343.

Catania, J. A., Gibson, D. R., Chitwood, D. D., & Coates, T. J. (1990). Methodological problems in AIDS behavioural research: Influences on measurement error and participation bias in studies of sexual behaviour. *Psychological Bulletin, 108*, 339–362.

Diamond, L. M. (2000). Sexual identity, attractions, and behaviour among young sexual-minority women over a 2-year period. *Developmental Psychology, 36*, 241–250.

Dickson, N. P., Paul, C., & Herbison, P. (1993). Adolescents, sexual behaviour and implications for an epidemic of HIV/AIDS among the young. *Genitourinary Medicine, 69*, 133–140.

Dickson, N. P., Paul, C., Herbison, P., & Silva, P. (1998). First sexual intercourse: Age, coercion, and later regrets reported by a birth cohort. *British Medical Journal, 316*, 29–33.

Fergusson, D. M., Horwood, L. J., & Beautrais, A. L. (1999). Is sexual orientation related to mental health problems and suicidality in young people? *Archives of General Psychiatry, 56*, 876–880.

Guardian Weekly. (2000). Where women rule. Guardian Weekly, 31 August–6 September.

Institute of Medicine. (1999). *Lesbian health. Current assessment and directions for the future*. Washington, DC: National Academy Press.

Johnson, A. M., Wadsworth, J., Wellings, K., & Field, J. (1994). *Sexual attitudes and lifestyles*. Oxford: Blackwell.

Kinsey, A. C., Pomeroy, W. B., & Martin, C. E. (1948). *Sexual behavior in the human male*. Philadelphia: Saunders.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organisation of sexuality*. Chicago: The University of Chicago Press.

LeVay, S. (1996). *Queer science*. Cambridge, MA: The MIT Press.

Michael, R. T., Wadsworth, J., Feinleib, J., Johnson, A. M., Laumann, E. O., & Wellings, K. (1998). Private sexual behaviour, public opinion, and public health policy related to sexually transmitted disease: A US–British comparison. *American Journal of Public Health, 88*, 749–754.

Northridge, M. E. (2001). Editorial note: Advancing lesbian, gay, bisexual and transgender health. *American Journal of Public Health, 91*, 855–856.

Pattatucci, A. M. L., & Hamer, D. H. (1995). Development and familiarity of sexual orientation in females. *Behavior Genetics, 25*, 407–420.

Paul, C., Dickson, N. P., Davis, P. B., Yee, R. L., Chetwynd, J., & McMillan, N. (1995). Heterosexual behaviour and HIV risk in New Zealand. *Australian Journal of Public Health, 19*, 13–18.

Pool, I., Dickson, J., Dharmalingam, A., Hillcoat-Nelletamby, S., Johnstone, K., & Roberts, H. (1999). *New Zealand's contraceptive revolutions*. Hamilton: Population Studies Centre, University of Waikato.

Russell, S. T., Franz, B. T., & Driscoll, A. K. (2001). Same-sex romantic attraction and experience of violence in adolescence. *American Journal of Public Health, 91*, 903–906.

Sandfort, T. (1998). Homosexual and bisexual behaviour in European countries. In M. Hubert, N. Bajos, & T. Sandfort (Eds.), *Sexual behaviour and HIV/AIDS in Europe*. London, Pennsylvania: UCL Press.

*N. Dickson et al. / Social Science & Medicine 56 (2003) 1607–1615*   1615

Sharples, K. J., Dickson, N. P., Paul, C., & Skegg, D. C. G. (1996). HIV/AIDS in New Zealand: An epidemic in decline? *AIDS, 10*, 1273–1278.

Silva, P. A., & Stanton, W. R. (1996). *From child to adult: the Dunedin multidisciplinary health and development study.* Auckland: Oxford University Press.

Statistics New Zealand. (1997). *New Zealand official year book 1997.* Wellington: Statistics New Zealand.

Turner, C. F., Ku, L., Rogers, S. M., Lindberg, L. D., Pleck, J. H., & Sonenstein, F. L. (1998). Adolescent sexual behaviour, drug use, and violence: Increased reporting with computer survey technology. *Science, 280*, 867–873.

Worth, H., Saxton, P., Hughes, A., Reid, A., & Segedin, R. (1997). Male Call/Waea Mai, Tane Ma. Report one: Methodology and demographic characteristics. Auckland: New Zealand AIDS Foundation.

# Tab 4

# The Role of the Father in Child Development

## Fifth Edition

Edited by

## Michael E. Lamb
University of Cambridge



**WILEY**

John Wiley & Sons, Inc.

This book is printed on acid-free paper. ♾

Copyright © 2010 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 646-8600, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering professional services. If legal, accounting, medical, psychological or any other expert assistance is required, the services of a competent professional person should be sought.

Designations used by companies to distinguish their products are often claimed as trademarks. In all instances where John Wiley & Sons, Inc. is aware of a claim, the product names appear in initial capital or all capital letters. Readers, however, should contact the appropriate companies for more complete information regarding trademarks and registration.

For general information on our other products and services please contact our Customer Care Department within the U.S. at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic books. For more information about Wiley products, visit our website at www.wiley.com.

*Library of Congress Cataloging-in-Publication Data:*
The role of the father in child development/edited by Michael E. Lamb. – 5th ed.
    p cm
  Includes index.
  ISBN 978-0-470-40549-9 (cloth)
  1.  Fathers.  2  Father and child–United States.  3.  Paternal deprivation–United States.
  4.  Single-parent families–United States.  I.  Lamb, Michael E., 1953-
  HQ756.R64 2010
  306.874'2–dc22
                                                             2009041484

Printed in the United States of America
10 9 8 7 6 5 4 3 2 1

# Tab 5

CHAPTER 11

# Gay Fathers

SUSAN GOLOMBOK and FIONA TASKER

LTHOUGH IT HAS always been the case that gay men have had children, it is only in recent years that children have been raised in gay-father families. This has occurred through several routes. First, children of previously married gay men are more likely to live with their father following divorce. Second, more gay men are adopting children both singly and as couples. Third, a small but increasing number of gay men are having children with lesbian women and sharing parenting with them. Finally, as a result of increasing accessibility to assisted reproductive technologies, gay men are beginning to have children through surrogacy arrangements. In their recently published report, the Ethics Committee of the American Society for Reproductive Medicine (2006) concluded that requests for assisted reproduction should be treated without regard for sexual orientation. Consequently, there is likely to be a rise in the number of gay men who become parents through assisted reproductive techniques.

. In spite of these new routes to parenthood, it remains the case that most gay fathers who no longer reside with the mother of their children do not have children living with them. This chapter traces the various ways in which gay men become fathers. We examine the experiences of those who had children in the context of a heterosexual relationship or marriage and those who planned their family after coming out as gay. The consequences for children are also explored, followed by a consideration of the implications of the existing body of research on gay-father families and the limitations of the findings.

## PATHWAYS TO PARENTING

It is difficult to accurately estimate how many gay men are involved in parenting. Given the prejudice that is regularly encountered by lesbians and gay men (homophobia) and mainstream society's assumption of heterosexuality (heterosexism), many individuals are reluctant to disclose their sexual identity. Further, a universally accepted definition of sexual identity remains elusive (Savin-Williams, 2005) or even untenable (Alexander, 1999;

319

Butler, 1990, 1993). Data from the National Health and Social Life Survey have indicated that between 2.7% and 4.9% of U.S. men have had a same-sex relationship (Laumann, Gagnon, Michael, & Michaels, 1994). These data have been used to estimate that between 1% and 12% of children are being raised by a gay or lesbian parent (Perrin, 2002a, b). If we consider only the male same-sex couples who declared an "unmarried partner" in the U.S. census in 2000, then 22% of male same-sex partner households also contained resident children (Simmons & O'Connell, 2003).

More detailed surveys using convenience and snowball sampling through the gay community have indicated that between 8% and 10% of gay men in the United States have parenting responsibilities (Bryant and Demian, 1994; Kaiser Family Foundation, 2001) and, as discussed later, more may be involved in the upbringing of children if broader definitions of parenting are considered.

Changes in the sociohistorical context for gay men have raised the visibility of gay parenthood, and gay fatherhood is less likely to be viewed by either mainstream society or the gay community as the "social enigma" it once was (Barret & Robinson, 2000; Bigner, 1996). Moreover, fathers generally are becoming more acceptable as primary caregivers within mainstream society. The increasing proportion of fathers being awarded custodial responsibility for their children has meant that "motherless" families are less likely to be seen as unusual or to necessarily threaten the "best interests of the child." Greater advocacy of gay fathers within increasingly diverse gay communities has meant that they are more accepted or tolerated by gay men not involved in parenting (Barret & Robinson). Gay parenthood seems more likely to be contemplated by younger cohorts of gay men than ever before. For example, for the 39 young adult gay men in Berkowitz's U.S. study: "The so-called gay lens into the future has shifted from an imagined life of childlessness to a life with new potentialities that include many familial possibilities, some of which involve becoming a parent and some of which do not" (Berkowitz, 2007, p. 245). Stacey (2006) identified a passion-for-parenthood continuum in the interview transcripts of the gay male parents and non-parents in Los Angeles who talked to her about their views on becoming a parent: Of the 50 men interviewed, 22 revealed a passionate commitment to parenting, 26 indicated how situational factors (especially a partner's interest in parenting) influenced their own decision making, while only two could be classed as completely rejecting the idea of parenthood.

Gay men's involvement in parenting arises through various routes in a wide diversity of circumstances. The largest group of gay parents so far researched appear to be those who had children in the context of previous heterosexual relationships and have subsequently identified as gay (Barrett & Tasker, 2001; Dunne, 2001). Both studies were conducted with nationwide samples in the United Kingdom. Most of these men then move out of the marital home, but some continue their relationship with the mother of their child. One common misconception is that gay men who fathered children through previous heterosexual relationships "are not really gay." Some men would no doubt self-identify, or be identified as, bisexual rather than gay in many contexts. Dunne has argued that the sexual and emotional feelings and

relationships narrated by the 50 gay fathers she interviewed were more complex than the identity categories available to them as descriptions (Dunne).

A growing group of gay parents are men who have children after coming out as gay in planned gay-father families. Parenthood may be achieved through adopting or fostering a child, through a surrogacy arrangement, or through a formal or informal agreement to share parenting with a single lesbian mother or a lesbian couple. Surrogacy may appeal to gay men who want a genetic connection with their baby and those who do not wish to share parenting across households (Lev, 2006). However, the financial costs of surrogacy can be prohibitive for many gay men: Not only do they need to pay expenses (and in some cases a fee) to the surrogate mother and sometimes to an egg donor as well, but they also must fund the necessary legal costs to ensure assignment of custody once the child is born.

Gay community surveys, such as the U.S. National Survey of Gay and Lesbian Parents have indicated that a sizeable group of planned gay-father families have been formed through adoptive parenting (Johnson and O'Connor, 2002). Nevertheless, gay men face a long and difficult journey when applying to adopt. A survey of adoption agencies in the United States has suggested that a growing number of agencies will consider lesbian or gay applicants (Brodzinsky, Patterson, & Vaziri, 2002). However, even when agencies are open to applications, studies surveying social workers in the adoption field have suggested that these professionals often hold negative and stereotypical views of gay men (Hicks, 2006), and gay parents have recounted previous instances of discrimination prior to successful adoption, for example, being placed last in the queue for babies, being matched with hard-to-place children, or experiencing "false starts" in the adoption process when a child's birth family member registers an objection (Hicks & McDermott, 1999). In a study conducted in New England, Gianino (2008) concluded that facing discrimination by public agencies can make private adoption agencies seem a more attractive option for gay men who can afford them but may expose them to the possibility of exploitation.

When joint adoption by a same-sex couple is not legal, couples are more likely than they would be elsewhere to conceal their relationship from the adoption agency, placing a strain on their relationship with each other and with the agency (Gianino, 2008). The gay father who is not legally recognized is left in a potentially vulnerable position, being unable to authorize medical or legal decisions for their child. The lack of legal recognition may also expose gay fathers to more subtle forms of prejudice. For example, the gay couples in Gianino's study who were not able to jointly adopt were sometimes quizzed by others as to who was the legal (i.e., the "real") adoptive parent (Gianino).

We can also catch glimpses of gay parenting in child-rearing arrangements with lesbian mothers in multiparental families (Gross, 2006; Stacey, 2006). In many of these cases, a gay father may be the known sperm donor and so be genetically related to the child he parents; or his partner may be the actual donor but the couple have planned fatherhood and both are involved in parenting. Children may be resident only part-time with their gay father(s) or may simply visit their fathers on a regular basis. Anecdotal reports indicate that these arrangements can be satisfying for the gay fathers involved, but if

322  GAY FATHERS

the living arrangements of the lesbian mother(s) change, it may be difficult for the father to claim legal rights (*The Times*, 2008).

Studies of planned lesbian-led families have indicated that in the absence of any continued involvement with a donor father, lesbian mothers often identify a close male friend to be a male role model or play a significant mentoring role in their child's life. Hare and Richards (1993) liken the mentoring role ascribed to these men by the lesbian mothers in their study to that of an older close friend rather than a father. Clarke (2006, 2007) has highlighted the hegemonic tensions involved in claiming gay men as role models. However, systematic research has not yet examined how gay men define their relationship to children in these family arrangements.

Gay men also have planned families with single heterosexual women, for example, with an intermediary organization arranging donor insemination for gay men and single heterosexual women wanting parenthood without intimate partnership (Segal-Engelchin, Erera, & Cwikel, 2005). In these hetero-gay family configurations, the single heterosexual mother and single gay father maintain separate households and the child generally resides with only one parent (usually the mother) but both share parental responsibilities (Segal-Engelchin et al.). The practical arrangements of coparenting between two households may in many ways be similar to those reached in harmonious divorce settlements, but the planned nature of these families may mean that their resemblance to postdivorce households is untainted by previous conflict. Segal-Engelchin and colleagues suggest several reasons why gay men may want to parent in this context, including perhaps wanting to coparent with a woman rather than a man in a quasi-traditional family arrangement, not wanting to be a resident parent, or the relative ease of this route to parenthood compared with the costs and difficulties associated with adoption or surrogacy. However, we do not know how gay men experience parenting in this context, or how the experience of growing up in a hetero-gay family may impact on child development.

## GAY MEN AS PARENTS: CONTEXT AND EXPERIENCE OF PARENTHOOD

Given the diversity in routes to gay parenthood and the variety of family structures formed, the main issue that gay fathers have in common may not be related to parenting per se but to how to best prepare their children to deal with societal institutions, communities, and individuals that rarely affirm gay fathering, frequently ignore it, or sometimes are openly hostile toward it.

Surveys that have assessed heterosexuals' attitudes toward same-sex parenting have found that same-sex parents are rated more poorly than heterosexual parents (Morse, McLaren, & McLachlan, 2007). From other studies, we can see indications of the complexity of responses that gay fathers might encounter from heterosexuals. For example, McLeod, Crawford, & Zechmeister (1999) assessed the attitudes of heterosexual college students toward gay male parenting through comparison of the responses to two vignettes: the first one depicting a boy with a gay couple, the second portraying an identical parenting situation except with a heterosexual couple.



In comparison to the control condition, students rated the child with the gay couple as experiencing significantly higher levels of general distress and, in particular, being more confused about their sexual and gender identity. While the gay fathers in the vignette were rated as being more loving, nurturing, and responsive to their adopted son than was the heterosexual father, this was paradoxically seen to count against the child's well-being because the alleged effeminacy of the gay men was seen as a contravention of the traditional patriarchal concept of fatherhood. In another study where heterosexual students were asked to evaluate vignettes depicting parenting competency, gay male parenting skills were rated most positively and heterosexual female parenting skills most negatively perhaps because low expectations of men's parenting meant greater praise for gay fathers who were seen as active parents (Massey, 2007).

Armesto (2002) has suggested that parenting is inevitably more stressful for gay men than for heterosexual men because gay fathers are a socially stigmatized group. While studies have not systematically examined coming out and psychological adjustment among gay fathers, other research has indicated that whether or not gay men decide to disclose to others, coming out decisions are omnipresent, stressful, and associated with increased risk to mental health (Carragher & Rivers, 2002; Meyer, 2003). Gay fathers additionally fear that disclosure may mean that their child will be stigmatized by association or that they will be rejected by their child (Bigner, 1996).

### Divorced Gay Fathers

At first glance, one enigma of gay parenting is how gay men came to have children within a marital or long-term heterosexual relationship. Findings from earlier and more recent research suggest these gay fathers often married because they had wanted to be a traditional husband or father (Barret & Robinson, 2000; Benson, Silverstein, & Auerbach, 2005; Bigner & Jacobsen, 1989; Bozett, 1981, 1987; Dunne, 2001; Miller, 1979; Wyers, 1987). These retrospective studies have recorded a mixture of motivations underlying fatherhood. Some men felt they had been responding to societal or interpersonal pressure to marry. Others recalled that when they married they did not know what it meant to have a gay identity, thought that a gay identity was incompatible with fatherhood, or could not see a reflection of themselves in the negative stereotypes of gay men they had encountered. Some felt that marriage would change their sexual desires away from men or that having children would emphasize their manhood both to themselves and to others. Others cited more positive personal reasons for matrimony and fatherhood, such as the desire to have children or an affection for their wife.

In Benson et al.'s (2005) qualitative study of 25 gay fathers living in metropolitan areas in the United States who had children while married, some highlighted having children as a catalyst that opened them up emotionally and from which they started to gain a sense of their own sexual identity (Benson et al.). Identifying as gay, however, meant that these fathers faced the challenge of whether and how to integrate their new sense of self within the traditional boundaries of fatherhood. Some fathers in Benson

324   GAY FATHERS

et al.'s study decided not to disclose their sexual identity to their families or
attempt to integrate their sexual identity with fatherhood; prominent reasons
in these men's accounts were protecting their children from any problems
disclosure might bring, feeling obliged to respond to pressure from their wife
(or other family members) not to disclose a gay identity, or not knowing when
to disclose or how to deal with the reactions they imagined their children or
other family members might have (see also Dunne (1987) for reflections on
group therapy with gay fathers around the issues involved in "coming out").
Writing from his psychoanalytic work with homosexual men married to
women, Isay (1998) suggested subconscious reasons connected with early
emotional loss of a psychological relationship with their own mother as the
motivation for some gay men to comply with matrimony and deny their
sexual feelings for other men. Other authors have suggested that some gay or
bisexual men reach an accommodation with their wives allowing for gay
relationships while still remaining married to, residing with, and/or con-
tinuing an emotionally or sexually intimate relationship with her (Dunne,
2001; Matteson, 1987).

For some fathers in Benson et al.'s study, the desire for greater authen-
ticity became the drive for "coming out" and the reason for disclosing to their
families (Benson et al., 2005). Other researchers have suggested that a key
factor in coming out and precipitating the end of a prior heterosexual
relationship was falling in love with a same-sex partner (Miller, 1979). Studies
have not systematically addressed whether having their father come out
as gay in the context of a gay partnership clarifies or compounds children's
ability to come to terms with their father's gay identity. However, children's
acceptance may be complicated by disclosure of HIV infection (Shuster, 1996)
or other family members' objections (Lynch & Murray, 2000). Looking back at
their experiences of disclosing, many gay fathers said that managing family
reactions was generally not as difficult as they had anticipated (Miller).
Nevertheless, one author has argued that emotional distress surrounding
the process of "coming out" may last several years before resolution occurs
(Bigner, 1996).

No studies have yet compared the emotional well-being and parenting of
gay fathers who have come out to their children versus those who have not.
However, uncontrolled and retrospective studies have suggested long-term
benefits for fathers of coming out to one's children (Armesto, 2002). Nearly
half of the fathers in Benson et al.'s study who had come out to their children
regarded it as a transformative experience, increasing openness and honesty
in their relationship with their children, and felt that this was reciprocated by
their children (Benson et al., 2005). These men felt both lucky to be a father
and satisfied with their gay identity: One father summed this up as having
"the best of both worlds" (pp. 15). However, the gay fathers in Benson et al.'s
study had to work hard to create a new social support network for themselves
that both facilitated their parenting and recognized their new gay identity.

Researchers have suggested that some of the gay fathers who had "come
out" to their children had developed a new parenting ideology that separated
fathering from (hetero)sexuality (Benson et al., 2005; Silverstein, Auerbach, &
Levant, 2002). Here, the gay father's parenting identity and sexual identity are

seen as complementary rather than exclusive—sexuality was not important for gay men's parenting; instead, it was the quality of their relationship with their children that mattered.

Entering into a new partnership may be a goal for many previously married gay men who would again like to have the commitment of a long-term relationship initially sought in marriage (Bigner, 1996). While forming new gay relationships postseparation or divorce presents similar challenges to those encountered in heterosexual stepfamilies, the process is more complicated in a new gay stepfather family because family members need to negotiate how "out" they will be as a family group (Lynch & Murray, 2000). In nearly all of the lesbian and gay stepfamilies interviewed by Lynch and Murray, decisions about whether to be out as a family had been a family decision led by the child's level of comfort with being out rather than by the biological parent and his or her new partner, who, for example, may have had to make compromises in openly expressing affection for each other.

A couple of research studies have indicated that successful gay partnerships are associated with positive parenting, although as yet no longitudinal studies have investigated causal linkage. Barrett and Tasker (2001) found that gay fathers with cohabiting partners rated themselves as being more successful than single gay fathers at meeting a variety of emotional, practical, and financial parenting challenges. In another study of 48 gay-father stepfamilies, the level of integration of a gay partner into family life with the children was the factor most associated with positive ratings of family satisfaction as reported by either divorced gay fathers, their partners, or their children (Crosbie-Burnett & Helmbrecht, 1993).

PLANNED GAY-FATHER FAMILIES

Brinamen and Mitchell have proposed a six-stage model describing the transition to parenting delineated from their thematic analyses of interviews with 10 gay men living in the San Francisco Bay area who were parenting a pre-school-age child (Brinamen & Mitchell, 2008). Initially these gay men recalled *abandoning a parent identity* as during their youth they had viewed fatherhood as incompatible with their developing sense of a gay identity. Later on, a growing sense of *comfort in a gay identity* engendered greater confidence in working out their own life goals, which led them to reexamine previously held views of both fatherhood and gay identity. Subsequently, *recognition (of the strength) of gay families* engendered a feeling of confidence in the contribution that families of choice built on strong emotional ties could make in supporting parenthood. In Gianino's study, the eight gay couples who had adopted children saw partnership as the foundation of their parenting and felt that their partnership was in turn strengthened by their experience of parenting together (Gianino, 2008).

Prior to embarking on parenthood, Brinamen and Mitchell (2008) interpose a fourth stage in their model of gay fatherhood: *seeking models and mentors.* Other researchers also have noted that gay fathers have carefully explored the prospect of parenthood by getting to know other gay families with children (these were more likely to be lesbian-led families than families led by gay

men) and by researching the growing literature on nonheterosexual parenting (Gianino, 2008; Schacher, Auerbach, & Silverstein, 2005). Once committed to the idea of parenthood, the gay men in these studies often made major adjustments to their lives, such as moving to a different neighborhood or changing jobs, to find a more conducive environment or access more support in bringing up children. Preparation for parenthood also involved telling others of their plans, and in particular sensitively informing their family of origin and coping with any negative responses. In Brinamen and Mitchell's fifth stage of the transition to parenthood, the gay father is seen as *recognizing the strengths of the gay father* as a parent: valuing what he could offer as a parent through being a gay man, for example, in terms of valuing difference or in being more emotionally available than most heterosexual fathers were seen as being. In the final stage of Brinamen and Mitchell's model, gay fathers are viewed as transitioning into parenthood through *integrating an expanded identity* as gay men and as fathers.

As gay fathers, the men interviewed in various studies have indicated how they have valued drawing upon a variety of sources of social support, not only from their own family of origin, with whom they often felt a deeper connection through parenthood, but also from other types of nontraditional families and new friends made through common parenting experiences with heterosexual couples (Brinamen & Mitchell, 2008; Gianino, 2008; Schacher et al., 2005) Some of the gay couples in Gianino's (2008) study described feeling isolated from mainstream parenting groups and children's services but linked this to their observation that these revolved around mothers, not fathers, as primary caregivers; their experiences as gay fathers were thus different from those of lesbian mothers in this key respect.

Most of the gay fathers studied have reported a positive response from the gay community to the announcement that they were expecting a child but also said that most of their gay friends would not choose to parent and indicated that some friendships had cooled over the years (Brinamen & Mitchell, 2008; Gianino, 2008; Mallon, 2004). In Brinamen and Mitchell's study, gay fathers felt that they had expanded their identity to become more than just a gay man and more than just a father, although this expanded identity was also countered by the feeling that they were set apart from both other gay men and other (heterosexual) fathers. Single gay fathers seem to have been more vulnerable to these feelings of isolation than were men in gay couples (Brinamen & Mitchell). Gay couples also appeared to have an easier time being accepted by heterosexual parents and by mainstream parenting services, perhaps because they fitted a more traditional parenting model (Brinamen & Mitchell). However, parenting as a gay couple may also increase the public visibility of the gay-father family, raising the greater possibility of encountering prejudice and the need for vigilance (Gianino).

In reflecting on the strengths they brought to parenthood, gay fathers have argued that they have been able to be more child centered than most heterosexual fathers could through their greater openness and tolerance of their child's choices (Brinamen & Mitchell, 2008). Bigner (1999) additionally has argued that gay fathers may model androgynous behavior, particularly for their sons, as fathers in motherless families must necessarily incorporate

nurturing roles into their parenting repertoire. The 21 urban American gay fathers interviewed by Schacher et al. (2005) described *degendered parenting* because their roles were not prescribed by gender as they were in the majority of heterosexual couples they knew. The gay fathers described themselves as having a hybrid parenting role, where both they and their partner divided child care duties by preference, aptitude, or equality, rather than splitting into "mother" or "father" roles, thus challenging the dominance embedded in (hetero)patriarchal fatherhood (see also Gianino, 2008; Silverstein et al., 2002).

Schacher et al. (2005) reported that the gay fathers they interviewed described a variety of different examples of heterosexist gender role strain as they experienced double prejudice: first, against nonheterosexual parenting; second, against a man taking on the role of the child's primary caregiver. They sometimes were the recipients of greater critical attention and comment even as they walked their children down the street. Within this context, gay fathers felt the responsibilities of trailblazing and the need to be "super-parents" to counteract cultural stereotypes, although pioneering social change also brought its own satisfactions. Nevertheless, these fathers described experiencing conflict, both internally and with their partner, as they made career compromises in order to look after their children. They sometimes felt personally devalued as a result of these compromises, despite clearly prioritizing children and fatherhood over monetary or career success and feeling immense personal satisfaction in their parenthood.

A further advantage of gay men's parenting may lie in the flexibility of multiparental child-rearing arrangements. There may be one, two, or more parents, some of whom live together in the same household while others live separately, some of whom may share the same ethnic identity while others do not, some of whom may be biologically related to a particular child while others are not. Many of the gay fathers in Schacher et al.'s study (2005) reconceptualized family relationships as being based on love rather than biology, encompassing a wide variety of family constellations.

## CONSEQUENCES FOR CHILD DEVELOPMENT

Studies of children raised by same-sex parents have almost exclusively focused on families headed by lesbian mothers rather than gay fathers. This body of research was initiated in the 1970s and concentrated on women who had become mothers within a heterosexual marriage before making the transition to a lesbian relationship. The findings of the early investigations were strikingly consistent (Golombok, Spencer, & Rutter, 1983; Green, Mandel, Hotvedt, Gray, & Smith, 1986; Hoeffer, 1981; Huggins, 1989; Kirkpatrick, Smith, & Roy, 1981). With respect to psychological well-being, children with lesbian mothers did not show a higher incidence of psychological disorder, or difficulties in peer relationships, than those from heterosexual homes. In addition, there was no evidence of gender identity confusion for any of the children studied, and in terms of gender role behavior, no differences were found between children with lesbian and heterosexual parents for either boys or girls (for reviews, see Falk, 1989; Golombok, 1999; Patterson, 1992, 2002). A longitudinal study of adults who had been raised as children in lesbian-

mother families found that these young men and women continued to function well in adult life (Tasker & Golombok, 1995, 1997). More young people from lesbian-mother families than from heterosexual families had experimented in same-sex relationships, although the large majority identified as heterosexual in adulthood (Golombok & Tasker, 1996).

More recent studies of children born through donor insemination and raised in lesbian-mother families from birth produced similar results. The children were not found to experience difficulties in terms of gender development, peer relationships, or psychological well-being (Bos, 2004; Brewaeys, Ponjaert, Van Hall, & Golombok, 1997; Chan, Raboy, & Patterson, 1998; Flaks, Ficher, Masterpasqua, & Joseph, 1995; Gartrell, 2005; Golombok, Tasker, & Murray, 1997; MacCallum & Golombok, 2004). Findings from general population samples in the United States (Wainright & Patterson, 2006; Wainright, Russell, & Patterson, 2004) and the United Kingdom (Golombok et al., 2003) are also in line with those of earlier investigations in that the children were found to be well adjusted with no differences in sex-typed behavior between the children of lesbian and heterosexual parents for either boys or girls.

### CHILDREN OF GAY FATHERS WHO LIVE WITH THEIR MOTHER

Much less research has been conducted on children with gay fathers, and the few studies that do exist are of children who live with their mother. There are no indications, either from fathers' reports or from the limited number of interviews with the children themselves, that children who live with their mother but remain in contact with their gay father experience emotional or behavioral problems (Barret & Robinson, 1994; Bigner, 1999; Bigner & Jacobsen, 1989; Bozett, 1987; Harris & Turner, 1986; Miller, 1979). However, no systematic evaluations of the self-esteem or psychological adjustment of children of gay fathers have been carried out, and no study has systematically investigated how children respond to the loss of contact with a gay father after divorce (Tasker, 2005). Estimates vary as to how likely children with gay fathers are to experience stigma and relationship problems with peers or adults outside the family. Wyers (1987) reported that 20% of children in his U.S. study were believed by their father to have experienced discrimination due to his sexual orientation. In a survey of 101 gay and bisexual fathers in the United Kingdom by Barrett & Tasker (2001), 37% reported that their children had experienced teasing by other children. In contrast, neither Bozett (1987) nor Miller (1979) recorded many instances of homophobia directed against children of gay fathers in their U.S. samples, although it was thought that the children may have avoided disclosing their father's sexual orientation to those from whom they anticipated a negative response.

A recent investigation has shed light on the experiences of young people with gay fathers from their own perspective based on an analysis of 67 published accounts from children of lesbian and gay parents in the United Kingdom, United States, and New Zealand, one-third of which were from those with a gay father (Fairtlough, 2008). Whereas 37 of the accounts were predominantly positive or neutral, and only three were rated as somewhat negative, 27 were characterized by both positive and negative feelings.

Qualitative analysis of these accounts showed that the problems the young people experienced arose almost entirely from the negative views of others. In addition to negative societal views and institutional discrimination against lesbian and gay people, the adolescents and young adults described instances of homophobic behavior from family members, including parents, as well as from peers. Just as in Tasker and Golombok's (1995, 1997) study of young adults raised in lesbian-mother families, these young people reported benefitting from both parental openness and from having control over when and how their family life was made public. Although the authors did not state whether the pattern of findings differed according to the gender of the same-sex parent, it seems likely that homophobia is just as salient a problem to young people with gay fathers as it is for those with lesbian mothers. In a study of school experiences in Australia, Ray and Gregory (2001) found teasing and bullying to be common. The children were frustrated by peers' lack of understanding about their families and lacked confidence in their teachers' abilities to deal with homophobia.

### CHILDREN WHO LIVE WITH GAY FATHERS

At present, little is known about the psychological development and well-being of the increasing number of children who are being raised by gay fathers, that is, children who live with their gay fathers and have done so from birth or early childhood. These children have generally been adopted by a gay couple or born through assisted reproduction procedures such as surrogacy and egg donation, although some are born within their gay father's marriage to, or relationship with, their mother and reside with their gay father.

Can we assume that the psychological outcomes for children who live with gay fathers will be the same as for children who live with lesbian mothers? Although the concern that children with lesbian mothers would show psychological problems was found to lack empirical support, the circumstances of children raised by gay fathers are more unusual. Not only are these children being raised by same-sex parents, but also it is rare for fathers, whether heterosexual or gay, to be primary caregivers. It is not known what the combined effect of these two factors will be on children's social, emotional, identity, and gender development as they grow up. Whereas studies of other types of nontraditional family suggest that the quality of family relationships is more important for children's psychological well-being than is family structure (Golombok, 2000), the psychological processes that operate in gay-father families may differ from those of other nontraditional family forms.

*Psychological Adjustment.* With respect to children's psychological adjustment, difficulties would not necessarily be predicted unless gay fathers differ from lesbian or heterosexual mothers with respect to the parenting processes that are associated with children's healthy psychological development such as parental warmth, sensitivity, emotional involvement, appropriate discipline, and control (Baumrind, 1989, 1991; Bornstein, 2002; Bowlby, 1969, 1988; Darling & Steinberg, 1993; Maccoby, 1992). The literature on fathering

suggests that fathers are just as capable of parenting as are mothers (Lamb, 1997; Parke, 1996), and that children are just as likely to develop a secure attachment relationship with their father as their mother (van IJzendoorn & De Wolff, 1997). However, relationships between parents and their children do not take place within a social vacuum. The wider social environment can have a marked impact on the quality of family life and can also have a direct effect on children's psychological well-being irrespective of the quality of family relationships. It has been argued that children raised in gay-father families may be exposed to greater prejudice and discrimination than children who grow up in families headed by lesbian mothers and thus may be at greater risk of developing psychological problems. Although both lesbian-mother families and gay-father families deviate from the heterosexual norm, gay-father families possess the additional feature of being headed by men in the absence of women and thus may be more likely to be stigmatized by the outside world. In spite of greater acceptance of nontraditional family structures over recent decades, it is often thought that mothers are more suited to parenting than are fathers.

Adoption and assisted reproduction bring with them additional issues. In heterosexual families, adoption is associated with a greater incidence of emotional and behavioral problems for children, although it is important to stress that difficulties are most likely among those who are adopted later in childhood, especially those who have experienced trauma in their early years (Brodzinsky, Smith, & Brodzinsky, 1998). Assisted reproduction procedures such as surrogacy and egg donation have also been predicted to result in an increased risk of psychological problems for children in heterosexual families due to the absence of a genetic and/or gestational link with the mother. Although the existing empirical evidence does not support this claim (Golombok, Jadva, Lycett, E., Murray, & MacCallum, 2005; Golombok, MacCallum, Murray, Lycett, & Jadva, 2006a; Golombok, Murray, Jadva, MacCallum, & Lycett, 2004a; Golombok et al., 2004b; Golombok et al., 2006b), little is known about children born through surrogacy or egg donation beyond the early years, particularly the consequences of ongoing contact with the egg donor or surrogate mother. Moreover, studies of adoptive families and assisted reproduction families created through gamete donation demonstrate that the quality of communication about the nature of their family, and the circumstances of their birth including their genetic origins, is central to children's psychological well-being and self-esteem (Daniels & Taylor, 1993; Freeman, Jadva, Kramer, & Golombok, 2009; Turner & Coyle, 2000) indicating that, for children with gay fathers, open communication about their origins and their family structure may be of crucial importance. Just as with adopted children (Grotevant & McRoy, 1998) and children conceived by donor insemination (Jadva, Freeman, Kramer, & Golombok, 2009), it appears that parents should talk to children about their nontraditional family at an early age. Children who were told about their gay father when young were reported to be more accepting than those who found out when older (Turner, Scadden, & Harris, 1990).

In the first controlled study of parenting and child development in gay-father families conducted in the United States, Farr and Patterson (2009) compared 29 gay couples with 27 lesbian couples and 52 heterosexual

couples, all of whom had an adopted child aged between 1 and 5 years. The children in the various family types did not differ with respect to psychological adjustment as assessed by the parent or teacher version of the Child Behavior Checklist (Achenbach & Rescorla, 2000) or the gender development of boys or girls as measured by the Pre-School Activities Inventory (Golombok & Rust, 2009). Regarding parenting behavior, no differences in disciplinary techniques or parenting stress were identified according to family type. However, heterosexual fathers perceived themselves as less competent at parenting than the other parents and a greater division of labor in relation to child care was reported by the heterosexual couples than by the lesbian or gay couples. As with studies of other family types (Golombok, 2000), family processes were found to be the most important predictors of child outcomes.

*Gender Development.*   What about children's gender development—are children who grow up with gay fathers likely to follow a different path from those with lesbian or heterosexual parents resulting from the presence of one or two male gay parents and the absence of a female parent from the home? Gender development is generally conceptualized according to three constructs: (a) gender identity, that is, a person's concept of him- or herself as male or female; (b) gender role behavior, that is, behavior that is considered to be typical for boys or girls in a particular culture; and (c) sexual orientation, that is, whether a person identifies as heterosexual, bisexual, lesbian, or gay. Although a male gender identity, masculine gender role behavior, and a heterosexual orientation typically go together, as do a female gender identity, feminine gender role behavior, and a heterosexual orientation, different permutations of these three constructs are not unusual. For example, a man may have a male gender identity, masculine gender role behavior, and a homosexual orientation, or he may have a female gender identity, feminine gender role behavior, and a heterosexual orientation. Similarly, a variety of patterns can be found among women (Hines, 2004).

A range of theories has been put forward to explain the processes involved in gender development, each suggesting a different developmental pathway for the sons and daughters of gay fathers. The most influential theories of gender development have arisen from biological (Hines, 2004), social learning (Bandura, 1977; Mischel, 1966, 1970), and cognitive developmental (Kohlberg, 1966; Martin, 1993) perspectives. It is now generally agreed that sex differences in behavior result from an interplay among biological, psychological, and social mechanisms from early fetal development onward (Bussey & Bandura, 1999; Golombok & Fivush, 1994; Hines, 2004; Ruble, Martin, & Berenbaum, 2006), with parents playing a minor, and possibly insignificant, role (Golombok & Tasker, 1996).

A few studies have been conducted in the United States of the gender development of the sons and daughters of gay fathers, focusing on children who remained with their mother. With respect to gender identity and gender role behavior, a small survey found the children of gay fathers to be developing typical gender role identification and gender role behavior (Harris & Turner, 1986; Turner et al., 1990). Other investigators have examined sexual orientation. From interviews with gay fathers about the sexual

orientation of 27 adult daughters and 21 adult sons, Miller (1979) reported that 3 daughters identified as lesbian, and 1 son identified as gay. Six sons and 13 daughters of gay fathers, aged between 14 and 35 years old, were interviewed by Bozett (1987). Two sons reported being gay, and one daughter identified as bisexual. In a more extensive study of 55 gay fathers and their 82 sons, the large majority of the sons were reported by their fathers to be heterosexual, with 9% classified as gay or bisexual (Bailey, Bobrow, Wolfe, & Mikach, 1995). Data obtained directly from around half of the sons generally validated the fathers' reports. As suggested by Bailey et al., fathers with gay offspring may have been more likely to participate in research of this kind because they believed that the researchers would find them especially interesting.

The only investigation to include a control group of young adults with heterosexual fathers, thus allowing a comparison between individuals with gay and heterosexual fathers using identical criteria for the assessment of sexual orientation, is a study of 24 gay fathers and 24 heterosexual fathers by Tasker and Barrett (2004) in the United Kingdom. Each group of fathers, matched for age and social class, had 36 adult sons and daughters who participated in a standardized, in-depth interview about their psychosexual development. The children of gay fathers were more likely than the children of heterosexual fathers to have been attracted to someone of the same gender and to have had a sexual relationship with someone of the same gender. All of the offspring of heterosexual fathers identified as heterosexual. Whereas the large majority of offspring of gay fathers also identified as heterosexual, six young adults did not. Of these, two sons identified as gay, one daughter identified as lesbian, and two sons and one daughter identified as bisexual.

The investigations by Bailey et al. (1995) and Tasker and Barrett (2004) obtained additional data on family environment factors that potentially could be related to the development of a lesbian, gay, or bisexual orientation for the offspring of gay fathers. Examples include the young person's frequency of contact with the father, acceptance of the father's gay identity, the father's response to the young person's partners, and the quality of the young person's relationship with the father. These possible influences were found to be unrelated to the young people's sexual orientation, suggesting that family environment factors do not explain the greater same-gender sexual interest shown by the adult offspring of gay fathers. The lack of influence of family environment factors in their study led Bailey et al. to argue that genetic factors may be involved. Nevertheless, the significant association between same-gender relationships and a more positive response by fathers to the young person's partners found in Tasker and Barrett's study is in line with Golombok and Tasker's (1996) conclusion that children who grow up in lesbian-mother families may be more likely to engage in same-sex relationships because they are not subject to the disapproval experienced by their peers from heterosexual homes. Research on the sexual orientation of children of same-sex parents is in its infancy, and no conclusions can be drawn about the relative influence of family environment and genetic factors. As with other aspects of human development and behavior, the answer is likely to involve a complex interplay between the two (Rutter, 2005), with different individuals following different

pathways from conception to adult life. What is more certain, however, is that the majority of children of gay fathers identify as heterosexual, indicating that the sexual orientation of parents is, at most, a minor influence on the sexual orientation of their daughters and sons.

As described above, only one controlled study has been conducted of the development of young children who are actually living in gay-father families (Farr & Patterson, 2009). In this study, no difference was identified in the sex-typed behavior of boys or girls in comparison with their counterparts from matched groups of lesbian and heterosexual families as measured by the Pre-School Activities Inventory (Golombok & Rust, 2009). Thus, the commonly held assumption that children raised by gay fathers would show atypical gender role behavior was not supported by the findings of this study.

## LIMITATIONS AND IMPLICATIONS

In spite of the pioneering studies of a small group of researchers in the 1970s and 1980s, studies of gay fathers and their children lag well behind those of families headed by lesbian mothers. Whereas much is known about children in lesbian-mother families, there is currently only one controlled study of children who live with gay fathers (Farr & Patterson, 2009). This is largely because children with gay fathers have generally been raised by their heterosexual mothers. It is only in recent years, through adoption, surrogacy, and a variety of parenting arrangements between gay fathers and heterosexual or lesbian mothers that children have begun to reside with gay fathers. Research on gay-father families is currently at the same place as research on lesbian-mother families was in the 1970s.

Although little is known about children who grow up with their gay fathers, the body of research that does exist has begun to shed light on the experiences of gay fathers and their children who live apart. These studies are not without their problems. Most are qualitative studies of small samples. Moreover, reliance on volunteers means that the samples may be biased. The nature of such bias is unknown and can be overcome only through the recruitment of representative samples. It is conceivable, however, that fathers whose children were experiencing problems may have been less likely to take part in research on children's psychological well-being. A further limitation is the absence of comparison groups of lesbian or heterosexual families in the majority of studies conducted so far. As a result, it is not known whether the findings regarding gay-father families also apply to other family types, or whether they arise from confounding factors such as age of the children, socioeconomic status, or route to parenthood. For example, until demographically matched comparison groups of lesbian-mother families are assessed using identical measures, we shall not know whether children of gay fathers are more or less likely to experience homophobia than are children of lesbian mothers. It should also be noted that the majority of gay fathers who have participated in research are white, college-educated, and "out" about their sexuality. They also tend to live in cities or areas that are tolerant of diversity, and thus their experiences may not be generalizable to less accepting communities.

334   GAY FATHERS

Research on lesbian-mother families has helped dispel myths about the problems that were widely assumed to arise for children. The findings of the studies initiated in the 1970s and continuing to this day have contributed to policy making and legislation in relation to same-sex parenting, not just for lesbian women but also for gay men. Many changes have taken place over the past 30 years; it is now rare for lesbian mothers to lose custody of their children following divorce on the grounds of their sexual orientation; in some countries and some states of the United States, lesbian and gay individuals can adopt children, sometimes jointly; and an increasing number of fertility clinics are offering assisted reproductive technologies not only to lesbian women but also to gay men. Although gay men experience many more obstacles to parenthood than do lesbian women, there is a slow shift toward acceptance of gay men as fathers. This was highlighted in November 2008 when Florida's 30-year-old ban on gay adoption was declared unconstitutional. In her ruling, the judge stated:

> Based on evidence presented from experts from all over this country and abroad, it is clear that sexual orientation is not a predictor of a person's ability to parent. . . . The most important factor in ensuring a well-adjusted child is the quality of parenting.

The move toward same-sex marriage and other forms of legal recognition of same-sex relationships (Herek, 2006; Wintemute, 2004, 2005, 2006), as well as the greater openness of adoption agencies (Brodzinsky et al., 2002) and fertility clinics to offer treatment to gay men (Ethics Committee of the American Society for Reproductive Medicine, 2006), is likely to produce an increase in, and greater acceptance of, gay-father families in the years to come.

## REFERENCES

Achenbach, T. M. & Rescorla, L. A. (2000). *Manual for the ASEBA. Preschool forms and profiles* Burlington, VT: University of Vermont, Research Center for Children, Youth and Families.

Alexander, J. (1999). Introduction to the special issue: Queer values, beyond identity. *Journal of Gay, Lesbian, and Bisexual Identity, 4*, 287–292.

American Civil Liberties Union (1999, April 6). *ACLU Fact Sheet: Overview of Lesbian and Gay Parenting, Adoption and Foster Care.* www.aclu.org/issues/gay/parent.html.

Armesto, J. C. (2002). Developmental and contextual factors that influence gay fathers' parental competence: A review of the literature. *Psychology of Men and Masculinity, 3*, 67–78.

Bailey, J. M., Bobrow, D., Wolfe, M., & Mikach, S. (1995). Sexual orientation of adult sons of gay fathers. *Developmental Psychology, 31*, 124–129.

Bandura, A. (1977). *Social learning theory.* Englewood Cliffs, NJ: Prentice Hall.

Barret, R. L., & Robinson, B. E. (2000). *Gay fathers. Encouraging the hearts of gay dads and their families.* New York. Jossey-Bass.

Barrett, H., & Tasker, F. (2001). Growing up with a gay parent: Views of 101 gay fathers on their sons' and daughters' experiences *Educational and Child Psychology, 18*, 62–77.

Baumrind, D. (1989). Rearing competent children. In W. Damon (Ed.), *Child development today and tomorrow* (pp. 349–379). San Francisco: Jossey-Bass.

Baumrind, D. (1991). Effective parenting during the early adolescent transition. In P. Cowan & M. Hetherington (Eds.), *Family transitions*. Hillsdale, NJ: Erlbaum.

Benson, A. L., Silverstein, L. B., & Auerbach, C. F. (2005). From the margins to the center: Gay fathers reconstruct the fathering role. *Journal of GLBT Family Studies, 1*(3), 1–29.

Berkowitz, D. (2007). A sociohistorical analysis of gay men's procreative consciousness. *Journal of GLBT Family Studies, 3*, 157–190.

Bigner, J. J. (1999). Raising our sons: Gay men as fathers. *Journal of Gay and Lesbian Social Services, 10*(1), 61–77.

Bigner, J. J. (1996). Working with gay fathers: Developmental, postdivorce parenting and therapeutic issues. In J. Laird & R.-J. Green (Eds.), *Lesbians and gays in couples and families* (pp. 370–403). San Francisco: Jossey-Bass.

Bigner, J., & Jacobsen, R. B. (1989). Parenting behaviors of homosexual and heterosexual fathers. In F. W. Bozett (Ed.), *Homosexuality and the family*. New York: Harrington Park.

Bornstein, M. H. (Ed.). (2002). *Handbook of parenting: Children and parenting*. Mahwah, NJ: Erlbaum.

Bos, H. (2004). *Parenting in planned lesbian families*. Amsterdam: Vossiuspers UvA.

Bowlby, J. (1969). *Attachment and loss: Vol. 1. Attachment*. London: Hogarth Press.

Bowlby, J. (1988). *A secure base: Clinical applications of attachment theory*. London: Routledge.

Bozett, F. W. (1981). Gay fathers: Evolution of the gay-father identity. *American Journal of Orthopsychiatry, 51*, 552–559.

Bozett, F. W. (1987). Children of gay fathers. In F. W. Bozett (Ed.), *Gay and lesbian parents* (pp. 39–57). New York: Praeger.

Brewaeys, A., Ponjaert, I., Van Hall, E., & Golombok, S. (1997). Donor insemination: Child development and family functioning in lesbian-mother families with 4–8 year old children. *Human Reproduction, 12*(6), 1349–1359.

Brinamen, C. F., & Mitchell, V. (2008). Gay men becoming fathers: A model of identity expansion. *Journal of GLBT Family Studies, 4*, 521–541.

Brodzinsky, D., Patterson, C. J. & Vaziri, M. (2002). Adoption agency perspectives on lesbian and gay prospective parents: A national study. *Adoption Quarterly, 5*(3), 5–23.

Brodzinsky, D. M., Smith, D. W., & Brodzinsky, A. B. (1998). Childrens adjustment to adoption: Developmental and clinical issues. *Developmental Clinical Psychology and Psychiatry, 38*, 1–141.

Brooks, D., & Goldberg, S. (2001). Gay and lesbian foster care placements: Can they meet the needs of waiting children. *Social Work, 46*, 147–157.

Bryant, A. S., & Demian, N. (1994). Relationship characteristics of American gay and lesbian couples: Findings from a national survey. *Journal of Gay and Lesbian Social Services, 1*: 101–117.

Bussey, K., & Bandura, A. (1999). Social cognitive theory of gender development. *Psychological Review, 106*(4), 676–713.

Butler, J. (1990). *Gender trouble: Feminism and the subversion of identity*. New York: Routledge.

Butler, J. (1993). *Bodies that matter: On the discursive limits of "sex."* New York: Routledge.

Carragher, D. J., & Rivers, I. (2002). Trying to hide: A cross-national study of growing up for non-identified gay and bisexual male youth. *Clinical Child Psychology and Psychiatry, 7*, 457–474.

Chan, R. W., Raboy, B., & Patterson, C. (1998). Psychosocial adjustment among children conceived via donor insemination by lesbian and heterosexual mothers. *Child Development, 69*(2), 443–457.

Clarke, V. (2006). "Gay men, gay men and more gay men": Traditional, liberal and critical perspectives on male role models in lesbian families. *Lesbian and Gay Psychology Review, 7,* 19–35.

Clarke, V. (2007). Men not included? A critical psychology analysis of lesbian families and male influence in child rearing. *Journal of GLBT Family Studies, 3,* 309–349.

Crosbie-Burnett, M., & Helmbrecht, L. (1993). A descriptive empirical study of gay male stepfamilies. *Family Relations, 42,* 256–262.

Daniels, K., & Taylor, K. (1993). Secrecy and openness in donor insemination. *Politics and Life Sciences, 12*(2), 155–170.

Darling, N., & Steinberg, L. (1993). Parenting style as context: An integrative model. *Psychological Bulletin, 118,* 487–496.

Dunne, E. J. (1987). Helping gay fathers come out to their children. *Journal of Homosexuality, 13,* 213–222.

Dunne, G. A. (2001). The lady vanishes? Reflections on the experiences of married and divorced non-heterosexual fathers. *Sociological Research Online, 6*(3), www.socresonline.org.uk/6/3/dunne.html.

Ethics Committee of American Society for Reproductive Medicine (2006). Access to fertility treatment by gays, lesbians and unmarried persons. *Fertility and Sterility, 86*(5), 1333–1335.

Fairtlough, A. (2008). Growing up with a lesbian or gay parent: Young people's perspectives. *Health and Social Care in the Community, 16*(5), 521–528.

Falk, P. J. (1989). Lesbian mothers, psychosocial assumptions in family law. *American Psychologist, 44*(2), 941–947.

Farr, R., & Patterson, C. (2009). *Adoptive families led by gay fathers: Family processes and outcomes.* Paper presented to the Society for Research in Child Development, Denver, CO.

Flaks, D. K., Ficher, I., Masterpasqua, F., & Joseph, G. (1995). Lesbians choosing motherhood: A comparative study of lesbian and heterosexual parents and their children. *Developmental Psychology, 31*(1), 105–114.

Freeman, T., Jadva, V., Kramer, W., & Golombok, S. (2009). Gamete donation: Parents' experiences of searching for their child's donor siblings and donor. *Human Reproduction, 23*(3), 505–516.

Gartrell, N. (2005). The national lesbian family study: 4. Interviews with the 10-year-old children. *American Journal of Orthopsychiatry, 75*(4), 551–572.

Gianino, M. (2008). Adaption and transformation: The transition to adoptive parent-hood for gay male couples. *Journal of GLBT Family Studies, 4,* 205–243.

Golombok, S. (1999). Lesbian mother families. In A. Bainham, M. Richards, & S. D. Sclater (Eds.), *What is a parent? A socio-legal analysis* (pp. 161–180). Oxford, UK: Hart.

Golombok, S. (2000). *Parenting: What really counts?* London: Routledge.

Golombok, S., & Fivush, R. (1994). *Gender development.* New York: Cambridge University Press.

Golombok, S., Jadva, V., Lycett, E., Murray, C., & MacCallum, F. (2005). Families created by gamete donation: Follow-up at age 2. *Human Reproduction, 20*(1), 286–293.

Golombok, S., Lycett, E., MacCallum, F., Jadva, V., Murray, C., Rust, J., et al. (2004b). Parenting children conceived by gamete donation. *Journal of Family Psychology, 18*(3), 443–452.

Golombok, S., MacCallum, F., Murray, C., Lycett, E., & Jadva, V. (2006a). Surrogacy families: Parental functioning, parent-child relationships and children's

psychological development at age 2. *Journal of Child Psychology and Psychiatry*, 47 (2), 213–222.

Golombok, S., Murray, C., Jadva, V., Lycett, E., MacCallum, F., & Rust, J. (2006b). Non-genetic and non-gestational parenthood. Consequences for parent-child relationships and the psychological well-being of mothers, fathers and children at age 3. *Human Reproduction*, 21, 1918–1924.

Golombok, S., Murray, C., Jadva, V., MacCallum, F., & Lycett, E. (2004a) Families created through a surrogacy arrangement. Parent-child relationships in the first year of life. *Developmental Psychology*, 40, 400–411.

Golombok, S., Perry, B., Burston, A., Murray, C., Mooney-Somers, J., Stevens, M., et al. (2003). Children with lesbian parents: A community study. *Developmental Psychology*, 39, 20–33.

Golombok, S & Rust, J. (2009). *Pre-school activities inventory* London: PsychCorp

Golombok, S., Spencer, A., & Rutter, M. (1983). Children in lesbian and single-parent households: Psychosexual and psychiatric appraisal. *Journal of Child Psychology and Psychiatry*, 24, 551–572.

Golombok, S., & Tasker, F (1996) Do parents influence the sexual orientation of their children? Findings from a longitudinal study of lesbian families. *Developmental Psychology*, 32(1), 3–11.

Golombok, S., Tasker, F., & Murray, C. (1997) Children raised in fatherless families from infancy. Family relationships and the socioemotional development of children of lesbian and single heterosexual mothers *Journal of Child Psychology and Psychiatry*, 38(7), 783–792.

Green, R., Mandel, J B., Hotvedt, M E., Gray, J., & Smith, L. (1986). Lesbian mothers and their children: A comparison with solo parent heterosexual mothers and their children. *Archives of Sexual Behavior*, 15(2), 167–184.

Gross, M. (2006). Biparental and multiparental lesbian and gay families in France *Lesbian and Gay Psychology Review*, 7, 35–46.

Grotevant, M., & McRoy, R. (1998). *Openness in adoption: Exploring family connections*. New York: Sage.

Hare, J., & Richards, L. (1993). Children raised by lesbian couples Does the context of birth affect father and partner involvement? *Family Relations*, 42, 249–255

Harris, M., & Turner, P. (1986). Gay and lesbian parents. *Journal of Homosexuality*, 12, 101–113.

Herek, G. (2006). Legal recognition of same-sex relationships in the United States. A social science perspective. *American Psychologist*, 61, 607–621.

Hicks, S (2006). Maternal men—perverts and deviants? Making sense of gay men as foster carers and adopters. *Journal of GLBT Family Studies*, 2, 93–114.

Hicks, S., & McDermott, J. (1999). *Lesbian and gay fostering and adoption Extraordinary yet ordinary*. London: Kingsley.

Hines, M. (2004). *Brain gender*. Oxford, UK: Oxford University Press

Hoeffer, B. (1981). Children's acquisition of sex-role behaviour in lesbian-mother families. *American Journal of Orthopsychiatry*, 24, 518–530.

Huggins, S. L. (1989). A comparative study of self-esteem of adolescent children of divorced lesbian mothers and divorced heterosexual mothers In F Bozett (Ed), *Homosexuality and the family* (pp. 123–135). New York: Harrington Park.

Isay, R. A. (1998). Heterosexually married homosexual men Clinical and developmental issues. *American Journal of Orthopsychiatry*, 68, 424–432.

Jadva, V., Freeman.T., Kramer, W., & Golombok, S (2009). The experiences of adolescents and adults conceived by sperm donation: Comparison by age of disclosure and family type *Human Reproduction*, 24(8), 1909–1919

Johnson, S. M., & O'Connor, E. (2002). *The gayby boom: The psychology of gay parenthood.* New York: New York University Press.

Kaiser Family Foundation (2001, November). *Inside-OUT: A report on the experiences of lesbians, gays and bisexuals in America and the public's views on issues and policies related to sexual orientation.* Publication #3193 (Menlo Park, CA: Henry J. Kaiser Foundation), www.kff.org/kaiserpolls/3193-index.cfm (retrieved January 7, 2009).

Kirkpatrick, M., Smith, C., & Roy, R. (1981). Lesbian mothers and their children: A comparative survey. *American Journal of Orthopsychiatry, 51,* 545–551.

Kohlberg, L. (1966). A cognitive-developmental analysis of children's sex-role concepts and attitudes. In E. E. Maccoby (Ed.), *The development of sex differences.* Stanford, CA: Stanford University Press.

Lamb, M. *(Ed.)* (1997). *The role of the father in child development.* New York: Wiley.

Laumann, E. O., Gagnon, J. H, Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality in the United States.* Chicago: University of Chicago Press.

Lev, A. I. (2006). Gay dads: Choosing surrogacy. *Lesbian and Gay Psychology Review, 7,* 73–77.

Lynch, J. M., & Murray, K. (2000). For the love of the children: The coming out process for lesbian and gay parents and stepparents. *Journal of Homosexuality, 39,* 1–24.

MacCallum, F., & Golombok, S. (2004). Children raised in fatherless families from infancy: A follow-up of children of lesbian and single heterosexual mothers. *Journal of Child Psychology and Psychiatry, 45,* 1407–1419.

Maccoby, E. E. (1992). The role of parents in the socialization of children. *Developmental Psychology, 28,* 1006–1017.

Mallon, G. P. (2004). *Gay men choosing parenthood.* New York: Columbia University Press.

Martin, C. L. (1993). New directions for investigating children's gender knowledge. *Developmental Review, 13*(2), 184–204.

Massey, S. G. (2007). Sexism, heterosexism, and attributions about undesirable behavior in children of gay, lesbian, and heterosexual parents. *Journal of GLBT Family Studies, 3,* 457–483.

Matteson, D. R. (1987). The heterosexually married gay and lesbian parent. In F.W. Bozett (Ed.), *Gay and lesbian parents* (pp. 138–161). New York: Praeger.

McLeod, A. C., Crawford, I., & Zechmeister, J. (1999). Heterosexual undergraduates' attitudes toward gay fathers and their children. *Journal of Psychology and Human Sexuality, 11,* 43–62.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129,* 674–697.

Miller, B. (1979). Gay fathers and their children. *Family Coordinator, 28,* 544–552.

Mischel, W. (1966). A social learning view of sex differences in behavior. In E. E. Maccoby (Ed.), *The development of sex differences* (pp. 56–81). Stanford, CA: Stanford University Press.

Mischel, W. (1970). Sex-typing and socialization. In P. Mussen (Ed.), *Carmichael's manual of child psychology* (Vol. 2, pp. 3–72). New York: Wiley.

Morse, C. N., McLaren, S., & McLachlan, A. J. (2007). The attitudes of Australian heterosexuals toward same-sex parents. *Journal of GLBT Family Studies, 3,* 425–455.

Parke, R. D. (1996). *Fatherhood.* Cambridge, MA: Harvard University Press.

Patterson, C. J. (1992). Children of lesbian and gay parents. *Child Development, 63,* 1025–1042.

Patterson, C. J. (2002). Lesbian and gay parenthood. In M. Bornstein (Ed.), *Handbook of parenting* (Vol. 3, pp. 317–338). Hillsdale, NJ: Erlbaum.

Perrin, E. C. (2002a). Coparent or second parent adoption by same-sex parents. *Pediatrics, 109,* 341–344.

Perrin, E. C. (2002b). *Sexual orientation in child and adolescent health care.* New York: Kluwer Academic/Plenum.

Ray, V., & Gregory, R. (2001). School experiences of the children of lesbian and gay parents. *Family Matters, 59,* 28–34.

Ruble, D. N., Martin, C. L., & Berenbaum, S. A. (2006). Gender development. In N. Eisenberg (Ed.), *Handbook of child psychology* (Vol. 3, pp. 858–932). Hoboken, NJ: Wiley.

Rutter, M. (2005). *Genes and behavior: Nature-nurture interplay explained.* Oxford, UK: Blackwell.

Savin-Williams, R. C. (2005). *The new gay teenager.* London: Harvard University Press.

Schacher, S. J., Auerbach, C. F., & Silverstein, L. B. (2005). Gay fathers expanding the possibilities for us all. *Journal of GLBT Family Studies, 1*(3), 31–52.

Segal-Engelchin, D., Erera, P. I., & Cwikel, J. (2005). The hetero-gay family. An emergent family configuration. *Journal of GLBT Family Studies, 1*(3), 85–103.

Shuster, S. (1996). Families coping with HIV disease in gay fathers: Dimensions of treatment. In J. Laird and R.-J. Green (Eds.), *Lesbians and gays in couples and families* (pp. 404–419). San Francisco: Jossey-Bass.

Silverstein, L. B., Auerbach, C. F., & Levant, R. F. (2002). Contemporary fathers reconstructing masculinity: Clinical implications of gender role strain. *Professional Psychology: Research and Practice, 33,* 361–369.

Simmons, T., & O'Connell, M. (2003, February). *Married-couple and unmarried-partner households: 2000.* Washington, DC: U.S. Census Bureau, www.census.gov/prod/2003pubs/censr-5.pdf (retrieved January 7, 2009).

Stacey, J. (2006). Gay parenthood and the decline of paternity as we knew it. *Sexualities, 9,* 27–55.

Tasker, F. (2005). Lesbian mothers, gay fathers, and their children: A review. *Developmental and Behavioural Pediatrics, 26*(3), 224–240.

Tasker, F., & Barrett, H. (2004, May 12–16). The sexual identity of young adult sons and daughters of gay fathers. Paper presented at the 7th Congress of the European Federation of Sexology, Brighton, UK.

Tasker, F., & Golombok, S. (1995). Adults raised as children in lesbian families. *American Journal of Orthopsychiatry, 65*(2), 203–215.

Tasker, F., & Golombok, S. (1997). *Growing up in a lesbian family.* New York: Guilford Press.

*The Times* (2008, December 18). Gay father hunts for lesbian mother who vanished with son. www.timesonline.co.uk/tol/news/uk/crime/article5362610.ece (accessed January 14, 2009).

Turner, A., & Coyle, A. (2000). What does it mean to be a donor offspring? The identity experiences of adults conceived by donor insemination and the implications for counselling and therapy. *Human Reproduction, 15*(9), 2041–2051.

Turner, P., Scadden, L., & Harris, M. (1990). Parenting in gay and lesbian families. *Journal of Gay and Lesbian Psychotherapy,* 55–66.

van IJzendoorn, M. H., & De Wolff, M. S. (1997) In search of the absent father—meta-analyses of infant-father attachment: A rejoinder to our discussants. *Child Development, 68*(4), 604–609.

Wainright, J., & Patterson, C. (2006). Delinquency, victimization, and substance use among adolescents with female same-sex parents. *Journal of Family Psychology, 20* (3), 526–530.

340   GAY FATHERS

Wainright, J., Russell, S., & Patterson, C. (2004). Psychosocial adjustment, school outcomes and romantic relationships of adolescents with same-sex parents. *Child Development*, *75*, 1886–1898.

Wintemute, R. W. (2004). Sexual orientation and the charter. The achievement of formal legal equality (1985–2005) and its limits. *McGill Law Journal*, *49*, 1143

Wintemute, R. W. (2005). From "sex rights" to "love rights": Partnership rights as human rights. In N. Bamforth (Ed.), *Sex rights*. Oxford, UK: Oxford University Press.

Wintemute, R.W. (2006). Same-sex marriage: When will it reach Utah? *Brigham Young University Journal of Public Law*, *20*, 527.

Wyers, N. L. (1987). Homosexuality in the family: Lesbian and gay spouses. *Social Work*, *32*, 143–148.

# Tab 5

Journal of Family Psychology
2006, Vol. 20, No. 3, 526–530

Copyright 2006 by the American Psychological Association
0893-3200/06/$12.00    DOI: 10.1037/0893-3200.20.3.526

## BRIEF REPORTS

# Delinquency, Victimization, and Substance Use Among Adolescents With Female Same-Sex Parents

Jennifer L. Wainright and Charlotte J. Patterson
University of Virginia

The question of whether parental sexual orientation has an impact on human development has important implications for psychological theories and for legal policy. This study examined associations among family type (same-sex vs. different-sex parents), family and relationship variables, substance use, delinquency, and victimization of adolescents. Participants included 44 adolescents living with female same-sex couples and 44 adolescents living with different-sex couples, matched on demographic characteristics and drawn from a national sample. Analyses indicated that adolescents were functioning well and that their adjustment was not associated with family type. Adolescents whose parents described closer relationships with them reported less delinquent behavior and substance use, suggesting that the quality of parent–adolescent relationships better predicts adolescent outcomes than does family type.

*Keywords:* sexual orientation, parenting, substance use, delinquency, victimization

The question of whether parental sexual orientation has an impact on human development has received considerable attention recently from a variety of sources (Stacey & Biblarz, 2001). This topic has important implications for theories of socialization (Golombok, 1999) and for law and social policy (Patterson, Fulcher, & Wainright, 2002; Perrin & the Committee on Psychosocial Aspects of Child and Family Health, 2002). A growing body of empirical research has examined outcomes among children who are reared by gay and lesbian parents.

Studies reported to date have identified few associations between parental sexual orientation and young children's well-being (Patterson, 2000), but have suggested that processes within the family may be associated with child outcomes (Chan, Raboy, & Patterson, 1998). We still have relatively few studies of adolescent offspring of lesbian or gay parents, however, and some have advised caution when generalizing the results of research conducted with young children to adolescents (e.g., Baumrind, 1995; Perrin & the Committee on Psychosocial Aspects of Child and Family Health, 2002).

The small body of research that has focused on adolescent offspring of families headed by same-sex couples found no differences in young people's self-esteem (Huggins, 1989); depression, anxiety, and peer group hostility

(Tasker & Golombok, 1997); or depressive symptoms, anxiety, grade-point average, trouble in school, school behavior, and romantic relationships (Wainright, Russell, & Patterson, 2004) as a function of mothers' sexual orientation. Wainright et al. (2004), however, did report significant associations between parental perception of parent–adolescent relationship quality and adolescent school adjustment.

Considerable research indicates that parenting style influences the effectiveness of parents' efforts to socialize their children (Steinberg & Silk, 2002). A warm, accepting style of parenting is generally related to optimal outcomes for adolescents (Rohner, 1999), especially if it is combined with appropriate limit setting and monitoring of adolescent behavior (Steinberg & Silk, 2002). In particular, family processes such as the quality of the parent–adolescent relationship have been found to be associated with adolescent risk behaviors (e.g., Crosnoe, Erickson, & Dornbusch, 2002; Matherne & Thomas, 2001).

We assessed levels of risk behavior among adolescent offspring of female same-sex parents and explored factors associated with individual differences within this group. We assessed family type (i.e., whether parent has a same-sex or different-sex partner) as well as relationship variables. On the basis of previous findings with children (e.g., Chan et al., 1998), we expected to find no differences in substance use, risky and delinquent behaviors, or victimization based on family type. Consistent with the literature on sources of individual differences among adolescents (e.g., Steinberg & Silk, 2002), however, we did expect to find significant associations between relationship variables such as the quality of the parent–adolescent relationship and adolescent outcomes.

Jennifer L. Wainright and Charlotte J. Patterson, Department of Psychology, University of Virginia.

Correspondence concerning this article should be addressed to Charlotte J. Patterson, Department of Psychology, P.O. Box 400400, University of Virginia, Charlottesville VA 22904. E-mail: CJP@virginia.edu

## Method

### Participants

Participating families were drawn from a large, nationally representative sample of adolescents in the United States collected for the National Longitudinal Study of Adolescent Health (Add Health), a school-based study of the health-related behaviors of adolescents in Grades 7–12 (See Bearman, Jones, & Udry, 1997). Data used in the present study were collected through the In-Home Interview (IHI) and surveys, as well as in-school surveys of students (collected in 1994–1995), and through in-home questionnaires of parents. Details on sampling and methods used in the current research can be found in an earlier publication (Wainright et al., 2004) that focused on psychosocial outcomes, school functioning, and romantic attractions.

The focal group of families that were headed by a mother who reported having a marriage or marriage-like relationship with a woman consisted of 44 adolescents, 23 girls and 21 boys. Approximately 31.8% identified themselves as non-White. On average, the adolescents were 15.1 years of age (*SD* = 1.5 years), with a range of 12 to 18 years of age. Average household income was approximately $45,500 per year. Each of these adolescents was matched with an adolescent from the Add Health database who was reared by different-sex parents, on the basis of gender, age, ethnic background, adoption status, learning disability status, family income, and parents' education. The final sample included 88 families, including 44 families headed by mothers with female partners and 44 comparison families headed by different-sex couples.

### Dependent Measures

*Substance use.* Adolescents' use of tobacco was assessed with a composite variable (Sieving et al., 2000) that uses four items to classify adolescents into one of seven levels of tobacco use (1 = *"never smoked,"* 3 = *"currently smoking 1–2 cigarettes/day,"* 5 = *currently smoking 6–10 cigarettes/day,"* 7 = *"currently smoking > 20 cigarettes/day"*). Friends' use of tobacco was assessed by asking how many of three best friends smoke at least 1 cigarette per day.

Use of alcohol was assessed with three variables from the Adolescent IHI. We utilized a composite variable (Sieving et al., 2000), which uses 2 items to create an eight-level variable about adolescents' use of alcohol in their lifetime and in the past 12 months (1 = *"2–3 drinks in lifetime,"* 3 = *"drank alcohol on 1 or 2 days in the past 12 months,"* 5 = *"drank 2–3 days a month in the past 12 months,"* 7 = *"drank 3–5 days a week in the past 12 months,"* 8 = *"drank every day or almost every day in the past 12 months"*). Adolescents were instructed to exclude "a sip or taste of someone else's drink." Individual items measured how often in the past 12 months adolescents had binged on alcohol (5+ drinks in a row) and had gotten drunk. Scores for these items ranged from 1 (*never*) to 7 (*every day or almost every day*).

Lifetime and current marijuana use were assessed with a composite variable (Sieving et al., 2000), which uses two survey items from the Adolescent IHI to form a seven-level variable (1 = *"never used marijuana,"* 3 = *">3 times in lifetime, no use in past 30 days,"* 5 = *"2–3 times in past 30 days,"* 7 = *">5 times in past 30 days"*).

Adolescents' risky use of alcohol and drugs was assessed with a scale of eight items (1 = *yes,* 0 = *no*; α = .78) from the Adolescent IHI, which asked whether the adolescent had driven a car, gone to school, gotten into a fight, or carried a weapon while consuming alcohol or drugs. The sum of the eight items was taken, with higher scores indicating more risky use.

Relationship and physical problems caused by adolescents' use of alcohol were assessed with a scale of nine items (α = .84) from the Adolescent IHI, asking about the frequency of being hung over, sick, in a fight, in a situation that was later regretted, or in trouble with parents, school, or friends or dates because of alcohol use in the past 12 months. Items were measured on a scale ranging from 0 (*never*) to 4 (*5 or more times*), and the mean of the nine items was taken, with higher scores indicating more problems.

Adolescents' joint occurrences of substance use and sexual activity were assessed with a scale of 6 items (1 = *yes,* 0 = *no*; α = .68) from the Adolescent IHI asking whether the adolescent had used drugs or alcohol or had been drunk the first time (three items) or most recent time (three items) he or she had sexual intercourse. The sum of the six items was taken, and higher scores indicated more joint occurrences.

*Delinquent behavior.* Adolescent delinquent behavior was assessed with 10 items (α = .74) from the portion of the Adolescent IHI in which adolescents listen to questions through headphones and record their answers on a laptop computer. These items ask about the occurrence of activities such as damaging others' property, shoplifting, and getting into fights in the past 12 months. Scores on this scale were the sum of the 10 items (1 = *yes,* 0 = *no*), with higher scores indicating more delinquent behaviors.

*Victimization.* Adolescents' experiences as victims and witnesses of violence were assessed with five items (α = .97) from the Adolescent IHI asking how often adolescents had been shot at, cut, or jumped; had a gun or knife pulled on them; or had seen someone shot or stabbed. Scores were the sum of 5 items (1 = *yes,* 0 = *no*). Higher scores indicated more victimization.

### Family and Relationship Variables

Adolescents' perceived care from adults, teachers, and friends was measured with three items from the Adolescent IHI regarding how much the adolescent believed that others care about them. The mean of the three items (α = .58) was taken, and possible scores ranged from 1 (*not at all*) to 5 (*very much*), with higher scores indicating perceptions of more caring. Parents' perceptions of the quality of their relationship with their child were assessed with a scale made up of the mean of six items (α = .71) from the Parent's In-Home Questionnaire. Items included parents' assessment of trust, understanding, communication, and general quality of relationship and were measured on a scale ranging from 1 to 5, with higher scores indicating closer relationships.

### Results

Overall, adolescents reported positive outcomes. They reported moderate use of cigarettes and alcohol, with 25% reporting that they had ever smoked regularly and 44% reporting that they had drunk alcohol when they were not with their parents. Reports of adolescents' frequency of alcohol use (*M* = 2.91, *SD* = 1.88) and tobacco use (*M* = 1.94, *SD* = 1.59) were low. Adolescents also reported low levels of alcohol abuse, including binge drinking (*M* = 1.82, *SD* = 1.53) and getting drunk (*M* = 1.81, *SD* = 1.46). Their reports of physical and relationship problems because of alcohol use (*M* = 0.24, *SD* = 0.46) were low, as were their reports of risky use of drugs and alcohol (*M* = 0.53, *SD* = 1.27) and reports of joint occurrences of sexual activity and drug or alcohol use (*M* = 0.23, *SD* = 0.71). They reported

low levels of delinquent behavior ($M = 1.81$, $SD = 1.86$) and victimization ($M = 0.39$, $SD = 0.88$).

As expected, we did not find a statistically significant difference in adolescents' reports of their frequency of alcohol, tobacco, or marijuana use as a function of family type. In addition, our analyses revealed no significant difference in the number who smoke among three best friends or frequency of getting drunk or binge drinking (see Table 1). Consistent with results for substance use, we found no significant difference in problems arising from alcohol or drug use (relationship and physical problems, risky use of alcohol and drugs, and sex while under influence of alcohol or drugs) as a function of family type. Analyses also revealed no difference in adolescents' delinquent behavior between offspring of same-sex couples and offspring of comparison families headed by different-sex couples. Similarly, we found no difference in adolescents' experiences as victims or witnesses of violence as a function of family type.

Overall, adolescents and their parents reported positive family relationships. Parents' perceptions of the quality of the relationship were high, with a mean of 4.20 ($SD = 0.53$) and a range of 2.66 to 5.00. Adolescents' perceptions of others' care were high ($M = 4.07$, $SD = 0.65$), with a range of 2.33 to 5.00. Consistent with results for adolescent outcomes, analyses revealed no differences in parent report of the quality of the parent–adolescent relationship or adolescent report of care from others as a function of family type.

Having found no associations between family type and adolescent risk behavior, we explored possible associations between processes in the adolescent's environment and adolescent outcomes. We conducted regression analyses separately for use of tobacco, alcohol, and marijuana, as well as victimization and delinquent behavior. Family type, gender, parental education, and family income were included as predictors. Variables and interactions that were not statistically significant predictors were removed from the models.

We also conducted logistic regressions on dichotomized outcome variables, but because results were similar to those for the multiple regression models, we do not describe them further.

Results showed that, as expected, quality of family relationships was significantly associated with many adolescent outcomes (see Table 2). Adolescents' tobacco use was associated with parental report of the quality of the parent–adolescent relationship ($\beta = -31$, $p < .01$) and with adolescents' reports of caring from adults and peers ($b = -.37$, $p < .01$). As expected, greater perceived care from others and more positive relationships were associated with lower levels of tobacco use. Adolescents' use of alcohol, use of marijuana, and delinquent behavior were associated with parental report of the quality of the parent–adolescent relationship ($\beta = -.26$, $p < .05$; $\beta = -.51$, $p < .001$; and $\beta = -.38$, $p < .001$, respectively), with more positive relationships associated with less use of alcohol and marijuana and less delinquent behavior. Boys reported more victimization than did girls ($\beta = -.25$, $p < .05$). Interactions between family type and predictor variables were not significant. In summary, adolescents' reports of family and relationship processes such as quality of the parent–child relationship and care from adults and peers were associated with several measures of adolescent outcomes and were better predictors of adolescent risk behavior than were family type and adolescent gender.

## Discussion

The results of the present study revealed that, across a diverse array of assessments, including measures of delinquent behavior, victimization, substance abuse, and qualities of family relationships, adolescents with female same-sex parents did not differ significantly from a matched group of adolescents living with different-sex parents. Regardless of family type, adolescents were less likely to

Table 1

*Adolescents' Mean (and Standard Deviation) Reports of Risk Behavior as a Function of Family Type*

| | Family type | |
| --- | --- | --- |
| Variable | Different sex<br>*M (SD)* | Same sex<br>*M (SD)* |
| Tobacco use | 2.50 (1.73) | 2.60 (1.91) |
| Of three best friends, number who smoke | 0.83 (0.91) | 0.84 (1.12) |
| Alcohol use | 2.91 (1.74) | 2.91 (2.02) |
| Frequency of getting drunk | 1.68 (1.20) | 1.93 (1.69) |
| Frequency of binge drinking | 1.61 (1.19) | 2.02 (1.80) |
| Marijuana use | 1.76 (1.57) | 2.02 (1.78) |
| Risky use of alcohol and drugs | 0.38 (0.92) | 0.68 (1.54) |
| Problems related to alcohol use | 0.18 (0.38) | 0.30 (0.53) |
| Sex under influence of alcohol or drugs | 0.14 (0.46) | 0.32 (0.88) |
| Delinquent behavior | 1.75 (1.82) | 1.86 (1.92) |
| Victimization | 0.25 (0.78) | 0.52 (0.95) |
| Care from others | 4.10 (0.62) | 4.05 (0.68) |
| Parent report of quality of relationship | 4.17 (0.50) | 4.23 (0.57) |

*Note.* According to Wilcoxon signed ranks test, there were no significant differences as a function of family type.

Table 2
*Prediction of Adolescent Risk Behavior*

| Variable | $B$ | $SE\,(B)$ | $\beta$ | $F$ | $df$ | $R^2$ |
|---|---|---|---|---|---|---|
| Tobacco use | | | | 5.42*** | 4, 69 | .24 |
|   Family type | .05 | .36 | .01 | | | |
|   Adolescent gender | .15 | .37 | .05 | | | |
|   Quality of relationship | −.96 | .33 | −.31** | | | |
|   Care from adults & peers | −.95 | .29 | −.37** | | | |
| Alcohol use | | | | 3.09* | 3, 69 | .12 |
|   Family type | <.01 | .43 | .001 | | | |
|   Adolescent gender | −.86 | .43 | −.22† | | | |
|   Quality of relationship | −.90 | .40 | −.26* | | | |
| Marijuana use | | | | 8.92*** | 3, 69 | .28 |
|   Family type | .42 | .36 | .12 | | | |
|   Adolescent gender | .47 | .36 | .13 | | | |
|   Quality of relationship | −1.66 | .33 | −.51*** | | | |
| Delinquent behavior | | | | 4.62** | 3, 71 | .16 |
|   Family type | .11 | .41 | .03 | | | |
|   Adolescent gender | −.56 | .41 | −.15 | | | |
|   Quality of relationship | −1.31 | .38 | −.38*** | | | |
| Victimization | | | | 3.14* | 2, 72 | .08 |
|   Family type | .20 | .20 | .11 | | | |
|   Adolescent gender | −.45 | .20 | −.25* | | | |

† $p < .10$.   * $p < .05$.   ** $p < .01$.   *** $p < .001$.

report risky behavior when parents described close relationships with them. Thus, as has been reported in studies of children with lesbian mothers (e.g., Chan et al., 1998), it was qualities of adolescent–parent relationships rather than family composition that was significantly associated with adolescent adjustment (Golombok, 1999).

Confidence in the present findings is bolstered by the strengths of the Add Health study (Bearman et al., 1997), which allowed for examination of important outcomes among adolescents living with female same-sex parents, as compared with a well-matched sample of adolescents living with different-sex parents, using data from a large national sample. Results of our current study add significantly to those from earlier studies, which were most often smaller in their size, less representative in their sampling, and less comprehensive in their assessment of adolescent outcomes (Stacey & Biblarz, 2001).

Despite the many strengths of the present study, however, we also acknowledge several limitations. For instance, parents were not asked directly about their sexual identities, and we were thus forced to rely on indirect assessments (e.g., parents' reports of being in a "marriage or marriage-like relationship" with a person of the same sex). The sample size of the current study is larger than those of much of the previous research with this population, but the finding of no group differences would be strengthened by replication in larger samples. Results that include variables with lower reliabilities should be interpreted with caution pending replication. Finally, our assessment of victimization did not include verbal harassment or bullying, and any interpretation of these data must consider this fact.

Major theories of human development have often been interpreted as predicting that adolescents living with same-sex parents would encounter important difficulties in their adjustment, especially during adolescence (Baumrind,

1995). The fact that results from a large national sample of American adolescents fail to confirm this view leads to questions about the extent to which predictions of the theories have been disconfirmed (Patterson, 2000). In particular, results of recent research on children and adolescents who are not living with different-sex parents (e.g., Patterson, 2000; Stevens, Golombok, Beveridge, & the ALSPAC Study Team, 2002) suggest that theorists may need to reconsider the importance of different-sex parents for human personal and social development (Silverstein & Auerbach, 1999).

Our current findings also have implications for public policies that involve children of lesbian parents (Patterson et al., 2002). Inasmuch as our findings suggest that adolescents living with same-sex parents develop in much the same ways as do adolescents living with different-sex parents, they provide no justification for limitations on child custody or visitation by lesbian parents. Our findings provide no warrant for legal or policy discrimination against adolescents with same-sex parents (Patterson et al., 2002).

In summary, the present study is the first to have assessed delinquent behavior, victimization, and substance use among adolescents living with same-sex versus different-sex couples. Family type was not linked to adolescent risk behavior, but the qualities of adolescents' relationships with parents were associated with several variables. Regardless of whether they lived with same-sex or different-sex couples, adolescents whose parents reported having close relationships with them were likely to have fewer problems with delinquency or substance use. Our results are consistent with theories that emphasize the importance of adolescent relationships with parents, and suggest that parental sexual orientation is not a major factor in shaping adolescent development or behavior.

530                                    BRIEF REPORTS

## References

Baumrind, D. (1995). Commentary on sexual orientation: Research and social policy implications. *Developmental Psychology, 31,* 130–136.

Bearman, P. S., Jones, J., & Udry, J. R. (1997). *The National Longitudinal Study of Adolescent Health: Research design.* Retrieved from http://www.cpc.unc.edu/addhealth

Chan, R. W., Raboy, B., & Patterson, C. J. (1998). Psychosocial adjustment among children conceived via donor insemination by lesbian and heterosexual mothers. *Child Development, 69,* 443–457.

Crosnoe, R., Erickson, K. G., & Dornbusch, S. M. (2002). Protective functions of family relationships and school factors on the deviant behavior of adolescent boys and girls: Reducing the impact of risky friendships. *Youth & Society, 33*(4), 515–544.

Golombok, S. (1999). New family forms: Children raised in solo mother families, lesbian mother families, and in families created by assisted reproduction. In L. Balter & C. S. Tamis-LeMonda (Eds.), *Child psychology: A handbook of contemporary issues* (pp. 429–446). Philadelphia, PA: Psychology Press/Taylor & Francis.

Huggins, S. L. (1989). A comparative study of self-esteem of adolescent children of divorced lesbian mothers and divorced heterosexual mothers. In F. W. Bozett (Ed.), *Homosexuality and the family* (pp. 123–135). New York: Harrington Park Press.

Matherne, M. M., & Thomas, A. (2001). Family environment as a predictor of adolescent delinquency. *Adolescence, 36*(144), 655–664.

Patterson, C. J. (2000). Family relationships of lesbians and gay men. *Journal of Marriage and the Family, 62,* 1052–1069.

Patterson, C. J., Fulcher, M., & Wainright, J. (2002). Children of lesbian and gay parents: Research, Law, and Policy. In B. L. Bottoms, M. B. Kovera, & B. D. McAuliff (Eds.), *Children and the law: Social science and policy.* New York: Cambridge University Press.

Perrin, E., & the Committee on Psychosocial Aspects of Child and Family Health. (2002). Coparent or second-parent adoption by same-sex partners [Policy statement]. *Pediatrics, 109,* 339–340.

Rohner, R. P. (1999). Acceptance and rejection. In D. Livinson, J. Ponzetti, & P. F. Jorgenson (Eds.), Encyclopedia of human emotions (Vol. 1, pp. 6–14). New York: Macmillan.

Sieving, R. E., Beurhing, T., Resnick, M. D., Bearinger, L. H., Shew, M., Ireland, M., Blum, R. W. (2000). Development of adolescent self-report measures from the National Longitudinal Study of Adolescent Health. *Journal of Adolescent Health, 28*(1), 73–81.

Silverstein, L. B., & Auerbach, C. F. (1999). Deconstructing the essential father. *American Psychologist, 54,* 397–407.

Stacey, J., & Biblarz, T. J. (2001). (How) does the sexual orientation of parents matter? *American Sociological Review, 66,* 159–183.

Steinberg, L., & Silk, J. S. (2002). Parenting adolescents. In M. H. Bornstein (Ed.), *Handbook of parenting: Volume 1. Children and parenting* (2nd ed.), Mahwah, NJ: Erlbaum.

Stevens, M., Golombok, S., Beveridge, M., & the ALSPAC Study Team. (2002). Does father absence influence children's gender development? Findings from a general population study of preschool children. *Parenting: Science and practice, 2,* 47–60.

Tasker, F. L., & Golombok, S. (1997). *Growing up in a lesbian family: Effects on child development.* New York: Guilford Press.

Wainright, J. L., Russell, S. T., & Patterson, C. J. (2004). Psychosocial adjustment, school outcomes, and romantic attractions of adolescents with same-sex parents. *Child Development, 75,* 1886–1898.

Received April 12, 2004
Revision received September 1, 2005
Accepted October 26, 2005 ∎

# Tab 6

CURRENT DIRECTIONS IN PSYCHOLOGICAL SCIENCE

# What Do We Know About Gay and Lesbian Couples?

Lawrence A. Kurdek

*Wright State University*

ABSTRACT—*Research on gay and lesbian couples is highlighted with regard to household labor, conflict, satisfaction, perceived social support, stability, and the variables that predict relationship quality. Relative to partners from married heterosexual couples, partners from gay and lesbian couples tend to assign household labor more fairly, resolve conflict more constructively, experience similar levels of satisfaction, and perceive less support from family members but more support from friends. The limited data available indicate that gay and lesbian couples may be less stable than married heterosexual couples. The factors that predict relationship quality tend to be the same for gay, lesbian, and heterosexual married couples. Overall, research paints a positive picture of gay and lesbian couples and indicates that they tend to be more similar to than different from heterosexual couples.*

KEYWORDS—*gay couples; lesbian couples; relationship quality; relationship stability*

In November 2004, Americans in 11 states voted on whether marriage should be legal for only heterosexual couples. The resounding message from the voters in each of these states was that marriage as a legal institution should, indeed, be reserved only for couples consisting of a man and a woman. One interpretation of voters' response to the gay-marriage issue is that most Americans regard gay and lesbian couples as being different from heterosexual couples. But what does research on gay and lesbian couples say on this matter? Does evidence support the view that gay and lesbian couples work in ways that are different from the way that heterosexual couples work? Before I examine aspects of these questions, I will address the question of the number of gay and lesbian couples in America.

## HOW MANY AMERICAN GAY AND LESBIAN COUPLES ARE THERE?

Because of the stigma associated with homosexuality, many gay and lesbian persons are reluctant to disclose their sexual orientation. Consequently, there are no definitive data on the number of gay and lesbian Americans. Perhaps the best available estimates were derived by Laumann, Gagnon, Michael, and Michaels (1994), who interviewed a national sample of 1,511 men and 1,921 women. Of this sample, 4.9% of the men and 4.1% of the women reported having engaged in sexual behavior with a person of their own sex since the age of 18, 6.2% of the men and 4.4% of the women reported having been attracted to a person of their own sex, and 2.8% of the men and 1.4% of the women identified themselves with a label denoting same-sex sexuality (e.g., homosexual).

Given the difficulty in estimating the number of gay and lesbian Americans, it is not surprising that there are also no definitive data on the number of gay and lesbian American couples. However, changes in the way information about households is collected in the United States Census have allowed estimates of the number of households headed by a person with a same-sex partner to be obtained. Data from the Census of 2000 (Simons & O'Connell, 2003) indicate that of the 5.5 million couples who were living together but not married, about 1 in 9 were same-sex couples. Of these couples, 301,026 involved male partners and 293,365 involved female partners. Children under the age of 18 resided with 22% of the male couples and with 33% of the female couples.

Because presenting oneself publicly as gay or lesbian opens the door to discrimination and even violence, estimates of the number of gay and lesbian individuals and couples are most assuredly underestimates. Nonetheless, it is clear that, despite a generally inhospitable social climate, being part of a couple is integral to the lives of many gay men and lesbians. Next, topics of particular relevance to gay and lesbian couples are reviewed.

## TOPICS RELEVANT TO GAY AND LESBIAN COUPLES

### Household Labor

One perception of partners from happy couples is that each partner does something to contribute to the overall well-being of

Address correspondence to Larry Kurdek, Department of Psychology, Wright State University, Dayton, OH 45435-0001; e-mail: larry.kurdek@wright.edu.

Copyright © 2005 American Psychological Society

Gay and Lesbian Couples

the couple. When members of a couple live together, the extent to which they depend on each other increases, making it likely that the general issue of "Who does what?" has to be confronted. For many heterosexual couples, biological sex is one major factor that determines which roles partners assume. For example, despite major changes in the number of American women who work outside the home, wives still do the majority of household tasks (Artis & Pavalko, 2003). Given the persistence with which biological sex is used to assign roles relevant to household labor in heterosexual couples, the division of household labor for gay and lesbian couples provides one way to examine how roles in relationships get assigned independently of biological sex.

Three conclusions emerge from studies of how members of gay and lesbian couples divide household labor (e.g., Carrington, 1999). First, members of gay and lesbian couples do not assign roles for household labor such that one partner is the "husband" and the other partner is the "wife." Second, although members of gay and lesbian couples do not divide household labor in a perfectly equal manner, they are more likely than members of heterosexual couples to negotiate a balance between achieving a fair distribution of household labor and accommodating the different interests, skills, and work schedules of particular partners. This pattern of negotiation holds true even when couples have children living with them (Patterson, 2000). Third, as couples become more established, partners are likely to specialize in the household tasks they do, perhaps as one way of getting household tasks done efficiently.

## Conflict

Conflict is inevitable in any relationship. In heterosexual couples, conflict is often thought to occur because of systematic differences in how men and women perceive their worlds. If this view of relationship conflict is valid, then one might expect that partners from same-sex couples would resolve conflict better than partners from heterosexual couples do because they perceive their worlds through similar lenses. Research supports this expectation.

Gottman et al. (2003) videotaped partners from gay, lesbian, and married heterosexual couples discussing problems in their relationships and then coded the emotions expressed by the partners in the course of the discussions. The researchers found that, relative to heterosexual partners, gay and lesbian partners began their discussions more positively and were more likely to maintain a positive tone throughout the course of the discussion. Findings from survey data also indicate that partners from gay and lesbian couples resolve conflict more positively than spouses from married couples do: They argue more effectively, are less likely to use a style of conflict resolution in which one partner demands and the other partner withdraws, and are more likely to suggest possible solutions and compromises (Kurdek, 2004a). Gottman et al. speculated that partners from gay and

lesbian couples handle conflict more positively than spouses from heterosexual couples do because they value equality more and have fewer differences in power and status between them.

It is of note that, although partners from gay and lesbian couples tend to resolve conflict more positively than spouses from married couples do, partners from gay, lesbian, and heterosexual couples are likely to disagree over the same issues. In a study in which partners rated how frequently they fought over 20 specific issues (Kurdek, 2004b), differences among gay, lesbian, and heterosexual couples were largely nonexistent. Equally striking was the finding that partners from gay, lesbian, and heterosexual couples identified the same areas as sources of the most conflict: finances, affection, sex, being overly critical, driving style, and household tasks. Thus, differences in conflict resolution appear to be due to how conflict is handled rather than to what the conflict is about.

### Perceived Support for the Relationship

Based on evidence that the level of support from members of one's social network affects the health of one's relationship, current theories about relationships (e.g., Huston, 2000) recognize that relationships develop within social contexts. Several studies have examined the extent to which members of gay and lesbian couples perceive support for their relationships (e.g., Kurdek, 2004a). Relative to spouses from heterosexual couples, partners from gay and lesbian couples are less likely to name family members as support providers and are more likely to name friends as support providers. These differences are notable because they are among the largest differences found in comparisons between heterosexual and gay or lesbian couples. The lack of family support for one's primary close relationship is often viewed as a unique stressor for gay men and lesbians and perhaps represents the overall lack of legal, social, political, economic, and religious support that gay and lesbian partners experience for their relationships. On the other hand, the high level of support that gay and lesbian partners enjoy from friends has been viewed as one way in which they compensate for the absence of institutionalized support.

### Satisfaction

Nearly all available evidence indicates not only that gay men and lesbians are, on average, satisfied with their relationships, but that their level of satisfaction is at least equal to that reported by spouses from married heterosexual couples (Blumstein & Schwartz, 1983; Kurdek, 2001). Further, longitudinal data from partners from gay, lesbian, and heterosexual couples indicate that, for each type of couple, self-reported relationship quality is relatively high at the start of the relationship but decreases over time (Kurdek, 1998).

### Stability

Perhaps the most important "bottom-line" question asked about gay and lesbian couples is whether their relationships last. Be-

Lawrence A. Kurdek

cause survey data (see Kurdek, 2004b) indicate that between 8% and 21% of lesbian couples and between 18% and 28% of gay couples have lived together 10 or more years, it is clear that gay men and lesbians can and do build durable relationships. More detailed information on the stability of gay and lesbian relationships is limited because few studies have followed the same samples of gay and lesbian couples over time. Nonetheless, findings from three studies are relevant.

Kurdek (2004a) reported that for 126 gay couples and 101 lesbian couples assessed annually up to 12 times, 24 of the gay couples (19%) and 24 of the lesbian couples (24%) dissolved their relationships. With controls for demographic variables (e.g., length of cohabitation), the difference in the rate of dissolution for gay and lesbian couples was not significant. Over a comparable period of 11 annual assessments, 70 of 483 heterosexual married couples (15%) ended their relationships. With controls for demographic variables, the dissolution rate for heterosexual couples was significantly lower than that for either gay or lesbian couples.

In their 18-month follow-up survey of partners from 1,021 married heterosexual couples, 233 cohabiting heterosexual couples, 493 cohabiting gay couples, and 335 cohabiting lesbian couples, Blumstein and Schwartz (1983) found that 4% of the married couples, 14% of the cohabiting heterosexual couples, 13% of the cohabiting gay couples, and 18% of the cohabiting lesbian couples had dissolved their relationships. Although these authors reported no statistical comparisons, my analyses of their data indicated that, although rates of dissolution did not differ for either gay couples versus lesbian couples or for gay and lesbian couples versus cohabiting heterosexual couples, both gay and lesbian couples were more likely to dissolve their relationships than married heterosexual couples were.

Andersson, Noack, Seierstad, and Weedon-Fekjaer (2004) examined differences in the dissolution rates of gay and lesbian registered partnerships in Norway and in Sweden. Because registered partnerships were first made available in Norway in 1993 and in Sweden in 1995, dissolution rates are necessarily based on couples with legal unions of relatively short duration. For both countries, dissolution rates were significantly higher for lesbian couples than they were for gay couples. In Norway, 56 out of 497 lesbian partnerships were dissolved (11.26%) as compared to 62 out of 796 gay partnerships (7.78%). In Sweden, 117 out of 584 lesbian partnerships were dissolved (20.03%) as compared to 135 out of 942 gay partnerships (14.33%). In comparison, the percentage of dissolved heterosexual marriages in Sweden was 8%. For both countries, the higher rate of dissolution for lesbian couples than for gay couples persisted even when statistical analyses controlled for length of the partnership (which, if different between the two groups, can produce illusory differences in gay and lesbian couples' stability).

In sum, the data are too scant to warrant any conclusions about the relative stability of gay and lesbian couples. However, it is of note that Blumstein and Schwartz's (1983) data indicated that the dissolution rate for cohabiting heterosexual couples was similar to that for both cohabiting gay couples and cohabiting lesbian couples. Unlike spouses from married heterosexual couples who experience social, religious, and legal barriers to leaving their relationships, cohabiting couples—whether gay, lesbian, or heterosexual—have no such institutionalized barriers. Further, although some gay and lesbian couples raise children, the majority do not (Simons & O'Connell, 2003), thereby removing another significant barrier to dissolution. Thus, perhaps what is most impressive about gay and lesbian couples is not that they may be less stable than heterosexual married couples, but rather that they manage to endure without the benefits of institutionalized supports.

### Factors Predicting Relationship Quality

One way of determining whether the relationships of gay men and lesbians work the same way the relationships of heterosexual persons do is to see if the links between variables known to be relevant to relationship functioning and relationship quality are as strong for gay and lesbian partners as they are for heterosexual married partners. The predictors of relationship quality that have been examined usually come from four classes of variables commonly used in research on relationships (e.g., Huston, 2000). These include characteristics each partner brings to the relationship (such as personality traits), how each partner views the relationship (such as level of trust), how partners behave toward each other (such as communication and conflict-resolution styles), and perceived level of support for the relationship (such as that from family members and friends).

The relevant findings are easily summarized. Nearly all studies (e.g., Kurdek, 2004a) find that the links between variables from the four classes just listed and relationship quality for gay and lesbian couples do not differ from the parallel links for heterosexual married couples. That is, the extent to which relationship quality is predicted by these four kinds of variables tends to be as strong for gay and lesbian couples as it is for heterosexual couples. Thus, despite external differences in how gay, lesbian, and heterosexual couples are constituted, the relationships of gay and lesbian partners appear to work in much the same way as the relationships of heterosexual partners do.

Based on evidence that gay and lesbian relationships are influenced by the same set of factors that influence heterosexual marriages, institutionalized support for gay and lesbian relationships might be expected to enhance the stability of these relationships just as it does for heterosexual marriages. In fact, this reasoning formed one of the bases for the American Psychological Association's passing a resolution declaring it unfair and discriminatory to deny same-sex couples legal access to civil marriage and all its attendant benefits, rights, and privileges (American Psychological Association, 2004).

## ISSUES FOR FUTURE RESEARCH

Future research on gay and lesbian couples needs to address several key issues. One is sampling: Because most studies have used convenience samples of mostly white and well-educated partners, the extent to which findings generalize to the larger population of gay and lesbian couples is unknown. Problems with regard to sampling may be eased as specialized populations—such as couples with civil unions from states with open records—become identified. Another issue is research methods: Most studies on gay and lesbian couples have used self-report surveys. Future work could address some of the biases associated with self-report data by employing behavioral observations as well as peer or partner ratings.

The life course of gay and lesbian relationships is another area requiring further research. Because gay and lesbian courtship is a fairly hidden process, little is known about how gay and lesbian relationships develop from courtship to cohabitation to marriage-like unions with high commitment. Recruiting dating couples for longitudinal research, however, remains a challenge. It is also necessary to establish what variables are unique to gay and lesbian persons. Most research has used theories and methods derived from work with heterosexual couples, so little is known about how variables unique to gay and lesbian persons—such as negotiating a private and public identity as a gay or lesbian person—affect the quality of their relationships. Finally, it is necessary to learn more about the forces that help stabilize relationships. Because it is unlikely that all American gay and lesbian couples will soon have the option to marry, they will need to continue to rely on less institutionalized forces to maintain the stability of their relationships. These include psychological processes such as commitment and social processes such as level of integration into the support systems of family, friends, and coworkers.

### Recommended Reading

Kurdek, L.A. (2001). (See References)

Kurdek, L.A. (2003). Differences between gay and lesbian cohabiting couples. *Journal of Social Personal Relationships, 20,* 411–436.

Kurdek, L.A. (2004a). (See References)

Patterson, C.J. (2000). (See References)

Peplau, L.A., & Beals, K.P. (2004). The family lives of lesbians and gay men. In A.L. Vangelisti (Ed.), *Handbook of family communication* (pp. 233–248). Mahwah, NJ: Erlbaum.

## REFERENCES

American Psychological Association (2004). *Resolution on sexual orientation and marriage.* Retrieved November 14, 2004 from http://www.apa.org/pi/lgbc/policy/marriage.pdf

Andersson, G., Noack, T., Seierstad, A., & Weedon-Fekjaer, H. (2004). *The demographics of same-sex "marriages" in Norway and Sweden.* Rostock, Germany: Max-Planck Institute for Demographic Research. Retrieved November 14, 2004 from http://www.demogr.mpg.de/papers/working/wp-2004-018.pdf.

Artis, J.E., & Pavalko, E.K. (2003). Explaining the decline in women's household labor: Individual change and cohort differences. *Journal of Marriage and Family, 65,* 746–761.

Blumstein, P., & Schwartz, P. (1983). *American couples: Money, work, sex.* New York: William Morrow.

Carrington, C. (1999). *No place like home: Relationships and family life among lesbians and gay men.* Chicago: University of Chicago Press.

Gottman, J.M., Levenson, R.W., Swanson, C., Swanson, K., Tyson, R., & Yoshimoto, D. (2003). Observing gay, lesbian, and heterosexual couples' relationships: Mathematical modeling of conflict interaction. *Journal of Homosexuality, 45,* 65–91.

Huston, T.L. (2000). The social ecology of marriage and other intimate unions. *Journal of Marriage and the Family, 62,* 298–320.

Kurdek, L.A. (1998). Relationship outcomes and their predictors: Longitudinal evidence from heterosexual married, gay cohabiting, and lesbian cohabiting couples. *Journal of Marriage and Family, 60,* 553–568.

Kurdek, L.A. (2001). Differences between heterosexual-nonparent couples and gay, lesbian, and heterosexual-parent couples. *Journal of Family Issues, 22,* 727–754.

Kurdek, L.A. (2004a). Are gay and lesbian cohabiting couples *really* different from heterosexual married couples? *Journal of Marriage and Family, 66,* 880–900.

Kurdek, L.A. (2004b). Gay men and lesbians: The family context. In M. Coleman & L.H. Ganong (Eds.), *Handbook of contemporary families: Considering the past, contemplating the future* (pp. 96–115). Thousand Oaks, CA: Sage.

Laumann, E.O., Gagnon, J.H., Michael, R.T., & Michaels, S. (1994). *The social organization of sexuality: Sexual practices in the United States.* Chicago: University of Chicago Press.

Patterson, C.J. (2000). Family relationships of lesbians and gay men. *Journal of Marriage and Family, 62,* 1052–1069.

Simons, T., & O'Connell, M. (2003). *Married-couple and unmarried-partner households: 2000.* Washington, DC: U.S. Census Bureau. Retrieved November 14, 2004, from http://www.census.gov/prod/2003pubs/censr-5.pdf

# Tab 7

HOME / SANDBOX : KEEPING AN EYE ON KIDS AND PARENTS.

# The Gay Science

**What do we know about the effects of same-sex parenting?**
*By Ann Hulbert*
Posted Friday, March 12, 2004, at 3:16 PM ET



First comes love, then comes marriage, then comes baby in the baby carriage: So far, the gay marriage debate has been about rights and romance and, of course, religion. Advocates and opponents alike have been notably quiet about a fourth "R"—raising children. But when the rhetoric heats up, we'll doubtless hear plenty from each side about the research on same-sex parenting and its effects on kids. What's surprising is that both camps have converged lately on a very basic point: The existing science is methodologically flawed and ideologically skewed. Don't count on that consensus, however, to dampen the feud.

You wouldn't guess from the current "expert" position on homosexual child-rearing that the data are in any doubt. Two years ago, the American Academy of Pediatrics put its imprimatur on the stance adopted by the American Psychiatric Association in 2000. An article in *Pediatrics* pronounced that "a growing body of scientific literature demonstrates that children who grow up with 1 or 2 gay and/or lesbian parents fare as well in emotional, cognitive, social, and sexual functioning as do children whose parents are heterosexual."

Like ⟨5⟩
PRINT
DISCUSS
E-MAIL
RSS
RECOMMEND...
REPRINTS
SINGLE PAGE

But behind the scenes, skeptics have emerged—and from an unexpected quarter. It's hardly startling to find conservative family-values crusaders and opponents of gay marriage balking at the verdict and challenging the validity of several decades' worth of data. As one of the most sober of them, Steven Nock of the University of Virginia, wrote in an affidavit in last year's Ontario Superior Court gay marriage case, "not a single one of those studies was conducted according to generally accepted standards of scientific research." What's jarring is to hear champions of family diversity and gay marriage chiming in. Who would have predicted this camp would come up with the most incisive critique of the claim that research has proved there are no differences between kids raised by gay and straight parents?

Advertisement



Whenever advocates shoot down findings that work in their favor, the result carries extra credibility. In this case it helps, too, that the professor stepping forth to do so, Judith Stacey, is a well-known sociologist whose strident advocacy of "alternative" families has made her a nemesis of traditionalists. Stacey's stringent assessment of 21 of the better studies on gay child-rearing, in an article titled "(How) Does the Sexual Orientation of Parents Matter?" cut through the ideological static that such a charged area of research almost inevitably generates. (Co-authored with Timothy J. Biblarz, it appeared in the *American Sociological Review* in 2001.)

Stacey readily concurred with the traditionalist critics' charge that scholarship in the still-fledgling field of gay parenting has been conducted almost entirely by researchers sympathetic to gay concerns. This is precisely why she set out to subject the studies to a "heightened degree of critical scrutiny." She focused in on the difficulties that have stymied good, systematic work. For starters, when the first small studies comparing children of hetero- and homosexual parents came out in the late 1970s, it was impossible to obtain representative samples—and it still is. After all, nobody really knows how big the population of homosexual-headed families with kids is or what it looks like. (The general demographic profile of such households is only beginning to emerge. Data from the 1990 Census suggested that 27 percent of lesbians in same-sex couples had given birth to children; between 5 percent and 17 percent of gay male households included kids. Estimates of the number of kids of gay and lesbian parents range from 6 million to 10 million, according to a group called COLAGE, or Children of Lesbians and Gays Everywhere.) Partly because

researchers are dealing with subjects who have not exactly clamored to be counted and measured, samples have been small and anything but random—they consist of adults and children who get referred or recruited. The resulting data have been heavily slanted to well-educated white families and overwhelmingly to lesbian parents rather than gay men with kids.

The problems don't stop there. A chunk of the gay-parenting literature dates to the 1980s, when researchers drew mostly on children born in heterosexual marriages that dissolved before or after a parent came out. (It was a decade during which studies of divorced- and single-parent families in general multiplied.) With this "transitional generation," it's impossible to disentangle the effects of parents' sexual orientation from those of divorce, of the revelation of homosexuality, and of re-partnering. And whatever impact social stigma had then, it's surely changed somewhat now that same-sex parenthood is more visible.

Finding suitable control groups is tricky, too. In the past, children of divorced single mothers have often served as the point of comparison, even though once-married lesbian mothers are more likely than their heterosexual peers to be living with new partners. Only in the 1990s have some (small) studies matched up children of homosexual and heterosexual donor-insemination couples. Given the limitations of such shaky cross-sectional research, longitudinal studies would be very useful—especially since there's so much interest in developmental issues, including the evolution of kids' gender identities and sexual orientations when they grow up with gay parents. Almost nobody, however, has tracked gay and lesbian families over time.

But Stacey's boldest move is to challenge not just the methodology but the fundamental assumption that has informed the bulk of gay parenting studies: the idea that it would be damning to discover that kids of gay parents deviated *in any way* from kids growing up with moms and dads. As other critics have pointed out, the defensive goal of proving sameness is almost a guarantee of weak science. (The hypothesis that both groups of kids are alike is hard to rule out, but that doesn't mean you've established that there are no differences.) That "heterosexist" bias, Stacey argues, has also encouraged researchers to fudge results, anxiously claiming homogeneity where there's actually some variety. Why, she asks, buy into the view that "*differences indicate deficits*"?

Her question is a good one to guide future work. But right now, it seems to be inspiring yet more dubious science, as the admittedly weak evidence is now sifted for indications that gay parents and their kids do in fact diverge from heterosexual families—and in advantageous ways. Dip into a recent book called *The Gay Baby Boom*, by Suzanne M. Johnson and Elizabeth O'Connor, and you'll find the muddled data often summoned as proof of the distinctiveness of gay child-rearing, rather than its equivalence to the heterosexual version. Out comes a portrait of egalitarian, consistent, harmonious, and "authoritative" (warm but not lax) lesbian co-parenting that moms and dads might learn from. (Dads, it seems, tend to lag on parenting skills tests.)

Digging around in the existing data on kids of gay parents leads the authors and others to similarly rosy speculations that these children are unusually open-minded. Some studies, for example, show boys playing less aggressively and behaving more "chastely" as youths, while girls' early interests are more androgynous and their adolescence evidently somewhat more sexually adventurous. On the hot topic of sexual orientation, the only long-term study of lesbian-headed families reports 64 percent of the young adult children saying they've *considered* same-sex relationships (compared to 17 percent with heterosexual parents)—although there is no statistical difference between the number in both groups who *identify* themselves as gay, lesbian, or bisexual."

From the perspective of sympathizers with the gay marriage cause, the bottom line of this turn-of-the-millennium revisionism is very upbeat: Kids of gays and lesbians are now judged to fare as well as *or better* than children of heterosexuals—especially, advocates note, when you factor in the prejudice and other pressures that such kids may face. The fact that they hold their own with children from more conventional families is read as an augury of unusual resilience (and some studies even report finding them more emotionally expressive). But you can bet that Focus on the Family and other conservatives are likely to take a rather dimmer view of this latest twist on the data. What pro-gay scholars hail as signs of empathetic flexibility are the kind of gender-bending proclivities that provide grist for more antigay alarm. The idea of "androgynous" parenting, together with tolerance of fluid notions of sexual identity, comes awfully close to the specter of queer parents spawning queer kids that haunts right-wing child-rearing expert/political advocate James Dobson and his followers, among others.

But wait: All the evidence—as both sides acknowledge—is seriously flawed and doesn't begin to supply anything like solid support for either the hopes of gay family harmony or the fears about scarred children and skewed parenting. And until gay couples are allowed to marry, there can't possibly be decent studies of whether the honorable estate confers the same benefits on kids whose parents are the same sex as it does on those who have a mom

**Summer Reading Top Kid's Picks** *(Patch - Babylon Village, NY)*

**Pleasantville Pediatrician Talks ADHD** *(Patch - Pleasantville-Briarcliff Manor, NY)*

**Female Anatomy Changes Post-Partum** *(Baby Health Guide)*

**Olney: Montero to Yanks 'imminent'** *(ESPN)*

**Too Much TV Can Make Your Sick Child Even Sicker** *(The Sick By CafeMom)*

and a dad. In the meantime, it's quite clear that the absence of good science won't—and shouldn't—settle a fraught debate. What will help clarify it are experiences like mine, watching my sister and her partner sharing the hard work and the happiness of raising their daughter. I can't think of a better argument for gay marriage than that.

*Correction, March 22, 2004: The original version of this piece stated that the same percentage of young adult children of homosexual and heterosexual mothers identified themselves as gay, lesbian, or bisexual. In fact, the researchers discovered no statistical difference in the number of young adult children from both groups who identified as gay or lesbian. (Return to corrected sentence.)*

0 Comments     Add Yours     Or join the discussion
                                 on the Fray

Like This Story     Like     8 people like this.

## MORE FROM SLATE

- **House Republicans defense of DOMA will be rooted in their own ugly history.**
- **Is Marcus Bachmann gay? Dan Savage and Jon Stewart think gaydar answers the question. They're wrong.**
- **Most Americans now support gay marriage. But they can't legalize it, thanks to the voters of 2004.**
- **Tim Tebow's Non-Abortion**
- **South Dakota Law Requires Women to Hear Anti-Choice Lectures**
- **Garrison Keillor Hints at Retirement**

## MORE FROM THE WEB

- **Mommy Matters: Have Fun While Preparing Your Kids For School** *(from Patch - Westhampton-Hampton Bays, NY)*
- **Coming Up: Bunco Game Night to Benefit Child Care Resources of Rockland** *(from Patch - Pearl River, NY)*
- **10 Ways to Make a Loved-One's Hospital Stay More Comfortable** *(from HealthCentral.com)*
- **Jackie Kennedy Tapes Reveal JFK and the First Lady Slept Around** *(from The Stir By CafeMom)*
- **Woman becomes second in NYC triathlon to die** *(from ESPN)*
- **The Big Problem Kate Middleton Has With Her New Home** *(from The Stir By CafeMom)*

[what's
this]

Tweet     Post     RSS     Print     E-mail

*Ann Hulbert is the author of* Raising America: Experts, Parents, and a Century of Advice About Children.

*Illustration by Robert Neubecker. Photograph of t
Dematteis/Reuters. Photograph of two mothers an
Erickson/CORBIS.*

Sponsored Links

**Are you pregnant?**
Learn the science behind baby's
today!
Cordblood.com



Singer Gavin Degraw Assaulted

Login     Login required, click I

Share     This Page

Sign up for *Slate's* daily newsletter.
Enter your e-mail address.          GO ▶

Follow                                        Cancel

# Tab 8

# THE CASE FOR
# Marriage

*Why Married People*

*Are Happier, Healthier,*

*and Better Off Financially*

Linda J. Waite

Maggie Gallagher

BROADWAY BOOKS
*New York*

*To Rafe*



A hardcover of this book was originally published in 2000 by Doubleday, a division of Random House, Inc. It is here reprinted by arrangement with Doubleday.

THE CASE FOR MARRIAGE. Copyright © 2000 by Linda J. Waite and Maggie Gallagher. All rights reserved. Printed in the United States of America. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without written permission from the publisher. For information address: Broadway Books, a division of Random House, Inc., 1540 Broadway, New York, NY 10036

Broadway Books titles may be purchased for business or promotional use or for special sales. For information, please write to: Special Markets Department, Random House, Inc., 1540 Broadway, New York, NY 10036.

BROADWAY BOOKS and its logo, a letter B bisected on the diagonal, are trademarks of Broadway Books, a division of Random House, Inc.

Visit our website at www.broadwaybooks.com

First Broadway Books trade paperback edition published November 2001

*Designed by Carla Bolte*

The Library of Congress has cataloged the hardcover as follows:

Waite, Linda J.
The case for marriage/Linda J. Waite and Maggie Gallagher.—1st ed.
p.   cm.
Includes bibliographical references and index.
1. Married couples—United States—Psychology.   2. Man-woman relationships—United States.   3. Single people—United States—Psychology.   I. Gallagher, Maggie.   II. Title.
HQ536.W33 2000
360.81´0973—dc21        00-022672

ISBN 0-7679-0632-2

9   10

# Tab 9

# LIFE
# WITHOUT
# FATHER

*Compelling new evidence that fatherhood and marriage are*
*indispensable for the good of children and society*

## DAVID POPENOE



MARTIN KESSLER BOOKS

THE FREE PRESS

*New York   London   Toronto   Sydney   Tokyo   Singapore*



THE FREE PRESS
A Division of Simon & Schuster Inc
1230 Avenue of the Americas
New York NY 10020

Copyright © 1996 by David Popenoe
All rights reserved
including the right of reproduction
in whole or in part in any form

The Free Press and colophon are trademarks
of Simon & Schuster Inc

Designed by Carla Bolte

Manufactured in the United States of America

10   9   8   7   6   5   4   3   2   1

Library of Congress Cataloging in Publication Data

Popenoe David 1932–
    Life without father  compelling new evidence that fatherhood and marriage are
indispensable for the good of children and society / David Popenoe
        p    cm
    Includes bibliographical references (p         ) and index
    ISBN 0-684-82297-0
    1 Fatherless family—United States   2 Fatherhood—United States   3 Fathers—
United States   4 Paternal deprivation—United States   5 Children of single parents—
United States   6 United States—Social conditions   1 Title
HQ756 P65   1996
306 874 2—dc20                                                      95–46233
                                                                         CIP

# Tab 10

# The Defense of Traditional Marriage

*George W. Dent, Jr.* [*]

The institution of marriage, which has been battered by decades of social and legal change, is now being buffeted by demands that marriage between persons of the same sex be legally recognized. For many, this is the paramount goal for gays: it would signify social acceptance of the moral equality of homosexuality and hetero-sexuality.[1]   The Vermont Supreme Court recently boosted this campaign by requiring that the benefits of marriage be made available to same-sex couples.[2]   The court left it to the legislature whether to

---

[*] Schott-van den Eynden Professor of Law, Case Western Reserve University School of Law. The author is grateful for helpful suggestions from Teresa Collett, David Coolidge, Rick Duncan and Lynn Wardle and from participants in a symposium on same-sex marriage conducted by the University of Chicago Law School Roundtable. The author also thanks David Dieteman and Ross Miller for their able research assistance.

[1] See RICHARD A. POSNER, SEX AND REASON 311 (1992) (noting that "permitting homosexual marriage would be widely interpreted as placing a stamp of approval on homosexuality"); David L. Chambers, *What If?: The Legal Consequences of Marriage and the Legal Needs of Lesbian and Gay Male Couples*, 95 MICH. L. REV. 447, 450 (1996) (legal recognition "would signify the acceptance of lesbians and gay men as equal citizens more profoundly than any other nondiscrimination laws that might be adopted. Most proponents of same-sex marriage . . . want marriage first and foremost for this recognition.") (footnote omitted); Thomas Stoddard, *Why Gay People Should Seek the Right to Marry*, OUT/LOOK 6, FALL, 1989, at 12-13 (arguing that gay marriage is "the political issue that most fully tests the dedication of people who are *not* gay to full equality of gay people"); Evan Wolfson, *Crossing the Threshold: Equal Marriage Rights for Lesbians and Gay Men and the Intra-Community Critique*, 21 N.Y.U. REV. L. & SOC. CHANGE 567, 607 (1994) (the significance of marriage lies in its "emotional, declarative, and often religious power"). *Accord* Craig W. Christensen, *If Not Marriage? On Securing Gay and Lesbian Family Values by a "Simulacrum of Marriage"*, 66 FORDHAM L. REV. 1699, 1733, 1783-84 (1998) ("[I]t is likely that the most far-reaching consequence of legalized same sex-marriage would be symbolic. . . . In one step, society would confer, perforce, the symbolic legitimation of intimacy that is always implicit in the celebration of marriage."). *See also* Sheila Rose Foster, *The Symbolism of Rights and the Costs of Symbolism: Some Thoughts on the Campaign for Same-Sex Marriage*, 7 TEMP. POL. & CIV. RTS. L. REV. 319, 321-23 (1998) (acknowledging the primacy of symbolism in the campaign for gay marriage).

[2] Baker v. State, 744 A.2d 864 (Vt. 1999). The decision was based on an unusual provision of the state constitution that reads, in pertinent part:

581

582            *Journal of Law & Politics*            [Vol.XV:581

fulfill this command by recognizing same-sex marriages,[5] or domestic partnerships, or otherwise. The demand for gay marriage deserves a rebuttal. Moreover, the arguments on both sides of this debate apply to many other relationships and activities (including polygamy, endogamy, cloning and bestiality) that have been denied recognition as marriage and often condemned as crimes. Hence, the clamor for same-sex marriage also challenges these exclusions and prohibitions.

This article reviews the possible justifications for legal recognition of marriage and finds some, such as encouraging stable, loving relationships, unpersuasive. However, other rationales—including protecting children, socializing adults, and promoting individual happiness—are valid, and these rationales apply only to traditional marriages. Accordingly, society has strong reasons to favor traditional marriage and to deny such treatment to the unmarried and to homosexual, endogamous and bestial relationships.

Part I of this article briefly reviews the relevant law. Part II discusses

---

That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community.

Vt. Const., ch. I, art. 7.

A couple of earlier rulings favoring same-sex marriage were later legislatively overruled. *See* Baehr v. Lewin, 852 P.2d 44, 75, 82 (Haw. 1993) (holding state must show compelling a reason to deny recognition of same-sex marriages); *on remand,* Baehr v. Miike, Civ. No. 91-1394, 1996 WL 694235 (Haw. Cir. Ct. Dec. 3, 1996) (finding no compelling reason). In 1998 Hawaii voters passed a Marriage Amendment to the state constitution providing: "The legislature shall have the power to reserve marriage to opposite-sex couples." Haw. Const., art. I, § 23 (http://www.state.hi.us/lrb/con/condoc.html (visited June 13, 2000)). The Hawaii Supreme Court then held that the "amendment validated [the existing marriage statute] by taking statute out of the ambit of the [state] equal protection clause." Baehr v. Miike, Civ. No. 91-1394-05, 1999 Haw. LEXIS 391, at *3 (Haw. Dec. 9, 1999).

A similar ruling in Alaska—*Brause v. Bureau of Vital Statistics,* No. 3AN-95-6562 CI, 1998 WL 88743 (Alaska Super. Feb, 27, 1998)—was also overruled by an amendment to the state constitution. Alaska Const., art. I, § 25 (1998).

[5] Some commentators dislike the term "same-sex marriage" because it suggests a "farcical construct of . . . a marriage touted to be not just for gays, but for any two persons of the same sex who wish to marry." Anthony C. Infanti, Baehr v. Lewin: *A Step in the Right Direction for Gay Rights?,* 4 LAW & SEXUALITY 1, 3 (1994). This article will use the terms same-sex, gay and homosexual marriage interchangeably.

The word "homosexual" is also problematic: "there is still no universally accepted definition of homosexuality among clinicians and behavioral scientists." William Byrne & Bruce Parsons, *Human Sexual Orientation: The Biologic Theories Reappraised,* 50 ARCHIVES GEN. PSYCHIATRY 228 (1993). Difficulty arises in part because sexual orientation is not bipolar but forms a continuum from strictly heterosexual through bisexual to strictly homosexual. *See infra* note 155. This article will not posit a precise definition although this may result in occasional vagueness.

the legitimate grounds for law-making in the liberal state.  Part III analyzes some invalid justifications for legal recognition of marriage. Part IV sets forth valid arguments for legal recognition.  Part V rebuts the arguments for same-sex marriage and other unconventional forms of marriage.

## I. THE CURRENT STATE OF THE LAW

Traditionally, American law did not recognize same-sex marriage and courts routinely upheld this exclusion,[4] but a few recent decisions have required their recognition.[5]  These decisions raised the question of whether other states would have to recognize gay marriages under the full faith and credit clause of the United States Constitution.[6] Several states adopted laws to deny recognition of same-sex marriages even if validated in other states.[7]  Congress also adopted the Defense of Marriage Act providing that states need not recognize a same-sex marriage even if it is valid in another state and that in federal law marriage is heterosexual and monogamous.[8]

All legal systems recognize marriage.   The criteria for a valid

---

[4] *See* Dean v. District of Columbia, 653 A.2d 307, 310-31 (D.C. App. 1995); In re Ladrach, 513 N.E.2d 828 (Oh. Ct. C.P. 1987); DeSanto v. Barnsley, 476 A.2d 952, 955-56 (Pa. Super. Ct. 1984); McConnell v. Nooner, 547 F.2d 54, 56 (8th Cir. 1976); Singer v. Hara, 522 P.2d 1187, 1189 (Wash. Ct. App. 1974); Jones v. Hallahan, 501 S.W.2d 588, 589-90 (Ky. Ct. App. 1973); Baker v. Nelson, 191 N.W.2d 185, 186-87 (Minn. 1971), *app. dismissed,* 409 U.S. 810 (1972). For other cases upholding the traditional male-female definition of marriage, see Storrs v. Holcomb, 645 N.Y.S.2d 286, 288 (Sup. Ct. 1996); In re Cooper, 564 N.Y.S.2d 684, 685 (Sur. Ct. 1990), *aff'd,* 592 N.Y.S.2d 797 (App. Div. 1993); Succession of Bacot, 502 So.2d 1118, 1130 (La. Ct. App. 1987); Slayton v. Texas, 633 S.W.2d 934, 937 (Tex. App. 1982); Adams v. Howerton, 486 F. Supp. 1119, 1122-23 (C.D. Cal. 1980), *aff'd,* 673 F.2d 1036 (9th Cir.), *cert. denied,* 458 U.S. 1111 (1982); Frances B. v. Mark B., 355 N.Y.S.2d 712, 716 (Sup. Ct. 1974); Anonymous v. Anonymous, 325 N.Y.S.2d 499, 501 (Sup. Ct. 1971);.

[5] These cases are cited *supra* note 2.

[6] U.S. Const. art. IV, § 1.  *See* Richard D. Mohr, *The Case for Gay Marriage,* 9 NOTRE DAME J.L. ETHICS & PUB. POL'Y 215, 236 (1995).  The Constitution may not require recognition.  For example, recognition of polygamous or incestuous marriages is not required of states that have a strong policy against validating such marriages.  *See* Deborah M. Henson, *Will Same-Sex Marriages Be Recognized in Sister States?: Full Faith and Credit and Due Process Limitations on States' Choice of Law Regarding the Status and Incidents of Homosexual Marriages Following Hawaii's* Baehr v. Lewin, 32 U. LOUISVILLE J. FAM. L. 551, 561-64 (1994).  *See generally* F.H. Buckley & Larry E. Ribstein, *A Choice-of-Law Solution to the Marriage Debates* (forthcoming).

[7] *See* Lynn D. Wardle, Williams v. North Carolina, *Divorce Recognition, and Same-Sex Marriage Recognition,* 32 CREIGHTON L. REV. 187, 239 (1998) (listing statutes as of late 1998).

[8] 28 U.S.C. § 1738C (1996).

marriage vary.  Thus, some cultures permit polygamy or endogamy, and others do not, but none has ever recognized gay marriages.[9] Some Scandinavian nations register and grant some benefits to "domestic partnerships" of gay couples, but these arrangements are still distinguished from marriage.[10]  The universal restriction of marriage to heterosexual relationships does not mean that the practice is instinctive, but it does show that the practice is not culturally contingent.  If a custom is important to group survival, it "will be routinely rediscovered by every culture, without need of either genetic descent or cultural transmission of the particulars."[11]

The issue here is not the permissibility but the legal recognition of same-sex marriages.  Unlike polygamy and endogamy, gay marriage is not a crime, but neither is it legally valid.  Two or more[12] people of the same sex may wed, treat themselves as married, and be treated as such by all who wish to do so.  These ceremonies have great emotional significance for some people.[13]  Some corporations and local governments now give same-sex domestic partnerships certain employment

---

[9] "Cultures and religions throughout history have recognized various forms of marriage. Same-sex marriage has not been one of them." STEVEN F. NOLL, TWO SEXES, ONE FLESH: WHY THE CHURCH CANNOT BLESS SAME-SEX MARRIAGE 41 (1997).  Historical recognition of gay marriage is at most a rare exception that proves the rule. John Boswell claimed the medieval Church treated some same-sex relationships as marriages. JOHN BOSWELL, SAME-SEX UNIONS IN PRE-MODERN EUROPE 191 (1994). Most scholars see these relationships as fraternal, not sexual. *See* Brent D. Shaw, *Book Review*, NEW REPUBLIC, July 18, 1994, at 33 (review of Boswell); Robin Darling Young, *Gay Marriage: Reimagining Church History*, FIRST THINGS, Nov., 1994, at 43-48; Constance Woods, *Same-Sex Unions or Semantic Illusions?*, COMMUNIO, Summer, 1995, at 316-317. William Eskridge catalogs many same-sex "marriages." WILLIAM N. ESKRIDGE, JR., THE CASE FOR SAME-SEX MARRIAGE 15-50 (1996).  However, most of these involve pederasty or transvestism, features that contemporary proponents of same-sex marriage disavow.  In general, his examples would strike most people as repugnant, not as admirable relationships that society should endorse. *See* Richard F. Duncan, *From Loving to Romer: Marriage and Moral Discernment*, 12 B.Y.U. J. PUB. L. 239, 249-50 (1998) (criticizing Eskridge's examples on moral grounds).

[10] For example, these laws exclude most child-rearing rights. *See* Lynn D. Wardle, *The Potential Impact of Homosexual Parenting on Children*, 1997 U. ILL. L. REV. 833, 892. *See generally* Lynn D. Wardle, *International Marriage and Divorce Regulation and Recognition: A Survey*, 29 FAM. L.Q. 497, 500 (1995).

[11] DANIEL C. DENNETT, DARWIN'S DANGEROUS IDEA: EVOLUTION AND THE MEANINGS OF LIFE 487 (1995).

[12] No state treats same-sex marriages as valid, so it seems that laws against polygamy do not apply to same-sex marriages.

[13] *See* Barbara J. Cox, *Same-Sex Marriage and Choice of Law: If We Marry in Hawaii, Are We Still Married When We Return Home?*, 1994 WIS. L. REV. 1033, 1037 n. 12 (describing the author's "commitment ceremony").

and other benefits granted to married couples.[14]

The nonrecognition of gay marriages has been challenged as an unconstitutional denial of equal protection. One question in the constitutional debate is the level of scrutiny that this practice deserves. *Baehr* held that the stringent "compelling justification" test applies under the Hawaii constitution.[15] The United States Supreme Court has applied the more lenient "rational basis" test in rejecting an equal protection claim against a criminal sodomy law; the Court refused to add homosexuality to the short list of categories that merit compelling justification review.[16] Scholars have debated this issue at length.[17] To rehash this argument is unnecessary since the justifications for traditional marriage easily survive even the stricter standard of review.

## II. LAW AND LEGITIMACY IN THE LIBERAL STATE

Marriage and sex raise questions about the legitimate scope of the law in liberal polities. The meaning of "liberal" is vague, but the core idea is that people have certain rights—a measure of freedom from government restraint of thought and action. People disagree about the scope of these rights. In this article, I posit a degree of individual autonomy broad enough to satisfy almost everyone. First, it is agreed that individuals have a "right to moral independence."[18] Government may forbid only acts that cause fairly direct, concrete harm to others.[19] This principle is invoked to challenge, for example, laws against

---

[14] *See* Wardle, *supra* note 10, 29 FAM. L.Q. at 509-11.

[15] See *Baehr*, *supra* note 2.

[16] Bowers v. Hardwick, 478 U.S. 186 (1986).

[17] For arguments in favor of a heightened level of judicial review, see Elvia R. Arriola, *Sexual Identity and the Constitution: Homosexual Persons as a Discrete and Insular Minority,* 14 WOMEN'S RIGHTS L. REP. 263, 272-78 (1992); William N. Eskridge, Jr., *A History of Same-Sex Marriage,* 79 VA. L. REV. 1419, 1425 n.13 (1993). For contrary arguments, see Richard F. Duncan, *Who Wants To Stop The Church: Homosexual Rights Legislation, Public Policy, And Religious Freedom,* 69 NOTRE DAME L. REV. 393, 407-11 (1994); Lynn D. Wardle, *A Critical Analysis of Constitutional Claims for Same-Sex Marriage,* 1996 B.Y.U. L. REV. 1, 88-95 (1996).

[18] RONALD DWORKIN, A MATTER OF PRINCIPLE 353 (1985).

[19] The classic source of the "harm" principle is Mill. *See* JOHN S. MILL, THE SUBJECTION OF WOMEN (1869); JOHN S. MILL, ON LIBERTY (1859). However, the principle is questioned even by many liberals who endorse the norm of moral independence. *See* Cass R. Sunstein, *Social Norms and Social Roles,* 96 COLUM. L. REV. 903, 947-48 (1996) ("[o]bstacles to autonomy and to good lives can . . . come from bad roles, norms, and meanings" which "sometimes private groups are unable to . . . change on their own," so that government must shape norms so as to nurture autonomy).

sodomy and abortion. The Supreme Court has sustained some of these challenges,[20] but even a challenge that fails in court may succeed in the legislative arena. Thus, although the Supreme Court has upheld the constitutionality of criminal sodomy laws,[21] most states have repealed these laws in the belief that homosexual acts in private between consenting adults do not harm others and should not be forbidden simply because a majority of citizens may consider the conduct unnatural, disgusting, immoral or sinful.[22]

The legitimate scope of law-making is broader in what Cass Sunstein calls the "expressive" function of the law, that is, "in expressing social values and in encouraging social norms to move in particular directions."[23] Despite some reckless claims that the liberal state must be value-neutral,[24] thoughtful commentators recognize that government may promote certain values and discourage others.[25] Indeed, it could hardly do otherwise. Virtually all law-making reflects value judgments, many of which are controversial;[26] to concede a sphere of

---

[20] Roe v. Wade, 410 U.S. 113 (1973).

[21] Bowers v. Hardwick, 478 U.S. 186, 196 (1986) (upholding Georgia criminal sodomy statute).

[22] *See* ESKRIDGE, *supra* note 9, at 135: "Only twenty states have fully enforceable laws prohibiting consensual sodomy." Further, "sodomy laws are almost never enforced against lesbians, bisexuals, or gay men within private spaces." *Id.* at 184.

[23] Sunstein, *supra* note 18, at 953. *See also* Lawrence Lessig, *The Regulation of Social Meaning*, 62 U. CHI. L. REV. 943 (1995); Cass R. Sunstein, *On the Expressive Function of the Law*, 144 U. PA. L. REV. 2021 (1996). This function is important to family law. *See* Carol Weisbrod, *On the Expressive Functions of Family Law*, 22 U.C. DAVIS L. REV. 991 (1989).

[24] *See* BRUCE ACKERMAN, SOCIAL JUSTICE IN THE LIBERAL STATE 11 (1980) ("No reason [for exercising power] is a good reason if it requires the power holder to assert . . . that his conception of the good is better than that asserted by any of his fellow citizens."); *see also* DWORKIN, *supra* note 17, at 191 ("[P]olitical decisions must be, so as far as is possible, independent of any particular conception of the good life, or of what gives value to life." ). More considered statements by Professor Dworkin contradict these passages. *See infra* note 28.

[25] In *A Theory of Justice*, perhaps the most influential liberal statement on legitimacy, John Rawls accepts the need for "some notion of goodness, for we need assumptions about the parties' motives in the original position." JOHN RAWLS, A THEORY OF JUSTICE 396 (1971). *See also* Michael J. Perry, *The Morality of Homosexual Conduct: A Response to John Finnis*, 9 NOTRE DAME J.L. ETHICS & PUB. POL'Y 41, 43 (1995): "[E]ven if the state cannot legitimately criminalize some particular conduct, it may nonetheless be the case that the state can legitimately judge the conduct to be immoral and, on the basis of that judgment, try to discourage the conduct or to protect others from it."

[26] "[G]overnments must inevitably act on the basis of some controversial conception of the human good . . . ." ROBERT P. GEORGE, MAKING MEN MORAL: CIVIL LIBERTIES AND PUBLIC MORALITY (1993) at 162.

individual autonomy is itself a value judgment.[27]   The expressive function is especially important in family law, which serves "both as a mechanism for meeting the needs of family members and as a vehicle for expressing our values and aspirations about family life to ourselves and our children."[28]   Thus the state may favor certain conduct, for instance by subsidizing education in some areas but not in others, even though some people dislike the state's choices.   The state may also discourage activities (such as smoking, drinking and gambling) both by taxation and exhortation, even if the state could not forbid these activities.   As these examples suggest, government may promote (or discourage) conduct because it believes that the conduct benefits (or harms) the individual, even if the individual does not agree.[29]   The expressive function of law is important because the social norms it fosters encourage good behavior; without this effect, coercion or economic pressure might be needed to induce desirable behavior.[30]

   Legal preferences concerning material interests, like health and wealth, provoke little opposition.   May government also promote (or deter) activity that it believes is spiritually enriching (or damaging)?   For some libertarians, spiritual enlightenment, or happiness, is a private matter in which the state should not interfere, especially when people disagree about what increases true happiness.   However, virtually all societies, including ours, accept that government may promote spiritual well-being.   Thus the state promotes the arts through public schooling, tax deductions for gifts to the arts, official acclaim (such as naming a poet laureate), subsidies for artistic activity, and beautification of public works.   These efforts are accepted even though they do not improve public health or increase economic output.   Moreover, the scope of proper state action is broader for children than for adults because children are less able to determine and protect their own interests.   Thus the state may mandate schooling and medical care for children even when it could not do so for adults.

[27] *See* id. at 158.

[28] Barbara Bennett Woodhouse, *Sex, Lies, and Dissipation: The Discourse of Fault in a No-Fault Era*, 82 GEO. L.J. 2525, 2526 (1994).

[29] Thus even Ronald Dworkin supports seat-belt laws on the ground that they give people what they really want rather than overriding their true desires. Ronald Dworkin, *Foundations of a Liberal Equality*, *in* 11 TANNER LECTURES ON HUMAN VALUES 77 (Grethe B. Peterson ed. 1990).

[30] *See* WILLARD GAYLIN & BRUCE JENNINGS, THE PERVERSION OF AUTONOMY 185 (1996) (appeals to social emotions are less oppressive than physical force); Sunstein, *supra* note 18, at 918 & n. 51, 955.

There is some tension between the liberal principles of democracy and individual autonomy. To thrive as a free person one needs certain attributes, including the skills necessary to earn a decent income, sufficient education to participate intelligently in public affairs, and a moral character strong enough to exercise one's autonomy to fashion a satisfying life. Democracy cannot prosper unless most citizens possess these attributes. The growing complexity of modern life demands more of these attributes for both individuals and society as a whole to flourish. People do not automatically acquire these qualities, though. The problems underdeveloped countries face in building democracy and economic prosperity show both the impossibility of achieving these goals without a populace that is adequately prepared and the difficulty of developing such a populace. Thus, ironically, an active government is necessary to nurture the kind of citizenry that can flourish under limited (or liberal) government and make that government work.

Even in its expressive functions, though, the state should not embrace values arbitrarily. As Dworkin puts it: "People have the right not to suffer disadvantage in the distribution of social goods and opportunities . . . just on the ground that their officials or fellow-citizens think that their opinions about the right way for them to lead their own lives are ignoble or wrong."[31] Similarly, Cass Sunstein says: "without very good reasons, social and legal structures ought not to turn differences that are irrelevant from the moral point of view into social disadvantages."[32] As Sunstein implies, moral considerations are appropriate in law-making, but the majority is not right simply because it is the majority.

The most influential statement of the liberal theory of justice comes from John Rawls. Rawls says justice demands rules that are fair in that they would be acceptable to persons in the "original position"—that is, without such particular features as wealth, race, sex, sexual orientation, and family status, that can lead to support for rules that favor one's own interests over others' interests.[33] Although Rawls has many critics,[34] this article accepts his principle. We may even extend Sun-

---

[31] DWORKIN, *supra* note 17, at 353.

[32] Cass R. Sunstein, *Homosexuality and the Constitution*, 70 IND. L.J. 1, 13 (1994).

[33] RAWLS, *supra* note 24, at 11-17, 136-42.

[34] *E.g.*, R.M. Hare, *Rawls' Theory of Justice: Part II*, 23 PHIL. Q. (SCOT.) 241 (1973); Russell Hittinger, *John Rawls*, Political Liberalism, 47 REV. METAPHYSICS 585 (1994); Douglas B.

stein's proposition and insist that, even where there are morally relevant differences, the legal consequences of those differences should be reasonable, not excessive. Thus, even if there is a valid basis for the law to favor traditional over same-sex marriage, defenders of the law should still explain why this disparate legal treatment is not disproportionate.

This does not mean that defenders of a promotional (as opposed to a prohibitory) law bear a heavy burden of proving the practical benefits of a law or of alternatives to it, especially if the law touches matters of great social concern and the alternatives are untested. The 20th century is littered with the ruins of grandiose social schemes that were earnestly promoted by intelligent people promising great benefits but that ultimately inflicted terrible damage. Experience proves the iron law of unintended consequences—new laws may or may not achieve their intended results, but they always produce unexpected results.[35] Human society is too complex and too poorly understood to permit confident predictions of the effects of significant legal change. A democracy may choose to experiment on itself, but it need not do so. Defenders of traditional laws may justly demand caution and convincing evidence that change will at least not make matters worse.[36] Tradition should not be followed blindly, but it deserves respect and may be properly maintained in case of doubt, especially concerning acts traditionally considered repugnant.[37]

Because marriage and the family are entwined with religion in Western (and most other) civilizations, the role of religion in law-making must be addressed. America, like many liberal states, forbids establishment of religion,[38] but all law rests on norms that are not

---

Rasmussen, *A Critique of Rawls' Theory of Justice*, 55 PERSONALIST 303 (1974).

[35] Even a liberal like Isaiah Berlin championed our "common sense beliefs, which at least have the merit of having been tested by long experience," over theories lacking empirical support. ISAIAH BERLIN, THE HEDGEHOG AND THE FOX 32 (1953).

[36] *See* David D. Haddock & Daniel D. Polsby, *Family as a Rational Classification*, 74 WASH. U.L.Q. 15, 45-46 (1996) (noting many unanswered questions about homosexual marriage and arguing for "the legal system treading very carefully until some of the answers to those questions emerge from the research currently under way").

[37] Physician and philosopher Leon Kass argues that our feelings of repugnance should be given weight in public policy: "in this age . . . repugnance may be the only voice that speaks up to defend the central core of our humanity." Leon R. Kass, *The Wisdom of Repugnance*, NEW REPUBLIC, June 2, 1997, at 20.

[38] "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I.

empirically verifiable.[39]  A law is not invalid simply because the values it expresses stem from religion if those values are accessible to conventional secular thought.[40]   Indeed, the liberal notion of human rights originated from religion, as evidenced by the statement in the Declaration of Independence: "We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights."[41]   The abolition of slavery, for example, is not illegitimate just because it sprang from a belief that slavery is offensive to God.  The same is true of arguments for gay rights, which are often based on religion.[42]

Western marriage laws grew out of and still largely reflect Christian beliefs,[43] but these laws do not establish religion—they neither command nor promote Christian faith or practices.  Moreover, as this article shows, traditional marriage laws can be justified on exclusively secular grounds.

### III. FALSE JUSTIFICATIONS OF MARRIAGE

Many justifications have been offered for legal recognition of marriage, but not all of them are persuasive.

#### A. To Encourage Stable, Loving Relationships

Some argue that love is the only valid requisite for marriage.[44]  This claim is both too broad and too narrow.  It is too broad because many loving relationships are considered improper for marriage.  Love takes

---

[39] Both religious and secular moralists ultimately found their views on faith. *See* RICHARD A. POSNER, THE PROBLEMATICS OF MORAL AND LEGAL THEORY (1999).

[40] Laws that do not compel or even encourage adherence to some religion can still be hard to justify on secular grounds.  Thus forbidding consumption of meat on Fridays (as the Catholic Church once did) or consumption of pork (as Islam and Judaism do) would be hard to vindicate in secular terms even though those rules do not compel or encourage adherence to any religion.

[41] THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

[42] *See* Samuel A. Marcosson, *The "Special Rights" Canard in the Debate Over Lesbian and Gay Civil Rights,* 9 NOTRE DAME J.L. ETHICS & PUB. POL'Y 137, 166 (1995) ("basic religious tenets . . . *support* the cause of barring discrimination on the basis of sexual orientation") (emphasis in original).

[43] The qualification "largely" is needed because Christian beliefs vary among denominations and change within denominations over time.  For example, our laws permit divorce, which most Protestant sects allow but which the Roman Catholic Church opposes.

[44] *See* Andrew H. Friedman, *Same-Sex Marriage and the Right to Privacy: Abandoning Scriptural, Canonical, and Natural Law Based Definitions of Marriage,* 35 HOWARD L.J. 173, 222-23 (1991).

many forms. C.S. Lewis distinguished family love, affection, erotic desire, friendship, and compassion.[45] All can be good, but compassion is not deemed a basis for marriage. Close relatives often love each other but cannot marry.[46] One who is married may love a third party more than one's spouse, but one cannot marry the third party.[47] Children can love but cannot marry. Many people love pets, but they cannot marry them. Hence, homosexual love is not the only love ineligible for marriage. Indeed, many forms of sexual love, such as pederasty, adultery, bestiality and incest, are criminal even in states that permit homosexual acts.[48]

This justification is also too narrow because love is not necessary for marriage. Love was long considered unimportant to marriage in the West, and still is in many non-Western societies.[49] Marriage exists in part—especially in some traditions—to provide for rearing children and for certain kinds of care and support between wife and husband.[50] Even in liberal states love is never a precondition to marriage, nor does its absence invalidate a marriage.[51] Most marriages were once arranged by parents; the couple might never see each other before the wedding.[52] Even in liberal societies many would consider a marriage successful despite the absence of romantic love if the couple treat each other with care, kindness and respect. In sum, love is neither a necessary nor a sufficient condition for a socially or legally acceptable marriage.

---

[45] C.S. Lewis, The Four Loves (1960).

[46] *See infra* notes 253-64 and accompanying text.

[47] *See infra* notes 239-52 and accompanying text.

[48] *See* Harry D. Krause, Family Law in a Nutshell 150 (3d ed. 1995) (in half the states adultery is still a crime).

[49] 2 Encyclopedia of Marriage and the Family 471-74 (1995). *See also* Margaret F. Brinig & Steven M. Crafton, *Marriage and Opportunism,* 23 J. Legal Stud. 869, 875 (1994) ("Although affection might grow out of long and close association between the spouses, it was by no means necessary for the practical purposes of marriage."). *But see* 2 Encyclopedia of Marriage and the Family 431 (1995) (stating that North Americans view love as the basis for marriage and as important to its continuation).

[50] 2 Encyclopedia of Marriage and the Family 472 (1995).

[51] *Id.*

[52] *See id.* at 473 ("Arranged marriages are the norm in many parts of the world.").

### B. Legal Benefits of Marriage

Some say it is unfair to deny gays the legal benefits of marriage.[53] If so, however, it is also wrong to withhold these benefits from unmarried people, and we should not validate gay marriages but eliminate the legal benefits of marriage, as some propose.[54] Some private and public employers now grant domestic partners (usually including but not limited to gay partners) of employees benefits which were traditionally limited to spouses.[55] Such changes do not necessitate changing the legal definition of marriage.

The tangible benefits of marriage do not interest most advocates of gay marriage.[56] This is not surprising. The law confers some material benefits on marriage, such as special tax treatment and coverage for spouses under some social welfare programs (like Social Security). These benefits are minor, though; most couples hardly consider them in deciding whether to marry. Marriage also incurs legal detriments, such as higher tax rates on two-earner couples, that often outweigh the benefits.[57] The law also sets legal rights of married people regarding child custody, division of assets, and right to support. These rights can be important after marriage, but they rarely provide an incentive to wed, primarily because they are a zero-sum game—the right of one spouse is the disability of the other. It is no surprise, then, that few gays bother to utilize laws recognizing domestic partners.[58]

---

[53] *See* ESKRIDGE, *supra* note 9, at 66-74.

[54] *See* MARTHA FINEMAN, THE NEUTERED MOTHER, THE SEXUAL FAMILY AND OTHER TWENTIETH CENTURY TRAGEDIES 228-30 (1995); Nancy D. Polikoff, *We Will Get What We Ask For: Why Legalizing Gay and Lesbian Marriage Will Not "Dismantle the Legal Structure of Gender in Every Marriage,"* 79 VA. L. REV. 1535, 1549 (1993) ("Advocating lesbian and gay marriage will detract from, even contradict, efforts to unhook economic benefits from marriage and make basic health care and other necessities available to all.").

[55] *See supra* note 14.

[56] *See* Chambers, *supra* note 1, at 450 ("[F]ew advocates [of gay marriage] address at any length the legal consequences of marriage").

[57] *See* James Alm & Leslie A. Whittington, *For Love or Money? The Impact of Taxes on Marriage,* 66 ECONOMICA 297 (1999) (marriage penalty tax reduces the marriage rate); Richard L. Elbert, *Love, God, and Country: Religious Freedom and the Marriage Penalty Tax,* 5 SETON HALL CONST. L.J. 1171, 1174-85 (1995) (describing history and status of the penalty); Richard B. Malamud, *Allocation of the Joint Return Marriage Penalty and Bonus,* 15 VA. TAX REV. 489 (1996); C. Eugene Steuerle, *Valuing Marital Commitment: The Radical Restructuring of our Tax and Transfer Systems,* 9 RESPONSIVE COMMUN. 35 (1999) (finding an "extraordinary array of marriage [tax] penalties").

[58] By the end of 1997 fewer than 300 couples had registered, and about 25% of these were siblings or elderly parents and adult children. *See* Susan Essoyan, *Hawaii Finds Slow Response to Domestic Partners Law,* DALLAS MORNING NEWS, Dec. 28, 1997, at A5, *available in* 1997 WL

Proponents of gay marriage care not about the material benefits it would bring but about its social acceptance as equal to traditional marriage.[59]

### C. Religious Rationales

Marriage has religious significance in Western and most other cultures. Basing the legal definition of marriage on religion would not breach the Constitution's Establishment Clause because it does not endorse or compel obedience to any faith, but religion alone cannot justify law in a liberal state.[60]

## IV. VALID ARGUMENTS FOR TRADITIONAL MARRIAGE

All societies celebrate marriage. Weddings typically feature elaborate rituals (usually religious) and festivities.[61] Marriage also has major legal consequences in all cultures.[62] Most religions venerate marriage, but even atheists must be struck by the prestige universally conferred upon marriage. The only event generally deemed more important is the installation of a new ruler. There must be powerful global reasons for this special treatment.

### A. Child Rearing

#### 1. The Importance of Marriage to Child-Rearing

The primary social function of marriage is rearing children. Christianity has long recognized this. The medieval jurist Gratian considered offspring the purpose of marriage.[63] The first English

---

16187525.

[59] See supra note 1.

[60] See, e.g., Ronald Dworkin, *The Right to Death*, NEW YORK REV. BOOKS, Jan. 31, 1991, at 14, 17 ("[T]he Constitution does not allow states to justify policy on grounds of religious doctrine"). See also supra text accompanying notes 38-41 (values underlying law should be accessible to secular thought).

[61] See Chambers, supra note 1, at 450 ("In our country, as in most societies throughout the world, marriage is the single most significant communal ceremony of belonging. It marks not just a joining of two people, but a joining of families and an occasion for tribal celebration and solidarity.")

[62] See I ENCYCLOPEDIA OF MARRIAGE AND THE FAMILY 182-87 (1995) (concerning divorce); II ENCYCLOPEDIA OF MARRIAGE AND THE FAMILY 442-47, 562-65 (1995) (concerning consequences of marriage for property ownership and related issues).

[63] See John T. Noonan, Jr., Contraception: A History of its Treatment by the Catholic

Book of Common Prayer listed the rearing of children as the first reason for marriage.[64]  After the decision in *Baehr* favoring gay marriage, the Hawaii legislature resolved that marriage is "intended to foster and protect the propagation of the human race."[65] Government efforts to provide comprehensive child care have never succeeded;[66] in every society today child-rearing is performed primarily by parents. Government programs can help children but can never substitute for good parents.[67]

In the middle of this century America gradually forgot the importance of traditional marriage to children.  Illegitimacy and divorce ("broken families") had been rare, so their effects on children were often considered minor and ascribed to causes (like poverty) other than family structure.  The explosion of bastardy and divorce in the last thirty years prompted closer inquiry, which revived appreciation of the importance of marriage to children.   Under every standard—educational achievement, drug use, criminal activity, physical and emotional health, social adjustment and adult earnings—children of intact marriages have fewer problems than children of broken families.[68]  Other causes, like poverty, add to childhood problems, but "[c]hildren in one-parent families are much worse off than those in two-parent families even when both families have the same earnings."[69] Moreover, other causes (like poverty) are not wholly separate but stem partly from marital failure.[70]

---

Theologians and Canonists 174, 289 (1966); *Genital Good,* 8 COMMUNIO 198, 214 (1981)

[64] The other two reasons were to avoid the sin of fornication and to encourage couples to provide "mutual society, help and comfort." Noll, *supra* note 9, at 41-42.

[65] Act of June 22, 1994, No. 217, § 1, 1994 Haw. Sess. Laws 217, *reprinted in* 20 FAM. L. REP. 2013, 2015 (1994).

[66] Even the most promising attempt—the communal raising of children in Israeli kibbutzim—has been largely abandoned. *See* Karl Zinmeister, *Actually, Villages Are Lousy at Raising Pre-School Children,* AMERICAN ENTERPRISE, May/June 1996, at 52, 54 (in nearly all kibbutzim "[i]nfant care has shifted back to parents").

[67] *See* Barbara Dafoe Whitehead, *Dan Quayle Was Right,* ATLANTIC MONTHLY, April 1993, at 47, 48 ("If we fail to come to terms with the relationship between family structure and declining child well-being, then it will be increasingly difficult to improve children's life prospects, no matter how many new programs the federal government funds.").

[68] *See generally* William Galston, *A Liberal-Democratic Case for the Two-Parent Family,* RESPONSIVE COMMUNITY, Winter 1990-91, 14-26.

[69] James Q. Wilson, *Human Remedies for Social Disorders,* PUB. INTEREST, Spring 1998, at 25, 27-28. *See also* SARA MCLANAHAN & GARY SANDEFUR, GROWING UP WITH A SINGLE PARENT: WHAT HURTS, WHAT HELPS (1994).

[70] *See infra* note 117 and accompanying text.

When one parent is absent, it is usually the father. The father's absence from the home is damaging to children.[71] Unwed fathers can be diligent but in practice rarely are: "All available evidence suggests that the most effective pathway to involved, committed, and responsible fatherhood is marriage."[72] Not only do children need two parents; it also seems that ideally a child should have both a mother and a father.[73] Some claim that same-sex couples can serve equally well as parents. Studies of children raised by gay parents are inconclusive, partly because samples have been so small.[74] Absent firmer empirical evidence, it is reasonable to assume that children with both a mother and a father will learn better how to live in a world composed of males and females.[75]

Although marriage involves an agreement between two people, it is not governed by general contract law. "[M]any of the terms of the marriage are prescribed by the state, not to be varied by the parties' private agreements."[76] The special treatment of marriage is justified by the presence of children: young children and children yet unborn cannot negotiate for themselves, so the state protects them by imposing contract terms on the parents.[77] Further, one spouse (usually the wife) often makes "significant and specific investments: contributions of time and energy and money, to each other and to their children, that may not see fruition for many years and that may

---

[71] Wade F. Horn & Andrew Bush, *Fathers and Welfare Reform*, PUB. INTEREST, Fall 1997, at 38, 39.

[72] *Id.* at 41.

[73] *See* ELISABETH BADINTER, XY: ON MASCULINE IDENTITY 43-66 (Lydia Davis, trans., Columbia University Press 1st ed. 1995) (1992); DAVID POPENOE, LIFE WITHOUT FATHER 139-190 (1996); MARY STEWART VAN LEEUWEN, GENDER AND GRACE (1990); Mary Stewart Van Leeuwen, *Opposite Sexes Or Neighboring Sexes? The Importance of Gender in the Welfare Responsibility Debate*, *in* WELFARE IN AMERICA 243, 243-74 (Stanley W. Carlson-Thies & James W. Skillen eds., 1996); Mary Stewart Van Leeuwen, *To Ask a Better Question: The Heterosexuality-Homosexuality Debate Revisited*, *in* INTERPRETATION (forthcoming); Wardle, *Potential Impact*, *supra* note 10, at 857-64 (discussing the importance to children of having both a mother and a father).

[74] *See infra* note 104.

[75] *See* ELIZABETH MOBERLY, PSYCHOGENESIS: THE EARLY DEVELOPMENT OF GENDER IDENTITY 79 (1983) (ascribing homosexuality primarily to a child's inability to identify with the parental figure of the same sex). Presumably, this is more likely to happen if a child has no parent of the same sex. This proposition does not require any assumption of significant innate behavioral differences between women and men. Even if the differences are socially determined, children must learn to live with them.

[76] Brinig & Crafton, *supra* note 48, at 870.

[77] *See* Gary Becker & Kevin Murphy, *The Family and the State*, 31 J.L. & ECON. 1, 3-5 (1988).

*Journal of Law & Politics*            [Vol.XV:581]

be worthless if the relationship does not endure."[78]  But the marriage relationship is "so complex that any attempt to specify in detail all of its terms would be futile as well as perhaps destructive."[79]

Since gay couples cannot reproduce, these considerations would not apply to gay marriages.  Recognition of gay marriages would inevitably lead to efforts to relax the mandatory contract terms designed for traditional marriages with children.[80]  To treat gay marriages differently would violate the notion that gay marriages are fundamentally the same as traditional marriages.[81]  Some compromise would be likely, but any compromise would impair the suitability of marital law for traditional couples.

Although some dismiss the traditional family as an anachronism, a vestige, a historical relic, the opposite is true—the traditional family is more essential now than ever.  In order to thrive the modern, liberal, capitalist democracy needs citizens with higher job skills, education, and moral character than pre-modern or undemocratic societies. These qualities are best cultivated in the traditional family; indeed, no society has developed such a citizenry except through the traditional family.  A cohesive community can compensate in part for parent's shortcomings, but in the mobile, atomized modern world tight-knit communities are rare.  Thus "the family, and specifically the bourgeois family, is the necessary social context for the emergence of the autonomous individuals who are the empirical foundation of political democracy."[82]

When people were few, procreation was encouraged to help each

---

[78] Brinig & Crafton, *supra* note 48, at 871.

[79] *Id.* at 870-71.

[80] Many proponents of gay marriage already advocate changing marriage laws in many ways. *See infra* notes 174-80 and accompanying text. Many also support more relaxed attitudes toward adultery and divorce. *See infra* notes 224-36 and accompanying text.

[81] It would be unwise to distinguish marriages by the "neutral" criterion of whether a couple has children. One spouse often makes an investment in the marriage prior to and in anticipation of having children. For example, if a couple plans to have children and to have the wife care for them in infancy, she may work rather than expand her education, then bank her earnings and saved tuition. If this couple divorces, even before having children, the settlement should take this contribution into account. For a gay couple, though, this reasoning would not apply.

[82] BRIGITTE & PETER BERGER, THE WAR OVER THE FAMILY: CAPTURING THE MIDDLE GROUND 172 (1984) (emphasis omitted). *See also* GAYLIN & JENNINGS, *supra* note 29, at 103 ("[M]arriage . . . serve[s] to bind sexual desire to reproduction and child care. By destroying the conditions that support parenting . . . we would destroy the child—and not only the child, but the society that will later be shaped by those parentless children, will suffer.").

tribe and humanity in general to survive. Underpopulation is rarely a problem today.[83]  However, with fertility below replacement level in most developed countries, marriage with children may cease to be the norm. The concern for others that matures through bearing and raising children could then give way to hedonism and narcissism.[84] Society may properly avoid this by favoring traditional marriage.

Traditional marriage is not incompatible with contraception, as claimed by some natural law scholars.[85]  Contracepted sex can tighten a marriage while delaying conception until the couple is ready to care properly for children.[86]  It can also prevent the conception of more children than the couple can adequately care for. Thus contraception can assist good parenting.

### 2. Marital Cohesion Affects All of Society

Hillary Clinton reminded America of the forgotten truth that it takes a village to raise a child.[87]  "[S]ociety requires a critical mass of married, two-parent families, both to raise their own children well and to serve as models for those who are being reared outside of the 'conventional' family."[88]  If broken families are few, their children still have many models of intact families (among relatives and neighbors, for example) to show them that this is the norm, what is expected of them, and to teach them what it means to be part of an intact family. It is hard for a child to learn how to be a good spouse and parent when he sees few examples around him.

Similarly, when the children of broken families are few, the misconduct to which they are prone is the exception. The majority in intact families set a standard that children from broken families tend

---

[83] Low population is a problem for some groups, though. For example, the low birth rate of American Jews combined with their high rate of intermarriage with non-Jews in a growing population makes some worry that there could eventually be too few Americans with a Jewish identity to constitute a viable community. *See* ALAN M. DERSHOWITZ, THE VANISHING AMERICAN JEW 1-2, 24-32 (1997) (giving statistics on the declining number of American Jews).

[84] *See infra* text accompanying notes 113-15.

[85] *See* John M. Finnis, *Law, Morality, and "Sexual Orientation,"* 9 NOTRE DAME J.L. ETHICS & PUB. POL'Y 11, 30-31 (1995).

[86] *See* Perry, *supra* note 24, at 50.

[87] HILLARY RODHAM CLINTON, IT TAKES A VILLAGE (1996).

[88] Horn & Bush, *supra* note 70, at 42. *See also* WILLIAM A. GALSTON, LIBERAL PURPOSES 285 (1991) (arguing family structure is not solely a private matter because it affects the stability of families generally). *See also* AMITAI ETZIONI, THE SPIRIT OF COMMUNITY 248 (1993) ("To shore up the moral foundations of our society, we start with the family").

to follow because children are even more loathe than adults to be different. If children from broken families predominate, though, they set a standard which other children tend to follow. In sum, if most children come from intact families, they pull up the behavior of other children; when most children come from broken families, they pull down the behavior of others.

More broadly, traditional marriage is inextricably tied to our concern for future generations and for the welfare of others. Concern for others is not innate—an infant cares only about itself, not others. Altruism is not learned primarily in formal schooling but by experience acquired in part in our own families—first as children of our parents, then as spouses and as parents of our children.[89] We also learn from our social milieu; we learn benevolence in a community where marrying and raising children is normal. To care for our own children—their schools, their safety, their socialization into the community—we must to some extent care for others. Moreover, although we are mortal, unaffected by events after we die, to care for our children we must care about the future world in which they will live after we die.

Altruism is often fragmentary; we may prefer ourselves to our children, our children to our neighbors, and our neighbors to strangers. But even partial altruism is an important social adhesive, and it can be augmented by more abstract concepts of benevolence, such as the Christian command to love not only those closest to us but all humanity, even our enemies. Thus the family provides both the literal nursery for our children and the metaphoric nursery of the family of man.

If the traditional family ceases to be the norm, altruism will erode.[90] In every society some people do not or cannot marry and bear and raise children. If they are viewed as unfortunate exceptions, the norm is not impaired. Recognition of gay marriages would mutilate the norm by granting, for the first time in history, equal honor to partnerships that inherently exclude the creation of life. The impact would be greater if, as seems likely, few gays elected to marry, stay

---

[89] *See infra* notes 113-19 and accompanying text (traditional marriage socializes adults, especially men, but same-sex marriage would not do so).

[90] *See* Gaylin & Jennings, *supra* note 29, at 114-19 (describing the profound influence of parents on the moral development of children). *See also infra* note 114 (marriage teaches "the acceptance of responsibilities we have not willed or chosen").

married, and adopted children.[91]  Like legalizing bestiality, cloning, and baby-selling,[92] validation of gay marriage would not cause direct, proximate harm, but it would damage society by degrading the way we see and relate to others.  Traditional marriage is a public good.  That is, it benefits not only married couples and their children but also generates positive externalities, or benefits to others.  Men and women who marry and stay married encourage others to do likewise, to the profit of society.

Judaism and Christianity are unusual in their reverence for the family and condemnation of polygamy and homosexuality.[93]  The ascendancy of Western civilization in the last 500 years may stem in part from this attitude.  By nurturing the institution that best instills bourgeois values, Judaism and Christianity made possible the economic and technological progress of the West.  Some of the harsher aspects of this attitude, such as criminalization of sodomy, may be unnecessary, but retaining reverence for the family may be essential to preserving and extending this progress.

### 3. Marriage Needs Society's Support

Unfortunately, marriages do not always occur and endure without encouragement from society.  Raising children is one of the most difficult and demanding jobs human beings undertake.  The temptation to shirk this task is especially strong in the modern world.  In the past the monetary cost of raising children was low, limited primarily to simple food and clothing.  Most people were farmers for whom children earned their keep from an early age by helping with farm work.  Adult children supported parents grown too old for laborious farm work.  Modern societies need parents to give children much more, including expensive, long-term schooling and health care.  Today, few children can help with their parents' jobs.  The opportunity costs of children are also higher for modern bourgeois couples who, unlike poor farmers, can devote available time to earning money at high rates or to innumerable leisure activities.  Caring for children reduces time available for these pursuits.  Finally, child

---

[91] *See supra* note 57 (few gays have used domestic partnership laws); *infra* notes 230 & 306 (instability of most gay male relationships).

[92] *See infra* notes 265-84 and accompanying text.

[93] See Sheryl E. Michaelson, Note, *Religion and Morality Legislation: A Reexamination of Establishment Clause Analysis,* 59 N.Y.U. L. Rev. 301, 308 & n.32 (1984).

rearing is often unpleasant and emotionally draining. Not surprisingly, then, parents are sometimes tempted to neglect their children's needs.

Despite the burdens of child-rearing, many people make extraordinary efforts to have and care for children. Many couples endure great expense, physical pain, emotional trauma, and humiliation in trying to conceive a baby. Others battle repeated obstacles to adopt a child. The high cost of giving children good care is paid not only by people who can easily afford it but also by many who are less wealthy and for whom the cost requires great sacrifice. Many parents absorb the unusual costs of children with disabilities, medical problems, or other special needs.

Regrettably, modern life often hinders good parenting. Market economies encourage material consumption by ubiquitous advertising and exhortations to self-gratification. The support for parenting long provided by religion is corroded by widespread secularism. Marriage and the family are denigrated by elites,[94] educators[95] and gay activists.[96] The state helps parents by providing services (like public schools) and subsidies (like tax credits and deductions) for children, and surely more could be done, but the state can never fully compensate the work good parents do. However, the state can encourage and support parents by recognizing and honoring marriage as the institution that best facilitates good parenting.[97]

It is not enough for society to applaud marriage without reference to the purpose of raising children. Indiscriminate applause could suggest that marriage exists to maximize self-gratification and should, therefore, be dissolved when it no longer seems to serve that purpose,

---

[94] First Lady Hillary Clinton once compared marriage to slavery. Hillary Rodham, *Children Under the Law*, 43 HARV. EDUC. REV. 487, 493 (1973).

[95] *See* Tamar Lewin, *Study Criticizes Textbooks on Marriage as Pessimistic*, N.Y. TIMES, Sept. 17, 1997, at A5, describing a study that concludes: "College students are being taught a pessimistic and sometimes inaccurate view of marriage, with great emphasis on issues like divorce and domestic violence, and little attention to the benefits of marriage, particularly for child-rearing . . . ."

[96] *See infra* notes 173-77 and accompanying text.

[97] *See* FRANCIS FUKUYAMA, TRUST: THE SOCIAL VIRTUES AND THE CREATION OF PROSPERITY 5 (1995):

A strong and stable family structure and durable social institutions cannot be legislated into existence. . . . A thriving civil society depends on a people's habits, customs, and ethics—attributes that can be shaped only indirectly through conscious political action and must otherwise be nourished through an increased awareness and respect for culture.

especially when the going gets rough. Child-rearing always has rough periods; that's precisely when society's help is most needed to keep parents together. What is wanted, then, is a buttress applied at this point of greatest stress; that is, an attitude that bolsters marriage as an institution for raising children. As social esteem for marriage and parenting declines, so does citizens' willingness to assume these roles.[98] Validation of same-sex marriages would accelerate this decline.

Gay couples do not conceive, so of course advocates of gay marriage tend to ignore the connection of marriage with child rearing. More telling, when they do note the connection, its significance escapes them. For example, Andrew Koppelman notes "the resentment that those with familial responsibilities that weigh heavily upon them feel toward those who seem free of such responsibilities."[99] Yet he then drops the point without considering that it might explain the need for society to celebrate traditional marriage.[100]

### 4. The Significance of Childless Heterosexual Couples

An objection to this justification of marriage is that heterosexual couples may marry even if they cannot or choose not to have children.[101] The argument is unpersuasive. First, society does not know which couples these are when they marry and could not even try to find out without incurring substantial government expense and unusual and offensive intrusion on their privacy.[102] Second, condi-

---

[98] Between 1957 and 1976 the "proportion of working men who found marriage and children burdensome more than doubled." Whitehead, *supra* note 66, at 58.

[99] ANDREW KOPPELMAN, ANTIDISCRIMINATION LAW AND SOCIAL EQUALITY 173 (1996).

[100] Andrew Sullivan acknowledges

> a difference that [he thinks] is inherent between homosexual and heterosexual adults [is that] . . . [t]he latter group is committed to the procreation of a new generation. The former simply isn't. . . . The timeless, necessary, procreative unity of a man and a woman is inherently denied to homosexuals; and the way in which . . . parenthood transforms their relationship, is far less common among homosexuals than among heterosexuals.

ANDREW SULLIVAN, VIRTUALLY NORMAL: AN ARGUMENT ABOUT HOMOSEXUALITY 196 (1995). Paula Ettelbrick concedes that the "origins of marriage are deeply imbedded in procreation and the two-parent family" and homosexual "family structures will never fit the heterosexual model." Paula L. Ettelbrick, *Wedlock Alert: A Comment on Lesbian and Gay Family Recognition*, 5 J.L & POL'Y 107, 160 (1996).

[101] *See* ESKRIDGE, *supra* note 9, at 96; Mohr, *supra* note 6, at 223; SULLIVAN, *supra* note 100, at 179 (1995); Sunstein, *supra* note 31, at 6.

[102] *See* Richard F. Duncan, *Homosexual Marriage and the Myth of Tolerance: Is Cardinal*

tions existing at the time of marriage may later change. Couples who do not want to bear children may change their minds. Couples who think they cannot bear children may prove wrong or, by medical help, become able to bear children. By contrast, we know without intrusion that same-sex couples are sterile and will remain so. Third, sterile couples can adopt. Same-sex couples can also adopt if the law permits, but there is considerable controversy about the effect on children being raised by a homosexual couple.[103]  Finally, even heterosexual couples that do not bear children reinforce the model of traditional marriage.[104]

Exceptions do not invalidate a norm or the necessity of norms. How some individuals make use of marriage, either volitionally or as the result of some incapacity, does not determine the purpose of that institution. In that context, heterosexual sterility does not contradict the meaning of marriage in the way same-sex unions would.[105]

Childless marriages are imperfect models, but no marriage is a Platonic ideal. By upholding marriage as a social norm, childless couples encourage others to follow that norm, including couples who might otherwise have illegitimate children.

Similarly, childless marriages may discourage divorce among couples with children. Childless couples have been respected for centuries. Many medieval theologians were hostile to sex and barely tolerated marriage as an inferior but, because of human frailty, necessary alternative to chastity. In St. Paul's words, "It is better to marry than to burn with passion."[106]  Still, they uniformly acknowledged the validity of childless marriages and of sex within those marriages.[107]

---

O'Connor a *"Homophobe"?*, 10 NOTRE DAME J.L. ETHICS & PUB. POL'Y 587, 597 (1996) ("the state could not exclude infertile heterosexual couples from marriage without imposing onerous invasions of privacy").

[103] Studies on gay parenting lack statistical validity. *See* Philip A. Belcastro *et al.*, *A Review of Data Based Studies Addressing the Effects of Homosexual Parenting on Children's Sexual and Social Functioning*, 20 J. DIVORCE & REMARRIAGE 105 (1993); Wardle, *Potential Impact, supra* note 10, at 844-52. *See also* Wardle, *id.* at 852-57, describing some possible dangers of gay parenting.

[104] "Even marriages that do not give rise to children exist in accord with, rather than in opposition to, [the] heterosexual norm." *The Homosexual Movement: A Response by the Ramsey Colloquium*, FIRST THINGS, March 1994, at 15, 18. The Ramsey Colloquium "is a group of Jewish and Christian theologians, ethicists, philosophers, and scholars that meets periodically to consider questions of morality, religion, and public life." *Id.* at 15.

[105] *Editorial*, COMMONWEAL, May 17, 1996, at 6.

[106] *1 Corinthians 7:9.*

[107] *See* VERN L. BULLOUGH & JAMES A. BRUNDAGE, SEXUAL PRACTICES AND THE MEDIEVAL CHURCH 65-66 (1982) (stating that Thomas Aquinas deemed intercourse natural and permissi-

This attitude persists today in the restrictions on divorce of childless couples.[108] If love and protection of children were the only reasons for social concern about marriage, the law would require only mutual consent for the divorce of childless couples. Society has an interest, though, in preserving these marriages as images (albeit imperfect) of a social ideal and in discouraging the attitude that marriages may be quickly and casually dissolved.[109]

Homosexual couples do not reinforce the model of traditional marriage. They send conflicting signals to children who must decide how to live their lives in a confusing world.[110] This does not mean that legitimizing gay marriages would lure otherwise heterosexual children into homosexuality, although that might happen occasionally. Rather, validation of same-sex marriages would eviscerate society's endorsement of traditional marriage[111] and thereby suggest indifference to illegitimacy, divorce, and child neglect.

### B. Socializing Adults

Marriage channels potentially destructive energy into beneficial activity. As the Ramsey Colloquium says: "Marriage is a place where, in a singular manner, our waywardness begins to be healed and our fear of commitment overcome, where we may learn to place another person's needs rather than our own desires at the center of life."[112] As an editorial in the journal *Commonweal* stated:

> Is there really any doubt that in tying sexual attraction to love and love to children and the creation of families, marriage fundamentally shapes our ideas of human dignity and the nature of society? Same-sex marriage, whatever its virtues, would narrow that frame

---

ble for barren couples).

[108] Although most states no longer require fault for divorce, they still require a delay before divorce can be granted. *See* Annot., 62 A.L.R.2d 1262-65 (1994) (describing state statutes requiring delay before divorce).

[109] *See* Whitehead, *supra* note 66, at 49 (asserting that liberal divorce laws undermine marriage generally by making divorce more socially acceptable).

[110] *See* Elizabeth Kristol, *The Marrying Kind*, FIRST THINGS, Jan., 1996, at 45, 46 (reviewing ANDREW SULLIVAN, VIRTUALLY NORMAL: AN ARGUMENT ABOUT HOMOSEXUALITY (1995)).

[111] *See infra* notes 200-10 and accompanying text (recognition of same-sex marriage would diminish esteem for marriage).

[112] *The Homosexual Movement: A Response by the Ramsey Colloquium, supra* note 105, at 17.

and foreshorten our perspective. Marriage, at its best, tutors us as no other experience can in the given nature of human life and the acceptance of responsibilities we have not willed or chosen.[113]

In the mid-twentieth century Americans lost this truth. With peace and prosperity, most Americans thrived, and the interests of individual and society usually coincided. That is, most people prospered through education, work, marriage, sobriety, thrift, and obedience to law—all values that benefit society generally. Those who divorced or never married tended to suffer for it; they had greater problems with drug use, criminal activity, physical and emotional health, social adjustment and earning a living.[114] In short, it was in the interests of individuals to marry and to stay married, and most did. Those who did not were generally regarded as either victims of unfortunate circumstances or as losers.

The breakdown of the family in the last 25 years reminded us of the importance of marriage in socializing adults. As the number of unmarried adults increased, so did the wayward conduct to which they are prone. The problem is greatest in inner cities ravaged by crime and drug abuse, mostly committed by unmarried men. Just as the breakdown of the family has a cumulative effect on children that exceeds its arithmetic growth,[115] so it also has a cumulative effect on adults. When bachelorhood was rare, adults were pressed to marry lest they be pitied or despised. That pressure has dissipated, and in some communities marriage is now so rare as to seem odd or even bizarre. As the resulting anti-social conduct proliferates, those who would formerly have avoided such conduct because it was considered deviant or disgraceful are no longer deterred.

There is also a negative synergy between the effects on children and on adults of the breakdown of the family. Children of broken families

---

[113] *Editorial, supra* note 106, at 6.

[114] The pathology of bachelorhood is particularly striking for men. *See* GEORGE AKERLOF, MEN WITHOUT CHILDREN (1997). The study notes, for example, that the incarceration for young married men is 2.6 per thousand, compared with 17.6 per thousand young single men.

Some believe that men are genetically harder to socialize than women. *See* Natalie Angier, *Parental Origin of Chromosome May Determine Social Graces, Scientists Say*, N.Y. TIMES, June 12, 1997, at A2 (reporting a study finding that girls lacking an X chromosome from their fathers were more anti-social; this suggests that the higher frequency of anti-social behavior in males, who get a Y rather than an X chromosome from their fathers, has a genetic basis).

[115] *See supra* text following note 66.

are less likely to marry, and unmarried adults are less likely to be good citizens if they come from broken families.[116]  With the breakdown of the traditional family there is a proliferation of people who grow up in broken families and never marry as adults; these people are especially likely to misbehave.

Some believe that recognizing same-sex marriage would help to socialize homosexuals.[117]  This seems unlikely because men are domesticated not by a wedding but by women and children.[118]  By law and by social and religious tradition fathers are supposed to provide for and instruct their children.  Despite the declining importance of gender differences, an expectation (sometimes reflected in the application if not the letter of the law)[119] lingers that husbands should be the primary breadwinners in the family.  These laws, traditions and expectations, which urge men to be socially responsible, would not extend to same-sex marriages.

### C. Promoting Individual Happiness

Traditional marriage enriches the individuals who enter into it as well as their children and society generally.  This effect satisfies even a strict test of liberal legitimacy because many benefits of marriage are not metaphysical but empirically verifiable.  Married people live longer and enjoy better physical and psychological health and greater wealth.[120]

Traditional marriage also yields spiritual benefits.  As Roger Scruton says: "In the heterosexual act, it might be said, I move out *from*

---

[116] *See* Wardle, *Potential Impact, supra* note 10, at 856.

[117] *See* ESKRIDGE, *supra* note 9, at 84 (same-sex marriage "civilizes gay men by making them more like lesbians").

[118] *See* GEORGE GILDER, MEN AND MARRIAGE 76 (1993); Hadley Arkes, *The Closet Straight,* NAT'L REV., July 5, 1993, at 43.  This also follows from evidence that men are harder to socialize than women, *see supra* note 115, and that lesbians are less promiscuous and more likely to achieve long-term relationships than gay men, *see infra* note 311 and accompanying text.

[119] Thus, despite the demise of laws distinguishing between husbands and wives with respect to child custody and alimony in divorce, it remains much more common for wives to get custody and for husbands to be required to pay alimony. *See infra* note 145.

[120] *See* Linda J. Waite, *Does Marriage Matter?,* 32 DEMOGRAPHY 483 (1995); Hara Estroff Marano, *Debunking the Marriage Myth: It Works for Women, Too,* N.Y. TIMES, Aug. 4, 1998, at F1 (citing findings that for both men and women marriage "lengthens life, substantially boosts physical and emotional health and raises income over that of single or divorced people or those who live together").  This phenomenon is observed in other countries as well. *See* Steven Stack & J. Ross Eshleman, *Marital Status and Happiness: A 17-Nation Study,* 60 J. MARR. & FAM. 527 (1998).

*Journal of Law & Politics*      [Vol.XV:581]

my body *towards* the other, whose flesh is unknown to me; while in the homosexual act I remain locked within my own body, narcissistically contemplating in the other an excitement that is a mirror of my own."[121]   Although this view echoes Judeo-Christian tenets, it is not a mere expression of religious opinion.   The unique value of heterosexual married love has been acknowledged in so many cultures that it may be taken as a general human good, like art and music, even if that value cannot be proved empirically.

Bearing and raising children in a traditional marriage is also an intrinsic human good.   The joy and fulfillment of parenthood acknowledged in all societies testify strongly to their universality. These attitudes may well have a scientific basis: According to one evolutionary hypothesis, love emerged along with the evolution of helpless offspring needing care from both parents, with consequent commitment and pairing.   People cherish a spouse because that spouse is the one person on a planet of billions who has as much of an interest in the fate of their children as they do.[122]

The persistence of homosexuality, divorce and marital strife shows that this evolved trait is not dominant in many people.   A person can feel romantic, erotic love for another person of the same sex, just as one can feel such love for a pet, even though reproduction is impossible in both cases.   Government should not punish people simply because a genetic trait is weak or lacking in them.   If the scientific basis of enduring love is exclusively heterosexual, though, government can promote human happiness by favoring traditional marriage as the most conducive setting for love.   Validating gay marriage would confuse and compromise this effect.

Adoption and illegitimate children can bring happiness, too, but are everywhere considered less desirable for both parents and children.   Thus, government may validly favor traditional marriage as a human good.   This does not mean the state should encourage a high

---

[121] ROGER SCRUTON, SEXUAL DESIRE: A MORAL PHILOSOPHY OF THE EROTIC 310 (1986) (emphasis in original).   Similar reasoning opposes endogamy. *See infra* notes 254-56 and accompanying text; *see also* Patrick Lee & Robert P. George, *What Sex Can Be: Self-Alienation, Illusion, Or One-Flesh Union*, 1997 AM. J. JURIS. 135 (arguing that heterosexual marital sex is an intrinsic human good).   Belief that traditional marriage is intrinsically good is not limited to Judaism and Christianity. *See* DAVID M. BUSS, EVOLUTIONARY PSYCHOLOGY 121 (1999) (finding that of 18 characteristics checked in international study on choosing a mate, "mutual attraction or love proved to be the most highly valued in a potential mate by both sexes").

[122] BUSS, *supra* note 122.

birth rate or penalize couples who cannot or choose not to bear children.[123]  However, government may grant traditional marriage benefits, including honor, in order to promote the intrinsic good of bearing and raising children.  Although homosexual acts are sterile, homosexuals can play a meaningful role in their families and have often done so.  They can have important bonds with their parents, siblings, nieces and nephews.  Indeed, without children of their own, they can devote greater attention to these relationships than can adults with children.

## V. REFUTING THE ARGUMENTS FOR SAME-SEX MARRIAGE

### A. *Rights to Autonomy in Intimate Relationships*

Some view legal recognition of same-sex marriages as part of a broad right to autonomy in intimate relationships, a corollary of the right of heterosexual couples to marry, to reproduce, to use contraceptives, and to obtain abortions.  But there is no such right, even among consenting heterosexual adults.  Thus the Supreme Court has upheld laws against polygamy[124] and has never questioned laws against incest, adultery, bestiality and necrophilia.  Unlike these other activities, same-sex marriage is not a crime; it is simply denied the legal recognition afforded to traditional marriages.  Government has wider latitude in promoting than in punishing behavior.[125]  Sexual autonomy is often claimed to be an element of privacy.[126]  Whatever force this claim has against criminal sodomy statutes does not extend to recognition of same-sex marriage, which entails abandonment of privacy and a demand for public validation.  Indeed, if sexual autonomy is a right, the state should have "no authority to sanction, to reward, or even to approve one set of family relations over another," as some gay activists argue.[127]

---

[123] *See supra* notes 102-10 and accompanying text.

[124] Cleveland v. United States, 329 U.S. 14, 20 (1946); Reynolds v. United States, 98 U.S. 145 (1878). *See* Earl M. Maltz, *Constitutional Protection for the Right to Marry: A Dissenting View*, 60 GEO. WASH. L. REV. 949 (1992) (denying a general constitutional right to marry).

[125] *See supra* notes 25-32 and accompanying text.

[126] *See* Friedman, *supra* note 43 (making a privacy claim for same-sex marriage).

[127] FRANK BROWNING, THE CULTURE OF DESIRE: PARADOX AND PERVERSITY IN GAY LIVES TODAY 154 (1993) (describing the position taken by Paula Ettelbrick during presentation opposing gay marriage, Chicago, Illinois, October 1989). *See also* Fenton Johnson, *Wedded to an Illusion*, HARPER'S MAG., November 1996, at 43, 49 (benefits should be granted to "couples who

The Supreme Court has forbidden states to deny recognition to some marriages, but it has never questioned the favored status of traditional marriage and has upheld not only laws against polygamy but also some restrictions on marriage of prison inmates[128] even though these strictures are much less widely established than the nonrecognition of same-sex marriages. Where the Court has sustained a constitutional right to marry, it has referred to marriage as "the relationship that is the foundation of the family in our society" and to protecting the "decision to marry and raise [a] child in a traditional family setting."[129] So stated, this right obviously does not encompass gay marriage.

As already shown, society has good reason to favor traditional marriage.[130] Accordingly, there is good reason not to embrace a right of sexual autonomy so broad as to deny that preference.

### B. Equality: Sex Discrimination and the Analogy to Race Discrimination

#### 1. Sex Discrimination

Some argue that traditional marriage is sex discrimination.[131] In one sense this claim is false: traditional law treats the sexes equally in that everyone may marry a person of the other sex but not a person of the same sex. This rationale elicits two objections. The first is more formal: If a man may marry a woman, it is sex discrimination to forbid a woman to marry a woman. This argument serves primarily to remind us how elusive or empty is the idea of equality.[132] The principle of equality insists that likes be treated alike; but since it does not tell us

---

demonstrate stability," whether or not they are married).

[128] *See* Turner v. Safley, 482 U.S. 78 (1987) (striking down some restrictions on the right of prison inmates to marry but upheld others). *Compare* Califano v. Jobst, 434 U.S. 47 (1977) (upholding provisions of the Social Security Act that terminated benefits to dependent children upon marriage to a person not entitled to benefits under the Act even though the prospect of losing benefits might deter some affected people from marrying) *with* Zablocki v. Redhail, 434 U.S. 374 (1978) (striking down law forbidding indigent, support-obligated fathers of children receiving public assistance to marry).

[129] Zablocki v. Redhail, 434 U.S. 374, 386 (1978).

[130] *See supra* notes 62-130 and accompanying text.

[131] *See* Baehr v. Lewin, 852 P.2d 44, *reconsideration granted*, 875 P.2d 225 (Haw. 1993) (holding that law recognizing heterosexual but not homosexual marriages constitutes sex discrimination in violation of the state constitution's Equal Protection Clause and Equal Rights Amendment); KOPPELMAN, *supra* note 100, at 154; Andrew Koppelman, *Why Discrimination Against Lesbians and Gay Men Is Sex Discrimination*, 69 N.Y.U. L. REV. 197 (1994).

[132] *See* Peter Westen, *The Empty Idea of Equality*, 95 HARV. L. REV. 537 (1982).

which things are alike, the principle collapses into a tautology—things that should be treated alike should be treated alike.   Not all distinctions based on sex are illegal.  We have separate bathrooms, sports teams and singing groups for men and women, so the sex distinction in marriage law is not necessarily improper.[133]

Discrimination against homosexual acts has been defended because they involve different conduct from heterosexual acts.   Andrew Koppelman objects that some sexual acts can be performed by either homosexual or heterosexual couples.[134]  Any force this objection has for criminal sodomy laws does not extend to marriage.  As Koppelman concedes, only heterosexual couples can perform reproductive intercourse.[135]  Since the main social function of marriage is child-rearing, society is warranted in distinguishing between homosexual and heterosexual conduct for purposes of marriage.  It is irrelevant that heterosexual couples may engage in sexual acts other than vaginal intercourse.  A society may (and ours usually does) treat marital sex as private.   Non-reproductive sex can also strengthen a marriage and thereby make a couple better parents.[136]

Koppelman and others also argue that discrimination against homosexuals oppresses women—heterosexism reinforces sexism.[137] He says sexism requires systematic sexual domination of women by men. Homosexuality is suppressed because it undermines this domination. Male homosexuality is especially threatening because society deems sexual penetration a humiliation to be borne only by women. This theory has many problems, beginning with the assumption of unrelieved male domination in our society.   Many factors cited to prove the subordination of racial minorities—shorter life expectancy and higher rates of illiteracy, school failure, drug abuse, mental illness

---

[133] This is true though some women are bigger, stronger or have deeper voices than some men.  Thus these facts refute Andrew Koppelman's claims that sex-based classifications are permissible only if they reflect generalizations that are "exceptionless," Andrew Koppelman, *Sexual Orientation Discrimination as Sex Discrimination: Answering the Objections* 16 (unpublished manuscript Oct. 14, 1999); and that "[a] party challenging a sex-based classification is not required to show anything about the relation between the statute and the subordination of women." *Id.* at 28.

[134] KOPPELMAN, *supra* note 100, at 157.

[135] *Id.*

[136] *See supra* note 86 and accompanying text.  Nor is it relevant that some heterosexual couples conceive children by means other than vaginal intercourse or do not have children at all. *See supra* notes 102-110 and accompanying text.

[137] KOPPELMAN, *supra* note 100, at 153-76.

and incarceration—would suggest that males, not females, are disadvantaged in our society.

It is dubious that such sexual inequality as does exist is sustained by heterosexism. As Koppelman concedes, cultures that approve homosexuality also subordinate women; indeed, "it is possible for male homosexuality (at least) to be associated with male privilege and the repudiation of women."[138] Hence Koppelman retreats to the claim that "'homophobia directed by men against men is misogynistic.'"[139] Even this narrower claim is shaky, though. If heterosexism supports male dominance, one would expect women to view homosexuality more favorably than men do, but Koppelman recognizes that this is generally not the case.[140]

Even if discrimination against homosexuality did bolster male dominance, it would be questionable whether traditional marriage laws contribute to this effect. One would have to argue that nonrecognition of same-sex marriages makes traditional marriage (more) disadvantageous to women. This argument seems implausible; indeed, many of Koppelman's own statements seem to refute it. He recognizes that women may support traditional families for fear of "'losing traditional male support.'"[141] He even concedes "it may be that traditional sex roles are the best ones for women."[142] We need not go that far. We need only recognize that the financial, physical and emotional burdens of child-rearing are better borne by two parents than by one. Thus men and women who have or expect to have children benefit from laws and customs that protect the traditional family. Indeed, since in all societies a parent who leaves the family is more likely to be the father, women have a more obvious interest than men in sheltering the traditional family.

More obvious, though maybe not more important. Although tradi-

---

[138] *Id.* at 171. *See also infra* text accompanying note 150.

[139] *Id., quoting* EVE KOSOFSKY SEDGWICK, BETWEEN MEN: ENGLISH LITERATURE AND MALE HOMOSEXUAL DESIRE 20 (1985).

[140] KOPPELMAN, *supra* note 100, at 161 n.52, *quoting* Gregory M. Herek, *On Heterosexual Masculinity: Some Psychical Consequences of the Social Construction of Gender and Sexuality*, 29 AM. BEHAV. SCI. 563, 564-65 (1986): "National opinion polls typically find no significant difference between males' and females' responses to questions about homosexuality." Since this fact weakens his attempt to link heterosexism to sexism, Koppelman then quotes Herek on some "[s]maller-scale experimental and questionnaire studies," *id.*, but this rescue effort seems desperate and unsuccessful.

[141] *Id.* at 173, *quoting* JEFFREY WEEKS, SEXUALITY AND ITS DISCONTENTS 37 (1985).

[142] *Id.* at 174.

tional marriage benefits both sexes, it seems to curb the inclinations of men more than of women.[143]   This is evidenced by the greater reluctance of men to marry.   Moreover, in some ways traditional marriage does not cement male dominance but alleviates a male disadvantage.   Children have closer biological ties to their mothers than to their fathers.   Conception is the end of the father's biological tie to the child but only the beginning of the mother's tie, which extends through nine months of pregnancy and, typically, through several months of nursing.

Without traditional marriage, the rights of the father, and even his identity, would be tenuous.   Many societies, including our own, grant mothers greater rights.   For example, mothers get child custody in most divorces and have exclusive discretion to abort.[144]   To some extent traditional marriage mitigates the inequality of paternal and maternal rights, though.   Thus Koppelman's thesis, as applied to marriage, seems not only unproved but backwards—traditional marriage restricts the conduct of men more than of women and relieves some disadvantages of fathers.[145]

Koppelman says homophobia is aimed particularly against men to deter them from fleeing heterosexuality,[146] but people do not flee from superiority.   Indeed, Koppelman himself recognizes a more plausible analysis: "resentment that those with familial responsibilities that weigh heavily upon them feel toward those who seem free from such responsibilities."[147]   In this view the role of husband/father is not a privilege of sexual domination but a responsibility so onerous that society must punish men who shirk it.

Some common sexual terms reveal scorn for women and male

---

[143] Despite the tangible benefits of marriage to men, *see* AKERLOF, *supra* note 115, "[m]en may experience the sexual exclusivity expected within marriage as more of a burden" than do women, Amy Wax, *Bargaining in the Shadow of the Market: Is There a Future for Egalitarian Marriage,* 84 VA. L. REV. 509 (1998).

[144] *See* ELEANOR E. MACCOBY & ROBERT H. MNOOKIN, DIVIDING THE CHILD 98-114 (1993) (mothers get custody 70-80% of the time); Planned Parenthood v. Casey, 505 U.S. 833, 893-95 (1992) (striking down law requiring consent of or even notice to father before abortion).

[145] Indeed, in light of arguments like Koppelman's, it is ironic that William Eskridge supports gay marriage due in part to the tendency of (gay) males to "lose their balance and succumb to private sirens if they are not socially and even legally constrained." ESKRIDGE, *supra* note 9, at 83.   Thus the argument for recognition of gay marriage is also based on gender stereotypes.

[146] *See* KOPPELMAN, *supra* note 100, at 164-65, 171.

[147] *Id.* at 179.

homosexuals.[148]  To be "screwed," for example, is to be mistreated. The vernacular also illuminates gender relations in marriage.  Some usage treats marriage as degrading to women.  More often, though, marriage is depicted as depriving men of freedom (sexual and otherwise) and saddling them with financial and other burdens. When a woman marries a man she puts a ring in his nose.  By contrast, the bachelor is a playboy—footloose, carefree, sexually adventurous, with plenty of money to spend on his own pleasures.  That these images are empirically false enhances rather than diminishes their psychological significance—despite the facts, men view marriage as detrimental.  Gay marriage is often supported in order to promote public acceptance of homosexual conduct, but such acceptance may be "inconsistent with a proper recognition of the equality of women with men in intrinsic worth."[149]

    Some say discrimination against homosexual conduct is improper (and unconstitutional) because sexual orientation is involuntary and immutable and sexual pleasure is too central to human flourishing to be restricted by law without a compelling reason, which is lacking here.[150]  Even if sexual orientation is immutable, it does not follow that law cannot base distinctions on it.  Many laws turn on involuntary characteristics, like age.[151]  They also differentiate by sex when there is good reason to do so, as in providing separate bedrooms or bathrooms for men and women to preserve sexual privacy. This separation is not universal—many societies (at one time, all societies) deem such privacy unnecessary, even absurd.  Thus, the justification for such distinctions need not be universal, but only reasonable by the standards of our own society.[152]

    A few people are immutably homosexual in that they cannot enjoy

---

[148] *See* II ENCYCLOPEDIA OF HOMOSEXUALITY (Walter R. Dynes, ed., 1990) 1200 (terms for homosexuals "tend to express in their meaning or derivation the hostility, the contempt, the hatred, and the fear that straight people have felt toward gay sex and those who practice it").

[149] Finnis, *supra* note 85, at 24.

[150] The Supreme Court has sometimes disfavored laws that discriminate on the basis of "immutable" characteristics. *See, e.g.*, Frontiero v. Richardson, 411 U.S. 677, 686-87 (1973).

[151] Thus blindness is involuntary yet is a bar to a driver's license, and a genetic predisposition to crime would not excuse criminal activity. Sunstein, *supra* note 31, at 9.

[152] *See* Dennis Prager, *Homosexuality, the Bible and Us—a Jewish Perspective*, THE PUBLIC INTEREST, Summer, 1993, at 60, 73 (arguing that "[w]hether or not homosexuals choose homosexuality is entirely unrelated to the question of whether society ought to regard it as an equally valid way of life").

heterosexual relations,[153] but many people can enjoy both. Kinsey found that sexual orientation is not strictly bipolar but forms a continuum covering strong and weak preferences and neutrality between gay and heterosexual acts.[154]   In societies intolerant of homosexuality more men with homosexual inclinations will enter traditional marriages. [155]   Moreover, even if sexual orientation is immutable in some adults, it does not follow that it is fixed at birth. Some scientists believe that sexual orientation may be influenced by experience in early childhood.[156]

Scholars disagree about the immutability of sexual orientation.[157] Koppelman premises his whole argument on the immutability of sexuality. Again, he claims that male "homophobia" stems from the "homophobe's" uncertainty and anxiety about his own sexuality,[158] but uncertainty arises only if sexuality is fluid. Law and social attitudes influence the frequency of homosexual behavior, as evidenced by the widely different rates of homosexual conduct between societies that condone and societies that condemn it.[159]  And even those capable only of homosexual relations are, if sane, able to abstain from sex with

---

[153] The most extensive study to date found that in America 2.8% of adult males and 1.4% of adult females are predominantly homosexual. *See* ROBERT T. MICHAEL, ET AL., SEX IN AMERICA: A DEFINITIVE SURVEY 176 (1994); EDWARD O. LAUMANN, ET AL., THE SOCIAL ORGANIZATION OF SEXUALITY 297 (1994). Very few people are totally incapable of enjoying heterosexual relations. *See* POSNER, *supra* note 1, at 100-01.

[154] ALFRED C. KINSEY ET AL., SEXUAL BEHAVIOR IN THE HUMAN MALE 638-41 (1948); *see also* ALAN P. BELL & MARTIN S. WEINBERG, HOMOSEXUALITIES: A STUDY OF DIVERSITY AMONG MEN AND WOMEN 53-61 (1978); RICHARD C. FRIEDMAN, MALE HOMOSEXUALITY: A CONTEMPORARY PSYCHOANALYTIC PERSPECTIVE 3 (1988).

[155] POSNER, *supra* note 1, at 117.

[156] *See* J. Maddox, *Is Homosexuality Hardwired?*, NATURE, Sept. 5, 1991, at 13 (stating that childhood experiences (including sexual arousal) may cause physical changes in the brain that become permanent).

[157] *Compare* POSNER, *supra* note 1, at 295 (concluding that the evidence indicates "strongly though not conclusively" that sexual orientation is more "determined" than "chosen") *with* Janet E. Halley, *Sexual Orientation and the Politics of Biology: A Critique of the Argument from Immutability*, 46 STAN. L. REV. 503 (1994) (denying the claim of immutability). A recent study could not replicate the results of a study by a homosexual activist purporting to identify a "gay gene." George Rice, *et al., Male Homosexuality: Absence of Linkage to Microsatellite Markers at Xq28*, SCIENCE, April 23, 1999, at 665. Some studies report substantial success with homosexuals who expressed a desire to change their sexual orientation. *See, e.g.*, THOMAS E. SCHMIDT, STRAIGHT AND NARROW? COMPASSION AND CLARITY IN THE HOMOSEXUALITY DEBATE 153-58 (1995).

[158] KOPPELMAN, *supra* note 100, at 164-65, 171.

[159] *See* I ENCYCLOPEDIA OF HOMOSEXUALITY, *supra* note 149, 578-80 (describing the impact of social attitudes on homosexual conduct).

others. Validating same-sex marriages would sow confusion: "children confronted with two equally legitimate images of adult sexual roles would be rudderless for many years, and no one knows what personal or social toll would result from this prolonged period of sexual confusion."[160]

Because heterosexual monogamy requires equal numbers of marriageable men and women, because there is already a relative scarcity of marriageable males, and because homosexuality seems to be more common among men than women, even a small increase in the number of active homosexuals could exacerbate the imbalance between marriageable men and women.[161] Again, liberal societies can (and often do) encourage behavior they consider socially beneficial without having to conclude that some contrary behavior, which is not so favored, is harmful. Traditional marriage is beneficial, so it is not improper, as sex discrimination or otherwise, for society to recognize it but not other kinds of marriage. Traditional marriage is encouraged by treating it as unique, which it would not be if same-sex marriages were treated equally. Therefore, the main consequence of recognizing same-sex marriage would not be a shift of some people to homosexual conduct, but the change in heterosexuals' no longer seeing traditional marriage as something special.

### 2. The Analogy to Racial Discrimination

Advocates of same-sex marriage compare it to interracial marriage.[162] Defenders of anti-miscegenation laws denied that they were racially discriminatory because they treated all races alike by limiting everyone to marrying a person of the same race. In *Loving v. Virginia*[163] the Supreme Court looked beyond this formal equality and found the laws discriminatory because they were "designed to maintain White Supremacy."[164] The laws were intended to preserve apartheid, a

---

[160] Kristol, *supra* note 111, at 46.

[161] *See infra* notes 237-38 and accompanying text. Further, validation of same-sex marriage would diminish esteem for marriage (see *infra* notes 202-10 and accompanying text) and thereby weaken the incentives for heterosexual men to marry.

[162] *See* Richard A. Epstein, *Caste and the Civil Rights Laws: From Jim Crow to Same-Sex Marriages*, 92 MICH. L. REV. 2456, 2474-75 (1994); Andrew Koppelman, *The Miscegenation Analogy: Sodomy Law as Sex Discrimination*, 98 YALE L.J. 145 (1988); Sylvia A. Law, *Homosexuality and the Social Meaning of Gender*, 1988 WIS. L. REV. 187, 232-33.

[163] 388 U.S. 1 (1967).

[164] *Id.* at 11.

racial caste system, by enforcing "racial boundaries."[165]

Gay marriage is radically different from, and antipodal to, interracial marriage within the traditions of Western culture.[166] Christianity expressly condemned racism as, for example, in the parable of the Good Samaritan.[167] Anti-miscegenation laws were almost unheard of outside the United States, and less than one-third of the states had such laws when *Loving* was decided.[168] Thus in striking down these laws *Loving* did not reject but embraced Western tradition.    By contrast, neither the West nor any other culture has ever recognized same-sex marriage, and Christianity, like Judaism, has always condemned homosexual acts. By embracing Western tradition *Loving* argues against recognition of same-sex marriage.

Anti-miscegenation laws prevented intimate contact between the races.  Traditional marriage laws do not keep the sexes apart but bring them together.[169]   Interracial marriages create mixed-race children; same-sex marriages do not create mixed-gender children.  In the analogy between race and gender, traditional marriage resembles integration; gay marriage resembles segregation.  It is not surprising, then, that most Afro-Americans reject the analogy between the civil rights and homosexual movements.[170]  Government does not compel racial integration, but it can encourage integration by education, exhortation and subsidies.    Likewise, government cannot force individuals into traditional marriages, but it can encourage traditional marriages by favoring them in various ways.

The logical inconsistency of gay marriage has already become apparent in litigation over the benefits offered by some employers to gay couples.   Suits have alleged that denial of these benefits to

---

[165] Sunstein, *supra* note 31, at 18.

[166] Even gay activists often admit that race and homosexuality are very different with respect to discrimination.  *See* SULLIVAN, *supra* note 101, at 151-54 (arguing that race is different because sexual orientation can be hidden and is a complex "mixture of identity and behavior;" and because "homosexuals are not subject to inherited and cumulative patterns of economic discrimination" and "[t]here was no slavery for homosexuals");  *see generally* Lynn D. Wardle, Loving v. Virginia *and the Constitutional Right to Marry, 1790-1990*, 41 HOWARD L.J. 289 (1998).

[167] Luke 10:30-37. The Samaritans were a disliked minority.  By helping the injured Levite the Good Samaritan ignored racial distinctions.

[168] *See* ESKRIDGE, *supra* note 9, at 120-21.

[169] *See* Sunstein, *supra* note 31, at 20 n.65.

[170] *See* Lena Williams, *Blacks Rejecting Gay Rights as a Battle Equal to Theirs*, N.Y. TIMES, June 28, 1993, at A1.

unmarried heterosexual couples is illegal discrimination. The first few claims have failed.[171] However, the arguments for legitimizing same-sex marriage based on equality and sexual privacy and autonomy would also bar discrimination against unmarried heterosexual couples. Certainly any claim that a gay marriage is morally superior or more beneficial to society than heterosexual cohabitation without marriage would strike most Americans as ludicrous.

### 3. If There Is an Equality Problem, Validating Same-Sex Marriage Does Not Solve It

If marriage laws cause invidious inequality by bestowing benefits on some but not all people, the just solution is not to extend those benefits to gay marriages. That step would still leave discrimination against polygamy and endogamy and, more importantly, against those who cannot or choose not to marry. Indeed, many gay activists oppose recognition of same-sex marriages because it would deprecate unmarried gays.[172] Complete equality would require eliminating any legal preference for marriage and treating all individuals alike, regardless of whether they are married. That advocates of same-sex marriage do not propose this shows that equality is not their real goal.

### C. Recognizing Gay Marriages Would Damage Traditional Marriage

### 1. Many Advocates of Same-Sex Marriage Want to Transform Traditional Marriage

Many advocates of same-sex marriage seek not to expand traditional marriage to gays but revolutionize the institution.[173] William Eskridge hopes gay marriage will dethrone the traditional family based on blood-relationships in favor of "families we choose."[174] Michaelangelo

---

[171] *See* Foray v. Bell Atlantic, 56 F. Supp 2d. 327 (S.D.N.Y. 1999) (denying relief under Federal statutes). The court concluded that the discrimination was not invidious because gay couples cannot marry but heterosexual couples can. *Id.* at 330. It is doubtful, however, that most Americans would find this a morally persuasive distinction.

[172] Stephen Noll usefully distinguishes between "deconstructionists [who] fear that marriage may co-opt the [gay] liberation movement, while reconstructionists argue that same-sex marriage may serve as a means by which the entire institution may be redefined." Noll, *supra* note 9, at 59. *See infra* notes 310-17 and accompanying text (many gays oppose recognition of gay marriage).

[173] *See* Nitya Duclos, *Some Complicating Thoughts on Same-Sex Marriage*, 1 LAW & SEXUALITY 31 (1991).

[174] ESKRIDGE, *supra* note 9, at 81; *see also* KATH WESTON, FAMILIES WE CHOOSE: LESBIANS,

Signorile urges activists "to fight for same-sex marriage and its benefits and then, once granted, redefine the institution of marriage completely, . . . to debunk a myth and radically alter an archaic institution . . . . The most subversive action lesbians and gay men can undertake . . . is to transform the notion of 'family' entirely."[175]  Urvashi Vaid wants to "assimilate the straight world to the gay world."[176]  Although the consequences of validating same-sex marriage cannot be predicted, companionate marriage fosters anti-homosexual attitudes[177] and could therefore be a target of gay activists.

The question of the impact of gay marriage on public attitudes raises a related question: Why do supporters of gay marriage spurn the alternative of domestic partnership laws, which could confer the same legal benefits as marriage?[178]  The reason is that they are interested primarily in the intangible benefits—the honor, respect, the social stamp of approval—that legally recognized marriage brings.[179]  But the corollary to recognition would be that traditional child-bearing and child-rearing marriages would no longer be legally special.  They would be treated as no better than a gay partnership, which to most people would constitute not only the denial of a deserved accolade but a calculated insult.

### 2. Weakening the Incentives to Marry

Why do couples marry?  A desire to make a mutual commitment, even in public, is not a reason since that can be done without marriage.  The material legal benefits of marriage are mostly minor and often outweighed by the material detriments.[180]  The main motives to marry, then, are intangible.  Society honors marriage.  Law confirms this honor by recognizing marriage.  In Judaism, Christianity, and many other faiths, marriage is a sacrament, a union blessed by

---

GAYS, KINSHIP 116 (1991); Sullivan, *supra* note 101, at 202-05.

[175] Michelangelo Signorile, *Bridal Wave*, OUT, Dec.-Jan., 1994, at 161.  *See also* Franklin Kameny, *Deconstructing the Traditional Family*, THE WORLD & I, Oct. 1993, at 393-95.  "[T]here is no legitimate basis for limiting the freedom of the individual to structure his family in nontraditional ways that he finds satisfying. . . ." *Id.* at 385.

[176] URVASHI VAID, VIRTUAL EQUALITY: THE MAINSTREAMING OF GAY AND LESBIAN LIBERATION 208 (1995).

[177] POSNER, *supra* note 1, at 157-58.

[178] *See supra* notes 13-14 and accompanying text.

[179] *See supra* note 1.

[180] *See supra* note 56.

God.  The religious associations of marriage are important even to unbelievers; many who otherwise never enter a church or temple still insist on being married there.  Marriage is "a public tradition that carries with it experience and wisdom beyond the reach of the lifetime of any single couple."[181]  People follow social norms because they value the opinions of others, and law helps to shape those norms.[182]

Marriage is the social norm for adults; singles fit awkwardly or not at all into many social settings.  Singles are often considered unfortunate ("he/she can't find a spouse") or psychologically stunted — unmarried men have been viewed as immature.  However, many norms that once made bachelorhood unattractive for men have weakened.[183]  Society generally treats a marriage as valid only if it is legally recognized.  Thus polygamous and endogamous marriages are generally honored only in societies where such marriages are legal.

Honor, or social approval, is the main reason why legal recognition of gay marriages is so eagerly sought.  Desire for honor and fear of dishonor are powerful incentives.  For example, Americans pay taxes more readily than most other people, not because our penalties for tax evasion are harsher but because our social customs condemn tax evasion;[184] elsewhere it is downplayed as illegal but not immoral.  People often endure terrible hardship, even brave certain death, to gain or maintain honor.[185]

The honor conferred by law is fragile, however, because it depends on social attitudes as material benefits do not.  A tax break can be extended from one group to others without reducing its worth to the former, but the award of honor is necessarily selective and judgmental.  An honor too freely granted loses value.[186]  If it is granted for acts

---

[181] Philip Turner, *Sexual Ethics and the Attack on Traditional Morality* 19 (1988) (pamphlet on file with the author).

[182] *See* MATT RIDLEY, THE ORIGINS OF VIRTUE: HUMAN INSTINCTS AND THE EVOLUTION OF COOPERATION 181-86 (1998); Sunstein, *supra* note 31, at 954.  *See also supra* notes 25-34 and accompanying text (discussing the "expressive" function of law, including the bestowing of honor).

[183] *See* Wax, *supra* note 144, at 666-67 (describing the demise of these norms).

[184] *See* Editorial, *Loopholes in I.R.S. Reform*, N.Y. TIMES, May 26, 1998, at A20 (tax compliance in America "is far higher than in many other Western countries").

[185] *See* JAMES M. MCPHERSON, FOR CAUSE AND COMRADES: WHY MEN FOUGHT IN THE CIVIL WAR 90-103(1997) (claiming that soldiers on both sides in the American Civil War fought more for honor than for abstract causes).

[186] *See* WILLIAM J. GOODE, THE CELEBRATION OF HEROES: PRESTIGE AS A CONTROL SYSTEM 46-48 (1978) (prestige is governed by laws of supply and demand).

most people condemn, its value will decline more sharply.  Thus many honors are aggressively restricted.  A corpse improperly buried at Arlington National Cemetery is exhumed and expelled,[187] and Congress enacts a law to limit this honor.[188]  An admiral kills himself because of charges that he wore medals he did not earn.[189]  Only one American — Martin Luther King, Jr. — is honored with an annual national holiday.  If these honors were granted liberally, they would be cheapened, and the impact of the honors on social attitudes and behavior would be diluted.

Gays themselves recognize the value of exclusion.  Although gays try to force organizers of ethnic parades to include them,[190] organizers of gay parades sometimes exclude transvestites and pro-pederasty groups[191] because including them would incur contempt for all gays.  Recognition of gay marriage would have the same effect on attitudes toward marriage generally.

Acknowledging the psychological function of law and honor shows that those who say that nonrecognition of gay marriage is "irrational" have a point.[192]  Soldiers who fight for honor or for a moral cause are not behaving "rationally" in the sense that the costs of their actions far exceed the material benefits.  The same is true of voting.  Because one vote rarely alters the result of an election, not voting is "rational apathy."[193]  A democracy, then, needs "irrational" citizens who devote more effort to studying issues, supporting candidates, and voting, than a rational weighing of material costs and benefits would warrant.  Democracies encourage this irrationality by trumpeting voting as a duty and a privilege.  But many people do not vote if they see that many of their fellow citizens don't bother.  For soldiering, too, social

---

[187] *See* Stephen Barr, *Panel Vows to Tighten Rules for Arlington Burial: Politically-Connected Have Edge, Chairman Says*, WASH. POST, Jan. 29, 1998, at A17.

[188] 38 U.S.C. § 2402 (1994).

[189] *See* Philip Shenon, *His Medals Questioned, Top Admiral Kills Himself*, N.Y. TIMES, May 17, 1996, at A3.

[190] *See* Hurley v. Irish-American Gay, Lesbian and Bisexual Group, 515 U.S. 557, 566 (1995) (striking down on First Amendment grounds state court order that organizers of St. Patrick's Day parade allow homosexual advocacy group to participate).

[191] See Mark Higgins, *Gays Put Their Pride on Parade*, SEATTLE POST-INTELLIGENCER, July 1, 1996, at B1 (pro-pederasty group excluded from a Seattle "gay pride" march).

[192] *See* ESKRIDGE, *supra* note 9, at 176-78 (arguing that sexual orientation is "an irrational classification").

[193] *See* ANTHONY DOWNS, AN ECONOMIC THEORY OF DEMOCRACY 260-74 (1957).

attitudes are crucial. When society denigrates military service, as happened with Americans in Vietnam, many young men try to avoid combat.

Similarly, marrying, staying married, and bearing and raising children are in any material accounting irrational. In that sense, Eskridge is right: society's privileging of traditional marriage encourages conduct that is in a sense irrational for individuals but essential to society's well-being. Eskridge denies that legal validation of marriage confers honor: "the state is not a bit choosy about who can marry."[194] This misses the point, and he corrects his own error when he says: "the state gives its stamp of approval to the institution of marriage," not "to particular couples."[195] But what is the nature of the institution which earns social approval? Eskridge himself is "choosy;" he disapproves some polygamous and incestuous marriages.[196]

Some support gay marriage precisely because it would change attitudes toward homosexuality generally.[197] They are probably right that recognition would change attitudes toward marriage just as liberalization of divorce laws did. Marriage, once a sacred bond that could be broken only with great difficulty and for compelling reasons, can now be dissolved by either party for any reason or no reason at all. Not surprisingly, respect for marriage plummeted.

It does not follow, though, that validating gay marriage would enhance regard for homosexuality without eroding respect for traditional marriage. Some claim that recognition would "buttress the ethic of heterosexual marriage, by showing how even those excluded from it can wish to model themselves on its shape and structure."[198] This defies belief. Most Americans oppose recognition of gay marriage,[199] and

---

[194] ESKRIDGE, *supra* note 9, at 106; *see also id.* at 105-09.

[195] *Id.* at 105.

[196] *Id.* at 146-51.

[197] *See supra* note 1.

[198] SULLIVAN, *supra* note 99, at 112.

[199] ESKRIDGE, *supra* note 9, at 244 n.53 (citing a 1992 poll). Eskridge admits recognition would provoke "vociferous, even violent resistance by homophobic heterosexuals." *Id.* at 81. Most Americans disapprove of homosexuality. *See* ALAN WOLFE, ONE NATION, AFTER ALL 72-76 (1998) (noting that in a survey, seventy percent of the people questioned condemned homosexuality). Wolfe found the dominant attitude to be: "[I]f what they're asking for is for me, Mr. Average American, to say yes, your life style is the moral equivalent of mine, that I'm not willing to do." Carey Goldberg, *Acceptance of Gay Men and Lesbians Is Growing, Study Says,* N.Y. TIMES, May 31, 1998, at A15. The National Gay and Lesbian Task Force found that "disapproval of homosexuality . . . was still 56 percent in 1996". *Id.*

public reaction to the decision in *Baehr v. Lewin* led to a Constitutional Amendment that allowed the Hawaii legislature to restrict marriage to opposite sex couples.[200] Validating gay marriage would break the link of marriage to the divine, to the miracle of creation of new life, and to the rich tradition of love and commitment between husbands and wives.   "[F]or our intimacies to survive they must receive public recognition and support."[201] Validating gay marriage would dilute this support and lead to demands that unmarried couples receive the same legal benefits as spouses.[202]

If respect for gay marriage did grow, it would do so at the expense of traditional religion: "People who reject Christian doctrine on sex . . . may reject the remainder of Christian doctrine as well . . . ."[203] Given the centrality of religion in fostering individual responsibility and concern for others and in resisting such social evils as drug abuse and crime,[204] such abandonment could seriously harm society.

Harvey Fierstein's play, *Torch Song Trilogy*, shows the typical feelings about gay marriage. After the death of his lover the protagonist tells his mother that he is "widowing." The outraged mother says: "Are you trying to compare my marriage with you and Alan? . . . How dare you! . . . May God strike me dead! Whatever I did to my mother to deserve a child speaking to me this way."[205] To most people, gay marriage would be a "mocking burlesque"[206] or "mere parody" of traditional marriage.[207] James Q. Wilson suspects legal recognition "would call even more seriously into question the role of marriage at a time when the threats to it, ranging from single-parent families to common divorces, have hit record highs."[208] Andrew Sullivan, an advocate of same-sex marriage, admits that "[e]ven those tolerant of homosexuals may find this institution [marriage] so wedded to the notion of heterosexual

---

[200] *See supra* note 2 and accompanying text.

[201] Turner, *supra* note 182, at 19.

[202] *See supra* text accompanying note 187.

[203] POSNER, *supra* note 1, at 175.

[204] *See* GUENTER LEWY, WHY AMERICA NEEDS RELIGION 117-21 (1996).

[205] HARVEY FIERSTEIN, TORCH SONG TRILOGY 144-46 (1979).

[206] Arkes, *supra* note 119, at 45.

[207] James Q. Wilson, *Against Homosexual Marriage*, COMMENTARY, March, 1996, at 34, 36 (quoting Kenneth Minogue's book review of Virtually Normal).

[208] *Id.*

*Journal of Law & Politics* [Vol.XV:581]

commitment that to extend it would be to undo its very essence."[209] Some back gay marriage despite its uncertain effects: "We ought to pull the pin and see what happens."[210] This attitude would strike many (including the author) as reckless when applied to an institution central to the condition of society.

Some commentators recall that the widespread and often bitter opposition to racial integration eroded after World War II and predict that hostility to gay marriage will also collapse if it is sanctioned.[211] Unfortunately, while racism has sharply declined in recent decades, considerable racial friction persists. Moreover, as already noted, the analogy to race is faulty.[212] Jim Crow segregation was a regional aberration, a deviation from Western tradition and from Christian and Jewish doctrine. By contrast, disapproval of homosexuality and reverence for traditional marriage are integral to Western tradition and Christianity. Thus a better comparison than racial integration would be cannibalism or commission of sex acts in public. Both have been condoned in some societies but long abhorred in Western civilization. It is doubtful that legalizing these acts would rapidly lead to their public acceptance. General approval of gay marriage would require either an official change in traditional Christian, Jewish, and Moslem doctrine, or wholesale abandonment of these faiths by Americans. Both are highly unlikely.

Revolutionizing social attitudes toward homosexuality seems especially unlikely if gay marriage were legally imposed by judges. In rulings on the death penalty, the rights of criminal defendants, racial preferences, and busing to promote school integration, the Supreme Court took positions far to the left of the American mainstream, but the people were not won over. Indeed, some decisions may have galvanized opposition and thereby reversed a gradual leftward trend in

---

[209] SULLIVAN, *supra* note 101, at 179.

[210] Christine Pierce, *Gay Marriage*, 26 J. SOCIAL PHIL. no. 2, 5, 10 (1995). The Supreme Court of Vermont flirted with a similar recklessness in *Baker v. State*, 744 A.2d 864 (Vt. 1999). While ordering the legislature to extend the same benefits to gay couples as to married couples, the court did not insist that marriage be open to gays because "[a] sudden change in the marriage laws or the statutory benefits traditionally incidental to marriage may have disruptive and unforeseen consequences." *Id.* at 887. Given this admission, it is astonishing that the court simply leaves the whole question to the legislature.

[211] *See* ON THE ROAD TO SAME-SEX MARRIAGE: A SUPPORTIVE GUIDE TO PSYCHOLOGICAL, POLITICAL, AND LEGAL ISSUES 194-96 (Robert P. Cabaj & David W. Purcell, eds., 1998).

[212] *See supra* notes 163-71 and accompanying text.

public opinion.[213]   Unlike the Court's dismantling of Jim Crow segregation, these decisions did not grow out of but often ran counter to Western tradition. Gay marriage is so contrary to Western tradition that the public would probably reject any judicial move to condone it.

The effect of validating gay marriage would turn in part on gays' response to it. Most advocates of gay marriage want it as an option for gays, not the norm; they do not expect that, for gays, love and marriage will go together like a horse and carriage. And why should they? The purposes of traditional marriage—to rear children, to give mothers economic support, and to yoke the energies of males to families—will not apply to gay couples. Although most lesbians already live in stable relationships, most gay men do not,[214] which suggests that sexual conduct is dictated by deep-seated attitudes toward fidelity and promiscuity rather than by a marriage certificate. The paucity of registrations under Hawaii's domestic partnership law[215] shows that the tangible legal benefits of marriage are unimportant to most gays. Despite legal recognition, few gay men would marry. The effect of recognition, then, might be less to elevate esteem for homosexuality than to diminish regard for marriage.

### 3. Weakening the Incentives to Stay Married

Recent research documents the carnage wrought by the breakdown of the traditional family. Children were supposed to profit if their parents' unhappy marriages were dissolved.[216] We now know that divorce devastates not only small children, as many expected, but older children, too, and the damage persists, often for life.[217] Most divorced

---

[213] Justice Ginsburg believes that the Court's abortion decisions may have had this effect. *See* Ruth Bader Ginsburg, *Speaking in a Judicial Voice,* 67 N.Y.U. L. REV. 1185, 1199-1205 (1992).

[214] *See infra* note 230.

[215] *See supra* note 57.

[216] "Perhaps the most persuasive justification for unrestricted availability of divorce is the empirical assumption that if either parent is sufficiently dissatisfied with the marriage to contemplate divorce, then the child may be more harmed by the continuation of the unhappy marriage than by divorce." Elizabeth S. Scott, *Rational Decisionmaking About Marriage and Divorce,* 76 VA. L. REV. 9 (1990) at 29.

[217] *See generally* LENORE WEITZMAN, THE DIVORCE REVOLUTION: THE UNEXPECTED SOCIAL AND ECONOMIC CONSEQUENCES FOR WOMEN AND CHILDREN IN AMERICA (1985); JUDITH S. WALLERSTEIN & SANDRA BLAKESLEE, SECOND CHANCES. MEN, WOMEN, AND CHILDREN: A DECADE AFTER DIVORCE (1989); *see also* Scott, supra note 216 at 29-37 (divorce damages children unless there is "intense conflict" within the marriage); Wax, *supra* note 144, at 671 (analyzing why and how divorce is more damaging to women and children than to men).

women and their children suffer a lower standard of living.[218]  The threat of divorce constrains women even during marriage.  Many women hold jobs, for example, not for the needs of the intact family but for fear of divorce.[219]  No-fault divorce causes an increase in abuse of wives by husbands[220] and creates uncertainty that discourages couples from having children.[221]

The impact of divorce on husbands is less clear but, given the benefits of marriage, it is likely that divorce generally leaves men worse off, too.  Although marriage is generally beneficial and divorce detrimental not only to children and society as a whole but also to the parties themselves, people often fail to appreciate this fact.  Accordingly, society needs to support marriage.[222]

Some supporters of gay marriage criticize those who worry more about homosexuality than about the bigger problem of divorce.[223]  The criticism is valid,[224] but it undermines rather than advances the case for gay marriage because it would further weaken the disincentives to divorce.  The main objection to divorce has always been its damage to children.  Since gays cannot reproduce and rarely adopt, this objection would not apply to most gay marriages.  A second objection is that divorce often injures wives both economically (because most women earn less than men) and socially (because it is harder for divorced women to remarry than for divorced men and because divorced women are less accepted in society than divorced men).  This objection would also be invalid for gay couples.

The absence of children and instability of gay relationships will

---

[218] *See* Scott, *supra* note 216, at 33.

[219] *See* Gene Koretz, *Why Married Women Work*, BUS. WEEK, Sept. 22, 1997, at 26 (citing study by Allen M. Parkman).

[220] Brinig & Crafton, *supra* note 48, at 887-92 (showing a positive correlation between the adoption of no-fault divorce and an increase in spouse abuse).

[221] *Id.* at 887 ("[T]here are fewer births per thousand population in those states that have adopted a true no-fault regime").

[222] The Ramsey Colloquium connects this need with the difficulties of rearing children: "Having and rearing children is among the most difficult of human projects. Men and women need all the support they can get to maintain stable marriages in which the next generation can flourish." *The Homosexual Movement: A Response by the Ramsey Colloquium*, *supra* note 105, at 18.  It can only be added that the difficulties of marriage are not limited to child-rearing.

[223] *See* Stephen A. Macedo, *Homosexuality and the Conservative Mind*, 84 GEO. L.J. 261, 287 & n.99 (1995).

[224] The same point is made by some who defend the family and criticize the homosexual movement. *See The Homosexual Movement: A Response by the Ramsey Colloquium*, *supra* note 105, at 16.

mean higher divorce rates for gay couples.[225]  Indeed, many of its advocates do not expect or want gay marriages to be permanent. In weddings of the Metropolitan Community Church, the largest sect dedicated to gays, couples vow to stay together "so long is there is love,"[226] not "until death us do part."[227]  A wedding sanctifies marriage, conveys its solemnity, and calls the community to support the couple. The formality of a marriage license both underscores the gravity of marriage and protects spouses (especially the weaker party—usually the wife) by clarifying and recording their status. Given the instability of gay marriages, it is not surprising that some of its advocates criticize the very requirement of a wedding ceremony and license and the legal recognition of marriage.[228]

Validating gay marriage would encourage adultery.  Sexual fidelity is rare among gay men.[229]  Andrew Sullivan cheers that gays' "need for

---

[225] *See* POSNER, *supra* note 1, at 305-06 (instability of gay relationships).

[226] ESKRIDGE, *supra* note 9, at 194 (quoting the vows taken in such ceremonies).  This attitude belies the claim voiced by Andrew Sullivan that recognizing gay marriage would stabilize gay relationships. SULLIVAN, *supra* note 101, at 202; *see also* Christensen, *supra* note 1, at 1726 (conceding uncertainty whether marriage has "the same meaning—entailing commitment to the same values—for gay people as for their heterosexual counterparts").

[227] THE BOOK OF COMMON PRAYER 302 (Seabury Press 1976). The difference is telling in one other respect. In Christianity and Judaism one *ought* to love one's spouse; ceasing to do so is a fault one should try to correct. The gay ceremony posits no such duty; the commitment ceases when love ends, for whatever reason.

[228] *See* Mohr, *supra* note 6, at 229-30 (calling the requirement of a ceremony "misguided" and calling gay marriage superior because it is not automatically sanctified).  Mohr says: "until recently, by far the most usual form of marriage in western civilization [was] common law marriage—in which there is no marriage license or solemnization." *Id.* at 230. Until recently, however, most people were peasants who lacked the capability, and often, the legal right to leave a small village, so informal marriages were usually stable. If they did dissolve, the law cared little because the demands of child-rearing are lower in agrarian societies and feudal societies cared little about peasant marriages. *See generally* MARY ANN GLENDON, THE TRANSFORMATION OF FAMILY LAW (1989).

[229] *See* DENNIS ALTMAN, THE HOMOSEXUALIZATION OF AMERICA, THE AMERICANIZATION OF THE HOMOSEXUAL 187 (1982) ("[A]mong gay men a long-lasting *monogamous* relationship is almost unknown."); DAVID P. MCWHIRTER & ANDREW M. MATTISON, THE MALE COUPLE: HOW RELATIONSHIPS DEVELOP 285 (1984) (finding that "sexual exclusivity . . . was not the ongoing expectation for most" male couples); Leon McCusick *et al.*, *AIDS and Sexual Behavior Reported by Gay Men in San Francisco*, 75 AM. J. PUBLIC HEALTH 493, 493-95 (1985) (reporting that their 1985 study revealed that substantial percentages of gay men were not involved in monogamous relationship).

The renowned expert on human sexuality, Dr. David Reuben, offers this explanation for the promiscuity of gay men: "Homosexuals are trying the impossible: solving the problem with only half the pieces. They say they want gratification and love but they eliminate, right from the start, the most obvious source of love and gratification — woman." Thomas Vinciguerra,

extramarital outlets" will make adultery more acceptable for all married couples.[230] He condemns the "baleful . . . attempt" to impose "a stifling model of heterosexual normality."[231] If same-sex marriages were made legally and socially equal, these attitudes would spread to traditional marriages.

The law could set separate divorce standards for traditional and same-sex marriages, but that would contradict the principle of gay activists that the two are equal. Since the main objections to divorce do not apply to gay marriages, a unified standard would inevitably drift toward easier divorces. Moreover, the case for gay marriage rests largely on the argument for autonomy in intimate matters.[232] In this view, society has no right to define marriage; it must only validate individuals' choices. But if the right to autonomy forbids society to limit the creation of marriage, it also forbids society to limit the termination of marriage. A right to marriage on demand also implies a right to divorce on demand.

Recognizing gay marriages would also dilute the social stigma of divorce. Divorce is discouraged not only by legal obstacles but also by the likely disapproval of relatives, neighbors, and friends at work and in church. This disapproval reflects popular belief that divorce is damaging, especially to wives and children, and that marriage is a sacred commitment not to be casually broken. These attitudes do not apply to gay marriages. Thus, treating gay and traditional marriages alike would further dilute the stigma of divorce. As Barbara Whitehead puts it: "Once the social metric shifts from child well-being to adult well-being, it is hard to see divorce and nonmarital birth in anything but a positive light."[233]

More generally, marriage loses its value as a standard form if it must cover many kinds of relationships.[234] In particular, legitimizing gay

---

*Everything You Ever Wanted to Know About Changing With the Times,* N.Y. TIMES, March 21, 1999, § 4, at 7 (quoting DAVID REUBEN, EVERYTHING YOU ALWAYS WANTED TO KNOW ABOUT SEX 142(1969)).

[230] SULLIVAN, *supra* note 101, at 202. Richard Mohr also praises gay male couples for realizing that sexual fidelity is not necessary to show their love for each other and advocating that in this respect, *inter alia,* gay male couples may "provide models and materials for rethinking family life and improving family law." Mohr, *supra* note 6, at 233.

[231] Sullivan, *supra* note 101, at 203; *see also* Peter Freiberg, *Some Gays Aren't Wedded to the Idea of Same-Sex Marriage,* THE ADVOCATE 530, no. 16 (1989).

[232] *See supra* notes 125-30 and accompanying text.

[233] Whitehead, *supra* note 66, at 52.

[234] *See generally* Douglas Allen, *An Inquiry into the State's Role in Marriage,* 13 J. ECON. BEHAV.

marriage would damage traditional families by promoting "an ideology of 'recreational' sexuality that divorces sex from marital unity and treats marital infidelity as a relatively unimportant matter."[235]

### D. Recognizing Same-Sex Marriage Would Harm the Vast Majority of Women Who Want Traditional Marriages

Legitimizing same-sex marriage would harm women more than men. Homosexuality is more common among men than women.[236] Condoning same-sex marriage and homosexuality would remove more men than women from the market for traditional marriage. That market already has more women than men for several reasons, including higher mortality, homosexuality, incarceration, and drug addiction rates among men, and greater reluctance of suitable men to seek marriage. The disparity is widest in inner cities.[237] It prevents some women who want a spouse from finding one. Further, a surplus of a commodity depresses its market value. The relative surplus of unmarried women strengthens the bargaining power of men, who can demand one-sided terms of courtship or simply forego marriage altogether because the surplus of single women enables them to obtain what they want from a woman without the burdens of marriage.

The surplus of single women also harms married women by enabling a divorced man to find a new spouse more easily than a divorced woman can. This increases the bargaining power of married men, who can more credibly threaten to divorce and re-marry than can their wives. Because there are more homosexual men than women, recognition of same-sex marriages would aggravate these problems by increasing the imbalance between men and women seeking traditional marriages, thereby undermining sexual equality.

### E. Recognizing Same-Sex Marriages Would Logically Require Several Other Changes in the Law

To repeat: Same-sex marriage is not singled out for non-recognition

---

& ORG. 171 (1990).

[235] Amitai Etzioni & Robert P. George, *Virtue and the State: A Dialogue Between a Communitarian and a Social Conservative*, RESPONSIVE COMMUNITY., Spring, 1999, at 54, 65 (statement by Robert P. George).

[236] POSNER, *supra* note 1, at 99.

[237] *See id.* at 136-41.

*Journal of Law & Politics*               [Vol.XV:581

in our law; many other forms of marriage—polygamy, endogamy, and bestiality—are invalid or even forbidden. Rather, traditional marriage is singled out for endorsement. Arguments for approving gay marriage apply at least as strongly to these other forms, and arguments against the others apply at least as strongly to gay marriage. The arguments for gay marriage also support cloning, and arguments against cloning also oppose gay marriage. If we condone gay marriage, then, we must also condone the other arrangements; if we reject the others, we must also reject gay marriage.

### 1. Polygamy

Gay activists champion autonomy in intimate relationships[238] and charge that traditionalists simply fear what is different and mindlessly mouth religious prejudice.[239] On these grounds polygamy is even easier to support because, unlike gay marriage, it has been and still is condoned by many religions and societies.[240] The Equal Protection argument for same-sex marriage also applies to polygamy. The ban on polygamy discriminates not only against religions that approve polygamy but also bisexuals, who cannot act on their sexual preference within marriage unless they can have multiple spouses. It is not surprising, then, that some commentators link the arguments for same-sex marriage and polygamy.[241] As Hadley Arkes says, "Every argument for gay marriage is an argument that would support polygamy."[242]

---

[238] *See supra* notes 125-30 and accompanying text.

[239] *See infra* notes 295-96 and accompanying text.

[240] In non-Western societies polygamy is the norm. POSNER, *supra* note 1, at 69. Unlike homosexuality, polygamy is not even condemned in the Bible but was practiced by the ancient Hebrews. *See* JAMES A. BRUNDAGE, LAW, SEX, AND CHRISTIAN SOCIETY IN MEDIEVAL EUROPE 52 (1987); Noonan, *supra* note 62, at 32. "Western Jews practiced polygamy until about A.D. 1000, Eastern Jews until well into the twentieth century." POSNER, *supra* note 1, at 49.

[241] *See* Chambers, *supra* note 1, at 489-91 (supporting legalization of polygamy). Leaders of the 1993 gay march on Washington drafted a platform that included a demand for "legalization of multiple partner unions." *See Texas Platform Agreement for Next Year's March,* WASH. BLADE, May 22, 1992. In 1972 the National Coalition of Gay Organizations demanded "[r]epeal of all legislative provisions that restrict the sex or number of persons entering into a marriage unit." ESKRIDGE, *supra* note 9, at 54 (quoting the National Coalition of Gay Organizations' 1972 demands for law reforms); *see also* PEGGY COOPER DAVIS, NEGLECTED STORIES: THE CONSTITUTION AND FAMILY VALUES 238-41 (1997). Richard Posner sees a positive correlation between acceptance of polygamy and rates of homosexual activity. He seems to believe that causation runs from the former to the latter. POSNER, *supra* note 1, at 136.

[242] *One Man, One Woman,* WASHINGTON WATCH, Jan. 26, 1998, at 1 (containing statement by Hadley Arkes). This point is conceded by some advocates of gay marriage. *See* Carlos A. Ball, *Moral Foundations for a Discourse on Same-Sex Marriage: Looking Beyond Political Liberalism,* 85

Laws against polygamy can be defended only with reasoning that also excludes same-sex marriage. In practice, polygamy usually means polygyny, which allegedly denies equality to women. At first blush this charge seems strange. Adding women to a law partnership or a college faculty is deemed to raise women's status. Why does not adding more women to a marriage do the same? The answer is that, unlike a law firm or faculty, marriage in our society is viewed as a unique personal, emotional, and sexual commitment between a man and a woman which would be diluted and distorted by polygamy.[243] This reasoning makes a normative judgment about marriage that also precludes gay marriages. If we eschew moral judgments in favor of value neutrality and individual autonomy, we can condone gay marriage but must also accept polygamy. To insist that gay marriages be monogamous would not only deny autonomy but also impose a normative judgment for which there is no basis in policy or in our society's traditions—that two men (or women) can marry, but that three men (or women) cannot marry.

Polygamy could not be limited to gays. Once the total ban on polygamy is breached, it would be inconsistent to forbid polyandry or marriages of equal numbers of men and women (such as a four-way marriage of two men and two women). Moreover, proponents of gay marriage want it treated the same as traditional marriage. That would preclude polygamy for gays only. Further, while recognizing gay marriages would aggravate the scarcity of marriageable men, polygamy would relieve this problem by reducing the numerical disparity between single men and women. Thus validating gay marriage would also increase the social need for polygamy.

Monogamy encourages a man to care for his wife (because he can have only one) and children (because he is likely to have fewer children than a polygynist).[244] Monogamy also protects weaker men by preventing stronger men from accumulating harems. Monogamy imposes a rule of one-to-a-customer, even though polygyny might be favored not only by alpha males but also by women who would prefer sharing a strong husband to sole possession of a weak one or to having

---

GEO. L.J. 1871, 1878-79 (1997); David L. Chambers, *Polygamy and Same-Sex Marriage*, 26 HOF-STRA L. REV. 53, 79-82 (1997); Chai Feldblum, *A Progressive Moral Case for Same-Sex Marriage*, 7 TEMP. POL. & CIV. RTS. L. REV. 485, 490 (1998).

[243] *See* Teresa Stanton Collett, *Recognizing Same-Sex Marriage: Asking for the Impossible?*, 47 CATH. U. L. REV. 1245, 1256 (1998).

[244] *See* POSNER, *supra* note 1, at 95, 216, 258.

no husband at all.[245]

Efforts by proponents of gay marriage to distinguish polygamy are unpersuasive and sometimes laughably disingenuous. William Eskridge waxes eloquent about the threat polygamy poses to the companionship between husband and wife,[246] but after this encomium he drops an endnote disclaiming any position on polygamy among gays.[247] His reticence is not surprising since any discrimination between gay and heterosexual polygamy would be impossible to square with his insistence on "formal equality."[248] He is numb to the uniqueness of the relationship between husband and wife that demands monogamy for them but not for gays or business partnerships.

Even if polygamy statistically increases certain problems, not all polygamous marriages would be troublesome. Thus a total prohibition of polygamy requires the kind of generalizing that Eskridge otherwise condemns. Consider, for example, a man who marries two wives in a country that permits polygamy and who then immigrates to America, where he must abandon the second wife or be guilty of a crime. Viewing the case alone, this result seems harsh and pointless — who is harmed by allowing this one exception? Making exceptions is tricky, though, and pushes the law onto a slippery slope. If an immigrant may keep two wives, why not three, or twenty-five? What if an American takes a second wife abroad and then returns?

Some may sincerely consider polygamy a good model for others, just as proponents see gay marriage as a positive model. Many people, however, view polygamy and gay marriage as contradicting the ideal of the traditional, companionate (*i.e.*, monogamous), heterosexual marriage. Legislation is a blunt instrument; it employs general rules covering broad categories, not individual, ad hoc decisions. Inevitably, then, it is either underinclusive or overinclusive. As America becomes more diverse, we must decide whether to retain or abandon various legal traditions not shared by new immigrants. For example, America has a rapidly growing number of Moslems,[249] who condone and may

---

[245] Some proponents of gay marriage acknowledge this as a possible argument in favor of polygyny. *See* Macedo, *supra* note 224, at 288 n.105; *see also* POSNER, *supra* note 1, at 94.

[246] ESKRIDGE, *supra* note 9, at 148-49.

[247] *Id.* at 253 n.56.

[248] *Id.* at 51, 122.

[249] *See A Crescent for a Cross: Islam Prospers in America*, CHRISTIANITY TODAY, Oct. 28, 1991, at 40.

support legalization of polygamy.[250]  We can hardly cling to a Christian, Eurocentric tradition of monogamy if we desert the universal tradition against gay marriage.  This does not mean that polygamists must be rigorously hunted down and prosecuted.  It may be sufficient to protect society's legitimate interest in monogamy that polygamy be tolerated but not validated; indeed, this seems to be the evolving attitude toward polygamy.[251]  It is the same attitude that now prevails toward gay marriage.

### 2. Endogamy

Western law has long banned endogamy.[252]  Again, the main arguments for endorsing gay marriage — individual autonomy in intimate affairs and validation of loving relationships – also apply to endogamy.  The main objection to endogamy — that it causes genetic defects—is scientifically feeble.[253]  Moreover, "we do not forbid [unrelated] people who are carrying the same dangerous recessive gene to marry each other."[254]  If the physical health of offspring were society's central goal, there are many steps that could be, but are not, taken that would be more effective than laws against endogamy.  Moreover, the rule bars marriage of many people who are not blood relatives — such as a parent and an adopted child.  Clearly, fear of birth defects was not the original reason for the taboo, but is a post-hoc rationalization.  Validating gay marriages would further eviscerate the birth-defect argument against endogamy since homosexual couples do not reproduce.

This prohibition is harder to defend than the nonrecognition of gay marriage.  Homosexuality does not appeal to most people,[255] but

---

[250] *See* Dirk Johnson, *Polygamists Emerge from Secrecy, Seeking Not Just Peace, But Respect*, N.Y. TIMES, Apr. 9, 1991, at A22.

[251] *See* Chambers, *supra* note 243, at 71 (polygamy is now rarely prosecuted).

[252] *See* JACK GOODY, THE DEVELOPMENT OF THE FAMILY AND MARRIAGE IN EUROPE 31-33 (1983) (describing gradual suppression of endogamy as power of Christianity grew in Europe); C. MORRIS, THE PAPAL MONARCHY: THE WESTERN CHURCH FROM 1050 TO 1250 331 (1989) (describing break up of close knit clans and dispersal of property caused by the church's ban on endogamy).

[253] *See* Carolyn S. Bratt, *Incest Statutes and the Fundamental Right of Marriage: Is Oedipus Free to Marry?*, 18 FAM. L.Q. 257, 267-81 (1984) (calling the genetic case against endogamy weak). Even some courts admit that the genetic objection to endogamy is weak. *See* Bucca v. State, 128 A.2d 506, 510 (N.J. Super. Ct. Ch. Div. 1957).

[254] POSNER, *supra* note 1, at 200.

[255] *See supra* note 154.

incest was common in primitive societies. Indeed, Freud called the taboo on incest the greatest wound inflicted on the id by civilization.[256] The argument that same-sex marriage is opposed only because it is different from the norm and contrary to religious prejudices applies even more forcefully to endogamy.[257]

The taboo on endogamy is good policy. It stabilizes families by avoiding the friction that would arise between husband and wife and between parents and siblings when a parent and child marry. This rationale does not apply to endogamous gay marriages since gays bear no children to marry. If endogamous gay marriages were permitted, though, the principle of equality would require acceptance of endogamous heterosexual marriages.

Bans on gay marriage and endogamy require a degree of otherness or diversity in marriage. Endogamy promotes allegiance to family, clan or tribe, not to the larger society. Christianity banned endogamy in order to weaken clan ties in favor of devotion to one God and one church.[258] Gay activists accuse their opponents of fearing what is different, but heterosexuality and exogamy both push us from the familiar toward the different—another family, the other sex and children. In this way exogamy and heterosexuality resemble public education, by which government also encourages (and to some extent requires) exposure to the world outside ourselves.

Efforts to turn people outward may be justified on fairly mundane, pragmatic grounds—interaction with a variety of people gives citizens a better understanding of and concern for society and its challenges. Again, the Ramsey Colloquium speaks eloquently:

> Human society requires that we learn to value difference within community. In the complementarity of male and female we find the paradigmatic instance of this truth. . . . [It] invites us to learn to accept and affirm the natural world from which we are too often alienated.
>
> Moreover, in the creative complementarity of male and female we are directed toward community with those unlike us. In the community between male and

---

[256] SIGMUND FREUD, CIVILIZATION AND ITS DISCONTENTS 41 (Joan Riviere trans., 1982).

[257] *See* Bratt, *supra* note 254 (defending endogamy).

[258] *See supra* note 253.

> female, we do not and cannot see in each other mere
> reflections of ourselves. In learning to appreciate this
> most basic difference, and in forming a marital bond,
> we take both difference and community seriously.[259]

This complementarity can also be justified as an end in itself—that is, that interaction with others different from ourselves is good in itself, part of human flourishing.[260]

William Eskridge's ambivalent discussion of exogamy is instructive. He admits that exogamy may be desirable because it requires "reach[ing] beyond" one's own family,[261] but he does not ask whether heterosexuality may be a desirable "reaching beyond" one's own gender. Predictably then, he hedges, calling this justification "tentative" and declaring himself "open to the argument" that restrictions on endogamy are unconstitutional.[262] Not surprisingly, some domestic partnerships laws are open to close relatives.[263]

### 3. Artificial Reproduction and Baby-Selling

Arguments for gay marriage based on equality and reproductive freedom also apply to artificial reproduction. Not surprisingly, this is now a civil rights issue for many homosexuals.[264] Gays can reproduce only by artificial means. If gay marriages become valid, equality and

---

[259] *The Homosexual Movement: A Response by the Ramsey Colloquium, supra* note 105, at 17.

[260] Friendship, mutual affection, and a desire for justice are values that involve relations with others and that many philosophers have considered intrinsically good. *See* CAMBRIDGE DICTIONARY OF PHILOSOPHY 830 (Robert Audi, ed., 1995).

[261] ESKRIDGE, *supra* note 9, at 151.

[262] *Id.*

[263] *See* 31 HAW. REV. STAT. ANN. § 572C-4 (Michie Supp. 1999) (listing requirements for status of "reciprocal beneficiaries," which do not exclude close relatives); 31 HAW. REV. STAT. ANN. § 572C-2 (Michie Supp. 1999) (listing findings of the state legislature which include "individuals who are related to one another" as covered by the law).

[264] *See* Christopher Rapp, *Gay Clones*, HETERODOXY, May, 1997, at 4 (describing efforts of the Clone Rights United Front). Laurence Tribe has recognized the connection between cloning and gay rights, including gay marriage. *See* Laurence H. Tribe, *Second Thoughts on Cloning*, N.Y. TIMES, Dec. 5, 1997, at 31; *see also* John A. Robertson, *Embryos, Families and Procreative Liberty: The Legal Structure of the New Reproduction*, 59 S. CAL. L. REV. 939, 960 (1986) ("[T]he couple's interest in reproducing is the same, no matter how conception occurs, for the values and interests underlying coital reproduction are equally present."). The Vermont Supreme Court cited the use of "assisted-reproductive techniques" by gay couples to justify their right to the same legal benefits as traditional married couples. Baker v. State, 744 A.2d 864, 881 (Vt. 1999).

autonomy could require that gays be allowed to use artificial reproduction, which will then become common, with consequences that are hard to predict but may be dire.

President Clinton has forbidden the use of federal money for human cloning,[265] and some states outlaw cloning altogether.[266] Such laws are harder to defend than the invalidity of gay marriages, polygamy, and endogamy. There is no legal tradition against cloning. Much condemnation of cloning comes from religious figures or carries religious overtones (such as warnings against humans playing God). Thus opponents of cloning, like opponents of polygamy, endogamy, and gay marriage, can be charged with imposing their own religious beliefs on others.[267] Unlike polygamy, cloning cannot be called degrading to women.[268] Unlike endogamy, it cannot be said to cause birth defects.

The gender equality argument for gay marriage[269] is at least as valid for cloning. Sexual reproduction forces humans into two rigid classes—men are fathers, women are mothers. Even with artificial insemination of a lesbian, a supposedly anonymous sperm donor might be identified and assert rights as a father. Artificial insemination is even more problematic for gay men, who must find an egg donor and a gestational (or birth) mother, who may be different people, both of whom could assert legal rights over the child. Cloning permits people to break free of these sex-based categories.

Like polygamy and endogamy, human cloning can be opposed on secular grounds, but these grounds also weigh against same-sex marriage. First, every child needs both a mother and a father, not only because two parents are better than one,[270] but also because children need intimate contact with both halves of humanity, female and male. Even with natural reproduction, death, divorce or abandonment may

---

[265]   *See Remarks Announcing the Prohibition on Federal Funding for the Cloning of Human Beings and an Exchange With Reports,* 33 WEEKLY COMP. PRES. DOC. 278 (Mar. 10, 1997).

[266]   *See, e.g.,* Cal. Health & Safety Code § 24185 (West Supp. 2000) (imposing five-year moratorium on cloning).

[267]   *See* Tribe, *supra* note 265 (condemning the invocation of "vague notions of what is 'natural'" to support the use of the law to outlaw cloning).

[268]   Cloning can be degrading to women if women's self-esteem and status in society depend in part on their unique ability to bear children. If they do, though, this fact also argues against legitimizing gay marriages, which are sterile.

[269]   *See supra* notes 132-52 and accompanying text.

[270]   *See supra* notes 66-74 and accompanying text.

deprive a child of one or both parents. But unlike natural repro-
duction, cloning and same-sex marriage guarantee that a child will not
have both a mother and a father. Cloning can also be opposed as
contrary to the principle of exposing people to others different from
themselves.[271] However, this principle also contradicts gay marriage.
Moreover, the issue on cloning is a criminal prohibition, which
requires stronger justification than mere nonrecognition, as is the case
with same-sex marriage.[272]

Most important, cloning and other artificial means of reproduction
threaten to undermine human freedom and dignity.[273] In the Western
tradition all people are "endowed by our Creator with certain rights."
Manufactured anthropoids, like Frankenstein's creature, are shunned
as monsters. Some artificial reproduction is tolerated because it is
used primarily when a physical defect in a spouse prevents natural
reproduction. Exceptions, like artificial insemination of lesbians, have
been too rare to attract much criticism. Cloning would be a radical
change — reproduction where there is no defect in a spouse, or when
there is no spouse at all.

Validating gay marriage would make artificial reproduction more
frequent and visible and provoke more objections. For a same-sex
couple to manufacture a child with no intention that it have both a
mother and a father might be considered child abuse, just as polygamy
has sometimes been judged inherently abusive to children.[274] Even
the time-honored practice of adoption creates emotional problems for
children.[275] Artificial reproduction by gay couples could inflict greater

---

[271] *See supra* notes 117 & 254 and accompanying text.

[272] *See supra* note 124 and accompanying text.

[273] *See* Clarke D. Forsythe, *Human Cloning and the Constitution*, 32 VAL. U. L. REV. 469, 535-
36 (1998); *see also* LEON R. KASS & JAMES Q. WILSON, THE ETHICS OF HUMAN CLONING (1998);
Leon R. Kass, *Why We Should Ban the Cloning of Human Beings*, 4 TEX. REV. L. & POL. 41 (1999).

[274] *See* In re State *ex rel.* Black, 283 P.2d 887 (Utah 1955) (finding child neglect solely
because of parents' polygamy). Recently a woman had sperm retrieved from her husband 30
hours after he died. The sperm was frozen for 15 months, then injected into the woman, who
conceived and bore a child. Alexander M. Capron, professor of law and medicine and co-
director of the Pacific Center for Health Policy and Ethics at the University of Southern Cali-
fornia, asked: "Is it appropriate to consciously bring a child into this world with a dead father?"
*A Birth Spurs Debate on Using Sperm After Death*, N.Y. TIMES, March 27, 1999, at A11. The same
question can be raised about bringing a child into the world with no father, living or dead. *See
supra* notes 67-74 on the importance of having both a mother and a father.

[275] *See* Frank C. Verhulst *et al.*, *Problem Behavior in International Adoptees: I. An Epidemiological
Study*, 29 J. AM. ACAD. CHILD & ADOLESCENT PSYCH. 94 (1990) (parents report more problem
behavior in adopted than in non-adopted children).

psychic harm. Further, manufactured children may not be accepted as fully human. Although manufactured people are genetically human, it would be hard for many people to treat 1,000 clones from one person as natural human beings.

Artificial reproduction could erode *agape*—the unselfish love for all humanity. In the West, *agape* stems from Judeo-Christian reverence for the miracle of life created by God through the union of a woman and a man. Philosophers have long recognized that seeing others as like ourselves is a necessary condition to altruism.[276] If many people are churned out in laboratories, this reverence may evaporate. To "love thy neighbour as thyself"[277] and to "do unto others as you would have them do unto you"[278] may cease to be aspirations if many of our neighbors come from a test tube.[279]

Condoning gay marriages would also militate against laws forbidding the sale of babies since these laws discriminate against gay couples, who cannot reproduce naturally. Like gay marriage, baby-selling inflicts no direct, proximate harm and laws against it are therefore irrational from a materialist perspective. Richard Posner concedes that baby-selling would cause "commodification," but considers that desirable.[280] Posner does not consider how humans' self-image would change if marriage were severed from procreation and children were genetically designed for marketability in laboratories and then auctioned to the highest bidder.[281]

---

[276] *See generally* DAVID HUME, A TREATISE OF HUMAN NATURE (Ernest Mossner, ed. 1969) (1888); ADAM SMITH, THE THEORY OF MORAL SENTIMENTS (D.D. Raphael & A.L. Macfie, eds. 1976) (1759).

[277] *Leviticus* 19:18 (King James); *Matthew* 19:19 (King James).

[278] The full quote is: "whatsoever ye would that men should do to you, do ye even so to them . . . ." Matthew 7:12 (King James).

[279] The religious and ethical arguments against cloning are summarized in NAT'L BIOETHICS ADVISORY COMM'N, CLONING HUMAN BEINGS 59-83 (1997).

[280] POSNER, *supra* note 1, at 409-16 (arguing that because "the 'purchasers' get no more power over the baby than natural parents have over their children," the commodity that would be sold if baby-selling was permitted "is not the baby but the natural mother's right to keep the baby").

[281] *See* David Frum, *Dispatches & Dialogues*, SLATE. (Mar. 17, 1997), available at <http://www.slate.msn.com/Dialogues2/97-03-11/Dialogues.asp?imsg=3 ("Gay marriage is maybe not the very last step in the transformation of children into commodities. But it's close to the last.").

#### 4. Bestiality, etc.

Like incest and polygamy, and unlike homosexuality, bestial relations are a crime in most states.[282] A materialist defense of this taboo is hard to discern. It cannot be the protection of animals, which, after all, can be killed for food or clothing.[283] Bestiality poses less of a threat than does homosexuality to spread disease or to divert people from socially constructive conduct. Moreover, many people love their pets and might like to marry them even if they do not want sex with the pet.

Bestiality and homosexuality can be differentiated in conventional morality. Many cultures have accepted at least some homosexual conduct, but few have accepted bestiality. In the West homosexuality is now grudgingly tolerated in general, but bestiality is considered revolting, degrading to humans, an offense human dignity. Advocates of gay marriage, however, reject conventional morality, including any restriction of sexual freedom imposed simply because society considers an act disgusting or degrading. If one invokes this principle to support gay marriage, there is no honest basis for rejecting marriage with animals.

Arguments for gay marriage also raise questions about other forbidden sexual acts which inflict no immediate, tangible harm, such as necrophilia, nudity and performance of sex acts in public, and exposing children to pornography. Most people suspect that these acts cause harm, just as they suspect that legitimizing gay marriages would cause harm; but proving a compelling state interest would be at least as hard in the former cases as in the latter.

#### 5. Child Marriage

William Eskridge defends minimum age laws for marriage,[284] but this position, too, clashes with his arguments for gay marriage. He says "adolescents are immature decision makers" and "are prone to bad decisions."[285] However, minimum age laws vary from state to state,[286] though maturation does not vary by state. Given Eskridge's claim that

---

[282] *See* John E. Theuman, Annotation, *Validity of Statutes Making Sodomy a Criminal Offense,* 20 A.L.R. 4th 1009, 1032-41 (1983).

[283] *See* POSNER, *supra* note 1, at 230-31.

[284] *See* ESKRIDGE, *supra* note 9, at 146-47.

[285] *Id.* at 147.

[286] *Id.* at 146.

the right to marry is trumped only by a compelling state interest, and since states with lower age laws have experienced no catastrophe, there can be no compelling need for anything but the lowest minimum age laws.

Eskridge says adolescents "are prone to bad decisions," but he offers no proof of this claim as to marriage. Given the instability of gay male couples,[287] it is unlikely that adolescent marriages would be less successful. Absent contrary proof, how can there be a constitutional right of marriage for gays but not for adolescents? Even if a statistical difference in favor of gay marriage could be shown, it would only be the kind of generalization that Eskridge opposes as a basis for law-making. For example, he rejects a distinction between gay and traditional marriage based on reproduction because some traditional married couples are sterile.[288] By this reasoning, adolescent marriage cannot be denied simply because some adolescents lack maturity; clearly some adolescents are mature and some adults are immature.

Minimum age laws can be vindicated only on grounds that also apply to gay marriages. The desire of two (or more) people to marry does not always trump society's interest in marriage as an institution for child-rearing and socialization. The law may justly prefer that adolescents acquire education and job skills before they marry so that they can properly care for their children. Not all adolescents will so use this time, and some will conceive children out of wedlock, but these facts do not invalidate the general rule. Rather, given the role of marriage as an aspirational model, the law may properly require a minimum age for marriage. Since reasonable people can disagree about the proper minimum age, state laws may vary. Similarly, society may legitimately decide that its interests in child-rearing and socialization are best served by preserving the traditional model of marriage which excludes same-sex marriage.

### 6. Conclusion

Advocates of same-sex marriage profess to champion "families we choose," but most defend restrictions on marriage and reproduction that are in principle indistinguishable from same-sex marriage and that would, therefore, probably collapse if same-sex marriages were recognized.

---

[287] *See supra* note 230 and *infra* note 305.

[288] ESKRIDGE, *supra* note 9, at 96-98.

*F. Recognition of Same-Sex Marriage Would Trigger Demands for Religious Exemptions*

Legally recognized marriages are not only treated specially by government but are also required by law to be treated in certain ways by private parties. For example, employers must grant certain benefits to married employees.[289] Obeying such laws for gay marriages would violate the religious beliefs of many citizens, who would seek exemption from these laws. Indeed, this has already happened. Recently San Francisco required municipal contractors to extend certain benefits to same-sex partners of employees.[290] The Catholic diocese objected that its compliance would tacitly endorse homosexual acts in contradiction of the church's tenets. The dispute was resolved when the church agreed to let unmarried employees designate a loved one to receive benefits. Since the designee could be a relative or friend without being a gay partner, this policy satisfied the law without implying approval of homosexual acts.[291]

Although this conflict was finessed, similar spats would not always be resolved to mutual satisfaction. Religious objectors probably have no constitutional right to relief from such laws.[292] However, some states have religious freedom laws that exempt citizens from laws that violate their religious faith unless the state has a compelling reason to demand compliance.[293] There is no compelling reason for the state to require citizens to treat same-sex marriages as valid. Thus, laws validating same-sex marriages would be subject to a religious exception in these states and would feed demands for exemptions in states that do not already have religious freedom laws. Such demands would generate disputes that undermine the goal of encouraging tolerance

---

[289] *See, e.g.,* Family Leave Act, 29 U.S.C. § 2601-2654 (1994) (requiring certain employers to grant employees leave in some situations).

[290] SAN FRANCISCO, CA., ORDINANCE 97-96-33.1 (1996).

[291] *See* Nancy J. Knauer, *Domestic Partnership and Same-Sex Relationships: A Marketplace Innovation and a Less Than Perfect Institutional Choice,* 7 TEMP. POL. & CIV. RTS. L. REV. 337, 341 (1998) (discussing the ordinance and the controversy surrounding it).

[292] "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability . . .'" Employment Div., Dep't. of Human Res. v. Smith, 494 U.S. 872, 879 (1990) (*quoting* United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)).

[293] The Supreme Court held the federal Religious Freedom Restoration Act unconstitutional, at least as applied to the states. City of Boerne v. Flores, 521 U.S. 507, 534-36 (1997).

of homosexuality.

### G. *Validating Gay Marriages Will Fuel Hostility to Religion*

Because America's largest religious denominations all condemn homosexuality, legal validation of same-sex marriages would delegitimize these sects. Many gay activists desire this consequence. They hope that, with the law's moral backing, traditional religious attitudes toward homosexuality "will ultimately be discredited and forced to the margin."[294] Their particular target is Catholicism, and their goal is to "Stop the Church"[295] by tactics that include desecration of the Mass. Their language is often vicious. In his award-winning book, *On Becoming a Man*, Paul Monette called opponents of gay activism "the Nazi Popes and all their brocaded minions, the rat-brain politicians, the wacko fundamentalists and their Book of Lies."[296] As already noted,[297] legal recognition of same-sex marriages would force religious people and institutions to seek exemptions from various laws. The very necessity of seeking such exemptions makes the petitioners appear aberrational.

Moreover, churches that disapprove same-sex marriages could lose their tax exemptions. The Supreme Court compelled the Internal Revenue Service to withdraw the tax exemption of Bob Jones University because it forbade interracial dating among students. Although the school rule broke no law, the Court held that it contravened a national policy against racial separation and therefore disqualified the school from a tax exemption. [298] If gay marriages are legally recognized, churches that refuse to acknowledge or perform them could lose their tax exemptions on the same theory of violating national policy even if the refusal did not break any law.[299]

Traditional Jews and Christians could also suffer employment

---

[294] Larry W. Yackle, *Parading Ourselves: Freedom of Speech at the Feast of St. Patrick*, 73 B.U. L. REV. 791, 792 (1993). *See generally* Duncan, *supra* note 16.

[295] This is the title of a documentary film about the disruption and desecration of a celebration of the Mass by AIDS and homosexual activists at St. Patrick's Cathedral in New York City. *See* Duncan, *supra* note 103, at 601-04.

[296] PAUL MONETTE, ON BECOMING A MAN 2 (1992).

[297] *See supra* notes 290-93 and accompanying text.

[298] Bob Jones Univ. v. United States, 461 U.S. 574 (1983).

[299] *See, e.g.*, Judith C. Miles, *Beyond Bob Jones: Toward the Elimination of Governmental Subsidy of Discrimination by Religious Institutions*, 8 HARV. WOMEN'S L.J. 31, 34 (1985) (arguing for denial of tax benefits to churches that discriminate).

discrimination if employers are forbidden to discriminate against homosexual employees, customers, etc. Because traditional Jews and Christians consider homosexual acts sinful, they might be considered likely to offend homosexuals. Indeed, a mere statement that one is a Jew or Christian might offend homosexuals. Employers might, therefore, feel constrained to exclude or to limit the job opportunities of traditional Jews and Christians.

Religion is generally a positive force in America,[300] so activity that acts to fuel hostility toward religion is harmful, even to the interests of homosexuals. Although our principal religious denominations condemn homosexual acts, they also advocate love and understanding for, and deplore violence against, homosexuals.[301] Thus hostility against traditional religious sects is likely not only to anger their adherents but also to weaken the restraints that these sects exert on violence and discrimination against gays.

### H. Public Health

Same-sex marriage is sometimes touted as a means of improving the health of homosexuals. The theory is that gay promiscuity, which spreads AIDS and other diseases, results from social condemnation of homosexuality and a lack of proper models: legal recognition would encourage gay marriage and discourage promiscuity.[302] It is questionable how far this goal would be realized. If social disapproval caused homosexual promiscuity, lesbians would also be promiscuous, but they are not.[303] Americans have grown more tolerant of homosexuality in recent decades, but this has not reduced gay men's promiscuity, and the cities most tolerant of homosexuality have the most promiscuity. Even the threat of AIDS and other diseases only slightly (and perhaps

---

[300] *See generally* LEWY, *supra* note 205.

[301] In a pastoral letter entitled "Always Our Children" the National Conference of Catholic Bishops said: "God does not love someone any less simply because he or she is homosexual." The letter encouraged parents to love gay children. *Bishops Say Gay Children Need Support*, N.Y. TIMES, Oct. 1, 1997, at A14 (quoting the letter).

[302] *See* ESKRIDGE, *supra* note 9, at 8-10, 209 (validating gay marriages would "civilize" gays and reduce promiscuity). Andrew Sullivan considers the widespread promiscuity of gays "depraved" but says it is not "inevitable" but occurs only because gays now lack the proper "social incentives." SULLIVAN, *supra* note 101, at 107. If gay marriages were valid, most gays would marry "with as much (if not more) commitment as heterosexuals." *Id.* at 183.

[303] *See infra* note 311.

*Journal of Law & Politics*          [Vol.XV:581]

temporarily) reduced promiscuity.[504]   It seems that men tend to be promiscuous.[305]

In married men promiscuity is curbed by the attitudes of wives and children and by their demands on the man's time and money.   "It is not heterosexuality that contributes stability [to marriage], but the presence of a female."[306]   Society has reason to deter adultery—it disrupts families and thus injures children. Advocates of gay marriage, though, laud its greater tolerance of adultery.[307]  Further, the social endorsement conveyed by legitimizing gay marriage would facilitate - homosexual conduct and unsafe sex.[308]   The public health argument for gay marriage is at best too weak to overcome the powerful arguments against it.

### I. Recognizing Same-Sex Marriages May Not Benefit Homosexuals

Validating gay marriage may not even benefit homosexuals.   Few gay couples registered under Hawaii's domestic partnership law.[309] Further, "most lesbians, who grow up facing the same stigmas and the same lack of role models as male homosexuals, live conventional lives and form long-term monogamous relationships.   Why, with gay men,

---

[504] *See* GABRIEL ROTELLO, SEXUAL ECOLOGY 92-95, 111 (1997) (stating that gay promiscuity thrives despite AIDS and that many gays oppose any effort to discourage promiscuity); MICHAELANGELO SIGNORILE, LIFE OUTSIDE 227-32, 306-07 (1997) (drawing the same conclusion); Kevin Sack, *H.I.V. Peril and Rising Drug Use*, N.Y. TIMES, Jan. 29, 1999, at A10 (reporting increase of unsafe sex among gay men).   For philosophical defenses of promiscuity, *see infra* note 316. Promiscuity is the norm and lasting fidelity the exception among gay men. In one study 50% of gay white men reported having over 500 sexual partners. Bell & Weinberg, *supra* note 149, at 85.   In another only 8% of gay men were "dating" only one person; 87% had multiple partners.   Fifty-seven percent reported over 30 partners in the preceding year. ADVOCATE, Aug. 23, 1994, at 22-23.   Much of the promiscuity of gay men occurs with strangers. *See* PHILIP BLUMSTEIN & PEPPER SCHWARTZ, AMERICAN COUPLES 295, 585-86 (1983); *see also supra* note 230.

[505] *See* POSNER, *supra* note 1, at 90-92.

[306] DONALD WEBSTER CORY, THE HOMOSEXUAL IN AMERICA: A SUBJECTIVE APPROACH 141 (1951).

[307] *See supra* notes 224-33 and accompanying text.

[308] *See supra* notes 152-61 and accompanying text (levels of homosexual activity vary according to social attitudes).   Married gays might be less likely to use condoms, and more likely to spread AIDS, because use of condoms implies adultery by oneself or one's spouse. *See* Richard A. Posner, *Should There Be Homosexual Marriage? And If So, Who Should Decide?*, 95 MICH. L. REV. 1578, 1582 n.8 (1997).

[309] *See supra* note 57 and accompanying text; *see also* Foster, *supra* note 1, at 327 (noting that few gay couples take domestic partnership benefits).

are quasi-marriages the exception to the rule?"[310]  Men, it seems, are more promiscuous than women.[311]  Also, the presence of children helps to keep married couples together.[312]  Since homosexual couples do not procreate and gay males, at least, rarely adopt, gay marriages would be less durable.

Moreover, many homosexuals despise marriage as stifling[313] and fear that validating gay marriage "would further outlaw all gay and lesbian sex that is not performed in a marital context."[314]  For some, promiscuity is desirable, not a fault to be corrected by pushing gays into marriage.[315]  Some lesbians disdain marriage as inherently patriarchal and prefer lesbian communes or question whether lesbian lovers should even live together.[316]  Further, some favor gay marriage in order to revolutionize the institution.[317]  They would probably drop their support if recognition meant only extending traditional marital

---

[310] Kristol, *supra* note 111, at 46; *see also* ESKRIDGE, *supra* note 9, at 83 ("The majority of surveys taken in the last twenty years have found more lesbians than gay men in committed long-term relationships.").  This fact is particularly striking because gay men are more numerous than lesbians. *See supra* note 162.

[311] *See* POSNER, *supra* note 1, at 90-92.

[312] *See* POSNER, *supra* note 1, at 305-07, 312.

[313] *See* Freiberg, *supra* note 232; Steven K. Homer, *Against Marriage*, 29 HARV. C.R.-C.L. L. REV. 505 (1994); David W. Dunlap, *Some Gay Rights Advocates Question Drive to Defend Same-Sex Marriage*, N.Y. TIMES, June 7, 1996, at A12.

[314] Paula L. Ettelbrick, *Since When is Marriage a Path to Liberation?*, OUT/LOOK, Fall, 1989, at 9, 16, *reprinted in* LESBIANS, GAY MEN, AND THE LAW 401, 403 (William Rubinstein, ed., 1993); *see also* Charles R.P. Pouncy, *Marriage and Domestic Partnership: Rationality and Inequality*, 7 TEMP. POL. & CIV. RTS. L. REV. 363, 370 (1998) ("The extension of same-sex marriage will cloak gay and lesbian couples in the traditions of patriarchy and heterosexism. Heterosexual norms will become the standards applied to lesbian and gay relationships, and the development of queer cultural constructions of intimate relationships will be stunted.") (footnote omitted).

[315] For philosophical defenses of promiscuity see DAVID A.J. RICHARDS, SEX, DRUGS, DEATH, AND THE LAW: AN ESSAY ON HUMAN RIGHTS AND OVERCRIMINALIZATION 29-63, 87-88, 93-95 (1982); Frederick Elliston, *In Defense of Promiscuity*, in PHILOSOPHICAL PERSPECTIVES ON SEX AND LOVE 146 (Robert M. Stewart, ed. 1995); Sheryl Gay Stolberg, *Gay Culture Weighs Sense and Sexuality*, N.Y. TIMES, Nov. 23, 1997, at B6 (describing debate among gays in which some "argue that promiscuous sex is the essence of gay liberation").

[316] *See* RUTHANN ROBSON, LESBIAN (OUT)LAW: SURVIVAL UNDER THE RULE OF LAW 124-27 (1992); Ettelbrick, *supra* note 314, at 14-17; Freiberg, *supra* note 225, at 18; SARAH LUCIA HOAGLAND, LESBIAN ETHICS: TOWARD NEW VALUE (1988); CLAUDIA CARD, LESBIAN CHOICES (1995); Nancy D. Polikoff, *supra* note 53, at 1536 (calling marriage "an inherently problematic institution that betrays the promise of both lesbian and gay liberation and radical feminism" and that "the desire to marry in the lesbian and gay community is an attempt to mimic the worst of mainstream society").

[317] *See supra* notes 174-77 and accompanying text.

norms to homosexuals.

The push for legal recognition may also be a strategic error. After the decision in *Baehr v. Lewin* opposition to gay marriage grew in Hawaii.[318] The quest for recognition also incurs opportunity costs. The energy it absorbs could, for example, be used to deter gay bashing and to reduce the spread of HIV and AIDS and help those already infected. The push for legal recognition of gay marriage may also alienate potential allies on these other issues.

David Chambers, who favors gay marriage, notes that Mormons were reviled and persecuted in the 19th Century, largely because they practiced polygamy. He says "the Mormons triumphed through surrender. After disavowing plural marriage, they were accepted into 'civilized' society and have thrived."[319] The hostility to gay marriage manifested in adoption of the Defense of Marriage Act and similar state laws[320] while society simultaneously grows more tolerant of other aspects of homosexuality suggests that retreat on the issue of same-sex marriage might be a wise tactic for those who seek greater social acceptance of homosexuality.

This article will not try to resolve or even join the debate among homosexuals; it merely notes the existence of the debate and the corollary that we cannot assume that legal recognition of same-sex marriages is desired by or desirable for homosexuals.

## VI. CONCLUSION

Those who have advocated legal recognition of same-sex marriage have acted in good faith belief that it would benefit homosexuals without harming others. It is now clear that this belief is false. The advocates should reconsider their position and, if they truly care about the well-being of our children and of our society, present and future, they should support traditional marriage.

---

[318] In a 1993 poll roughly 60% opposed gay marriage, 30% favored it, and 10% were undecided. *See Same-Sex Marriages Not So Popular*, HONOLULU STAR.-BULL., June 19, 1993, at A1; Linda Hosek, *Poll: Unions for Gays Won't Hurt Isle Image*, HONOLULU STAR-BULL., Feb. 3, 1994, at A6. A 1996 poll found opposition had risen to 71%. *See Same-Sex Marriages Opposed by 71% in Poll*, HONOLULU ADVERTISER, Feb. 23, 1996, at A1.

[319] Chambers, *supra* note 243, at 77; *see also* Ralph Wedgwood, *What Are We Fighting For?*, HARV. GAY & LESBIAN REV., Fall 1997, at 32-33 (advocating pursuit of the rights and benefits of marriage for gays and not "'marriage' as such").

[320] *See supra* notes 7-9 and accompanying text.

# Tab 11

Sex Res Soc Policy (2010) 7:176–200
DOI 10.1007/s13178-010-0017-y

# Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults in a US Probability Sample

Gregory M. Herek · Aaron T. Norton ·
Thomas J. Allen · Charles L. Sims

Published online: 3 March 2010
© The Author(s) 2010. This article is published with open access at Springerlink.com

**Abstract** Using data from a US national probability sample of self-identified lesbian, gay, and bisexual adults ($N=662$), this article reports population parameter estimates for a variety of demographic, psychological, and social variables. Special emphasis is given to information with relevance to public policy and law. Compared with the US adult population, respondents were younger, more highly educated, and less likely to be non-Hispanic White, but differences were observed between gender and sexual orientation groups on all of these variables. Overall, respondents tended to be politically liberal, not highly religious, and supportive of marriage equality for same-sex couples. Women were more likely than men to be in a committed relationship. Virtually all coupled gay men and lesbians had a same-sex partner, whereas the vast majority of coupled bisexuals were in a heterosexual relationship. Compared with bisexuals, gay men and lesbians reported stronger commitment to a sexual-minority identity, greater community identification and involvement, and more extensive disclosure of their sexual orientation to others. Most respondents reported experiencing little or no choice about their sexual orientation. The importance of distinguishing among lesbians, gay men, bisexual women, and bisexual men in behavioral and social research is discussed.

G. M. Herek (✉) · A. T. Norton · T. J. Allen · C. L. Sims
Psychology Department, University of California,
One Shields Avenue,
Davis, CA 95616-8686, USA
e-mail: gmherek@ucdavis.edu

A. T. Norton
e-mail: atnorton@ucdavis.edu

T. J. Allen
e-mail: tjallen@ucdavis.edu

② Springer

**Keywords** Lesbians · Gay men · Bisexuals · Public policy · Sampling · Survey research · Committed relationships · Politics and religion · Identity, community, and disclosure

"Empirical studies using nonrepresentative samples of gay men and lesbians show that the vast majority of participants have been involved in a committed relationship at some point in their lives [and] that large proportions are currently involved in such a relationship...." (American Psychological Association 2007, pp. 14–15)

"...[D]ata are not available to indicate the exact number of lesbian and gay parents in the United States...." (American Psychological Association 2007, p. 25)

"Most or many gay men and lesbians experience little or no choice about their sexual orientation." (American Psychological Association 2003, p. 8)

These three passages, all excerpted from amicus briefs submitted jointly by the American Psychological Association (APA) and other professional organizations in court cases involving gay rights, illustrate some of the ways in which descriptive data about the lesbian, gay, and bisexual population are relevant to policy debates. In each instance, the APA and its co-amici summarized current knowledge about an aspect of the US gay, lesbian, and bisexual population that was relevant to a question being considered by the court—respectively, how many gay men and lesbians are involved in a committed relationship, how many are parents, and how many experience their sexual orientation as a choice. Yet, in each instance, the briefs could not provide definitive population estimates because relevant data were not available from nationally represen-

177

tative samples of self-identified gay, lesbian, and bisexual adults.

The need for data describing the gay, lesbian, and bisexual population is not limited to legal proceedings. As Black et al. (2000) have noted, such data are relevant to a wide variety of policy debates in the USA, including those about initiatives designed to prohibit discrimination based on sexual orientation, public policy concerning the provision of benefits to same-sex couples, military policy concerning service by openly gay personnel, and lesbian and gay parental rights. They observed that "informed policy analysis about these issues requires accurate demographic information about the lesbian and gay population" (Black et al. 2000, p. 139).

Population data describing lesbians, gay men, and bisexuals also have important scientific implications insofar as they can inform researchers who study the gay, lesbian, and bisexual population. Examination of demographic, social, and psychological patterns in the population, for example, can highlight gaps in current scientific knowledge and suggest hypotheses for empirical testing. Reliable estimates of the extent to which various characteristics and experiences are present in the sexual-minority population can also assist researchers in interpreting data from nonprobability samples and assessing their likely generalizability.

To date, however, most social science knowledge about people who identify as gay, lesbian, or bisexual has been based on data from nonprobability samples. These samples have been recruited through such venues as clubs, cafes, and commercial establishments catering to gay men, lesbians, and bisexuals; neighborhood and community events; community-based organizations; local and national publications; e-mail lists and web-based communities; and friendship networks (e.g., Bell and Weinberg 1978; Bradford et al. 1994; Herek et al. 1999; Martin and Dean 1990; Riggle et al. 2005; Rothblum et al. 2004; Rothblum and Factor 2001). Researchers have also used public records to recruit specific groups, such as same-sex couples who have married or legally registered their partnership in states where they are allowed to do so (Balsam et al. 2008; Rothblum et al. 2008). Although the data collected from such samples are sources of important information, the extent to which their participants represent the larger population is unknown (Harry 1986; Meyer and Colten 1999; Sell and Petrulio 1996).

It has often been assumed that traditional probability sampling methods—which permit assessment of sampling error and whose results can be generalized beyond a specific sample—are not feasible with lesbians, gay men, and bisexuals because nonheterosexuals constitute only a small proportion of the population and because sexual stigma deters some individuals from disclosing their homosexual or bisexual orientation to researchers. Con-

cerns about the limitations of findings from convenience samples, however, have fostered the development of innovative strategies for obtaining probability samples of gay, lesbian, and bisexual people (Cochran and Mays 2006; Meyer and Wilson 2009). For example, researchers have used various methods to identify nonheterosexuals in large national probability samples (Badgett 1995; Cochran and Mays 2006; Edelman 1993; Harry 1990; Laumann et al. 1994) and have applied probability sampling methods to specific settings or venues where sexual-minority individuals are known to be concentrated (Blair 1999; Diaz et al. 2004; Diaz et al. 1996; Stall and Wiley 1988).

When examining this body of research, it is important to note that sexual orientation is a multifaceted construct that encompasses sexual attraction, sexual behavior, personal identity, romantic relationships, and community membership (Herek 2000; Sell 2007). Most social and behavioral research has operationally defined sexual orientation in terms of attraction, behavior, or identity, or some combination of these constructs. Which of these definitions is most appropriate for a particular study depends on the research goals (Sell and Silenzio 2006). For example, studies of sexually transmitted diseases among men who have sex with men might optimally focus on sexual behavior, whereas research on experiences stemming from one's status as an openly gay, lesbian, or bisexual individual would, ideally, operationalize sexual orientation in terms of identity.

However, even in studies for which sexual orientation identity is the relevant variable, researchers employing existing data sets based on large probability samples have often had to operationalize sexual orientation in terms of sexual behavior simply because most surveys have not collected data about identity. In many studies of economic discrimination that use national survey data sets, for example, the results have been characterized in terms of disparities between heterosexual workers and their gay or lesbian counterparts (e.g., Badgett 1995; Berg and Lien 2002; Blandford 2003). Although the terms "heterosexual," "gay," and "lesbian" suggest a focus on identity, limitations of the available data dictated that the operational definitions of sexual orientation be based on self-reported sexual behavior, from which the researchers inferred respondents' sexual orientation identity.

Although unavoidable, such use of sexual behavior as a proxy for identity and community membership is limiting for several reasons (see Herek et al. 2007). For example, it inevitably excludes gay, lesbian, and bisexual individuals who were not sexually active during the specified time period (e.g., Carpenter 2005). Moreover, the population of individuals who have experienced same-sex attractions or engaged in same-sex sexual behavior includes many people who do not identify as lesbian, gay, or bisexual (e.g., Cochran and Mays 2006; Laumann et al. 1994). Insofar as

🍀 Springer

Sex Res Soc Policy (2010) 7:176–200

much of the stigma directed at gay, lesbian, and bisexual people finds behavioral expression when others become aware of their sexual orientation identity (e.g., Herek 2009b), the experiences of self-identified gay, lesbian, and bisexual people are likely to differ in important respects from, say, self-identified heterosexuals with incidental same-sex attractions or sexual behavior.

Some studies with probability samples have operationalized sexual orientation in terms of identity, but they have been limited by small sample sizes.[1] For example, the National Health and Social Life Survey collected data about respondents' sexual behavior, attractions, and sexual orientation identity. However, the sample ultimately included only 24 women who identified as lesbian or bisexual and only 39 men who identified as gay or bisexual (Laumann et al. 1994). Similarly, the National Survey of Midlife Development in the United States asked respondents to label their sexual orientation as heterosexual, homosexual, or bisexual. Of the approximately 3,000 respondents in this national probability sample, only 41 identified as homosexual and only 32 as bisexual (Mays and Cochran 2001). Such small numbers clearly preclude extensive analysis of self-identified lesbians, gay men, and bisexuals.

Other studies using probability samples have obtained larger numbers of self-identified lesbian, gay, and bisexual respondents, but the samples have been restricted to specific US states (Carpenter 2005) or cities (Blair 1999; Sell et al. 2007) or to gay neighborhoods or venues in specific cities (Diaz et al. 1996; Stall and Wiley 1988). These studies have yielded invaluable data, but their findings may not be generalizable beyond those settings.

Another important limitation is that the data from probability samples have generally not permitted separate analyses of self-identified lesbians, gay men, bisexual women, and bisexual men. As noted previously, some studies that directly assessed sexual orientation identity have yielded samples that were simply too small to permit separate analyses of subgroups (e.g., Laumann et al. 1994; Mays and Cochran 2001). In other studies, the sexual orientation question was not framed in a manner that permitted differentiation between bisexual and homosexual respondents. For example, exit polls conducted in conjunction with national elections have asked respondents to indicate whether they are gay, lesbian, or bisexual without differentiating among these groups (Edelman 1993; Hertzog 1996).

Yet, empirical research with nonprobability samples suggests that important differences may exist among sexual-minority subgroups. For example, lesbians may differ from gay men in their likelihood of being involved in an intimate relationship (Peplau and Fingerhut 2007), bisexuals may differ from lesbians and gay men in the extent to which they are open about their sexual orientation and feel connected to a sexual-minority community (Balsam and Mohr 2007), and lesbians and bisexual women may differ from gay and bisexual men in the extent to which they manifest self-directed stigma (Balsam and Mohr 2007; Herek et al. 2009). Whether or not these findings can be generalized beyond the specific samples in which they were initially observed is as yet unknown, but they highlight the value of collecting data from probability samples that are sufficiently large to permit comparisons among gender and sexual orientation subgroups.

This article uses data from a national probability sample of self-identified gay, lesbian, and bisexual adults to estimate population parameters on a variety of demographic, psychological, and social variables. Recognizing that sexual orientation subgroups may differ, we also compare and contrast gay men, lesbians, bisexual men, and bisexual women on each variable. Rather than testing specific hypotheses, our central goal is to report basic descriptive data about self-identified gay, lesbian, and bisexual adults. Although an overwhelming number of questions about potentially interesting and important characteristics of the sexual-minority population could be generated, practical considerations limited the number of variables that could be assessed. Guided mainly by our review of policy studies and amicus briefs from scientific and professional organizations that have addressed topics for which data about the US population of self-identified gay, lesbian, and bisexual adults would be relevant (e.g., American Psychological Association 1986, 2003, 2007; Belkin 2008; Black et al. 2000; Egan and Sherrill 2005; Herek 2006; Schaffner and Senic 2006), we focused on variables in four categories.

First, we examined the basic demographic characteristics of this population, including age, educational background, and race and ethnicity. We also examined key variables identified by Black et al. (2000) as warranting description, including geographical distribution, household structure, and military veteran status.

Second, consistent with the present study's focus on adults who identify as gay, lesbian, or bisexual, we report descriptive data about key aspects of sexual orientation identity. These include the extent to which respondents used various identity labels in describing themselves; felt committed to their sexual orientation identity; had disclosed their sexual orientation to others; and were involved with

---

[1] The problem of small sample size is not restricted to studies that have focused on sexual orientation identity. For example, an analysis of data from male respondents in the third National Health and Nutrition Examination Survey Studies ($N=3,648$) yielded a weighted total of 79 men who reported any same-sex sexual behavior during their lifetime (Cochran and Mays 2000). A 1985 ABC News-*Washington Post* poll recruited a national probability sample of men and included a question about sexual attraction. Of the 663 respondents, 16 reported that they were attracted to members of their same sex and another five volunteered that they were attracted to both men and women (Harry 1990).

🕗 Springer

Sex Res Soc Policy (2010) 7:176–200                                                     179

the gay, lesbian, and bisexual community. We also assessed the extent to which respondents perceived they had chosen their sexual orientation, an issue that has often been raised in policy debates and in legal discussions of gay, lesbian, and bisexual rights (see, for example, the 2003 APA amicus brief quoted at the beginning of this article; see also Herman 1997).

Third, recognizing the importance of religious and political institutions in shaping contemporary policy and public opinion affecting gay, lesbian, and bisexual people, we assessed several aspects of respondents' religious and political involvement. Although it is widely recognized that the condemnation of homosexuality that characterizes many religious denominations often creates conflicts and challenges for gay, lesbian, and bisexual people, there has been relatively little examination of the role that religion plays in the lives of sexual-minority individuals (Rodriguez and Ouellette 2000). We obtained descriptive data concerning respondents' affiliation with a religious denomination, their participation in religious services, and the importance of religion in their daily lives. In the realm of political involvement, national exit poll data have suggested that lesbian, gay, and bisexual voters tend to be liberal and identify with the Democratic Party (e.g., Edelman 1993; Hertzog 1996). We assessed the extent to which these attributes characterize the larger lesbian, gay, and bisexual population.

Finally, relevant to ongoing national debates about marriage equality and lesbian and gay parenting (e.g., Herek 2006), we collected data concerning respondents' current relationship and parental status, as well as their future aspirations related to marrying. We also asked respondents about their general attitudes toward civil unions and marriage rights for same-sex couples.[2]

**Method**

The study employed a probability sample of English-speaking, self-identified lesbian, gay, and bisexual adults residing in the USA. The sample was drawn from the Knowledge Networks (KN) panel, a large (approximately 40,000 households at the time of data collection) probability sample of English-speaking US residents who were recruited through random digit dialing (RDD) methods. Upon initially joining the KN panel, respondents agreed to participate regularly in on-line surveys and were provided with free Internet access and equipment if they did not already have it. Thus, in contrast to Internet studies with volunteer samples recruited via the Web, the KN panel includes individuals who would not otherwise have Internet access because of their

financial or social situation. Reflecting this fact, KN samples more closely match the US population than do other Internet samples. Indeed, they are demographically similar to the RDD samples used in traditional telephone surveys (Chang and Krosnick 2009; see also Berrens et al. 2003) and have been used extensively in academic research (for examples, see Knowledge Networks 2009).

Sample and Procedure

All KN panel members routinely answer a battery of background questions, including one about their sexual orientation ("Are you yourself gay, lesbian, or bisexual?"). A probability sample of 902 English-speaking adults (≥18 years of age) was drawn from the subset of all panel members who had previously responded affirmatively to this question. Following standard KN procedures, they each received an e-mail invitation to complete the survey at their convenience. A follow-up e-mail was sent to nonresponders after approximately 1 week. Neither invitation mentioned sexual orientation. As with all KN surveys, panel members were free to decline to participate.

A total of 775 individuals (86%) accessed the questionnaire between September 13 and October 7, 2005. In response to an initial screening question (described subsequently), six respondents declined to state their sexual orientation, and 50 indicated they were heterosexual.[3] They were thanked for their assistance, and their survey was terminated. This

---

[3] We hypothesized that these individuals were heterosexual respondents who had incorrectly characterized their sexual orientation on the original screening questionnaire (e.g., due to misunderstanding the question). However, we also recognized that some may have been gay, lesbian, or bisexual but reluctant to disclose this fact in the current questionnaire (e.g., out of concern that their responses might be seen by a household member who was unaware of their sexual orientation). We compared the personal characteristics of these respondents with those of the self-identified sexual-minority adults in the current sample. On most variables (including marital status, race and ethnicity, current employment status, residence in a metropolitan area, presence of children under 18 in their household, Internet access independent of KN, political party affiliation, and self-described political ideology), the 50 respondents who reported they were heterosexual differed from the self-identified sexual-minority sample. Although we cannot draw definitive conclusions, these patterns are consistent with the hypothesis that most of the 50 respondents were indeed heterosexual. Moreover, insofar as educational level is correlated with general questionnaire response validity (e.g., Krosnick 1991), the fact that these respondents had less formal education than others (42% had not attended college) is consistent with the hypothesis that many of them had misunderstood the original KN screening question. These analyses suggest that simply asking respondents whether they are "gay, lesbian, or bisexual"—with response options of "yes" and "no"—may not be an optimal strategy for ascertaining sexual orientation identity in national probability samples. The question on the current survey, which presented the different sexual orientations along a continuum and included the familiar term "straight" as a synonym for "heterosexual," may have been easier to comprehend and answer accurately.

screening process left 719 self-identified lesbian, gay, and bisexual respondents who completed the questionnaire. Within that group, 56 households were represented by multiple respondents. In these cases, one respondent was randomly selected from the household for inclusion in the data set, yielding a final sample of 662. Taking into account all attrition in the KN panel since the earliest stage of RDD recruitment, the response rate for the present study was 30% (American Association for Public Opinion Research 2006 [Formula 3]). This rate is relatively high for contemporary commercial surveys (Holbrook et al. 2008).

### Measures

The variables included in the questionnaire are described here, and the wording of most questions is reported in the tables. When appropriate, the question wording was tailored to respondents' sexual orientation (bisexual vs homosexual) and gender.

*Basic Demographic Characteristics and Other Background Variables* Information about respondents' age, race and ethnicity, residence, location, and household composition had been routinely collected by Knowledge Networks in prior questionnaires. The present survey included a question asking whether the respondent was currently on active military duty, a member of the Military Reserves or National Guard, or a military veteran.

*Sexual Orientation Identity* As noted previously, all respondents had reported they were gay, lesbian, or bisexual on a previously administered KN questionnaire. The present survey began with a screening question that asked respondents "Which of the following best describes your sexual orientation?" and provided five options arrayed on a continuum from homosexual to heterosexual. For male respondents, the options were (a) gay or homosexual; (b) bisexual, mostly attracted to men; (c) bisexual, equally attracted to men and women; (d) bisexual, mostly attracted to women; (e) heterosexual or straight. For females, the first response option was lesbian, gay, or homosexual, and options (b) and (d) were transposed. Respondents were asked how often they use various identity terms to describe themselves ("Gay," "Lesbian" [women only], "Bisexual," "Queer," "Dyke" [women only], "Homosexual"). They were then asked to indicate their preferred term for characterizing their own sexual orientation (e.g., "Gay," "Lesbian," "Bisexual," "Queer," "Homosexual"). This label was subsequently inserted into questions that referred to the respondent's sexual orientation or identity. This individualized item wording is indicated throughout the present article as *[L/G/B/Q/H]*.

We used two measures to assess the strength of respondents' commitment to their sexual orientation identity and to

the larger gay, lesbian, and bisexual community. First, three items assessing commitment to a sexual-minority identity were taken from the Internalized Homophobia Scale, or IHP (Herek et al. 1998; Herek et al. 2009): (1) "In general, I'm glad to be *[L/G/B/Q/H]*"; (2) "If someone offered me the chance to be completely heterosexual ('straight'), I would accept the chance"; and (3) "I wish I weren't *[L/G/B/Q/H]*." Second, two items assessing community identification were adapted from the Importance to Identity subscale of the Collective Self-Esteem scale (Herek and Glunt 1995; Luhtanen and Crocker 1992): (1) "My membership in the *[L/G/B/Q/H]* community is an important reflection of who I am" and (2) "Overall, my membership in the *[L/G/B/Q/H]* community has very little to do with how I feel about myself." All of these items were presented with 5-point Likert-type response formats ranging from "strongly agree" to "strongly disagree," with each respondent's preferred identity label substituted for *[L/G/B/Q/H]*.

Perceived choice about one's sexual orientation was assessed with the question, "How much choice do you feel you had about being *[L/G/B/Q/H]*?" The response options were "no choice at all," "a small amount of choice," "a fair amount of choice," and "a great deal of choice."

Respondents were asked their age when they first knew about their sexual orientation ("How old were you when you first knew or decided you were [gay/lesbian/bisexual]?") and when they first disclosed it to another person ("How old were you the first time you told someone else that you are [gay/lesbian/bisexual]?"). They were subsequently asked whether their mother or father knew about their sexual orientation and, if applicable, how many of their sisters and brothers knew about it. In addition, using a scale that ranged from 0 (*not at all out to any of them*) to 7 (*completely out to all of them*), respondents reported the extent to which they were "out of the closet (openly *[L/G/B/Q/H]*)" to six additional groups: (1) "other relatives—not your immediate family," (2) "your current heterosexual ('straight') friends," (3) "your casual acquaintances who are heterosexual ('straight'),", (4) "heterosexual ('straight') friends whom you knew before you came out," (5) "your boss and other supervisors at work," and (6) "the people you work with on a daily basis (other than your boss or supervisors)." A "doesn't apply to me" response option was included for each group.

Community involvement was assessed by asking respondents to "rate how important each of the following activities is to you these days. By important, we mean that you would feel differently about life and about yourself if you couldn't do this activity." The list of activities was adapted from a scale developed by Herek and Glunt (1995) and consisted of the following: (1) "Knowing what is going on in the local *[L/G/B/Q/H]* community," (2) "Doing volunteer work in the *[L/G/B/Q/H]* community," (3) "Giving money to *[L/G/B/Q/H]* organizations," (4) "Being politically active in the

*[L/G/B/Q/H]* community," and (5) "Reading community newspapers and magazines for news about the *[L/G/B/Q/H]* community." Each activity was rated on a 4-point scale (Not at all important, Somewhat important, Fairly important, Very important).

Respondents also were asked whether they had ever engaged in a variety of activities related to lesbian, gay, or bisexual issues, including public expressions of opinion ("Wore a button, posted a sign, or displayed a bumper sticker"); participating in a rally, march, or demonstration; contacting a government official; and contributing money to a lesbian, gay, or bisexual organization or cause. For comparison purposes, this series of questions was followed by a parallel set of items that asked whether the respondent had participated in the same activities for "a *non-gay* issue or cause—that is, something *not* related mainly to gay men, lesbians, or bisexuals."

*Political and Religious Involvement* Information about respondents' political party affiliation and ideology (liberal, moderate, conservative) had been previously collected by Knowledge Networks. For the present study, respondents were asked whether they had voted in the most recent (2004) presidential election and, if so, for which candidate. They were also asked for information about their religious denomination, frequency of attendance at religious services during the previous 12 months, how much guidance religion provides in their day-to-day living, and (for respondents who reported affiliation with a religious denomination and any attendance at religious services) the extent to which their congregation includes lesbian, gay, and bisexual members.

*Relationships, Marriage, and Family* Respondents were asked their current relationship status, their legal marital status, and how many children they have (including adopted children and stepchildren). Respondents currently in a relationship (including those who were married) were asked the gender of their partner. Those who were in a relationship but not married were asked whether they were cohabiting and the likelihood that they would marry their partner if their state were to allow same-sex marriages (this conditional clause was omitted for respondents in Massachusetts, the only state where marrying a same-sex partner was legal at the time of data collection). Those who were not currently in a relationship were asked whether they would like to marry someday. Respondents' attitudes toward marriage rights for same-sex couples were assessed with three items. Using a 5-point Likert-type response format ranging from "strongly agree" to "strongly disagree," they indicated the extent to which they agreed or disagreed with each of the following statements: (1) "The law should allow two people of the same sex to marry each other." (2) "There is really no need to legalize same-sex marriage in the United States." (3) "The U.S. public *isn't* ready for a debate about gay marriage." In

addition, respondents were asked whether they strongly supported, somewhat supported, somewhat opposed, or strongly opposed state laws to create civil unions. An accompanying note explained that "civil unions are not marriage, but give a same-sex couple some legal protection in their home state in areas such as inheritance, health insurance, and hospital visits."

Data Analysis

Tables 1, 2, 3, 4, 5, 6, 7, and 8 report population parameter estimates with 95% confidence intervals (CIs). The CIs facilitate comparisons among the four gender and sexual orientation subgroups and are preferable to *p* values because they indicate whether group differences are statistically significant while also providing additional information about effect size (Cumming 2008; Wilkinson and Task Force on Statistical Inference 1999).

As reported subsequently, the four subgroups differed significantly in age, race, and educational level. We conducted analyses to assess whether these demographic patterns might account for the group differences in the outcome variables reported in Tables 3, 4, 5, 6, 7, and 8. For each outcome variable, therefore, we conducted two linear regression analyses (for continuous and ordinal outcome variables) or two logistic regression analyses (for categorical outcome variables). In the first equation, sexual orientation (homosexual vs bisexual), gender, and their multiplicative interaction term were entered. In the second equation, age, educational level, and race (dichotomized as Black vs non-Black) were added as statistical controls. Except when noted in the subsequent text, inclusion of the control variables did not alter the patterns of significant differences among subgroups shown in the tables.

Weighting

The KN panel's original RDD design yielded a simple random sample with equal probability of selection for all US households with a landline telephone. However, the actual probability of selection for individual respondents was affected by multiple factors (e.g., differences in household size, number of telephone lines). Design weights were assigned to each case to adjust for unequal probability of selection (e.g., Kish 1965).[4] Because the use of weighted

---

[4] Design weights were computed to account for (a) variations in the number of adults and telephone lines in the household; (b) over-sampling of Blacks and Hispanics, households with prior Internet access, and, early in the life of the KN panel, residents of California, New York, Florida, Texas, and Central regional states; (c) under-sampling of telephone numbers for which matching addresses were unavailable and of households in areas without MSN-WebTV coverage; and (d) slight overrepresentation of Chicago and Los Angeles during KN's early pilot testing.

data necessitates special analytic techniques to correct standard errors (Lee and Forthofer 2006), analyses were conducted using STATA and SPSS Complex Samples, which permit such correction.

## Results

The sample consisted of 311 women (152 lesbians, 159 bisexuals) and 351 men (241 gay men, 110 bisexuals). Applying design weights, the weighted sample was 34.8% gay male, 14.6% lesbian, 26.9% bisexual male, and 23.7% bisexual female (Table 1).[5] Unless otherwise indicated, the weighted data are used hereafter.

### Representativeness Check

One challenge associated with evaluating the representativeness of a lesbian, gay, and bisexual probability sample is the general lack of comparison data from the population of self-identified sexual minorities. Even though the US Census does not collect information about individuals' sexual orientation, however, Census data are available for a subset of the sexual-minority population, namely, adults who report they are members of a cohabiting same-sex couple. Taking advantage of the fact that such individuals were able to identify themselves in the 2000 Census, we assessed the present sample's representativeness by comparing its members who were cohabiting with a same-sex partner to their counterparts in the Census data.

These comparisons are shown in Table 2, with the 2000 Census data corrected for misclassifications of some heterosexual couples due to miscodings of the partners' gender (Black et al. 2007).[6] Except for mean age, the two groups do not differ significantly, as indicated by the overlapping 95% CIs. These findings are consistent with the conclusion that, apart from being slightly older, the current sample was generally representative of self-identified lesbian, gay, and bisexual adults in the USA.

Age, Race, Ethnicity, and Education

As shown in Table 1, the mean age of respondents was 39,[7] approximately two thirds were non-Hispanic White, and roughly one third had earned a college degree. Significant differences were observed in these variables among the sexual orientation and gender groups. Gay men ($M=$ 45 years) were significantly older than all other groups, and lesbians ($M=40$ years) were significantly older than bisexual women ($M=32$ years). Only 43% of bisexual men were non-Hispanic White, compared with more than 70% of other respondents (21% of bisexual men were Hispanic and 29% were non-Hispanic Black). More homosexuals than bisexuals had earned a bachelor's degree: 46% of gay men and 41% of lesbians reported having a degree, compared with only 16% of bisexual men and 28% of bisexual women.

According to Census data from approximately the same time period, the mean age of US adults (18 and older) was 45, about 75% were non-Hispanic White, and 24% had earned a college degree.[8] Thus, the present sample was younger than the US adult population, was less likely to be non-Hispanic White, and had a higher level of formal education. However, these patterns were not uniform across subgroups within the sample. Gay men's mean age was not significantly different from that of US adult men, whereas the other sexual orientation groups were significantly younger. Patterns of race and ethnicity among gay men and lesbians did not differ from the US population, but bisexual men were less likely to be non-Hispanic White, and bisexual women were less likely to be Hispanic or non-Hispanic Black.[9] Finally, whereas gay men and lesbians were significantly more likely than the US adult population to have earned a college degree, bisexual men and women did not differ significantly from the population in this regard.

---

[5] Among bisexuals, 27% (40 men, 33 women) reported they were mainly attracted to people of their same sex, 39% (34 men, 71 women) were mainly attracted to the other sex, and 34% (36 men, 55 women) were attracted equally to both sexes. Because of the large margin of error associated with groups of such small size, these three categories were combined for the analyses presented subsequently.

[6] We are grateful to Dr. Gary Gates (UCLA Williams Institute) for his kind assistance in this regard.

[7] Approximately one third of the respondents (34%) were under 30, 33% were 30–44 years old, and 33% were 45 or older. Gay men were underrepresented in the 18–29 age category, compared with bisexual men and women; bisexual men were underrepresented in the 30–44 category, compared with gay men and lesbians; and bisexual women were underrepresented in the 45 and older category, compared with gay men and lesbians. However, because of the small number of respondents in some subcategories, these comparisons across sexual orientation subgroups must be considered tentative.

[8] Comparisons were made with data from the US Census Bureau's American Community Surveys 2000–2003, using the UC Berkeley SDA interface (http://sda.berkeley.edu/archive.htm).

[9] These patterns describe respondents who identified with a single racial or ethnic group. Our data do not permit intensive analyses of respondents reporting mixed race ancestry.

Case 1:10-cv-08435-BSJ-JCF   Document 121   Filed 08/08/12   Page 165 of 208

**Table 1** Demographic characteristics of sample

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Unweighted *N* | 241 | 152 | 110 | 159 | 662 |
| Weighted % | 34.8 | 14.6 | 26.9 | 23.7 | 100 |
| CI | 28.9–41.2 | 11.7–18.2 | 19.1–36.4 | 18.8–29.3 | |
| **Age** | | | | | |
| Range | 23–89 | 18–79 | 18–40 | 18–76 | 18–89 |
| Mean | 45.3 a | 40.1 b | 36.6 bc | 31.8 c | 39.0 |
| CI | 43.0–47.5 | 37.7–42.6 | 32.0–41.1 | 29.3–34.3 | 37.1–40.9 |
| **Race/Ethnicity** | | | | | |
| Non-Hispanic White | 70.5% ab | 74.4% a | 43.0% b | 77.5% a | 65.4% |
| CI | 59.6–79.5 | 62.6–83.5 | 25.8–62.1 | 65.9–86.0 | 56.5–73.2 |
| Non-Hispanic Black | 14.0% | 12.8% | 28.6% | 5.2% | 15.6% |
| CI | 7.6–24.3 | 6.1–24.9 | 10.9–56.8 | 2.4–10.9 | 9.1–25.5 |
| Hispanic | 11.3% | 10.5% | 20.6% | 6.2% | 12.5% |
| CI | 6.1–20.0 | 5.0–20.6 | 7.2–46.6 | 2.7–13.6 | 7.4–20.2 |
| Other, mixed race | 4.2% | 2.3% | 7.8% | 11.1% | 6.5% |
| CI | 1.0–16.1 | 0.8–6.6 | 3.2–17.7 | 4.8–23.5 | 3.8–11.0 |
| **Education (highest level)** | | | | | |
| Less than high school | 5.6% | 7.8% | 8.0% | 8.9% | 7.3% |
| CI | 2.2–13.5 | 3.1–18.4 | 3.1–19.4 | 3.6–20.2 | 4.6–11.6 |
| High school diploma | 19.5% | 17.5% | 47.2% | 26.8% | 28.4% |
| CI | 12.6–29.1 | 9.8–29.3 | 27.1–68.3 | 16.5–40.4 | 20.7–37.6 |
| Some college (<4 years) | 28.5% | 33.8% | 28.9% | 36.8% | 31.4% |
| CI | 21.4–36.9 | 25.3–43.5 | 15.1–48.2 | 27.1–47.8 | 25.6–37.7 |
| Bachelor's degree or higher | 46.4% a | 40.9% ac | 15.9% b | 27.5% bc | 32.9% |
| CI | 37.5–55.4 | 31.9–50.6 | 9.1–26.1 | 19.3–37.4 | 27.5–38.8 |
| **Military service** | | | | | |
| Currently serving or veteran | 15.1% a | 10.6% a | 20.8% a | 0.7% b | 12.6% |
| CI | 9.8–22.5 | 5.5–19.4 | 11.4–34.8 | 0.1–5.1 | 9.3–16.8 |
| Never served | 84.9% a | 89.4% a | 79.2% a | 99.3% b | 87.4% |
| CI | 77.5–90.2 | 80.6–94.5 | 65.2–88.6 | 94.9–99.9 | 83.2–90.7 |
| **Census region** | | | | | |
| Northeast | 21.9% | 17.8% | 27.6% | 18.5% | 22.0% |
| CI | 15.5–30.1 | 10.7–28.0 | 12.4–50.5 | 12.3–27.0 | 16.3–29.0 |
| South | 37.7% | 36.2% | 40.6% | 35.1% | 37.7% |
| CI | 29.4–46.8 | 26.8–46.8 | 21.3–63.4 | 23.9–48.2 | 30.4–45.5 |

 Springer

184                                                                      Sex Res Soc Policy (2010) 7:176–200

**Table 1** (continued)

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Midwest | 11.9% | 22.9% | 17.1% | 16.5% | 16.0% |
| CI | 7.8–17.8 | 16.2–31.3 | 8.8–30.4 | 11.0–24.1 | 12.5–20.2 |
| West | 28.4% | 23.2% | 14.7% | 29.9% | 24.3% |
| CI | 20.4–38.2 | 16.3–31.9 | 7.6–26.6 | 20.7–41.0 | 19.5–29.9 |
| Type of residence area | | | | | |
| Large city | 56.1% | 40.8% | 43.3% | 38.0% | 46.1% |
| CI | 47.1–64.7 | 31.1–51.2 | 24.1–64.7 | 27.7–49.5 | 39.0–53.5 |
| Small city | 18.1% | 27.1% | 21.8% | 27.0% | 22.5% |
| CI | 12.7–25.0 | 19.0–37.2 | 9.7–41.9 | 18.4–37.6 | 17.4–28.5 |
| Suburban | 17.5% | 16.7% | 22.2% | 18.6% | 18.9% |
| CI | 11.7–25.2 | 10.8–25.0 | 8.5–46.6 | 9.8–32.4 | 13.3–26.2 |
| Rural or small town | 8.4% | 15.4% | 12.7% | 16.4% | 12.5% |
| CI | 4.7–14.7 | 9.9–23.1 | 6.7–22.7 | 10.1–25.7 | 9.5–16.3 |
| Housing | | | | | |
| Homeowner | 56.4% a | 60.9% a | 30.8% b | 40.3% ab | 46.4% |
| CI | 46.9–65.4 | 50.2–70.7 | 18.2–47.0 | 30.0–51.6 | 39.5–53.3 |
| Renter | 38.9% a | 34.1% a | 67.6% b | 52.8% ab | 49.2% |
| CI | 29.9–48.7 | 24.5–45.1 | 51.0–80.8 | 41.4–64.0 | 42.0–56.5 |
| Doesn't pay for housing | 4.8% | 5.0% | 1.6% | 6.8% | 4.4% |
| CI | 2.3–9.7 | 2.2–11.1 | 0.4–5.7 | 2.4–17.9 | 2.7–7.3 |
| Household composition | | | | | |
| 1 adult (18 years or older) | 55.4% a | 28.7% b | 30.1% ab | 21.8% b | 36.7% |
| CI | 46.4–64.1 | 21.0–37.8 | 17.2–47.1 | 15.0–30.5 | 30.7–43.2 |
| 2 adults | 32.3% a | 54.0% b | 44.6% ab | 55.3% b | 44.2% |
| CI | 25.0–40.5 | 44.0–63.8 | 24.6–66.6 | 43.6–66.5 | 37.0–51.8 |
| 3+ Adults | 12.3% | 17.3% | 25.2% | 22.9% | 19.0% |
| CI | 7.2–20.3 | 10.5–27.2 | 12.4–44.7 | 13.1–37.0 | 13.9–25.5 |
| % with any children (<18 years) | 4.8% a | 16.6% a | 25.6% ab | 49.3% b | 22.7% |
| CI | 2.0–10.9 | 9.8–26.8 | 10.0–51.5 | 38.0–60.8 | 16.3–30.6 |

Within rows, values with different lowercase letters differ significantly, as indicated by nonoverlapping confidence intervals

 Springer

185

Table 2 Demographic characteristics of cohabiting same-sex couples: 2000 US Census data and current sample

| Variable | US Census | Current sample |
|---|---|---|
| Gender (% female) | 49.3% (48.8–49.9) | 48% (39.1–56.9) |
| Race/ethnicity (% non-Hispanic White) | 77.4% (77.0–77.9) | 74.1% (63.7–82.4) |
| Mean age (years) | 40.1 (40.0–40.3) | 43.8 (41.7–45.9) |
| Education (% with college degree or higher) | 41.9% (41.3–42.4) | 48% (39.2–56.9) |
| Employment status (% employed) | 79.2% (78.7–79.6) | 79.2% (70.7–85.7) |
| Housing (% homeowner) | 61.8% (61.2–62.3) | 69.1% (59.5–77.2) |
| Military service (% veteran) | 12.0% (11.7–12.4) | 11.8% (6.9–19.4) |

Table displays population parameter estimates and 95% confidence intervals (CIs) for same-sex cohabiting couples in 2000 US Census and current sample. Census data are drawn from a combined sample of the 1% and 5% Public Use Micro Samples of the 2000 US Census by G. Gates (May 3, 2007, personal communication), based on Black et al. (2003)

Residence Variables

In terms of residence patterns, the sample generally matched the US population except that a disproportionately small number of respondents lived in the Midwest. Within the sample, the sexual orientation groups did not differ significantly in their geographic distribution or the extent to which they resided in urban, suburban, or rural settings (Table 1). Women were more likely than men to live in a household with another adult. Although higher proportions of homosexuals reported owning their home and more bisexuals reported renting, this difference was not significant when age, education, and race were statistically controlled.

Military Service

Approximately 15% of gay men and 11% of lesbians had a history of military service. Compared with the US adult population, gay men were significantly less likely to have served, compared with all adult males (approximately 25% of whom had served), whereas lesbians were significantly more likely to have a history of military service, compared with all adult females (approximately 2% of whom had

served). By contrast, bisexual men and women did not differ significantly from the US population in their pattern of military service.

Sexual Orientation Identity

*Identity Labels* Table 3 reports the proportions of respondents in each subgroup who said they used various identity labels for themselves "all the time," "often," or "sometimes" (vs respondents who reported using the labels "rarely" or "never"). Nearly all homosexual men (93%) called themselves "Gay" at least sometimes, as did 76% of lesbians, 19% of bisexual men, and 10% of bisexual women. The proportions of lesbians (73%) and bisexual women (11%) who used "Lesbian" as an identity label was about the same as the proportions using "Gay." Among bisexuals, 71% of men and 60% of women labeled themselves "Bisexual" at least sometimes. By contrast, "Bisexual" was rarely used as an identity label by gay men (2%) or lesbians (8%). "Queer" was used by relatively few respondents (12% overall), and "Dyke" was used as a self-label by only 10% of women. "Homosexual" was used at least sometimes by more than one third of the gay men and lesbians, but by relatively few bisexuals. Only 4% of respondents reported never using any of the labels.

*Identity Commitment and Community Identification* IHP scores were computed by summing responses to the items and dividing by 3 (responses to the "glad to be [L/G/B/Q/H]" item were reversed). This procedure yielded a scale score ($\alpha=0.82$) that could range from 1 to 5, with higher scores indicating more negative attitudes toward or greater psychological distancing from one's sexual-minority identity (Herek et al. 2009).[10] As indicated by the relatively low overall IHP mean score (Table 3), respondents generally expressed positive feelings about their sexual orientation identity. Indeed, only 6% of respondents manifested a general pattern of agreement with statements expressing negative feelings about one's sexual orientation (i.e., scored 4 or greater). The greatest degree of identity distancing was observed among bisexual men, who scored significantly higher than lesbians but whose mean score was nevertheless below the hypothetical midpoint of the scale.[11]The two items assessing community identification were not significantly intercorrelated ($r=-0.09$) and thus were analyzed separately. As shown in Table 3, a majority of respondents agreed that their membership in the sexual-minority

---

[10] Coefficient *alpha* was computed with unweighted data for all scales reported in this article.
[11] Because IHP scores were highly skewed, analyses were also conducted with a log-transformation of the scale scores. The pattern of results did not differ from the raw scores. Table 3 reports the more easily interpreted raw scores.

⌂ Springer

186                                                                                           Sex Res Soc Policy (2010) 7:176–200

**Table 3** Identity characteristics

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Self-labeling (% using label "all the time," "often," or "sometimes") | | | | | |
| "Gay" | 93.0% a | 75.9% b | 18.7% c | 9.5% c | 50.7% |
| CI | 87.7–96.1 | 66.3–83.5 | 10.2–31.6 | 5.9–14.9 | 43.5–58.0 |
| "Lesbian" | N/A | 73.4% a | N/A | 11.2% b | 34.9% |
| CI | | 64.2–80.9 | | 7.0–17.5 | 28.3–42.3 |
| "Bisexual" | 2.4% a | 7.6% a | 71.3% b | 60.3% b | 35.4% |
| CI | 1.0–5.3 | 3.7–14.9 | 54.9–83.5 | 49.0–70.7 | 27.7–44.0 |
| "Queer" | 16.8% | 16.4% | 8.5% | 7.2% | 12.2% |
| CI | 11.8–23.2 | 10.4–24.8 | 3.7–18.2 | 2.7–17.5 | 9.2–16.0 |
| "Homosexual" | 38.7% a | 35.9% a | 10.8% b | 3.7% b | 22.5% |
| CI | 30.4–47.7 | 27.0–45.9 | 5.0–21.8 | 1.8–7.4 | 18.1–27.6 |
| "Dyke" | N/A | 16.9% | N/A | 6.0% | 10.1% |
| CI | | 11.2–24.8 | | 1.9–17.0 | 6.3–16.1 |
| Identity distancing (mean IHP; higher score = greater distancing) | 1.97 ab | 1.65 a | 2.62 b | 1.84 ab | 2.07 |
| CI | 1.77–2.16 | 1.49–1.82 | 1.88–3.36 | 1.63–2.06 | 1.81–2.32 |
| Community identification (% strongly agree or agree somewhat) | | | | | |
| "My membership in the *[L/G/B/Q/H]* community is an important reflection of who I am." | 44.6% a | 43.1% a | 15.6% b | 24.7% ab | 32.0% |
| CI | 35.8–53.8 | 33.6–53.0 | 8.4–27.0 | 15.0–38.0 | 26.4–38.2 |
| "Overall, my membership in the *[L/G/B/Q/H]* community has very little to do with how I feel about myself." | 55.1% | 51.3% | 60.2% | 68.1% | 59.0% |
| CI | 46.1–63.9 | 41.2–61.4 | 37.8–78.9 | 57.9–76.8 | 51.6–66.0 |
| Perceived choice about sexual orientation | | | | | |
| No choice at all | 88.0% a | 68.4% b | 38.3% bc | 40.6% c | 60.6% |
| CI | 80.6–92.8 | 57.8–77.4 | 21.8–57.9 | 30.1–52.0 | 52.6–68.1 |
| Small amount | 6.9% | 15.2% | 22.4% | 15.2% | 14.2% |
| CI | 3.2–14.1 | 9.6–23.3 | 8.6–46.9 | 9.6–23.1 | 9.2–21.3 |
| Fair amount/Great deal | 5.2% a | 16.4% ab | 39.3% bc | 44.3% c | 25.2% |
| CI | 2.6–9.9 | 9.3–27.3 | 20.6–61.9 | 32.9–56.3 | 18.4–33.5 |

Within rows, values with different lowercase letters differ significantly, as indicated by nonoverlapping confidence intervals. N/A=question not asked

🖄 Springer

Sex Res Soc Policy (2010) 7:176–200

**Table 4** Openness about sexual orientation

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Mean age of self-identification | 15.1 a | 18.0 b | 17.5 ab | 19.9 b | 17.3 |
| CI | 14.0–16.1 | 16.5–19.5 | 14.6–20.4 | 18.5–21.4 | 16.4–18.3 |
| Mean age of first disclosure | 20.2 | 21.1 | 21.5 | 21.0 | 20.9 |
| CI | 19.2–21.2 | 19.7–22.4 | 18.6–24.4 | 19.7–22.4 | 20.0–21.7 |
| Out to: | | | | | |
| Mother | 73.8% a | 81.4% a | 25.0% b | 35.4% b | 52.7% |
| CI | 65.5–80.6 | 73.0–87.7 | 12.2–44.5 | 25.9–46.2 | 45.3–60.0 |
| Father | 60.1% a | 58.0% a | 19.5% b | 22.2% b | 39.8% |
| CI | 50.7–68.9 | 47.6–67.8 | 8.3–39.4 | 15.2–31.2 | 33.2–46.5 |
| Sister(s) (out to one or more) | 82.3% ab | 87.4% a | 56.8% bc | 50.4% cd | 69.1% |
| CI | 73.3–88.7 | 78.2–93.0 | 34.4–76.7 | 36.8–63.9 | 61.7–75.7 |
| Brother(s) (out to one or more) | 84.8% a | 81.5% a | 58.9% ab | 39.1% b | 66.3% |
| CI | 77.1–90.3 | 70.7–89.0 | 35.1–79.2 | 27.4–52.2 | 58.3–73.6 |
| Out to at least one: | | | | | |
| Distant family member | 80.3% a | 83.2% a | 27.6% b | 53.3% c | 60.3% |
| CI | 80.3–86.9 | 83.2–89.3 | 27.6–47.8 | 53.3–64.6 | 60.3–68.0 |
| Current heterosexual friend | 86.4% ab | 94.2% a | 69.2% b | 84.1% ab | 82.6% |
| CI | 79.3–91.4 | 86.7–97.6 | 51.6–82.6 | 73.1–91.1 | 77.4–86.7 |
| Casual heterosexual friend | 81.6% a | 85.6% a | 49.9% b | 69.1% ab | 70.9% |
| CI | 74.1–87.3 | 77.4–91.1 | 29.2–70.7 | 58.2–78.3 | 63.0–77.7 |
| Prior heterosexual friend | 83.5% a | 89.5% a | 39.8% b | 79.8% a | 71.2% |
| CI | 75.9–89.0 | 81.3–94.3 | 22.7–59.8 | 68.8–87.6 | 61.9–79.0 |
| Coworker | 80.8% a | 77.4% ab | 18.1% c | 56.0% b | 57.8% |
| CI | 72.8–86.8 | 67.5–85.0 | 9.5–31.6 | 43.7–67.5 | 49.3–65.8 |
| Boss or supervisor | 72.8% a | 71.2% ab | 13.8% c | 50.3% b | 50.9% |
| CI | 63.7–80.4 | 60.9–79.7 | 7.0–25.4 | 38.0–62.6 | 43.0–58.8 |
| Mean Summary Score. Extent of outness to: | | | | | |
| Extended family, heterosexual friends, and acquaintances | 5.40 ac | 5.73 a | 2.52 b | 4.45 c | 4.46 |
| CI | 4.94–5.86 | 5.29–6.17 | 2.12–2.92 | 3.81–5.08 | 4.10–4.83 |
| Coworkers and supervisors | 5.20 a | 4.98 a | 1.78 b | 3.36 c | 3.80 |
| CI | 4.64–5.76 | 4.37–5.58 | 1.23–2.33 | 2.52–4.20 | 3.33–4.27 |

Within rows, values with different lowercase letters differ significantly, as indicated by nonoverlapping confidence intervals. Questions about outness to parents were worded to reflect whether each parent was living or deceased. Questions about outness to siblings were asked only if respondents reported that they had one or more sisters or brothers

 Springer

188

Sex Res Soc Policy (2010) 7:176–200

**Table 5** Community involvement and activism

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Importance of community involvement (% responding "very important" or "fairly important") | | | | | |
| Knowing what is going on | 57.4% a | 47.3% a | 29.0% ab | 15.7% b | 38.4% |
| CI | 48.2–66.1 | 37.4–57.4 | 12.1–54.8 | 9.4–25.3 | 31.4–45.9 |
| Doing community volunteer work | 29.4% a | 29.0% a | 10.7% ab | 12.2% b | 20.3% |
| CI | 22.0–38.0 | 20.8–38.8 | 4.8–22.1 | 7.2–20.0 | 16.1–25.2 |
| Giving money to organizations | 43.1% a | 33.9% a | 6.5% b | 7.8% b | 23.5% |
| CI | 34.3–52.3 | 25.2–43.8 | 3.0–13.6 | 4.5–13.0 | 19.0–28.6 |
| Being politically active | 33.4% a | 36.2% a | 8.4% b | 13.4% b | 22.3% |
| CI | 25.5–42.4 | 27.2–46.3 | 3.8–17.4 | 8.1–21.5 | 18.0–27.4 |
| Reading newspapers and magazines | 56.0% a | 51.6% a | 31.3% ab | 19.4% b | 40.0% |
| CI | 46.5–65.0 | 41.5–61.6 | 13.9–56.2 | 12.1–29.6 | 33.1–47.4 |
| Community activism (% reporting having ever done this related to a sexual minority issue) | | | | | |
| Button, sign, bumper sticker | 43.6% ab | 58.1% a | 23.5% b | 41.7% ab | 39.9% |
| CI | 35.0–52.7 | 47.6–67.9 | 11.2–42.8 | 30.6–53.7 | 33.4–46.7 |
| Rally, march, or demonstration | 49.4% a | 44.4% ab | 25.3% ab | 27.9% b | 37.0% |
| CI | 40.3–58.5 | 34.8–54.4 | 12.5–44.6 | 19.7–38.1 | 30.9–43.7 |
| Contacting a government official | 42.3% a | 39.1% a | 24.7% ab | 20.2% b | 31.9% |
| CI | 33.8–51.3 | 30.3–48.7 | 11.7–44.8 | 13.2–29.7 | 26.1–38.3 |
| Contributing money | 65.3% a | 53.3% ab | 28.0% bc | 24.6% c | 43.9% |
| CI | 56.1–73.5 | 43.0–63.4 | 14.6–47.0 | 16.8–34.5 | 37.1–50.8 |

Within rows, values with different lowercase letters differ significantly, as indicated by nonoverlapping confidence intervals

community had little to do with how they felt about themselves, and fewer than half considered their community membership to be an important reflection of themselves. These patterns were different across subgroups, however, with lesbians and gay men indicating stronger identification with the sexual-minority community than bisexuals (Table 3).

*Choice about Sexual Orientation* Overall, respondents reported that they did not experience their sexual orientation as a choice. This pattern varied somewhat, however, according to gender and sexual orientation. The vast majority of gay men (88%) and roughly two thirds of lesbians (68%) reported having had no choice at all about their sexual orientation. Combining respondents who said they'd had a small amount of choice with those reporting

no choice, 95% of gay men and 84% of lesbians could be characterized as perceiving that they had little or no choice about their sexual orientation. More bisexuals than homosexuals reported having had a fair amount or great deal of choice about their sexual orientation. Nevertheless, fewer than half of the bisexuals (39% of men, 44% of women) endorsed either of the latter response options.

*Disclosure of Sexual Orientation* On average, respondents reported having first recognized their own sexual orientation when they were 17 years old (Table 4). Gay men said they first knew or decided they were gay at age 15, which was significantly younger than for lesbians (18 years) or bisexual women (20 years). Bisexual men reported that they recognized their bisexuality at 17.5 years. On average, all groups

Sex Res Soc Policy (2010) 7:176–200

189

**Table 6** Religious characteristics of sample

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Religious denomination | | | | | |
| Protestant/other Christian: not Born Again | 31.6% | 36.6% | 29.9% | 22.6% | 29.7% |
| CI | (23.5–41.0) | (27.6–46.6) | (15.5–49.8) | (15.7–31.4) | (24.0–36.2) |
| Born Again Christian | 15.9% | 14.8% | 22.1% | 16.3% | 17.5% |
| CI | (10.6–23.1) | (8.2–25.3) | (6.6–53.3) | (7.6–31.5) | (11.1–26.3) |
| Catholic | 21.8% | 16.4% | 26.3% | 11.2% | 19.7% |
| CI | (15.3–30.2) | (9.9–25.9) | (11.1–50.5) | (6.3–19.3) | (14.0–26.8) |
| Jewish | 0.4% | 1.9% | 0.5% | 2.4% | 1.2% |
| CI | (0.1–3.0) | (0.8–4.9) | (0.1–2.3) | (0.8–6.8) | (0.6–2.2) |
| Wiccan, pagan | 1.5% | 4.5% | 1.5% | 6.6% | 3.1% |
| CI | (0.4–5.3) | (2.1–9.4) | (0.4–5.2) | (3.4–12.4) | (2.0–5.0) |
| Buddhist | 0.4% | 1.1% | 3.4% | 5.8% | 2.6% |
| CI | (0.1–2.6) | (0.3–3.8) | (0.5–20.8) | (2.3–13.7) | (1.1–5.9) |
| Atheist, agnostic, none | 26.7% | 21.4% | 16.3% | 30.7% | 24.2% |
| CI | (19.4–35.7) | (14.2–31.1) | (8.2–29.9) | (21.0–42.5) | (19.3–29.8) |
| Attendance at religious services (past 12 months) | | | | | |
| Weekly or more | 7.2% | 8.9% | 24.0% | 7.5% | 12.0% |
| CI | (4.0–12.6) | (4.9–15.6) | (8.3–52.6) | (3.4–15.8) | (6.5–21.2) |
| Less than weekly but at least monthly | 13.9% | 7.9% | 12.7% | 7.9% | 11.3% |
| CI | (8.1–22.7) | (4.2–14.4) | (4.0–33.8) | (4.1–14.5) | (7.3–16.9) |
| Once or a few times | 39.3% | 48.6% | 30.8% | 44.1% | 39.5% |
| CI | (30.9–48.4) | (38.7–58.6) | (14.9–53.1) | (32.8–56.0) | (32.8–46.7) |
| Never | 39.7% | 34.6% | 32.5% | 40.5% | 37.2% |
| CI | (31.1–48.9) | (25.0–45.6) | (18.8–50.1) | (30.1–51.8) | (31.1–43.8) |
| Type of congregation | | | | | |
| All or mostly heterosexual | 35.2% | 36.5% | 43.9% | 30.8% | 36.7% |
| CI | (27.0–44.3) | (27.9–46.2) | (24.9–64.8) | (22.1–41.2) | (30.0–44.0) |
| At least half sexual minority | 12.0% | 16.5% | 19.3% | 12.3% | 14.7% |
| CI | (6.7–20.5) | (10.1–25.8) | (4.9–52.4) | (4.5–29.1) | (8.6–24.0) |
| Not applicable | 52.8% | 47.0% | 36.9% | 56.9% | 48.6% |
| CI | (43.6–61.8) | (37.0–57.2) | (21.7–55.1) | (45.0–68.0) | (41.5–55.8) |

 Springer

Sex Res Soc Policy (2010) 7:176–200

**Table 6** (continued)

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Amount of daily guidance from religion | | | | | |
| None at all | 33.4% | 26.7% | 16.7% | 35.0% | 28.3% |
| CI | (25.5–42.4) | (18.3–37.1) | (9.0–28.9) | (25.1–46.2) | (23.2–34.1) |
| Some | 44.5% | 42.1% | 44.9% | 42.8% | 43.9% |
| CI | (35.6–53.9) | (32.7–52.1) | (25.8–65.7) | (32.1–54.1) | (36.8–51.1) |
| Quite a bit | 15.0% | 14.1% | 17.6% | 12.7% | 15.0% |
| CI | 10.0–21.7 | 8.7–22.0 | 8.7–32.3 | 5.1–28.3 | 11.0–20.2 |
| A great deal | 7.1% | 17.1% | 20.8% | 9.5% | 12.8% |
| CI | 3.9–12.4 | 10.3–27.1 | 6.0–51.8 | 5.3–16.5 | 7.2–21.7 |
| Mean score | 1.96 | 2.22 | 2.42 | 1.97 | 2.12 |
| CI | 1.8–2.1 | 2.0–2.4 | 1.9–2.9 | 1.8–2.2 | 2.0–2.3 |

reported having first told someone else about their sexual orientation when they were in their early 20s (Table 4). However, the regression analysis revealed differences among the subgroups. With age, education, and race entered in the equation, the effect of age was significant ($b$=0.26 [CI=0.18, 0.34], $t(643)$=6.50, $p$ <0.001), and the parameter estimates became significant for both sexual orientation ($b$=2.40 [CI= 0.69, 4.10], $t(643)$=2.76, $p$ < 0.01) and gender ($b$=−2.30 [CI =−3.93, −0.66], $t(643)$=−2.76, $p$ < 0.01). Thus, older respondents were likely to have first disclosed their sexual orientation at a later age than younger respondents. When this generational difference was statistically controlled, bisexuals and women tended to have first disclosed at a later age than, respectively, homosexuals and men.

Regarding respondents' outness within their immediate families, Table 4 indicates that their fathers were the least likely to know about their sexual orientation, whereas their sisters were the most likely to know. Gay men and lesbians were substantially more open about their sexual orientation with their parents and siblings than were bisexuals. For example, they were about three times as likely as bisexual men, and at least twice as likely as bisexual women, to be out to their mother.

Similar patterns were observed for outness to relatives outside one's immediate family, heterosexual friends and acquaintances, and workplace contacts (Table 4). The four items assessing openness to distant family members and heterosexual friends and acquaintances were recoded as a continuum ranging from 1 to 8, summed, and divided by the number of items. The resulting scale scores ($\alpha$ = 0.91) can range from 1 (*not at all out*) to 8 (*completely out*). The same

procedure was followed with the two items about outness in the workplace ($\alpha$ = 0.95). On average, respondents scored at the midpoint for outness to extended family and heterosexual friends and acquaintances, and slightly lower for outness to coworkers and supervisors. Comparisons of summary scores revealed that lesbians and gay men were more out to their relatives and heterosexual acquaintances and in the workplace than were bisexuals, especially bisexual men.

With the demographic control variables included in the regression equation, the unstandardized parameter estimates for workplace outness remained significant for sexual orientation but not for gender. Instead, the parameter for race became significant ($b$ = 1.10 [CI=0.28, 1.92], $t(568)$ = 2.63, $p$ < 0.001), indicating that Black respondents were less open about their sexual orientation in the workplace than were others. With this effect statistically controlled, bisexual men were still significantly less open in the workplace than other groups, as indicated by the significant parameter estimate for the gender × sexual orientation interaction ($b$=−1.52 [CI=−2.84, −0.19], $t(568)$=−2.25, $p$ < 0.05).

*Community Involvement and Activism* As shown in Table 5, fewer than half of the respondents attached a high level of importance to any of the aspects of community involvement included in the questionnaire. The greatest importance was accorded to obtaining information about the community ("knowing what is going on" and "reading newspapers or magazines"). Gay men and lesbians placed more importance on each of the five types of community involvement than did bisexual men and women. By summing responses and dividing by the total number of items, scale scores were

Sex Res Soc Policy (2010) 7:176–200
191

**Table 7** Political characteristics of sample

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women | Total |
|---|---|---|---|---|---|
| Party affiliation | | | | | |
| Democrat | 82.0% | 81.7% | 60.5% | 76.0% | 74.7% |
| CI | (74.6–87.6) | (71.3–88.9) | (38.1–79.3) | (65.5–84.0) | (66.7–81.3) |
| Republican | 13.1% | 16.7% | 29.8% | 17.3% | 19.2% |
| CI | (8.7–19.3) | (9.8–27.1) | (12.8–55.2) | (10.4–27.5) | (13.0–27.4) |
| Other | 4.9% | 1.6% | 9.6% | 6.7% | 6.1% |
| CI | (2.0–11.3) | (0.3–7.1) | (3.5–23.8) | (3.4–12.6) | (3.7–10.0) |
| Political ideology | | . | | | |
| Liberal | 62.9% | 66.0% | 45.3% | 53.0% | 56.4% |
| CI | 53.1–71.8 | 55.4–75.2 | 25.7–66.4 | 41.1–64.5 | 48.6–63.8 |
| Moderate | 27.4% | 24.5% | 27.5% | 33.4% | 28.4% |
| CI | 19.2–37.5 | 16.8–34.3 | 13.6–47.6 | 22.5–46.5 | 22.4–35.4 |
| Conservative | 9.7% | 9.5% | 27.2% | 13.6% | 15.2% |
| CI | 5.7–15.9 | 4.4–19.3 | 10.1–55.6 | 7.5–23.6 | 9.1–24.3 |
| % Voted in 2004 | 88.8% | 83.6% | 86.1% | 83.4% | 86.2% |
| CI | (79.9–94.1) | (71.3–91.2) | (71.4–93.9) | (71.9–90.8) | (80.8–90.2) |
| Candidate voted for | | | | | |
| John Kerry | 86.2% | 91.5% | 81.9% | 79.6% | 84.4% |
| CI | (79.5–91.0) | (84.5–95.5) | (66.5–91.1) | (69.9–86.8) | (79.6–88.3) |
| George W. Bush | 11.7% | 7.6% | 9.9% | 15.0% | 11.2% |
| CI | (7.4–18.0) | (3.9–14.3) | (5.0–18.6) | (9.4–23.1) | (8.4–14.8) |
| Ralph Nader | 1.4% a | 0 b | 7.1% a | 2.9% a | 3.2% |
| CI | (0.3–5.9) | | (1.9–23.4) | (0.7–11.2) | (1.3–7.6) |

Within rows, values with different lowercase letters differ significantly, as indicated by nonoverlapping confidence intervals

computed that indicate overall perceived importance of involvement in the sexual-minority community. Scores can range from 1 to 4, with higher scores indicating greater importance attached to community involvement ($\alpha = 0.91$). Gay men and lesbians scored significantly higher on this measure than bisexuals: Mean scores were 2.4 for gay men (CI = 2.25–2.57), 2.25 for lesbians (2.06–2.45), 1.65 for bisexual men (1.44–1.86), and 1.68 for bisexual women (1.54–1.82). Consistent with that pattern, lesbians and gay men reported higher levels of past activism in all areas, compared with bisexuals (see Table 5). The four sexual-minority activism items were summed to form an index ranging from 0 (did not engage in any of the activities) to 4

(engaged in all activities; not shown in Table 5). Gay men reported community activism in significantly more areas ($M = 1.97$, CI = 1.71–2.29) than did bisexual men ($M = 1.01$, CI=0.38–1.65) or bisexual women ($M = 1.13$, CI=0.83–1.44). Lesbians also reported activism in more areas ($M = 1.94$, CI = 1.63–2.26) than bisexuals, but their CI slightly overlapped with that of bisexual men. When the parallel questions about activism that was unrelated to sexual-minority issues were combined to create a summary score, a similar pattern emerged. As with sexual-minority activism, bisexuals reported a lower level of general activism than gay men and lesbians, although only the difference between gay men ($M = 2.13$, CI = 1.86–2.40)

&#x2469; Springer

192                                                                                     Sex Res Soc Policy (2010) 7:176–200

**Table 8** Relationship and family characteristics

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women[a] | Total |
|---|---|---|---|---|---|
| Current relationship status | | | | | |
| In a same-sex relationship | | | | | |
| Married, civil union, domestic partner | 4.1% a | 16.1% b | 0.2% c | 1.5% ac | 4.2% |
| CI | 2.3–7.4 | 9.8–25.2 | 0–1.7 | 0.5–4.3 | 2.9–6.1 |
| Cohabiting[b] | 24.9% a | 45.3% b | 3.0% c | 3.3% c | 16.9% |
| CI | 18.5–32.6 | 35.5–55.4 | 0.9–9.5 | 1.3–8.2 | 13.5–21.0 |
| Not cohabiting | 10.7% ab | 14.5% a | 2.1% ab | 2.8% b | 7.1% |
| CI | 6.7–16.6 | 8.1–24.7 | 0.5–8.8 | 1.1–7.2 | 5.0–10.0 |
| In a different-sex relationship | | | | | |
| Currently married | 0.3% a | 0 a | 29.2% b | 45.2% b | 18.6% |
| CI | 0.1–1.1 | | 13.8–51.5 | 34.3–56.6 | 13.2–25.7 |
| Cohabiting, not married | 0 a | 0 a | 0.8% b | 16.3% c | 4.1% |
| CI | | | 0.2–3.7 | 7.7–31.2 | 1.9–8.6 |
| Not cohabiting | 0 a | 0 a | 7.9% b | 7.0% b | 3.8% |
| CI | | | 3.2–18.3 | 3.3–14.4 | 2.1–6.7 |
| Not in a committed relationship[c] | 60.0% a | 24.2% b | 56.7% a | 23.3% b | 45.2% |
| CI | 51.3–68.1 | 16.9–33.2 | 36.2–75.2 | 15.3–33.8 | 37.9–52.7 |
| Would like to marry someday? (respondents not currently in a relationship) | | | | | |
| Yes | 33.8% | 46.0% | 43.0% | 40.9% | 38.1% |
| CI | 22.9–46.8 | 27.8–65.3 | 23.9–64.5 | 20.9–64.4 | 29.4–47.6 |
| No | 22.6% | 8.3% | 25.9% | 8.3% | 20.1% |
| CI | 13.5–35.5 | 3.3–19.5 | 12.7–45.8 | 3.3–19.0 | 13.8–28.4 |
| Not sure | 43.5% | 45.7% | 31.0% | 50.9% | 41.8% |
| CI | 30.5–57.5 | 27.4–65.1 | 14.5–54.5 | 29.4–72.0 | 32.5–51.7 |
| How likely would marry current same-sex partner, if legal?[d] (Respondents currently in a same-sex relationship)[c] | | | | | |
| Not at all likely | 21.6% | 11.5% | * | * | |
| CI | 13.3–33.2 | 5.9–21.1 | | | |
| Somewhat likely | 37.7% a | 12.2% b | * | * | |
| CI | 26.3–50.6 | 6.8–20.8 | | | |
| Fairly likely or very likely | 40.7% a | 76.4% b | * | * | |
| CI | 29.8–52.5 | 65.6–84.5 | | | |

 Springer

Sex Res Soc Policy (2010) 7:176–200

193

**Table 8** (continued)

| Variable | Gay men | Lesbians | Bisexual men | Bisexual women[e] | Total |
|---|---|---|---|---|---|
| Parental status | | | | | |
| No children | 91.6% a | 65.1% b | 63.5% bc | 32.8% c | 66.2% |
| CI | 87.1–94.6 | 54.9–74.1 | 42.1–80.7 | 23.6–43.5 | 59.1–72.7 |
| 1 child | 3.3% a | 15.7% b | 8.4% ab | 27.5% b | 12.2% |
| CI | 1.5–7.1 | 10.2–23.3 | 3.6–18.5 | 17.2–40.8 | 8.7–16.9 |
| 2+ children | 5.1% a | 19.3% b | 28.0% bc | 39.7% c | 21.5% |
| CI | 3.0–8.5 | 12.0–29.4 | 12.8–50.9 | 29.4–51.1 | 15.9–28.4 |

Within rows, values with different lowercase letters differ significantly, as indicated by nonoverlapping confidence intervals. * = results not reported because of the small number of bisexuals in a same-sex relationship

[a] Two bisexual women reported that they were cohabiting but did not report the gender of their partner; they are excluded from the "Relationship Status" section of the table

[b] Includes four lesbians and four gay men who reported they were in a cohabiting relationship but did not report the gender of their partner, as well as one lesbian and one bisexual woman who characterized their cohabiting partner as transgender

[c] Includes two lesbians and three gay men who did not report their current relationship status but reported elsewhere in the questionnaire that they were legally single or divorced

[d] For Massachusetts residents, the clause "if same-sex marriages were legally recognized in your state" was not included in the question

[e] Because of the small number of bisexual men and women in a same-sex relationship, responses are reported only for gay men and lesbians

and bisexual women ($M = 1.46$, CI = 1.11–1.82) was reliable. Lesbians ($M = 1.93$, CI = 1.62–2.25) scored between the two, and bisexual men scored the lowest, albeit with the largest CI ($M = 1.34$, CI = 0.64–2.05).

Religious and Political Characteristics

As shown in Table 6, more than half of the respondents belonged to a Christian denomination, and most of these were Catholics (20%) or Protestants who reported they were not born again Christians (30%). However, slightly more than one respondent in six reported being born again. Roughly 3% reported they were Wiccan or pagan, and about the same proportion were Buddhist. About 1% were Jewish. Nearly one respondent in four was an atheist or agnostic or reported having no religion.

Across sexual orientation subgroups, the distributions among religious denominations, attendance at religious services, and proportion of sexual-minority members in one's congregation did not differ significantly. However, with age, education, and race statistically controlled, lesbians and bisexual men reported receiving significantly more daily guidance from their religion, compared with gay men and bisexual women. With religious guidance expressed as a score on a 4-point scale (1 = *none at all*, 4 = *a great deal of guidance*), lesbians' and bisexual men's mean scores were 2.22 and 2.42, respectively, compared with 1.96 for gay men and 1.97 for bisexual women (Table 6). Examination

of the frequencies within each response category suggests that lesbians and bisexual men were somewhat more likely to report that religion offers them a great deal of guidance, whereas gay men and bisexual women were more likely to report receiving no guidance from religion.

However, in response to a follow-up question ("How important is spirituality in your life?"), roughly two thirds of the respondents who said they received no daily guidance from religion nevertheless assigned at least some importance to spirituality (not shown in Table 6). When these responses were combined with ratings of the importance of religion, the aforementioned group differences were eliminated. Only 10.6% of the sample reported both that they received no guidance from religion and that spirituality was "not at all important" to them (CI=7.6–14.7). A majority (51.8%, CI=44.6–59.0) reported either that they received "some" guidance from religion or that spirituality was "not too important." Another 21.4% (CI= 16.7–26.9) received "quite a bit" of guidance or considered spirituality to be "somewhat important," and 16.2% (CI= 10.4–24.5) received "a great deal" of guidance or considered spirituality to be "very important."

As reported in Table 7, the sample largely identified as Democratic, tended to be politically liberal, and overwhelmingly reported having voted for John Kerry in the 2004 presidential election. These patterns are consistent with findings from previous studies that gay, lesbian, and bisexual voters are less conservative than the general voting

public (e.g., Edelman 1993; Hertzog 1996). Except for the fact that no lesbians reported having voted for Ralph Nader, the subgroups did not differ significantly on these variables.

### Relationship and Family Characteristics

Women were significantly more likely than men to report they were currently in a committed relationship, either heterosexual or homosexual. As shown in Table 8, 60% of gay men and 57% of bisexual men were *not* in a committed relationship, compared with fewer than one fourth of lesbians and bisexual women. Another notable difference was observed between homosexual and bisexual respondents: Whereas all coupled lesbians and virtually all coupled gay men reported that their partner was someone of their same sex, the vast majority of coupled bisexual men (88%) and women (90%) had a different-sex partner.

Most uncoupled respondents either stated they would like to marry someday or indicated uncertainty about it; overall, only 20% expressed no interest in ever marrying. Among respondents who were currently in a same-sex relationship, significantly more lesbians than gay men said they were "very likely" or "fairly likely" to marry their partner (76% and 41%, respectively), whereas more gay men than lesbians said they were "somewhat likely" to marry (38% and 12%, respectively). In all, nearly 90% of lesbians and 80% of gay men indicated some likelihood of marrying their current partner. (Because so few bisexuals were in a same-sex relationship, their responses to this question are not reported.)

Overall, approximately one third of respondents reported having one or more children, including adopted and stepchildren. Gay men were the least likely to have a child (8%), whereas approximately two thirds of bisexual women reported having one or more children. About one third of lesbians and bisexual men reported having children.

Respondents overwhelmingly supported legal recognition for same-sex couples. Although bisexual males were somewhat less supportive than others, the overlapping confidence intervals across groups indicate that these differences were not reliable. Overall, 77.9% of respondents (CI=69.7–84.4) agreed that "The law should allow two people of the same sex to marry each other," whereas 74.4% (CI=66.4–81.1) *disagreed* with the assertion that "There is really no need to legalize same-sex marriage in the United States." Similarly, 89.1% (CI=81.2–93.9) supported civil unions. The sample was divided in its response to the statement "The U.S. public *isn't* ready for a debate about gay marriage." A plurality (42%, CI = 35.1–49.2) disagreed, but 28.1% (CI = 23.0–33.9) agreed, and 29.9% (CI = 22.9–38.1) placed themselves "in the middle" between agreement and disagreement.

### Discussion

The data presented here offer a wealth of information about the general characteristics of self-identified gay, lesbian, and bisexual adults in the USA while highlighting important commonalities and differences among sexual orientation subgroups. Without recapitulating all of the results, we comment here on some key findings.

To begin, the composition of the sample is noteworthy. With design weights applied to account for aspects of the sampling procedures that might have affected respondents' likelihood of inclusion in the KN panel, fully half of the participants identified as bisexual, indicating that bisexuals constitute a substantial portion of the self-identified sexual-minority population. In addition, gay men outnumbered lesbians at a ratio of approximately 2.4:1. This finding is consistent with data from other national probability samples (Black et al. 2000; Laumann et al. 1994) and suggests that self-identified gay men may outnumber self-identified lesbians in the US adult population. Among self-identified bisexuals, by contrast, the weighted proportions of women and men did not differ significantly. Within genders, the weighted sample included more gay than bisexual men and more bisexual women than lesbians, but the difference was reliable only among the women respondents. Of course, any inferences from these patterns about the composition of the sexual-minority population must be considered tentative until more data are obtained from other probability samples.

Sexual orientation and gender subgroups within the sample differed on key demographic variables, with bisexuals tending to be younger than homosexuals, and bisexual men the least likely to be non-Hispanic White or to have a college degree. Comparisons to the US adult population using contemporaneous Census data suggest that lesbians and bisexuals (but not gay men) may be younger, on average, than the US adult population; that bisexual men (but not lesbians, gay men, or bisexual women) may be less likely to be non-Hispanic White; and that lesbians and gay men (but not bisexuals) may be more highly educated. These patterns are consistent with previous findings from nonprobability samples indicating that lesbians and gay men tend to be highly educated (e.g., Herek et al. 1999; Rostosky et al. 2009; Rothblum and Factor 2001). They are also consistent with past observations that bisexual behavior is more common among African American and Latino men than among non-Hispanic White males (e.g., Millett et al. 2005; O'Leary et al. 2007; Rust 2000).

Bisexual men and women were not only younger than the US adult population, they were also significantly younger than lesbians and gay men. This age difference might reflect generational differences in patterns of identity

🖄 Springer

Sex Res Soc Policy (2010) 7:176–200                                                    195

labeling: Perhaps younger people are more likely than their older counterparts to view their own sexuality in fluid terms and thus to identify as bisexual rather than exclusively homosexual or heterosexual. Alternatively, it could reflect developmental differences insofar as some younger respondents who currently self-identify as bisexual might later identify as gay or heterosexual (indeed, roughly one fifth of bisexual men and one tenth of bisexual women said they label themselves Gay or Lesbian at least some of the time). These accounts are not mutually exclusive. Younger adults may be more open to a bisexual identity today than was the case a generation ago, and bisexuality may constitute a transitional identity for some individuals who will ultimately define their sexuality in terms of exclusive attraction to men or women. Indeed, the findings of the present study suggest that bisexuals may constitute a more heterogeneous population than gay men and lesbians, one that includes not only individuals who publicly identify as bisexual but also those who privately acknowledge same-sex attractions while currently maintaining a heterosexual relationship, and still others who are in the process of defining their sexuality. It is possible that comparisons of self-identified bisexual men and women according to their self-reported attraction patterns (i.e., mainly attracted to men, mainly attracted to women, equally attracted to both sexes) would yield useful insights in this regard. However, the present sample was not large enough to permit such analyses.

Compared with bisexual men and women, gay men and lesbians were more strongly committed to a minority sexual identity, identified more strongly with a sexual-minority community, were more likely to consider their community membership to be a reflection of themselves, and were generally more open about their sexual orientation. Overall, gay men and lesbians tended to attach greater importance than bisexuals to community involvement and were more likely to engage in such behaviors as attending rallies and demonstrations or donating money to community organizations. Here again, the present data suggest that the population of individuals who label themselves bisexual may be a more diverse group than those who self-identify as lesbian or gay and may include many women and men for whom being bisexual is not a primary basis for a personal identity or community involvement. These patterns may also reflect, in part, bisexuals' sometimes marginal status in established gay and lesbian communities, along with the relative lack of visible bisexual communities, owing to bisexuality's recent emergence as a public identity linked to a social movement (Herdt 2001; Udis-Kessler 1995).

Related to this point, substantial minorities of the bisexual respondents said they never (4.6% of bisexual women, 8.1% of bisexual men) or rarely (34.9% and 20.7%, respectively) used Bisexual as a self-descriptor. By

contrast, men who indicated they were homosexual overwhelmingly reported using the term Gay to describe themselves at least some of the time. Similarly, about three fourths of homosexual women used Lesbian as a self-label, and roughly the same proportion employed Gay as a self-descriptor. The latter finding is somewhat surprising because Gay has often been assumed to be primarily a male-oriented identity label (e.g., Kulick 2000).

Other patterns of self-labeling also warrant comment. The term Queer was used by only a small minority of respondents, as was the case for Dyke among female respondents. Considerably more respondents (more than one third of gay men and lesbians) used Homosexual as a self-descriptor at least some of the time. Notably, gay male and lesbian respondents were much more likely to say they never used Queer as a self-descriptor (58.9% of gay men, 65% of lesbians) than to say they never used Homosexual (32% and 34.1%, respectively). Bisexuals, by contrast, were about equally likely to say they never used either term. Among bisexual men, 71.7% never used Homosexual and 77.9% never used Queer; for bisexual women, the proportions were 88.8% and 87.3%, respectively. Thus, although Queer has sometimes been suggested as an inclusive label for sexual minorities (e.g., Jacobs 1998), it appears that a majority of US gay, lesbian, and bisexual adults never used it to describe themselves at the time the survey was conducted.

Some recent court cases addressing rights for gay, lesbian, and bisexual people have considered questions related to the origins of sexual orientation and its mutability (e.g., In re Marriage Cases 2008; Varnum v. Brien 2009). Moreover, some opponents of equal rights for sexual minorities have asserted that homosexuality represents a willful choice of a sinful way of life (Herman 1997).[12] In this context, it is noteworthy that most respondents in the present study—including bisexual men and women—reported that they experienced little or no choice about their sexual orientation. The question of exactly what is meant by "choice" in this realm warrants further discussion and research (see, for example, Whisman 1996), but if one's sexual orientation were experienced as a choice, it seems reasonable to expect that large numbers of gay, lesbian, and bisexual people would report this perception in response to a survey question.

We believe that the responses to this question may also provide a useful insight for interpreting the often observed correlation between heterosexuals' levels of sexual prejudice and their beliefs about whether homosexuality is a choice (e.g., Haider-Markel and Joslyn 2008; Hegarty

---

[12] At least one conservative Christian organization has broken with this position, stating on its website that "[w]e do not believe anyone chooses his or her same-sex attractions" (Love Won Out 2008).

🖄 Springer

Sex Res Soc Policy (2010) 7:176–200

2002). If, as the present data indicate, gay, lesbian, and bisexual people experience little or no choice about their sexual orientation, they probably communicate this fact to their heterosexual friends and relatives. Given the consistently high correlations observed between heterosexuals' attitudes toward sexual minorities and the extent of their personal relationships with nonheterosexual individuals (Herek and Capitanio 1996; Lewis 2008; Pettigrew and Tropp 2006), the correlation that is reliably observed between origin beliefs and attitudes may result at least in part from both variables' association with personal contact.

Related to this point, the data reveal notable differences in disclosure and outness between gay men and lesbians, on the one hand, and bisexuals, on the other. The parents and siblings of gay men and lesbians are substantially more likely to know about the latter's sexual orientation than is the case for the families of bisexual men and women. A similar pattern was also observed in most categories of friends, other family, and coworkers: Compared with lesbians and gay men, significantly fewer bisexuals—especially men—reported they were out of the closet to even one member of these groups. Coming out as bisexual may differ in important respects from coming out as a gay or lesbian person (McLean 2007). Nevertheless, insofar as heterosexuals' levels of sexual prejudice are reduced by having personal relationships with nonheterosexuals (Herek and Capitanio 1996; Lewis 2008; Pettigrew and Tropp 2006), these patterns could have important implications for societal attitudes toward bisexual men and women.

The data indicate that self-identified gay, lesbian, and bisexual adults tend to be less religious and more politically liberal than the US population. Although most respondents reported that religion or spirituality provides some guidance in their daily lives, the sample overall reported a fairly low level of religious commitment. Slightly more than one fourth stated that they receive "quite a bit" or "a great deal" of guidance from religion in their daily lives, and this proportion increased to approximately 38% when the question was expanded to include spirituality as well as formal religion. By comparison, in the 2004 American National Election Survey (ANES), 35% of US adults reported that religion provides a great deal of guidance in their day-to-day lives, and another 24% said it provides quite a bit of guidance.[13] Whereas about one fourth of the present sample reported at least monthly attendance at religious services, a 2008 Pew survey found that 39% of Americans reported at least weekly attendance at religious

worship services (Pew Forum on Religion and Public Life 2008).

The data corroborate previous findings that sexual minorities constitute a politically progressive constituency (e.g., Edelman 1993; Hertzog 1996; Schaffner and Senic 2006). A majority of respondents described themselves as liberal, and the sample was overwhelmingly Democratic in party affiliation and voting patterns. By comparison, 25% of the 2004 ANES respondents said they were liberal, and 32% identified as Democrats, whereas a plurality (about 41%) described themselves as conservative and 29% identified as Republicans.

Consistent with findings from previous research with convenience samples (Peplau and Fingerhut 2007), sexual-minority women were substantially more likely than sexual-minority men to report that they were currently in a committed relationship. Whereas virtually all coupled gay men and lesbians had a same-sex partner, the vast majority of coupled bisexuals were in a heterosexual relationship. This disproportionate number of different-sex couples among bisexual adults probably has multiple explanations. In part, it may simply reflect the fact that most adults are heterosexual, and thus, bisexuals have many more opportunities to form a different-sex intimate relationship than a same-sex relationship. In addition, same-sex relationships are stigmatized and lack widespread legal recognition in the USA, whereas different-sex relationships enjoy social approval and many tangible benefits (Herek 2006). These factors may facilitate different-sex relationships among those bisexuals who are attracted to the other sex at least as much as to their own sex (roughly three fourths of the bisexual respondents in the present sample).

Among respondents who were not currently in a committed relationship, relatively few said they would *not* want to marry someday. A plurality, however, indicated uncertainty about the desirability of marrying. Among the homosexual respondents currently in a relationship, lesbians were substantially more likely than gay men to say they would be "very likely" or "fairly likely" to marry their current partner if they could legally do so (76% vs 41%). This pattern is consistent with the available data concerning patterns of marriage and registrations of civil unions and domestic partnerships, which reveal that female couples are considerably more likely than male couples to formally register their relationship when the law allows them to do so (Korber and Calvan 2008; Rothblum et al. 2008). It is also consistent with the present finding that lesbians are significantly more likely than gay men to live in a household with at least one other adult. Lesbians' greater tendency to seek legal recognition of their relationships may be explained in part by the fact that they are about four times more likely than gay men to have one or more

---

[13] The figures are based on our analysis of the 2004 National Election Study pre-election interview data, using the UC Berkeley SDA interface (http://sda.berkeley.edu/archive.htm).

children or to report that they have children younger than 18 years residing in their home. Seeking legal protections and benefits for children may be an important motivator for marrying (Herek 2006).

The data obtained in any survey are subject to possible error due to sampling, telephone noncoverage, and problems with question wording. In addition to these sources of error, we note several important limitations of the present study that should be kept in mind when interpreting the results. Our operationalization of sexual orientation in terms of identity means that the findings reported here should not be generalized to the population of US adults who experience same-sex attractions or have engaged in same-sex sexual behavior but do not identify as lesbian, gay, or bisexual. The sample was restricted to English-speaking adults in households with a telephone; thus, it is potentially problematic to generalize from these results to non-English speakers, nonadults, and individuals without a telephone.

In addition, it is likely that some lesbian, gay, and bisexual adults in the full KN panel did not report their true sexual orientation in response to the original screening question and thus had no opportunity of being included in the present sample. Insofar as self-administered Internet questionnaires appear to elicit greater disclosure of sensitive and potentially stigmatizing information than telephone and face-to-face interviews (e.g., Kreuter et al. 2008), such underreporting may be less common in the KN panel than in surveys using other modes of data collection. Without minimizing the possibility of problems created by such nonreporting in the present study, we note that many respondents who had not disclosed their sexual orientation to their family or friends nevertheless reported it in the questionnaire.

Another potential limitation results from the fact that the data are derived from self-reports. As in any survey study, some respondents may have provided inaccurate responses to questions, either intentionally (e.g., because of social desirability concerns) or because of problems with comprehension or recall (Tourangeau et al. 2000). Yet another potential concern is whether the survey responses obtained from experienced Internet panel members might differ from those of naïve or "fresh" respondents. To date, the minimal research that has addressed this issue suggests that the response patterns of the two groups probably do not differ substantially (Toepoel et al. 2009). Finally, as with all surveys, the data represent a snapshot of the population at the time the study was fielded. Additional research with comparable probability samples will be needed to develop a more definitive portrait of sexual-minority adults in the USA. Such research will be useful not only in assessing the extent to which the findings of the present study can be reliably replicated but also might permit more detailed analyses of key subgroups within the sexual-minority

population. It would be illuminating, for example, to compare lesbian, gay, and bisexual adults in different race and ethnic groups on many of the variables discussed previously. In the present sample, these subgroups are too small for reliable analyses.

Throughout the present article, we have noted the importance of having accurate data about gay, lesbian, and bisexual people for legal and policy debates. Such information will also be highly useful for informing behavioral and social science research on sexual orientation and sexual minorities in a variety of ways. In particular, the present findings highlight the importance for researchers of distinguishing among lesbian, gay, bisexual female, and bisexual male individuals, rather than combining them into an undifferentiated "LGB" group. For example, the data indicate that sexual orientation groups differ in their levels of identity commitment, community involvement, and outness. Future research might profitably examine whether the meanings attached to these and related variables—and, indeed, the very concept of community membership—might differ among sexual orientation subgroups.

Moreover, because these variables may play important roles in moderating the effects of sexual stigma on psychological well-being (Herek and Garnets 2007; Meyer 2003), studies of sexual-minority mental health should include separate analyses of bisexuals and homosexuals, as well as of men and women. A similar analytic strategy should be followed in studies of intimate relationships among sexual minorities because, as shown here, sexual orientation and gender groups differ significantly in their relationship patterns. More broadly, the present study demonstrates the need for researchers to conceive of gay men, lesbians, bisexual men, and bisexual women not only as a cultural minority united by the common experience of sexual stigma but also as distinct groups whose members have different experiences, beliefs, and needs.

As society confronts a widening array of policy issues that uniquely affect sexual minorities, accurate scientific information about the lesbian, gay, and bisexual population will continue to be needed by government officials, the courts, and legislative bodies. Social and behavioral researchers working in this area have long recognized the value of data collected through probability sampling methods and have used a variety of creative strategies during the past two decades to obtain such data. In reporting what is perhaps the most extensive description to date of a national probability sample of self-identified lesbian, gay, and bisexual adults in the USA, the present article extends these efforts. We hope it will be useful not only for informing policy but also for generating hypotheses that can be tested in future studies with ever more sophisticated samples.

🖄 Springer

**Acknowledgments** Data collection was funded by a grant to Gregory Herek from the Gill Foundation. Throughout the project, we received assistance, feedback, and helpful suggestions from a large number of colleagues—too many to list here. We express our appreciation to all of them and our special thanks to Lee Badgett, Aaron Belkin, Murray Edelman, Gary Gates, Ethan Geto, Jeff Henne, Anne Peplau, and Ken Sherrill. We also thank Clinton Anderson and Linda Garnets for their helpful comments on an earlier draft of this article.

**Open Access** This article is distributed under the terms of the Creative Commons Attribution Noncommercial License which permits any noncommercial use, distribution, and reproduction in any medium, provided the original author(s) and source are credited.

## References

American Association for Public Opinion Research. (2006). *Standard definitions: Final dispositions of case codes and outcome rates for surveys*. Lenexa, KS: Author.

American Psychological Association. (1986). *Bowers v. Hardwick: Brief for amicus curiae, Supreme Court of the United States*. Washington, DC: Author.

American Psychological Association. (2003). *Lawrence v. Texas: Brief for amicus curiae, Supreme Court of the United States*. Washington, DC: Author.

American Psychological Association. (2007). *In re marriage cases: Brief for amicus curiae, California Supreme Court*. Washington, DC: Author.

Badgett, M. V. L. (1995). The wage effects of sexual orientation discrimination. *Industrial & Labor Relations Review, 48*, 726–739.

Balsam, K. F., & Mohr, J. J. (2007). Adaptation to sexual orientation stigma: A comparison of bisexual and lesbian/gay adults. *Journal of Counseling Psychology, 54*, 306–319.

Balsam, K. F., Beauchaine, T. P., Rothblum, E. D., & Solomon, S. E. (2008). Three-year follow-up of same-sex couples who had civil unions in Vermont, same-sex couples not in civil unions, and heterosexual married couples. *Developmental Psychology, 44*, 102–116.

Belkin, A. (2008). "Don't ask, don't tell": Does the gay ban undermine the military's reputation? *Armed Forces & Society, 34*, 276–291.

Bell, A. P., & Weinberg, T. S. (1978). *Homosexualities: A study of diversity among men and women*. New York: Simon & Schuster.

Berg, N., & Lien, D. (2002). Measuring the effect of sexual orientation on income: Evidence of discrimination? *Contemporary Economic Policy, 20*, 394–414.

Berrens, R. P., Bohara, A. K., Jenkins-Smith, H., Silva, C., & Weimer, D. L. (2003). The advent of Internet surveys for political research: A comparison of telephone and Internet samples. *Political Analysis, 11*, 1–22.

Black, D., Gates, G., Sanders, S., & Taylor, L. (2000). Demographics of the gay and lesbian population in the United States: Evidence from available systematic data sources. *Demography, 37*, 139–154.

Black, D., Gates, G., Sanders, S., & Taylor, L. (2003). *The measurement of same-sex unmarried partner couples in the 2000 U.S. Census*. Paper presented at the meeting of the Population Association of America, Minneapolis, MN.

Black, D., Gates, G., Sanders, S., & Taylor, L. (2007). *The measurement of unmarried partner couples in the 2000 U.S. Census (On-line working paper CCPR-023-07)*. Los Angeles: California Center for Population Research. http://www.ccpr.ucla.edu/ccprwpseries/ccpr_023_07.pdf. Accessed 7 Sept 2007.

Blair, J. (1999). A probability sample of gay urban males: The use of two-phase adaptive sampling. *Journal of Sex Research, 36*, 39–44.

Blandford, J. M. (2003). The nexus of sexual orientation and gender in the determination of earnings. *Industrial & Labor Relations Review, 56*, 622–642.

Bradford, J., Ryan, C., & Rothblum, E. D. (1994). National Lesbian Health Care Survey: Implications for mental health care. *Journal of Consulting and Clinical Psychology, 62*, 228–242.

Carpenter, C. S. (2005). Self-reported sexual orientation and earnings: Evidence from California. *Industrial & Labor Relations Review, 58*, 258–273.

Chang, L., & Krosnick, J. A. (2009). National surveys via RDD telephone interviewing vs. the Internet: Comparing sample representativeness and response quality. *Public Opinion Quarterly, 73*, 641–678.

Cochran, S. D., & Mays, V. M. (2000). Lifetime prevalence of suicide symptoms and affective disorders among men reporting same-sex sexual partners: Results from NHANES III. *American Journal of Public Health, 90*, 573–578.

Cochran, S. D., & Mays, V. M. (2006). Estimating prevalence of mental and substance-using disorders among lesbians and gay men from existing national health data. In A. M. Omoto & H. S. Kurtzman (Eds.), *Sexual orientation and mental health: Examining identity and development in lesbian, gay, and bisexual people* (pp. 143–165). Washington, DC: American Psychological Association.

Cumming, G. (2008). Replication and *p* intervals: *p* values predict the future only vaguely, but confidence intervals do much better. *Perspectives on Psychological Science, 3*, 286–300.

Diaz, R. M., Stall, R. D., Hoff, C., Daigle, D., & Coates, T. J. (1996). HIV risk among Latino gay men in the southwestern United States. *AIDS Education and Prevention, 8*, 415–429.

Diaz, R. M., Ayala, G., & Bein, E. (2004). Sexual risk as an outcome of social oppression: Data from a probability sample of Latino gay men in three U.S. cities. *Cultural Diversity and Ethnic Minority Psychology, 10*, 255–267.

Edelman, M. (1993). Understanding the gay and lesbian vote in '92. *The Public Perspective, 4*(3), 32–33.

Egan, P. J., & Sherrill, K. (2005). Marriage and the shifting priorities of a new generation of lesbians and gays. *PS: Political Science & Politics, 38*, 229–232.

Haider-Markel, D. P., & Joslyn, M. R. (2008). Beliefs about the origins of homosexuality and support for gay rights: An empirical test of attribution theory. *Public Opinion Quarterly, 72*, 291–310.

Harry, J. (1986). Sampling gay men. *Journal of Sex Research, 22*, 21–34.

Harry, J. (1990). A probability sample of gay males. *Journal of Homosexuality, 19*(1), 89–104.

Hegarty, P. (2002). "It's not a choice, it's the way we're built": Symbolic beliefs about sexual orientation in the US and Britain. *Journal of Community & Applied Social Psychology, 12*, 153–166.

Herdt, G. H. (2001). Social change, sexual diversity, and tolerance for bisexuality in the United States. In A. R. D'Augelli & C. J. Patterson (Eds.), *Lesbian, gay, and bisexual identities and youth: Psychological perspectives* (pp. 267–283). New York: Oxford University Press.

Herek, G. M. (2000). Homosexuality. In A. E. Kazdin (Ed.), *Encyclopedia of psychology* (Vol. 4, pp. 149–153). Washington, DC: American Psychological Association.

Herek, G. M. (2006). Legal recognition of same-sex relationships in the United States: A social science perspective. *American Psychologist, 61*, 607–621.

Herek, G. M. (2009a). Hate crimes and stigma-related experiences among sexual minority adults in the United States: Prevalence estimates from a national probability sample. *Journal of Interpersonal Violence, 24*, 54–74.

Sex Res Soc Policy (2010) 7:176–200                                                                    199

Herek, G. M. (2009b). Sexual stigma and sexual prejudice in the United States: A conceptual framework. In D. A. Hope (Ed.), *Contemporary perspectives on lesbian, gay and bisexual identities: The 54th Nebraska Symposium on Motivation* (pp. 65–111). New York: Springer.

Herek, G. M., & Capitanio, J. P. (1996). "Some of my best friends": Intergroup contact, concealable stigma, and heterosexuals' attitudes toward gay men and lesbians. *Personality and Social Psychology Bulletin, 22*, 412–424.

Herek, G. M., & Garnets, L. D. (2007). Sexual orientation and mental health. *Annual Review of Clinical Psychology, 3*, 353–375.

Herek, G. M., & Glunt, E. K. (1995). Identity and community among gay and bisexual men in the AIDS era: Preliminary findings from the Sacramento Men's Health Study. In G. M. Herek & B. Greene (Eds.), *AIDS, identity, and community: The HIV epidemic and lesbians and gay men* (pp. 55–84). Thousand Oaks: Sage.

Herek, G. M., Cogan, J. C., Gillis, J. R., & Glunt, E. K. (1998). Correlates of internalized homophobia in a community sample of lesbians and gay men. *Journal of the Gay and Lesbian Medical Association, 2*, 17–25.

Herek, G. M., Gillis, J. R., & Cogan, J. C. (1999). Psychological sequelae of hate-crime victimization among lesbian, gay, and bisexual adults. *Journal of Consulting and Clinical Psychology, 67*, 945–951.

Herek, G. M., Chopp, R., & Strohl, D. (2007). Sexual stigma: Putting sexual minority health issues in context. In I. Meyer & M. Northridge (Eds.), *The health of sexual minorities: Public health perspectives on lesbian, gay, bisexual, and transgender populations* (pp. 171–208). New York: Springer.

Herek, G. M., Gillis, J. R., & Cogan, J. C. (2009). Internalized stigma among sexual minority adults: Insights from a social psychological perspective. *Journal of Counseling Psychology, 56*, 32–43.

Herman, D. (1997). *The antigay agenda: Orthodox vision and the Christian right*. Chicago: University of Chicago Press.

Hertzog, M. (1996). *The lavender vote: Lesbians, gay men, and bisexuals in American electoral politics*. New York: New York University Press.

Holbrook, A. L., Krosnick, J. A., & Pfent, A. (2008). The causes and consequences of response rates in surveys by the news media and government contractor survey research firms. In J. Lepkowski, C. Tucker, J. M. Brick, E. de Leeuw, L. Japec, P. J. Lavrakas, et al. (Eds.), *Advances in telephone survey methodology* (pp. 499–528). New York: Wiley.

In re Marriage Cases, 183 P.3d 384, 76 Cal. Rptr. 3d 683 (2008).

Jacobs, G. (1998). The struggle over naming: A case study of "queer" in Toronto, 1990–1994. *World Englishes, 17*, 193–201.

Kish. L. (1965). *Survey sampling*. New York: Wiley.

Knowledge Networks. (2009). Knowledge Networks bibliography: Articles and presentations based on KN collected data, analysis, methodology. http://www.knowledgenetworks.com/ganp/. Accessed 26 March 2009.

Korber, D., & Calvan, B. C. (2008). Female couples taking the lead in same-sex marriage. *Sacramento Bee*. http://www.sacbec.com/101/v-print/story/1027609.html. Accessed 20 June 2008.

Kreuter, F., Presser, S., & Tourangeau, R. (2008). Social desirability bias in CATI, IVR, and Web Surveys: The effects of mode and question sensitivity. *Public Opinion Quarterly, 72*, 847–865.

Krosnick, J. A. (1991). Response strategies for coping with the cognitive demands of attitude measures in surveys. *Applied Cognitive Psychology, 5*, 213–236.

Kulick, D. (2000). Gay and lesbian language. *Annual Review of Anthropology, 29*, 243–285.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality: Sexual practices in the United States*. Chicago: University of Chicago Press.

Lee, E. S., & Forthofer, R. N. (2006). *Analyzing complex survey data* (2nd ed.). Thousand Oaks: Sage.

Lewis, G. B. (2008). *The friends and family plan: Knowing LGBs and supporting gay rights* Atlanta: Andrew Young School of Policy Studies Research Paper Series No. 07-10. http://ssrn.com/abstract=975975 Accessed 4 February 2010.

Love Won Out. (2008). Frequently asked questions. http://www.lovewonout.com/questions/. Accessed 29 Aug 2009.

Luhtanen, R., & Crocker, J. (1992). A collective self-esteem scale: Self-evaluation of one's social identity. *Personality and Social Psychology Bulletin, 18*, 302–318.

Martin, J. L., & Dean, L. (1990). Developing a community sample of gay men for an epidemiologic study of AIDS. *American Behavioral Scientist. 33*, 546–561.

Mays, V. M., & Cochran, S. D. (2001). Mental health correlates of perceived discrimination among lesbian, gay, and bisexual adults in the United States. *American Journal of Public Health, 91*, 1869–1876.

McLean, K. (2007). Hiding in the closet? Bisexuals, coming out and the disclosure imperative. *Journal of Sociology, 43*, 151–166.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*, 674–697.

Meyer, I. H., & Colten, M. E. (1999). Sampling gay men: Random digit dialing versus sources in the gay community. *Journal of Homosexuality, 37*(4), 99–110.

Meyer, I. H., & Wilson, P. A. (2009). Sampling lesbian, gay, and bisexual populations. *Journal of Counseling Psychology, 56*, 23–31.

Millett, G., Malebranche, D., Mason, B., & Spikes, P. (2005). Focusing "down low": Bisexual Black men, HIV risk and heterosexual transmission. *Journal of the National Medical Association, 97*, 52S–59S.

O'Leary, A., Fisher, H. H., Purcell, D. W., Spikes, P. S., & Gomez, C. A. (2007). Correlates of risk patterns and race/ethnicity among HIV-positive men who have sex with men. *AIDS and Behavior, 11*, 706–715.

Peplau, L. A., & Fingerhut, A. W. (2007). The close relationships of lesbians and gay men. *Annual Review of Psychology, 58*, 405–424.

Pettigrew, T. F., & Tropp, L. R. (2006). A meta-analytic test of intergroup contact theory. *Journal of Personality and Social Psychology, 90*, 751–783.

Pew Forum on Religion and Public Life. (2008). U.S. religious landscape survey. http://religions.pewforum.org/pdf/report2-religious-landscape-study-full.pdf. Accessed 23 June 2008.

Riggle, E. D., Rostosky, S. S., & Reedy, C. S. (2005). Online surveys for BGLT research: Issues and techniques. *Journal of Homosexuality, 49*(2), 1–21.

Rodriguez, E. M., & Ouellette, S. C. (2000). Gay and lesbian Christians: Homosexual and religious identity integration in the members and participants of a gay-positive church. *Journal for the Scientific Study of Religion, 39*, 333–347.

Rostosky, S. S., Riggle, E. D. B., Home, S. G., & Miller, A. D. (2009). Marriage amendments and psychological distress in lesbian, gay and bisexual (LGB) adults. *Journal of Counseling Psychology, 56*, 56–66.

Rothblum, E. D., & Factor, R. (2001). Lesbians and their sisters as a control group: Demographic and mental health factors. *Psychological Science, 12*, 63–69.

Rothblum, E. D., Balsam, K. F., & Mickey, R. M. (2004). Brothers and sisters of lesbians, gay men, and bisexuals as a demographic

Sex Res Soc Policy (2010) 7:176–200

comparison group. *Journal of Applied Behavioral Science, 40,* 283–301.

Rothblum, E. D., Balsam, K. F., & Solomon, S. E. (2008). Comparison of same-sex couples who were married in Massachusetts, had domestic partnerships in California, or had civil unions in Vermont. *Journal of Family Issues, 29,* 48–78.

Rust, P. C. (2000). Bisexuality in HIV research. In P. C. Rust (Ed.), *Bisexuality in the United States: A social science reader* (pp. 356–399). New York: Columbia University Press.

Schaffner, B., & Senic, N. (2006). Rights or benefits? Explaining the sexual identity gap in American political behavior. *Political Research Quarterly, 59,* 123–132.

Sell, R. L. (2007). Defining and measuring sexual orientation for research. In I. H. Meyer & M. E. Northridge (Eds.), *The health of sexual minorities: Public health perspectives on lesbian, gay, bisexual, and transgender populations* (pp. 355–374). New York: Springer.

Sell, R. L., & Petrulio, C. (1996). Sampling homosexuals, bisexuals, gays, and lesbians for public health research: A review of the literature from 1990 to 1992. *Journal of Homosexuality, 30*(4), 31–47.

Sell, R. L., & Silenzio, V. M. B. (2006). Lesbian, gay, bisexual, and transgender public health research. In M. D. Shankle (Ed.), *The handbook of lesbian, gay, bisexual, and transgender public health* (pp. 33–56). New York: Harrington Park Press.

Sell, R. L., Kates, J., & Brodie, M. (2007). Use of a telephone screener to identify a probability sample of gays, lesbians, and bisexuals. *Journal of Homosexuality, 53*(4), 163–171.

Stall, R., & Wiley, J. (1988). A comparison of alcohol and drug use patterns of homosexual and heterosexual men: The San Francisco Men's Health Study. *Drug and Alcohol Dependence, 22,* 63–73.

Toepoel, V., Das, M., & Van Soest, A. (2009). Effects of design in web surveys: Comparing trained and fresh respondents. *Public Opinion Quarterly, 72,* 985–1007.

Tourangeau, R., Rips, L. J., & Rasinski, K. A. (2000). *The psychology of survey response.* Cambridge: Cambridge University Press.

Udis-Kessler, A. (1995). Identity/politics: A history of the bisexual movement. In N. Tucker (Ed.), *Bisexual politics: Theories, queries, and visions* (pp. 17–30). New York: Haworth Press.

Varnum v. Brien, Iowa Sup. LEXIS 31 (2009).

Whisman, V. (1996). *Queer by choice: Lesbians, gay men, and the politics of identity.* New York: Routledge.

Wilkinson, L., & Task Force on Statistical Inference. (1999). Statistical methods in psychology journals: Guidelines and explanations. *American Psychologist, 54,* 594–604.

# Tab 12



SCHOOL OF LAW

CASE WESTERN RESERVE
U N I V E R S I T Y

# NO DIFFERENCE?: AN ANALYSIS OF SAME-SEX PARENTING

George W. Dent, Jr.

Case Research Paper Series in Legal Studies
Working Paper 2011-11
May, 2011

This paper can be downloaded without charge from the
Social Science Research Network Electronic Paper Collection:

For a complete listing of this series:
http://ssrn.com/abstract=1848184

Electronic copy available at: http://ssrn.com/abstract=1848184
CASE WESTERN RESERVE UNIVERSITY

## No Difference?: An Analysis of Same-Sex Parenting

- George W. Dent, Jr.[1]

The principal argument for traditional marriage is that it is uniquely beneficial to children. Accordingly, a key tenet of the campaign for same-sex marriage ("SSM") is that same-sex couples are just as good as other parents; there is "no difference" between the two. This article analyzes this claim and concludes that it is unsubstantiated and almost certainly false.

### I. No Difference from What?

In *Perry v. Schwarzenegger* the District Court pronounced that "same-sex parents and opposite-sex parents are of equal quality."[2] Some scholars make similar claims.[3] A crucial problem with the "no difference" claim is determining what is alleged to be no different from what. Defenders of traditional marriage claim that children generally fare best when raised by their married biological parents and (correlatively) that children would not fare as well with same-sex married couples.

Since SSM has been recognized only recently and only in a few jurisdictions, these claims cannot be empirically refuted or confirmed. In fact, no one has tried. In *Perry* the plaintiffs' expert witness could not identify any study comparing children raised by same-sex couples with children raised by their married, biological parents.[4] Studies of children raised by same-sex couples often compare them with children raised by single mothers.[5] Others compare them to children raised by divorced heterosexual

---

[1] Schott-van den Eynden Professor of Law, Case Western Reserve University School of Law.

[2] Mimeo. Op. at 127.

[3] *See e.g.*, Michael S. Wald, *Adults' Sexual Orientation and State Determinations Regarding Placement of Children*, 40 Fam. L.Q. 381, 400 (2006); Gregory N. Herek, *Legal Recognition of Same-Sex Relationships in the United States: A Social Science Perspective*, 61 Am. Psych. 607, 611 (2006) (stating that "[e]mpirical studies comparing children raised by sexual minority parents with those raised by otherwise comparable heterosexual parents have not found reliable disparities in mental health or social adjustment"); Carlos A. Ball, The Morality of Gay Rights: An Exploration in Political Philosophy 168 ("The social science literature indicates that lesbians and gay men as a group meet their responsibilities toward their children as well and as completely as do heterosexual parents.") (footnote omitted).

[4] ER 263-87.

[5] "[T]he biggest problem by far is that the vast majority of these studies compare single lesbian mothers to single heterosexual mothers--in other words, they compare children in one kind of fatherless family with children in another kind of fatherless

1

Electronic copy available at: http://ssrn.com/abstract=1848184

parents.[6] Clearly neither comparison group does as well as children raised by their married, biological parents, so on its face these claims carry little weight even if they are true.

Moreover, studies do suggest at least one significant difference of children raised by same-sex couples: they are more likely to engage in homosexuality and to experience greater confusion and anxiety about sex.[7] Again, the absence of longitudinal data and of statistically significant samples mandates caution in weighing these findings. However, these new findings do raise suspicion that there may be other differences from same-sex parenting that have not yet been uncovered.

## II. Other Methodological Problems

Most studies of same-sex parenting have small, self-selected samples of children who have not been in the household very long and who have been evaluated at a single

---

family." Steven Nock, *quoted in* THE REVOLUTION IN PARENTHOOD: THE EMERGING GLOBAL CLASH BETWEEN ADULT RIGHTS AND CHILDREN'S NEEDS 21-22 (INST. FOR AMERICAN VALUES 2006) [hereinafter THE REVOLUTION IN PARENTHOOD]. *See also* A. Dean Byrd, *Conjugal Marriage Fosters Healthy Human and Societal Development, in* WHAT'S THE HARM?: DOES LEGALIZING SAME-SEX MARRIAGE REALLY HARM INDIVIDUALS, FAMILIES OR SOCIETY? 16 (Lynn D. Wardle, ed. 2008) [hereinafter WHAT'S THE HARM?] ("The studies on same-sex parenting . . . are basically restricted to children who were conceived in a heterosexual relationship whose mothers later divorced and self-identified as lesbians. It is these children who were compared to divorced, heterosexual, mother-headed families.").

[6] *See, e.g.,* Mary Parke, *Are Married Parents Really Better for Children? What Research Says About the Effects of Family Structure on Child Well-Being* 6, *available at* www.clasp.org.

[7] *See* Walter R. Schumm, *Children of Homosexuals More Apt To Be Homosexuals? A Reply to Morrison and to Cameron Based on an Examination of Multiple Sources of Data*, 42 J. BIOSOCIAL SCI. 721 (2010) (meta-analysis finding that children raised by gay couples are much more likely than others to be gay); Richard E. Redding, *It's Really About Sex: Same-Sex Marriage, Lesbigay Parenting, and the Psychology of Disgust*, 15 DUKE J. GENDER L. & POLICY 127, 143-44, 147-51 (2008) (reviewing studies and concluding that homosexuality does seem to be more common among children raised by same-sex couples); Traycee Hansen, A Review and Analysis of Research Studies Which Assessed Sexual Preference of Children Raised by Homosexuals (2009), *available at* http://www.drtaycehansen.com/Pages/writings_sexprefprt.html (concluding that studies by pro-homosexual researchers "can't be used to make definitive statements, [but] are suggestive that homosexual parents are rearing disproportionate numbers of non-heterosexual children"); Judith Stacey & Timothy J. Biblarz, *(How) Does the Sexual Orientation of Parents Matter*, 66 AM. SOCIO. REV. 159 (2001) (study finding homosexually parented children are more likely to experience sexual confusion and to engage in homosexual and bisexual behavior).

2

Electronic copy available at: http://ssrn.com/abstract=1848184

time rather than followed for a substantial period.[8] One researcher who clearly supports the gay movement concedes:

> [T]here has never been a comprehensive study of same-sex parents and their children from nationally representative data; . . . . The studies that have been done on same-sex couples have been mostly small scale studies of non-random samples from sampling frames that are not nationally representative.[9]

This is not necessarily a result of any impropriety by the investigators. Until recently few examples of same-sex parenting existed (especially for gay male homes),[10] so a large, longitudinal study is not yet possible. Given the small number of children now being raised by same-sex couples, getting a statistically significant random sample would be extremely expensive; it would require looking at a very large, random sample of children in order to get information about the one percent or so with same-sex couples. It is not surprising, then, that no one has done this.

---

[8] A group of 70 prominent scholars from all relevant academic fields concluded: "The current research on children raised by [same-sex couples] is inconclusive and underdeveloped--we do not yet have any large, long-term studies that can tell us much about how children are affected by being raised in a same-sex household." WITHERSPOON INST., MARRIAGE AND THE PUBLIC GOOD: TEN PRINCIPLES 18 (2006) [hereinafter MARRIAGE AND THE PUBLIC GOOD]. *See* Lynn D. Wardle, *Considering the Impacts on Children and Society of "Lesbigay" Parenting*, 23 QUINNIPIAC L. REV. 541 (2004) [hereinafter Wardle, *Considering the Impacts*] (listing methodological flaws of these studies, especially use of small, self-selected samples). *See also* Lynn D. Wardle, *The Potential Impact of Homosexual Parenting on Children*, 1997 U. ILL. L. REV. 833, 897 [hereinafter Wardle, *Potential Impact*]. The most recent study to claim to prove the success of same-sex parenting is Laura Langbein & Mark A. Yost, Jr., *Same-Sex Marriage and Negative Externalities*, 90 SOC. SCI. Q. xx (2009). It has the same methodological shortcomings as the prior studies. *See* Douglas W. Allen, Let's Slow Down: Comments on Same-Sex Marriage and Negative Externalities 3 (Dec., 2010), *available at* http://ssrn.com/abstracts=1722764.

[9] Michael J. Rosenfeld, Abstract, The Development of Children of Same-Sex Couples 2, *available at* http://www.stanford.edu/~mrosenfe/same-sex%20and%20their%20children,%20abstract.pdf. *See also* Michael J. Rosenfeld, *Nontraditional Families and Childhood Progress Through School*, 47 DEMOGRAPHY 755, 757 (2010) (stating that the sample sizes of studies of same-sex parenting remain too small for statistically powerful tests) [hereafter Rosenfeld, *Nontraditional Families*].

[10] *See* Charlotte Patterson, *Lesbian and Gay Parenting* 15, *available at* http://www.apa.org/pi/lgbt/resources/parenting-full.pdf (reporting only two longitudinal studies of lesbian parenting and none of gay male parenting). *See also* Byrd, *supra* note x, at 16 ("Studies of children raised by male couples are virtually non-existent.").

Instead, researchers have sought volunteers to be studied.[11] The validity of self-selected samples is doubtful. The legal guardians of children--of whatever sexual orientation or legal relationship--are unlikely to volunteer for a study if their children are not doing well. Also, "several of the most important [studies] have been based on samples of women who became parents through assisted reproductive technology," who tend to be "white, upper-middle class women."[12] They may not be representative of the broader population.

Further, homosexual couples in these studies are intrepid pioneers, keenly aware of the obstacles they face. They would not take up the challenge of same-sex parenting unless they felt themselves able to conquer the difficulties and were determined to do so. In many social experiments such pioneers succeed, but less impressive people who later try the same thing do less well.[13] Whatever the success of the pioneers of same-sex parenting has been, that success may not be matched by others in the future.

Finally, some studies find that children raised by their married, biological parents fare best.[14] They may then claim that this result stems from the "higher socioeconomic status" of these parents.[15] That conclusion, however, raises the question of the direction of cause and effect. A classic justification for marriage is that having a wife and the presence or prospect of children motivates a man to earn more money and achieve higher status.[16] Thus higher socioeconomic status of married couples may be a result of marriage.

---

[11] *See* Paul Cameron, *Homosexual Parents: Testing "Common Sense"--A Literature Review Emphasizing Golombok & Tasker Longitudinal Study of Lesbians' Children*, 85 PSYCHOL. REP. 282, 318 (1998); George A. Rekers, *An Empirically-Supported Rational Basis for Prohibiting Adoption, Foster Parenting, and Contested Child Custody by Any Person Residing in a Household that Includes a Homosexuality-Behaving Member*, 18 ST. THOMAS L. REV. 325, 401-02 (2005).

[12] Rosenfeld, *Nontraditional Families, supra* note x, at 757. *See also* Charlotte J. Patterson, *Family Relationships of Lesbians and Gay Men*, 62 J. MARRIAGE & FAM. 1052, 1058 (2000).

[13] *See* DIANE RAVITCH, THE DEATH AND LIFE OF THE GREAT AMERICAN SCHOOL SYSTEM: HOW TESTING AND CHOICE ARE UNDERMINING EDUCATION x (2010).

[14] *See* Rosenfeld, *Nontraditional Families, supra* note xx, at 755, 770 (finding that children of heterosexual married couples have the lowest rate of grade retention in school). Note that this group includes adopted children and children living with one biological parent who has divorced the other biological parent and remarried. Such children tend not to do as well as children living with the married biological parents, so the study does not reveal the full advantages of their latter milieu.

[15] *See id.*

[16] *See infra* note xx.

4

For lack of evidence, especially about male couples and long-term effects, uncertainty about gay parenting will persist for years. Liberalization of divorce was touted on the seemingly humane premise that some marriages are irreparably broken and that it is better to let the parties end these marriages rather than to perpetuate their misery by forcing a couple either to stay married or to endure a long, bitter, damaging legal battle over questions of fault.[17] It was argued that children would not be harmed by divorce because they are "infinitely malleable."[18] "[I]t was fashionable among intellectuals to contend that the best interest of adults also serve the best interests of children. This once conventional wisdom has proven to be gravely mistaken. . . ."[19]

The damage done to children by divorce became evident only many years after divorce laws were liberalized and divorce became more common.[20] The experience with liberalized divorce follows the law of unintended consequences--major legal changes invariably produce unexpected effects. Likewise, an unprecedented change in the law and meaning of marriage may have detrimental consequences. The studies invoked by the gay movement cannot refute this possibility.

### III. Further Reasons for Doubt

---

[17] *See* JANE LEWIS, THE END OF MARRIAGE? INDIVIDUALISM AND INTIMATE RELATIONS 5 (2001).

[18] Seana Sugrue, *The Erosion of Marriage: A Pyrrhic Victory?, in* WHAT'S THE HARM?, *supra* note x, at 302.

[19] Seana Sugrue, *Canadian Marriage Policy: A Tragedy for Children*, REPORT, INST. FOR MARRIAGE & FAMILY CANADA 2 (May 31, 2006), *quoted in* Lynne Marie Kohm, *What's the Harm to Women and Children?: A Prospective Analysis, in* WHAT'S THE HARM?, *supra* note x, at 79, 86.

[20] *See* MARGARET F. BRINIG, FROM CONTRACT TO COVENANT: BEYOND THE LAW AND ECONOMICS OF THE FAMILY 174-77 (2000); ELIZABETH MARQUARDT, BETWEEN TWO WORLDS: THE INNER LIVES OF CHILDREN OF DIVORCE (2005); JUDITH WALLERSTEIN, JULIA LEWIS & SANDRA BLAKESLEE, THE UNEXPECTED LEGACY OF DIVORCE: A 25 YEAR LANDMARK STUDY (2000); BARBARA DAFOE WHITEHEAD, THE DIVORCE CULTURE: RETHINKING OUR COMMITMENTS TO MARRIAGE AND THE FAMILY (1996). Liberalized divorce also harms women. *See* LENORE J. WEITZMAN, THE DIVORCE REVOLUTION: THE UNEXPECTED SOCIAL AND ECONOMIC CONSEQUENCES FOR WOMEN AND CHILDREN IN AMERICA (1985). It took almost forty years before rigorous studies were possible, and they showed the great damage wrought by liberalized divorce. Allen, *supra* note x, at 2.

One striking datum: "the single strongest social predictor (as opposed to personality predictor) of early death was parental divorce during childhood." Katherine Bouton, *Eighty Years Along, a Longevity Study Still Has Ground to Cover*, N.Y. TIMES, Apr. 19, 2011, at D3 (citing a finding in HOWARD S. FRIEDMAN & LESLIE R. MARTIN, THE LONGEVITY PROJECT: STARTLING DISCOVERIES FOR HEALTH AND LONG LIFE FROM THE LANDMARK EIGHT-DECADE STUDY (2011)).

There are further empirical evidence and inductive reasons indicating that same-sex married couples almost certainly would not be equally good parents as are married biological parents.

*A. Adoption Vs. Biology*

Every child with homosexual guardians has lost at least one biological parent. Loss of a parent is universally regarded as a great misfortune. If the child has one biological parent, the other adult is a step-parent. In fables step-parents are typically hostile to their step-children.[21] Homosexual couples with children often experience competition or jealousy over parenting, and the children often have a preference for or "primary bond" with one parent.[22] If one is the child's biological parent, it would be natural for the child to identify the other as secondary, or as not a true parent at all.[23]

Alternatively, the child with homosexual custodians has lost both parents. This is universally regarded as a tragedy. Adoption can be a great blessing for children whose parents are unable or unwilling to care for them, but even adoption by a traditional married couple is not equal to the biological family.[24] If same-sex couples are just as

---

[21] *See* BRUNO BETTELHEIM, THE MEANING AND IMPORTANCE OF FAIRY TALES 66-73 (1975) (discussing "The Fantasy of the Wicked Stepmother").

[22] *See* Claudia Ciano-Boyce & Lynn Shelley-Sireci, *Who Is Mommy Tonight? Lesbian Parenting Issues*, 43 J. HOMOSEXUALITY No. 2, at 1, 10-11 (2002); Susan Bennett, *Is There a Primary Mom? Parental Perceptions of Attachment Bond Hierarchies Within Lesbian Adoptive Families*, 20 CHILD & ADOLESCENT SOC. WORK J. No. 3, at 159, 166-69 (2003).

[23] *See* Louis DeSerres, *Preserve Marriage--Protect Children's Rights, in* WHAT'S THE HARM?, *supra* note x, at 106 ("This biological imbalance can also be the source of numerous tensions and conflicts that are not likely to benefit the child. . . .").

[24] *See* David M. Brodzinsky, *Long-Term Outcomes in Adoption*, 3 THE FUTURE OF CHILDREN 153, 153 (Spring, 1993) ("A selective review of the literature indicates that, although most adoptees are well within the normal range of functioning, as a group they are more vulnerable to various emotional, behavioral, and academic problems than their peers living in intact homes with their biological parents."); Gail Slap et al., *Adoption as a Risk Factor for Attempted Suicide During Adolescence*, 108 PEDIATRICS 330 (Aug. 2001) ("Attempted suicide is more common among adolescents who live with adoptive parents than among adolescents who live with biological parents."); Michael Wierzbicki, *Psychological Adjustment of Adoptees: A Meta-Analysis*, 22 J. CLINICAL CHILD PSYCH. 447 (1993) (meta-analysis of 66 published studies finding that adoptees had significantly higher levels of maladjustment, externalizing disorders, and academic problems than nonadoptees); Matthew D. Bramlett et al., *The Health and Well-Being of Adopted Children*, 119 PEDIATRICS, Supp. 2007, at S54. *See also* SHARON VANDIVERE ET AL., ADOPTION USA: A CHARTBOOK BASED ON THE 2007 NATIONAL SURVEY OF ADOPTIVE PARENTS 5 (2007), which found *inter alia*:

6

good as biological parents, they must be *better* than traditional married couples as adoptive parents. It would be astounding if this were true, and there is no evidence to suggest that it is.

Adopted children often crave knowledge of and contact with their biological parents and are challenging laws that prevent them having it.[25] In effect, these children assert the natural importance of blood ties and a human right to access to their biological parents. The law increasingly acknowledges such a right. The Convention on the Rights of the Child, for example, recognizes the right of every child, "as far as possible . . . to know and be cared for by his or her parents."[26] Because homosexual couples cannot biologically create children, however, the SSM movement must deny the importance of blood ties and any right of children to access to their biological parents.[27]

*B. Special Issues with Same-Sex Couples*

---

[C]ompared to the general population of children, adopted children are more likely to have ever been diagnosed with—and to have moderate or severe symptoms of—depression, ADD/HAD, or behavior/conduct disorder. . . . . [P]arental aggravation (for example, feeling the child was difficult to care for, or feeling angry with the child . . . is more common among parents of adopted children than among parents in the general U.S. population (11 compared with 6 percent).

[25] *See* Patrick F. Fagan, Adoption Works Well: A Synthesis of the Literature 13 (Family Research Council, Nov., 2010) ("At some stage, adopted children commonly desire to get to know their birth mother."). "It is now being widely recognized that adopted children have the right to know who their biological parents are whenever possible, and legislation establishing that right has become the norm." MARGARET SOMERVILLE, THE ETHICAL IMAGINATION: JOURNEYS OF THE HUMAN SPIRIT 147 (2006). "Children also have a right to be reared within their biological families and to have a mother and a father, unless an exception can be justified as being in the 'best interests' of a particular child." Margaret Somerville, *Children's Human Rights to Natural Biological Origins and Family* Structure, 1 INT'L J. JURISP. FAM. 35, 35 (2011). *See also* David Crary, *Sperm-Donors' Kids Seek More Rights, Want to End Anonymous Sperm Donation*, *available at* http://www.app.com/apps/pbcs.dll/article?AID-2010100812064; Vardit Ravitsky & Joanna E. Scheib, Donor-Conceived Individuals' Right to Know, The Hastings Center, Bioethics Forum (July 20, 2010), *available at* http://www.thehastingscenter.org/Bioethicsforum/Post.aspx?id=4811&blogid=140.

[26] Convention on the Rights of the Child, G.A. Res. 44/25, at 166, 168, U.N. Doc. A/RES/44/25 (Nov. 20, 1989), *reprinted in* 28 I.L.M. 1456 (1989), *available at* http://www.ochr.org/english/law/pdf/crc.pdf. Unfortunately, the United States has not ratified this convention.

[27] *See infra* note x and accompanying text.

In addition to the detriments of adoption even by a traditional married couple, there are reasons to believe that adoption by same-sex couples would raise further problems.

### 1. Children's Sexuality

The claim that living with a same-sex couple does not affect a child's sexuality is implausible. "It would be surprising indeed if . . . children's own sexual identities were unaffected by the sexual identities of their parents."[28] Even young children may sense, or be told by others, that their guardians are unusual--queer--thereby initiating their sexualization at an unusually early age. There is evidence that children raised by homosexuals are more likely to engage in homosexuality and to feel confused about their sexual identity.[29]

### 2. Durability and Fidelity

Other aspects of homosexual relationships make same-sex couples less likely to be good parents. Heterosexual relationships are more durable. The bond between woman and man is rooted in the biological necessity to nurture human infants for a long time.[30] The parents' fidelity affirms paternity--the identity of the father--which is hidden by promiscuity in some other species, including close relatives of humans, like chimpanzees.[31] The recognition of paternity lets a father care for his own children, which includes caring their mother--his mate. The recognition of "patrilineal kin" also made it

---

[28] Diana Baumrind, *Commentary on Sexual Orientation: Research and Social Policy Implications*, 31 DEVELOPMENTAL PSYCH. 130, 134 (1995). *See also* A. Dean Byrd, *Gender Complementarity and Child-Rearing: Where Tradition and Science Agree*, 6 J. L. & FAMILY STUD. 213, x (2004) ("Children learn about male-female relationships through the modeling of their parents."); Bruce Ellis, *Of Fathers and Pheromones: Implications of Cohabitation for Daughters' Pubertal Timing, in* JUST LIVING TOGETHER: IMPLICATIONS OF COHABITATION ON FAMILIES, CHILDREN, AND SOCIAL POLICY 161 (A. Booth & A. Crouter eds., 2002); Susan Golombok & Fiona Tasker, *Do Parents Influence the Sexual Orientation of Their Children? Findings from a Longitudinal Study*, 32 DEVELOPMENTAL PSYCH. 3 (1996).

[29] *See supra* note x and accompanying text.

[30] Discussing the emergence of human beings from other primates, Dr. Bernard Chapais, a primatologist, said: "If you take the promiscuity that is the main feature of chimp society and replace it with pair bonding, you get many of the most important features of human society." *Quoted in* Nicholas Wade, *New View of How Humans Moved Away from Apes*, N.Y. TIMES, Mar. 11, 2011, at Ax. *See generally* BERNARD CHAPAIS, PRIMEVAL KINSHIP (2008).

[31] *See* Wade, *supra* note x ("the presence of both parents revealed the genealogical structure of the family, which is at least half hidden in chimp societies").

possible to "move forward and establish peaceful relations with other groups."[32] For either parent to have sex outside the marriage can disrupt their bond by creating competing demands from other children and the other parent(s).

It would be astonishing if this natural bond, a product of a million years of evolution, were just coincidentally equaled by the bond between same-sex couples, which has no biological basis. A comparison with other species is instructive. Among some animals male and female mate for life; among many they do not. But in no species do members of the same sex mate for life. Homosexuals have less reason to bond as couples and, when they do bond, less reason for the bond to be enduring and exclusive. Not surprisingly, then, homosexuals are less inclined than heterosexuals to marry,[33] and gays who do marry have a high divorce rate.[34]

---

[32] *Id.* (quoting primatologist Bernard Chapais). *See also* Nicholas Wade, *Supremacy of a Social Network*, N.Y. TIMES, Mar. 15, 2011, at D4.

[33] *See* Paul Ames, Dutch Gays Don't Take Advantage of Opportunity to Marry (Apr. 20, 2011), *available at* http://www.globalpost.com (reporting statistics from the Netherlands national statistics agency that "just 20 percent of gay Dutch couples are married, compared to 80 percent of heterosexual couples"); Harry R. Jackson, Jr., *What's the Vex of Same-Sex*, TownHall.com, Oct. 12, 2009, *available at* http://townhall.com?Common/PrintPage.aspx?g=c9bc9aad-468e-49e2-9e1c-03225fd7ba2 (reporting that in the Netherlands, where SSM is recognized, only 12% of gays have chosen to marry). *See also* Maggie Gallagher & Joshua K. Baker, *Demand for Same-Sex Marriage: Evidence from the United States, Canada, and Europe*, 3 IMAPP POLICY BRIEF No. 1, 1, 6 (Apr. 26, 2006), *available at* http://www.marriagedebate.com/pdf/imapp.demandforssm.pdf. In 2006 the New Jersey Supreme Court found that there were "16,000 same-sex couples living in committed relationships" among a state population of 8,500,000. Lewis v. Harris, 908 A.2d 196, 218 (N.J. 2006). Those 32,000 people are less than 0.4% of the population. One study found that only 85,000 same-sex couples had entered into a legally recognized relationship in America. That is about 1/18th of 1% of the U.S. population. Gary J. Gates, M.V. Lee Badgett & Deborah Ho, Marriage, Registration and Dissolution by Same-Sex Couples in the U.S. 5 (July 2008), *available at* http://www.ssrn.com/abstract=1264106.

In Oregon 2,600 same-sex couples [thus 5,200 people], comprising about 20% of the of Oregon's same-sex couples, registered in the first year after Oregon instituted domestic partnerships, even though this offered most of the legal protections and benefits of marriage. Steve McKinsey, *Only One-Fifth of Oregon's Same-Sex Couples Opt for Union*, THE OREGONIAN, Feb. 2, 2009, *available at* http://blog.oregonlive.com/news_-impact/2009/02/domestic_partnerships.html. 70% were female. Oregon's population was estimated at 3,790,060 in 2008. *See* http://quickfacts.census.gov/gfd/states/41000.html. Thus those 5,200 people are less than 0.0014% of the population.

In three years only 6,500 couples registered under Vermont's civil union law. *See* Pam Belluck, *Gays Respond: 'I do,' 'I Might' and 'I Won't,'* N.Y. TIMES, Nov. 26, 2003, at A1. One reason for the low number is that "couples who came of age in the 1960's and

Where homosexuals (especially gay men) do marry or otherwise enter into a
committed relationship, it generally happens later in life than it generally does for normal
couples.[35] This is not surprising. A normal motive for a traditional marriage is to start a
family, so it generally occurs when the couple is young enough to bear children and to
handle the physical rigors of raising them. Gay couples do not bear children. Further,
"gay men tend to be even more preoccupied than most straight women with their bodies,
physical attractiveness, attire, adornment and self-presentation."[36] They may choose to

---

1970's [tended] to see marriage as a heterosexual institution symbolizing a system that
they could not, or would not, want to be part of." *Id.* Only 166 of General Motors'
1,300,000 employees claimed the same-sex benefits it offered. *See* Maggie Gallagher,
*What Is Marriage For?*, WKLY. STANDARD, Aug. 4/Aug. 11, 2003, *available at* LEXIS,
Nexis Library, The Weekly Standard File. In short, very few same-sex couples have
sought legal recognition when it is available, and most (especially the males couples) had
no interest in establishing legal recognition.

[34] *See* Gunnar Andersson et al., *The Demographics of Same-Sex Marriages in
Norway and Sweden*, 43 DEMOGRAPHY 79 (2006) ( "divorce-risk levels are considerably
higher in same-sex marriages" ); DENNIS ALTMAN, THE HOMOSEXUALIZATION OF
AMERICA, THE AMERICANIZATION OF THE HOMOSEXUAL 187 (1982) ("[A]mong gay men
a long-lasting *monogamous* relationship is almost unknown."); Maria Xiridou et al., *The
Contribution of Steady and Casual Partnerships to the Incidence of HIV Infection in
America*, 17 AIDS 1029, 1031 (2003) (finding that among a sample of Amsterdam men
that gay male partnerships lasted on average 1.5 years and that men in these partnerships
had an average of eight casual partners per year); Maggie Gallagher & Joshua K. Baker,
*Same-Sex Unions and Divorce Risk: Data from Sweden*, IMAPP POLICY BRIEF, May 3,
2004 (study of registered partnerships in Sweden finding that gay male couples were 50%
more likely to divorce, and lesbian couples were over 150% more likely to divorce than
heterosexual couples); C.C. Hoff et al., *Serostatus Differences and Agreements About
Outside Sex Partners Among Gay Couples*, 21 AIDS EDUC. & PREVENTION x (2009)
(study finding that half of gay couples in committed relationships had explicit agreements
allowing sex with others); Lawrence Kurdek, *Are Gay and Lesbian Cohabiting Couples
Really Different from Heterosexual Married Couples?*, 66 J. FAMILY & MARRIAGE 893
(Nov. 2004) (finding that the dissolution rate of homosexual couples was more than three
times that of heterosexual married couples, and the dissolution rate of lesbian couples
was more than four times that of heterosexual married couples).

[35] *See* Gates et al., *supra* note x, at 9 (study finding that same-sex couples who
married in Massachusetts were considerably older than opposite-sex couples who
married).

[36] Judith Stacey, Fellow Families? Genre of a Gay Male Intimacy and Kinship in
a Global Metropolis (2006), *available at*
http://www.leeds.ac.uk/CAVA/papers/intseminar3Stacey.htm

10

marry only when they no longer feel attractive enough for the promiscuity of the homosexual "meat market."[37]

Many gay men are promiscuous to an extent incompatible with marriage.[38] Some gays disdain monogamy as proper only for heterosexuals because they bear children, not a model gays should emulate.[39] One says: "Gay liberation was founded . . . on a sexual brotherhood of promiscuity and any abandonment of that promiscuity would amount to a communal betrayal of gargantuan proportions."[40] Promiscuity is implicit in educational materials about homosexuality, which are becoming more common in public schools.[41]

Due in part to promiscuity, homosexuals have high rates of disease. Gay men became more cautious about sex after the onset of AIDs, but infection rates soon rebounded to their former levels.[42] Gay men also suffer disproportionately from many

---

[37] This possibility seems consistent with the importance of physical appearance in the gay male marketplace:

In cruising culture, the gay male sexual sports arena, it's all in the gaze. Erotic attraction and connection occur (or fail) in the blink of an eye. . . . The extraordinary emphasis on the visual at the core of this dynamic imposes painful challenges for gay men seeking eros and intimacy who fall outside desirable standards of beauty and youth."

*Id.*

[38] In one study 43% of white male homosexuals reported having sex with 500 or more partners, with 28% having 1,000 or more sex partners. MARTIN S. BELL & ALAN P. WEINBERG, HOMOSEXUALITIES: A STUDY OF DIVERSITY AMONG MEN AND WOMEN 308-09 (1978). *See* also Paul Van den Ven et al., *A Comparative Demographic and Sexual Profile of Older Homosexually Active Men*, 34 J. SEX RESEARCH 354 (1997) (finding similar figures). Homosexual promiscuity is acknowledged by many homosexuals. *See* MARSHALL KIRK & HUNTER MADSEN, AFTER THE BALL 280-347 (1990). Even gay men with a "steady partner" tend to be promiscuous. *See* Jackson, *supra* note x (reporting that "in the Netherlands . . . homosexual men who have a steady partner have had an average of eight other sexual partners per year; lesbians were found to have more male partners over their lifetime than heterosexual women.").

[39] *See* DAVID A.J. RICHARDS, SEX, DRUGS, DEATH, AND THE LAW: AN ESSAY ON HUMAN RIGHTS AND OVERCRIMINALIZATION 53 (1982); Michael Bronski, *Behind the SexPanic! Debate*, HARV. GAY & LESBIAN REV. 29 (Spring 1998); Caleb Crain, *Pleasure Principles: Queer Theorists and Gay Journalists Wrestle Over the Politics of Sex*, LINGUA FRANCA 27 (Oct. 1997); Sheryl Gay Stolberg, *Gay Culture Weighs Sense and Sexuality*, N.Y. TIMES, Nov. 23, 1997, § 4, at 1.

[40] GABRIEL ROTELLO, SEXUAL ECOLOGY: AIDS AND THE DESTINY OF GAY MEN xx (1997).

[41] *See* George W. Dent, Jr., *Straight Is Better: Why Law and Society May Justly Prefer Heterosexuality*, x TEX. REV. L. & POLITICS x, x (2011).

[42] *See* Centers for Disease Control and Prevention, *CDC Analysis Provides New Look at Disproportionate Impact of HIV and Syphilis Among U.S. Gay and Bisexual Men*

other diseases.[43] The tendency of male homosexual acts to spread disease may help explain the revulsion many people feel about them.[44] Lesbians also suffer high rates of certain diseases and drug abuse.[45] Homosexuals also have higher rates of suicide, mental illness, and drug and substance abuse.[46] Although many homosexuals brag about the

---

(Mar. 10, 2010), *available at*
http://www/cdc/gov/nchstp/Newsroom/msmpressrelease.html (report finding that "the rate of new HIV diagnoses among men who have sex with men (MSM) is more than 44 times that of other men and more than 40 times that of women," and even greater discrepancies for syphilis) [hereafter CDC Analysis]. This report stated that one reason for the high rate of HIV infection among gay men is "complacency about HIV risk." *See also* Centers for Disease Control, *Resurgent Bacterial Sexually Transmitted Disease Among Men Who Have Sex with Men--King County, Washington, 1997-99*, MORBIDITY & MORTALITY WKLY. REPT., Sept. 10, 1999, at 773; Byrd, *supra* note x, at 14 (summarizing several studies).

[43] *See* Byrd, *supra* note x, at 13-14 (summarizing several studies); Anne Tompalo & H. Hunter Handsfield, *Overview of Sexually Transmitted Diseases in Homosexual Men, in* AIDS AND INFECTIONS OF HOMOSEXUAL MEN 3 (Pearl M. & Donald Armstrong eds., 2d ed. 1989) ("homosexual men were known to be at high risk of acquiring sexually transmitted diseases"); Centers for Disease Control, Sexually Transmitted Disease Surveillance 2009, at 33 (Nov. 2010) (finding high and growing rates of syphilis infection among homosexual men).

[44] *See* Roger Scruton, *Gay Reservations, in* THE LIBERATION DEBATE 108, 122 (Michael Leahy & Dan Cohn-Sherbok eds., 1996); Redding, *supra* note x, at 180-91 (discussing the evolutionary basis for disgust and the widespread feelings of disgust for homosexual acts)..

[45] *See* Katherine Fethers, et al., *Sexually Transmitted Infections and Risk Behaviors in Women Who Have Sex with Women*, 76 SEXUALLY TRANSMITTED INFECTIONS 345 (2000).

[46] *See* D.M. Ferguson et al., *Is Sexual Orientation Related to Mental Health Problems and Suicidality in Young People?*, 56 ARCHIVES GEN. PSYCH. 876 (1999) (study concluding: "Gay, lesbian and bisexual young people were at increased risks of major depression . . . generalized anxiety disorder . . . conduct disorder . . . [and] suicide attempts."); Richard Herrel *et al.*, *Sexual Orientation and Suicidality*, 56 ARCHIVES OF GEN. PSYCH. 867 (1999) (study finding that "same gender sexual orientation is significantly associated with each of the suicidality measures"); Christine E. Grella et al., *Influence of Gender, Sexual Orientation, and Need on Treatment Utilization for Substance Use and Mental Disorders: Findings from the California Quality of Life Survey*,19 BMC PSYCH. 52 (2009), *available at* http://www.biomedcentral.com/1471-244X/9/52 (empirical study finding that homosexuals were twice as likely to seek mental health, and substance abuse treatment); Redding, *supra* note x, at 156-59 (reviewing literature); Yue Zhao et al., *Suicidal Ideation and Attempt Among Adolescents Reporting "Unsure" Sexual Identity or Heterosexual Identity Plus Same-Sex Attraction or Behavior: Forgotten Groups?*, 49 J. AM. ACAD. OF CHILD & ADOLESCENT PSYCH. 89 (2010) (study finding homosexual and bisexual youths have higher suicide risk than others). Many gay men also suffer from eating disorders. Stacey, *supra* note x; Cassandra

12

absence of gender discrimination in their relationships, those relationships are often abusive.[47]

Some gays blame the pathology of promiscuity and disease on their social oppression.[48] William Eskridge argues that validating SSM would "civilize gay men by making them more like lesbians."[49] Both claims are weak. Society condemns promiscuity in homosexuals more than their fidelity or abstinence. One study found HIV infection of gay men in American cities to be highest in San Francisco, a famously gay friendly city. Its rate was 150% higher than in Pittsburgh, not a particularly gay-friendly city, which had the lowest rate.[50] Similarly, high levels of mental illness among gays are also found in the Netherlands, perhaps the most gay-friendly country in the world.[51]

---

Brooks, *Meth Use Among Gay Men Remains a Pervasive Problem*, SEATTLE TIMES, Aug. 27, 2010.

[47] *See* Byrd, *supra* note x, at 12-13 (summarizing several studies); Lisa K. Waldner-Haugrud et al., *Victimization and Perpetration Rates of Violence in Gay and Lesbian Relationships: Gender Issues Explored*, 12 VIOLENCE & VICTIMS 173 (1997) (reporting that "47.5% of lesbians and 29.7% of gays have been victimized by a same sex partner); P.A. Brand & A.H. Kidd, *Frequency of Physical Aggression in Heterosexual and Female Homosexual Dyads*, 59 PSYCH. REPTS. 1307 (1986) (finding reports of abuse in 30% of lesbian relationships); C.K. Waterman et al., *Sexual Coercion in Gay Male and Lesbian Relationships: Predictors and Implications and Support Services*, 26 J. SEX RESEARCH 118 (1989); S. Owen & T.W. Burke, *An Exploration of the Prevalence of Domestic Violence in Same-Sex Relationships*, 95 PSYCH. REPTS. 129 (2004); U.S. Dep't of Justice, Office of Justice Programs, Extent, Nature, and Consequences of Intimate Partner Violence: Findings from the National Violence Against Women Survey 30 (July, 2000), *available at* http://www.ncjrs.gov/txtfiles1/nij/181867.txt ("Same-sex cohabitants reported significantly more intimate partner violence than did opposite-sex cohabitants— 39% of lesbians reported being raped, physically assaulted, and/or stalked by a cohabiting partner at some time in their lifetimes, compared to 21% of heterosexual women. Among men, the comparable figures are 23.1% and 7.4%.").

[48] *See* Christopher Banks, The Cost of Homophobia: Literature Review of the Economic Impact of Homophobia on Canada, *available at* http://lgbthealth.net/downloads/research/Human_Impact_of_Homophobia.pdf.

[49] WILLIAM N. ESKRIDGE, JR, THE CASE FOR SAME-SEX MARRIAGE 84 (1996). *See also* JONATHAN RAUCH, GAY MARRIAGE: WHY IT IS GOOD FOR GAYS, GOOD FOR STRAIGHTS, AND GOOD FOR AMERICA 19-21 (2004).

[50] "The estimated level of [HIV] infection among homosexual men ranges from 20% in a Pittsburgh study to 50% in a San Francisco study." THOMAS E. SCHMIDT, STRAIGHT & NARROW 27 (1995) (citing many studies).

[51] T.G. Sandfort et al., *Same-Sex Behavior and Psychiatric Disorder*, 58 ARCHIVES GEN. PSYCH. 87 (2001).

13

As for marriage civilizing gay men, probably few gay men (especially the young) will marry,[52] and marriages that are entered into are likely to be short-lived.[53] Further, if the threat of deadly diseases from homosexual acts, including the "gay plague" of AIDS, has not deterred gay men's promiscuity, it is unlikely that a wedding ring will. Men are not domesticated by a wedding ceremony and a ring, but by a wife and children.[54]

Gay couples are also more prone to adultery.[55] This is hardly surprising since, unlike normal couples, adultery in gays does not threaten to create new children who would compete for resources and care with the couple's own biological children.[56] They may have different expectations or preferences than do normal married couples about adultery[57] as well as other matters, like the sharing of finances.[58]

Given the fragility of homosexual relationships, children in these homes are more likely to suffer the stresses of divorce and to learn that marriage is temporary, not a lasting relationship of trust. Every child raised by a homosexual couple has already lost at least one biological parent, so a divorce may cause heightened trauma. Given the frequent infidelity in homosexual couples, children in these homes are more likely to witness conflict over infidelity and to see it as a normal part of marriage. Given the frequent

---

[52] See Gates et al. *supra* note x, at 8 (finding that two-thirds of same-sex couples that entered into a legally recognized relationship were female). *See also supra* note x.

[53] See *supra* note x and accompanying text.

[54] See GEORGE GILDER, MEN AND MARRIAGE 12-18 (1993); RICHARD A. POSNER, SEX AND REASON 312 (1992) (stating that the presence of children helps to keep married couples together).

[55] One study of 156 male couples found that for them "fidelity is not defined in terms of sexual behavior, but rather by their emotional commitment to one another." All the couples who had been together over five years made allowance for outside sexual activity. DAVID P. MCWHIRTER & ANDREW M. MATTISON, THE MALE COUPLE: HOW RELATIONSHIPS DEVELOP 252-53 (1984). *See also* KIRK & MADSEN, *supra* note x, at 330 (study finding that "the cheating ratio of 'married' gay males, given enough time, approaches 100%"). Andrew Sullivan exhorts heterosexuals to develop a greater "understanding of the need for extramarital outlets between two men than between a man and a woman. . . . The truth is, homosexuals are not entirely normal; and to flatten their varied and complicated lives into a single, moralistic model is to miss what is essential and exhilarating about their otherness." ANDREW SULLIVAN, VIRTUALLY NORMAL: AN ARGUMENT ABOUT HOMOSEXUALITY 202-03 (1995).

[56] See *supra* notes x-x and accompanying text.

[57] See Craig Christensen, *If Not Marriage? On Securing Gay and Lesbian Family Values by a "Simulacrum of Marriage,"* 66 FORDHAM L. REV. 1699, 1726 (1998) (conceding that marriage may not have "the same meaning--entailing commitment to the same values--for gay people as for their heterosexual counterparts"). *See also supra* note x (discussing understandings and practices concerning fidelity among gay couples).

[58] See George W. Dent, Jr., *"How Does Same-Sex Marriage Threaten You?,* 59 RUTGERS L. REV. 233, 250 & n.94 (2007).

14

violence in homosexual couples, children in these homes are more likely to witness domestic violence and to understand it as a normal part of marriage.

A child whose mother lives with a man other than his biological father is more likely to be abused by that man than a child living with his biological father is likely to be abused by him.[59] Every child raised by a gay male couple has at least one unrelated male adult in the home. There is no reason to think that such a child will fare better than a child living with an unrelated heterosexual male. The high rates of child sex abuse among homosexuals and bisexuals[60] are also a cause for concern. At the least, given the uncertain effects of homosexual parenting, the children raised by homosexual couples are being treated as guinea pigs, which is troubling.

*3. Parents and Gender*

Advocates of same-sex parenting claim there is no difference between having a mother and a father and having two guardians of the same sex.[61] This, too, is implausible. Men and women differ in significant ways.[62] A growing body of studies confirms: "Mothers and fathers contribute in gender specific and in gender complementary ways to the healthy development of children."[63] "Fathers tend to do things differently, but not in

---

[59] *See* W. Bradford Wilcox, Suffer the Little Children: Cohabitation and the Abuse of America's Children (Apr. 22, 2011), *available at* http://www.thepublicdiscourse.com/2011/04/3181 (citing a new federal study showing that "children living with their mother and her boyfriend are about 11 times more likely to be sexually, physically, or emotionally abused than children living with their married biological parents").

[60]*See* R. Blanchard et al., *Pedophiles: Mental Retardation, Maternal Age, and Sexual Orientation*, 28 ARCHIVES OF SEXUAL BEHAVIOR 111 (1999); Kurt Freund & Robin J. Watson, *The Proportions of Heterosexual and Homosexual Pedophilia: An Explanatory Study*, 18 J. SEX & MARITAL THERAPY 34 (1992).

[61] *See* Louise B. Silverstein & Carl F. Auerbach, *Deconstructing the Essential Father*, 54 AM. PSYCHOLOGIST 397 (1999).

[62] *See generally* STEVEN PINKER, THE BLANK SLATE: THE MODERN DENIAL OF HUMAN NATURE 343-50 (2002); DAVID C. GEARY, MALE, FEMALE: THE EVOLUTION OF HUMAN SEX DIFFERENCES (1998); Dorion Sagan, *Gender Specifics: Why Women Aren't Men*, N.Y. TIMES, June 21, 1998, § 15, at 1 (stating that hormonal differences affect all organs of the body, abilities, behaviors, and effects of medication).

[63] Byrd, *supra* note x, at 5; Ilanit Gordon *et al.*, *Oxytocin and the Development of Parenting in Humans*, 68 BIO. PSYCH. 377 (Aug. 15, 2010) (finding that hormonal differences between men and women are associated with different parenting behavior). "In the last 20 years, everyone's been talking about how important it is for fathers to be involved." Sara S. McLachlan, professor of sociology and public affairs at Princeton University, *quoted in* Laurie Tarkan, *Fathers Gain Respect from Expert (and Mothers)*, N.Y. TIMES, Nov. 3, 2009, at D5. *See also* MARRIAGE AND THE PUBLIC GOOD, *supra* note x, at 18; WADE HORN & TOM SYLVESTER, FATHER FACTS 153 (2002); ELEANOR E.

ways that are worse for the children. Fathers do not mother, they father."[64] The contribution of fathers benefits their children.[65] The presence of fathers in the home also benefits the neighborhoods where they live.[66]

Because of problems like these, "the American College of Pediatricians believes it is inappropriate, potentially hazardous to children, and dangerously irresponsible to change the age-old prohibition on homosexual parenting, whether by adoption, foster care, or by reproductive manipulation."[67] Most European countries bar adoption by gays and lesbians.[68] A complete prohibition on adoption or foster care by homosexual couples would be inappropriate. In worn-torn, impoverished countries there are starving orphans

---

MACOBY, TWO SEXES: GROWING UP APART, COMING TOGETHER (1998); Thomas G. Powers et al., *Compliance and Self-Assertion: Young Children's Responses to Mothers Versus Fathers*, 30 DEVELOPMENTAL PSYCH. 980 (1994); Robin Fretwell Wilson, *Undeserved Trust: Reflections on the ALI's Treatment of De Facto Parents, in* RECONCEIVING THE FAMILY: CRITIQUE ON THE AMERICAN LAW INSTITUTE'S *PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION* 90, 106-10 (Robin Fretwell Wilson, ed. 2006); A. Sarkadi et al., *Father's Involvement and Children's Developmental Outcomes: A Systematic Review of Longitudinal Studies*, 97 ACTA PAEDIATRICA 153 (2008) (review spanning 20 years of studies including over 22,000 children found that fathers reduce behavioral problems in boys and psychological problems in girls, enhance cognitive development, and decrease delinquency).

In a recent study, fathers who were counseled in parenting spent more time with their children, "and the children were much less aggressive, hyperactive, depressed or socially withdrawn than children of fathers in the control group." *See* Tarkan, *supra*. Studies with animals have found behavioral and even neurological deficiencies in mammals raised without fathers. *See* Shirley S. Wang, *This Is Your Brain Without Dad*, WALL ST. J., Oct. 27, 2009, at x.

[64] Child psychologist Dr. Kyle Pruett, *quoted in* Tarkan, *supra* note x, at D5.

[65] "[C]ontrolling for income and all other factors, youths in father-absent families . . . had significantly higher odds of incarceration than those of other-father families." Cynthia C. Harper & Sara S. McLanahan, *Father Absence and Youth Incarceration*, 14 J. RES. ON ADOLESCENCE 369, 385-86 (2004)

[66] *See* SARA MCLANAHAN & GARY SANDEFUR, GROWING UP WITH A SINGLE PARENT: WHAT HURTS, WHAT HELPS? 137 (1994) (noting that crime is higher in communities with higher proportions of single-mother families); Amy L. Anderson, *Individual and Contextual Influences on Delinquency: The Role of the Single-Parent Family*, 30 J. CRIM. JUST. 575, 582 (2002) (finding that eighth graders attending schools with a higher proportion of teens from single-parent families committed more violent offenses, regardless of their own family structure).

[67] American College of Pediatricians, Homosexual Parenting: Is It Time for Change? (rev'd Mar. 26, 2009), *available at* http://www.acpeds.org/?CONTEXT=art&cat=22&art=50&BISKIT=2920801063.

[68] *See* YUVAL MERIN, EQUALITY FOR SAME-SEX COUPLES: THE LEGAL RECOGNITION OF GAY PARTNERSHIPS IN EUROPE AND THE UNITED STATES 254 (2002).

who would be better off if they were adopted by a carefully screened homosexual couple. However, adoption by homosexual couples should be limited, requiring a showing that no better placement is possible.

### III. SAME-SEX COUPLES AND ARTIFICIAL REPRODUCTION

Not surprisingly, some homosexuals are using artificial means of reproduction.[69] Recognition of SSM arguably requires that artificial reproduction (including cloning) be legalized. Since homosexuals cannot create children sexually, the principle of equality arguably entitles them to other means of reproducing.[70] This argument has already been accepted in some countries that have validated SSM.[71]

Artificial reproduction generally entails the separation of the resulting child from one or both of its biological parents. To plan deliberately to separate a child from one or both parents seems to be child abuse.[72] At least in theory, biological parents can act in

---

[69] *See* BALL, *supra* note x, at 166 (stating that "changes in reproductive technology have made it possible for lesbians and gay men to have biological children").

[70] *See* Anthony C. Infanti, Dismembering Families, Univ. of Pittsburgh Legal Stud. Research Paper No. 2009-11 (April 2009), *available at* http://www.ssrn.com/abstract=1374492 (arguing that denial of a federal tax deduction for the medical costs of artificial reproduction "contributes to the subordination of lesbian and gay families as well as many other nontraditional American families"). *See also* DeSerres, *supra* note x, at 104-05. Under the Universal Declaration of Human Rights the right to marry includes the right to found a family. UNITED NATIONS, UNIVERSAL DECLARATION OF HUMAN RIGHTS, Art 16.1. To complete this bootstrap circle of reasoning, after SSM is invoked to justify gays' use of artificial reproduction, the possibility of artificial reproduction is then cited to justify SSM. *See* Karen Streuning, *Looking for Liberty and Defining Marriage in Three Same-Sex Marriage Cases, in* MORAL ARGUMENT, RELIGION, AND SAME-SEX MARRIAGE: ADVANCING THE PUBLIC GOOD 19, 38 Gordon A. Babst et al., eds. 2009).

[71] *See* DeSerres, *supra* note x, at 104 (citing a French parliamentary report); Elizabeth Marquardt, How Redefining Marriage Redefines Parenthood (Dec. 1, 2010), *available at*, http://familyscholars.org/2010/12/01/how-redefining-marriage-redefines-parenthood/ (stating facts indicating that use of third party sperm and egg donors to conceive children "does appears to be increasing in jurisdictions that have recognized same-sex marriage or similar arrangements"). The likelihood that recognition of SSM would "normalize" artificial reproduction also casts doubt on Dale Carpenter's claim that recognition would reduce "the number of scenarios in which you have multiple adults vying for children." Dale Carpenter, *The Unconservative Consequences of Conservative Opposition to Gay Marriage, in* WHAT'S THE HARM?, *supra* note xx, at 319, 323.

[72] *See* Camille W. Williams, *Planned Parent-Deprivation: Not in the Best Interests of the Child,* 4 WHITTIER J. CHILD & FAM. ADVOC. 375 (2005); SOMERVILLE, *supra* note x, at 147 (drawing ethical distinction between accidental and deliberate

their own interests; infant or unborn children cannot. Although baby selling is illegal, adults can give or take pay for egg or sperm donations or surrogate motherhood and take steps to prevent the resulting children from having any legal rights against, or contact with, or even knowledge of the identity of their parents. In this way some men have sired hundreds of children.[73]

Artificial reproduction is more problematic than adoption because the former is harder for the law to monitor. Every adoption must be approved by a court charged to protect the child. Artificial reproduction gets little legal oversight.[74] The children created are subject to the whims of adults. Artificial reproduction also differs from adoption in that the former is irreversible. If an adoption goes awry it can be rescinded, but the artificial creation of a human being cannot be undone. Neither artificially created children nor adoptees have an adequate natural family to which they can return. The difference between the two is that for the artificially created child this happens by the design of the custodial parents.

The law has paid little attention to the rights of children regarding their biological parents because in the past there was no threat to these rights. Children lived with their natural parents unless the parents died, voluntarily surrendered them, or were found unfit by a court. Through artificial reproduction children may be separated from their biological parents without any of these conditions being present. This separation damages children. Children artificially conceived and raised apart from their biological fathers "hunger for an abiding paternal presence."[75]

---

destruction of "children's links to their biological parents, and especially for society to be complicit in this destruction").

[73] *See* Rachel Lehmann-Haupt, *Mapping the God of Sperm*, NEWSWEEK, Dec. 16, 2009, at xx, *available at* http://www.newsweek.com/id/227104 (discussing a man who is the father of nearly 400 children by sperm donation).

[74] *See* Mark Hansen, . . . *and Baby Makes Litigation*, ABA J. 53, 54-55 (March 2011) (stating that state laws governing assisted reproductive technology "vary widely" and that "a majority of states . . . have no laws directly addressing surrogacy"). *See generally* NAOMI R. CAHN, TEST TUBE FAMILIES: WHY THE FERTILITY MARKET NEEDS LEGAL REGULATION (2009).

[75] KYLE PRUETT, FATHERNEED 207 (2000); *see also* DAVID POPENOE, LIFE WITHOUT FATHER (1996). *See also* Barbara Dafoe Whitehead, *Answered Prayers: Where Is Technological Reproduction Taking Us?*, COMMONWEAL, Oct. 20, 2006, at 133 (citing study finding widespread identity problems among such children resulting from artificial insemination); THE REVOLUTION IN PARENTHOOD, *supra* note 54, at 17 (stating that damage to children raised by same-sex couples may be greater when "[a]dults purposefully conceive a child with the clear intention of separating that child from a biological parent."). *See also* ELIZABETH MARQUARDT, NORVAL D. GLENN & KAREN CLARK, MY DADDY'S NAME IS DONOR: A NEW STUDY OF YOUNG ADULTS CONCEIVED

18

Some dangers of artificial reproduction were adumbrated by Aldous Huxley in his novel, *Brave New World*. In this world, people are created in test tubes in laboratories. Each child is given genes appropriate to a certain function and status. Some are given low intelligence but a strong physical constitution so they can perform menial, physical labor. Others get high intelligence and serve as the ruling class.

Some details of Huxley's vision now seem implausible, but the overall picture is a prescient warning. Artificial reproduction could enable the wealthy to manufacture genetically superior offspring.[76] This would increase class (and perhaps racial) inequality. In short, it would create genetic castes. Artificial reproduction could actually limit reproductive choice. Those with access to reproductive technology would face a Hobson's choice of either using it to fabricate the most advanced product or, by eschewing technology and using natural reproduction, condemn their children to genetic inferiority. Artificial reproduction could also worsen gender inequality.[77]

Some people have superior talents that bring them more prestige, fame, and respect than others enjoy. We accept these inequalities because they seem accidental and randomly bestowed. These inequalities would be hard to justify if talents were manufactured products available only to the wealthy. There is another possibility that homosexuals usually ignore. If, as seems likely, genes are at least a substantial factor in determining sexuality, before long science may identify the genes that contribute to homosexuality.[78] In a culture that honors untrammeled reproductive freedom, what objection could there be to parents' choosing to screen out "gay genes"?

In the novel *The Elementary Particles* by French writer Michel Houellebecq[79] the problems of the human race are "solved" by eliminating love and replacing natural

---

THROUGH SPERM DONATION 5 stating that "on average, young adults conceived through sperm donation are hurting more, are more confused, and feel more isolated from their families. They fare worse than their peers raised by biological parents on important outcomes such as depression, delinquency and substance abuse.") (Inst. for American Values 2010); Alessandra Rafferty, *Donor-Conceived and Out of the Closet*, NEWSWEEK, Feb. 25, 2001, at x.

[76] *See generally* MAXWELL J. MEHLMAN & JEFFREY R. BOTKIN, ACCESS TO THE GENOME: THE CHALLENGE TO EQUALITY (1998).

[77] Some feminists have warned of the dangers of artificial reproduction under male control. *See* Christine Stolba, *Overcoming Motherhood: Pushing the Limits of Reproductive Choice*, POLICY REV., Dec. 2002-Jan. 2003, at x.

[78] A team of Chinese biologists found that male mice genetically engineered to lack serotonin exhibited homosexual behavior; male mice with serotonin did not. *See* Janelle Weaver, Is Homosexuality Based on a Brain Chemical? (Mar. 25, 2011), *available at* http://www.livescience.com/13408-brain-chemical-serotonin-sexual-orientation.html/

[79] MICHEL HOUELLEBECQ, THE ELEMENTARY PARTICLES (1998).

reproduction with cloning so that all people are genetically identical. This certainly does eliminate inequality, but what then is the purpose of life? What happens to the idea that every person is unique and has a right to his own personality and beliefs and to choose his own, unique life plan? Most people would consider Houellebecq's world not idyllic but horrible. It might be better to avoid these problems of artificial reproduction by severely restricting its use to begin with.

More generally, artificial reproduction threatens relationships between children and parents. What will happen to the bonds between parents and their first child when the parents get a genetically enhanced second child who is bigger, stronger, smarter, healthier, and better looking than the first?[80] In short, what will happen to relations between parents and children when children become manufactured products? Artificial reproduction threatens to transform what it means to be human. We consider ourselves a different species from Neanderthals and other earlier humanoids. At what point would genetically enhanced beings become so different from us as to be a different species, one that renders *homo sapiens* as obsolete as the Neanderthals now are? For these reasons some consider most artificial reproduction a denial of the child's human rights.[81] Because of its dangers many foreign countries regulate artificial reproduction.[82]

A total ban on artificial reproduction may go too far. In some cases a married woman and man cannot conceive a child by coitus but only by in vitro fertilization. It is hard to see a strong objection to this, which does not involve separation of the child from its biological parents. Permitting any artificial reproduction, however, puts the law on a very slippery slope. Immediately there will be demands based on the cry of "equality" to permit *every* form of artificial reproduction.[83] Such demands must be resisted.

## IV. The Importance of Blood Ties

---

[80] This scenario is not entirely fanciful. An online sperm and egg bank is being established that will accept only donations from beautiful people so that ugly people can have beautiful children. *See Dating Site Creates Online Sperm and Egg Bank*, NEWSWEEK, *Available at* http://www.newsweek.com/blogs/techtonic-shifts/2010/06/21/dating-site-creates-online-sperm-and-egg-bank.html.

[81] "The obligations we owe to human beings include not to manufacture them; not to make them into objects or commodities; and to respect their right not to be designed by another human being." SOMERVILLE, *supra* note x, at 122.

[82] *See generally* CAHN, *supra* note x; MERIN, *supra* note x, at 254 (stating that "all European countries except the Netherlands explicitly prohibit lesbians (and single women) from obtaining" alternative reproductive services)..

[83] *See, e.g.*, Radhika Rao, *Equal Liberty: Assisted Reproductive Technology and Reproductive Equality*, 76 GEO. WASH. L. REV. 1457 (2008) (urging courts to focus on reproductive equality rather than making substantive determinations about artificial reproduction); Andrew B. Coan, *Assisted Reproductive Equality: An Institutional Analysis*, 60 CASE W. L. REV. 1143 (2010) (*semble*).

Most people instinctively value blood ties. The American slave hymn, *Sometimes I Feel Like a Motherless Child*, moves most people.[84] Many couples that have difficulty in conceiving a child make heroic efforts to do so, often at great expense and enduring humiliating and painful medical procedures.

Nonetheless, there is a movement to reduce or eliminate the social and legal significance of the biological nexus between parents and children.[85] It is argued that "parents" should be those who really perform normal parenting functions.[86] This would deprive biological parents of any rights in their children and deny children any rights in their biological parents. Most people would consider that prospect appalling.

Because homosexuals can get children only through adoption or artificial reproduction, homosexual activists support the movement to disparage blood ties. William Eskridge says that recognizing SSM "involves the reconfiguration of the family, de-emphasizing blood, gender, and kinship ties. . . . Gay experience with 'families we choose' delinks family from gender, blood, and kinship. Gay families . . . often form no more than a shadowy connection between the larger kinship groups."[87] As David Blankenhorn says, children in a homosexual household will not be treated as the victims of a tragedy; rather "it will be explained to everyone, including the children, that something wonderful has happened!"[88] Homosexuals may tell children conceived by artificial insemination that they do not have a mother or a father.[89]

As Eskridge suggests, validating SSM would affect not only children in homosexual households. By changing the meaning of parenthood it would affect all children. Traditionally biological parents have inalienable duties to their children. As the adages say, you can choose your friends but not your relatives, and home is where they

---

[84] The hymn stems from the practice of deliberately separating a slave mother and child by the sale of one or another. *See* WILLIAM E. BARTON, HYMNS OF THE SLAVE AND THE FREEDMAN 17 (n.p.d.).

[85] They are not the only supporters. Feminists who want to diminish or abolish the rights of biological fathers (including sperm donors in artificial insemination) are also advocates. *See* Susan Frelich Appleton, Gender and Parentage: Family Law's Equality Project in Our Empirical Age 6-7 (June 21, 2010), *available at* http://ssrn.com/abstract=1628232.

[86]*See id.*

[87] WILLIAM N. ESKRIDGE, JR., GAYLAW: CHALLENGING APARTHEID IN THE CLOSET 11 (1999).

[88] David Blankenhorn, *Protecting Marriage to Protect Children*, L.A. TIMES, Sept. 19, 2008, at xx.

[89]*See* Jerry Mahoney, *Mom/Not Mom/Aunt*, N.Y. TIMES, July 16, 2010, at x (reporting that the author and his homosexual partner were told by their surrogacy agency "not to use the 'm-word. 'This child will have two fathers,' the staff member scolded. 'He or she will have an egg donor and a surrogate, but no mother." *See also supra* note 53.

can't turn you away. "De-emphasizing blood" and validating "families we choose" imply that biological parents may choose to eschew those duties. If biology is irrelevant, parents have no more rights in or responsibility to their biological children than any other adults. The law could abandon consistency and continue to impose duties on biological parents despite "de-emphasizing blood" in favor of "families we choose," but the new social meaning of parenthood would make it harder to enforce those duties.

Ironically, many same-sex couples who do have children tacitly confirm the importance of blood ties. They often arrange get an infant who is the biological child of one member of the couple. Many people consider this inadequate and argue for a "birthright of children to be connected to their mothers and fathers."[90] As a French parliamentary commission put it, "The interests of the child must outweigh the exercise of the freedom of adults."[91] The United Nations Convention on the Rights of the Child states that each child "shall have, as far as possible, the right to know and be cared for by his or her parents."[92] David Blankenhorn argues that "children have the right, insofar as society can make it possible, to know and to be cared for by the two parents who brought them into this world."[93]

The law has begun to recognize a right of offspring of artificial insemination to know who their fathers are.[94] If children born of "surrogate mothers" have not demanded to know who their mothers are, that is only because surrogacy is so new that few children of surrogates are old enough yet to assert their rights.

Does a mere right to know one's biological parents go far enough? These children have already been denied the right to grow up with their real parents. If that happened because their guardians had bought or stolen the child from the parents, we would

---

[90] Daniel Cere, *War of the Ring, in* DIVORCING MARRIAGE: UNVEILING THE DANGERS IN CANADA'S NEW SOCIAL EXPERIMENT 9, 11 (Daniel Cere & Douglas Farrow eds., 2004). *See also* Margaret Somerville, *What About the Children?, in id.* at 67.

[91] Commission Report to Parliament on the Family and the Rights of Children 48, National Assembly, France (Jan. 25, 2006) (Eng. translation), *quoted in* DeSerres, *supra* note 48, at 112.

[92] UNITED NATIONS, CONVENTION ON THE RIGHTS OF THE CHILD, Art. VII (1989).

[93] Blankenhorn, *supra* note x, at xx. *See also* Daniel Cere, *Toward an Integrative Account of Parenthood, in* WHAT IS PARENTHOOD? X, x (Daniel Cere & Linda McClain, eds. forthcoming) (referring to children's rights "to a maternal bond" and to "be connected to their genetically-related parents").

[94] *See* Neal Hall, *Daughter of Sperm Donor Seeks to Know Identity of Biological Father,* VANCOUVER SUN, Oct. 27, 2008, at xx. Some children are deploying sophisticated techniques to find their fathers despite legal obstacles. *See* Rachel Lehmann-Haupt, *Are Sperm Donors Really Anonymous Anymore?,* SLATE, March 1, 2010, *available at* http://www.slate.com/toolbar.aspx?action=print&id-2243743.

22

consider the child gravely wronged and injured. How is a child any less wronged or injured by artificial reproduction?

Some argue that many children already live with homosexual adults and will continue to do so even if we do not recognize SSM, so we may as well recognize it and give those children the resulting benefits.[95] This argument assumes, however, that recognizing SSM will affect only homosexuals who marry and will not diminish the existing benefits of marriage. This discussion here shows, however, that recognizing SSM will profoundly change the meaning of marriage from a child-centered institution to one intended primarily for the gratification of adults. This change would diminish respect for marriage and probably impair its benefits to children.

Recognizing SSM may not even generate much benefit for children with homosexual guardians. The benefits of marriage to children arise mainly from binding them with their biological parents. With SSM, this is impossible. Many gay couples have children because one of the child's biological parents left the other and now lives with another adult. I know of no evidence that children benefit if those two people are married, even if they are of different genders. It is speculative that children in a gay household will benefit if the adults are in a recognized marriage. The number of children in gay households is also small, so that any benefits to those children would likely be outweighed by damage to the much larger number of other children.[96]

### Conclusion

The claim that there is "no difference" between homosexual and heterosexual parents[97] is ambiguous. If it means that same-sex couples are as good as single parents, the statement may be true, but it is largely irrelevant to the debate over same-sex marriage where the issue is whether SSM is just as good as traditional marriage. If the claim is that same-sex parents are just as good as married, biological parents, the statement is not supported by any substantial evidence and is almost certainly false. Empirical studies indicate some problems with same-sex parenting, and inductive reasons give further cause for concern.

---

[95] *See* Carpenter, *supra* note x, at 320.

[96] Dale Carpenter gives some numbers that are hard to reconcile. At one point he estimates the number of such children as "at least a million." Carpenter, *supra* note x, at 320. However, he also recites an estimate of 777,000 same-sex couple households and says that "about 20% or all male couple households in the United States and one-third of all female couple households in the United States are raising children." *Id.* That would mean 200,000-250,000 such households, which would have to have an average of four to five children each to bring the total of children to 1,000,000. That seems unlikely.

[97] *See supra* note x and accompanying text.

23

Supporters of SSM want to change marriage--an institution that has been fundamental in every culture in every corner of the globe throughout history--in a way that, with a few recent exceptions, has never been tried before. Minimal prudence forbids such a radical change until we have strong evidence that it will do no harm. In other words, the burden of proof should be on advocates of SSM. They cannot sustain that burden now, and it unlikely that they will ever be able to do so because only traditional marriage is rooted in human nature.[98] Accordingly, same-sex marriage should not be recognized at law, artificial reproduction should be permitted only to traditional married couples, and adoption by same-sex couples should be allowed only in limited circumstances.

---

[98] *See* Redding, *supra* note x, at 143 (stating that the importance of these issues "argues for setting a fairly demanding standard when relying on lesbigay parenting research in guiding public policy.").

24