12-2335-cv(L)
<u>Windsor v. United States</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued: September 27, 2012    Decided: October 18, 2012)

Docket No. 12-2335-cv(L); 12-2435(Con)

- - - - - - - - - - - - - - - - - - - -x

EDITH SCHLAIN WINDSOR, IN HER OFFICIAL CAPACITY AS EXECUTOR
OF THE ESTATE OF THEA CLARA SPYER,

<u>Plaintiff-Appellee</u>,

- v.-

UNITED STATES OF AMERICA,

<u>Defendant-Appellant</u>,

and

BIPARTISAN LEGAL ADVISORY GROUP OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,

<u>Intervenor-Defendant-Appellant</u>.

- - - - - - - - - - - - - - - - - - - -x

Before:        JACOBS, <u>Chief Judge</u>, STRAUB and DRONEY,
               <u>Circuit Judges</u>.

Intervenor Bipartisan Legal Advisory Group of the

United States House of Representatives appeals from an order

of the United States District Court for the Southern

District of New York granting summary judgment in favor of

1    the surviving spouse of a same-sex couple who was denied the

2    benefit of the spousal deduction under federal tax law.  The

3    United States, the defendant, is a nominal appellant.  For

4    the following reasons, we conclude that Section 3 of the

5    Defense of Marriage Act violates equal protection and is

6    therefore unconstitutional.

7         Judge STRAUB dissents in part and concurs in part in a

8    separate opinion.

9                              STUART F. DELERY, Acting
10                             Assistant Attorney General,
11                             United States Department of
12                             Justice, Washington, DC (Michael
13                             Jay Singer, August E. Flentje,
14                             on the brief), for Defendant-
15                             Appellant.
16
17                             PAUL D. CLEMENT, Bancroft PLLC,
18                             Washington, DC (H. Christopher
19                             Bartolomucci, Conor B. Dugan,
20                             and Nicholas J. Nelson, on the
21                             brief; Kerry W. Kircher, William
22                             Pittard, Christine Davenport,
23                             Todd B. Tatelman, Mary Beth
24                             Walker, Office of General
25                             Counsel, United States House of
26                             Representatives, Washington, DC,
27                             of counsel), for Intervenor-
28                             Defendant-Appellant.
29
30                             ROBERTA A. KAPLAN, Paul, Weiss,
31                             Rifkind, Wharton & Garrison LLP,
32                             New York, NY (Andrew J. Ehrlich,
33                             Jaren Janghorbani, Paul, Weiss,
34                             Rifkind, Wharton & Garrison LLP,
35                             New York, NY, James D. Esseks
36                             and Rose A. Saxe, American Civil

```
 1                        Liberties Union, New York, NY,
 2                        and Melissa Goodman, Arthur
 3                        Eisenberg, and Mariko Hirose,
 4                        New York Civil Liberties Union
 5                        Foundation, New York, NY, on the
 6                        brief), for Appellee.
 7
 8                        Vincent P. McCarthy, Litchfield,
 9                        CT, for amicus curiae American
10                        College of Pediatricians in
11                        support of Intervenor-Defendant-
12                        Appellant.
13
14                        Joseph A. Campbell, Alliance
15                        Defending Freedom, Scottsdale,
16                        AZ, for amicus curiae Frederick
17                        Douglas Foundation in support of
18                        Intervenor-Defendant-Appellant.
19
20                        Cecilia Noland-Heil, American
21                        Center for Law & Justice,
22                        Virginia Beach, VA (Erik
23                        Zimmerman, Jay Alan Sekulow and
24                        Stuart J. Roth, American Center
25                        for Law & Justice, Virginia
26                        Beach, VA and Washington, DC, on
27                        the brief), for amici curiae
28                        Former Attorneys General Edwin
29                        Meese III and John Ashcroft in
30                        support of Intervenor-Defendant-
31                        Appellant.
32
33                        Gregory F. Zoeller, Attorney
34                        General, State of Indiana,
35                        Indianapolis, IN (Thomas M.
36                        Fisher, Solicitor General, Ellen
37                        H. Meilaender, Deputy Attorney
38                        General, on the brief), for
39                        amici curiae States of Indiana,
40                        Alabama, Alaska, Arizona,
41                        Colorado, Georgia, Idaho,
42                        Kansas, Michigan, Nebraska,
43                        Oklahoma, South Carolina, South
44                        Dakota and Virginia in support
```

3

```
1              of Intervenor-Defendant-
2              Appellant.
3
4              Joshua K. Baker, National
5              Organization for Marriage,
6              Washington, DC (William C.
7              Duncan, Marriage Law Foundation,
8              Lehi, UT, on the brief), for
9              amicus curiae National
10             Organization for Marriage in
11             support of Intervenor-Defendant-
12             Appellant.
13
14             Steven W. Fitschen, The National
15             Legal Foundation, Virginia
16             Beach, VA, for amicus curiae
17             Concerned Women for America in
18             support of Intervenor-Defendant-
19             Appellant.
20
21             William F. Sheehan, Goodwin
22             Procter LLP, Washington, DC
23             (Andrew S. Hudson, Goodwin
24             Procter LLP, Washington, DC and
25             Nathalie F.P. Gilfoyle, American
26             Psychological Association,
27             Washington, DC, on the brief),
28             for amici curiae the American
29             Psychological Association, the
30             American Academy of Pediatrics,
31             the American Psychiatric
32             Association, the American
33             Psychoanalytic Association, the
34             National Association of Social
35             Workers and its New York City
36             and State Chapters, and the New
37             York State Psychological
38             Association in support of
39             Plaintiff-Appellee.
40
41             Susan L. Sommer, Lambda Legal
42             Defense & Education Fund, Inc.,
43             New York, NY (Timothy S. Fischer
44             and Brian P. Rice, McCarter &
```

4

```
 1                         English, LLP, Hartford, CT and
 2                         Shannon P. Minter and
 3                         Christopher F. Stoll, National
 4                         Center for Lesbian Rights, San
 5                         Francisco, CA, on the brief),
 6                         for amici curiae Bar
 7                         Associations and Public Interest
 8                         and Legal Service Organizations
 9                         in Support of Plaintiff-
10                         Appellee.
11
12                         Matthew F. Damm, O'Melveny &
13                         Myers LLP, New York, NY (Dawn
14                         Sestito, Demitri D. Portnoi, and
15                         Amy R. Lucas, O'Melveny & Myers
16                         LLP, Los Angeles, CA and New
17                         York, NY, on the brief), for
18                         amici curiae Family Law
19                         Professors in Support of
20                         Plaintiff-Appellee.
21
22                         Michael A. Cardozo, Corporation
23                         Counsel of the City of New York,
24                         New York, NY (Francis F. Caputo,
25                         Susan Paulson, on the brief),
26                         for amici curiae the City of New
27                         York, the Council of the City of
28                         New York, Michael R. Bloomberg,
29                         in His Official Capacity as
30                         Mayor of the City of New York,
31                         and Christine C. Quinn, in Her
32                         Official Capacity as Speaker of
33                         the Council of the City of New
34                         York in Support of Plaintiff-
35                         Appellee.
36
37                         Mark Wolinsky, Wachtell, Lipton,
38                         Rosen & Katz, New York, NY
39                         (Jonathan M. Moses, Kevin S.
40                         Schwartz, Luke M. Appling, on
41                         the brief), for amicus curiae
42                         the Partnership for New York
43                         City in Support of Plaintiff-
44                         Appellee.
```

