1    STRAUB, *Circuit Judge*, dissenting in part and concurring in part:

2                                  **INTRODUCTION**

3          I respectfully dissent in part and concur in part.

4          I concur with those parts of the majority opinion that (1) deny BLAG's motion to dismiss

5    the appeal taken by the United States, and (2) decline to certify to the New York Court of

6    Appeals the question of whether the State of New York recognized Windsor's marriage at the

7    time of her wife's death.  For the reasons that follow, I dissent from the majority's holding that

8    DOMA is unconstitutional under the Fifth Amendment's equal protection guarantee.

9          The majority holds DOMA unconstitutional, a federal law which formalizes the

10   understanding of marriage in the federal context extant in the Congress, the Presidency, and the

11   Judiciary at the time of DOMA's enactment and, I daresay, throughout our nation's history.  If

12   this understanding is to be changed, I believe it is for the American people to do so.

13         Forty years ago, the United States Supreme Court was presented with the essentially

14   identical challenge we have here.  The then DOMA-like Minnesota law was upheld in that state's

15   highest court because it found that the right to marry without regard to sex was not a

16   fundamental right and the law's thrust was not irrational or invidious discrimination.  The

17   Supreme Court of Minnesota held that the applicable Minnesota statute defining marriage as a

18   union between a man and a woman did not violate the United States Constitution.  Upon their

19   appeal to the United States Supreme Court, the plaintiffs' jurisdictional statement squarely

20   claimed that Minnesota's same-sex marriage prohibition violated their equal protection rights.

21   The Supreme Court, in dismissing the appeal for "want of a substantial federal question,"

22   obviously found no constitutional infirmity in that DOMA-like Minnesota law.  I am unable to

                                        -1-

Case: 12-2335   Document: 448   Page: 28   07/18/2012   501238   2 of 40

1   conclude, as it is suggested we should, that the Supreme Court of the United States would have

2   held as it did had it concluded that the Minnesota law was unconstitutional—at a time when it

3   was required to accept the appellate challenge.  The Supreme Court made a merits decision, and

4   has never walked away from it or ever suggested that its disposition elided a merits

5   determination on some procedural basis.  It has further instructed us that such a disposition,

6   albeit summary, rejects the challenge presented in the jurisdictional statement and is binding on

7   the lower federal courts.  And, as recently as 2003, Justice O'Connor reminded us that rational

8   reasons exist to promote the traditional institution of marriage.  *Baker* dictates my decision.

9           Furthermore, it is argued here that we are to disregard this binding precedent and the

10   traditionally applicable rational basis standard of review and, instead, now create a new type of

11   suspect classification requiring a heightened level of scrutiny in respect of the federal definition

12   of marriage.  The Supreme Court has never done so, while reminding us to be wary of creating

13   any new such classification and itself not having created any in decades.  I believe it would be

14   imprudent to do so in this case.  Eleven of our nation's federal Circuit Courts of Appeals have

15   not utilized an elevated form of scrutiny as to sexual orientation discrimination.  Most recently,

16   the First Circuit went to the extreme of creating a new, increased level of rational basis analysis.

17   This appears to be the first case in which this Court is asked to do the same or more, and the

18   majority is the first to apply intermediate scrutiny to invalidate the federal definition of marriage

19   as between a man and a woman.  The discrimination in this case does not involve a recognized

20   suspect or quasi-suspect classification.  It is squarely about the preservation of the traditional

21   institution of marriage and its procreation of children.  DOMA centers on legitimate state

22   interests that go beyond mere moral disapproval of an excluded group.  DOMA's classification is

1    to be reviewed on the basis of whether it has a rational relation to any legitimate end.  Utilizing

2    that standard, I conclude that DOMA is constitutional.  The rational basis standard is most

3    deferential to the determinations of the Congress.  Such may be conclusory and are not to be

4    tried in the traditional fact-oriented process.  The public policy choice set forth in DOMA is to be

5    made by Congress, not the Judiciary.  In DOMA, Congress has set the boundaries for marriage—

6    all in keeping with American society's historical view of a marriage as being between a man and

7    a woman.  This is not the first time the Congress has signaled its intentions in various definitions

8    of eligibility for federal purposes as to children, marriage, and domestic relations.  These have at

9    times conflicted with state laws but the federal law has always prevailed for federal purposes.

10          The Congress had the benefit of advice from the Department of Justice that DOMA is

11    constitutional.  The Congress decided to codify what had always been implicit in federal law.

12    The history of federal legislation in respect of the meaning of marriage or spouse was never even

13    suggested to mean anything other than the lawful union of one man and one woman for all

14    federal purposes.  The nation's traditional understanding was memorialized in DOMA.  Congress

15    explicitly sought to recognize for federal purposes the significance of our historical

16    understanding of a mainstream value, joining the biological component of the marriage

17    relationship to the legal responsibility of rearing the offspring of that union.  The Congress

18    referenced its intention to sanction, for federal purposes, society's desire to approve the man and

19    woman long term union as the ideal by which to beget and rear children.  Indeed, state high

20    courts—as in New York—have credited their legislature's rational decisions to promote the

21    welfare of children via opposite-sex marriage laws.  Further, Congress has articulated, as another

22    legitimate reason for DOMA, that the federal fisc as well as America's desired right to equitable

-3-

1    distribution of benefits should not be based on the particularity or peculiarity of any state's

2    definition of marriage, but rather the federal government is entitled to codify a single definition

3    of marriage as historically understood.

4         The Congress was uniform and consistent.  And, it chose not to rush ahead with a

5    redefinition at a time when all the states utilized the traditional definition of marriage.  It chose to

6    let the issue evolve within American society.  The Congress accomplished its task in a manner

7    which continues to respect the principle of federalism.  The states remain free to define marriage

8    as they choose, pursuant to DOMA.  And, forty-one of our states continue to define marriage as

9    DOMA does.  The totality of the foregoing is sufficient to hold DOMA constitutional under the

10   rational basis standard.  Even the majority opinion, while ultimately holding DOMA

11   unconstitutional under a higher level of scrutiny, appears to imply that DOMA passes rational

12   basis review.  (Maj. Op. at 22:3–9.)

13        My final observation relates to the Attorney General's current position.  His assertion that

14   sexual orientation is a suspect classification and that DOMA fails to pass strict scrutiny is

15   recently minted, and is contrary to an established body of cases to the contrary.  The Attorney

16   General's position is unprecedented in its departure from the Department of Justice's long-

17   standing policy of defending federal statutes even if the President disagrees as a matter of policy.

18        At bottom, the issue here is marriage at the federal level for federal purposes, and not

19   other legitimate interests.  The Congress and the President formalized in DOMA, for federal

20   purposes, the basic human condition of joining a man and a woman in a long-term relationship

21   and the only one which is inherently capable of producing another generation of humanity.

22   Whether that understanding is to continue is for the American people to decide via their choices

1   in electing the Congress and the President.  It is not for the Judiciary to search for new standards

2   by which to negate a rational expression of the nation via the Congress.

3                                          **DISCUSSION**

4   *I.      The Origin and Impact of DOMA*

5           DOMA was enacted in 1996 in response to the possible end to the exclusion of same-sex

6   couples from civil marriage in Hawaii.  In *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993), the Hawaii

7   Supreme Court held that denying same-sex couples the right to marry must be justified under

8   strict scrutiny, and remanded for further proceedings consistent with this determination.[1]  The

9   House Judiciary Committee's Report on DOMA (the "House Report") described *Baehr* as part of

10   an "orchestrated legal assault being waged against traditional heterosexual marriage."  *See* H.R.

11   Rep. No. 104-664, at 2–3 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906–07 ("House

12   Report" or "H. Rep.").

13          DOMA has two key provisions.  Section 2, the choice-of-law section, states:

14                  No State, territory, or possession of the United States, or Indian
15                  tribe, shall be required to give effect to any public act, record, or
16                  judicial proceeding of any other State, territory, possession, or tribe
17                  respecting a relationship between persons of the same sex that is
18                  treated as a marriage under the laws of such other State, territory,
19                  possession, or tribe, or a right or claim arising from such
20                  relationship.

21   28 U.S.C. § 1738C.  This provision expresses Congress's desire to prevent a situation where one

22   state would be forced to recognize same-sex marriages performed and recognized in a different

23   state.

---

[1] Same-sex marriage never became law in Hawaii because, following *Baehr*, the Hawaii Constitution was amended
to allow for the legislative prohibition of same-sex marriage.  *See* Haw. Const. art. I, § 23.  But, this did not occur
until after DOMA was enacted.

1    Section 3, the definitional section of DOMA, provides:

2            In determining the meaning of any Act of Congress, or of any
3            ruling, regulation, or interpretation of the various administrative
4            bureaus and agencies of the United States, the word "marriage"
5            means only a legal union between one man and one woman as
6            husband and wife and the word "spouse" refers only to a person of
7            the opposite sex who is a husband or a wife.

8    1 U.S.C. § 7.  This provision articulates Congressional recognition, for federal purposes, that

9    marriage is the union of a man and a woman.

10            The House Report indicates that several motivations led Congress to pass DOMA.  It

11    identifies four "governmental interests advanced by this legislation:  (1) defending and nurturing

12    the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality;

13    (3) protecting state sovereignty and democratic self-governance; and (4) preserving scarce

14    government resources."  (H. Rep. at 12–18.)  The House Report also justifies DOMA as a means

15    to "encourag[e] responsible procreation and child-rearing," H. Rep. at 13, and as a way to reflect

16    Congress's "moral disapproval of homosexuality, and a moral conviction that heterosexuality

17    better comports with traditional (especially Judeo-Christian) morality."  (H. Rep. at 16.)