5

```
 1                              Suzanne B. Goldberg, Columbia
 2                              Law School, New York, NY, for
 3                              amicus curiae Columbia Law
 4                              School Sexuality & Gender Law
 5                              Clinic in Support of Plaintiff-
 6                              Appellee.
 7
 8                              Catherine R. Connors, Pierce
 9                              Atwood LLP, Portland, ME, for
10                              amici curiae Historians in
11                              Support of Plaintiff-Appellee.
12
13                              Miriam R. Nemetz, Mayer Brown
14                              LLP, Washington, DC (Kathleen
15                              Connery Dawe and Michael B.
16                              Kimberly, Mayer Brown LLP,
17                              Washington, DC, and Heather C.
18                              Sawyer, Committee on the
19                              Judiciary, John Conyers, Jr.,
20                              and Jerrold Nadler, Ranking
21                              Members, Washington, DC), for
22                              amici curiae Members of the U.S.
23                              House of Representatives, in
24                              Support of Plaintiff-Appellee.
25
26                              Nicole G. Berner, Washington, DC
27                              (James B. Coppess, AFL-CIO,
28                              Washington, DC, Patrick
29                              Szymanski, Change to Win,
30                              Washington, DC, and Alice
31                              O'Brien, National Education
32                              Association, Washington, DC, on
33                              the brief), for amici curiae
34                              American Federation of Labor and
35                              Congress of Industrial
36                              Organizations, Change to Win,
37                              and National Education
38                              Association in support of
39                              Plaintiff-Appellee.
40
41                              Joseph F. Tringali, Simpson
42                              Thacher & Bartlett LLP, New
43                              York, NY (Alexandra C. Pitney
44                              and Nicholas S. Davis, on the
```

6

```
 1                          brief), for amici curiae Service
 2                          and Advocacy for Gay, Lesbian,
 3                          Bisexual and Transgender Elders
 4                          (SAGE), National Senior Citizens
 5                          Law Center and American Society
 6                          on Aging in support of
 7                          Plaintiff-Appellee.
 8
 9                          Debo P. Adegbile, NAACP Legal
10                          Defense & Education Fund, Inc.,
11                          New York, NY (Elice C. Boddie,
12                          Rachel M. Kleinman, Ria A.
13                          Tabacco, Joshua Civin, NAACP
14                          Legal Defense & Education Fund,
15                          Inc., New York, NY, and
16                          Washington, DC), for amicus
17                          curiae NAACP Legal Defense &
18                          Education Fund, Inc., in support
19                          of Plaintiff-Appellee.
20
21                          Harvey J. Wolkoff, Ropes & Gray
22                          LLP, New York, NY (Stuart W.
23                          Yothers and Samuel P. Bickett,
24                          Ropes & Gray LLP, New York, NY
25                          and Steven M. Freeman and Seth
26                          M. Marnin, Anti-Defamation
27                          League, New York, NY, on the
28                          brief), for amici curiae Anti-
29                          Defamation League, Central
30                          Conference of American Rabbis,
31                          Congregation Beit Simchat Torah,
32                          Bend the Arc: A Jewish
33                          Partnership for Justice,
34                          Hadassah: the Women's Zionist
35                          Organization of America, the
36                          Hindu American Foundation,
37                          Interfaith Alliance Foundation,
38                          Japanese Citizens League, the
39                          Justice and Witness Ministries:
40                          United Church of Christ,
41                          National Counsel of Jewish
42                          Women, People for the American
43                          Way Foundation, Union for Reform
44                          Judaism, Women's League for
```

```
 1                          Conservative Judaism, and Women
 2                          of Reform Judaism in support of
 3                          Plaintiff-Appellee.
 4
 5                          Sharon L. Nelles, Sullivan &
 6                          Cromwell LLP, New York, NY (H.
 7                          Rodgin Cohen, Mitchell S. Eitel,
 8                          William H. Wagener, Heather H.
 9                          Volik, Diana G. Iskelov,
10                          Sullivan & Cromwell LLP, New
11                          York, NY and Laura W. Brill and
12                          Meaghan Field, Kendall Brill &
13                          Klieger LLP, Los Angeles, CA, on
14                          the brief), for amici curiae
15                          Professors of Family and Child
16                          Welfare Law in support of
17                          Plaintiff-Appellee.
18
19                          Eric T. Schneiderman, Attorney
20                          General, State of New York, New
21                          York, NY (William H. Sorrell,
22                          Attorney General, State of
23                          Vermont, Montpelier, VT and
24                          George Jepsen, Attorney General,
25                          State of Connecticut, Hartford,
26                          CT, on the brief) for amici
27                          curiae States of New York,
28                          Vermont, and Connecticut in
29                          support of neither party.
30
31                          Melanie Sloan, Citizens for
32                          Responsibility and Ethics in
33                          Washington, Washington, DC,
34                          (Anne L. Weismann, Citizens for
35                          Responsibility and Ethics in
36                          Washington, Washington, DC and
37                          Alan B. Morrison, George
38                          Washington Law School,
39                          Washington, DC, on the brief),
40                          for amicus curiae Citizens for
41                          Responsibility and Ethics in
42                          Washington in support of neither
43                          party.
44
```

8

1  DENNIS JACOBS, <u>Chief Judge</u>:

2      Plaintiff Edith Windsor sued as surviving spouse of a

3  same-sex couple that was married in Canada in 2007 and was

4  resident in New York at the time of her spouse's death in

5  2009.  Windsor was denied the benefit of the spousal

6  deduction for federal estate taxes under 26 U.S.C. § 2056(A)

7  solely because Section 3 of the Defense of Marriage Act

8  ("DOMA"), 1 U.S.C. § 7, defines the words "marriage" and

9  "spouse" in federal law in a way that bars the Internal

10  Revenue Service from recognizing Windsor as a spouse or the

11  couple as married.  The text of § 3 is as follows:

12      In determining the meaning of any Act of Congress, or
13      of any ruling, regulation, or interpretation of the
14      various administrative bureaus and agencies of the
15      United States, the word "marriage" means only a legal
16      union between one man and one woman as husband and
17      wife, the word "spouse" refers only to a person of the
18      opposite sex who is a husband or a wife.

19  1 U.S.C. § 7.  At issue is Windsor's claim for a refund in

20  the amount of $363,053, which turns on the constitutionality

21  of that section of federal law.

22      For the reasons that follow we hold that:

23      **I.**  Windsor has standing in this action because we

24  predict that New York, which did not permit same-sex

25  marriage to be licensed until 2011, would nevertheless have

9

1    recognized Windsor and Thea Clara Spyer as married at the

2    time of Spyer's death in 2009, so that Windsor was a

3    surviving spouse under New York law.

4        **II.**  Windsor's suit is not foreclosed by Baker v.

5    Nelson, 409 U.S. 810 (1971), which held that the use of the

6    traditional definition of marriage for a state's own

7    regulation of marriage status did not violate equal

8    protection.

9        **III.**  Section 3 of DOMA is subject to intermediate

10   scrutiny under the factors enumerated in City of Cleburn v.

11   Cleburn Living Center, 473 U.S. 431 (1985), and other cases.

12       **IV.**  The statute does not withstand that review.

13                              *  *  *

14       On June 6, 2012, the United States District Court for

15   the Southern District of New York (Jones, J.) granted

16   summary judgment in favor of Windsor in a thorough opinion.