18            Given the broad range of federal laws to which marital status is relevant, the

19    consequences of DOMA are far-reaching.  In addition to preventing a surviving same-sex spouse

20    like Windsor from inheriting money or property free from an estate tax, DOMA prevents same-

21    sex married couples from lessening tax burdens by filing joint federal tax returns, *see* 26 U.S.C.

22    § 1(a)-(c); prevents the surviving spouse of a same-sex marriage from collecting Social Security

23    survivor benefits, *see, e.g.*, 42 U.S.C. § 402; and prevents federal employees from sharing their

24    health insurance and certain other medical benefits with same-sex spouses.  As a result of

25    DOMA, married same-sex couples are deprived of many other, lesser-known rights, benefits, and

-6-

1   privileges including, *inter alia*, benefits relating to intellectual property; housing benefits;

2   veteran's benefits; immigration entitlements (same-sex spouses are the only legally married

3   spouses of American citizens who can face deportation); employment benefits in the private

4   sector (including sick leave to care for one's spouse under the Family and Medical Leave Act);

5   and protections relating to domestic and intimate partner crimes and family violence.

6        In sum, DOMA codifies, for purposes of federal statutes, regulations, and rulings, the

7   understanding of marriage as "only a legal union between one man and one woman as husband

8   and wife," *see* 1 U.S.C. § 7, and it reserves to each state the ability to retain that definition as its

9   policy if the state so chooses, or to alter it, as it sees fit.  *See* 28 U.S.C. § 1738C.  In enacting

10   DOMA, therefore, Congress (1) maintained the status quo as to the federal definition of marriage

11   for the purposes of federal programs and benefits; and (2) recognized the right of any state to

12   allow gays and lesbians to marry while, at the same time, permitting other states to adhere to

13   their existing understandings of the institution of marriage.

14   **II.   Standard of Review**

15        We review a grant of summary judgment de novo.  *Bank of N.Y. v. First Millennium, Inc.*,

16   607 F.3d 905, 914 (2d Cir. 2010).  Summary judgment is appropriate only if "there is no genuine

17   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

18   R. Civ. P. 56(a).  A fact is material "if it 'might affect the outcome of the suit under the

19   governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable

20   jury could return a verdict for the nonmoving party.'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62,

21   69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

1        There being no dispute as to the material facts in this matter, I find, as a matter of law,

2    that DOMA is constitutional.

3    **III.    *The Precedential Effect of* Baker v. Nelson**

4        The majority concludes that Windsor's claim is not foreclosed by the Supreme Court's

5    summary dismissal in *Baker v. Nelson*, 409 U.S. 810 (1972).  In *Baker*, a same-sex couple

6    seeking the right to marry challenged a Minnesota law that limited marriage to opposite-sex

7    couples on the grounds that it violated due process and equal protection, as it unconstitutionally

8    discriminated on the basis of sex.  *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971).  The

9    Minnesota Supreme Court, applying rational basis review, upheld the statute because it found the

10   right to marry without regard to sex was not fundamental, and because classifying who can

11   marry based on sex was not "irrational or invidious discrimination."  *Id.* at 187.  The Court

12   reasoned that "[i]t is unrealistic to think that the original draftsmen of our marriage statutes,

13   which date from territorial days, would have used the term" to mean anything other than "the

14   state of union between persons of the opposite sex."  *Id.* at 186.  In so doing, the Court found

15   support in the 1966 version of Webster's Third New International Dictionary, the fourth edition

16   of Black's Law Dictionary, the Book of Genesis, and *Skinner v. Oklahoma*, which declared that

17   "[m]arriage and procreation are fundamental to the very existence and survival of the race."  316

18   U.S. 535, 541 (invalidating Oklahoma's Habitual Criminal Sterilization Act under the Fourteenth

19   Amendment's Equal Protection Clause).

20       The Minnesota Supreme Court rejected petitioners' reliance on *Griswold v. Connecticut*,

21   381 U.S. 479 (1965), and *Loving v. Virginia*, 388 U.S. 1 (1967).  The Minnesota Supreme Court

22   held that the privacy right recognized in *Griswold* was "inherent in the marital relationship," and

1  that *Loving* did not militate in favor of petitioners because "Virginia's anti-miscegenation

2  statute . . . was invalidated solely on the grounds of its patent racial discrimination." *Id.* at 186–

3  87. The Court concluded that in both a "commonsense and in a constitutional sense, there is a

4  clear distinction between a martial restriction based merely upon race and one based upon the

5  fundamental difference in sex." *Id.* at 187. The United States Supreme Court summarily

6  dismissed the appeal of the Minnesota Supreme Court's ruling for "want of a substantial federal

7  question." *Baker*, 409 U.S. at 810.

8           The equal protection guarantee of the Fifth Amendment, which applies to the federal

9  government, functions identically to the Equal Protection Clause of the Fourteenth Amendment,

10  which applies to the states. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).

11  Therefore, jurisprudence interpreting one applies to the other. It follows that any ruling of the

12  Supreme Court on a Fourteenth Amendment equal protection challenge to the denial of same-sex

13  marriage applies with equal force to an equal protection challenge to the denial of same-sex

14  marriage under the Fifth Amendment.

15          According to the jurisdictional statement of the appellants in *Baker*, the case presented,

16  *inter alia*, the question of "[w]hether appellee's refusal, pursuant to Minnesota marriage statutes,

17  to sanctify appellants' marriage because both are of the male sex violates their rights under the

18  equal protection clause of the Fourteenth Amendment." (JA-695.) The question presented here,

19  by Windsor, can be formulated in a strikingly similar fashion: "Whether Section 3 of the

20  Defense of Marriage Act is consistent with the equal protection component of the Fifth

21  Amendment Due Process Clause." (DOJ Br. at 2.)

1    *Baker* is a disposition on the merits, not a mere denial of certiorari, *Hicks v. Miranda*, 422

2 U.S. 332, 344 (1975), and any ruling inconsistent with its terms must be avoided.  "[L]ower

3 courts are bound by summary decisions by this Court until such time as the Court informs (them)

4 that (they) are not."  *Hicks*, 422 U.S. at 344–45 (internal quotation omitted).

5    A summary dismissal means that "the Court found that the decision below was correct

6 and that no substantial question of the merits was raised."  E. Gressman, et al., *Supreme Court*

7 *Practice* § 5.18, p.365 (9th ed. 2007).  *See also Roxbury Taxpayers Alliance v. Del. Cnty. Bd. of*

8 *Supervisors*, 80 F.3d 42, 48 (2d Cir. 1996) (recognizing dismissal for want of a substantial

9 federal question as "a decision on the merits of the case"); *Port Auth. Bondholders Protective*

10 *Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 262 n.3 (2d Cir. 1967) ("[U]nless and until the

11 Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that

12 if the Court has branded a question as unsubstantial, it remains so except when doctrinal

13 developments indicate otherwise."); *cf. Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir. 1973)

14 (rejecting argument that summary dispositions have "very little precedential significance" and

15 stating that "we are bound by the Supreme Court's summary affirmances until such time as the

16 Court informs us that we are not") (internal quotation omitted).  Thus, *Baker* squarely rejected

17 the contention that prohibiting same-sex marriages violated equal protection.[2]

18    Whatever factual differences exist between the challenge to the Minnesota law presented

19 in *Baker* and Windsor's challenge to DOMA, they are too attenuated to remove the instant case

20 from the scope of *Baker's* precedential effect.  Although the facts in this case are not identical to

---

[2] 1988 legislation curtailing the Supreme Court's appellate jurisdiction did not change the precedential import of summary dispositions.  "Abolition of the [mandatory] appeal jurisdiction does not change this rule."  16B Charles Alan Wright & Arthur R. Miller, et al., *Federal Practice & Procedure* § 4014 (2d ed. 2012).

1    those in *Baker*, the "precedential value of a dismissal for want of a substantial federal question

2    extends beyond the facts of the particular case to all similar cases."  *Wright v. Lane Cnty. Dist.*

3    *Court*, 647 F.2d 940, 941 (9th Cir. 1981); *see also League of Women Voters of Nassau Cnty. v.*

4    *Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 164 (2d Cir. 1984) (the court's "responsibility in

5    gauging [a summary disposition's] authority . . . is to mark out the 'reach and content' of that

6    prior disposition").

7           The same-sex couple in *Baker* argued that Minnesota's exclusion of same-sex couples

8    from the institution of civil marriage violated the Equal Protection Clause because it was

9    discrimination not rationally related to any legitimate governmental interest.  Forty years may

10    have passed, but Windsor makes the same claim today (based on, *inter alia*, similar arguments

11    regarding the over-and under-inclusiveness of the limitation on the marriage right vis-à-vis the

12    procreation rationale).  Whatever differences exist between Windsor's claim and those advanced

13    in *Baker*, they are insignificant compared to the central fact that both cases present equal

14    protection challenges to laws prohibiting the recognition of any marriage entered into by two

15    persons of the same sex.  Thus, any distinctions do not render DOMA sufficiently different from

16    Minnesota's marriage law at the time of *Baker* such that it can be said the issues in this case were

17    not before and decided by the Supreme Court.  The relevant facts of this case are substantially

18    similar to those of *Baker*, which necessarily decided that a state law defining marriage as a union

19    between a man and woman does not violate the Equal Protection Clause.  *Baker* is the last word

20    from the Supreme Court regarding the constitutionality of a state law limiting marriage to

21    opposite-sex couples under the Equal Protection Clause and thus remains binding on this Court,

1    given that the equal protection component of the Fifth Amendment is identical to and

2    coextensive with the Fourteenth Amendment guarantee.