17   Windsor v. United States, 833 F. Supp. 2d 394 (S.D.N.Y.

18   2012).  The court ruled that Section 3 of DOMA violated the

19   equal protection because there was no rational basis to

20   support it.  Id. at 406.  "We review a district court's

21   grant of summary judgment de novo, construing the record in

22   the light most favorable to the nonmoving party."  Church of

10

1    <u>American Knights of the Ku Klux Klan v. Kerik</u>, 356 F.3d 197,

2    203 (2d Cir. 2004).

3        A preliminary issue concerning alignment of the parties

4    on appeal has been presented by motion.  The United States,

5    initially named as the sole defendant, conducted its defense

6    of the statute in the district court up to a point.  On

7    February 23, 2011, three months after suit was filed, the

8    Department of Justice declined to defend the Act thereafter,

9    and members of Congress took steps to support it.  The

10   Bipartisan Legal Advisory Group of the United States House

11   of Representatives ("BLAG") retained counsel and since then

12   has taken the laboring oar in defense of the statute.  The

13   United States remained active as a party, switching sides to

14   advocate that the statute be ruled unconstitutional.

15       Following the district court's decision, BLAG filed a

16   notice of appeal, as did the United States in its role as

17   nominal defendant.  BLAG moved this Court at the outset to

18   strike the notice of appeal filed by the United States and

19   to realign the appellate parties to reflect that the United

20   States prevailed in the result it advocated in the district

21   court.  The motion is denied.  Notwithstanding the

22   withdrawal of its advocacy, the United States continues to

11

1    enforce Section 3 of DOMA, which is indeed why Windsor does

2    not have her money.  The constitutionality of the statute

3    will have a considerable impact on many operations of the

4    United States.  See INS v. Chadha, 462 U.S. 919, 931 (1983)

5    ("When an agency of the United States is a party to a case

6    in which the Act of Congress it administers is held

7    unconstitutional, it is an aggrieved party for purposes of

8    taking an appeal . . . . The agency's status as an aggrieved

9    party . . . is not altered by the fact that the Executive

10   may agree with the holding that the statute in question is

11   unconstitutional.").

12

13                           **DISCUSSION**

14                               **I**

15        For the purpose of federal estate taxes, the law of the

16   state of domicile ordinarily determines whether two persons

17   were married at the time of death.  Eccles v. Comm'r, 19

18   T.C. 1049, 1051, 1053-54 (1953); Rev. Rul. 58-66, 1958-1

19   C.B. 60 ("The marital status of individuals as determined

20   under state law is recognized in the administration of the

21   Federal income tax laws.").  At the time of Spyer's death in

22   2009, New York did not yet license same-sex marriage itself.

1    A separate question--decisive for standing in this case--is

2    whether in 2009 New York recognized same-sex marriages

3    entered into in other jurisdictions.  That question was

4    presented to the New York Court of Appeals in <u>Godfrey v.</u>

5    <u>Spano</u>, 13 N.Y.3d 358 (2009).  However, the court was able to

6    resolve that case on other grounds, finding "it unnecessary

7    to reach defendants' argument that New York's common-law

8    marriage recognition rule is a proper basis for the

9    challenged recognition of out-of-state same-sex marriages."

10   <u>Id.</u> at 377.

11        When we are faced with a question of New York law that

12   is decisive but unsettled, we may "predict" what the state's

13   law is, consulting any rulings of its intermediate appellate

14   courts and trial courts, or we may certify the question to

15   the New York Court of Appeals.  <u>See State Farm Mut. Auto.</u>

16   <u>Ins. Co. v. Madella</u>, 372 F.3d 500, 505 (2d Cir. 2004).  BLAG

17   urges that we certify this question, observing that this is

18   an option that we have and that the district court did not.

19   We decline to certify.

20        First, the Court of Appeals has signaled its

21   disinclination to decide this very question.  When it

22   elected to decide <u>Godfrey</u> on an alternative sufficient

13

1    ground, the Court of Appeals expressed a preference and

2    expectation that the issue would be decided by the New York

3    legislature: "[w]e . . . hope that the Legislature will

4    address this controversy." Godfrey, 13 N.Y.3d at 377.  We

5    hesitate to serve up to the Court of Appeals a question that

6    it is reluctant to answer for a prudential reason.

7         Second, rulings of New York's intermediate appellate

8    courts are useful and unanimous on this issue.  It is a

9    "well-established principle that the ruling of an

10   intermediate appellate state court is a datum for

11   ascertaining state law which is not to be disregarded by a

12   federal court unless it is convinced by other persuasive

13   data that the highest court of the state would decide

14   otherwise." Statharos v. New York City Taxi and Limousine

15   Comm'n, 198 F.3d 317, 321 (2d Cir. 1999) (internal quotation

16   marks and ellipsis omitted).  Three of New York's four

17   appellate divisions have concluded that New York recognized

18   foreign same-sex marriages before the state passed its

19   marriage statute in 2011.  See In re Estate of Ranftle, 81

20   A.D.3d 566 (1st Dep't 2011) (Windsor's home Department,

21   recognizing a 2008 Canadian marriage); Lewis v. N.Y. State

22   Dep't of Civil Serv., 872 N.Y.S.2d 578 (3rd Dep't 2009),

14

1  <u>aff'd on other grounds sub nom.</u> <u>Godfrey</u>, 13 N.Y.3d 358;

2  <u>Martinez v. Cnty. of Monroe</u>, 850 N.Y.S.2d 740 (4th Dep't

3  2008).  Two of these cases, <u>Lewis</u> and <u>Martinez</u>, were decided

4  *before* Spyer died on February 5, 2009.  Given the consistent

5  view of these decisions, we see no need to seek guidance

6  here.  Because Windsor's marriage would have been recognized

7  under New York law at the time of Spyer's death, she has

8  standing.

9

10                              **II**

11      In <u>Baker v. Nelson</u>, an appeal from a Minnesota Supreme

12  Court decision finding no right to same-sex marriage, the

13  Supreme Court issued a summary dismissal "for want of a

14  substantial federal question."  409 U.S. 810 (1971).  The

15  Minnesota Supreme Court had held that "[t]he equal

16  protection clause of the Fourteenth Amendment, like the due

17  process clause, is not offended by the state's

18  classification of persons authorized to marry." <u>Baker v.</u>

19  <u>Nelson</u>, 291 Minn. 310, 313 (Minn. 1971).  According to BLAG,

20  <u>Baker</u> compels the inference that Congress may prohibit same-

21  sex marriage in the same way under federal law without

22  offending the Equal Protection Clause.  We disagree.