3         Since *Baker* holds that states may use the traditional definition of marriage for state

4    purposes without violating equal protection, it necessarily follows that Congress may define

5    marriage the same way for federal purposes without violating equal protection. *See Citizens for*

6    *Equal Prot. v. Bruning*, 455 F.3d 859, 870 (8th Cir. 2006) ("In the nearly one hundred and fifty

7    years since the Fourteenth Amendment was adopted, to our knowledge no Justice of the Supreme

8    Court has suggested that a state statute or constitutional provision codifying the traditional

9    definition of marriage violates the Equal Protection Clause or any other provision of the United

10    States Constitution."); *McConnell v. Nooner*, 547 F.2d 54, 56 (8th Cir. 1976) (per curiam) (*Baker*

11    "constitutes an adjudication on the merits which is binding on the lower federal courts"); *Adams*

12    *v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980) (finding *Baker* controlling in case where

13    same-sex spouse appealed denial of petition with INS to be classified as "immediate relative"),

14    *aff'd*, 673 F.2d 1036, 1039 n.2 (9th Cir. 1982) (acknowledging precedential nature of *Baker*);

15    *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1305 (M.D. Fla. 2005) (*Baker* is "binding precedent" with

16    "dispositive effect" requiring dismissal of equal protection challenge to DOMA).

17         The correctness of the *Baker* holding was placed squarely before the Supreme Court in

18    that case's jurisdictional statement. The Court's summary dismissal for want of a substantial

19    federal question is therefore a controlling precedent, unless and until re-examined by the

20    Supreme Court. *Hicks*, 422 U.S. at 343–45. "The Court neither acknowledges nor holds that

21    other courts should ever conclude that its more recent cases have, by implication, overruled an

22    earlier precedent. Rather, lower courts should follow the case which directly controls, leaving to

-12-

1    this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 207

2    (1997).[3]

3         The close resemblance between the issue presented in *Baker* and the claim advanced by

4    Windsor means that the scope of *Baker* controls the question raised by this appeal, foreclosing

5    Windsor's claim.  That is, both cases involve the validity of same-sex couples' deprivation of

6    marriage rights, a question already presented to and adjudicated on the merits by the Supreme

7    Court.  In addition, if, as *Baker* held, denying same-sex couples the right to marry does not

8    violate equal protection, it follows that denying same-sex couples a subset of the rights (*i.e.*,

9    federal rights) associated with marriage is also constitutional.  This conclusion is inescapable.

10   For the sake of completeness, in the event that there is any doubt that *Baker* forecloses

11   Windsor's claim, I now proceed to consider the merits.

12   **IV.     *Principles of Equal Protection Analysis***

13        "The Due Process Clause of the Fifth Amendment assures every person the equal

14   protection of the laws, 'which is essentially a direction that all persons similarly situated should

15   be treated alike.'"  *Able v. United States*, 155 F.3d 628, 631 (2d Cir. 1998) (quoting *City of*

16   *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).

---

[3] Although we have noted that questions may stop being "insubstantial" when subsequent doctrinal developments so indicate, *Port Auth. Bondholders*, 387 F.2d at 263 n.3, the Supreme Court has never, despite the numerous developments in the last forty years, stated that its holding in *Baker* is invalid.  I am not convinced by Windsor's arguments that the Supreme Court's decisions in *Romer v. Evans* and *Lawrence v. Texas* have eroded *Baker's* foundations such that it no longer holds sway.

In *Romer*, the Supreme Court applied rational basis scrutiny to laws that discriminated on the basis of sexual orientation.  In *Lawrence*, the Supreme Court expressly stated that "[t]he present case does not involve . . . whether the government must give formal recognition to any relationship that homosexual persons seek to enter."  *Lawrence*, 539 U.S. at 578.  Consequently, there are no doctrinal changes in Supreme Court jurisprudence implying that *Baker* is no longer binding authority and *Baker's* effect therefore hinges on whether the issues in this case were presented to and necessarily decided by the Supreme Court.

1          When the subject of unequal treatment is a member of a class that historically has been

2   the object of discrimination, or government conduct employs a classification—*inter alia*, race,

3   alienage, nationality, sex, and illegitimacy—closely associated with inequality, "the Supreme

4   Court has required a higher degree of justification than a rational basis, either strict or

5   intermediate scrutiny.  Under the strict scrutiny test the government must demonstrate a

6   compelling need for the different treatment and that the provision in question is narrowly tailored

7   to achieve its objective.  Under intermediate scrutiny, the government must at least demonstrate

8   that the classification is substantially related to an important governmental objective." *Id.* at

9   631–32 (internal citations omitted).

10          Where no suspect classification is employed or fundamental right infringed upon by

11   government conduct, the constitutional guarantee of equal protection is satisfied where a

12   classification bears a rational relationship to an appropriate governmental interest.  *See Heller v.*

13   *Doe*, 509 U.S. 312, 320 (1993).  In evaluating whether the asserted purposes of a federal law are

14   rationally related to its ends, we defer to the judgment of Congress.  Congressional enactments

15   that do not infringe upon a fundamental right or employ a suspect classification are entitled to "a

16   strong presumption of validity," and must be sustained if "'there is any reasonably conceivable

17   state of facts that could provide a rational basis for the classification.'"  *Id.* at 319–20 (quoting

18   *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  Rational basis review in an equal

19   protection analysis does not authorize "'the judiciary [to] sit as a superlegislature to judge the

20   wisdom or desirability of legislative policy determinations made in areas that neither affect

21   fundamental rights nor proceed along suspect lines.'"  *Id.* at 319 (quoting *New Orleans v. Dukes*,

22   427 U.S. 297, 303 (1976)).

-14-

1        Unlike under heightened scrutiny, in a rational basis equal protection analysis courts look

2    to any "conceivable basis" for the challenged law, not limited to those articulated by or even

3    consistent with the rationales offered by the legislature.  *Beach Commc'ns*, 508 U.S. at 312.[4]

4    Those attacking the rationality of a legislative classification have the burden "to negative every

5    conceivable basis which might support it."  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S.

6    356, 364 (1973) (internal quotation omitted).  "The Constitution presumes that, absent some

7    reason to infer antipathy, even improvident decisions will eventually be rectified by the

8    democratic process and that judicial intervention is generally unwarranted no matter how

9    unwisely we may think a political branch has acted."  *Vance v. Bradley*, 440 U.S. 93, 97 (1979)

10   (footnote omitted).  "[A] law will be sustained if it can be said to advance a legitimate

11   government interest, even if the law seems unwise or works to the disadvantage of a particular

12   group, or if the rationale for it seems tenuous."  *Romer v. Evans*, 517 U.S. 620, 632 (1996).

13   Under the rational review framework, where there are "plausible reasons" for Congressional

14   action, a court's "inquiry is at an end."  *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

15   This standard of review is "a paradigm of judicial restraint."  *Beach Commc'ns*, 508 U.S. at 314.

16   "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even

17   when there is an imperfect fit between means and ends."  *Heller*, 509 U.S. at 321.  "Only by

18   faithful adherence to th[e] guiding principle of [restraint in] judicial review of legislation is it

19   possible to preserve to the legislative branch its rightful independence and its ability to function."

20   *Beach Commc'ns*, 508 U.S. at 315 (internal quotation omitted).

---

[4] Indeed, in *Beach Communications*, the Supreme Court upheld the challenged law using a posited reason for a federal agency regulation, even though Congress had previously rejected that purpose and the regulation presented a conflict in the statutory scheme. *Id.* at 318.

1          Having a conceivable legitimate governmental interest is, alone, not sufficient for rational

2    basis review.  To survive rational basis review, a law must also have a rational relationship to the

3    asserted legitimate governmental interest.  In assessing the existence of a rational relationship,

4    courts should be guided by the knowledge that rational basis review is "the most relaxed and

5    tolerant form of judicial scrutiny under the Equal Protection Clause."  *City of Dallas v. Stanglin*,

6    490 U.S. 19, 26 (1989).

7          However, even under rational basis review, a law will fail if it seeks to further an

8    illegitimate end.  For example, "the accommodation of . . . bias or animosity can never serve as a

9    legitimate government interest; mere negative attitudes, or fear, unsubstantiated by factors which

10   are properly cognizable in the circumstances, are not permissible bases for differential treatment

11   by the government."  *Able*, 155 F.3d at 634 (internal quotations omitted).  Laws that single out a

12   certain class of citizens for disfavored legal status "raise the inevitable inference that the

13   disadvantage imposed is born of animosity toward the class of persons affected."  *Romer*, 517

14   U.S. at 633–34.  And such animosity cannot constitute a legitimate governmental objective.

15   *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

16         Where the discrimination challenged is motivated both by impermissible purposes (*e.g.*,

17   animus, negative attitudes, malice, fear, the desire to harm a group, moral disapproval,

18   ignorance) and permissible purposes (under rational basis review, virtually any goal not

19   forbidden by the Constitution), the law may still be constitutionally valid.  While "negative

20   attitudes," "fear" or other biases "may often accompany irrational (and therefore

21   unconstitutional) discrimination, their presence alone does not a constitutional violation make."

22   *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).