                              15

1    "The Supreme Court has long recognized that the

2    precedential value of a summary dismissal is limited to 'the

3    precise issues presented and necessarily decided by' the

4    dismissal."  Alexander v. Cahill, 598 F.3d 79, 89 n.7 (2d

5    Cir. 2010) (quoting Mandell v. Bradley, 432 U.S. 173, 176

6    (1977)).  The question whether the federal government may

7    constitutionally define marriage as it does in Section 3 of

8    DOMA is sufficiently distinct from the question in Baker:

9    whether same-sex marriage may be constitutionally restricted

10   by the states.  After all, Windsor and Spyer were actually

11   married in this case, at least in the eye of New York, where

12   they lived.  Other courts have likewise concluded that Baker

13   does not control equal protection review of DOMA for these

14   reasons.[1]

_____

      [1] See Massachusetts v. U.S. Dep't of HHS, 682 F.3d 1, 8
(1st Cir. 2012) (finding that Baker permitted equal
protection review so long as arguments did not "rest on a
constitutional right to same-sex marriage"); Windsor, 833 F.
Supp. 2d at 399-400 ("The case before the Court does not
present the same issue as that presented in
Baker. . . . Accordingly, after comparing the issues in
Baker and those in the instant case, the Court does not
believe that Baker 'necessarily decided' the question of
whether DOMA violates the Fifth Amendment's Equal Protection
Clause."); Pedersen v. Office of Pers. Mmgmt., No.
3:10-cv-1750, 2012 WL 3113883, at *11 (D. Conn. July 31,
2012) ("DOMA impacts federal benefits and obligations, but
does not prohibit a state from authorizing or forbidding
same-sex marriage, as was the case in Baker."); Golinski v.
U.S. Office of Pers. Mgmt., 824 F. Supp. 2d 968, 982 n.5

16

1    Even if <u>Baker</u> might have had resonance for Windsor's

2    case in 1971, it does not today.  "'[I]nferior federal

3    courts had best adhere to the view that if the Court has

4    branded a question as unsubstantial, it remains so *except*

5    *when doctrinal developments indicate otherwise*.'"  <u>Hicks v.</u>

6    <u>Miranda</u>, 422 U.S. 332, 344 (1975) (quoting <u>Port Auth.</u>

7    <u>Bondholders Protective Comm. v. Port of N.Y. Auth.</u>, 387 F.2d

8    259, 263 n.3 (2d Cir. 1967) (Friendly, <u>J.</u>)) (emphasis

9    added).  In the forty years after <u>Baker</u>, there have been

10   manifold changes to the Supreme Court's equal protection

11   jurisprudence.

12       When <u>Baker</u> was decided in 1971, "intermediate scrutiny"

13   was not yet in the Court's vernacular.  <u>See Craig v. Boren</u>,

14   429 U.S. 190, 218 (1976) (Rehnquist, <u>J.</u>, dissenting)

15   (coining "intermediate level scrutiny").  Classifications

_____

(N.D. Cal. 2012) ("The failure of the federal government to
recognize Ms. Golinski's marriage and to provide benefits
does not alter the fact that she is married under state
law."); <u>Dragovich v. U.S. Dept. of Treasury</u>, No. 4:10-cv-
01564-CW, 2012 WL 1909603, at *6-7 (N.D. Cal. May 24, 2012);
<u>Smelt v. Cnty of Orange</u>, 374 F. Supp. 2d. 861, 872-74 (C.D.
Cal. 2005), <u>vacated in part on other grounds</u>, 447 F.3d 673
(9th Cir. 2006); <u>In re Kandu</u>, 315 B.R. 123, 135-38 (Bankr.
W.D. Wash. 2004); <u>see also</u> <u>Perry v. Brown</u>, 671 F.3d 1052,
1082 n. 14 (9th Cir. 2012) (finding that <u>Baker</u> did not
preempt consideration of Proposition 8 case, because "the
question of the constitutionality of a *state's* ban on
same-sex marriage" was not before the court) (emphasis
added).

based on illegitimacy and sex were not yet deemed quasi-
suspect. See Lalli v. Lalli, 439 U.S. 259, 264-65, 275
(1982) (applying intermediate scrutiny to a classification
based on illegitimacy, and describing how heightened
scrutiny had been used for such classifications starting in
1976); Frontiero v. Richardson, 411 U.S. 677, 682 (1973)
(plurality opinion) (identifying sex as a suspect class);
Boren, 429 U.S. at 197-98 (applying intermediate scrutiny to
a classification based on sex); United States v. Virginia,
518 U.S. 515, 575 (1996) (Scalia, J., dissenting)
(summarizing that sex-based classifications were analyzed
with rational basis review before the 1970's).[2]  The Court
had not yet ruled that "a classification of [homosexuals]
undertaken for its own sake" actually lacked a rational
basis. Romer v. Evans, 517 U.S. 620, 635 (1996).  And, in
1971, the government could lawfully "demean [homosexuals']
existence or control their destiny by making their private
sexual conduct a crime." Lawrence v. Texas, 539 U.S. 558,
574, 578 (2003) (noting that there was a "tenable" equal

---

[2] While other classifications have been deemed quasi-
suspect or suspect over the years, the decisions to add sex
and illegitimacy are especially helpful in analyzing whether
the classification made in DOMA merits intermediate
scrutiny.

1    protection argument against such laws, but choosing instead

2    to overturn <u>Bowers v. Hardwick</u>, 478 U.S. 186 (1986)).  These

3    doctrinal changes constitute another reason why <u>Baker</u> does

4    not foreclose our disposition of this case.

5         The First Circuit has suggested in dicta that

6    recognition of a new suspect classification in this context

7    would "imply[] an overruling of <u>Baker</u>."  <u>See</u> <u>Massachusetts</u>,

8    682 F.3d at 9.  We disagree for two reasons that the First

9    Circuit did not discuss.  First, when it comes to marriage,

10   legitimate regulatory interests of a state differ from those

11   of the federal government.  Regulation of marriage is "an

12   area that has long been regarded as a virtually exclusive

13   province of the States."  <u>Sosna v. Iowa</u>, 419 U.S. 393, 404

14   (1975).  It has for very long been settled that "[t]he

15   State . . . has [the] absolute right to prescribe the

16   conditions upon which the marriage relation between its own

17   citizens shall be created, and the causes for which it may

18   be dissolved."  <u>Pennoyer v. Neff</u>, 95 U.S. 714, 734-35

19   (1878), <u>overruled on other grounds by Shaffer v. Heitner</u>,

20   433 U.S. 186 (1977).  Therefore, our heightened scrutiny

21   analysis of DOMA's marital classification under federal law

22   is distinct from the analysis necessary to determine whether

23   the marital classification of a state would survive such

24   scrutiny.

1       Second, the Supreme Court's decision to apply rational

2   basis review in Romer does not imply to us a refusal to

3   recognize homosexuals as a quasi-suspect class.  See

4   Massachusetts, 682 F.3d at 9.  The litigants in Romer had

5   abandoned their quasi-suspect argument after the trial court

6   decision.  See Romer, 517 U.S. at 640 n.1 (Scalia, J.,

7   dissenting).  We are satisfied, for these reasons, that

8   Baker has no bearing on this case.

9

10                              III

11      "In deciding an equal protection challenge to a statute

12  that classifies persons for the purpose of receiving

13  [federal] benefits, we are required, so long as the

14  classifications are not suspect or quasi-suspect and do not

15  infringe fundamental constitutional rights, to uphold the

16  legislation if it bears a rational relationship to a

17  legitimate governmental objective."  Thomas v. Sullivan, 922

18  F.2d 132, 136 (2d Cir. 1990).  Of course, "'a

19  bare . . . desire to harm a politically unpopular group

20  cannot constitute a legitimate government interest.'"  Romer

21  v. Evans, 517 U.S. 620, 634-35 (1996) (quoting Dep't. of

22  Agric. v. Moreno, 413 U.S. 528, 534 (1973)).  So while

23  rational basis review is indulgent and respectful, it is not

20

1  meant to be "toothless."  Schweiker v. Wilson, 450 U.S. 221,

2  234 (1981) (quoting Mathews v. Lucas, 427 U.S. 495, 510

3  (1976)).