1    Because any single valid rationale is sufficient to support DOMA's constitutionality, I

2    analyze only as many possible interests as necessary to sustain the law.  *See F.C.C. v. Beach*

3    *Commc'n, Inc.*, 508 U.S. 307, 317 (1993).  I find that several of BLAG's rationale suffice to

4    satisfy constitutional scrutiny.

5    ***V.      DOMA Survives Rational Basis Review***

6         The House Report identifies four governmental interests advanced by DOMA:

7    "(1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending

8    traditional notions of morality; (3) protecting state sovereignty and democratic self-governance;

9    and (4) preserving scarce government resources."  (H. Rep. at 12.)

10        BLAG contends that DOMA is supported by six rationales, all of which independently

11   justify the legislation under rational basis review.  DOMA, it is argued, advances governmental

12   interest in:  (1) maintaining a uniform federal definition of marriage, (2) preserving the public

13   fisc and respecting prior legislative judgments, (3) exercising caution, (4) recognizing opposite-

14   sex couples' unique ability to procreate, (5) incentivizing the raising of children by their

15   biological parents, and (6) encouraging childrearing in a setting with both a mother and a father.

16        At oral argument, the Department of Justice confirmed that in 1996, in "a couple of

17   different letters," it indicated to Congress that it believed "courts would uphold section three of

18   DOMA."  (Oral Arg. Tr. 42:8–14.)  Specifically, in a letter dated May 14, 1996, the Department

19   of Justice indicated to the Honorable Henry J. Hyde, Chairman of the House Committee on the

20   Judiciary, that "[t]he Department of Justice believes that H.R. 3396 [DOMA] would be sustained

21   as constitutional."  (H. Rep. at 32.)  On May 29, 1996, the Department of Justice again advised

22   Congress, in a letter to the Honorable Charles T. Canady, Chairman of the House Subcommittee

-17-

1    on the Constitution (Committee on the Judiciary), that DOMA "would be sustained as

2    constitutional if challenged in court, and that it does not raise any legal issues that necessitate

3    further comment by the Department."  (*Id.* at 32–33.)

4           The Department of Justice maintained this position until early 2011, defending DOMA

5    against numerous lawsuits in the intervening years.  Indeed, from 2009 through early 2011, the

6    Department of Justice took the position that uniformity and a desire to preserve the status quo

7    vis-à-vis a federal definition of marriage provided a rationale for DOMA sufficient to sustain the

8    law under rational basis review, which was argued to be the applicable standard of scrutiny.  *See*

9    Office of Pers. Mgmt. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *Gill v. Office of Pers.*

10   *Mgmt.*, No. 09-cv-10309 (JLT), at 16–19 (D. Mass. Sept. 18, 2009) (docket entry no. 21); U.S.

11   Dep't of Health and Human Servs. Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss,

12   *Commonwealth of Mass. v. U.S. Dep't of Health and Human Servs.*, No. 09-cv-11156 (JLT), at

13   28–31 (D. Mass. Oct. 30, 2009) (docket entry no. 17); U.S. Dep't of the Treasury Mot. to

14   Dismiss, *Dragovich v. Dep't of Treasury*, No. 10-cv-1564 (CW), at 18–24 (N.D. Cal. July 2,

15   2010) (docket entry no. 25); U.S. Office of Pers. Mgmt. Supplemental Br. in Resp. to Ct.'s Order

16   of Oct. 15, 2010, *Golinski v. Office of Pers. Mgmt.*, No. 10-257 (JSW), at 10–15 (N.D. Cal. Nov.

17   19, 2010) (docket entry no. 83).  As late as January of 2011, the Department of Justice told the

18   First Circuit that DOMA was not unconstitutional.  *See* Corrected Br. for the U.S. Dep't of

19   Health and Human Servs., *Commonwealth of Mass. v. U.S. Dep't of Health and Human Servs.*,

20   Nos. 10-2204, 10-2207, 10-2214, at 26–55 (1st Cir. Jan. 19, 2011).  No relevant facts or law

21   have changed since early 2011 when the Department of Justice last took this position.  Indeed, at

22   oral argument, the Department of Justice acknowledged that its current position on DOMA is, in

1    part, a result of "a decision that has been made by the Attorney General and by the President, [a]

2    constitutional judgment." (Oral Arg. Tr. 42:21–43:6.)

3            Even now the Department of Justice acknowledges that "a reasonable argument for

4    Section 3's constitutionality may be proffered under" the rational basis standard, and that there

5    exists "substantial circuit court authority applying rational basis review to sexual-orientation

6    classifications." (JA-56, JA-53.) At argument, the Department of Justice summarized its most

7    recent arguments for DOMA's rational basis as "maintaining the status quo" and achieving "a

8    degree of uniformity for federal benefits, coupled with preserving room for state policy

9    development." (Oral Arg. Tr. 44:3–7.)

10            As explained above, only if there is no conceivable legitimate governmental interest, or

11    DOMA is not rationally related to any such interest, will the statute be unconstitutional under

12    rational basis review.

13        **A.        *Responsible Procreation and Childrearing by Biological Parents***

14            In enacting DOMA, Congress sought to explicitly recognize, for federal purposes, the

15    biological component of the marital relationship and the legal responsibility of rearing the

16    offspring of such a union. Numerous state high courts have accepted this as a rational basis for

17    excluding same-sex couples, even legally recognized same-sex parents, from the institution of

18    civil marriage. DOMA advances the governmental interest in connecting marriage to biological

19    procreation by excluding certain couples who cannot procreate simply by joinder of their

20    different sexual being from the federal benefits of marital status.

21            Under rational basis review, courts must consider and credit all rationales for restricting

22    federal marriage benefits to opposite-sex couples that do not evince unconstitutional animus.

-19-

1    Numerous courts have recognized that denying same-sex couples federal marriage rights or even

2    the right to marry at all can be grounded in reasons other than animus.  *See Massachusetts v. U.S.*

3    *Dep't of Health and Human Servs.*, 682 F.3d 1, 16 (1st Cir. 2012) ("*Massachusetts v. HHS*")

4    ("we do not rely upon the charge that DOMA's hidden but dominant purpose was hostility to

5    homosexuality"); *In re Kandu*, 315 B.R. 123, 147–48 (Bankr. W.D. Wash. 2004) (noting that

6    DOMA can be explained by legitimate governmental interests); *Standhardt v. Superior Court*, 77

7    P.3d 451, 465 (Ariz. Ct. App. 2003) ("Arizona's prohibition of same-sex marriages furthers a

8    proper legislative end and was not enacted simply to make same-sex couples unequal to

9    everyone else."); *Jones v. Hallahan*, 501 S.W.2d 588, 590 (Ky. Ct. App. 1973) ("We do not

10   consider the refusal to issue the [marriage] license [to persons of the same sex] a punishment.");

11   *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 680 (Tex. Ct. App. 2010) (rejecting argument

12   that limiting marriage and divorce to opposite-sex couples is "explicable only by class-based

13   animus").  *See also Lawrence v. Texas*, 539 U.S. 558, 585 (2003) ("Unlike the moral disapproval

14   of same-sex relations—the asserted state interest in this case—other reasons exist to promote the

15   institution of marriage beyond mere moral disapproval of an excluded group.") (O'Connor, J.,

16   concurring).

17          The interest in recognizing the connections between marriage and childrearing by

18   biological parents can be broken down into several components.  First, DOMA expresses

19   Congressional recognition that "responsible begetting and rearing of new generations is of

20   fundamental importance to civil society."  (Amicus Br. of States of Indiana, et al. at 25.)

21   Because the state has an interest in children, the state is thus also interested in preventing

22   "irresponsible procreation," a phenomenon implicated exclusively by heterosexuals.  (BLAG Br.

Case: 12-2335   Document: 40   Page: 21   10/18/2012   750169   40

1    at 49.)  Because of these legitimate interests, reserving federal marriage rights to opposite-sex

2    couples "protect[s] civil society," Amicus Br. of States of Indiana, et al. at 25, because without

3    the inducement of marriage, opposite-sex couples would accidentally procreate, giving rise to

4    unstable and unhealthy families.  Marriage thus plays the important role of "channel[ing]

5    opposite-sex] sexual desires" which, in the absence of marriage, would result in unstable

6    relationships, which have been documented to be harmful to children.  (Amicus Br. of States of

7    Indiana, et al. at 26.)

8            As stated by BLAG, "[m]arriage attempts to promote permanence and stability, which are

9    vitally important to the welfare of the children of the marriage."  (BLAG Br. at 48–49.)  That is,

10   marriage works to combat the risk of instability which is characteristic of inherently procreative

11   opposite-sex relationships, but absent from same-sex relationships.  *See* Amicus Br. of States of

12   Indiana, et al. at 24 ("civil marriage recognition arises from the need to encourage biological

13   parents to remain together for the sake of their children").[5]  DOMA advances this interest, in that

14   the state only needs to provide incentives to opposite-sex couples in the form of marriage,

15   because only opposite-sex couples have unintended, unplanned, unwanted children.  Same-sex

---

[5] *See also Andersen v. King Cnty.*, 138 P.3d 963, 982–83 (Wash. 2006) ("[A]s *Skinner*, *Loving*, and *Zablocki* indicate, marriage is traditionally linked to procreation and survival of the human race. Heterosexual couples are the only couples who can produce biological offspring of the couple.  And the link between opposite-sex marriage and procreation is not defeated by the fact that the law allows opposite-sex marriage regardless of a couple's willingness or ability to procreate.  The facts that all opposite-sex couples do not have children and that single-sex couples raise children and have children with third party assistance or through adoption do not mean that limiting marriage to opposite-sex couples lacks a rational basis. Such over- or under-inclusiveness does not defeat finding a rational basis."); *Lewis v. Harris*, 875 A.2d 259, 277 (N.J. App. Div. 2005) (Parrillo, J.A.D., concurring) ("[A] core feature of marriage is its binary, opposite-sex nature. . . .  [T]he binary idea of marriage arose precisely because there are two sexes."); *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 979 n.1 (Mass. 2003) (Sosman, J., dissenting) ("[T]he reasons justifying the civil marriage laws are inextricably linked to the fact that human sexual intercourse between a man and a woman frequently results in pregnancy and childbirth . . . that fact lies at the core of why society fashioned the institution of marriage in the first place.").