4     The district court ruled that DOMA violated the Equal

5  Protection Clause for want of a rational basis.  Windsor,

6  833 F. Supp. 2d at 406.  But the existence of a rational

7  basis for Section 3 of DOMA is closely argued.  BLAG and its

8  amici proffer several justifications that alone or in tandem

9  are said to constitute sufficient reason for the enactment.

10  Among these reasons are protection of the fisc, uniform

11  administration of federal law notwithstanding recognition of

12  same-sex marriage in some states but not others, the

13  protection of traditional marriage generally, and the

14  encouragement of "responsible" procreation.

15     Windsor and her amici vigorously argue that DOMA is not

16  rationally related to any of these goals.  Rational basis

17  review places the burden of persuasion on the party

18  challenging a law, who must disprove "'every conceivable

19  basis which might support it.'"  Heller v. Doe, 509 U.S.

20  312, 320 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts

21  Co., 410 U.S. 356, 364 (1973)).  So a party urging the

22  absence of any rational basis takes up a heavy load.  That

23  would seem to be true in this case--the law was passed by

1    overwhelming bipartisan majorities in both houses of

2    Congress; it has varying impact on more than a thousand

3    federal laws; and the definition of marriage it affirms has

4    been long-supported and encouraged.

5        On the other hand, several courts have read the Supreme

6    Court's recent cases in this area to suggest that rational

7    basis review should be more demanding when there are

8    "historic patterns of disadvantage suffered by the group

9    adversely affected by the statute." See Massachusetts, 682

10   F.3d at 10-11; Able v. U.S., 155 F.3d 628, 634 (2d Cir.

11   1998); United States v. Then, 56 F.3d 464, 468 (2d Cir.

12   1995) (Calabresi, J., concurring).  Proceeding along those

13   lines, the district court in this case and the First Circuit

14   in Massachusetts both adopted more exacting rational basis

15   review for DOMA.  See Massachusetts, 682 F.3d at 11

16   (describing its "more careful assessment"); Windsor, 833 F.

17   Supp. 2d at 402 (noting that "rational basis analysis can

18   vary by context").  At argument, counsel for BLAG wittily

19   characterized this form of analysis as "rational basis plus

20   or intermediate scrutiny minus."  Oral Arg. Tr. 16:10-12.

21       The Supreme Court has not expressly sanctioned such

22   modulation in the level of rational basis review; discussion

23   pro and con has largely been confined to concurring and

22

1    dissenting opinions.[3]  We think it is safe to say that there

2    is some doctrinal instability in this area.

3         Fortunately, no permutation of rational basis review is

4    needed if heightened scrutiny is available, as it is in this

5    case.  We therefore decline to join issue with the dissent,

6    which explains why Section 3 of DOMA may withstand rational

7    basis review.

_____

   [3] *Compare* <u>Lawrence</u>, 539 U.S. at 580 (O'Connor, <u>J.</u>,
concurring) ("When a law exhibits such a desire to harm a
politically unpopular group, we have applied a more
searching form of rational basis review to strike down such
laws under the Equal Protection Clause.") *and* <u>U.S. R.R. Ret.
Bd. v. Fritz</u>, 449 U.S. 166, 188 (1980) (Brennan, <u>J.</u>,
dissenting) ("In other cases, however, the courts must probe
more deeply.") *with* <u>City of Cleburne, Tex. v. Cleburne
Living Center</u>, 473 U.S. 432, 459-60 (1985) (Marshall, <u>J.</u>,
concurring in part and dissenting in part) ("The refusal to
acknowledge that something more than minimum rationality
review is at work here is, in my view,
unfortunate . . . . [B]y failing to articulate the factors
that justify today's 'second order' rational-basis review,
the Court provides no principled foundation for determining
when more searching inquiry is to be invoked.  Lower courts
are thus left in the dark on this important question, and
this Court remains unaccountable for its decisions
employing, or refusing to employ, particularly searching
scrutiny.") *and* <u>Mass. Bd. of Ret. v. Murgia</u>, 427 U.S. 307,
321 (1976) (Marshall, <u>J.</u>, dissenting) ("[T]he Court has
rejected, albeit Sub silentio, its most deferential
statements of the rationality standard in assessing the
validity under the Equal Protection Clause of much
noneconomic legislation."). <u>But see</u> <u>U.S. R.R. Ret. Bd.</u>, 449
U.S. at 176 n.10 ("The comments in the dissenting opinion
about the proper cases for which to look for the correct
statement of the equal protection rational-basis standard,
and about which cases limit earlier cases, are just that:
comments in a dissenting opinion.").

Case: 12-2335   Document: 44-1   Page: 24   10/18/2012   75xxxx   of 3

1    Instead, we conclude that review of Section 3 of DOMA

2    requires heightened scrutiny.  The Supreme Court uses

3    certain factors to decide whether a new classification

4    qualifies as a quasi-suspect class.  They include: A)

5    whether the class has been historically "subjected to

6    discrimination," Bowen v. Gilliard, 483 U.S. 587, 602

7    (1987); B) whether the class has a defining characteristic

8    that "frequently bears [a] relation to ability to perform or

9    contribute to society," Cleburne, 473 U.S. at 440-41; C)

10   whether the class exhibits "obvious, immutable, or

11   distinguishing characteristics that define them as a

12   discrete group;" Bowen, 483 U.S. at 602; and D) whether the

13   class is "a minority or politically powerless."  Id.

14   Immutability and lack of political power are not strictly

15   necessary factors to identify a suspect class.  See

16   Cleburne, 473 U.S. at 442 n.10 ("'[T]here's not much left of

17   the immutability theory, is there?'") (quoting J. Ely,

18   Democracy and Distrust 150 (1980)); Cleburne, 473 U.S. at

19   472 n.24 (Marshall, J., concurring in part and dissenting in

20   part) ("The 'political powerlessness' of a group may be

21   relevant, but that factor is neither necessary, as the

22   gender cases demonstrate, nor sufficient, as the example of

23   minors illustrates."); Nyquist v. Mauclet, 432 U.S. 1, 9

24

1    n.11 (1977) (rejecting the argument that alienage did not

2    deserve strict scrutiny because it was not immutable); see

3    also Pedersen, 2012 WL 3113883, at *13; Golinski, 824 F.

4    Supp. 2d at 983; Kerrigan v. Comm'r of Pub. Health, 289

5    Conn. 135, 167-68 (2008). Nevertheless, immutability and

6    political power are indicative, and we consider them here.

7    In this case, all four factors justify heightened scrutiny:

8    A) homosexuals as a group have historically endured

9    persecution and discrimination; B) homosexuality has no

10   relation to aptitude or ability to contribute to society; C)

11   homosexuals are a discernible group with non-obvious

12   distinguishing characteristics, especially in the subset of

13   those who enter same-sex marriages; and D) the class remains

14   a politically weakened minority.

15   **A)   History of Discrimination**

16      It is easy to conclude that homosexuals have suffered a

17   history of discrimination.  Windsor and several amici labor

18   to establish and document this history, but we think it is

19   not much in debate.  Perhaps the most telling proof of

20   animus and discrimination against homosexuals in this

21   country is that, for many years and in many states,

22   homosexual conduct was criminal.  These laws had the

23   imprimatur of the Supreme Court.  See Bowers, 478 U.S. at

25

1    196; see also Lawrence, 539 U.S. at 578 (noting that such

2    laws "demean[ed homosexuals'] existence [and] control[led]

3    their destiny").