1    couples, by contrast, reproduce only "deliberately choosing to do so and by devoting a serious

2    investment of time, attention, and resources."  (Amicus Br. of States of Indiana, et al. at 35.)

3          Numerous courts have accepted this rationale as a basis for excluding same-sex couples

4    from civil marriage.  The New York Court of Appeals, for instance, determined that

> 5    The Legislature could . . . find that [heterosexual] relationships are
> 6    all too often casual or temporary.  It could find that an important
> 7    function of marriage is to create more stability and permanence in
> 8    the relationships that cause children to be born.  It thus could
> 9    choose to offer an inducement—in the form of marriage and its
> 10   attendant benefits—to opposite-sex couples who make a solemn,
> 11   long-term commitment to each other.  The Legislature could find
> 12   that this rationale for marriage does not apply with comparable
> 13   force to same-sex couples.  These couples can become parents by
> 14   adoption, or by artificial insemination or other technological
> 15   marvels, but they do not become parents as a result of accident or
> 16   impulse.  The Legislature could find that unstable relationships
> 17   between people of the opposite sex present a greater danger that
> 18   children will be born into or grow up in unstable homes than is the
> 19   case with same-sex couples, and thus that promoting stability in
> 20   opposite-sex relationships will help children more.

21   *Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006) (plurality opinion).  *See also Andersen*, 138

22   P.3d at 1002 (Johnson, J., concurring); *Morrison v. Sadler*, 821 N.E.2d 15, 24–25 (Ind. Ct. App.

23   2005).

24         DOMA furthers the interest in recognizing the link between marriage and procreation for

25   the reasons noted by the Maryland Court of Appeals:

> 26   [S]afeguarding an environment most conducive to the stable
> 27   propagation and continuance of the human race is a legitimate
> 28   government interest.  The question remains whether there exists a
> 29   sufficient link between an interest in fostering a stable environment
> 30   for procreation and the means at hand used to further that goal, i.e.,
> 31   an implicit restriction on those who wish to avail themselves of

1                 State-sanctioned marriage.  We conclude that there does exist a

2                 sufficient link. . . .  This "inextricable link" between marriage and

3                 procreation reasonably could support the definition of marriage as

4                 between a man and a woman only, because it is that relationship

5                 that is capable of producing biological offspring of both members

6                 (advances in reproductive technologies notwithstanding).

7 *Conaway v. Deane*, 932 A.2d 571, 630–31 (Md. 2007) (internal citations omitted).

8        Another component of the procreation and childrearing rationale for restricting federal

9 rights to opposite-sex marriage is the Congressional desire to have children raised in families

10 with only biological mothers and fathers, which same-sex couples cannot provide.  Thus, BLAG

11 contends that DOMA "offer[s] special encouragement for relationships that result in mothers and

12 fathers jointly raising their biological children," an interest which "simply does not apply to

13 same-sex couples."  (BLAG Br. at 54.)  DOMA accomplishes this encouragement by limiting

14 federal marriage rights to opposite-sex couples.

15        Congress might well have enacted DOMA after consulting "the entire history of

16 civilization" regarding the "problems" that arise when there is no institution to encourage

17 biological parents to remain together.  (Amicus Br. of States of Indiana, et al. at 35.)  This, too,

18 has been accepted as a rational reason for excluding same-sex couples (including legally

19 recognized same-sex parents) from civil marriages.  *See, e.g.*, *Hernandez*, 855 N.E.2d at 8

20 (plurality opinion) ("Plaintiffs seem to assume that they have demonstrated the irrationality of

21 the view that opposite-sex marriages offer advantages to children by showing there is no

22 scientific evidence to support it.  Even assuming no such evidence exists, this reasoning is

23 flawed.  In the absence of conclusive scientific evidence, the Legislature could rationally proceed

1    on the commonsense premise that children will do best with a mother and father in the home.").[6]

2    I agree with BLAG that the evidence offered by Windsor and the professional organizations and

3    child welfare amici who advocate for affirmance does not make Congress's "common sense"

4    regarding the needs of children a forbidden governmental interest under rational basis review.

5    (BLAG Br. at 55.)

6        As noted hereafter in the context of uniformity, the manner in which DOMA furthers the

7    legitimate governmental interests in childrearing, responsible procreation, and biological

8    parentage respects the principles of federalism.  States may still arrive at individual

9    determinations regarding who may and may not marry, and DOMA does nothing to change this

10    functioning of our federal system.[7]  DOMA simply excludes certain couples who are married

11    under state law from eligibility for certain *federal* rights, benefits, privileges, and obligations.

12        DOMA's exclusion of married same-sex couples, under the rational basis review where

13    means and ends need not match, *see Heller*, 509 U.S. at 321, is sufficiently related to the federal

14    interest in recognizing the link between the marital relationship and the rearing of its offspring.

15

16

---

[6] Amici American Psychological Association, American Academy of Pediatrics, American Psychiatric Association, American Psychoanalytic Association, National Association of Social Workers, and New York State Psychological Association argue that no such credible evidence exists.  *See* Amicus Br. of the American Psychological Association, et al. at 15–23.

[7] The majority's holding that DOMA's definition of marriage as between a man and a woman is unconstitutional will doubtless be used to invalidate the laws in those forty-one states.  Such has to be so given the fact that the equal protection analysis by the majority in this case for federal purposes pursuant to the Fifth Amendment is the same as that to be applied as to the states pursuant to the Fourteenth Amendment and is, therefore, the yardstick by which to hold unconstitutional the law in the forty-one states.  Indeed, an affirmance by the Supreme Court of the majority's view would likely doom the laws of the forty-one states which exclude same-sex couples from civil marriage.

1        **B.      *Maintaining the Status Quo of Uniformity***

2        BLAG contends that DOMA is rationally related to the legitimate governmental "interest

3    in uniform eligibility for federal marital benefits."  (BLAG Br. at 39.)  Congress, it is argued, has

4    a "long history of enacting federal definitions of marriage that do not simply incorporate state

5    definitions and inevitably will conflict with some of them."  (*Id.* at 42–43.)  A uniform federal

6    definition of marriage "ensures that similarly-situated couples will have the same benefits

7    regardless of which state they happen to live in."  (*Id.* at 39–40.)  The District Court expressed

8    skepticism regarding the legitimacy of this end, but principally rejected this justification because

9    DOMA "intrude[s] upon the states' business of regulating domestic relations."  (JA-1007–09.)

10   Windsor and various amici argue that "[t]he federal government [has always] accepted states'

11   determinations of who was validly married – no matter how far states' criteria for validity

12   diverged from one other," Historians Amicus Br. at 15, and that the promulgation of a federal

13   definition of marriage "injects the federal government into domestic relations law and works to

14   delegitimize both the lawful marriages of thousands of same-sex couples and the considered

15   judgments of . . . [s]tates to sanction same-sex marriages, . . . intrud[ing] on core state powers."

16   (States of New York, Vermont, and Connecticut Amicus Br. at 14.)

17       The subject of domestic relations, including marriage, has been the province of the states.

18   *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) ("Long ago we observed that

19   '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to

20   the laws of the States and not to the laws of the United States.'") (quoting *In re Burrus*, 136 U.S.

21   586, 593 (1890)).  But DOMA does not change this, and does nothing to strip the status that

1    states confer on couples they marry.  Instead, DOMA limits the *federal* benefits, rights,

2    privileges, and responsibilities of marriage to a subset of those deemed married under state law.

3           That the federal government often defers to state determinations regarding marriage does

4    not obligate it to do so.  While a state may be perfectly disinterested in prying into the reasons a

5    couple marries, the federal government remains deeply and properly concerned with the

6    reason(s) why a couple weds.  *See Massachusetts v. HHS*, 682 F.3d at 12 ("Congress surely has

7    an interest in who counts as married.  The statutes and programs that section 3 governs are

8    federal regimes such as social security, the Internal Revenue Code and medical insurance for

9    federal workers; and their benefit structure requires deciding who is married to whom.").