4        BLAG argues that discrimination against homosexuals

5    differs from that against racial minorities and women

6    because "homosexuals as a class have never been politically

7    disenfranchised."  True, but the difference is not decisive.

8    Citizens born out of wedlock have never been inhibited in

9    voting; yet the Supreme Court has applied intermediate

10   scrutiny in cases of illegitimacy.  See generally Lalli v.

11   Lalli, 439 U.S. 259 (1982).  Second, BLAG argues that,

12   unlike protected classes, homosexuals have not "suffered

13   discrimination for longer than history has been recorded."

14   But whether such discrimination existed in Babylon is

15   neither here nor there.  BLAG concedes that homosexuals have

16   endured discrimination in this country since at least the

17   1920s.  Ninety years of discrimination is entirely

18   sufficient to document a "history of discrimination."  See

19   Pedersen, 2012 WL 3113883 at *21 (summarizing that "the

20   majority of cases which have meaningfully considered the

21   question [have] likewise held that homosexuals as a class

22   have experienced a long history of discrimination").

23       **B)   Relation to Ability**

```
 1        Also easy to decide in this case is whether the class

 2   characteristic "frequently bears [a] relation to ability to

 3   perform or contribute to society."  Cleburne, 473 U.S. at

 4   440-41; see Frontiero, 411 U.S. at 686 ("[W]hat

 5   differentiates sex from such non-suspect statuses as

 6   intelligence or physical disability, and aligns it with the

 7   recognized suspect criteria, is that the sex characteristic

 8   frequently bears no relation to ability to perform or

 9   contribute to society.").  In Cleburne, the Supreme Court

10   ruled that heightened scrutiny was inappropriate because

11   "those who are mentally retarded have a reduced ability to

12   cope with and function in the everyday world."  473 U.S. at

13   442.  The Court employed similar reasoning with respect to

14   age classifications, finding that heightened scrutiny was

15   not appropriate for mandatory retirement laws because

16   "physical ability generally declines with age" and such

17   requirements reasonably "serve[d] to remove

18   from . . . service those whose fitness for uniformed work

19   presumptively has diminished with age."  Murgia, 427 U.S. at

20   316.

21        There is no such impairment here.  There are some

22   distinguishing characteristics, such as age or mental

23   handicap, that may arguably inhibit an individual's ability
```

27

1    to contribute to society, at least in some respect.  But

2    homosexuality is not one of them.  The aversion homosexuals

3    experience has nothing to do with aptitude or performance.

4        We do not understand BLAG to argue otherwise.  Rather,

5    BLAG suggests that the proper consideration is whether "the

6    classification turns on 'distinguishing characteristics

7    relevant to interests the State has the authority to

8    implement,'" quoting <u>Cleburne</u>, 473 U.S. at 441.  Thus, BLAG

9    urges that same-sex couples have a diminished ability to

10   discharge family roles in procreation and the raising of

11   children.  BLAG cites no precedential application of that

12   standard to support its interpretation, and it is

13   inconsistent with actual cases.  <u>See, e.g.</u>, <u>Frontiero</u>, 411

14   U.S. at 686 (distinguishing that sex, unlike intelligence,

15   has no bearing on one's general ability to contribute to

16   society).  In any event, the abilities or inabilities cited

17   by BLAG bear upon whether the law withstands scrutiny (the

18   second step of analysis) rather than upon the level of

19   scrutiny to apply.  <u>Cf</u>. <u>Clark v. Jeter</u>, 486 U.S. 456, 461

20   (1988) (defining the test for intermediate scrutiny as

21   whether a classification is "substantially related to an

22   important government interest").

23

28

C)   **Distinguishing Characteristic**

We conclude that homosexuality is a sufficiently discernible characteristic to define a discrete minority class.  See <u>Rowland v. Mad River Local School Dist.,</u> <u>Montgomery County, Ohio</u>, 470 U.S. 1009, 1014 (1985) (Brennan, <u>J.</u>, dissenting from denial of certiorari) ("[H]omosexuals constitute a significant and insular minority of this country's population.").

This consideration is often couched in terms of "immutability."  BLAG and its amici argue that sexual orientation is not necessarily fixed, suggesting that it may change over time, range along a continuum, and overlap (for bisexuals).  But the test is broader: whether there are "obvious, immutable, *or* distinguishing characteristics that define . . . a discrete group."  See <u>Bowen</u>, 483 U.S. at 602 (emphasis added).  No "obvious badge" is necessary.  <u>See</u> <u>Mathews v. Lucas</u>, 427 U.S. 495, 506 (1976).  Classifications based on alienage, illegitimacy, and national origin are all subject to heightened scrutiny, <u>Cleburne</u>, 473 U.S. at 440-41, even though these characteristics do not declare themselves, and often may be disclosed or suppressed as a

29

1    matter of preference.[4]  What seems to matter is whether the

2    characteristic of the class calls down discrimination when

3    it is manifest.

4         Thus a person of illegitimate birth may keep that

5    status private, and ensure that no outward sign discloses

6    the status in social settings or in the workplace, or on the

7    subway.  But when such a person applies for Social Security

8    benefits on the death of a parent (for example), the

9    illegitimate status becomes manifest.  The characteristic is

10   necessarily revealed in order to exercise a legal right.

11   Similarly, sexual preference is necessarily disclosed when

_____

     [4] Alienage and illegitimacy are actually subject to
change.  See Pedersen, 2012 WL 3113883 at *23 ("The Supreme
Court has held that resident aliens constitute a suspect
class despite the ability to opt out of the class
voluntarily.  Additionally, one's status as illegitimate may
be subject to change and is therefore not a strictly
immutable characteristic.") (internal citation omitted); see
also Watkins v. U.S. Army, 875 F.2d 699, 726 (9th Cir. 1989)
(Norris, J., concurring) ("It is clear that by
'immutability' the [Supreme] Court has never meant strict
immutability in the sense that members of the class must be
physically unable to change or mask the trait defining their
class.  People can have operations to change their sex.
Aliens can ordinarily become naturalized citizens.  The
status of illegitimate children can be changed. People can
frequently hide their national origin by changing their
customs, their names, or their associations. . . . At a
minimum, then, the Supreme Court is willing to treat a trait
as effectively immutable if changing it would involve great
difficulty, such as requiring a major physical change or a
traumatic change of identity.").

1    two persons of the same sex apply for a marriage license (as

2    they are legally permitted to do in New York), or when a

3    surviving spouse of a same-sex marriage seeks the benefit of

4    the spousal deduction (as Windsor does here).

5        BLAG argues that a classification based on sexual

6    orientation would be more "amorphous" than discrete.  It may

7    be that the category exceeds the number of persons whose

8    sexual orientation is *outwardly* "obvious, immutable, or

9    distinguishing," and who thereby predictably undergo

10   discrimination.  But that is surely also true of

11   illegitimacy and national origin.  Again, what matters here

12   is whether the characteristic invites discrimination when it

13   is manifest.

14       The class affected by Section 3 of DOMA is composed

15   entirely of persons of the same sex who have married each

16   other.  Such persons constitute a subset of the larger

17   category of homosexuals; but as counsel for BLAG conceded at

18   argument, there is nothing amorphous, capricious, or

19   tentative about their sexual orientation.  Oral Arg. Tr.