10          For example, when people marry for immigration purposes, the federal government may

11   validly deem the marriage "fraudulent," even though it remains valid under state law.  *See* 8

12   U.S.C. § 1325(c) ("Any individual who knowingly enters into a marriage for the purpose of

13   evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or

14   fined not more than $250,000, or both."); 8 U.S.C. §§ 1154(a)(2)(A), 1255(e).  Courts have

15   recognized this principle.  *See, e.g.*, *Taing v. Napolitano*, 567 F.3d 19, 21 (1st Cir. 2009)

16   (plaintiff remained a "spouse" and "immediate relative" under the Immigration and

17   Naturalization Act, even if her marriage actually ceased under state law upon the death of her

18   spouse); *Adams v. Howerton*, 673 F.2d 1036, 1040–41 (9th Cir. 1982) (even same-sex marriage

19   valid under state law does not count as a marriage for federal immigration law purposes); *Lutwak*

20   *v. United States*, 344 U.S. 604, 610–11 (1953) (noting a marriage's adherence to local law is

21   immaterial if the marriage was "part of [a] conspiracy to defraud the United States").  Tellingly,

22   Windsor does not argue that federal Immigration and Customs Enforcement interferes with

-26-

1    traditional state functions when it leaves states free to recognize, for their own purposes, any

2    marriage they like but refuses to grant legal residency to immigrants it believes married only to

3    secure the benefits of marriage.

4            DOMA alters the general, but by no means unyielding, practice of the federal

5    government accepting marriages recognized by state law.  However, at the time Congress acted,

6    all states recognized only opposite-sex marriages, and the fact that Congress chose to maintain

7    that status quo in response to this new, evolving social issue does not invalidate its legislative

8    interest.  It may be that, prior to DOMA, any federal "definition" of marriage was limited to

9    advancing the targeted goal of a particular federal program, not a blanket, undifferentiated policy

10   choice imposed on statuses created by states.  *See Massachusetts v. HHS*, 682 F.3d at 12.  But

11   this fact does not render the asserted interest in uniformity illegitimate or so lacking a "footing in

12   the realities of the subject addressed by the legislation" as to fail rational basis review.  *Heller*,

13   509 U.S. at 321.

14           Section 3 of DOMA was enacted as the debate regarding marriage equality was just

15   beginning in the states.  At that time, no state had actually permitted same-sex couples to marry.

16   In the intervening years, six states and the District of Columbia have enacted statutes or issued

17   court decisions that permit same-sex marriage.[8]  On the other hand, thirty states have amended

18   their founding documents by constitutional amendment to prohibit same-sex marriage, and

19   eleven more states have enacted statutes to the same effect.[9]  Given the evolving nature of this

---

[8] *See* N.Y. Dom. Rel. Law § 10-a (McKinney 2011); N.H. Rev. Stat. § 457:1-a (2010); D.C. Stat. § 46-401 (2010); Vt. Stat. Ann. tit. 15 § 8 (2009); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Goodridge*, 798 N.E.2d 941 (Mass. 2003).

[9] *See* Ala. Const. Art. I, § 36.03; Ala. Code § 30-1-19; Alaska Const. Art. 1, § 25; Alaska Stat. § 25.05.013; Ariz. Const. Art. 30 § 1; Ariz. Rev. Stat. §§ 25-101 & 25-112; Ark. Const. Amend. 83, § 1; Ark. Code Ann. §§ 9-11-109,

1    issue, Congress was entitled to maintain the status quo pending further developments.

2    Otherwise, "marriage" and "spouse" for the purposes of federal law would depend on the

3    outcome of this debate in each state, with the meanings of those terms under federal law

4    changing with any change in a given state.  As Windsor rightly notes, prior to DOMA, a state's

5    authorization of same-sex marriage had numerous implications for federal laws to the extent

6    those laws were construed to incorporate state-law definitions of marriage.  In order to avoid

7    federal implications of state-law developments in the area of marriage, Congress, by enacting

8    DOMA, reasonably froze federal benefits policy as it existed in 1996 with respect to same-sex

9    marriage.

10          The federal government can legitimately limit the national impact of state-level policy

11   development.  Doing so facilitates the ability of the states to serve as laboratories of policy

12   development.  As the Massachusetts Supreme Court stated when it held that the Massachusetts

13   state constitution required allowing same-sex couples to marry, "[t]he genius of our Federal

---

9-11-107, 9-11-208; Cal. Const. Art. I, § 7.5; Colo. Const. Art. 2, § 31; Colo. Rev. Stat. § 14-2-104; 13 Del. Code
Ann. § 101; Fla. Const. Art. 1 § 27; Fla. Stat. § 741.212; Ga. Const. Art. 1, § 4, I; Ga. Code Ann. § 19-3-3.1; Haw.
Const. Art. 1, § 23; Haw. Rev. Stat. § 572-1; Idaho Const. Art. III, § 28; Idaho Code Ann. §§ 32-201 & 32-209; 750
Ill. Comp. Stat. 5/212; Ind. Code § 31-11-1-1; Kan. Const. Art. 15, § 16; Kan. Stat. Ann. §§ 23-101 & 23-115; Ky.
Const § 233A; Ky. Rev. Stat. Ann. §§ 402.005 & 402.020; La. Const. Art. 12, § 15; La. Civ. Code Ann. Art. 86, 89;
Me. Rev. Stat. Ann. tit. 19-A, § 701; Md. Code Ann., Fam. Law, § 2-201; Mich. Const. Art. 1, § 25; Mich. Comp.
Laws § 551.1; Minn. Stat.§ 517.03; Miss. Const. Art. 14, § 263A; Miss. Code Ann. § 93-1-1; Mo. Const. Art. I,
§ 33; Mo. Rev. Stat. § 451.022; Mont. Const. Art. XIII, § 7; Mont. Code Ann. § 40-1-401; Neb. Const. Art. I, § 29;
Nev. Const. Art. 1, § 21; N.C. Gen. Stat. § 51-1.2; N.D. Const. Art. XI, § 28; N.D. Cent. Code §§ 14-03-01 & 14-
03-08; Ohio Const. Art. 15, § 11; Ohio Rev. Code Ann. § 3101.01(C); Okla. Const. Art. 2, § 35; Okla. Stat. Ann. tit.
43, § 3.1; Or. Const. Art. XV, § 5a; 23 Pa. Cons. Stat. §§ 1102, 1704; S.C. Const. Art. XVII, § 15; S.C. Code Ann.
§ 20-1-15; S.D. Const. Art. 21, § 9; S.D. Codified Laws § 25-1-1; Tenn. Const. Art. XI, § 18; Tenn. Code Ann.
§ 36-3-113; Tex. Const. Art. 1, § 32; Tex. Fam. Code Ann. §§ 2.001(b) & 6.204; Utah Const. Art. I, § 29; Utah
Code Ann. §§ 30-1-2(5) & 30-1-4.1; Va. Const. Art. 1, § 15-A; Va. Code Ann. §§ 20-45.2 & 20-45.3; Wash. Rev.
Code § 26.04.010(1); W. Va. Code § 48-2-603; Wis. Const. Art. XIII, § 13; Wis. Stat. §§ 765.001(2) & 765.04;
Wyo. Stat. Ann. § 20-1-101.  The statutory prohibitions or amendments of nineteen of these forty-one states forbid
not only same-sex marriage, but any other form of relationship recognition, such as domestic partnership or civil
union, between two persons of the same sex.

1    system is that each State's Constitution has vitality specific to its own traditions, and

2    that . . . each State is free to address difficult issues of individual liberty in . . . its own" manner.

3    *Goodridge*, 798 N.E.2d at 967.

4          Windsor argues that DOMA upends, rather than preserves, the status quo of

5    Congressional control over the meaning of marriage for federal purposes.  But this argument is

6    contrary to the clear legal landscape at the time of DOMA's enactment—that is, at the time, all

7    states were in full accord in recognizing only opposite-sex marriages.  Congress's actions allow

8    it to maintain a "wait-and-see" approach in the face of evolving state approaches to same-sex

9    marriages, thereby avoiding the need to immediately deal with the potentially significant impact

10   on federal law that a state's recognition of same-sex marriage could have.  Indeed, the far-

11   reaching impact of the federal definition of marriage in terms of rights, benefits, responsibilities,

12   and privileges (upon which Windsor places great emphasis) means that Congressional action can

13   quite reasonably be understood to have perceived this potential impact and decided that it was in

14   the federal government's interest to maintain consistency and uniformity in distributing federal

15   benefits and administering federal programs.

16         Congress may, and both parties agree that it often does, borrow definitions from state

17   law, but Windsor is incorrect to suggest that it is required to do so or is irrational when it does

18   not.  Put directly, Congress may also legitimately take an approach that attempts to create

19   uniformity across the states.  In DOMA, Congress chose to adopt a uniform federal definition of

20   "marriage" and "spouse" for purposes of federal laws.  Congress could rationally conclude that

21   maintaining the status quo at the federal level during a period of flux would allow states that

1    wish to make changes in the legal definition of marriage to retain their inherent prerogative to do

2    so, while permitting others to maintain the traditional view.

3            Rational basis review embodies the principle that, as Congress did in enacting DOMA,

4    legislatures are free to refine their "preferred approach as circumstances change and as they

5    develop a more nuanced understanding of how best to proceed." *Massachusetts v. Envtl. Prot.*

6    *Agency*, 549 U.S. 497, 524 (2007).  Contrary to Windsor's contention, the preservation of the

7    status quo—the definition of marriage that was uniform among all fifty states in the year of

8    DOMA's passage—constitutes a legitimate governmental interest insofar as it allows Congress

9    the ability to "wait and see" how the issue of same-sex marriage would take shape among the

10   many and diverse states of our nation.

11           The uniformity that DOMA recognized and maintained has been recognized both

12   explicitly and implicitly by courts for many years from various jurisdictions across the nation.