20   12:11-14.  Married same-sex couples like Windsor and Spyer

21   are the population most visible to the law, and they are

22   foremost in mind when reviewing DOMA's constitutionality.

23

31

1    We therefore conclude that sexual orientation is a

2    sufficiently distinguishing characteristic to identify the

3    discrete minority class of homosexuals.

4    **D)    Political Power**

5    Finally, we consider whether homosexuals are a

6    politically powerless minority.  See Bowen, 483 U.S. at 602.

7    Without political power, minorities may be unable to protect

8    themselves from discrimination at the hands of the

9    majoritarian political process.  We conclude that

10   homosexuals are still significantly encumbered in this

11   respect.

12   The question is not whether homosexuals have achieved

13   political successes over the years; they clearly have.  The

14   question is whether they have the strength to politically

15   protect themselves from wrongful discrimination.  When the

16   Supreme Court ruled that sex-based classifications were

17   subject to heightened scrutiny in 1973, the Court

18   acknowledged that women had already achieved major political

19   victories.  See Frontiero, 411 U.S. at 685.  The Nineteenth

20   Amendment had been ratified in 1920, and Title VII had

21   already outlawed sex-based employment.  See 78 Stat. 253.

22   The Court was persuaded nevertheless that women still lacked

23   adequate political power, in part because they were "vastly

32

1  underrepresented in this Nation's decisionmaking councils,"

2  including the presidency, the Supreme Court, and the

3  legislature.  <u>Frontiero</u>, 411 U.S. at 686 n.17.

4       There are parallels between the status of women at the

5  time of <u>Frontiero</u> and homosexuals today: their position "has

6  improved markedly in recent decades," but they still "face

7  pervasive, although at times more subtle,

8  discrimination . . . in the political arena."  <u>Frontiero</u>,

9  411 U.S. at 685-86.  It is difficult to say whether

10 homosexuals are "under-represented" in positions of power

11 and authority without knowing their number relative to the

12 heterosexual population.  But it is safe to say that the

13 seemingly small number of acknowledged homosexuals so

14 situated is attributable either to a hostility that excludes

15 them or to a hostility that keeps their sexual preference

16 private--which, for our purposes, amounts to much the same

17 thing.  Moreover, the same considerations can be expected to

18 suppress some degree of political activity by inhibiting the

19 kind of open association that advances political agendas.

20 <u>See</u> <u>Rowland</u>, 470 U.S. at 1014 (Brennan, <u>J.</u>, dissenting from

21 denial of certiorari) ("Because of the immediate and severe

22 opprobrium often manifested against homosexuals once so

23 identified publicly, members of this group are particularly

33

1  powerless to pursue their rights openly in the political

2  arena.").

3       In sum, homosexuals are not in a position to adequately

4  protect themselves from the discriminatory wishes of the

5  majoritarian public.

6                        *  *  *

7       Analysis of these four factors supports our conclusion

8  that homosexuals compose a class that is subject to

9  heightened scrutiny.  We further conclude that the class is

10 quasi-suspect (rather than suspect) based on the weight of

11 the factors and on analogy to the classifications recognized

12 as suspect and quasi-suspect.  While homosexuals have been

13 the target of significant and long-standing discrimination

14 in public and private spheres, this mistreatment "is not

15 sufficient to require 'our most exacting scrutiny.'"

16 Trimble v. Gordon, 430 U.S. 762, 767 (1977) (quoting Mathews

17 v. Lucas, 427 U.S. 495, 506 (1976)).

18      The next step is to determine whether DOMA survives

19 intermediate scrutiny review.

20

21                         IV

22      To withstand intermediate scrutiny, a classification

23 must be "substantially related to an important government

34

1    interest."  Clark v. Jeter, 486 U.S. 456, 461 (1988).

2    "Substantially related" means that the explanation must be

3    "'exceedingly persuasive.'"  United States v. Virginia, 518

4    U.S. 515, 533 (1996) (quoting Mississippi Univ. for Women v.

5    Hogan, 458 U.S. 718, 724 (1982)).  "The justification must

6    be genuine, not hypothesized or invented post hoc in

7    response to litigation."  Id.

8        BLAG advances two primary arguments for why Congress

9    enacted DOMA.  First, it cites "unique federal interests,"

10   which include maintaining a consistent federal definition of

11   marriage, protecting the fisc, and avoiding "the unknown

12   consequences of a novel redefinition of a foundational

13   social institution."  Second, BLAG argues that Congress

14   enacted the statute to encourage "responsible procreation."

15   At argument, BLAG's counsel all but conceded that these

16   reasons for enacting DOMA may not withstand intermediate

17   scrutiny.  Oral Arg. Tr. 16:24-17:6.

18       A)   Maintaining a "Uniform Definition" of Marriage

19       Statements in the Congressional Record express an

20   intent to enforce uniform eligibility for federal marital

21   benefits by insuring that same-sex couples receive--or

1    lose--the same federal benefits across all states.[5]

2    However, the emphasis on uniformity is suspicious because

3    Congress and the Supreme Court have historically deferred to

4    state domestic relations laws, irrespective of their

5    variations.

6         To the extent that there has ever been "uniform" or

7    "consistent" rule in federal law concerning marriage, it is

8    that marriage is "a virtually exclusive province of the

9    States." Sosna, 419 U.S. at 404.  As the Supreme Court has

10   emphasized, "the states, at the time of the adoption of the

11   Constitution, possessed *full power* over the subject of

12   marriage and divorce. . . . [T]he Constitution delegated *no*

13   *authority* to the Government of the United States on the

14   subject of marriage and divorce." Haddock v. Haddock, 201

15   U.S. 562, 575 (1906) (emphasis added), overruled on other

16   grounds by Williams v. State of North Carolina, 317 U.S. 287

17   (1942).  DOMA was therefore an unprecedented intrusion "into

18   an area of traditional state regulation." Massachusetts,

19   682 F.3d at 13.  This is a reason to look upon Section 3 of

_____

       [5]  For example, certain legislators were concerned that
it would be administratively difficult to deal with benefit
changes as same-sex couples moved between states with
different policies on same-sex marriage.  See, e.g., 150
Cong. Rec. 15318 (2004) (Sen. Inhofe).

1  DOMA with a cold eye.  "The absence of precedent . . . is
2  itself instructive; '[d]iscriminations of an unusual
3  character especially suggest careful consideration to
4  determine whether they are obnoxious to the constitutional
5  provision.'"  Romer v. Evans, 517 U.S. 620, 633 (1996)
6  (quoting Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32,
7  37-38 (1928)).

8      Moreover, DOMA's sweep arguably creates more discord
9  and anomaly than uniformity, as many amici observe.  Because
10 DOMA defined only a single aspect of domestic relations law,
11 it left standing all other inconsistencies in the laws of
12 the states, such as minimum age, consanguinity, divorce, and
13 paternity.  See Br. of Amici Curiae Family Law Professors
14 Supporting Petitioner at 12-13 (noting that "the federal
15 government has always accepted the states' different ways of
16 defining parental status" and offering numerous examples of
17 critical differences in state parental policies).