13   Perhaps most explicitly, the Supreme Court stated:

14                   [N]o legislation can be supposed more wholesome and necessary
15                   in the founding of a free, self-governing commonwealth, fit to take
16                   rank as one of the co-ordinate states of the Union, than that which
17                   seeks to establish it on the basis of the idea of family, as consisting
18                   in and springing from the union for life of one man and one
19                   woman in the holy estate of matrimony; the sure foundation of all
20                   that is stable and noble in our civilization; the best guaranty of that
21                   reverent morality which is the source of all beneficent progress in
22                   social and political improvement.
23
24   *Murphy v. Ramsey*, 114 U.S. 15, 45 (1885).

25           Other courts have explained that this uniformity has not always been explicit or necessary

26   to state.  Almost forty years ago a Washington state court put it thus:  "[A]lthough it appears that

27   the appellate courts of this state until now have not been required to define specifically what

-30-

1    constitutes a marriage, it is apparent from a review of cases dealing with legal questions arising

2    out of the marital relationship that the definition of marriage as the legal union of one man and

3    one woman who are otherwise qualified to enter into the relationship not only is clearly implied

4    from such cases, but also was deemed by the court in each case to be so obvious as not to require

5    recitation." *Singer v. Hara*, 522 P.2d 1187, 1191–92 (Wash. Ct. App. 1974). *See also Jones v.*

6    *Hallahan*, 501 S.W.2d 588, 590 (Ky. Ct. App. 1973) ("In substance, the [marital] relationship

7    proposed by the [same-sex] appellants does not authorize the issuance of a marriage license

8    because what they propose is not a marriage.").

9         Cases predating *Murphy* demonstrate that the Supreme Court consistently lauded this

10   conception of marriage as a critical social institution. *See Reynolds v. United States*, 98 U.S.

11   145, 165-66 (1878) ("Marriage, while from its very nature a sacred obligation, is nevertheless, in

12   most civilized nations, a civil contract, and usually regulated by law.  Upon it society may be

13   said to be built, and out of its fruits spring social relations and social obligations and duties.").

14        Subsequent to *Murphy,* the Supreme Court has continued to view the biological link of

15   parents to children as deserving of special recognition and protection. *See Michael H. v. Gerald*

16   *D.*, 491 U.S. 110, 120 n.1 (1989) (indicating that where, *inter alia*, a "husband and wife" are

17   "cohabiting," there is a presumption that they are in a "harmonious and apparently exclusive

18   marital relationship"); *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (noting the special

19   "intimate relation of husband and wife"); *see also Lawrence v. Texas*, 539 U.S. 558, 567 (2003)

20   ("[I]t would demean  a married couple were it to be said marriage is simply about the right to

21   have sexual intercourse.").  And marriage has been noted to carry special legal entitlements for

22   those men and women who enter into it. *See, e.g., Griswold¸* 381 U.S at 495 (noting it is hard to

1  conceive of what "is more private or more intimate than a husband and wife's marital relations"

2  and "the rights to marital privacy and to marry and raise a family are of similar order and

3  magnitude as the fundamental rights specifically protected" in the Constitution) (Goldberg, J.,

4  concurring); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (determining right to "marry,

5  establish a home and bring up children" is a liberty right under the Fourteenth Amendment).[10]

6        The Supreme Court also has taken care to preserve and distinguish the rights of the

7  natural—that is, biological—family over "families" other than the biological. *See Lehr v.*

8  *Robertson*, 463 U.S 248, 256–57 (1983) ("The institution of marriage has played a critical role

9  both in defining the legal entitlements of family members and in developing the decentralized

10  structure of our democratic society. In recognition of that role . . . state laws almost universally

11  express an appropriate preference for the formal family.") (footnotes omitted).[11] It has noted that

12  "the Constitution protects the sanctity of the family precisely because the institution of the family

---

[10] *See also Caban v. Mohammed*, 441 U.S. 380, 397 (1979) ("Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship . . . , it by no means follows that each unwed parent has any such right.") (internal citations omitted) (Stewart, J., dissenting); *Poe v. Ullman*, 367 U.S. 497, 553 (1961) (recognizing that "the intimacy of husband and wife is necessarily an essential and accepted feature of the institution of marriage, an institution which the State not only must allow, but which always and in every age it has fostered and protected," and noting also that the "State" may "exert its power . . . to say who may marry") (Harlan, J., dissenting).

[11] *See also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting the "absence of dispute" that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment," and noting that "[e]ven when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life"); *Trimble v. Gordon*, 430 U.S. 762, 769 (1977) (describing the "family unit" as "perhaps the most fundamental social institution of our society"); *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 823, 843–45 (1977) (noting New York State's support of laudable policy that "natural parents" provide the "positive, nurturing family relationships" and "normal family life in a permanent home" that offers the "best opportunity for children to develop and thrive" and noting the "usual understanding of 'family' implies biological relationships") (internal citations omitted); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious . . . than property rights.") (internal citations and quotations omitted); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents.").

1    is deeply rooted in this Nation's history and tradition." *Moore v. City of E. Cleveland, Ohio*, 431

2    U.S. 494, 503 (1977) (Powell, J., plurality opinion).  The Court has indicated repeatedly that

3    "history and tradition" are the "source for 'supplying . . . content to th[e] Constitutional

4    concept'" that biological family units are afforded additional protections under our nation's laws.

5    *Id.* at 540 (citing *Poe v. Ulman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)).  Thus, it is

6    and always has been the "'traditions and (collective) conscience of our people,'" not the

7    "personal and private notions" of judges, that determine societal rights, including what marriage

8    is as an institution and who is entitled to participate in it.  *Griswold*, 381 U.S. at 493 (citing

9    *Snyder v. Commonwealth of Mass.*, 291 U.S. 97, 105 (1934)) (Goldberg, J., concurring).

10          In light of these decisions relying on the traditional understanding of marriage as only

11   between one man and one woman, I join Justice Black in the sentiment that "[o]ne of the most

12   effective ways of diluting or expanding a constitutionally guaranteed right is to substitute for the

13   crucial word or words of a constitutional guarantee another word or words, more or less flexible

14   and more or less restricted in meaning." *Griswold*, 381 U.S. at 509 (Black, J., dissenting).

15          Marriage today, according to the federal government, means what it has always meant—a

16   holy union, essential to the survival of the species, between a man and a woman, the principal

17   purpose of which is to encourage responsible child rearing.  *Murphy* set forth this understanding,

18   *Baker v. Nelson* reaffirmed it, and no Supreme Court case since *Murphy* gives me reason to

19   doubt that definition should not still stand.

20          Having found the interest in maintaining uniformity (including in the form of the 1996

21   status quo) legitimate, the means employed to advance this goal appear appropriate.  As noted

22   above, BLAG argues that DOMA "ensures that *similarly-situated* couples [*i.e.*, married same-sex

-33-

Case: 12-2335   Document: 449   Page: 281   10/18/2012   750704   40

1   couples and all unmarried couples] will have the same federal benefits [*i.e.*, none] regardless of

2   which state they happen to live in, and avoids a confusing situation in which same-sex couples

3   would lose (or gain) federal marital status simply by moving between states with different

4   policies on recognition of same-sex marriages."  (BLAG Br. at 39–40 (emphasis added).)  The

5   relevant discrimination, however, to be justified by BLAG is DOMA's differential treatment of

6   married couples based on the sex of the persons constituting the couple.  Married same-sex

7   couples are similarly-situated to married opposite-sex couples with respect to the relevant

8   characteristic at issue:  marital status.

9          Windsor claims that the line DOMA draws fails rational basis review because the

10  purported justifications for the discrimination "make no sense" and "are impossible to credit" in

11  light of how the groups at issue are similarly situated.  However, the regulation of federal

12  programs is emphatically the province of Congress.  Having not previously defined the scope of

13  federal programs the way DOMA does should not forever bind Congress's hands from doing so,

14  or make Congressional action nonsensical, especially when viewed in light of the clear and

15  unaltered judicial characterization of the nation's historical understanding of marriage.

16         Windsor contends that DOMA creates complexity and establishes two tiers of married

17  couples in states that permit same-sex marriage.  But the question of uniformity of marriage at

18  the state level is not DOMA's concern.  While the tension between state and federal policies in

19  this area are real, they are no greater than those that have existed *among* the states—tensions

20  which Windsor acknowledges reflect the essence of, and have endured under, our federal system.

21         I conclude, therefore, that it was rational for Congress to prefer uniform substantive

22  eligibility criteria for federal marital benefits for same-sex couples over "uniform" deference to

1    varying state criteria.  Such a goal may be an exception to Congress's general deference to the

2    states in the area of marriage (even in the face of contentious state-level variation) but this in no

3    way makes the legislative classification employed in pursuit of uniformity irrational in light of

4    the tremendous deference we afford acts of Congress under rational basis review.  *See Heller*,

5    509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept a legislature's

6    generalizations even when there is an imperfect fit between means and ends.").

7            When, as here, an issue involves policy choices, the Supreme Court has cautioned that

8    "the appropriate forum for their resolution in a democracy is the legislature."  *Maher v. Roe*, 432

9    U.S. 464, 479 (1977).  DOMA rationally serves the legitimate government interest in

10   maintaining the status quo of the definition of marriage pending evolution of the issue in the

11   states.

12                                    *        *        *

13           Because the recognition of the biological connection of marriage to childrearing and the

14   pursuit of uniformity (including in the form of preserving the status quo) are sufficient to support

15   DOMA under rational basis review, I choose not to discuss the other asserted rationales.  *Beach*

16   *Commc'ns*, 508 U.S. at 317.  Nevertheless, I next address whether sexual orientation

17   classifications should, as a matter of first impression in this Circuit, be subject to heightened

18   scrutiny in an equal protection analysis.