18     The uniformity rationale is further undermined by
19 inefficiencies that it creates.  As a district court in this
20 Circuit found, it was simpler--and more consistent--for the
21 federal government to ask whether a couple was married under
22 the law of the state of domicile, rather than adding "an
23 additional criterion, requiring the federal government to

1    identify and exclude all same-sex marital unions from

2    federal recognition." <u>Pedersen</u>, 2012 WL 3113883 at *48; <u>see</u>

3    <u>Golinski</u>, 824 F. Supp. 2d at 1001-02 ("The passage of DOMA

4    actually undermined administrative consistency by requiring

5    that the federal government, for the first time, discern

6    which state definitions of marriage are entitled to federal

7    recognition and which are not.").

8         Because DOMA is an unprecedented breach of longstanding

9    deference to federalism that singles out same-sex marriage

10   as the only inconsistency (among many) in state law that

11   requires a federal rule to achieve uniformity, the

12   rationale premised on uniformity is not an exceedingly

13   persuasive justification for DOMA.

14        **B)   Protecting the Fisc**

15        Another professed goal of Congress is to save

16   government resources by limiting the beneficiaries of

17   government marital benefits.  H.R. Rep. No. 104-664, at 18

18   (1996), <u>reprinted in</u> 1996 U.S.C.C.A.N. 2905, 2922.  Fiscal

19   prudence is undoubtedly an important government interest.

20   Windsor and certain amici contest whether the measure will

21   achieve a net benefit to the Treasury; but in matters of the

22   federal budget, Congress has the prerogative to err (if

23   error it is), and cannot be expected to prophesy the future

1   accurately.  But the Supreme Court has held that "[t]he

2   saving of welfare costs cannot justify an otherwise

3   invidious classification." <u>Graham v. Richardson</u>, 403 U.S.

4   365, 375 (1971) (quotation marks omitted).  As the district

5   court observed, "excluding any arbitrarily chosen group of

6   individuals from a government program conserves government

7   resources." <u>Windsor</u>, 833 F. Supp. 2d at 406 (quotation

8   marks).

9        Citing <u>Bowen v. Owens</u>, 476 U.S. 340, 348 (1986), BLAG

10  draws the distinction that DOMA did not *withdraw* benefits

11  from same-sex spouses; since DOMA was enacted before same-

12  sex marriage was permitted in any state, DOMA operated to

13  prevent the *extension* of benefits to people who never

14  enjoyed them.  However, <u>Bowen</u> was decided on rational basis

15  grounds and did not involve an invidious classification.

16  <u>Id.</u> at 349-50.  Moreover, DOMA is properly considered a

17  benefit withdrawal in the sense that it functionally

18  eliminated longstanding federal recognition of all marriages

19  that are properly ratified under state law--and the federal

20  benefits (and detriments) that come with that recognition.

21       Furthermore, DOMA is so broad, touching more than a

22  thousand federal laws, that it is not substantially related

23  to fiscal matters.  As amicus Citizens for Responsibility

1   and Ethics in Washington demonstrates, DOMA impairs a number

2   of federal laws (involving bankruptcy and conflict-of-

3   interest) that have nothing to do with the public fisc.  See

4   Br. of Amicus Curiae Citizens for Responsibility and Ethics

5   in Washington at 5-11, 18-23.  DOMA transcends a legislative

6   intent to conserve public resources.

7        For these reasons, DOMA is not substantially related to

8   the important government interest of protecting the fisc.

9        **C) Preserving a Traditional Understanding of Marriage**

10       Congress undertook to justify DOMA as a measure for

11  preserving traditional marriage as an institution.  150

12  Cong. Rec. 14951.  But "[a]ncient lineage of a legal concept

13  does not give [a law] immunity from attack for lacking a

14  rational basis."  Heller, 509 U.S. at 326.  A fortiori,

15  tradition is hard to justify as meeting the more demanding

16  test of having a substantial relation to an important

17  government interest.  Similar appeals to tradition were made

18  and rejected in litigation concerning anti-sodomy laws.  See

19  Lawrence, 539 U.S. at 577-78 ("'[T]he fact that the

20  governing majority in a State has traditionally viewed a

21  particular practice as immoral is not a sufficient reason

22  for upholding a law prohibiting the practice; *neither*

23  *history nor tradition* could save a law prohibiting

40

1    miscegenation from constitutional attack.'") (quoting

2    <u>Bowers</u>, 478 U.S. at 216 (Stevens, <u>J.</u>, dissenting)) (emphasis

3    added).

4         Even if preserving tradition were in itself an

5    important goal, DOMA is not a means to achieve it.  As the

6    district court found: "because the decision of whether

7    same-sex couples can marry is left to the states, DOMA does

8    not, strictly speaking, 'preserve' the institution of

9    marriage as one between a man and a woman."  <u>Windsor</u>, 833 F.

10   Supp. at 403.

11        Preservation of a traditional understanding of marriage

12   therefore is not an exceedingly persuasive justification for

13   DOMA.

14   **D)  Encouraging Responsible Procreation**

15        Finally, BLAG presents three related reasons why DOMA

16   advances the goals of "responsible childrearing":  DOMA

17   subsidizes procreation because only opposite-sex couples can

18   procreate "naturally"; DOMA subsidizes biological parenting

19   (for more or less the same reason); and DOMA facilitates the

20   optimal parenting arrangement of a mother and a father.  We

21   agree that promotion of procreation can be an important

22   government objective.  But we do not see how DOMA is

23   substantially related to it.

41

1     All three proffered rationales have the same defect:

2     they are cast as incentives for heterosexual couples,

3     incentives that DOMA does not affect in any way.  DOMA does

4     not provide any incremental reason for opposite-sex couples

5     to engage in "responsible procreation."[6]  Incentives for

6     opposite-sex couples to marry and procreate (or not) were

7     the same after DOMA was enacted as they were before.[7]  Other

8     courts have likewise been unable to find even a *rational*

9     connection between DOMA and encouragement of responsible

10    procreation and child-rearing.  See Massachusetts, 682 F.3d

11    at 14-15 (underscoring the "lack of any demonstrated

12    connection between DOMA's treatment of same-sex couples and

13    its asserted goal of strengthening the bonds and benefits to

14    society of heterosexual marriage") (citations omitted);

15    Windsor, 833 F. Supp. at 404-05; Pedersen, 2012 WL 3113883,

16    at *40-43.

17

---

[6] "[T]he argument that withdrawing the designation of 'marriage' from same-sex couples could on its own promote the strength or stability of opposite-sex marital relationships lacks any such footing in reality." Perry v. Brown, 671 F.3d 1052, 1089 (9th Cir. 2012).

[7] To the extent that BLAG is suggesting that Congress' laws might actually *influence* sexual orientation, there is no evidence to support that claim (and it strikes us as far-fetched).

42

1    DOMA is therefore not substantially related to the

2    important government interest of encouraging procreation.

3                                    ***

4    DOMA's classification of same-sex spouses was not

5    substantially related to an important government interest.

6    Accordingly, we hold that Section 3 of DOMA violates equal

7    protection and is therefore unconstitutional.

8

9                                     V

10    Our straightforward legal analysis sidesteps the fair

11    point that same-sex marriage is unknown to history and

12    tradition.  But law (federal *or* state) is not concerned with

13    holy matrimony.  Government deals with marriage as a civil

14    status--however fundamental--and New York has elected to

15    extend that status to same-sex couples.  A state may enforce

16    and dissolve a couple's marriage, but it cannot sanctify or

17    bless it.  For that, the pair must go next door.

18

19                            **CONCLUSION**

20    For the foregoing reasons, we AFFIRM the grant of

21    Windsor's motion for summary judgment.