19   ***VI.    Appropriate Level of Review for Sexual Orientation Discrimination***

20           The Supreme Court has reserved heightened scrutiny for a small number of subject

21   classifications—principally race, alienage, nationality, sex, and illegitimacy.  Heightened

22   scrutiny attaches in recognition that these traits have been used to impose, and are therefore

-35-

1    closely associated with, social inequality.  Therefore, government conduct that employs these

2    classifications is suspect and must have more than a legitimate or merely permissible

3    justification.

4          The question of the appropriate level of scrutiny for laws that discriminate in respect of

5    the definition of marriage on the basis of sexual orientation is an issue of first impression in this

6    Circuit.  *See Able v. United States*, 155 F.3d 628, 632 (2d Cir. 1998) (declining to consider, in

7    military context where judicial deference is "at its apogee," the question whether sexual

8    orientation discrimination would trigger heightened scrutiny because challengers did not argue

9    for "any more onerous standard than the rational basis test" and therefore "the sole question

10   before us is whether the Act survives rational basis review").

11         "[W]here individuals in the group affected by a law have distinguishing characteristics

12   relevant to interests the State has the authority to implement, the courts have been very reluctant,

13   as they should be in our federal system and with our respect for the separation of powers, to

14   closely scrutinize legislative choices as to whether, how, and to what extent those interests

15   should be pursued."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 441–42

16   (1985).  The Supreme Court has repeatedly rejected arguments by litigants and rulings by lower

17   courts that would grant heightened review to legislative distinctions based on mental handicap,

18   *id.* at 442–47, kinship, *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), age, *Mass. Bd. of Ret. v.*

19   *Murgia*, 427 U.S. 307, 314 (1976), and poverty, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411

20   U.S. 1, 29 (1973).

21         The Supreme Court, despite having the opportunity to apply heightened review,

22   invalidated the provision of the Colorado Constitution challenged in *Romer* under rational basis

-36-

1    review.  *See* 517 U.S. 620 (1996).  That *Romer* was decided under the rational basis standard

2    without a need to employ a more exacting level of review does not mean that the question of the

3    appropriate tier of equal protection scrutiny was not before the Court.  Indeed, although the

4    *Romer* plaintiffs "elected not to appeal" the lower court's determination that sexual orientation

5    does not constitute a "suspect" or "quasi-suspect" classification, the Supreme Court "evidently

6    agree[d] that 'rational basis' . . . is the governing standard."  *Romer*, 517 U.S. at 641 n.1 (Scalia,

7    J., dissenting).

8            Until the majority's opinion, DOMA had never been held by the Supreme Court or any

9    Circuit Court to involve a suspect or quasi-suspect classification.  Indeed, in light of the Supreme

10   Court's reluctance to apply heightened scrutiny to new categories of discrimination, and in

11   consideration of the fact that it declined to do so in *Romer*, eleven other circuits have also not

12   taken this step.  *See Massachusetts v. HHS*, 682 F.3d at 9; *Davis v. Prison Health Servs.*, 679

13   F.3d 433, 438 (6th Cir. 2012); *Perry v. Brown*, 671 F.3d 1052, 1082 (9th Cir. 2012); *Cook v.

14   Gates*, 528 F.3d 42, 61–62 (1st Cir. 2008); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113

15   (10th Cir. 2008); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 867 (8th Cir. 2006); *Johnson

16   v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Lofton v. Sec'y of Dep't of Children & Family

17   Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Thomasson v. Perry*, 80 F.3d 915, 927–28 (4th Cir.

18   1996); *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 573–74 (9th Cir.

19   1990); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Woodward v. United States*,

20   871 F.2d 1068, 1076 (Fed. Cir. 1989); *Padula v. Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987);

21   *Nat'l Gay Task Force v. Bd. of Educ. of City of Okla. City*, 729 F.2d 1270, 1273 (10th Cir. 1984),

22   *aff'd by an equally divided court*, 470 U.S. 903 (1985) (per curiam).  In *Massachusetts v. HHS*,

-37-

1   the First Circuit rejected the application of strict and intermediate scrutiny, recognized that

2   DOMA satisfies rational basis review, and yet went on to create a novel "plus" level of scrutiny

3   applicable to DOMA, in contravention of the Supreme Court's holding in *Baker*.  Such judicial

4   impositions of new levels of review deprive the American people of further consideration of

5   DOMA through their democratically elected representatives.

6          Significantly, numerous Circuit Courts of Appeals decisions declining to extend

7   heightened scrutiny to sexual orientation discrimination post-date both *Romer v. Evans* and

8   *Lawrence v. Texas*.  Windsor argues that the determinations made regarding the appropriate level

9   of scrutiny in decisions such as *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008) (rational-basis

10  review applies, and "*Lawrence* does not alter this conclusion") and *Witt v. Dep't of Air Force*,

11  527 F.3d 806, 821 (9th Cir. 2008) (Circuit precedent requiring rational-basis review "was not

12  disturbed by *Lawrence*, which declined to address equal protection") are distinguishable because

13  the cases arose in a military context where judicial deference is "at its apogee."  *See Able*, 155

14  F.3d at 632.  But as the voluminous authority cited above makes clear, *see* Section IV, *supra*,

15  whatever additional deference courts afford Congressional action in the military context, rational

16  basis review is, even in the civilian context, highly deferential to the legislature, not a mechanism

17  for judges to second guess properly enacted legislative judgments, and the "paradigm of

18  restraint."  *See Beach Commc'ns*, 508 U.S. at 314.  *See also Perry*, 671 F.3d at 1080 n.13

19  (relying, in the civilian context, on rulings that declined to apply heightened scrutiny to sexual

20  orientation classifications in the military context).  Indeed, the Department of Justice so

21  acknowledged last year—until it changed its constitutional position following the President's

22  announcement of a change in policy.

1       Therefore, I would join these eleven circuits, driven not only by a reluctance to do that

2    which the Supreme Court itself has not undertaken when given the chance, but also out of

3    routine respect for extant precedent.  Subjecting the federal definition of marriage to heightened

4    scrutiny would defy or, at least, call into question the continued validity of *Baker*, which we are

5    not empowered to do.  *Baker* involved a law that prohibited same-sex marriage, and thus

6    discriminated on the basis of sexual orientation.  Holding that sexual orientation merits

7    heightened scrutiny would be substantively inconsistent with *Baker* since (1) any legislative

8    action faces a high likelihood of invalidation under heightened scrutiny, and (2) it would be

9    curious to apply heightened scrutiny to a form of discrimination that does not raise a substantial

10    federal question of constitutional law.  *See Massachusetts v. HHS*, 682 F.3d at 9 ("[T]o create

11    such a new suspect classification for same-sex relationships would have far-reaching

12    implications—in particular, by implying an overruling of *Baker*, which we are neither

13    empowered to do nor willing to predict.").  Any such development must come from the elected

14    representatives of the American people.[12]

---

[12] Indeed, one elected representative—the President—has already taken steps to mitigate the harms visited upon same-sex couples by DOMA.  The President has issued a memorandum requiring all executive departments and agencies to take steps, consistent with existing law, to extend benefits to the same-sex domestic partners of federal employees, and where applicable, to the children of same-sex domestic partners of federal employees.  *See* Presidential Memorandum, Extension of Benefits to Same-Sex Domestic Partners of Federal Employees (June 20, 2010).  The Office of Personnel Management ("OPM") was directed to clarify that for purposes of employee assistance programs, same-sex domestic partners and their children qualify as "family members."  In addition, pursuant to a Presidential Memorandum Regarding Federal Benefits and Non-discrimination (June 17, 2009), OPM issued regulations expanding the definition of "qualified relatives" to include same-sex domestic partners of eligible federal employees in the federal long-term care insurance program.  *See* 5 CFR 875.213 (June 1, 2010).

In Congress, efforts provide various types of federal benefits for same-sex domestic partners—such as health insurance, life insurance, pensions, and other employment-related benefits—are routinely introduced, if unsuccessful.  *See, e.g.*, S. 2521, 110th Cong. (2007); H.R. 4838, 110th Cong. (2007) (bills died in committee); S. 1102, 111th Cong. (2009); H.R. 2517, 111th Cong. (2009) (no action taken on either version after being reported out

Case: 12-2335   Document: 449   Page: 362   10/18/2012   750   Page 40

1    Whatever the merits of doing so in a context other than the marital union, I conclude that,

2    in respect of the unique institution of marriage it would be imprudent to announce a new rule

3    under which sexual orientation is subject to heightened scrutiny.

4                                              **CONCLUSION**

5    For the foregoing reasons, I would hold that per *Baker*, the legislative distinction drawn

6    by DOMA satisfies rational basis review and is therefore constitutional.

7    Whether connections between marriage, procreation, and biological offspring recognized

8    by DOMA and the uniformity it imposes are to continue is not for the courts to decide, but rather

9    an issue for the American people and their elected representatives to settle through the

10   democratic process.  Courts should not intervene where there is a robust political debate because

11   doing so poisons the political well, imposing a destructive anti-majoritarian constitutional ruling

12   on a vigorous debate.  Courts should not entertain claims like those advanced here, as we can

13   intervene in this robust debate only to cut it short.

14   I respectfully dissent from the majority opinion to the extent it holds otherwise.

---

of committees); S. 1910, 112th Cong. (2011) (reported out of committee); H.R. 3485, 112th Cong. (2011) (remains
in committee).